

Exponent
3401 Market Street
Suite 300
Philadelphia, PA 19104

telephone 215-594-8800
facsimile 215-594-8899
www.exponent.com

June 30, 2011

Jeffrey R. Williams, Esq.
Schiff Hardin LLP
One Market Spear Tower, 32nd Floor
San Francisco, CA 94105

Subject:   Padilla v. Hunter Douglas
              Project No. 1104630.000

Dear Mr. Williams:

I am writing to summarize the work undertaken by Exponent® Failure Analysis Associates (FaAA) in connection with human factors issues in the above-referenced case and the preliminary conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology from and performed Honors research in psychology at Rutgers University. I hold a Ph.D. in experimental psychology from Johns Hopkins University and conducted post-doctoral research at Stanford University, with a focus in cognitive neuroscience. I am a Senior Managing Scientist at Exponent and a member of the Human Factors Practice, where I routinely address how the capabilities and limitations of people interact with the products, equipment, and systems in their environment, and how this interaction affects safety. Much of my work focuses on child safety. As part of that work, I analyze the developmental abilities and limitations of children at different ages and the ways these impact how they engage in activities and use products in different environments. I investigate the accident patterns that are unique to children and the effectiveness of strategies used to reduce child injury, including child supervision, teaching children safety rules, and controlling their environment. I frequently use large-scale databases (e.g., National Electronic Injury Surveillance System, National Fire Incident Reporting System) to analyze the frequency and patterns of accidents, identify patterns of unsafe behaviors, and to measure risk. I have published papers and presented at conferences related to human factors issues, including visual information processing, risk communication through warnings, and brain functioning. I have also presented findings of my research and analyses to governmental agencies such as the Consumer Product Safety Commission and the Food and Drug Administration. I am a member of the Human Factors and Ergonomics Society, the

Association for Psychological Science, the Society for Neuroscience, and the Society for Risk Analysis.

Over the past 30 years, there has developed a sizable literature on behavioral responses to risk communications. Significant reviews of and annotated guides to the literature for different periods and content areas can be found in McCarthy et al. (1984), Ayres et al. (1989, 1998), Miller & Lehto (2001), and DeJoy et al. (2006). Key factors considered in the scientific literature include the likely effectiveness of providing a warning about a particular hazard (e.g., DeJoy et al., 2006; Soumerai et al., 1989; Ayres et al., 1994; Arndt et al., 1998; Dorris & Purswell, 1977), labeling directives presented by regulatory agencies and in relevant standards and guidelines (e.g., Sala et al., 2010; Wood et al., 2006; Diedrich et al., 2001), relationships between the number of warnings presented and attention and memory (e.g., Chen et al., 1997; Dorris, 1991; Frantz et al., 1999), the likely effect of formatting and the inclusion of specific warning elements on compliance (e.g., Young et al., 2002; Guo et al., 2003; Weatherby et al., 2001), individuals' acceptance of communication and motivation to alter behavior (e.g., Wogalter et al., 1989; Rascati et al., 1996; Soumerai et al., 1998), the effect of media and publicity (e.g., Soumerai, et al., 1992; Kerpelman, 1978), and the selection of hazards to warn about based on the highest potential impact, in terms of injury counts, risk analysis, or accident mode analysis (e.g., McCarthy et al., 1995; Ayres & Wood, 1995). The significant body of literature to which these studies belong allows for scientific investigation as to what, when, where, and how warnings could be provided and the likely impact they are to have on human behaviors. The results and evolving base of knowledge have in some instances been incorporated by regulatory agencies with respect to safety information and has shaped specific guidance statements (Sala et al., 2010). Based on a synthesis of findings from published scientific studies, frameworks have been developed identifying factors that must be present for a warning to result in reductions in harmful behaviors (Ayres et al., 1989).

A copy of my resume is attached. Also included is a listing of depositions and trial testimony for the past four years. My billing rate is $275 an hour. A list of the materials I have reviewed to date is also included. Based on the review of the case material, I have the following understanding of the incident:

> On April 22, 2008, Max Padilla (3 years, 9 months of age)[1] was fatally injured while in his room.[2] His parents, Jose and Ruth Padilla, and sisters, Carolina (approximately six-and-a-half years old)[3] and Jacqueline (approximately one-and-a-half years old),[4] were at the residence at the time.[5] Mrs. Padilla testifies that prior

---

[1] Age calculated from the date of birth provided in the deposition of Jose Padilla (Jose Padilla), p. 22
[2] Exhibits 1 (M00186-M00187) and 2 (M00188-M00191) to the deposition of Roberto Frias
[3] Age calculated from the date of birth provided in the deposition of Jose Padilla, pp. 83-84
[4] Age calculated from the date of birth provided in the deposition of Jose Padilla, pp. 83-84
[5] Plaintiff's Answers to Defendant Hunter Douglas Window Coverings, Inc.'s First Set of Interrogatories, p. 2



to the incident, she and the children were playing outside.[6] Following Mr. Padilla's arrival home from work, Mr. Padilla and Max entered the house.[7] Mr. Padilla states that he went to the basement and saw Max go into the kitchen.[8] Mrs. Padilla states that she went in the house to search for Max[9] (when he did not answer her calls)[10] and eventually looked in his bedroom and her daughters' bedroom.[11] Upon not finding Max, Mr. and Mrs. Padilla both continued to look for him.[12] Mrs. Padilla testifies that she returned upstairs to Max's room and saw him entangled in one of the looped cords associated with the blind.[13] Max did not survive his injuries.[14]

It is alleged that the incident vertical blind was manufactured by Hunter Douglas Window Coverings Inc.[15] It was purchased by Mrs. Brenda Davis in 1995,[16] the mother of the previous owner, Mrs. Mindy Roberts, who sold the house to the Padillas in 2002.[17] The head rail of the blind measured 5 feet, 10 inches in length. A braided fabric closed loop cord (2 feet, 3½ inches in length from rail to loop) and a beaded closed loop metal pull chain (2 feet, 7 inches in length from rail to loop) were located on the right side of the blind.[18] The distance from the floor to the bottom of the cord was 3 feet, 9 inches.[19] At the time of purchase, alternative control mechanisms (i.e., a wand or cord tensioner) were offered as optional alternatives for the blind.[20]

The plaintiff alleges that the vertical miniblind at issue was defective and unreasonably dangerous.[21] It is further alleged that the Defendants acknowledged this by engaging in a voluntary retrofit/recall program claimed by the plaintiff to be ineffective.[22] The plaintiff also alleges that the vertical miniblind at issue failed to contain warnings of the dangers associated with cord and metal bead chains

---

[6] Ruth Padilla, pp. 33-34
[7] Jose Padilla, pp. 40, 43, 46
[8] Jose Padilla, pp. 44-47
[9] Ruth Padilla, pp. 42-43
[10] Ruth Padilla, pp.42-43
[11] Ruth Padilla, pp. 43-48
[12] Jose Padilla, p. 49; Ruth Padilla, pp. 45-47
[13] Ruth Padilla, pp. 45-48, 52
[14] Ruth Padilla, p. 57
[15] Plaintiff's First Amended Complaint at Law, pp. 1-2
[16] Deposition of Brenda Davis (Brenda Davis), pp. 6, 28; Deposition of Mindy Roberts (Mindy Roberts), pp. 14-15, 28-29
[17] Mindy Roberts, p. 8; Ruth Padilla, pp. 15-16
[18] Bates numbered document M00192
[19] Bates numbered document M00192
[20] Deposition of Richard Anderson (Richard Anderson), pp. 58-60; Deposition of Don Fraser, p. 39
[21] Plaintiff's First Amended Complaint at Law, p .6
[22] Plaintiff's First Amended Complaint at Law, pp .5, 9



greater than 7¼ inches.[23] The plaintiff states that if he had known of the dangers associated with the miniblinds, he would have stopped using it and would have removed it from his household.[24]

Based on my review of relevant case materials, and my education and experience, I have determined the following:

**History of Coordinated Efforts between the Consumer Product Safety Commission and the Window Blind Industry**

In 1981, staff of the Consumer Product Safety Commission (CPSC) conducted a review of consumer-product related accidental ligature strangulations of children under the age of five and identified several different types of products associated with these incidents.[25] Types of children's products included clothing, pacifier cords and necklaces, toys and crib toys, play equipment and cribs. Products not identified as children's products included drapery and blind cords, ropes and chains, cords, strings and electric cords. Of the 298 incidents identified in this report during an eight-year period, from 1973 to 1980, 41 fatalities were associated with window covering cords. Most of these reported fatalities involved the child being in a crib at the time of the incident, and the report suggests this is likely due to the natural placement of a crib next to a window by parents.

CPSC staff also attempted to identify ways in which these concerns could be addressed. However, further investigations suggested that product design changes to window coverings were likely not to be an effective option. A second 1981 CPSC report noted that products such as apparel, window cords, swings and necklaces were "not addressable by Commission action since they either are not intended for children or cannot be changed to reduce the hazard without drastically diminishing the utility."[26] Similarly, a later 1982 CPSC report also identified drapery or blind cords to be among products that "do not appear amenable to product design changes or elimination as a potential strangulation risk."[27] Both reports recommend informational campaigns aimed at increasing parental awareness to be the best way to address the issue,[28] with one summarizing the conclusion "…increasing consumer awareness of the hazard appears to be the only viable approach."[29]

Consistent with the suggestions contained in these reports, efforts were taken to increase the public's awareness. The CPSC and the American Window Covering Manufacturers' Association (AWCMA) issued a joint release in 1985 that warned of the potential danger of

---

[23] Plaintiff's First Amended Complaint at Law, p .9
[24] Plaintiff's First Amended Complaint at Law, p .11
[25] Rutherford & Kelley, 1981
[26] Hapulka, 1981, p. 5
[27] Rogers, 1982, p. 2
[28] Hapulka, 1981; Rogers, 1982
[29] Rogers, 1982



child strangulation associated with window blind or drapery cords. The release stated, "Most of the children were under two years of age and were in cribs which had been placed near window covering pull cords. Other victims were children who were not in cribs, but who were playing with the cord."[30] Means to keep the cords out of children's reach were suggested, and included tying the cord to itself or using clamps, clothes pins, cleats or tie-down devices.

In 1994, the CPSC, working with the industry, announced a program to address window covering associated child strangulations consisting of three parts: (1) installation of safety tassels to improve the safety of existing window coverings, (2) modifying future production, and (3) implementation of an educational campaign, including product alerts in packaging, brochures, and posters.[31] This announcement also recommended that children's cribs never be placed within reach of a window blind. The current release reversed the earlier advice suggesting to "Wrap or tie the cord to itself," stating, "CPSC recommends against knotting or tying the cords together because this creates a new loop in which a child could become entangled."[32] The release also noted that while the "safety tassels" could not be installed on vertical blinds, potential concerns for these products could be addressed with tie-down devices.

In 1996, a standard addressing the use of devices and components designed to reduce the possibility of injury such as strangulation was approved. The *ANSI/WCMA A100.1 1996, American National Standard for Safety of Corded Window Covering Products* specified a number of product requirements to address potential concerns associated with pull cords. Additionally, the standard stated that safety information should accompany the product, requiring that a warning label be placed on the bottom rail of horizontal window blinds and a hang tag be placed on the product, both communicating the potential hazards to children. Even though the incident vertical blinds predated the publication of the standard, Mr. Richard Anderson, Senior Vice President and Technical Director[33] for Hunter Douglas, testifies that at the time the subject blinds were manufactured, they would have included warnings;[34] Mr. Ronald Rubinoff, Hunter Douglas' Vice-President and General Manager of the Window Designs Division,[35] confirms that in the mid 1990's Hunter Douglas used hang tags attached to the chain or cord of vertical blinds.[36] This testimony is consistent with that of Mrs. Davis, who affirms that a warning was present on the head railing of the window blind in Megan's room.[37]

---

[30] CPSC Release #85-069, 1985
[31] CPSC Release #95-003, 1994
[32] CPSC Release #95-003, 1994
[33] Richard Anderson, pp. 10-11
[34] Richard Anderson, p. 96
[35] Deposition of Ronald Rubinoff (Ronald Rubinoff), p. 45
[36] Ron Rubinoff, pp. 29-30
[37] Brenda Davis, p. 20



Hunter Douglas, in cooperation with the CPSC, engaged in a retrofit campaign in 1995 and 1996, which included a website for a repair kit, a toll free number that customers could call,[38] and tension devices to address potential strangulation hazards in continuous loop products (e.g., vertical blinds).[39] In addition, television and public service advertisements were produced as part of this effort.[40]

My review of fatalities associated with window cords from 1982 to 1995 and the available published studies investigating the same during this time frame shows that the predominant accident scenario involved horizontal blinds that were accessible to children in play yards or cribs. The attention, focus, and implementation of remedial measures by the industry, specifically Hunter Douglas, and the CPSC, including the product requirements developed as part of the 1996 standard, availability of retrofit kits and tension devices, and efforts made to inform the public, were reasonable given the available knowledge and data in this timeframe.

A 1997 *Journal of the American Medical Association* article, co-authored by a member of the CPSC, reviewed U.S. child window cord strangulations from 1981 to 1995, and was hailed by the CPSC as "the first study to so thoroughly investigate how these deaths occur."[41] An analysis of data from four different CPSC data sources, including death certificates, in-depth investigations (INDP), the Injury or Potential Injury Incident (IPII) file, and the National Electronic Injury Surveillance System (NEISS) identified window-covering components associated with recorded injuries. They included pull cords (88%), slat strings (7%), bottom horizontal cord (3%), and torn curtain fabric (2%). This study identified two common injury scenarios: "(1) infants in cribs near windows may become entangled in drapery pull cords while sleeping or playing, or (2) toddlers may be suspended from pull cords after jumping or falling from furniture placed near a window." Horizontal venetian blinds or miniblinds was the product most often associated with fatalities, with 86% of reported deaths involving this style of window covering. The article suggested, "Measures can be taken to reduce mortality caused by window pull cords", highlighting the design standards addressed in the 1996 standard and the availability of "tie-downs" for "continuous looped" coverings.[42]

A 1999 review of window blind deaths conducted by the CPSC found that children could become entangled in the inner cords that raise the blind slats. The Window Covering Safety Council (WCSC) put forth a corrective action plan upon being notified of this by the CPSC. In 2000, the CPSC and the WCSC announced a retrofit campaign to address this issue of inner cords loops. As part of the recall, consumers could obtain free repair kits for their existing blinds. A toll-free number and website were also provided. The release associated with this recall to repair noted, "the industry has further redesigned window blinds. Newly

---

[38] Deposition of Joseph Jankoski (Joseph Jankoski), pp. 65-66
[39] Joseph Jankoski, p. 73
[40] Joseph Jankoski, p. 144
[41] CPSC release #97-136, 1997
[42] Rauchschwalbe & Mann, 1997, p. 1698

manufactured blinds have attachments on the pull cords so that the inner cords can't form a loop if pulled by a young child."[43] In August of 2002, the standard was updated to reflect these issues by way of design requirements and modified warnings. All of these changes were to address the issues of inner cords, and consequently, horizontal blinds; no additional or alternative means were devised to address vertical blinds, though the initial release reiterated that consumers with continuous loop cords (e.g, vertical blinds) should install tie-downs to address potential safety concerns.

Mr. Statler asserts that "even the most casual review of the available in-depth investigations, and literature on the subject" would have revealed risk associated with inner cord and vertical blind strangulations.[44] The CPSC's own press releases and the numerous studies and reviews of the available data clearly demonstrate the significant efforts put forward and the fact that the understanding gained appropriately emphasized pull cords, particularly those attached to horizontal blinds, as the primary area of concern. Indeed, the industry's actions have been commensurate with available knowledge at the time. In the mid-1980's, when CPSC analyses had suggested that increasing awareness was the "only viable approach" to preventing child strangulations, the AWCMA and the industry joined in approaches targeted at informing consumers of potential hazards. In the mid-1990's, design changes and retrofit kits focused on concerns associated with pull cords, which comprised a considerable majority of incidents that had been identified, including those associated with continuous loop cords. After the CPSC recognized hazards related to inner cords in 1999, the WCMA, industry, and the CPSC worked together and amended the standard with increased emphasis on this issue.

Mr. Statler claims in his report that while loops were eliminated on two-corded horizontal blinds manufactured after January 1, 1995, looped pull cords on vertical blinds and inner cords were not addressed in the standards process.[45] Such claims are simply untrue. In fact, the standard specified generic hang tags that included the statement, "Young children can strangle in the loop of pull cords, chain and bead cords, and cords that run through window coverings".[46] Furthermore, one of the product requirements within the 1996 standard relates to a passive tension device for continuous loop cords.

Mr. Statler's assertion that as an industry group, WCMA had "unfettered discretion to set product safety standards"[47] fails to recognize the process employed to develop the ANSI/WCMA standard. In fact, CPSC has publicly noted their involvement in the development of this standard.[48] Indeed, in contrast to Mr. Statler's portrayal, multiple CPSC releases emphasize the collaborative nature of the actions undertaken with the industry and

---

[43] CPSC release #01-023, 2000
[44] Report of Stuart Statler, p. 14
[45] Report of Stuart Statler, p. 11
[46] *ANSI/WCMA A100.1 1996, American National Standard for Safety of Corded Window Covering Products.* Section 5.1.2
[47] Report of Stuart Statler, p. 13
[48] e.g., Rauchschwalbe, 1997



the WCMA or WCSC. For instance, in the 1994 release, CPSC Chairman Ann Brown claimed, "This collaborative effort… epitomizes how government and industry can work together to save lives."[49] Indeed, the CPSC's website includes its work with industry with regard to window pull cords among its "Success Stories".[50]

**Human Factors Considerations in Design and Availability of Control Mechanisms**

Across a range and variety of products, consumers often have choices as to the design, style, usability, and environment for use. One's decision as to which product to purchase for an intended use is often based on a number of factors and can include, among others, aesthetics, quality, brand, price, functionality, and safety.[51] The underlying combination and purchase decision is ultimately in the hands of the consumer; different products may be more or less appropriate to different consumers for a variety of reasons. Human factors is the scientific study of how people's capabilities and limitations contribute to the way in which they interact with a product, system, or environment, and is often turned to when considering the usability, functionality, and safety of a design; for example, regulations under the Poison Prevention Packaging Act (PPPA) govern that while child resistant packaging must be designed such that is sufficiently difficult for a child to access it must also be sufficiently easy for intended users, such as adults and the elderly, to open.

With respect to window coverings, there are a number of distinct product offerings for consumers to consider. For example, roll-up shades, horizontal blinds, and vertical blinds are all distinct products that can be hung over windows and window-like structures in the home. However, each product is unique and has certain characteristics that make them more or less suited for specific applications. For example, vertical blinds are differentiated from other window treatments in part by the way in which they hang and the direction in which they are drawn open (i.e., left to right, right to left, or from the center toward the sides). This operating characteristic makes vertical blinds particularly attractive for use on sliding doors and less so for traditional windows that open bottom to top. This is reflected in the depiction of and statements made regarding the use of vertical blinds in the marketing, sales, and advertising information for this product across retailers, distributors, and manufacturers; though there would be little to prevent a consumer from installing vertical blinds in other settings, it is reasonable to expect that the vast majority of vertical blinds would be installed in common rooms (e.g., living rooms, kitchens, etc.).

For vertical blinds to be functional, there must be a means by which the angle of the individual slats can be adjusted (for both control over privacy and/or lighting) and a means by which to draw open the slats and provide access to the window or door against which it is installed. For the vertical blinds at issue in this matter, Hunter Douglas offered two

---

[49] CPSC release #95-003, 1994
[50] CPSC, 1996
[51] Belch & Willis, 2001; Hoyer, 1984; Sproles & Kendall, 1986; Tse, 1998; Ziamou & Ratneshwar, 2003



mechanisms through which to achieve this function, a nylon pull cord and beaded chain or the PermAssure Wand.[52] If the nylon pull cord and beaded chain option was chosen, these components would be installed at either side; to operate, a user would approach this single point of access, pull on the nylon cord to draw open the blinds, and pull on the beaded chain to rotate the slats. Should the PermAssure Wand option be chosen, a rigid rod (the Wand) would be attached to the lead edge of the vertical blinds (or one of the lead edges if the vertical blinds opened from the center). The user would approach and interact with the Wand to perform both the opening and rotating functions; physically pushing or pulling the Wand the entire travel length of the desired opening in order to draw the blinds or twisting the Wand in order to adjust the angle at which the slats lay.

The selection of the most appropriate control mechanism considers the capabilities and limitations of the user and the interaction the user will likely have with the product given the environment for use. Just as a single style of window covering may not be appropriate for all users, the same is true for the mechanism used to control and adjust the blind. For instance, the Wand places additional demands on a user that may present difficulties for specific populations or in specific environments that the nylon pull cord and beaded chain option does not. For example, aging is typically accompanied by decreases in physical strength, flexibility, reach, mobility, and dexterity.[53] Furthermore, physical disabilities, whether typically associated with aging (e.g., arthritis, Parkinson's disease) or otherwise (e.g., physical impairments, cerebral palsy), additionally may constrain physical activities. The need to reach the Wand and continually apply force through it for the entire range of motion while opening the blind would limit or exclude access to a portion of the intended user population. Additionally, the fine motor, hand or finger strength, and manipulation required to adjust the slats through use of the Wand would pose similar challenges to older and disabled users. The environment for use compounds this problem. Given the expected applications for vertical blinds, it is reasonable that other items, furniture, or architectural elements may impinge on or limit the space available somewhere along the run of the vertical blinds. Such additional constraints would exacerbate existing difficulties for portions of the user population, and potentially further limit or remove functionality across a wider range of users.

The environment in which a product will be kept and/or used affects other considerations as to its design. For example, although the PPPA requires child-resistant packaging for specific products, it also allows manufacturers to market and sell a version of the same products in non-child resistant packaging intended for households without young children; even for chemicals, cosmetics, acids, drugs, and supplements for which there are mandated limitations to child access, there is an acknowledgement that a single design may not be appropriate for all users and environments. This same sentiment, that there is not a single solution

---

[52] Deposition of Don Fraser, p. 24
[53] Peebles & Norris, 1998; Smith, Norris, & Peebles, 2000; Story, et al., 1998; Perry, 2010; Birren & Schaie, 2006; Strength Data for Design Safety – Phase 1 & 2; Smith et al., 1999



appropriate across all environments, holds for other child safety issues. For example, a parent or caretaker's use of and level of reliance on strategies meant to protect children from harm (e.g., supervision, controlling the environment, teaching safety rules) varies according to the room of the house in which the child is located.[54] The typical application of vertical blinds would likely place such products in common rooms of a household, areas of the house where mothers report using supervision and rule-based strategies more often than reliance on control over the environment, not like a bedroom or playroom, where a parent would more likely expect a child to stay for lengths of time without explicit parental or caregiver interaction or direction.

While Mr. Statler asserts that the alternative control mechanisms "should have been offered as part and parcel of the sale of the blinds themselves,"[55] he does not offer any evidence regarding what the practices or availability of these optional controls were within the industry within the relevant timeframe. Mr. Statler's indictment of Hunter Douglas regarding alternative control mechanisms is confined solely to the actions and options offered by Hunter Douglas without providing the context or consideration of what other manufacturers were offering at this time.

Providing consumers with options as to the control mechanism to purchase and install, whether it be the nylon pull cord and beaded chain, the cord and chain with a tensioner device, or the PermAssure Wand, provides a range of safe options and allows them to select the one that best fits their environment and needs. Given the expected application of vertical blinds and the range of intended users and their associated capabilities and limitations, the review and understanding of incident data at the time of manufacture, and the expected nature of child interaction with the product, it would not have been appropriate to offer the PermAssure Wand as the sole control mechanism for the vertical blinds in question.

**Knowledge of Safety Information and Behaviors**

Mindy Roberts purchased the home on 16375 Terry Lane in 1994.[56] After moving in, Mrs. Roberts, with the help of her mother, Brenda Davis, purchased blinds to get the nursery ready for the birth of Mrs. Robert's daughter, Megan.[57] Mrs. Roberts testifies that the Hunter Douglas window blinds were purchased for Megan's room in 1995 or 1996.[58] Mrs. Davis states that she used to have a side business in which she made drapes and ordered blinds for friends and other customers.[59] She took the window measurements, ordered the window blinds and installed them as part of her business.[60] Mrs. Davis, with Mrs. Robert's help,

---

[54] Morrongiello, 2004
[55] Report of Stuart Statler, p. 22
[56] Mindy Roberts, p. 8
[57] Brenda Davis, pp. 7, 28; Mindy Roberts, pp. 28-29
[58] Mindy Roberts, pp. 14-15
[59] Brenda Davis, p. 8
[60] Brenda Davis, pp. 8-9



installed the blinds in Megan's room,[61] and stated that she would always rely on the instructions for installation.[62]

In his report, Mr. Statler asserts that Mrs. Davis "testifies that she has no recollection of any warning whatever – hang tag or adhesive label – appearing on the unit when she received it."[63] This is a mischaracterization of Mrs. Davis's testimony. When asked whether she had a memory that the window blind she installed in "Megan's room" had a warning, she affirmed that it did have a warning attached to the headrail,[64] but could not say whether or not a warning was on the window blind cord.[65] However, Mrs. Davis was aware that window blinds were shipped with warnings, either on the track of the blind or a piece of cardboard attached to the cord, stating that the product "could be hazardous to children"[66] and that there was a risk of strangulation.[67] Mrs. Davis also testifies that she would have taken the warning label off the cord after reading it because she did not want it to show, and likewise would probably have removed a label from the headrail if it was going to show.[68]

Both Mrs. Davis and Mrs. Roberts knew to take precautions with children around window blinds with cords. Mrs. Davis testifies that she was aware of information from the Window Covering Manufacturers Association addressing the dangers of window blind cords to young children.[69] She also testifies that she knew this from common sense and states that she would have instructed her daughter and son-in-law of this risk if they did not already know of it.[70] Mrs. Roberts testifies that she heard on the news that cords could be dangerous and should be kept out of the reach of young children[71] and testifies that she took precautions to keep the cords out of reach. She would keep the nylon cord wound up and on top of the headrail when she was not using it, having to stand on a stool to do this.[72] Despite Mrs. Davis' familiarity with blind cleats and similar devices[73] that function to secure cord loops, she states that she would install cleats for cosmetic purposes[74] as opposed to the safety function that they would serve.

---

[61] Mindy Roberts, pp. 18-19
[62] Brenda Davis, p. 9
[63] Report of Stuart Statler, p. 19
[64] Brenda Davis, p. 20
[65] Brenda Davis, p. 21
[66] Brenda Davis, pp. 20-21
[67] Brenda Davis, p. 48
[68] Brenda Davis, pp. 21-22, 40-41
[69] Brenda Davis, p. 23
[70] Brenda Davis, p. 45
[71] Mindy Roberts, p. 38
[72] Mindy Roberts, pp. 39-40
[73] Brenda Davis, pp. 34-35
[74] Brenda Davis, p. 38



According to Mrs. Roberts, she had no problems with the blind in Megan's room, and it was in working order until she sold the house to the Padillas.[75] According to her testimony, the blinds were still there when they sold the house to the Padillas in 2002.[76] Despite an understanding of the potential hazards window cords can pose to children, the availability of alternative designs, familiarity with the safety information provided along with window coverings, and related experience gained through working with and installing window coverings in a professional capacity, neither Mrs. Davis nor Mrs. Roberts made any effort from the time the blinds were purchased and installed to alter the free hanging nylon cord and beaded chain that accompanied the vertical blinds at issue in the present case.

Assertions that a lack of warnings caused or contributed to an accident presume that product users are ignorant of the potential hazards of using products in particular ways, and/or that the mere act of making safety information available to users will induce them to modify their behavior and thereby reduce accident frequency. While a manufacturer, and/or an industry as a whole, can work towards making the appropriate information for safe use of a product available through reasonable channels (e.g., warnings accompanying a product, public outreach programs, press releases, cooperation with third parties, education efforts), whether a consumer will comply with the safety communication is largely dependent on factors related to the receiver. Cognitive psychology research has provided strong evidence for the inability of clearly visible stimuli to sometimes reach awareness, a phenomenon identified as "inattentional blindness."[77] Research on the effectiveness of warnings has shown that certain criteria must be met before information presented can affect and change user behavior,[78] and the results of the accumulating research demonstrate the difficulty of changing product user behavior and improving safety via warnings.[79] For example, for very familiar items, the user presumably already knows (or thinks he/she knows) the hazards and rules for use, so warnings tend not to be read and heeded;[80] a basic premise of whether a warning will be effective necessitates that users seek and attend to such information.

When asked what he and his wife did to make their house safe when they first had children, Mr. Padilla testifies that he would make sure that there were not dangerous things around his children during the summer like insects and spiders.[81] According to Mr. Padilla, he had never heard or read anything that described making cords on window blinds safe for children.[82] He testifies that he did not read the newspaper, magazines or parenting magazines regularly, but would watch the news on television when he had time.[83] Mrs. Padilla testifies that she did not

---

[75] Mindy Roberts, pp. 19-20
[76] Mindy Roberts, pp. 8, 13; Ruth Padilla, pp. 15-16
[77] Mack & Rock, 1998; Simons & Chabris, 1999; Simons & Levin, 1998
[78] Ayres, et al., 1989
[79] e.g., Ayres, et al. 1998
[80] e.g., Dorris & Purswell, 1977; Otsubo, 1988; Zeitlin, 1994
[81] Jose Padilla, p. 70
[82] Jose Padilla, pp. 69-70
[83] Jose Padilla, pp. 89-90



look up any safety information prior to any of her pregnancies.[84] Neither Mr. nor Mrs. Padilla spoke to their pediatrician about child safety issues.[85]

Despite the availability of safety information concerning child strangulation and window coverings and efforts made by the industry, Hunter Douglas, and the CPSC to alert consumers about these potential hazards, Mr. and Mrs. Padilla claim that had they been aware of this, they would have removed the product from the window.[86] In general, such claims are not supported by scientific research or other facts in the case. Studies show that people greatly overestimate their own compliance rates with warnings.[87] They systematically estimate that their own compliance levels would be higher than those of other people, even while overestimating others' compliance. For example, when presented with a label on hammers, subjects predicted they would have a 50% compliance rate on average and that other people would comply at an average rate of 42%. Actual compliance with the warnings was zero.[88]

Similar findings have been reported across a variety of warning formats, products and environments.[89] In one study, subjects performed a "chemistry-lab" task and were exposed to either a text-only warning, or a warning consistent with design components identified in the warnings literature suggested to increase sign conspicuity (e.g., color). Predictions as to whether these signs would be noticed differed for the text only warning (24%) and the warning formatted for conspicuity (93%), as too did predictions as to whether the warnings would be complied with (27% and 86% for text only and conspicuity formatted warnings respectively)[90] However, none of the participants looked at or read the posted warnings, regardless of the warning format.[91]

In the present instance, Mr. Padilla testifies that Max had a television on top of the dresser in his room and that he would worry about the television falling on Max and that he "was always taking care of it".[92] However, there is no testimony that he removed the television or secured it to the wall to prevent this from happening; despite recognizing and identifying a safety concern, Mr. Padilla failed to take action to resolve the situation and remove this hazard from his son's room. Based on a scientific understanding of behavioral responses to safety information and the information available as to Mr. and Mrs. Padilla's safety information seeking behavior and limited response to acknowledged and obvious safety concerns, no additional or alternative safety information accompanying the product would

[84] Ruth Padilla, p. 71
[85] Ruth Padilla, pp. 70-71
[86] Plaintiff's First Amended Complaint at Law, p. 11
[87] Ayres et al., 1990; Dorris and Purswell, 1977
[88] Ayres et al., 1990; Dorris and Purswell, 1977
[89] Shaver, et al., 2006; Frantz, et al., 2005
[90] Frantz, et al., 2005
[91] Smith-Jackson & Durak, 2000
[92] Jose Padilla, pp. 86-87



have altered their behavior, and the prediction the Plaintiffs makes to the contrary is incorrect.

**Summary of Opinions and Conclusions**

In summary, the opinions in this report are stated to a reasonable degree of scientific certainty and include the following:

- The response of Hunter Douglas specifically, and the window covering industry in general, in the mid-1990's to the identification of child strangulation hazards associated with window covering cords, and the developmental process engaged in by Hunter Douglas and the window covering industry to address these concerns, was reasonable given the accumulated knowledge about these incidents.

- The product's functionality would be limited or eliminated for a portion of the intended user population due to human factors issues related to people's capabilities and limitations and the expected use environment for the product if the PermAssure Wand were the only control mechanism available. Given the human factors relevant to this product and the understanding of the hazards posed by vertical blinds, it was reasonable for Hunter Douglas to have offered consumers options as to the control mechanism for the subject blinds.

- Mrs. Davis and Mrs. Roberts understood the potential hazards associated with cords attached to window blinds. Despite this understanding, they failed to address this condition. There is no scientific reason to believe that additional or alternative warnings or safety information would have altered their behavior with respect to the selection, purchase, installation, and use of the incident product.

- Mr. and Mrs. Padilla did not demonstrate safety information seeking behaviors with respect to child safety in general and that related specifically to window coverings, and displayed limited response to acknowledged and obvious safety concerns. There is no scientific reason to believe that additional or alternative warnings or safety information provided with the product would have altered their behavior and averted this incident.



I reserve the right to supplement this report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery and through any additional work. If you have any questions about this report, please do not hesitate to contact me.

Sincerely,

Joseph B. Sala, Ph.D.
Senior Managing Scientist
Human Factors
Enclosures (2)

## List of Materials

- Complaint at Law
- Plaintiff's First Amended Complaint at Law
- Defendant Hunter Douglas Window Coverings, Inc.'s Rule 26(a)(1) Initial Disclosures
- Plaintiff's Answers to Defendant Hunter Douglas Window Coverings, Inc.'s First Set of Interrogatories
- Plaintiff's Rule 26(a)(2) Disclosures
- Photos taken by Oak Forest Police Department of Max Padilla on 04/22/2008
- Epidemiologic Investigation Reports and supplemental documents, 1982-2005
- Expert reports:
  - Robert Wright 03/18/2011
  - Stuart Statler 03/22/2011
  - Rose Ray  06/28/2011
- Depositions:
  - Richard Anderson 11/14/2010
  - Brenda Davis 05/21/2010
  - Don Fraser 11/18/2010
  - Roberto Frias 11/19/2009
  - Joseph F. Jankoski 10/28/2010
  - Michelle Jorden, M.D. 03/17/2010 with exhibits
  - Jose Maxmilian Padilla 02/10/2010
  - Ruth Jacqueline Padilla 02/10/2010
  - Mindy Roberts 05/21/2010 exhibits
  - Stuart M. Statler 04/28/2011
  - Eugene Thompson 11/18/2010
  - Robert Wright, Ph.D. 04/19/2011
  - Ronald Rubinoff 01/20/2011
- Exhibits 1-7 marked in depositions on 11/19/2009-11/20/2009
- Affidavit of Brenda Davis

- *ANSI/WCMA A100.1 1996, American National Standard for Safety of Corded Window Covering Products.* Section 5.1.2
- Poison Prevention Packaging Act, 15 U.S.C. §§ 1471-1477
- Ayres, T. J., Gross, M. M., Wood, C.T., Horst, D. P., Beyer, R. R., & Robinson, J. N. (1989). What is a warning and when will it work? In *Proceedings of the Human Factors Society 33rd annual meeting* (pp. 426-430). Santa Monica, CA: Human Factors Society.



- Ayres, T. J., Gross, M. M., Horst, D.P., Wood, C. T., Beyer, R. R., Acomb, D. B., & Bjelajac, V. M. (1990). Do subjective ratings predict warning effectiveness? *Proceedings, Human Factors Society Annual Meeting.*
- Ayres, T. J., Wood, C. T., Schmidt, R. A., Young, D. E., & Murray, J. (1998). Effectiveness of warning labels and signs: An update on compliance research. In *Proceedings of the Silicon Valley Ergonomics Conference & Exposition, ErgoCon '98* (pp. 199-205).
- Belch, M. S., & Willis, L. A. (2002). Family decision at the turn of the century: Has the changing structure of households impacted the family decision-making process? *Journal of Consumer Behaviour, 2*, 111-124.
- Birren, J. E., & Schaie, K. W. (Eds.). (2006). Handbook of The Psychology of Aging, 6th Edition. Burlington, MA: Elsevier Academic Press
- Dorris, A.L, Purswell, J.L. (1977). Warnings and human behavior: Implications for the design of product warnings. *Journal of Products Liability*, 255-263.
- Government Consumer Safety Research. (2000). Strength data for design safety – Phase 1
- Government Consumer Safety Research. (2002). Strength data for design safety – Phase 2
- Halupka, S. W. (1981). *Analysis of string and elastic hazards to children* [CPSC memorandum]. U.S. Consumer Product Safety Commission.
- Hoyer, W. D. (1984). An Examination of Consumer Decision Making for a Common Repeat Purchase Product. *Journal of Consumer Research, 11*, 822-829.
- Mack, A., & Rock, I. (1998). *Inattentional blindness.* Cambridge, MA: MIT Press.
- Morrongiello, B. A., Ondejko, L., & Littlejohn, A. (2004). Understanding toddlers' in-home injuries: II. Examining parental strategies, and their efficacy, for managing child injury risk. *Journal of Pediatric Psychology, 29*, 433-446.
- Otsubo, S. M. (1988). *A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs.* Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 33rd Annual Meeting.
- Peebles, L., & Norris, B. (2003). Filling 'gaps' in strength data for design. *Applied Ergonomics, 34*, 73-88.
- Perry, L. S. (2010). The aging workforce: Using ergonomics to improve workplace design. Professional Safety, April: 22-28.
- Rauchschwalbe, R. (1997). Window covering pull-cords. *Consumer Product Safety Review, 1*(4), 7. Available online: http://www.cpsc.gov/cpscpub/pubs/cpsr_nws04.pdf
- Rauchschwalbe, R., & Mann, N. C. (1997). Pediatric window-cord strangulations in the United States, 1981-1995. *Journal of the American Medical Association, 277*, 1696-1698.
- Rogers, T. (1982). Briefing paper on alternative strategies to address accidental ligature strangulations of children less than five years of age. U.S. Consumer Product Safety Commission.



- Rutherford, G. W., Jr., & Kelly, S. (1981). *Special report: Accidental strangulations (ligature) of children less than 5 years of age*. U.S. Consumer Product Safety Commission.
- Frantz, J.P., Young, S.L., Rhoades, T.P., & Wisniewski, E.C. (2005). Predicted versus actual response to warning signs and labels: Examining the role of ANSI Z535 features. In *Proceedings of the Human Factors and Ergonomics Society '05* (pp. 1785-1789).
- Shaver, E.F., Young, S.L., Frantz, J.P., Rhoades, T.P., Hall, S.M, & Shah, R.J. (2006). Comparison of ANSI and ISO Standard Formats on People's Response to Product Warnings. *Proceedings of the Human Factors and Ergonomics Society 50th Annual Meeting – 2006, 5,* 2197-2201
- Simons, D.J. & Chabris, C. F. (1999). Gorillas in our midst: sustained inattentional blindness for dynamic events. *Perception, 28*, 1059-1074
- Simons, D. J. & Levin, D.T. (1998). Failure to detect changes to people during a realworld interaction. *Psychonomic Bulletin & Review, 5(4)*, 644-649.
- Smith-Jackson, T. & Durak, T. (2000). Posted warnings, compliance, and behavioral intent. In *Proceedings of the IEA 2000/HFES 2000 Congress* (pp. 4-115-4-118)
- Smith, C. D., Umberger, G. H., & Manning, E. L. et al. (1999). Critical decline in fine motor hand movements in human aging. *Neurology, 53*, 1458-1461.
- Smith, S. A., Norris, B. J. and Peebles, L. (2000). OLDER ADULTDATA: The Handbook of Measurements and Capabilities of the Older Adult – Data for Design Safety, Department of Trade and Industry, London, UK.
- Sproles, G. B. & Kendall, E. L. (1986). A methodology for profiling consumers' decision-making styles. *The Journal of Consumer Affairs, 20*, 267-279.
- Story, M. F., Mueller, J. L., & Mace, R. L. (1998). *The Universal Design File Designing for People of All Ages and Abilities.* The Center for Universal Design: NC State University.
- Tse, A. C. B. (1999). Factors affecting consumer perceptions on product safety. *European Journal of Marketing, 33*, 911-925.
- Ziamou, P. L. & Ratneshwar, S. (2003). Innovations in product functionality: When and why are explicit comparisons effective? *Journal of Marketing, 67*, 49-61.
- U.S. Consumer Product Safety Commission. (1985). *CPSC warns of the danger of children strangulation in window blind or drapery cords* [Release #85-069]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/prhtml85/85069org.html
- U.S. Consumer Product Safety Commission. (1994). *CPSC and industry redesign products to save lives* [Release #95-003]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/PRHTML95/95003org.html
- U.S. Consumer Product Safety Commission. (1996). *CPSC works with industry to save lives: Window pull-cords and strangulations*. Available online: http://www.cpsc.gov/CPSCPUB/PUBS/SUCCESS/cords.html
- U.S. Consumer Product Safety Commission. (1997). *The number of children who strangle in window cords has been under-reported according to a new study in JAMA*



[Release #97-136]. Available online:
http://www.cpsc.gov/CPSCPUB/PREREL/PRHTML97/97136org.html

- U.S. Consumer Product Safety Commission. (2000). *CPSC, window covering industry announce recall to repair window blinds: New investigation of children's deaths leads to redesigned window blinds* [Release #01-023]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/prhtml01/01023org.htm
- Zeitlin, L. R. (1994). *Failure to follow safety instructions: Faulty communication or risky decisions?* Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 39th Annual Meeting.





Exponent
3401 Market Street
Suite 300
Philadelphia, PA 19104

telephone 215-594-8800
facsimile 215-594-8899
www.exponent.com

**Joseph B. Sala, Ph.D.**
**Senior Managing Scientist**

**Professional Profile**

Dr. Joseph B. Sala is a Senior Managing Scientist in Exponent's Human Factors practice. Dr. Sala's work focuses on the cognitive, perceptual, physical, and developmental human factors issues relating to accidents and injuries. Dr. Sala applies this expertise to the analysis of visibility, the effect of attention on human performance, lifespan and age differences in behavior, human information processing and decision-making, and the development and evaluation of warning and safety information. He has analyzed human factors issues in accidents associated with a number of scenarios (e.g., motor vehicles, consumer products usage, slips/trips and falls, recreational activities) resulting in a variety of injuries (e.g., burns and scalds, submersions, mechanical suffocation, electrocutions, poisonings).

Using large-scale incident and injury data (e.g., the Consumer Product Safety Commission's National Electronic Injury Surveillance System, Centers for Disease Control's Wide-ranging Online Data for Epidemiologic Research, etc.), Dr. Sala has performed injury and risk analysis to measure the safety of products, and he has examined the effectiveness of some of the strategies used to reduce risk. In addition, he has used his experience to conduct product usability studies and to examine the physical and cognitive abilities of both child and adult users as they interact with particular products and environments.

Prior to joining Exponent, Dr. Sala completed a Ph.D. in psychology at the Johns Hopkins University and was a post-doctoral fellow at Stanford University. During that time he focused his research on the cognitive neuroscience of human information processing, the brain mechanisms underlying learning, memory, vision, and cognitive control, and their behavioral manifestations. In his research, he used a variety of experimental methods (behavioral, neuroimaging, and patient case studies) and statistical analyses to explore the interactions between learning, vision, working memory, and attention.

**Academic Credentials and Professional Honors**

Post Doctoral Fellow, Stanford University
Ph.D., Psychological and Brain Sciences, Johns Hopkins University, 2003
M.A., Psychological and Brain Sciences, Johns Hopkins University, 2001
B.A., Psychology, Rutgers University, 1998
B.S., Administration of Justice, Rutgers University, 1998

Lecturer, Drexel University, 2007–2010; National Research Service Award training grant through the Department of Neurobiology, Stanford University, 2004–2005; J. Brien Key Graduate Award, 2002, 2000; National Science Foundation Graduate Research Fellowship Honorable Mention, 2000; Edward J. Bloustein Distinguished Scholar, 1994–1998

**Publications**

Rodowicz KA, Muhammad R, Heller M, Sala J, Mkandawire C. Biomechanical, perceptual, and cognitive factors involved in maintaining postural control while standing or walking on non-moving and moving surfaces: A literature review. Proceedings, ASME International Mechanical Engineering Congress & Exposition, Vancouver, British Columbia, IMECE2010-39276, in press.

Muhammad R, Rodowicz KA, Heller M, Sala J, Mkandawire C. Biomechanical, perceptual, and cognitive factors involved in balance recovery following unexpected perturbations: A literature review. Proceedings, ASME International Mechanical Engineering Congress & Exposition, Vancouver, British Columbia, IMECE2010-39285, in press.

Khan FS, Sala JB, Arndt SR. Considerations in the textless presentation of warning and safety information. Proceedings, 15th Annual International Conference on Industrial Engineering Theory, Applications and Practice, Mexico City, Mexico, 2010.

Khan FS, Sala, JB, Arndt SR. Reducing subjectivity when attempting auditory scene recreation in accident reconstruction. Proceedings, Human Factors and Ergonomics Society 54th Annual Meeting, San Francisco, CA, 2010.

Sala JB, Nichols EA, Muhammad R, Lakhiani SD, Rauschenberger R, Wood CT. Government, warnings, safety information: A comparison of inter-agency regulations and guidance. In: Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries. Karwowski W, Salvendy G (eds), pp. 1047–1056, CRC Press, 2010.

Sala JB, Courtney SM. Flexible working memory representation of the relationship between an object and its location as revealed by interactions with attention. Attention, Perception, Psychophysics 2009; 71(7):1525–1533.

Khan FS, Sala JB, Arndt SR. Psychoacoustic response to auditory warnings. Proceedings, 14th Annual International Conference on Industrial Engineering Theory, Applications and Practice, Anaheim, CA, 2009.

McGowan JC, Shkolnikov Y, Sala JB, Ray R. Diffuse electrical injury: A questionable phenomenon. Biomedical Engineering, Recent Developments (ISBN 978-1-930636-07-1) 2008; 65–67.

McGowan JC, Shkolnikov Y, Sala JB Ray R. Diffuse electrical injury: Questioning the scientific basis. IEEE Proceedings of the Canadian Conference on Electrical and Computer Engineering, Niagara Falls, pp. 1977–1980, 2008.

Sala JB, Courtney SM. Binding of what and where during working memory maintenance. Cortex 2007; 43:5–21.



Huntley-Fenner G, Wood CT, Sala JB.  Study of the impact of California's Proposition 65 warnings on safety related awareness and behaviors.  Proceedings, Society for Risk Analysis, San Antonio TX, December 9–12, 2007.

Courtney SM, Roth JK, Sala JB.  A hierarchical biased-competition model of domain-dependent working memory maintenance and executive control.  In:  The Cognitive Neuroscience of Working Memory.  Oxford University Press, 2007.

Wood CT, Sala JB, Sanders K, Cassidy P.  Trends in consumer product warnings.  Proceedings, 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.

Sanders K, Wood CT, Sala JB.  Human factors engineering for medical devices.  In:  Bringing Your Medical Device to Market.  Food Drug Law Institute, Washington, D.C., 2006.

Sayala S, Sala JB, Courntey SM.  Increased neural efficiency with repeated performance of a working memory task is information-type dependent.  Cerebral Cortex 2006; 16: 609–617.

Preston A, Gaare M, Sala JB, Wagner AD.  Stimulus-specific novelty encoding and subsequent memory responses in human medial temporal lobe.  Cognitive Neuroscience Society Annual Meeting Abstracts, New York, NY, April 9–12, 2005.

Rämä P, Poremba A, Sala JB, Yee L, Malloy M, Mishkin M, Courtney SM.  Dissociable functional cortical topographies for working memory maintenance of voice identity and location.  Cerebral Cortex 2004, 14:768–780.

Sayala S, Sala JB, Courtney SM.  Spatially selective changes in fMRI activation during repeated performance of working memory tasks.  Society For Neuroscience Annual Meeting Abstracts, San Diego CA, October 23–27, 2004.

Sala JB, Badre D, Wagner AD.  Investigating effective connectivity of prefrontal cortex and cognitive control using dynamic causal modeling.  Poster presented at Bay Area Memory Meeting, 2004.

Sala JB, Courtney SM.  Active maintenance and the binding of information during working memory.  Cognitive Neuroscience Society Annual Meeting Abstracts, San Francisco CA, April 18–20, 2004.

Sala JB, Rama P, Courtney SM.  Functional topography of a distributed neural system for spatial and nonspatial information maintenance in working memory.  Neuropsychologia 2003, 41(3):341–356.

Sala JB, Sayala S, Courtney SM.  Altered working memory activation pattern in a multiple sclerosis patient with superior frontal white matter lesions.  Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 8-12, 2003.



Sayala S, Sala JB, Courtney SM. Changes in parietal cortex during repeated performance of working memory tasks. Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 8–12, 2003.

Yee L, Sala JB, Courtney SM. Working memory for color versus shape. Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 8–12, 2003.

Sala JB, Courtney SM. Contribution of non-preferred information to activation during working memory for objects-in-locations. Society for Neuroscience Annual Meeting Abstracts, Orlando FL, November 2–7, 2002.

Sala JB, Courtney SM. Working memory for the conjunction of pattern identity and location. Human Brain Mapping Annual Meeting Abstracts, Sendai Japan, June 10–16, 2002.

Rämä P, Sala JB, Gillen JS, Pekar JJ, Courtney SM. Dissociation of the neural systems for working memory maintenance of verbal and nonspatial visual information. Cognitive, Affective, & Behavioral Neuroscience 2001; 1(2):161–171.

Sala JB, Rämä P, Courtney SM. Patterns of activation during encoding, maintenance and recognition phases of a working memory task. Society for Neuroscience Annual Meeting Abstracts, San Diego CA, November 10–15, 2001.

Sala JB, Rämä P, Courtney SM. Modulation of perceptual processing during encoding versus recognition in working memory. Talk presented at Attention and Capture Conference – Eastern Psychological Association, Baltimore MD, 2001.

Sala JB, Rämä P, Courtney SM. Involvement of spatially specialized areas in object working memory. Cognitive Neuroscience Society Annual Meeting Abstracts, New York NY, 2001.

Sala JB, Rämä P, Gillen JS, Courtney SM. Working memory for identity and location of faces or houses: an fMRI investigation. Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 4–9, 2000.

Rämä P, Sala JB, Gillen JS, Courtney SM. Working memory for famous and unfamous faces and names. Society for Neuroscience Annual Meeting Abstracts, New Orleans LA, November 4–9, 2000.

**Peer Reviewer**

Invited Reviewer: *Journal of Neuroscience, NeuroImage, Cognitive Brain Research,* and *Behavioral and Cognitive Neuroscience Reviews*, *Human Factors and Ergonomics Society*



**Project Experience**

Evaluated the visibility of pedestrians and other roadway objects, assessing the effects of a variety of factors such as lighting and potential obstructions.

Assessed the adequacy of a variety of product related safety information in a number of "failure to warn" claims. Considered alternative or additional information and its potential to produce behavioral change and or result in accident avoidance.

Designed testing protocols to address the cognitive, behavioral, and physical abilities of children. Evaluated the design of a wide variety of products and attempts to limit child access and activation.

Performed quantitative and comparative injury risk analysis across a wide variety of consumer, recreational, and occupational products.

Assisted manufacturers to respond to governmental agency (e.g., CPSC, FDA, EPA) inquiries regarding product safety, recall, and regulatory matters.

Developed, revised, and commented on warnings, labeling, and instructions for an array of consumer, recreational, and occupational products.

Assessed the conspicuity of a variety of environmental stimuli, relating physical attributes to the capabilities and limitations of human sensory systems and associating these factors to accident causation and avoidance.

Studied public awareness and understanding of posted warnings and the effect this signage may have on human behavior.

Assisted manufacturers in the development of internal design standards addressing potential hazards and increasing consistency across products.

**Professional Affiliations**

- Society for Neuroscience
- Society for Risk Analysis
- Human Factors and Ergonomics Society
- Association for Psychological Science



**Previous 4 years of Deposition and Trial Testimony by Joseph B. Sala**
**June 23, 2011**

| Deposition Date | Trial Date | Case Name | Court |
|---|---|---|---|
| 10/2007 | | Lankford v. Skaff Engineering | Commonwealth of Kentucky Letcher Circuit Court |
| 08/2008 | | DiRosa v. Asphalt Paving Systems | Superior Court of New Jersey Law Division - Camden County |
| 12/2009 | | Bragdon v. Karl R. Johnson Trucking, Inc. and Delbert Degree | Caledonia Superior Court - State of Vermont |
| | 01/2010 | Izikoff v. Nissan North America, Inc. | Circuit Court of Suner County, Tennessee for the Eighteenth Judicial Distrcit at Gallatin |
| | 01/2010 | Bragdon v. Karl R. Johnson Trucking, Inc. and Delbert Degree | Caledonia Superior Court - State of Vermont |
| | 01/2010 | McLaughlin v. John F. Kennedy Catholic High School | Supreme Court of the State of New York County of New York |
| 02/2010 | | Mendez v. Estwing Manufacturing Company, Inc. | United States District Court for the Southern District of Texas, Houston Division |
| | 02/2010 | Rosado v. Onarato | Supreme Court of the State of New York County of Richmond |
| | 06/2010 | Jennings v. Starland Ballroom | Superior Court of New Jersey Middlesex County |
| 08/2010 | | Hawley v Paschall Truck Lines Inc. and William v. Vest | United States District Court Western District of New York |
| 11/2010 | | Kelliane Kelly-Williams v. AT&T, Inc. | Ninth Judicial District Court Parish of Rapides State of Louisiana |
| | 01/2011 | Moyer v. Albert Einstein Healthcare Network | Court of Common Pleas Phliadelphia, Pennsylvania |
| 01/2011 | | Metso Paper USA, Inc. v. General Electric Company | United States District Court for the Middle District of Pennsylvania |
| 03/2011 | | Juliet Green Cooper v. Racetrac Petroleum, Inc., et al. | Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida |
| | 06/2011 | Phillips v. Comcast, SALP | Court of Common Pleas Phliadelphia, Pennsylvania |