```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2

 3   JOSEPH M. PADILLA, as the    )
     Special Administrator of the )
 4   Estate of Maximilian Padilla,)
                                  )
 5                Plaintiff        )
                                  )  Case No. 09 CV 1222
 6                                )
        -v-                       )
 7                                )  Judge Robert M. Dow, Jr.
     HUNTER DOUGLAS WINDOW        )
 8   COVERINGS, INC.; WINDOW      )
     COVERING MANUFACTURERS       )
 9   ASSOCIATION; AND WINDOW      )
     COVERING SAFETY COUNCIL,     )
10   AMERICAN BLIND AND WALLPAPER )
     FACTORY, INC.                )
11                                )
                Defendants.  )
12

13
                      July 26, 2011
14

15        Oral deposition of JOSEPH B. SALA, Ph.D., taken
     at 1700 Two Logan Square, 18th and Arch Streets,
16   Philadelphia, Pennsylvania, 19103, commencing
     at 9:14 a.m. on the above date, before Bonnie Smith,
17   Registered Professional Reporter and Notary Public.

18
     ATKINSON-BAKER, INC.
19   COURT REPORTERS
     TELEPHONE:  1-800-288-3376
20   www.depo.com

21   REPORTED BY:  Bonnie Smith, RPR #1627
     FILE NO.:  A506B9E
22

23

24

25
```

1

1

2

3

APPEARANCES:

4

5

JAUREGUI & ASSOCIATES, P.C.
6    BY:  ARTURO JAUREGUI, ESQ.
     120 W. Madison Street
7    Suite 400
     Chicago, Illinois  60602
8    (212) 781-9103
     arjauregui@aol.com
9    Attorneys for Plaintiff

10   SCHIFF, HARDIN, LLP
     BY:  JEFFREY WILLIAMS, ESQ.
11   One Market Spear Street Tower
     Thirty-Second Floor
12   San Francisco, California, 94105
     (415) 901-8763
13   jrwilliams@schiffhardin.com
     Attorneys for Hunter Douglas Window Coerings, Inc.

14
     CARROLL & WEISS
15   BY:  MICHAEL WEISS, ESQ.
     1819 Peach Tree Road, Suite 104
16   Atlanta, Georgia 30309
     Attorneys for Window Covering Manufacturers
17   Association and Window Covering Safety Council
     (404) 228-5337
18   (Via telephone)

19
                              -----
20

21

22

23

24

25

2

```
 1                        INDEX

 2

 3   WITNESS                          PAGE NO.

 4   JOSEPH B. SALA, Ph.D.

 5     By Mr. Jauregui                      6

 6

 7                      EXHIBITS

 8

 9   EXHIBIT NO.    DESCRIPTION

10   1             Report of Sala -  6/30/11      7

11   2              CV - Sala                     8

12   3             List of depo cases - Sala      9

13   4             Legal documents/depositions   11

14   5             Police Report                 11

15   6             24 Photos of room & incident  12
                   blind
16
     7             Report of Stuart Statler      12
17                 3/22/11

18   8             Report of Robert Wright       13
                   3/18/11
19
     9              Examples of blinds           14
20

21   10            Rutherford & Kelly 1981 report 16

22   11            Halpulka 1981 report          19

23   12            Rogers 1982 memorandum        22

24   13            Five CPSC releases            23

25
```

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 14 | Rauschschwalbe & Mann 1997 article | 25 |
| 15 | 1996 version American National Standard for safety of corded window covering products | 28 |
| 16 | Rauschschwalbe & Mann 1997 article | 34 |
| 17 | 2001 research paper by Belch & Willis | 34 |
| 18 | 1984 Hoyer article | 36 |
| 19 | 1986 Sproles & Kendrall article | 38 |
| 20 | 1998 Tse article | 40 |
| 21 | Ziamou & Ratneshwar 2003 3 articles | 42 |
| 22 | 1998 Peebles & Norris article | 52 |
| 23 | 2000 Smith, Norris & Peebles article | 59 |
| 24 | Story, et al publication | 69 |
| 25 | Perry 2010 article | 75 |
| 26 | Biren & Schaie article | 77 |
| 27 | Strength Data for Design Safety - Phase 1 & II? | 79 |
| 28 | 1999 Smith, et all article | 83 |
| 29 | 2004 Morrongiello, et al article? | 86 |
| 30 | 1998 Mack & Rock chapter | 89 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT NO.      DESCRIPTION                    PAGE NO.

31          1999 Simons & Chabis article     101

32          1998 Simons & Levin publication  102

33          1989 Ayres, et al article        109

34          1998 Ayres, et al article        113

35          1977 Doris & Pursell article     115

36          1988 Otsubo article              117

37          1994 Zeilin article              119

38          1990 Ayres, et al article        121

39          2006 Shaver, et al article       124

40          2005 Frantz, et al article       128

41          Smith-Jackson & Durak article    130

42          January 2010 edition of Poison   132
            Prevention Packaging Act of 1970

-----

1          JOSEPH B. SALA, Ph.D., having been

2     duly sworn, was examined and testified as

3     follows:

4                    -----

5                 EXAMINATION

6                    -----

7  BY MR. JAUREGUI:

8  Q.     Let the record reflect this is the

9  discovery deposition of Dr. Joseph B. Sala.  And

10  before I go any further, can you --- how do you

11  pronounce your last name?

12  A.     Sala.

13  Q.     Sala.  Taken pursuant to the Rules of

14  Civil Procedure, the Federal Rules of Civil

15  Procedure, the rules for the Northern District of

16  Illinois, taken by agreement of the parties

17  pursuant to court order.

18          Doctor, can you please spell your full

19  name for the record, please?

20  A.     Sure.  Joseph, J-O-S-E-P-H, Sala, S, as in

21  Sam, A-L-A.

22  Q.     What is your date of birth, Dr. Sala?

23  A.     4/1/76.

24  Q.     Now, Dr. Sala, before we went on the

25  record you were kind enough to introduce me to the

1    materials that you brought with you today; is that

2    correct?

3    A.      Yes.

4    Q.      And these materials are largely contained

5    in the two three-ring binders in front of you?

6    A.      Correct.

7    Q.      Why don't we go as quickly as we can, and

8    I would like to mark your report in this case as

9    Exhibit No. 1.  Dr. Sala, what I'd like to do is

10   mark the materials you brought here today.  We're

11   going to mark your report as Exhibit No. 1.  Is

12   that okay if I attach the stickers here on the

13   documents?

14   A.      Yes.

15   Q.      Thank you.

16                        -----

17                   (Report of Dr. Joseph B. Sala dated

18           June 30, 2011, marked Exhibit No. 1.)

19                        -----

20   BY MR. JAUREGUI:

21   Q.      This is not your report.  This is a copy

22   of your CV; correct?

23   A.      No.  This is a copy of my report, and at

24   the end of the report is my CV.

25   Q.      All right.  So this is your report,

1    Exhibit No. 1.  Okay.  And then why don't we mark

2    your CV as Exhibit No. 2.

3    A.      Would you like me to separate that?

4    Q.      Is it attached here?

5    A.      It's at the back of my report.  Yeah.

6    Q.      Okay.  Why don't we -- you can leave it

7    there.  We'll just designate that it's marked as

8    Exhibit No. 2.

9                        -----

10                   (Curriculum Vitae of Joseph B. Sala

11        marked Exhibit No. 2.)

12                        -----

13   BY MR. JAUREGUI:

14   Q.      Okay.

15   A.      And then finally, the last page of this

16   would be the my previous four years list of cases.

17   Q.      That would the list of cases?

18   A.      Yes.

19   Q.      Okay.  That would be the list of cases

20   that you worked on as an expert witness; is that

21   correct?

22   A.      That I provided testimony at the trial

23   deposition.

24                   MR. JAUREGUI:  Okay.  That would be

25        marked as Exhibit No. 3.

1              (List of trial deposition cases for

2          Joseph B. Sala marked Exhibit No. 3.)

3                        -----

4    BY MR. JAUREGUI:

5    Q.      All right.  So that's that.  And then what

6    would be the next binder which you have over here?

7    A.      We can start with this binder.

8    Q.      Okay.  Why don't we do that.  Go ahead.

9    Why don't you put it in front of and tell me what

10   it is, the first tab that you have there.

11   A.      The first tab are some of the legal

12   documents that I cite in my report.

13   Q.      And by legal documents do you -- why don't

14   you tell me what's the first tab you have?

15   A.      The Plaintiff's First Amended Complaint At

16   Law.

17                  MR. JAUREGUI:  Okay.  The

18           Plaintiff's Complaint will be Exhibit

19           No. 4.

20                  MR. WILLIAMS:  Are you going to do

21           them one by one or by categories?

22   BY MR. JAUREGUI:

23   Q.      I'll tell you what.  Why don't -- tell me

24   what else do you have in the legal documents.  So

25   it's the complaint and what else?

1  A.      It's the complainant, the Plaintiff's

2  Answers To Defendant Douglas Window Covering First

3  Set of Interrogatories.

4  Q.      What other legal documents do you have

5  there?

6  A.      The depositions in the case.  Deposition

7  of Jose Padilla.

8  Q.      Hold on a second.

9  A.      I'm sorry.

10 Q.      Deposition of Jose Padilla?

11 A.      Deposition of Ruth Padilla, Deposition of

12 Brenda Davis, Deposition of Mindy Roberts,

13 Deposition of Stuart Statler, Deposition of Robert

14 Wright, Deposition of Richard Anderson, deposition

15 of Don Frazier, deposition of Roberta Frias,

16 deposition of Joseph Jankoski, deposition of

17 Ronald Rubinnoff, deposition of Eugene Thompson,

18 deposition of Michelle Jordan.  That would be the

19 legal documents.

20 Q.      That would be what you called earlier as

21 the set of legal documents?

22 A.      Yes.

23             MR. JAUREGUI:  Why don't we call it

24       as a group as Exhibit No. 4.

25                   -----

1              (Legal documents including

2          depositions marked Exhibit No. 4.)

3                          -----

4    BY MR. JAUREGUI:

5    Q.      All right.  What is the next set of

6    documents that you have --

7    A.      The police report.

8    Q.      -- after the legal documents?

9    A.      Police report.

10              MR. JAUREGUI:  Okay.  Mark that as

11          Exhibit No. 5, please.

12                          -----

13              (Police Reports marked Exhibit

14          No. 5.)

15                          -----

16   BY MR JAUREGUI:

17   Q.      What's the next document?

18   A.      Photographs.

19   Q.      Can you describe what photographs are

20   contained there?

21   A.      Sure.  They'd be photographs of the

22   incident blinds we had taken at the scene, and

23   then also what appear to be recreations from or

24   reconstruction efforts where the blinds were put

25   back on the windows.

1    Q.      Are there any other photographs there?

2    A.      I don't believe so.

3    Q.      We're going to mark that as group Exhibit

4    No. 6.

5                          -----

6                   (Twenty-four photographs of room

7           and incident blind marked collectively

8           Exhibit No. 6.)

9                          -----

10   BY MR JAUREGUI:

11   Q.      What is the next set of documents?

12   A.      The report of Stuart Statler.

13                  MR. JAUREGUI:  Okay.  We're going

14          to label that as Exhibit No. 7.

15                         -----

16                  (Report of Stuart Statler dated

17          March 22, 2011, marked Exhibit No. 7.)

18                         -----

19   BY MR JAUREGUI:

20   Q.      All right.  And the next document that you

21   have there?

22   A.      The report of Robert Wright.

23                  MR. JAUREGUI:  That will be Exhibit

24          No. 8.

25                         -----

1          (Report of Robert Wright dated

2          March 18, 2011, marked Exhibit No. 8.)

3                              -----

4    BY MR. JAUREGUI:

5    Q.      What do we have next?

6    A.      Examples of vertical blinds.

7    Q.      What is the source of that information?

8    A.      These are taken from the internet

9    depictions of vertical blinds and sales forms for

10   vertical blinds.

11   Q.      When was the information downloaded from

12   the internet?

13   A.      This was downloaded sometime -- I don't

14   have the specific dates -- sometime between the

15   production of the report and this deposition.

16   Q.      So it would have been downloaded within

17   the last month?

18   A.      Likely within the last month or so.

19   Q.      Is that information of examples of

20   vertical blinds from a particular vendor?

21   A.      No.  It's a variety of vendors and

22   manufacturers.

23   Q.      Any of those blinds manufactured by Hunter

24   Douglas.

25   A.      There may be in there.  I'm not sure of

```
 1    all the sales they are.  They list the specific

 2    manufacturer.

 3                              -----

 4                    (Examples of vertical blinds marked

 5           Exhibit No. 9.)

 6                              -----

 7    BY MR. JAUREGUI:

 8    Q.      Did you rely on any of the documents

 9    marked Exhibit No. 9 for your report?

10    A.      Well, I referenced in my report the

11    depiction of blinds and sales and characterization

12    of blinds, and these are examples of that.

13    Q.      Is there anything specific or particular

14    about the sales or the depictions of those blinds

15    that is relevant to this case?

16    A.      Not these in particular.  It's the general

17    information and how I speak about it in my report.

18    Q.      You're not suggesting that the way --

19    strike that.  Did you tell me that there is an

20    order form in there?

21    A.      There are some ordering forms, for

22    example, there is a print-out from Lowes where one

23    could order vertical blinds.

24    Q.      All right.  You're not suggesting the

25    ordering procedures available in July of 2011 were
```

1    the same ordering alternatives or options that

2    were available back in 1995, are you?

3    A.      No, I am not.

4    Q.      All right.  The next set of documents,

5    doctor.  We're up to Exhibit 9.  So does that --

6    these the entire contents of your first binder,

7    then?

8    A.      Yes.

9    Q.      Okay.  We'll move on to the second binder

10   now.  What's the first set of records in the

11   second binder?

12   A.      The first set of records is a memorandum

13   with the subject, Special Report, Accidental

14   Strangulation Of Children Less Than Five Years Of

15   Age.

16   Q.      What is the source of that document?

17   A.      This would be a -- I believe it's a U.S.

18   Consumer Product Safety Commission document.

19   Q.      Is there a date for that report?

20   A.      May 7th, 1981.

21   Q.      To facilitate the labeling on these

22   documents, we'll just refer to that as the May 7,

23   1981, report from the Consumer Product Safety

24   Commission.  Is that adequate for you?  What did

25   you label it?

1    A.      We labeled it -- I labeled it Rutherford &

2    Kelly, 1981.  I can refer to the rest of the

3    documents in that way, if you'd like.

4    Q.      And Rutherford & Kelly, what is that?

5    A.      Those are the authors of this memorandum.

6    Q.      But is the memorandum from the Consumer

7    Product Safety Commission?

8    A.      I believe that they were employed by...

9              MR. JAUREGUI:  All right.  We're

10        going to the label the Rutherford & Kelly

11        '81 report as Exhibit No. 10.

12                          -----

13              (Rutherford & Kelly 1981 report

14        marked Exhibit No. 10.)

15                          -----

16   BY MR. JAUREGUI:

17   Q.      What relevance, if any, does Exhibit

18   No. 10 have to your report in this case?

19   A.      It's referenced in my report on the

20   background as to development and understanding of

21   window cord strangulations and more generally

22   ligatures.

23   Q.      Is it your understanding that as of 1981

24   there were already reports of strangulations of

25   young children from window blind cords?

1    A.        This report details an investigation the

2    investigators or the researchers performed on

3    ligature strangulations in general, and it calls

4    out a number of products that are related to such

5    strangulations.

6    Q.        Do you know if the investigators reached

7    any conclusions in that study?

8    A.        Yes, they did.

9    Q.        What were those conclusions, generally?

10   A.        Generally, that there are a variety of

11   consumer products that are related, that there

12   were some that seemed could not be dealt with

13   without affecting the functionality of the product

14   through design, and there were calls for increased

15   consumer education.

16   Q.        Were window blinds one of the products

17   that they said they could not address with any

18   alterations of the signs of the time?

19   A.        I believe that that was the gist, that

20   drapery cords and blind cords fell into that

21   category.

22   Q.        Did you agree with that conclusion?

23   A.        It seemed very well supported by their

24   evidence.

25   Q.        Did you agree the completion of that

1    report was also applicable in 1995 at the time

2    when the window blind at issue was manufactured?

3    A.       I think that what I detailed in my report

4    is evolving knowledge about it and the efforts

5    that went towards it.  And so I believe that over

6    time with the industry they developed additional

7    means to try and address this issue.

8    Q.       So do I take it that by 1995 you have the

9    understanding that there were other alternative

10   means, alternative designs to address the issue of

11   window covering strangulation?

12   A.       Can you define other alternative designs?

13   Q.       Such as window coverings with wands or the

14   use of tension devices which may have not been

15   available in 1981?

16   A.       By 1995 products such as that were

17   definitely on the market.

18   Q.       So by 1995 there were other alternative

19   designs that may not have been available in 1981?

20   A.       I -- I don't know the full extent of the

21   product offerings in 1981.  It very well that some

22   of those products may have existed and their

23   reference to design changes may incorporate those

24   into their overall conclusion.  They're not

25   specific as to what designs were available in

1    1981.

2    Q.      So what is the specific purpose of you

3    using that document in your report in this case?

4    A.      To detail the history of this issue

5    that we're here to speak about today and the

6    evolution of the safety knowledge about the issue

7    at hand.

8    Q.      Anything other than used to bring back the

9    relevant historical background?

10   A.      I think that's probably the sum of its

11   purpose there.

12   Q.      What's the next document that you have

13   there?

14   A.      The document is Hapulka 1981.

15   Q.      Can you spell that, please?

16   A.      H-A-P, as in Peter, U-L-K-A.

17   Q.      Okay.  And what is that, doctor?

18   A.      That is, again, another memorandum from

19   the U.S. Consumer Product Safety Commission.

20                    MR. JAUREGUI:  All right.  We're

21             going to label the Hapulka memorandum as

22             Exhibit No. 11.

23                           -----

24                    (Halpuka 1981 memorandum marked

25             Exhibit No. 11.)

19

1    BY MR. JAUREGUI:

2    Q.      I'm putting you to work, doctor.  What's

3    the date of that memorandum?

4    A.      June 2nd, 1981.

5    Q.      And what is the gist of that memorandum?

6    A.      It's largely similar.  It's -- it's

7    similar to the Rutherford & Kelly, again,

8    detailing the investigations into ligature

9    strangulations, children's products, and generally

10   consumer products at large.

11              MR. WILLIAMS:  Can we go off the

12         record?

13                      -----

14              (Off the record at 9:32 a.m.)

15                      -----

16              (On the record at 9:46 a.m.)

17                      -----

18              MR. JAUREGUI:  We're going to get

19         back on the record.  I'm going to ask you

20         please identify yourself for the record

21         and state who you represent.  Can you

22         please go ahead and introduce yourself?

23              MR. WEISS:  Yes, sir.  Mike Weiss,

24         from Carroll Weiss in Atlanta calling in

25         representing Window Covering Manufacturers

1          Association and Window Covering Safety

2          Council.

3                    MR. JAUREGUI:  Thanks.

4     BY MR. JAUREGUI:

5     Q.     All right.  Now, we'll pick up where we

6     left off, Dr. Sala.  We left off at Exhibit

7     No. 11.  Of what significance, if any, is

8     Exhibit 11 to the report you have prepared in this

9     case?

10    A.     Similar to the Exhibit 10, this is detail

11    on the scientific understanding of these sorts of

12    ligature strangulations.

13    Q.     And this -- strike that.  This scientific

14    understanding is as of 1981?

15    A.     At the time.  Yes.

16    Q.     What's the next document that you have

17    there, doctor?

18    A.     The next document would be Rogers 1982.

19    Q.     And what is that document, if you can

20    describe it?

21    A.     Another memorandum from the U.S. Consumer

22    Product Safety Commission.

23                    MR. JAUREGUI:  We are going to mark

24          the Rogers 1982 memorandum as an exhibit.

25                    Doctor, if you would do the honors

1          there.

2                                    -----

3                    (Rogers 1982 memorandum marked

4          Exhibit No. 12.)

5                                    -----

6    BY MR. JAUREGUI:

7    Q.      If you can tell us, what is the gist of

8    Rogers 1982 memorandum?

9    A.      It is similar to the other two documents.

10   These three have very similar findings and

11   research aims.

12   Q.      And did you rely on this document in

13   preparing your report in this case?

14   A.      Yes, as cited in my report and as

15   referenced in my previous answers.

16   Q.      Next document that you have in front of

17   you?

18   A.      The next set of documents are CPSC,

19   Consumer Product Safety Commission releases.

20   Q.      Can you tell me what the date of those

21   releases are?

22   A.      One is from December 20th, 1985, one is

23   October 4th, 1994, one is, I believe 1997.

24   Q.      Is there a month?

25   A.      I'm sorry.  I'm looking right now.  I'm

1    sorry.  This is 1996.

2    Q.       Is there a month?

3    A.       I do not have a month on this one.

4    Q.       Okay.

5    A.       The next is June 3rd, 1997, and then

6    November 1st, 2000.

7                    MR. JAUREGUI:  We're going to mark

8            Exhibit No. -- strike that.  We're going

9            to mark as group Exhibit CPSC releases

10           that you just identified for me, I counted

11           five, one for '85, '84, '86, '87  and

12           2000, as group Exhibit No. 13.

13                   THE WITNESS:  Excuse me.  I believe

14           you said '84.  It was '94.  You said '84.

15                   MR. JAUREGUI:  1994.  I stand

16           corrected.  That would be October 4th,

17           1994?

18                   THE WITNESS:  Yes.

19                   MR. JAUREGUI:  All right.

20                           -----

21                   (Five Consumer Product Safety

22           Commission releases marked collectively

23           Exhibit No. 13.)

24   BY MR. JAUREGUI:

25   Q.       And what relevance, if any, do any of the

 1    Consumer Product Safety Commission releases have

 2    relative to the report that you have prepared in

 3    this case?

 4    A.       Again, they're cited in my report, and so

 5    I relied on them in the manner in which I detailed

 6    in my report, and they provided information,

 7    again, about the knowledge about window cord

 8    safety, window cord strangulations, and the work

 9    done to understand this.

10    Q.       Do you consider the information and data

11    from the Consumer Product Safety Commission such

12    as the one contained in Exhibit No. 13 reliable?

13    A.       I -- I believe that -- that the

14    information and the data is -- is there and it

15    reflects what has been done.  I have no reason to

16    doubt the reliability of their analyses, and it

17    comports with my understanding of the hazards as

18    well.

19    Q.       Is there a specific reason why you

20    selected those releases versus thousands of other

21    releases that the Commission has issued over the

22    years?

23    A.       These are directly related to window cord

24    strangulation.

25    Q.       And that's the reason why you selected

1    them?

2    A.      That's the -- that's the issue that I was

3    dealing with here, and they are relied on for the

4    purposes of my report, and that's why I selected

5    them.

6    Q.      All right.  What's the next set of

7    documents you have there, doctor?

8    A.      The next document is an article by

9    Rauschschwalbe & Mann, 1997.

10                    MR. JAUREGUI:  We're going to mark

11           the Rauschschwalbe article '97 as Exhibit

12           No. 14.

13                               -----

14                    (Rauschschwalbe & Mann 1997 article

15           marked Exhibit No. 14 for identification.)

16                               -----

17   BY MR. JAUREGUI:

18   Q.      Can you tell me what is the gist of that

19   article, doctor, Exhibit 14?

20   A.      Again, this is an article that details the

21   understanding of window cords, potential hazards

22   associated with window cords and strangulation.

23   Q.      And what was the understanding in 1997 as

24   of the date of that publication?

25   A.      That there are a number of reports related

1    to window cord strangulations and there are

2    patterns that can be identified from this data.

3    Q.      Does the article identify any such

4    patterns?

5    A.      It does.

6    Q.      What are the patterns?

7    A.      The patterns that they identified are

8    infants and kids near windows may become entangled

9    with drapery pull cords while sleeping or playing.

10   Two, toddlers may be suspended from pull cords

11   after jumping or falling from furniture placed

12   near a window.

13   Q.      Did you find the patterns of how

14   strangulations occurred relevant to this

15   case?

16   A.      Well, they're relevant to the issue at

17   hand and what is known about how the events

18   occurred.

19   Q.      Are there any similarities between the

20   patterns identified in the Rauschschwalbe '97

21   article to the manner in how the incident at issue

22   occurred?

23               MR. WILLIAMS:  Objection.  Vague.

24               Go ahead.

25               THE WITNESS:  Well, the ultimate

1          issue that we're here and what happened

2          with the Padilla child being found within

3          one of the cords is similar to those

4          incidents.

5    BY MR. JAUREGUI:

6    Q.      All right.  What's the next set of

7    documents you have, doctor?

8    A.      The next set of documents is the 1996

9    version of the American National Standard For

10   Safety Of Corded Window Covering Products.

11              MR. JAUREGUI:  We're going to mark

12          the 1986 American National Standard for?

13              THE WITNESS:  Safety Of Corded

14          Window Covering Products.

15              MR. JAUREGUI:  As Exhibit 15.

16          Thank you.

17              MR. WILLIAMS:  You said 1986.  It's

18          1996.

19              THE WITNESS:  1996.

20              MR. JAREGUI:  1996.

21              THE WITNESS:  1996.  I'm sorry.

22              MR. WILLIAMS:  You didn't, he did.

23              MR. JAUREGUI:  1996.

24              THE WITNESS:  1996.

25              MR. JAUREGUI:  It is 1996.

```
 1                              -----

 2                        (1996 version of the American

 3               National Standard for safety of corded

 4               window covering products marked Exhibit

 5               No. 15.)

 6                              -----

 7   BY MR. JAUREGUI:

 8   Q.      Of what significance, if any, is the 1996

 9   standard to the report that you have prepared in

10   this report?

11   A.      It's cited in my report as part of the

12   history of the -- how the industry has addressed

13   this issue.  It shows the standards that they work

14   with, the CPSC, to come up with a time frame,

15   which they did so.

16   Q.      And anything else other than the

17   illustration of historically how the industry has

18   responded?

19   A.      Well, also the ways in which technically

20   they did so.

21   Q.      What was the 1996 standard intended to

22   address?

23   A.      The 1996 standard -- I'd rather just refer

24   back to the standard.

25   Q.      That's fine.
```

1   A.      I can read to you the scope and the

2   objective of the standard.

3   Q.      Well, do you have an understanding, is

4   there a way -- I know that you use it in your

5   report, you cited to it.  Do you have an

6   understanding as to what the '96 standard intended

7   to do?

8   A.      Yes.  But it also listed clearly what they

9   intended to do.

10  Q.      Whichever way is more comfortable in

11  answering that question, go ahead.

12  A.      All right.  So the objective of the

13  standard, listed as the objective of the standard

14  is to provide requirements for covered products

15  that reduce the possibility of injury including

16  strangulation to young children from the bead

17  chain or for any type of flexible loop device used

18  to operate the product.

19  Q.      Was there any specific product the '96

20  standard was intended to address?

21  A.      Window coverings.  A variety of products.

22  Q.      Do you know whether horizontal blinds was

23  the primary product that the '96 standard was

24  intended to address?

25  A.      Well, that was covered in the standard.

1   The horizontal blinds were covered in the

2   standard.

3   Q.      So were there other window coverings other

4   than horizontal blinds that the '96 standard was

5   intended to address, as you understand it?

6   A.      As I understand it, this is a standard

7   that is meant, as it's stated, to address some of

8   the possible injuries to young children related to

9   window coverings, and they have a variety of

10  requirements and performance sort of standards

11  that they set that window coverings would meet.

12  Q.      Do you know if vertical blinds were within

13  the group of products that was attended to be

14  addressed by the '96 standard?

15  A.      I believe that the standard does have a

16  reference to vertical blinds.

17  Q.      Can you look that up and see if it does?

18  A.      Yes.  Products covered include cellular

19  shades, horizontal blinds, pleated shades, roll-up

20  blinds, roller shades, Roman shades, traverse

21  rods, and vertical blinds.

22  Q.      And what was specifically -- do you know

23  what the standards or how the standard

24  specifically intended to address the hazard of

25  strangulation for young children from vertical

1    blinds?

2    A.      Well, the standard sets forth -- my

3    understanding of the standards set forth

4    requirements.  It doesn't outline how

5    manufacturers should design a product, but rather

6    it sets out some performance standards that the

7    products need to meet based on whatever -- what

8    features or what characteristics a product might

9    have.

10   Q.      What performance standards do you

11   understand the '96 standard set for addressing the

12   strangulation hazard from vertical blinds?

13                   MR. WILLIAMS:  Objection.  I think

14          it's vague because it encompasses a whole

15          lot of things.  You don't want him reading

16          from the report and I don't want him to

17          paraphrase and inadvertently miss

18          something.

19                   Go ahead if you're comfortable with

20           the question.

21                   THE WITNESS:  Phrased as broadly as

22          that, I -- again, my understanding is that

23          based on specific characteristics for a

24          given product, you want to apply the

25          standard to make sure that one's product

1                    meets the standard.  But without speaking

2                    of a specific design or product I don't

3                    want to have to guess as to something that

4                    would encompass all vertical blinds.

5     BY MR. JAUREGUI:

6     Q.        All right.  I understand that.  Now, the

7     blind at issue here is a vertical blind; is that

8     correct?

9     A.        Yes.  That's my understanding.

10    Q.        And one of the opinions or the opinions

11    that you're offering in this case you are opining

12    that Hunter Douglas responded appropriately back

13    in 1995 at the time when this window blind was

14    manufactured in addressing the strangulation

15    hazard from vertical blinds; is that correct?

16    A.        You know, I'm probably more comfortable

17    with the opinions as I expressed them in my

18    report.  I don't know if I can completely endorse

19    your paraphrase of my -- my report.

20    Q.        All right.  We'll get to your opinions in

21    a second, doctor.  All right.  What's the next set

22    of documents you have in front of you, doctor?

23    A.        I have -- this is another short article

24    written by Rauschschwalbe, same spelling as the

25    last, written in 1997.

1    Q.       What's the subject of that article?

2    A.       Window Covering Pull Cords.

3    Q.       All right.  Does the article address the

4    pull cord from a specific product?

5    A.       No.  Generally, the window coverings in

6    general.

7    Q.       And what does the -- strike that.  Are

8    there any conclusions reached in that article.

9    A.       There are conclusions and there is

10   information as to what can be done to -- by

11   consumers to remove this hazard.

12   Q.       And did you rely on this article for your

13   opinions?

14   A.       Again, I referenced it in the report.

15   Q.       And when you say you referenced it, does

16   that mean you relied on it or not?

17   A.       I utilized the information that was in it

18   to support my opinions.

19   Q.       And Miss Rauschschwalbe, is she an

20   employee of the Consumer Product Safety

21   Commission?

22   A.       That's my understanding.

23   Q.       Do you know what her position was at the

24   time with the Commission?

25   A.       No.  I know she was -- at the time of this

 1   she's listed as being part of the Office Of

 2   Compliance, but I don't know her position.

 3                  MR. JAUREGUI:  Let's go ahead and

 4          mark that as Exhibit No. 16, the

 5          Rauschschwalbe '97 article.

 6                              -----

 7                  (Rauschschwalbe 1997 article marked

 8          Exhibit No. 16.)

 9                              -----

10   BY MR. JAUREGUI:

11   Q.     What's the next document you have in your

12   report -- I mean, in your materials, rather?

13   A.     The next article is a research paper by

14   Belch & Willis.

15                  MR. JAUREGUI:  We're going to mark

16          the research paper by Belch & Willis as

17          Exhibit No. 17.

18                              -----

19                  (2001 Research paper by Belch &

20          Willis marked Exhibit No. 17.)

21                              -----

22   BY MR. JAUREGUI:

23   Q.     When was that study published?

24   A.     2001.

25   Q.     What was the subject of the study?

1  A.      Generally, purchasing decisions and how

2  consumers make purchasing decisions.

3  Q.      Does the article speak of any particular

4  products or just generally purchasing decisions?

5  A.      Much of the research I referenced in this

6  is very general to purchasing decisions and what

7  sorts of information that consumers consider and

8  rely on.

9  Q.      Any of the purchasing decisions or any --

10  strike that.  Any of the purchasing literature

11  that you reviewed and relied upon for your report,

12  does that relate in any way directly to the issue

13  of purchasing the window coverings?

14  A.      It was not meant to reference to this

15  specific incident.

16  Q.      What is the relevance of the Belch &

17  Willis article to the opinions you're offering in

18  this case?

19  A.      Just to have a scientific understanding of

20  how and what sorts of information people may

21  consider when deciding to buy a given product.

22  Q.      To your understanding have there ever been

23  any studies that have been done of people that

24  purchase window coverings and what goes into their

25  decision-making in terms of choosing the options

1   of their market?

2   A.      I'm not -- I'm not aware and I don't have

3   in my possession any scientific articles of that

4   sort.

5   Q.      Do you consider the work reliable from

6   Belch & Willis?

7   A.      Certainly I have incorporated some of the

8   information here to my opinions.

9   Q.      Have you used their information in other

10  cases where you have been retained as an expert?

11  A.      For a similar purpose, yes.

12  Q.      Do any of the authors have any association

13  with Exponent Failure Analysis?

14  A.      Not to my knowledge.

15              MR. JAUREGUI:  I need more exhibit

16      stickers.

17  BY MR. JAUREGUI:

18  Q.      All right.  We're moving along doctor.

19  What is the next set of records that you have in

20  your materials?

21  A.      Article by Hoyer.

22              MR. JAUREGUI:  We're going to mark

23      the Hoyer article as Exhibit No. 18.

24                  -----

25              (1984 Hoyer article marked Exhibit

1       No. 18.)

2    BY MR. JAUREGUI:

3    Q.      What is the subject matter of that

4    article?

5    A.      Same vein as Exhibit No. 17.

6    Q.      Which is dealing with --

7    A.      Consumer -- consumer purchasing decisions.

8    Q.      And is it your understanding that in

9    1984 the thinking of consumers in choosing what

10   type of products to purchase was the same as in

11   1995?

12   A.      I believe for the purpose of that I've

13   relied on or I've utilized this in my report that

14   the general findings and data that are in this

15   paper as well as the other consumer purchasing

16   holds.

17   Q.      Just can you cite some examples?  I want

18   to make sure that I understand.  What type of

19   consumer purchasing decisions are you talking

20   about here?

21   A.      Sure.  What I use these articles for in my

22   report is to support the statement that one's

23   decision as to which product to purchase for an

24   intended use is often based on a number of factors

25   and can include, among other things, aesthetics,

37

1    quality, brand, price, functionality and safety.

2    So these documents were support for those being

3    contributing factors to a purchaser's decision to

4    purchase a product.

5    Q.      Do you know if any of the items that were

6    addressed in the Hoyer '84 article or the research

7    paper by Belch & Willis dealt with any products

8    which were considered to be unreasonably dangerous

9    to children?

10   A.      I don't believe that they were -- that

11   that would be how the products they considered

12   would be characterized.

13   Q.      So they did not deal with articles or

14   products that would be considered unreasonably

15   dangerous to children?

16   A.      I don't believe so.

17   Q.      What's the next set of documents that you

18   have?

19   A.      Article by Sproles & Kendrall, 1986.

20              MR. JAUREGUI:  We're going to mark

21        the Sproles & Kendrall '86 article as

22        Exhibit No. 19.

23                         -----

24              (1986 Sproles & Kendrall article

25        marked Exhibit No. 19.)

1                          -----

2    BY MR. JAUREGUI:

3    Q.      What's the subject matter of that article?

4    A.       The same as the previous two documents.

5    And, again, toward the same purpose as the other

6    two and the sentence that I've read from the

7    report.

8    Q.      Do you consider the '86 article, again, to

9    be relevant and contemporaneous to the decisions

10   that a consumer would have made in 1995 when

11   purchasing a vertical blind?

12                    MR. WILLIAMS:  Objection.  Vague,

13           compound.  Relevant.  Contemporaneous.

14                    Go ahead.

15                    THE WITNESS:  I believe that the

16           article supports the statement as I made

17           in the report and how it relates to my

18           statements about this in the report.

19   BY MR. JAUREGUI:

20   Q.      Do you know that article dealt with any

21   products that were either regulated by the

22   Consumer Product Safety Commission or were

23   otherwise considered to be unreasonably dangerous

24   to children?

25   A.       I don't believe that that would have been

1    the case.

2    Q.        What's the next set of documents you have

3    in your report?

4    A.        Tse, that is T-S-E, 1998.

5    Q.        And what is that?  Is that an article or a

6    publication?

7    A.        The same.  Publication article.  And,

8    again, it is dealing with the topics that I've

9    covered for the previous three and is included in

10   my report along with the statement that I read

11   into the record.

12                   MR. JAUREGUI:  We are going to mark

13        the Tse article '98 as Exhibit 20.

14                        -----

15                   (1998 Tse article marked Exhibit

16        No. 20 for identification.)

17                        -----

18   BY MR. JAUREGUI:

19   Q.        Same question as I asked for the other

20   publications.  Do you know whether or not the '88

21   publication dealt with the consumer choices

22   related to the purchase of window blinds?

23   A.        Can you repeat that question for me.

24   Q.        Yes.  The previous publication that we

25   reviewed you told me that this publication looked

1    at the type of thinking that consumers --

2    A.        Yes.

3    Q.        -- engaged in when choosing a product.  My

4    question related to this article, for the '98

5    article.  Do you know whether that article dealt

6    with any window covering products?

7    A.        I don't believe it was specific to window

8    coverings.

9    Q.        Do you know whether or not that article

10   dealt with products that were considered to be

11   unreasonably dangerous against children?

12   A.        I don't believe that to be the case.

13   Q.        And did you rely on that article for -- to

14   support the opinion that you have in your report

15   stating consumer choices when it comes to safety,

16   aesthetics, price and other issues?

17   A.        That these are -- that these are -- that

18   consumers based their decision to purchase a

19   product for an intended use based on factors

20   including those.  Yes.

21   Q.        Are any of those studies that we reviewed,

22   the last four studies or articles, are they based

23   on any type of empirical data?

24   A.        Yes.  Some of them are.

25   Q.        Some of them are?  Which ones?

1   A.       I believe that the Belch article collected

2   data and analyzed data.  As to the Hoyer as well

3   as the Sproles and I believe that the Tse was a

4   review article of other articles.

5   Q.       Do you know if any -- if the premise of

6   this publication has being discredited in any way,

7   shape or form?

8   A.       I do not.

9   Q.       What's the next set of records you have in

10  your materials?

11  A.       Ziamou & Ratneshwar, 2003.

12               MR. JAUREGUI:  We're going to mark

13          as Ziamou & Ratneshwar, all three articles

14          as Exhibit No. 21.

15                         -----

16               (Three articles by Ziamou &

17          Ratneshwar, 2003, marked collectively

18          Exhibit No. 21.)

19                         -----

20  BY MR. JAUREGUI:

21  Q.       What is the subject matter of that

22  article?

23  A.       Same as the last and the last of the

24  articles I cited with reference to consumer

25  purchasing issues.

1    Q.      Do any of the -- strike that.  Do any of

2    the others have any affiliation with Exponent?

3    A.      Not to my knowledge.

4    Q.      Do you know whether or not the work is

5    considered authoritative in the field of consumer

6    purchasing decisions?

7    A.      Well, it's a peer review published

8    article.  So I think that the scientific community

9    would consider that is of a value to be considered

10   as data.

11   Q.      Have you ever offered these type of

12   opinions on consumer purchasing decisions in other

13   cases that you've testified at trial?

14   A.      I've talked about that in these -- in

15   cases, yes.

16   Q.      And have those opinions been admitted by

17   the court or have been limited in any way or form?

18   A.      Can you break that into two separate

19   questions?

20   Q.      Yeah.  Have these -- have your decisions

21   on consumer purchasing decisions been introduced

22   in a court of law as evidence of consumer

23   purchasing decisions?

24   A.      I don't believe so.

25   Q.      Have they been excluded by a court?

1    A.       No, they haven't.

2    Q.       Have you ever attempted to introduce these

3    opinions in a court of law?

4    A.       As expressed in a report --

5    Q.       Yes.

6    A.       -- yes.  At deposition or trial they have

7    not come up.

8    Q.       But they have not been accepted or

9    admitted into evidence by a court of law; is that

10   correct?

11   A.       Not to my knowledge.  I don't know where

12   all the cases --

13   Q.       Do you know what kinds of cases or the

14   names of the cases where you have attempted to

15   offer opinions on consumer purchasing decisions in

16   the past?

17              MR. WILLIAMS:  Well, objection.

18         Vague.  You say attempted to offer

19         opinions.  He just told you he's included

20         opinions of this nature in reports before.

21         As I understand it, in none of those cases

22         has the case progressed far enough to

23         either deposition or trial.  So I think

24         the characterization attempting to offer

25         something suggests that it was rejected or

1          excluded.  So I don't know that's fair.

2          So the question I believe is vague as

3          phrased.

4    BY MR. JAUREGUI:

5    Q.      Let's clear that up, doctor.  Have you

6    offered any opinions at trial dealing with

7    consumer purchasing decisions?

8    A.      Related to purchasing decisions?

9    Q.      Yes.

10   A.      Not directly.

11   Q.      Not directly --

12   A.      Related to purchasing decisions.  Yes.

13   Q.      I'm sorry.  I didn't get your answer.

14   A.      I have offered opinions that would be

15   related to purchasing decisions.

16   Q.      Okay.  In what cases?  You're looking at

17   Exhibit 3?

18   A.      I'm looking at Exhibit 3.

19   Q.      That's your list of cases?

20   A.      My list of cases.

21   Q.      All right.

22   A.      The first trial case there, Izikoff versus

23   Nissan North America.

24   Q.      All right.  That's January 2010?

25   A.      Yes.  That dealt -- that case dealt with a

1   consumer's purchase and use of a vehicle and an

2   injury that allegedly happened during his

3   interaction with that product, and I held opinions

4   as to whether or not additional information or

5   safety information provided about functionality

6   would have either averted or altered the

7   gentleman's behavior, which I believe also

8   encompassed the purchase of that vehicle.

9   Q.      Did you testify at trial?

10  A.      I did.

11  Q.      Do you know whether your testimony and the

12  consumer choice of purchasing the vehicle was

13  admitted into evidence?

14  A.      Again, you're referencing it as a separate

15  opinion as to the purchase.  I think that the

16  opinion about his purchase of that vehicle was

17  part of the -- my full opinion and none of my

18  opinions in that case were excluded.

19  Q.      What was the outcome of that case?

20  A.      I believe going off my memory that there

21  was a defense verdict in that case.

22  Q.      Can you narrow down the issues for me?

23  What was the issue there with respect to the

24  choice of the consumer in choosing -- was it a

25  consumer's choice in choosing that particular

1  vehicle?

2  A.     To get more specific, I'd really need to

3  review the issues as hand.  It's been a while

4  since I've reviewed this case.  My memory was that

5  this issue was relevant to this case, but to

6  address it anymore specifically, I'd really have

7  to review some materials and I don't have them and

8  I'm not prepared to do so.

9  Q.     I understand that, and I don't mean to

10  push because it's not a memory test in this issue.

11  But I just want an understanding as to whether or

12  not the issue in that case was the vehicle that

13  the consumer chose to purchase versus some

14  particular type of tires or a specific feature of

15  the vehicle.

16  A.     I believe that in this sense it would be

17  an issue of a feature as it related to the

18  purchase of the vehicle.

19  Q.     All right.

20  A.     And, again, this is -- I'm trying to

21  remember how exactly this -- this case was back a

22  number of years.

23  Q.     That's fair.  And the type of analysis

24  that you did in that case do you feel is similar

25  to the type of analysis that you've done in this

1    case?

2    A.       I believe that there are similarities

3    between these -- these issues, or some of the

4    issues that I've dealt with in these two cases.

5    Q.       All right.  Did any of the issues in that

6    component, if there was a component of the

7    vehicle, did that involve a strangulation hazard?

8    A.       No.

9    Q.       Is there any comparison in terms of the

10   product that you're dealing with, a motor vehicle,

11   versus a vertical blind with loop cords that is

12   found in the bedroom of a young boy?

13   A.       I don't think the two products would be

14   similar in that respect.

15   Q.       Dr. Sala, to your understanding do you

16   know -- strike that.  As of today do you know how

17   many children have died as a result of window

18   covering strangulations?

19                  MR. WILLIAMS:  Objection.  Vague.

20                  Go ahead.

21                  THE WITNESS:  I don't have a number

22          off the top of my head.

23   BY MR. JAUREGUI:

24   Q.       Do you know if it's more like 300?

25   A.       I do not know.

1  Q.      You reviewed the Jama article of 1997, did

2  you not, in referencing your opinions?

3  A.      Yes.

4  Q.      Okay.  And in that article it indicates as

5  of 1995 there were close to -- strike that --

6  there were over 300 deaths already?

7              MR. WILLIAMS:  Do you want him to

8          review the article?

9  BY MR. JAUREGUI:

10 Q.      You can go ahead.

11 A.      The article reports a summation of

12 unreported and of about 176, and reported, N

13 equals 183 cases, indicates that 359 window cord

14 strangulations may have occurred during the time

15 period of interest.

16 Q.      And what was the time period?

17 A.      Their time period is listed as 1981

18 through 1995.

19 Q.      All right.  So let's just say we're

20 dealing with 359 deaths, just for the sake of this

21 question.  Do you know whether anyone has ever

22 gone back and attempted to interview the parents

23 of the victims to try to determine what went into

24 their thinking in terms of making the decisions in

25 purchasing the type of window covers that they

49

1   chose?

2   A.     I know of no -- I don't know of any

3   attempt to do so.

4   Q.     Wouldn't that be a more relevant

5   comparison in this case if you're going to use

6   consumer choices and what rights consumer choices

7   to go back after or have a sample of 359 deaths to

8   see what went into the thinking of those people?

9   Wouldn't that be a more relevant comparison than

10   to compare consumer choices that have nothing to

11   do with window coverings?

12   A.     I think you're -- you're -- you're

13   misunderstanding how I am attempting to use this

14   information.  I'm not specifically stating that

15   these articles tell us how consumers choose window

16   coverings, rather than I was using these articles

17   as a way to help understand that choices, consumer

18   choices, to make -- choices that consumers make in

19   purchasing a variety of products will incorporate

20   things such as the factors that I referenced in

21   here.

22         I'm not disputing that a study

23   specifically designed to address how and what

24   people consider in purchasing window blinds

25   specifically couldn't give us more information,

1  but this was general information and knowledge

2  about what sorts of information people consider in

3  general when purchasing consumer products.

4  Q.      All right.  So you're not disputing that a

5  study limited to what went into the thinking when

6  a parent or a consumer orders a particular window

7  covering would be more relevant when determining

8  what goes into the thinking of parents or

9  consumers when they choose window coverings?

10  A.      Without knowing the outcome of that study

11  I can't answer more relevant, but I think that

12  would provide additional information.  But I know

13  of no such study.

14              MR. JAUREGUI:  Just go off the

15          record.

16                      -----

17              (Off the record at 10:32 a.m.)

18                      -----

19              (On the record at 10:32 a.m.)

20                      -----

21  BY MR. JAUREGUI:

22  Q.      What's the next document that you have in

23  your materials?

24  A.      Did we stop at Exhibit No. 21?

25  Q.      Yes.  We're up to Exhibit 22, whatever

1    that's next.

2    A.      The next article is Peebles & Norris,

3    1998.

4                  MR. JAUREGUI:  We're going to go

5          ahead and mark the Peebles & Norris '88

6          article as Exhibit 22.

7                        -----

8                  (1998 Peebles & Norris article

9          marked Exhibit No. 22.)

10                       -----

11   BY MR. JAUREGUI:

12   Q.      What's the subject matter of that article?

13   A.      Strength Capabilities Of Humans.

14   Q.      Did that study rely on any empirical data?

15   A.      Yes.

16   Q.      What typed of data?

17   A.      Strength data.

18   Q.      Can you be more specific?

19   A.      Including pushing, rip strength, pinch

20   strength, twisting strength.  Did I say pull

21   strength?

22   Q.      Pull?

23   A.      Pull.

24   Q.      All right.  What was the population that

25   that study was conducted about?

1    A.        Ages 2 through 90.

2    Q.        What were the conclusions of that study,

3    if any?

4    A.        The conclusions were really the data

5    itself and the breakdown of the data that can be

6    considered.

7    Q.        Do you know -- strike that.  Do you know

8    if that article was peer reviewed?

9    A.        I believe it was.

10   Q.        So that article is now 22 years old,

11   roughly?  Let me withdraw that question.  Do you

12   know what was the period of time that they looked

13   at the data for?

14   A.        I don't think it was -- I think it was an

15   experiment that was run I don't think over a --

16   for a long period of time.  I think it was a more

17   punctate --

18   Q.        A more what?  I'm sorry.

19   A.        More punctate.

20   Q.        What do you mean by more punctate?

21   A.        I don't think it was meant to span a

22   particular period of time, rather, I think the

23   experiment run in a single --

24   Q.        Single run, one --

25   A.        A single time frame.  I'm not sure what

1    the time frame of when it was collected was.

2    Q.       Do you know what were the items that were

3    used to test strength of the population of 2 to 90

4    years old?

5    A.       There were a variety of instruments.

6    Q.       Such as?

7    A.       Such as -- can't find the specific

8    manufacturer or listing of the device, but it's

9    referenced as a force plate and variety of

10   attachments to allow for interaction, whether they

11   be pushed, pulled or some other manner of force.

12   Q.       Did you say a forced plate?

13   A.       Force.

14   Q.       F-O-R --

15   A.       F-O-R-C-E.

16   Q.       Plate, P-L-A-T-E?

17   A.       A device that measures how much force is

18   applied to it.

19   Q.       Do you know what this study's objective

20   was?

21              MR. WILLIAMS:  What's this study's

22        objective was?

23   BY MR. JAUREGUI:

24   Q.       Objective was.  Yes.

25   A.       To collect data as to how much force could

1    be applied.

2    Q.        Do you know who commissioned the study?

3              MR. WILLIAMS:  If anyone.

4              THE WITNESS:  I know that the

5         authors were part of the Product Safety

6         And Testing Group, School Of Mechanical

7         Materials Manufacturing, Engineering and

8         Management, the University of Nottingham,

9         University Park, Nottingham, U.K.  I don't

10        know the funding source.

11   BY MR. JAUREGUI:

12   Q.        This U.K., that's in the United Kingdom?

13   A.        Yes.

14   Q.        Do you know if anyone in the United States

15   used this article to make comparisons to the

16   ability of someone to operate a window covering

17   blind?

18   A.        As I sit here I don't know anyone that's

19   made that specific comparison.

20   Q.        Have you ever yourself used this article

21   in your opinions in other cases to show what the

22   amount of force may be needed to operate a given

23   product?

24   A.        This is a source document that I often

25   considered.

1    Q.      What other cases have you used this kind

2    of information?

3    A.      Well, I've -- it's --

4                  MR. WILLIAMS:  Just I'll object.

5           Disclose any cases where you're doing

6           consulting work that is not of a public

7           nature.

8                  THE WITNESS:  I don't have a

9           complete list of all the -- all of my

10          cases in front of me, but this would be

11          something that as a human factor scientist

12          I often refer to to look to, and this

13          would be one of the documents that I used,

14          to look to the strength capabilities of

15          humans of different ages.

16   BY MR. JAUREGUI:

17   A.      In your mind, as a human factors expert,

18   what are the similarities between a force plate in

19   a  vertical blind with pull cords?

20                 MR. WILLIAMS:  Objection.  Vague.

21                 THE WITNESS:  This, as I utilize

22          and I provide this, is information, what I

23          take from this is the general trends over

24          ages.  And what this data generally shows

25          is that across a wide variety of force

1        applications, the ability to apply force

2        decreases as one ages.

3   BY MR. JAUREGUI:

4   Q.      So the ability to apply force decreases as

5   someone ages?

6   A.      Yes.

7   Q.      That's common sense, isn't it?

8   A.      I think that the degree to which it does

9   and the age of the profile of such is an area

10  where data can be collected and analyzed and used

11  to form decisions.

12  Q.      All right.  You've seen pictures of the

13  vertical blind at issue in this case, have you

14  not?

15  A.      Yes.

16  Q.      Do you know what is the amount of force

17  that is necessary to operate the window -- a

18  vertical window blind with a pull cord and the --

19  strike that.  Do you know what is the amount of

20  force that it takes to operator a vertical blind

21  with a loop cord and a loop chain such as the one

22  at issue in this case?

23              MR. WILLIAMS:  Objection.  Vague.

24       Compound.

25              Go ahead.

1              THE WITNESS:  I have not measured

2         the pull force that would have been

3         necessary to operate the subject vertical

4         blind.

5   BY MR. JAUREGUI:

6   Q.      Have you seen any data from Hunter Douglas

7   telling you what is the amount of force that is

8   the necessary to operate the vertical blind at

9   issue in this case?

10  A.      I have not seen that data.

11  Q.      Wouldn't that data be relevant to your

12  opinions in this case?

13              MR. WILLIAMS:  Objection.  Vague.

14              THE WITNESS:  I don't believe I

15         needed that data to render the opinions

16         that I've reached in this report.

17  BY MR. JAUREGUI:

18  Q.      All right.  What's the next set of records

19  you have in front of you, doctor?

20  A.      Smith, Norris & Peebles, 2000.

21              MR. JAUREGUI:  That would be

22         Exhibit No. 23, Smith, Norris & Peebles,

23         2000.

24                        -----

25

1              (2000 Smith, Norris & Peebles

2          article marked Exhibit No. 23.)

3                      -----

4    BY MR. JAUREGUI:

5    Q.      Let me go back to the previous Exhibit,

6    Number 22.  Did you rely on the study in Exhibit

7    No. 22 for the amount of force that is used to

8    operate any given product for any of your opinions

9    in this case?

10   A.      It hasn't formed my general knowledge and

11   opinions in this case.

12   Q.      What do you mean by that?  Did you rely on

13   them or not?

14   A.      I incorporated the data and the purpose of

15   the study and the analysis from the study into my

16   analysis of the current design and -- or the

17   design at issue and the issues into this case.

18   Q.      Do you know whether or not there is any

19   difference in the amount of force that it takes to

20   operate the gadget that they tested in the article

21   that you mentioned earlier versus the amount of

22   force that it takes to operate the vertical blind

23   at issue in this case?

24                 MR. WILLIAMS:  Objection.  Vague.

25                 Go ahead if you understand.  I

1          don't understand.

2                    THE WITNESS:  Can -- can you

3          repeat?

4     BY MR. JAUREGUI:

5     Q.       The 1988 article by Peebles & Norris, that

6     was published in the U.K.; correct?

7     A.       Well, it was published.

8     Q.       Okay.  And it dealt with the strength

9     capabilities of individuals, in this case a study

10    that was done in the pull, grip, spun, pinch,

11    twisting of individuals as it related to their

12    ability to operate the gadget that you identified

13    for me as a force plate?

14    A.       The instrument.  Yes.

15    Q.       The instrument.  All right.  Now, my

16    question to you, then, given that, do you know

17    whether there are any differences in the amount of

18    force that it takes to operate the instrument in

19    the '88 article versus the amount of force that is

20    needed to operate the vertical blind at issue in

21    this case?

22    A.       I'm sorry.  I'm having trouble following,

23    because you say the amount of force to operate the

24    instrument.  The instrument is a measuring device,

25    so it measures how much force one applies.

1    Q.      I understand that.  And my understanding

2    is that it must have taken a certain amount of

3    force to operate the instrument that was used in

4    the '88 study; correct?

5    A.      No.  That's not my understanding.

6    Q.      All right.  So what is your understanding

7    of this device?

8    A.      This is a device, the instrument was a

9    device to measure how much force is applied to it.

10   There's -- there's no requirement of force to

11   operate it.  It's simply a measuring device.

12   Q.      All right.  Fair enough.  How is that,

13   again, that study relevant to the amount of force

14   that is used or necessary to operate a vertical

15   blind such as the one at issue in this case?

16   A.      I think that what this article is evidence

17   of is that as we age, as we go through certain

18   periods of our life, we lose strength or the

19   ability to apply forces in certain interactions or

20   certain manners of application of force, and that

21   there is a pattern that they've identified that

22   shows this decline in force and application of

23   force.

24   Q.      All right.  Is the implication of your

25   opinions in this case that for a 90 year old

1    person it is easier to operate a vertical blind

2    with loop cords and loop chains rather than, you

3    know, a wand that has no cords for its operation?

4    A.        There are a number of reasons why I

5    would -- I would think that the majority of 90

6    year olds would have easier accessibility -- more

7    accessibility to the loop chain or loop cord than

8    to the wand.  That's what I've expressed in this

9    report.

10   Q.        Tell me some of those reasons.

11   A.        Again, as expressed in this article and in

12   my report, one of the reasons would be the loss of

13   strength and mobility and reach to perform the

14   necessary actions to operate the wand mechanism

15   versus the chain mechanism.

16   Q.        Tell me specifically how is it different,

17   how do you envision that being different to

18   operating a vertical blind that has a loop cord

19   and a loop chain versus operating a vertical blind

20   with a wand?

21   A.        What I -- going to my report, and I'd be

22   happy to go into here as well, is that the two

23   mechanisms require very different interactions.

24   In the instance of the loop chain and cord,

25   there's a single point of access through which one

1    needs to approach a single point, reach and pull

2    down or up on the -- one of the cords in order to

3    either adjust the tilt or angle of the shades or

4    to draw back or close the vertical shades

5    themselves.

6            The wand mechanism requires a wholly

7    different set of interactions in which the user

8    would have to approach the wand, reach for the

9    wand, and then either perform a pushing motion or

10   a pulling motion in order to draw the wand and

11   move with that product through the entire range of

12   the opening or the desired opening and closing in

13   order to draw the blinds.  And then, in order to

14   adjust the tilt, my understanding is they would

15   need to perform a twisting action with their

16   finger, some fine motor control in order to adjust

17   the tilt of the vanes.

18   Q.      Are these your opinions?  Are these are

19   your personal opinions?

20   A.      That's my understanding of how the design

21   is described and the operation of these

22   mechanisms.

23   Q.      What empirical data do you have to base

24   your opinion that it's easier for a 90 year old

25   person, to use that example in this case, to

1    operate a vertical blind with the loop cord and

2    loop chain versus operating a vertical blind with

3    a wand?

4    A.      The documents that I've cited in my report

5    when I've discussed this that detail out some of

6    the known limitations and capabilities of aging

7    populations as well as disabled populations.  The

8    research that's been done -- excuse me -- that's

9    been done on accessibility to these -- these --

10   these groups, and my background, training and

11   education in areas of human factors.

12   Q.      Are you referring to some of the articles

13   that we both reviewed or are there more

14   articles --

15   A.      There are more articles.

16   Q.      Well, we'll get to those, and I'll ask you

17   that question again.

18          Did you know of any data from Hunter

19   Douglas indicating that it is easier to operate a

20   vertical blind with loop cord and a loop chain

21   than it is to operate a vertical blind fitted with

22   a wand?

23   A.      I have not received any such data from

24   Hunter Douglas.

25   Q.      Did you ask them for my such data?

1    A.       I had general requests for information

2    from Hunter Douglas.  That sort of data, I think,

3    would have been within the type that we've

4    discussed, and I have not seen that data.

5    Q.       Do you know if they have that data and

6    they simply didn't give it to you or they do not

7    have that data?

8    A.       I'm not sure what -- what or where data is

9    within Hunter Douglas.  I don't have that

10   knowledge.

11   Q.       Is there any other type of data that you

12   requested from Hunter Douglas that was not

13   provided to you?

14   A.       I -- again, I don't think that this can be

15   characterized as data that I -- that I requested

16   that's not been provided to me.  I think that I've

17   had discussions as to what data I would be basing

18   my analysis on.  And if this data was available

19   and it was provided, I would have considered it,

20   but I didn't see that data.  I don't know what

21   data they do or do not have.

22   Q.       What type of data did you have in mind?

23   A.       The data that we've been discussing as to

24   the populations of -- of users.

25   Q.       So none of that data was provided to you?

1   A.        I did not receive any of that data.  Like

2   I said, there -- there -- the -- the -- I don't

3   think that that is appropriate to phrase it that I

4   have requested it and it has not been provided,

5   rather, I have not been in receipt of this data if

6   it should exist.

7   Q.        And if it exits, that would be more

8   relevant to your analysis, would it not?

9                    MR. WILLIAMS:  Objection.  Vague.

10         More irrelevant than what?

11  BY MR. JAUREGUI:

12  Q.        From the data that you're relying upon

13  which has nothing to do with window blinds such as

14  the 1988 study conducted in the United Kingdom.

15  A.        No.  I don't think that it necessarily

16  would be more relevant.  I think that these issues

17  that human factor scientists look into are related

18  to human capabilities and limitations, and they're

19  very well documented in the literature and

20  available for application to a wide range of

21  discussions.

22  Q.        Are you aware now that there are many

23  studies in the United States indicating that

24  elderly people are a lot more active and remain

25  more active into their later years than they used

1     to some years ago?

2     A.      I would have to have some more detail as

3     to those -- those sorts of articles, but that

4     could be your representation of them.

5     Q.      Do you know whether any of the data that

6     you have in mind or any -- strike that.  Do you

7     know whether any of the information that you have

8     in mind about the inability of elderly people to

9     operate a vertical blind with a wand, do you know

10    if any studies have been done, for example, in

11    nursing homes?

12    A.      If you're asking me specifically about the

13    data that I've -- I've looked at and considered or

14    cited in my report, I don't believe anything

15    specifically was designed to address nursing homes

16    specifically.

17    Q.      Wouldn't you find data specifically

18    relevant in terms of the ability of the elderly

19    population to operate certain products?

20                    MR. WILLIAMS:  I'm sorry.  Can I

21            have that --

22                    MR. JAUREGUI:  Let me withdraw that

23            question.

24                    MR. WILLIAMS:  Let's take a break

25            after this question.

1              MR. JAUREGUI:  No.  This is a good

2         time to take a break, because we're going

3         to go into the next Exhibit.

4              MR. WILLIAMS:  Let's take a break

5      before the next question.

6              Ten minutes, Mike.

7                        -----

8              (Off the record at 10:57 a.m.)

9                        -----

10             (On the record at 11:04 a.m.)

11                       -----

12             MR. JAUREGUI:  All right.  I think

13     we're up to Exhibit No. 24.

14             Mike, are you there?

15             MR. WEISS:  I'm here.

16             MR. JAUREGUI:  All right, Mike.

17     We're back on the record.

18  BY MR. JAUREGUI:

19  Q.    Can you please tell me the next set of

20  records that you have in your materials.

21  A.    The next is a publication by Story, et al.

22  Q.    What's the date of that publication?

23  A.    1998.

24             MR. JAUREGUI:  We're going to mark

25         the Story, et al publication as Exhibit

```
1              No. 24.

2                              -----

3                      (Publication by Story, et al marked

4              Exhibit No. 24.)

5                              -----

6    BY MR. JAUREGUI:

7    Q.      What's the subject matter of that

8    publication?

9    A.      Universal design.

10   Q.      Can you tell me more?

11   A.      Sure.  Universal design is generally

12   principles behind designing accessible products

13   for a range of ages and abilities.

14   Q.      Any of the authors of the articles that we

15   have reviewed thus far, do any of these authors

16   have any relationship or affiliation with Exponent

17   Failure Analysis?

18   A.      Not to my knowledge.

19   Q.      All right.  So what's the general tenet of

20   that publication?

21   A.      Again, this is information about

22   considering abilities, ranges of abilities,

23   limitations and ages when designing products and

24   is really the basis for the opinions I reach as to

25   how different designs may be more or less
```

1   appropriate for different groupings based on

2   ranges of abilities and capabilities and

3   limitations.

4   Q.      Do you know the publication that deals

5   specifically with any particular type of consumer

6   products?

7   A.      It's a range of products.

8   Q.      What is the range?

9   A.      Very, very wide range.  They deal with

10  principles and design and focus more on the

11  abilities and limitations of people, and then give

12  examples of how some of these are incorporated

13  into certain designs of products.

14  Q.      Do you know whether window coverings is

15  one of the products that is incorporated into the

16  discussion of that article?

17  A.      I do not believe it is.

18  Q.      Do you know if any of the products

19  discussed in that publication are products that

20  are considered to be unreasonably dangerous to

21  young children?

22  A.      I don't believe they are.

23  Q.      Of what relevance, if any, is the Story,

24  et al '88 publication at all to your opinions in

25  this case?

1    A.       Again --

2                    MR. WILLIAMS:  '88 or '98?

3                    THE WITNESS:  It's '98.

4    BY MR. JAUREGUI:

5    Q.       '98.  With that correction.

6    A.       Again, this serves as part of the basis

7    for my opinions about the different design options

8    and the different degrees of accessibility the

9    design options may have for ranges in the

10   population.

11   Q.       Are you then saying that, again, a

12   vertical blind designed with a loop cord and loop

13   chain is accessible to a wider range of population

14   than the same vertical blind this time with a

15   wand?

16   A.       What I'm saying is that the one design may

17   have greater accessibility to certain ages or

18   ranges of population based on the analysis that I

19   performed in these articles and my analysis as

20   presented in the report.

21   Q.       And in this instance which design is more

22   accessible to a wider range of population?

23   Vertical blinds with the loop and -- cord and loop

24   chain or the vertical blind with the wand?

25   A.       I haven't attempted to quantify which

1    one would be more or to a wider range.  Rather,

2    I think that in my report I've identified

3    certain limitations that would prove difficult

4    for certain populations to operate a wand but

5    would have greater accessible to something like a

6    chain.

7                    MR. JAUREGUI:  Can you read me back

8            the answer, please.

9                    -----

10                   (The court reporter read back the

11           last answer.)

12                   -----

13   BY MR. JAUREGUI:

14   Q.    So which blind has more limitations to the

15   larger population.  One with the wand, a vertical

16   blind with a wind or a vertical blind with a loop

17   chain and cord?

18                   MR. WILLIAMS:  Objection.  It's

19           vague.

20                   Go ahead if you can.

21                   THE WITNESS:  Again, I -- I don't

22           think I've offered an analysis or opinions

23           to try and compare between the two, the

24           merit or the range of populations, try to

25           compare between them.  What my report and

1           the opinions expressed therein are aimed

2           at is the fact that the differences in the

3           design makes them different as to the

4           accessibility certain populations may have

5           to them.

6                Like I said previously, I haven't

7           tried to quantify which one would be more

8           or less accessible to a wider range of

9           which I'm understanding your question to

10          be, but rather, that certain limitations

11          would pose difficulties for a design

12          whereas the alternative design would be

13          more accessible to this range of

14          population.

15  BY MR. JAUREGUI:

16  Q.     I understand your answer.  What I'm trying

17  to understand is, in your mind which design poses

18  more limitations and difficulties to a population

19  than the other?

20              MR. WILLIAMS:  Same objection.

21              THE WITNESS:  Again, I don't

22          believe that I can answer that in the very

23          general and broad sense that you've asked

24          the question.

25  BY MR. JAUREGUI:

1    Q.      So how would you answer that?

2    A.       If we were to talk about a specific

3    population, for example, if we were to say a

4    population of someone that was seated in a

5    wheelchair, then I think that based on everything

6    I've seen or I've considered and relied on as a

7    basis and the design, that the chain and loop

8    would be more accessible, more accessible to them

9    than a wand mechanism to control.

10   Q.      What about a 90 year old person that is

11   still mobile and not sitting in a wheelchair?

12   Which model would be more accessible to a 90 year

13   old person?

14   A.       Based -- I think that based on what,

15   again, on the articles that I have provided as

16   references, basis of my opinions and my

17   educational experience and training, that in

18   general I would be expect the loop and pull cord

19   to have greater accessibility than a wand.

20   Q.      And, again, none of those articles have

21   dealt specifically with the ability of the elderly

22   population to operator window covering blinds; is

23   that correct?

24   A.       Their general abilities, capabilities,

25   limitations and performance that we know of due to

1    aging.

2    Q.        What is the next document in your

3    materials?

4    A.        The next article is an article by Perry,

5    2010.

6                      MR. JAUREGUI:  Perry 2010 article

7            would be marked as Exhibit 25.

8                              -----

9                      (Perry 2010 article marked Exhibit

10           No. 25.)

11                             -----

12   BY MR. JAUREGUI:

13   Q.        Can you tell me what is the subject matter

14   of that article?

15   A.        Aging and age-related declines in

16   performance.

17   Q.        Where did that article appear?  In what

18   publication?

19   A.        The article appeared in Professional

20   Safety.

21   Q.        And what is that, Professional Safety?

22   A.        It's a journal.

23   Q.        Do you subscribe to that?

24   A.        I do not subscribe to that journal.

25   Q.        With all of the articles and applications

1   that we have reviewed thus far, did Hunter Douglas

2   or anyone from Hunter Douglas, including your

3   attorney, Mr. Williams, ask you to incorporate any

4   of these materials in that analysis?

5   A.      These were all the materials that I have

6   brought into the case.

7   Q.      So it was your decision to select these

8   materials?

9   A.      This were -- these were materials that I

10  reviewed independently and have -- have provided

11  as basis for my opinions.

12  Q.      What is the general gist of the 2010 Perry

13  article?

14  A.      Again, there are a number of changes that

15  have an identifiable pattern that result in

16  performance, decrements, physical, cognitive, as

17  we age.

18  Q.      Did that article deal with the decrease in

19  physical force, cognitive ability in relation to

20  any particular products?

21  A.      Not to particular products.  It's more

22  general than that.

23  Q.      Do you know if anyone commissioned that

24  article?

25  A.      I don't know the funding source.

1   Q.      What significance, if any, does that

2   article have to your opinions in this case?

3   A.      Again, this is part of the basis of my

4   opinions as to the limitations of populations and

5   how this can be, or this is incorporated into the

6   designs of products and what can be more or less

7   successful under, that is, design changes.

8   Q.      Do you know if that article dealt with the

9   physical or cognitive ability of individuals to

10  operate window covering?

11  A.      I don't believe that that was specifically

12  considered.

13  Q.      What is the next document?

14  A.      The next document is Biren & Schaie.

15              MR. JAUREGUI:  We are going to mark

16          the Biren & Schaie '06 article as Exhibit

17          No. 26.

18                          -----

19              (2006 Biren & Schaie article marked

20          Exhibit No. 26.)

21                          -----

22  BY MR. JAUREGUI:

23  Q.      What is the subject matter of that

24  publication?

25  A.      Again, subject matter is aging and the

1  patterns of performance and limitations associated

2  with aging.

3  Q.      Do you know what was the setting of -- is

4  it a study or article?

5  A.      This is a text.

6  Q.      It comes from -- it's a chapter from a

7  textbook?

8  A.      Yes.

9  Q.      What's the name of the textbook?

10  A.      Handbook Of The Psychology Of Aging.

11  Q.      Do you know whether that particular

12  chapter deals with the issue of the elderly

13  population's ability to operate window coverings?

14  A.      Not specifically window coverings.

15  Q.      What are the products, if any, the article

16  addressed?

17  A.      The article addresses aging complexity and

18  motor performance, and so it is specifically

19  addressing motor performance and changes as we

20  age.

21  Q.      What significance, if any, is that study

22  to your opinions in this case?

23  A.      Again, this is an article that I'm

24  providing as part of the basis for my opinions

25  related to various designs and the accessibility

1    that different designs have to different

2    populations based on limitations and capabilities

3    of humans.

4    Q.       What's the next document that you have in

5    your materials?

6    A.       This is actually -- there are two sets of

7    studies here.  Strength Data For Design Safety.

8    Q.       What's the date of that study?  Tell you

9    what, let's come back to that.  Let's see the

10   other article, since you have two in one.  What's

11   the other article that you have there?

12   A.       One is -- the first one is Phase 1.

13   Q.       Okay.  And the second one?

14   A.       Phase 2.

15   Q.       That makes sense.  Right.  All right.

16   Does it have the same title?

17   A.       Yes.  Strength Data For Design Safety.

18   Q.       What is the date -- let's strike whatever

19   I said before.

20              MR. JAUREGUI:  Let's go ahead and

21          mark as Exhibit No. 27, Phase 1 and Phase

22          2 studies entitled Strength Data For

23          Design Safety.

24                    -----

25              (Phase 1 and Phase 2 of Strength

1          Data For Design Safety marked Exhibit

2          No. 27 for identification.)

3                          -----

4                  THE WITNESS:  Just so I understand,

5          Exhibit 27, Phase 1 and Phase 2, the

6          sticker should go on Phase 2?

7                  MR. JAUREGUI:  On the first one.

8          It encompasses both studies, so you should

9          put it at the beginning.  That would be

10         Group Exhibit 27, encompassing Phase 1 and

11         Phase 2 of that study.

12                 MR. WILLIAMS:  I'm sorry.  Was

13         there was a year for that, a date --

14                 MR. JAUREGUI:  No.  We're getting

15         to that.

16  BY MR. JAUREGUI:

17  Q.      What was the publication for Phase 1

18  first?

19  A.      October 2000.

20  Q.      All right.  That's for Phase 1.  And the

21  publication for Phase 2?

22  A.      June 2002.

23  Q.      All right.  You told me the title of

24  Phase 1 and Phase 2 of that study.  Why don't we

25  take a look at Phase 1 first, Strength Data For

1    Design Safety.  What specifically did that Phase 1

2    address?

3    A.        This, again, is a -- a -- a compendium of

4    strength data for different applications of force

5    across ages.

6    Q.        Do you know whether the strength data for

7    different applications was tested on different

8    products?

9    A.        This was -- I don't believe it was tested

10   on products but on measuring devices.

11   Q.        Do you know what type of measuring

12   devices?

13   A.        In Phase 1 under Equipment, it identifies

14   the different pieces of equipment that was used.

15   Do you want me read them into the record?

16   Q.        Yes.

17   A.        "Finger push strength, pinch-pull strength

18   and wrist twisting strength were measured on a

19   series of specially made handles which were

20   atttached to a Mecmesin Advanced Force Gauge

21   (AFG 500N).  Hand grip strength was measured using

22   a Handgrip Dynamometer (MKIIIa) made by the

23   Medical Physics Department, Queen's Medical

24   Centre, Nottingham, U.K.  Opening strength and

25   push and pull strength were measured with the aid

1  of strain gauges which were atttached to

2  custom-made equipment."

3  Q.      Do you know whether any of the items

4  tested in that study included window coverings?

5  A.      Again, this did not test certain products

6  but, rather, tested the abilities of people to

7  apply forces in a variety of interactions.

8  Q.      What were the age ranges that were tested

9  in that study?

10  A.      Two through ninety.

11  Q.      What conclusions, if any, did that study

12  reach, Phase 1?

13  A.      Again, the conclusions are couched in the

14  form of the results that they provide as to how

15  much force people of varying age groups can apply

16  through a given interaction.

17  Q.      What significance, if any, does this study

18  have on your opinions?

19  A.      Again, this is part of the basis for my

20  opinion that the designs provide different

21  accessibility to different populations based on

22  their capabilities and limitations.

23  Q.      What about Phase 2?  Was it dealing with

24  the same subject matter as Phase 1?

25  A.      Similar subject matter.  Yes.

1    Q.      All right.  What were the conclusions of

2    that study?

3    A.      Very much the same.  They were just

4    different tests.

5    Q.      What was the test that was in Phase 2?

6    A.      Different -- different interactions.  They

7    had some different forms or interactions to

8    measure the ability of people to apply force.

9    Q.      Did Phase 2 of that study include the

10   ability of people to operate window blind

11   coverings?

12   A.      Window coverings were not used in these

13   studies.

14   Q.      What significance, if any, does the

15   Phase 2 Strength Data For Design Safety article

16   have on your opinions in this case?

17   A.      It would be -- my answer would be the same

18   as I provided for Phase 1.

19   Q.      What's the next document you have there?

20   A.      Smith, et al, 1999.

21               MR. JAUREGUI:  We're going to mark

22          that article Exhibit No. 28, Smith et al,

23          '99.

24                              -----

25               (1999 Smith, et al article marked

83

1          Exhibit No. 28. )

2                              -----

3     BY MR. JAUREGUI:

4     Q.        What's the subject matter of that article?

5     A.        Decline in fine motor abilities associated

6     with aging.

7     Q.        What was the context in which that study

8     was conducted?

9     A.        Looking at human aging and how abilities

10    to perform fine motor hand movements decreased.

11    Q.        Is it your testimony here today that in

12    order to operate a vertical blind, it requires

13    some type of fine motor skills whereas the ability

14    to operate a window blind, just a vertical blind

15    with loop pulls and loop chains does not require

16    fine your motor skills?

17    A.        I don't think that is characterization of

18    my testimony.  I think that I'm using this as a

19    basis for, again, the -- my opinion associated

20    with the fact that different designs will be more

21    or less accessible to different populations based

22    on how one is intended to interact with it.

23    Q.        Generally, given the studies that you

24    reviewed, I take it that your opinion would be the

25    older you get -- as you get older, whether the

1    ability to use your fine motor skills decrease.

2    A.        The fine motor abilities decrease as one

3    ages.  And so performing operations or interacting

4    with products that require fine motor skill or

5    fine motor ability would be more difficult than a

6    set of actions that doesn't require fine motor

7    skills.

8    Q.        Keeping that very answer, are the skills

9    you use to operate a window blind covering with

10   loop cords and a loop chain different than the

11   skills to operate a vertical blind or a window

12   covering with a wand different in terms of whether

13   one requires fine motor skills and the other does

14   not?

15   A.        Yes.  I believe that certain aspects of

16   the way one would interact with the wand would

17   differ from how one would interact with the loop

18   cords, and certain interactions with the wand

19   would require greater fine motor skills than with

20   the loop cords.

21   Q.        If you leave, the example that you gave me

22   earlier of someone sitting in a wheelchair, if you

23   take the wheelchair out of the equation, your

24   answer is the same?

25   A.        Yes.  I believe it is.

1    Q.       What was the relevance of the Smith, et al

2    '99 article to your opinions in the case?

3    A.       I believe I covered that in one of my

4    previous answers on this article.  But, again,

5    basis -- part of the basis of my opinions relating

6    to the design, different designs having different

7    accessibility to different populations.

8    Q.       What's the next article you have there?

9    A.       Publication Morrongiello, et al, 2004.

10   Q.       Is that an article or book chapter?  What

11   is that?

12   A.       It's an article.

13   Q.       It's an article.

14                   MR. JAUREGUI:  We'll label the

15          Morrongiello article Exhibit 29.

16                   THE WITNESS:  That's probably the

17          correct way to pronounce it.

18                   MR. JAUREGUI:  Just made it up.

19                          -----

20                   (2004 Morrongiello, et al article

21          marked Exhibit No. 29.)

22                          -----

23   BY MR. JAUREGUI:

24   Q.       What is the subject matter of that

25   article?

1    A.      The subject matter is parental supervision

2    and the methods employed by parents to supervise

3    or control hazards in the household.

4    Q.      Do you know if that article dealt with the

5    subject of parental supervision as it deals with

6    the interaction of children with window coverings?

7                    MR. WILLIAMS:  Specifically?

8                    MR. JAUREGUI:  Yes.

9                    THE WITNESS:  Not specifically

10            window coverings.  It dealt more with the

11            issues of supervision by the room in which

12            children are located and different styles

13            of supervision.

14   BY MR. JAUREGUI:

15   Q.      And you have opinions in this case, do you

16   not, as to supervision that the Padillas provided

17   to the child in relation to the safety measures

18   that they took with regard to the vertical blinds?

19   A.      Can you repeat that question?

20   Q.      Never mind.  I'll withdraw it.  We'll get

21   to your opinions.  What relevance, if any, is the

22   Morrongiello study to your opinions in this case?

23   A.      The articles and the subject matter is

24   incorporated on the basis of for my opinions

25   related to the types of supervision one might

1    expect parents to engage in and different types of

2    control mechanisms one might be engaged in in

3    child safety in different rooms of the house.

4    Q.       Where was that article published?

5    A.       Journal Of Pediatric Psychology.

6    Q.       Who reads the article?

7    A.       I'm sorry?

8    Q.       Who reads those articles?  What's the

9    intended population of that publication, if you

10   know?

11   A.       Well, I think that quite often researchers

12   will read this.  This is a form of a basic

13   research.  I don't know what the readership of

14   this journal -- demographics of this journal are.

15   Q.       What relevance, if any, does the

16   Morrongiello study -- I'm sorry.  I think I

17   already asked you that question.  What is the next

18   item that you have there?

19   A.       The next article is Mack & Rock, 1998.

20                   MR. JAUREGUI:  We'll label the

21           Mack & Rock '98 article as Exhibit

22           No. 30.

23                   THE WITNESS:  It is actually a

24           book.  When I checked out the book, it's a

25           chapter from the book.

1           (1998 Mack & Rock chapter from

2           Inattentional Blindness marked Exhibit

3           No. 30.)

4                                -----

5     BY MR. JAUREGUI:

6     Q.      What is the particular chapter of the

7     book?

8     A.      This particular chapter introduces an

9     overview of the act of inattentional blindness.

10    Q.      What book was it published in?

11    A.      Inattentional Blindness.

12    Q.      What does that subject deal with?

13    A.      The subject generally deals with the

14    cognisystem of attention and perception.

15    Q.      How is that relevant to the dangers of

16    strangulation that are posed to young children

17    from window covering cords?

18    A.      This is information that I -- serves as a

19    basis for opinions related to safety information

20    and one's attention to and noticing of safety

21    information.

22    Q.      So, basically, this has to do with the

23    issue whether or not consumers pay attention to

24    ordinance?

25    A.      This is actually more general to how

1    people attend to and perceive and take in the

2    world around them and can be applied and has been

3    applied to safety information.

4    Q.        Do you know if anyone other than yourself

5    has ever used this study to compare it to how

6    people attend to or perceive the danger posed to

7    young children from window blind coverings?

8    A.        I don't know.

9    Q.        Is this the first time that you used this

10   study in this context?

11   A.        Specific to window blind coverings --

12   Q.        Yes.

13   A.        -- have I used this?  Yes.  I believe that

14   this is the first -- my first presentation of this

15   material in that way.

16   Q.        Can you tell me specifically what that

17   study dealt with?  Was that a study that was done

18   in a lab, in a classroom setting?  How was the

19   study conducted?

20   A.        Again, this is not a -- this is a

21   textbook, and the topic is inattentional

22   blindness.  It's not a single study.

23   Q.        Oh, okay.  So it's -- what would you call

24   that?

25   A.        There are a number and series of studies

1  that deal with the topic of attention, which is a

2  cognitive construct that dictates how or provides

3  information about how we perceive the world around

4  us.  And this book and this idea is a -- is a, I

5  guess, a summary or a collection of what we've

6  learned from research into this area.

7  Q.      As you sit here today, do you know what

8  the people that participated in that article,

9  review, study, whatever you want to call it, what

10  were they asked to look at and compare it and then

11  they were asked questions about their perception

12  or their attention to the given questions that

13  they were asked about?

14  A.      I am familiar with many of the studies

15  that are referenced in this field of research.

16  Q.      Okay.  We had that article pulled from the

17  internet, and my recollection is that it had some

18  kind of, like, charts with various similar figures

19  within that chart, and people were asked to take a

20  look at a given chart and compare it to the next

21  chart, and they were asked to tell apart the

22  similarities.  Is that what you recall?

23  A.      That's -- that's one type of study that

24  goes into this research.

25  Q.      Okay.  What does that have anything to do

1    with window covering hazards as they pose a danger

2    to children?

3    A.      Again, I explained how -- what this is a

4    basis for.  This is a basis for how people attend

5    and take in and process information from their

6    surroundings.

7    Q.      You said there are significant differences

8    whether people in that article were asked to view

9    a piece of paper with some drawings as opposed to

10   them transferring that information to an actual

11   physical product, a blind, and you're

12   extrapolating as to whether or not parents would

13   pay attention to either whether or not they had

14   any warnings or whether or not the particular

15   blind in issue posed a particular risk for their

16   children.

17              MR. WILLIAMS:  Wait.  I don't know

18          if there was a question there.  If it was,

19          it occurred a long time ago at the

20          beginning.  I think you started out by

21          saying, isn't there a difference.  And if

22          that's your question --

23              MR. JAUREGUI:  Yes.

24              MR. WILLIAMS:  -- vague and

25          ambiguous and unintelligible.

1          THE WITNESS:  Can you rephrase the

2      question?

3  BY MR. JAUREGUI:

4  Q.      Yes.  Isn't there a difference in the

5  level of attentiveness or perception of how a

6  parent may perceive the danger that is posed by a

7  physical product such as a window blind with loop

8  cords versus the attentiveness or the perception

9  of someone that is in a controlled setting and is

10  asked to look at charts or drawings and asked to

11  tell the difference between the drawings?

12          MR. WILLIAMS:  Same objection.

13          THE WITNESS:  I don't think I can

14      answer the question you're posing because

15      you're mixing a lot of ideas that are

16      being brought to bear here.  The basic

17      research that I am citing as a basis for

18      my opinions as to how people attend is

19      what we know of the basic perceptual and

20      attentive processes humans engage in,

21      regardless of situation.  There is

22      something that, from basic science into

23      visual perception and cognition, there --

24      we know how people attend to and extract

25      information.  That's the basic science

1              that I am drawing on as a basis for

2              opinions that I've combined with other

3              research on warnings and behavioral

4              response to safety information.

5    BY MR. JAUREGUI:

6    Q.      All right.  And for the purpose of the

7    opinions in the case, one of your opinions, on

8    Page 14 you state, even if there had been

9    additional warnings in the case given the

10   Padillas' conduct, those warnings would not have

11   made a difference.

12   A.      I think that's a paraphrase of my

13   opinions.

14   Q.      Oh, please, take a look on Page 14.  It's

15   one of your last opinions there.

16   A.      Right.  The last bullet point which reads,

17   "Mr. and Mrs. Padilla did not demonstrate safety

18   information seeking behaviors with respect to

19   child safety in general and that related

20   specifically to window coverings and displayed

21   limited response to knowledge and obvious safety

22   concerns.  There is no scientific reason to

23   believe that additional or alternative warnings or

24   safety information provided with the product would

25   have altered their behavior and averted this

1    incident."

2    Q.      Are you talking about that inattentive

3    blindness there?

4    A.      That -- I'm talking about the -- the basic

5    way in which people perceive the world around them

6    and the way in which our information and

7    perceptual systems are designed to process

8    information, and that factors into my analysis as

9    to whether additional and alternative information

10   that would have been in the environment would have

11   changed or affected their behaviors.

12   Q.      And one of the articles that you relied on

13   for that opinion is that article, Inattentive

14   Blindness --

15   A.      That is --

16   Q.      -- is it not?

17   A.      That is a -- that is a basis of science's

18   understanding of how people process and attend and

19   perceive information in the world around them.

20   Q.      And you relied on that article for your

21   opinions in this case?

22   A.      That is the basis of my opinions.

23   Q.      And to your knowledge that article has

24   never been discredited by anyone in the field?

25                   MR. WILLIAMS:  Objection.  Vague.

1    It's what he means discredit.  Criticize

2    --

3  BY MR. JAUREGUI:

4  Q.    Did anyone question the findings in

5  today's environment, its conclusions, as far as

6  you know?

7  A.    As far as I know, I think that this is a

8  fairly well -- a fairly well regarded study.  And

9  upon my review of the data, it holds significant

10  merit.

11  Q.    Okay.  Have you relied on this case to

12  offer opinions in other consults or similar cases?

13              MR. WILLIAMS:  Regarding this

14        article?  You said this case.

15  BY MR. JAUREGUI:

16  Q.    This article.  Yes.

17  A.    I've presented this article as a basis for

18  opinions on how people perceive and attend to

19  items in their environment in other cases.

20  Q.    Okay.  Can you give me some examples of

21  those cases?  Are they on your -- Exhibit 3 of

22  your list of selected cases attached to your

23  Curriculum Vitae?

24  A.    Some of them would be.  Yes.

25  Q.    Okay.  Could you review those cases for

1  me?

2  A.      I believe that I based this off of my

3  memory of the articles I've -- and some of the

4  research I've provided for the basis for my

5  opinions in other cases.

6  Q.      Okay.

7  A.      I believe that I've utilized this article

8  in Phillips V Comcast.

9  Q.      Is that the very last case?

10  A.      Yes.  Cooper V Racetrac.  Metso Paper --

11  Q.      Hold on a second.  I'm trying to find it

12  here.

13  A.      I'm going in reverse order.

14  Q.      Oh, okay.  Where's Cooper at?

15  A.      The next case up from Phillips.

16  Q.      All right.  Juliet Green Cooper.  Okay.  I

17  didn't see that.  Okay.

18  A.      Metso Paper V General Electric.

19  Q.      All right.

20  A.      I likely would have referenced that in

21  Moyer V Albert Einstein Health Care Network.  It's

22  kind of difficult to remember back.

23  Q.      Okay.  That's fine.  Do you know what were

24  the issues in Phillips V Comcast?

25  A.      Attention and visual perception.

1    Q.      To what?

2    A.      To warnings and the environment and visual

3    features of the environment.

4    Q.      What were the issues in that litigation?

5    A.      What do you mean by issues?

6    Q.      What was being litigated?  You were

7    brought in as an expert.  What were you asked to

8    opine on attention and visual perceptions?  In

9    what context?

10   A.      In the context of a -- generally, that was

11   operating a scooter in a parking facility or

12   parking lot, and he ran into or drove into a

13   barrier of sorts.

14   Q.      And the issue was whether or not he had

15   perceived any warnings or the dangers caused by

16   the barrier?

17   A.      Some of the issues in this case were

18   whether or not this barrier would have been

19   visible to him and whether additional signage or

20   warnings in the area would have altered his

21   behavior.

22   Q.      Did you testify at trial in that case?

23   A.      I did.

24   Q.      What was the outcome of that case?

25   A.      I believe -- you know, I -- I think it

1    was -- I think it was a split and attribution of

2    fault.  I'm not...

3    Q.      What about Juliet Green Cooper?

4    A.      That was a warnings issue related to

5    warnings accompanying a fuel pump.

6    Q.      In a motor vehicle?

7    A.      Well, at a gas station.

8    Q.      And your testimony, there was no

9    additional warnings would have changed the outcome

10   in that case?

11   A.      Having difficulty remembering the

12   specifics, so I'd rather not --

13   Q.      Do you know what the outcome of that case

14   was?

15   A.      I believe it's ongoing.  I gave a

16   deposition.

17   Q.      All right.  What about Metso Paper versus

18   USA?

19   A.      This was a warnings case about warning on

20   a -- safety information provided with a metal

21   halide lamp.

22   Q.      What was the outcome of that case?

23   A.      Again, it's an ongoing deposition.

24   Q.      Moyer, what was your testimony in that

25   case?

1    A.       That was a case involving a woman that --

2    that was attempting to hold open a sliding door.

3    Q.       And the issues was warnings?

4    A.       That was one of the issues.

5    Q.       And in that case you relied on the article

6    Inattended Blindness as well?

7    A.       As to -- to address issues of what would

8    have been perceptible to the scene as she

9    approached this doorway.  Yes.

10   Q.       In the four cases that we've reviewed thus

11   far, none of those cases involved injuries to

12   children; correct?

13   A.       Those do not involve injuries to children.

14   Q.       And none of those cases involve injuries

15   to people from window coverings; correct?

16   A.       Those do not involve window coverings.

17   Q.       What's the next document you have there?

18   We're up to now 31.

19   A.       This article is Simons & Chabis, 1999.

20                    MR. JAUREGUI:  We're going to mark

21            the Simons & Chabis 1999 article as

22            Exhibit 31.

23                              -----

24                    (1999 Simons & Chabis marked

25            Exhibit No. 31.)

```
 1                          -----

 2   BY MR. JAUREGUI:

 3   Q.      What was the subject matter of that

 4   article?

 5   A.      This was similar to the Mack & Rock

 6   chapter.  This deals with the inability of people

 7   to perceive objects in their environment.

 8   Q.      Is it an article or a chapter from a book?

 9   A.      It's an article.

10   Q.      Where was it published, by publication?

11   A.      Perception.

12   Q.      Do you subscribe to that publication?

13   A.      I do not subscribe to that publication.

14   Q.      What is the intended audience for that

15   publication?

16   A.      I think that Perception has been read by

17   scientists in the field of perception and

18   cognition, but I'm not aware of what the full

19   reader demographics are of the journal.

20   Q.      Of what significance, if any, is the

21   Simons & Chabris article to your opinions in this

22   case?

23   A.      Again, this is -- this is basic research

24   that informs us as to the ability of people to

25   perceive and detect things in the world around
```

1    them specifically as it relates to attention and

2    goal-oriented behaviors.

3    Q.      Did that article study the behavior of

4    people in relation to any specific problems?

5    A.      Not in relation to specific problems.  No.

6    Q.      What was the setting of that study, do you

7    know?

8    A.      It was a laboratory setting.

9    Q.      Controlled environment?

10   A.      It was a controlled environment.

11   Q.      Do you know if that publication dealt with

12   the issue of strangulation of young children from

13   window blind coverings?

14   A.      It did not.

15   Q.      What's the next document that you have

16   there.  Let me -- let me go back here.  Did you

17   rely on that article for your opinions in this

18   case?

19   A.      Again, this is part of the basis of my

20   opinions as it relates to perception and visual

21   attention.

22   Q.      Exhibit No. 32 for your next document,

23   whatever that is.

24              (1998 Simons & Levin publication

25         marked Exhibit No. 32 for identification.)

1    BY MR. JAUREGUI:

2    Q.       All right.  What do you have there next?

3    A.       Simons & Levin, 1998.

4    Q.       What's the subject of that publication?

5    A.       Similar subject as the previous two.

6    Q.       And that is?

7    A.       The way in which people perceive and

8    detect items in the world around them and the role

9    attention plays in this.

10   Q.       Does the article have a title?

11   A.       The article does.

12   Q.       What's the title?

13   A.       Failure To Detect Changes To People During

14   Real World Interaction.

15   Q.       Failure to deduct --

16   A.       To detect.

17   Q.       Changes --

18   A.       To People --

19   Q.       Okay.

20   A.       -- During A Real World Interaction.

21   Q.       Was it a study or article?  What kind of

22   publication was that?

23   A.       It was a study.

24   Q.       What did it study?  Were there any

25   specific products that were analyzed in that

1  study?

2  A.       Not specific products, but cognitive

3  processes and perceptual processes of humans.

4  Q.       I take it window blind coverings were not

5  one of the products that was discussed in that

6  article?

7  A.       That was not discussed in that article.

8  Q.       What relevance, if any, are the -- let me

9  withdraw that question.  What were the conclusions

10  of that article?

11  A.       The conclusions that -- were that, I

12  think, largely the fact that people are often

13  blind to changes in visual information in their

14  environment that they are not attending to, and

15  that people fail to perceive and fail to detect

16  information within their environment to which they

17  are not specifically attending.

18  Q.       What significance, if any, does this

19  article have to your opinions in this case?

20  A.       Again, this is -- this is the basis of

21  scientific research on how people perceive and

22  attend to and interact with the world around them,

23  and how the basic capabilities and limitations of

24  our cognitive and perceptual systems dictate what

25  information we may or may not take in from the

1   world around us.

2   Q.      Is this relevant to the issue of how

3   people perceive risk?

4   A.      I'm sorry?

5   Q.      Is this article relevant to how people, in

6   this case consumers, perceive the risk of danger?

7   Risk of danger.

8                    MR. WILLIAMS:  Objection.

9   BY MR. JAUREGUI:

10  Q.      Of any given product.

11                   MR. WILLIAMS:  Go ahead.

12                   THE WITNESS:  I've had -- I'm

13        having trouble incorporating your --

14  BY MR. JAUREGUI:

15  Q.      All right.  Let me withdraw that question.

16  How is this article relevant to the issue of how

17  people, consumers in this case, perceive the risk

18  of strangulation to young children from window

19  covering cords?

20  A.      This article and the way in which I am

21  basing opinions on this and other articles in my

22  report is relevant to the -- the detection and

23  attention given to safety information that might

24  be presented in terms of warnings, or whatnot, to

25  people within the environment.  That would relate

1   to the risk of strangulation, as I understand your

2   question.

3   Q.      All right.  Do you know the risk of

4   strangulation that is posed to window coverings to

5   young children, whether that risk of strangulation

6   is an open obvious or is it a latent and hidden

7   danger?

8   A.      Can you repeat that.

9   Q.      Do you know whether the danger of

10  strangulation to young children from window

11  covering cords, in your view is that an open and

12  obvious danger or is it latent and hidden?

13  A.      I think the -- the -- you know, some of

14  those terms I would wrestle with in terms of

15  trying to define.  I think that there are aspects

16  of the hazard that some people would be able to

17  appreciate and would determine to be hazardous,

18  and there are -- there are other segments that may

19  not be fully aware of that hazard's present --

20  presence, whether it be because they have not

21  sought the information to -- to be informed of

22  that or whether they fail to detect the presence

23  of something like the window cord in that

24  environment.

25  Q.      You're an expert in human factor analysis;

1    correct?

2    A.      Um-hum.

3    Q.      And one of the issues that you look at is

4    the cognitive ability and the perception ability

5    of people to perceive the world that surrounds

6    them; correct?

7              MR. WILLIAMS:  The world that

8         surrounds them?

9              MR. JAUREGUI:  Yes.

10   BY MR. JAUREGUI:

11   Q.      The environment that surrounds them.

12   A.      Yes.  That one I deal with.

13   Q.      Does it matter to you whether people are

14   aware of the danger?  I mean, they cannot perceive

15   a danger if they're not aware of it.  Do you agree

16   with that?

17   A.      No, I --

18              MR. WILLIAMS:  I'm going to object.

19         That's vague and ambiguous.

20              Go ahead

21              THE WITNESS:  I don't -- I'm having

22         difficult following your --

23   BY MR. JAUREGUI:

24   Q.      All right.  Let me put it in context of

25   this case.  The Padillas have testified in this

1    case they were not aware of the risk of

2    strangulation by the window loop cords in the

3    vertical blind in this case.  All right.  Now,

4    that has to do with perception; correct?  They

5    were not aware of a danger that existed in the

6    house?

7    A.      I understand that to be their testimony.

8    Yes.

9    Q.      All right.  How -- strike that.  Does that

10   make any difference in your analysis as to whether

11   or not someone perceives a danger that is open

12   versus a danger that is hidden?

13                  MR. WILLIAMS:  Objection.  Vague

14          and ambiguous still.

15                  THE WITNESS:  I -- as I'm

16          understanding your question, I don't

17          believe so.  I would say that the -- a

18          person's awareness of -- of a danger is

19          potentially not the same thing as whether

20          or not that underlying danger is, in your

21          terms, open and obvious or hidden.  There

22          are other factors that determine whether

23          or not someone might become aware of it.

24   BY MR. JAUREGUI:

25   Q.      Such as?

1    A.      Such as the -- the attention they give to

2    relevant issues or the efforts they -- they make

3    in addressing or becoming aware or perceiving

4    either the world around them or the information

5    that's available at the time that we're talking

6    about.

7    Q.      All right.  We will deal with those issues

8    in a little bit.  What is the next document that

9    you have in your materials?

10   A.      The next article is Ayres, et al, 1989.

11                   MR. JAUREGUI:  We will call the

12           Ayres '89 article Exhibit No. 33.

13                            -----

14                   (1989 Ayres et al article marked

15           Exhibit No. 33.)

16                            -----

17   BY MR. JAUREGUI:

18   Q.      What is the title of that article?

19   A.      What Is A Warning And When Will It Work.

20   Q.      Did that article deal with any specific

21   product?

22   A.      Not specific products.

23   Q.      Where was that article published?

24   A.      I believe that the article was published

25   in -- get the specific here -- proceedings of the

1    Human Factors Society 33rd Annual Meeting.

2    Q.       What are the conclusions of that article?

3    A.       The article presents and summarizes

4    information as to what warnings are generally

5    accepted to contain and the role that warnings can

6    serve in altering behaviors and when a warning

7    may, in fact, alter behaviors.

8    Q.       Do you know the author?

9    A.       They're a variety of authors.

10   Q.       Ayres, do you know who Ayres is?

11   A.       Yes, I do.

12   Q.       What's the first name?

13   A.       Thomas.

14   Q.       How do you know Mr. Ayres?

15   A.       I have met him at conferences.

16   Q.       Do you know him in any other capacity?

17   A.       In a professional setting as conferences

18   and a colleague.

19   Q.       Other than -- he's a colleague of yours?

20   A.       Well, that we are both human factor

21   scientists that research warnings and related

22   issues.

23   Q.       Do you know if Mr. Ayres has done any

24   specific warnings as they relate to window

25   coverings?

1   A.      I do not know.

2   Q.      Do you know if the subject of his article

3   as he relates to warnings deals with products that

4   are considered to be unreasonably dangerous to

5   children?

6   A.      Within this article?

7   Q.      Yes.

8   A.      I don't believe that -- that the authors

9   addressed specific consumer products that would be

10  considered to be reasonably dangerous to children.

11  Q.      We did a Google on Mr. Ayres and it

12  revealed that he's affiliated with Exponent

13  Failure Analysis.  Did you know that?

14  A.      He was.  He's a previous employee.

15  Q.      When did he leave?

16  A.      He left before I started.  I'm not sure

17  what year.

18  Q.      When did you start at Exponent?

19  A.      I started in 2005.

20  Q.      Do you know why Mr. Ayres left Exponent?

21  A.      I do not.

22  Q.      Have you seen Mr. Ayres after 2005?

23  A.      As I indicated, I've seen him at

24  conferences.  That's why I'm familiar with him.

25  Q.      After 2005?

1   A.      Yes.

2   Q.      Did you ever ask him why he left Exponent?

3   A.      No, I did not.

4   Q.      Did he ever tell you?

5   A.      No.

6   Q.      How is the Ayres article relevant to your

7   opinions in this case?

8   A.      Again, this is a basis for my opinions as

9   they relate to expected response to warning

10  information and human response to behaviors

11  with -- human behavior with response to safety

12  information.

13  Q.      Have you used this publication in your

14  other opinions in the past?

15  A.      I have.

16  Q.      These are in cases that you've testified

17  in court?

18  A.      Yes.

19              MR. JAUREGUI:  We'll go through

20          those cases in a minute.  Let's take a one

21          minute, 30 second break here.

22              -----

23          (Off the record at 12:07 p.m.)

24              -----

25          (On the record at 12:11 p.m.)

1    BY MR. JAUREGUI:

2    Q.      What is the next set of documents you have

3    in your materials?

4    A.      Article by Ayres, et al, 1998.

5              MR. JAUREGUI:  We'll mark the '98

6        Ayres article Exhibit No. 34.

7                          -----

8              (1998 Ayres, et al article marked

9        Exhibit No. 34.)

10                         -----

11   BY MR. JAUREGUI:

12   Q.      Is this the same author as we discussed

13   before?

14   A.      Yes.

15   Q.      What is the subject matter of this

16   article?

17   A.      The effectiveness of warning labels and

18   signs.

19   Q.      Warning labels and signs?

20   A.      And signs.

21   Q.      Do you know whether that article dealt

22   with any specific product?

23   A.      I believe that this is a review of a

24   number of articles.  Some of them dealt with

25   specific consumer products.

1    Q.      Do you know whether any of the articles

2    that are incorporated in the discussion of the '98

3    articles dealt with window coverings, warnings?

4    A.      It doesn't appear that any of them did.

5    Q.      What's the general gist of that article?

6    A.      It's detailing difference in methodologies

7    and how some of the signs of behavior compliance

8    has been -- has been measured up to the date of

9    this article.

10   Q.      When you say behavior compliance, what do

11   you mean by that?

12   A.      Whether people alter their behaviors based

13   on safety information provided along with the

14   product or the environment.

15   Q.      What significance, if any, does this

16   article have to your opinions in this case?

17   A.      Again, this is part of the basis on -- for

18   my opinions as to the expected behavioral response

19   to warnings.

20   Q.      And in this case, your opinion, the

21   warnings would not have made a difference in the

22   outcome of this case; correct?  Is that the --

23   A.      One of the --

24   Q.      Is that the bottom line?

25   A.      Summary of one of my opinions is what I

1    read into the record before that appears in my

2    report.

3    Q.      What's the next set of documents in your

4    materials?

5    A.      Doris & Purswell, 1977.

6    Q.      Is that an article or some kind of

7    publication?

8    A.      Yes.  It's an article.

9                  MR. JAUREGUI:  We will label the

10          Doris & Purswell '77 article as Exhibit

11          No. 35.

12                         -----

13                  (1977 Doris & Purswell article

14          marked Exhibit No. 35.)

15                         -----

16   BY MR. JAUREGUI:

17   Q.      Would you essentially tell me what is the

18   subject matter of that article?

19   A.      Behavioral Response To Warnings.

20   Q.      Do you know what the article concludes?

21   A.      Well, it talks about studies and

22   experiments run with warnings and reports on

23   whether or not and the proportion of people that

24   would or that detected and followed the warnings.

25   Q.      How is that article relevant to your

1   opinions in this case?

2   A.       Again, this is part of the basis of my

3   opinions on Behavioral Response To Warnings.

4   Q.       Did the '77 article deal with the issue of

5   window covering cords?

6   A.       It did not deal with window covering

7   cords.

8   Q.       Do you know whether that article dealt

9   with any products considered to be unreasonably

10  dangerous to children?

11  A.       I don't -- it's difficult to answer

12  whether it would be considered unreasonably

13  dangerous to children.  One of them was a tool, a

14  hammer, so I don't know if you find many people

15  saying that that was a product that children might

16  have, children.

17  Q.       What's the next set of documents you have?

18  A.       Otsubo, 1988.

19  Q.       Can you spell that?

20  A.       O-T-S-U-B as in boy, O.

21  Q.       Did you say 1988?

22  A.       Yes.

23               MR. JAUREGUI:  We'll label the

24          Otsubo '88 article as Exhibit No. 38.

25               MR. WILLIAMS:  Forty-two?  Did you

1     say 38?

2                    MR. JAREGUI:  Thirty-eight.

3                    THE WITNESS:  Thirty-six.

4                    MR. JAUREGUI:  Thirty-six.  I'm

5          sorry.

6                    MR. WILLIAMS:  I'm sorry.  I

7          started missing numbers about three ago.

8                            -----

9                    (1988 Otsubo article marked Exhibit

10         No. 36 for identification.)

11                           -----

12    BY MR. JAUREGUI:

13    Q.     What is the subject of -- the subject

14    matter of the article in Exhibit 36?

15    A.     Again, it would be similar the others,

16    which is the behavioral response to safety and

17    warning information.

18    Q.     What were the conclusions of that article?

19    A.     The -- that the effectiveness of warnings

20    varied with the manipulated variables which were

21    the levels of product danger and the warning

22    provided.

23    Q.     Did that article indicate whether the

24    higher the danger posed by the product the more

25    attention people paid to it?

1    A.        Let me review so I don't misstate the --

2    Q.        Okay.

3    A.        The article speaks to this and with

4    reference to the people's familiarity with the

5    product with the sense that the more familiar a

6    person is with the product, the less likely they

7    are to perceive and attend to the warnings that

8    may accompany the product.

9    Q.        Do you know whether or not that article

10   dealt with the issue of window coverings?

11   A.        It did not.

12   Q.        Do you know whether or not that article

13   dealt with any products that pose an unreasonable

14   risk of injury to young children?

15   A.        Well, again, this was done with respect to

16   circular saws and jigsaws.

17   Q.        So it's not a product that children would

18   be expected to come in contact with?

19   A.        No.  This article is not a product

20   intended for child interaction.

21   Q.        What is the significance, if any, of that

22   article to your findings in this case?

23   A.        Again, this is part of the basis for my

24   expectations as to behaviors and response to

25   warnings and safety information provided.

 1  Q.      What's the next set of documents you have

 2  there?

 3  A.      Zeitlin.

 4  Q.      Is that an article.

 5  A.      It's an article.

 6              MR. JAUREGUI:  We'll label the

 7         Zeitlin article as Exhibit 37.

 8                        -----

 9              (1994 Zeitkin article marked

10         Exhibit No. 37 for identification.)

11                        -----

12  BY MR. JAUREGUI:

13  Q.      What is the subject matter addressed in

14  that article, in Exhibit 37?

15  A.      This is the same, again, behavioral

16  response to safety information.

17  Q.      What was the date of that publication?

18  A.      1994.

19  Q.      Do you know the setting where that study

20  was -- do you know whether there was a study

21  conducted?

22  A.      There was.

23  Q.      Do you know the setting of the study?

24  A.      It was a laboratory experiment.

25  Q.      Do you know what products were tested?

1    A.      An electric chain saw.

2    Q.      You'll agree with me an electric chain saw

3    has nothing to do with or no similarity to window

4    cords; correct?

5                    MR. WILLIAMS:  I'll object.  Vague.

6                    MR. JAUREGUI:  Withdraw that.

7    BY MR. JAUREGUI:

8    Q.      You would agree with me an electric chain

9    saw has no similarity with a vertical blind loop

10   cord such as the one we have in this case?

11                   MR. WILLIAMS:  Go ahead.

12                   THE WITNESS:  They are different

13        consumer products.

14   BY MR. JAUREGUI:

15   Q.      Generally you would not expect a child to

16   come into contact with an electric chain saw, is

17   that --

18   A.      I think that an electric chain saw is not

19   intended for a child's use.

20   Q.      Well, what was the general conclusions of

21   that article?

22   A.      Again, that the -- the user's familiarity

23   and confidence with a product affects the

24   attention given to and the compliance with

25   warnings.

1    Q.      Did you draw any conclusions from that

2    article to support the opinions in this case?

3    A.      Yes.  This is -- again, this is part of

4    the basis for opinions with regard to

5    behavioral -- expectation as to behavioral effects

6    of warnings and safety information.

7    Q.      What's the next set of documents in your

8    materials?

9    A.      Ayres, et al, 1990.

10                   MR. JAUREGUI:  That will be Exhibit

11          No. 38, Ayres et al, '90.

12                                -----

13                   (1990 Ayres et al article marked

14          Exhibit No. 38 for identification.)

15                                -----

16   BY MR. JAUREGUI:

17   Q.      Can you tell us what the subject matter of

18   that publication is?

19   A.      This publication investigates subjective

20   impressions and ratings, the effectiveness of

21   warnings compared to actual behavioral compliance.

22   Q.      What do you understand the subjective

23   impressions mean?

24   A.      Whether or not people feel that they would

25   comply with a warning or whether others would

1    comply with a warning as compared to whether or

2    not the underlying behavior is actually changed.

3    Q.      So, essentially, some people would say,

4    they would comply, they would follow the warnings,

5    but the studies such as these shows otherwise?

6    A.      Well, this is a study that compares when

7    people are directed to a warning and asks whether

8    or not they think they would comply with it or

9    whether or not they think people would comply with

10   it; that they offer subjective evaluations that,

11   yes, they or others would comply with that warning

12   at high rates and comparatively when put into a

13   setting where people are given the product, you

14   see very different and much lower rates of

15   compliance with the actual warning.

16   Q.      Do you know whether or not there were any

17   specific warnings from specific products that were

18   reviewed or analyzed in that article?

19   A.      Yes, there were.

20   Q.      What were those products?

21   A.      For example, one of them was a hammer

22   warning.

23   Q.      Any other products?

24   A.      Yes.  I believe that there were also other

25   products.  Glues.

1    Q.      I'm sorry?

2    A.      Glue.

3    Q.      Glue?

4    A.      Glue, I believe.

5    Q.      Okay.

6    A.      And other signage.

7    Q.      Do you know whether any of those products

8    posed an unreasonable risk of injury to young

9    children?

10   A.      Again, I think that some of these products

11   would have recognized risk to children.

12   Characterized unreasonable or not, I'm not sure

13   what you're -- you're --

14   Q.      Do you know whether any of the products

15   included window coverings?

16   A.      No.  I don't believe any of the products

17   were window coverings.

18   Q.      Do you know whether or not any of the

19   products included some type of cord or wires?

20   A.      I don't believe any of them were.

21   Q.      All right.  For what purpose, if any, did

22   you rely on this study?

23   A.      Again, I relied on this study as a basis

24   for my opinions related to behavioral response and

25   statements as to whether or not one would have

1    complied with the warning had it been present to

2    assess the validity of such a statement.

3    Q.      And your conclusions are incorporated in

4    your opinions, sir?

5    A.      Yes, they are.

6    Q.      All right, what do you have, the next set

7    of documents, sir?

8    A.      Shaver et al, 2006.

9            MR. JAUREGUI:  That will be Exhibit

10           No. 39.  Off the record.

11                   -----

12                   (Off the record at 12:26 p.m.)

13                   -----

14                   (On the record at 12:26 p.m.)

15                   -----

16                   (2006 Shaver, et al article marked

17           Exhibit No. 39.)

18                   -----

19   BY MR. JAUREGUI:

20   Q.      What is the subject matter of the

21   Shaver, et al article?

22   A.      This is a very similar article and in much

23   effects an extension of the previous article we

24   spoke of.

25   Q.      And did that article deal with any

1   specific warnings from the specific type product?

2   A.      It -- it did indeed deal with specific

3   products.

4   Q.      What were the products?

5   A.      One -- the product which they considered

6   here was a cabinet.

7   Q.      Okay.  Is that it?

8   A.      They also reviewed other warnings, papers.

9   Q.      But the specific product was a cabinet?

10  A.      Yes.  A file cabinet.

11  Q.      Do you know what the conclusions of that

12  article were?

13  A.      Similar to the previous article,

14  differences between subjective ratings of

15  compliance and the actual underlying behavioral

16  effectiveness and also related to different styles

17  of warning formats.

18  Q.      Did you rely on that study for your

19  opinions in this case?

20  A.      I used this as a basis for my opinions.

21  Q.      Do you know if the danger or risk of

22  injury posed to a young child by a cabinet is the

23  same as the risk of injury of strangulation posed

24  to a young child by a window covering cord?

25              MR. WILLIAMS:  Objection.  Vague

```
 1              and ambiguous.

 2                   Go ahead.

 3                   THE WITNESS:  I don't think I

 4         can -- without more definition of terms in

 5         that question I don't think I can answer

 6         that.

 7    BY MR. JAUREGUI:

 8    Q.      What terms would you like me to define?

 9    A.      Can you read back the question?

10                                -----

11                   (The court reporter read back the

12         last question.)

13                                -----

14    BY MR. JAUREGUI:

15    Q.      I understand your question.  Let's just

16    say whether the severity of an injury to a young

17    child by a cabinet is the same as the severity of

18    the injury posed to a young child from a window

19    covering cord.

20                   MR. WILLIAMS:  Same objection.

21                   THE WITNESS:  If we're talking

22         about the severity of injury that a child

23         might experience through an interaction

24         with the window cord as compared to a file

25         cabinet, yes, it could be -- potentially
```

1    be the same severity.

2    BY MR. JAUREGUI:

3    Q.    Do you have any data to indicate children

4    have died as a result of their interaction with

5    a cabinet such as the one discussed in that

6    study?

7    A.    I do not have with me any data about

8    the -- about injuries to young children with file

9    cabinets per se.  But the way that you phrased

10   your question as to should a child be interacting,

11   the mechanism for injury here is -- that they're

12   talking about is a tip-over and a fall onto a

13   person, and that is an injury mode that is quite

14   prevalent in children with items falling on

15   children.

16   Q.    Do you know whether file cabinets have any

17   types of cords that would pose risk of

18   strangulation to young children?

19   A.    I don't believe that file cabinets would

20   have cords.

21   Q.    All right.  Next set of documents?

22   A.    Frantz.

23   Q.    France?

24   A.    Frantz, F-R-A-N-T-Z, et al, 2005.

25             MR. JAUREGUI:  We will label that

1          article as Exhibit No. 40.

2                              -----

3                  (2005 Frantz, et al article marked

4          Exhibit No. 40 for identification.)

5                              -----

6    BY MR. JAUREGUI:

7    Q.      What is the subject matter of the Frantz

8    article?

9    A.      Again, this is an article -- excuse me --

10   very much in the same vein as the previous two,

11   about predicted versus actual response to

12   warnings, subjective ratings versus actual

13   response.  And, again, looking at the idea of

14   adding or taking away specific formatting features

15   to the warnings.

16   Q.      Do you know whether that was a study

17   conducted in that article?

18   A.      It's a review and re-analysis of an

19   extension of existing published studies.

20   Q.      Do you know whether any of the studies or

21   articles that were reviewed within that article

22   included injuries from window covering cords?

23   A.      I don't believe they were.

24   Q.      For what purpose, then, did you rely on

25   the Frantz article for purposes of your opinions

1    in this case?

2    A.        Again, as a basis for my opinions

3    regarding behavioral response to safety

4    information and warnings.

5    Q.        Do you know whether any of the items in

6    the Frantz study dealt with any products that are

7    considered to be unreasonably dangerous to

8    children?

9    A.        Again, I just would say that, you know,

10   whether or not the product was considered to be

11   unreasonably dangerous to children, I think that

12   it reviews the file cabinet that we talked about,

13   also construction hazard signs, things that would

14   be recognized as hazards to children.

15   Q.        What's the next of the records you have

16   there in your materials?

17   A.        Smith-Jackson & Durak, 2000.

18                    MR. JAUREGUI:  We will label this

19          Smith-Jackson & Durak article, 2000,

20          Exhibit No. 41.

21                            -----

22                    (2000 Smith-Jackson & Durak article

23          marked Exhibit No. 41.)

24                            -----

25   BY MR. JAUREGUI:

1    Q.        Tell me what is the subject matter of that

2    article?

3    A.        This is an experiment that the -- that was

4    run to investigate the detection or the noticing,

5    the reading and compliance with a posted sign or

6    posted warnings, and then the effect that

7    formatting changes have on those.

8    Q.        Was there a study done in connection with

9    that article?

10   A.        Yes.

11   Q.        Was that a controlled study done in a lab?

12   A.        It was a -- it was an experimental setup.

13   It was designed to be -- to simulate a chemistry

14   lab.  So, yes, it was a laboratory experiment.

15   Q.        Who was the audience that was exposed to

16   that experiment?

17   A.        They were students at Virginia Tech.

18   Q.        Pretty smart folks; right?

19   A.        Uh --

20   Q.        Say yes, otherwise, you'll get in trouble

21   with that.  Were they, like, chemistry students

22   or --

23   A.        They're described as participants from

24   introduction to psychology course and other

25   students.

1  Q.      All right.  Well, what was the general

2  conclusion of that article?

3  A.      That none of the subjects in the

4  experiment looked at any of the warnings signs

5  regardless of the warning sign that was posted.

6  Q.      Do you know what products that they were

7  looking at?

8  A.      In this experiment it was what they termed

9  a chemical mixing task.  They had to mix a series

10  of chemicals, as I explained, set up to be a

11  chemistry lab.

12  Q.      How are the findings of that study

13  relevant to your conclusions in this case?

14  A.      Again, these are part of the basis for my

15  expectations as to the behavioral response to

16  safety and warning information.

17  Q.      All right.  What's the next set of

18  documents you have?

19  A.      The final document --

20  Q.      All right.

21  A.      -- is --

22  Q.      Lunch.

23  A.      -- Poison Prevention Packaging Act Of 1970

24  Regulations.  And this is --

25  Q.      1970 regulations?

1    A.       Well, it's the -- the Poison Prevention

2    Packaging Act was instituted in 1970.

3    Q.       Okay.

4    A.       And this is the January 2010 edition of

5    the Act.

6                        -----

7                   (January 2010 edition of Poison

8            Prevention Packaging Act of 1970 marked

9            Exhibit No. 42.)

10                       -----

11   BY MR. JAUREGUI:

12   Q.       I know it's kind of self-explanatory, but

13   tell me what was the general subject matter of

14   that article?

15   A.       Well, the Poison Prevention Packaging --

16   Q.       Or the act.

17   A.       The Act is -- outlines regulations on

18   packaging that must be used to prevent childhood

19   poisonings, and it details the intent and some of

20   the designed considerations of such packaging.

21   Q.       What were the findings or recommendations

22   from that article?

23   A.       Well, that certain products require

24   special packaging.  That the packaging needs to be

25   designed such that it limits access to children of

1    a certain age, and is still accessible and usable

2    by adults over a certain age.  There are testing

3    procedures that are described therein and there

4    are provisions included to allow for packaging

5    that does not meet these requirements for these

6    specific types of product.

7    Q.      What, if any, of its findings in the

8    article or package that you have there in

9    Exhibit 42 did you rely upon for your opinions in

10   this case?

11   A.      Again, I am offering this as a basis for

12   my opinions as it relates to the range of designs

13   in offering options as to design to allow

14   accessibility to different populations with

15   different limitations.

16   Q.      That study specifically deals only with

17   medicines?

18   A.      Well --

19   Q.      Or poisons?

20   A.      The regulation deals with more than just

21   medications.

22   Q.      But generally what's the field of --

23   A.      They -- they list the -- they list the

24   actual products that it did -- is meant to

25   address.

1   Q.      Can we just generally say that it

2   addresses the subject of medicine and any other

3   chemicals or compounds?

4   A.      Chemicals and compounds.

5   Q.      That presents a risk upon young children?

6   A.      That would be -- let me just make --

7   Q.      Just generalizing.  Go ahead.  The longer

8   you take, the longer you have to wait for lunch.

9   A.      I just didn't want to misstate what is

10  there.  A listing of 32 specific things that

11  require the packaging with some sub-bullets

12  underneath them that span from Pages 810 to 814.

13  They're all under the heading of 1700.14,

14  Substances Requiring Special Packaging.

15  Q.      None of those items have anything to do

16  with the window coverings; correct?  They are an

17  entirely separate category of products?

18  A.      These -- window coverings are not on this

19  list.

20              MR. JAUREGUI:  All right.  We're

21         going to break for lunch.

22                     -----

23              (Off the record at 12:40 p.m.)

24                     -----

25              MR. JAUREGUI:  Back on the record.

1         (On the record at 1:18 p.m.)

2                    -----

3    BY MR. JAUREGUI:

4    Q.        Dr. Sala, before we broke we had

5    finished marking the two-ring binders that are in

6    front of you containing the materials and

7    information that you either relied upon or used in

8    preparing your report in this case; is that

9    correct?

10   A.        Yes.

11   Q.        Does that include the entire contents of

12   your file in this case?

13   A.        Well, there were -- there were documents

14   that have been forwarded to me that I believe are

15   part of the production of documents that are not

16   included in here.

17   Q.        Okay.  Can you tell me what those

18   documents are?

19   A.        Those would largely be additional legal

20   documents or documents that came through the

21   discovery process.  There's a list of materials

22   that I've been -- received and reviewed in the

23   back of my report.

24   Q.        All right.  Just tell me what page you're

25   on.

1    A.        Page 16.

2    Q.        All right.  Are there any documents on

3    Page 16 which were not included in the documents

4    that we just finished reviewing in Exhibits 1

5    through 42?

6    A.        Yes, there are.

7    Q.        Can you identify those documents?

8    A.        The Complaint At Law.

9    Q.        Okay.

10   A.        Defendant Hunter Douglas Window Coverings,

11   Incorporated, Rule 26(a)(1) initial disclosures.

12   Q.        Anything else?

13   A.        Plaintiff's Rule 26(a)(2) disclosures.

14   Photos taken by Oak Forrest Police Department of

15   Max Padilla.  Epidemiological Investigation Report

16   and Supplemental Documents, 1982 to 2005.

17   Q.        Okay.

18   A.        Rose Ray's expert report.  Possibly some

19   of the exhibits.  I'm not sure to what extent all

20   the exhibits that have been reproduced in these

21   binders.  And affidavit of Brenda Davis.

22   Everything else should be reflected in the report,

23   the contents.

24   Q.        The Exhibits 1 through 7 marked in

25   depositions 11/19 and 11/20, do you know what

1    those deposition are?

2    A.      Not off the top of my head.

3    Q.      So those are -- you are referencing the

4    dates when those depositions were taken and the

5    exhibits that were attached to those deposition

6    transcripts?

7    A.      Yes.

8              MR. WILLIAMS:  Probably that's your

9         client's and the first respondents that we

10        took in those two days in Chicago.

11   BY MR. JAUREGUI:

12   Q.      All right.  And the affidavit of Brenda

13   Davis?

14   A.      Yes.

15   Q.      These are all -- all of the documents that

16   you just identified for me, these are documents

17   that you used upon your review in preparation for

18   your report but they are not in the list of

19   materials that we just reviewed?

20   A.      They're not included in -- in these

21   binders.

22   Q.      All right.  Exhibits 1 through 14.

23   A.      Some of the -- some of what I have here as

24   photographs may be from that exhibit list.  I see

25   exhibit markings on them.

1    Q.      Okay.  Does that constitute the entire

2    contents of your file in this case?

3    A.      Plus the binders that I have here.

4    Q.      Yes.  All right.  When were you hired in

5    this case?

6    A.      I actually -- I can't remember off the --

7    I can't recall off the top of my head.

8    Q.      It's just a point of reference when you

9    prepare your report.  Your report has a date of

10   June 30, 2011, as the date of completion.  Is that

11   accurate?

12   A.      Yes.

13   Q.      Using that as a date of reference, does

14   that remind you of when you were first retained in

15   this case?

16   A.      No, it does.

17   Q.      Do you have a letter of engagement?

18   A.      I likely do have a letter of engagement.

19   Q.      Is there a reason why you didn't bring

20   that with you today?

21   A.      I didn't receive any -- any request for

22   documents to be provided.

23   Q.      Do you have any communications between you

24   and Mr. Williams regarding this case?

25   A.      I don't believe I have any hard copy

1    communications.

2    Q.      Do you have e-mails regarding

3    communication between you and Mr. Williams in this

4    case?

5    A.      I -- there might be some in scheduling of

6    the deposition or -- nothing of substance, though.

7    Q.      Earlier you told me that you had requested

8    certain materials from Hunter Douglas for your

9    report in this case.  Did you make that request in

10   writing or orally?

11   A.      Again, I think that's a

12   mischaracterization.  I tried to explain.  It

13   wasn't a request for production of documents.

14   These were conversations that I likely had with

15   Mr. Williams as to the types of information that I

16   would be trying to incorporate herein, and it was

17   more a discussion than it was a request for any

18   sort of production.

19   Q.      Are there any documents at all documenting

20   any of your correspondence or conversations with

21   Mr. Williams regarding any requests for materials

22   that you would have need or that you ask that it

23   be provided to you by Hunter Douglas?

24   A.      I have no memory of any such documents.

25   Q.      How much are you charging for your fees?

1    A.      Exponent bills my time at 275 an hour.

2    Q.      What's the percentage that goes to you?

3    A.      I receive an annual salary.

4    Q.      What's your annual salary at Exponent?

5    A.      I'm sorry.  I'm not at liberty to disclose

6    that on the record.

7    Q.      How much -- do you work exclusively for

8    Exponent?

9    A.      I do.

10   Q.      When did you start working for Exponent

11   exclusively?

12   A.      2005.

13   Q.      Prior to 2005 where were you employed?

14   A.      I was a -- before Exponent I was a

15   post-doctoral fellow at Stanford University.

16   Q.      What was your field of study there?

17   A.      Cognitive neuroscience.

18   Q.      And did you obtain your degree?

19   A.      Well, that was post-doctoral studies.

20   Q.      Okay.

21   A.      So that was following the attainment of my

22   Ph.D.

23   Q.      Where did you obtain -- where did you

24   obtain your doctoral degree?

25   A.      Johns Hopkins University.

1    Q.      In what area?

2    A.      Cognitive neuroscience, experimental

3    psychology.  The department was the Department Of

4    Psychological And Brain Sciences.

5    Q.      Do you know if there is a specific field

6    of study known as human factors?

7    A.      Human factors is largely an umbrella sort

8    of terminology for a collection of disciplines.

9    There are, I believe, some universities that may

10   offer a -- or that begun to offer a human factors

11   degree, but largely it is a collection of studies

12   related to human performance.

13   Q.      What makes you an expert on human factors?

14   A.      I would say my education, training and

15   experience.

16   Q.      What other employment prior to your

17   employment with Exponent did you have?

18   A.      There was the post-doctoral studies and

19   fellowship at Stanford, my graduate career at

20   Johns Hopkins, and prior to that there was a --

21   between undergraduate and graduate school there

22   was a one year employment at a group home for

23   adolescents.

24   Q.      A group of --

25   A.      A group home for adolescents.

1    Q.        For how long did you work there?

2    A.        One year.

3    Q.        What did you do there?

4    A.        I was a supervising counselor.

5    Q.        When did you start working as an expert on

6    human factor analysis?

7    A.        In 2005 when I joined Exponent.

8    Q.        How did you become to be hired by

9    Exponent?

10   A.        I applied -- well, I first came for an

11   informational interview to learn what the company

12   was like and about.  I then get formal

13   presentation and interview and was hired on.

14   Q.        Did you talk to anyone other than

15   Mr. Williams in preparing your report for this

16   case?

17   A.        Yes.

18   Q.        Who else did you talk to?  Let me just

19   break it down.  Did you talk to anyone from Hunter

20   Douglas?

21   A.        I spoke with Mr. Jankoski.

22   Q.        When did you speak with Mr. Jankoski?

23   A.        It was prior to the production of my

24   report, but I can't remember the date.

25   Q.        Was that a telephonic conversation?

1    A.      Yes.

2    Q.      Or an in-person conversation?

3    A.      Telephonic.

4    Q.      Telephonic?

5    A.      Yes.

6    Q.      What was the subject of the that

7    conversation?

8    A.      Vertical blinds and the application of

9    vertical blinds in the home.

10   Q.      Who initiated the call?

11   A.      I believe it was a call-in number.

12   Q.      Did he ask you to call him or did you call

13   him or -- I mean, who set up the call?

14   A.      Mr. Williams' office set up the call.

15   Q.      Why was that call set up between you and

16   Mr. Jankoski?

17   A.      So that I can -- the call was set up so

18   that I could hear Mr. Jankoski describe the

19   application of vertical blinds and the environment

20   and his experience with where and how they were

21   used in commercial -- consumer setting.

22   Q.      Why was that information relevant to your

23   report in this case?

24   A.      Well, the -- the -- where in the

25   environment for use is something that I

1    incorporate into my report.  And in speaking with

2    Mr. Jankoski, I wanted to make sure that my

3    understanding of the product was consistent with

4    the experiences of Hunter Douglas.

5    Q.      What did Mr. Jankoski tell you about the

6    place and the environment in which vertical blinds

7    were used?

8    A.      Well, he confirmed that the -- that

9    vertical blinds are most often in settings like

10   over patio doors or tall and long windows, that

11   parts of their design are uniquely appropriate for

12   such settings.

13   Q.      Did you ask Mr. Jankoski to provide you

14   any data related to his understanding of the use

15   and location of vertical blinds?

16   A.      No.

17   Q.      Did Mr. Jankoski tell you whether or not

18   Hunter Douglas had any data supporting the

19   statements -- or the representations he was making

20   to you regarding the use and location of vertical

21   blinds?

22   A.      I am not positive what sorts of data

23   Mr. Jankoski would be able to provide.  Specific

24   to that I think that -- I'm not familiar enough

25   with Hunter Douglas' internal workings to suggest

1    what they might be able to provide.

2    Q.        Did you ask him to provide you with any

3    data?

4    A.        I did not ask for any specific data.  I

5    asked what he could inform me about this, and

6    after then we had a discussion about the -- the --

7    about these topics.

8    Q.        And the use and location of vertical

9    blinds, is that something that you consider

10   important to the opinions in this case?

11   A.        Well, I think that it's a topic that I

12   wrote about in my report, and I think it is part

13   of the product and how I consider it in the -- in

14   its use and the person or the expected

15   interactions consumers would have with it.

16   Q.        Did Mr. Jankoski represent to you or did

17   he give you any percentages as to the number of

18   vertical blinds that were used in certain

19   locations of the house versus other locations,

20   i.e., in common areas where you have the sliding

21   doors as opposed to children's bedrooms?

22   A.        We talked about that topic, and it seemed

23   as if there wasn't any way to quantify something

24   like that based on what he had available to him.

25   Q.        All right.  Is it your understanding, if

1   you have an understanding, of whether Mr. Jankoski

2   was providing that information to you from some

3   document that he was looking at or was it just

4   something that -- what his impression was from his

5   exposure or from his work in the window covering

6   industry?

7   A.      I don't know what he particularly had in

8   front of him or if he -- if he had documents that

9   he was referring to.  This was a conversation that

10  we had over the phone.

11  Q.      Other than the representations that were

12  made to you by Mr. Jankoski regarding location and

13  use of the vertical blinds, did you have any other

14  information that you relied upon or used for -- in

15  your report?

16  A.      Excuse me.  As to the application of the

17  vertical blinds, I have the independent work that

18  I undertook to -- to observe vertical blinds in

19  use and in settings as well as the work that I

20  performed to try and ascertain the depiction of

21  and description of vertical blinds currently

22  provided through the internet and manufacturers

23  and suppliers.

24  Q.      And are you talking about the search that

25  you did over the internet that we discussed

1    earlier about the materials that are included in

2    your --

3    A.     Yes.

4    Q.     -- in your binder?

5    A.     Yes.  There's examples of depictions and

6    characterizations of vertical blinds.

7    Q.     Okay.  So from the work that you did on

8    the internet, how long did that search take you to

9    do?

10    A.     I don't have a specific recollection of

11    the time I spent on that search.

12    Q.     Did it take you more than an hour?

13    A.     It likely --

14               MR. WILLIAMS:  Did we lose you?

15               MR. WEISS:  I think I might have

16        lost you.

17               MR. WILLIAMS:  Okay.  Good Because

18        we didn't touch anything.  How long ago

19        did you drop, Mike?

20               MR. WEISS:  About 30 seconds.

21               MR. WILLIAMS:  Okay.  Why don't you

22        see if you have any questions when Arturo

23        picks back up.  I suspect you won't.

24               MR. WEISS:  Thank you.

25    BY MR. JAUREGUI:

1    Q.      So the question pending is, I asked you --

2    you said that you had done some independent work

3    related to the usage of vertical blinds; correct?

4    A.      Yes.

5    Q.      And I asked you if that work was related

6    to the internet search that you had done as

7    reflected by the documents that were in one of the

8    exhibits in your -- one of the three-ring binders;

9    correct?

10   A.      Yes.

11   Q.      And I asked you how long did that search

12   take you, and you told me that you were not able

13   to --

14   A.      I don't remember the specific time frame.

15   Q.      Did you -- how do you bill Mr. Williams

16   here?

17   A.      It will be, I believe, a monthly invoice.

18   Q.      All right.  And in that monthly invoice

19   did you itemize how you spend your time and the

20   work that you are doing in this case?

21   A.      There is an itemization.

22   Q.      Okay.  So if I go back and look at that

23   itemization for the manner in which you had spent

24   the time in this case, that will give us an idea

25   of the amount of time that you spent during the

1   internet search regarding the use of vertical

2   blinds?

3   A.      To the degree of specificity that it's

4   itemized in the bill.

5   Q.      All right.  So tell me what is it that you

6   learned from that independent report that you did

7   regarding the usage of vertical blinds?

8   A.      Again, what I was finding in my review of

9   vertical blinds, their documentation, their

10  description, their depiction, was that these are

11  oftentimes over long banks of windows or patio

12  doors.  They're often described with reference to

13  patio doors.  And, again, this was confirmed by

14  the conversation I had with Mr. Jankoski, the

15  sizes of blinds typically when sold in box stores

16  or home improvement stores are typically very

17  long, seven feet or so tall.  That would be

18  appropriate for something like a patio door or a

19  sliding glass door.

20  Q.      Is it your understanding that vertical

21  blinds are supposed to be exclusively used for

22  either tall windows or patio doors?

23  A.      That is not what I said.

24  Q.      Okay.  Do you know what kind of

25  information or data Hunter Douglas keeps when a

1    consumer orders a product, a Hunter Douglas

2    product?

3    A.      I do not have that sort of information.  I

4    don't know.  I wouldn't be the appropriate person

5    to ask as to what level of communication exists

6    between the consumer and Hunter Douglas directly.

7    Q.      Do you know whether at the time when a

8    consumer orders a vertical blind, the consumer

9    states whether that window blind is going to be

10   for a bedroom in a child's room versus that

11   vertical blind being designated for use in a

12   common area such as a family room?

13   A.      Again, I wouldn't be the appropriate

14   person to ask about communications between the

15   consumers and Hunter Douglas.  At least part of my

16   understanding is that there is often a distributor

17   that works between the consumer and manufacturer.

18   I -- that's not my area of expertise.

19   Q.      Do you know what type of information, if

20   any -- strike that.  Do you know what is the role

21   of the distributor in relation to the transaction

22   that is made in this case for a vertical blind?

23   Do you know what role the distributor played, if

24   any, in this case?

25                   MR. WILLIAMS:  In general?

1                MR. JAUREGUI:  In this case.

2                MR. WILLIAMS:  Okay.  Object.

3                THE WITNESS:  In --in this case I

4      have seen reference to an entity, but I

5      don't have any specific knowledge or

6      detailed knowledge about that company or

7      distributor.

8  BY MR. JAUREGUI:

9  Q.     What is the reference or entity that

10  you're talking about?

11  A.     I believe it was American Blinds And

12  Wallpaper Company.

13  Q.     And is it your understanding that the

14  distributor of this Hunter Douglas product was

15  American Blinds And Wallpaper?

16  A.     Again, I wouldn't -- I don't even want to

17  characterize they were the distributor.  It seems,

18  my understanding, that they had some transactional

19  role involved with Mrs. Davis' purchase or

20  Mrs. Roberts' purchase, but it's -- I don't want

21  to conjecture as to what their role was

22  specifically.

23  Q.     And how did you come across that

24  information?

25  A.     I believe that this was from the

1    deposition testimony provided.

2    Q.       As you sit here today do you have -- do

3    you know one way or the other whether American

4    Blinds And Wallpaper had anything to do in this

5    transaction?

6    A.       Not specifically.  I would have no more

7    information than other people in this case that

8    would be more appropriate to answer questions as

9    to that.

10   Q.       So other than the information that

11   Mr. Jankoski gave you about the location and usage

12   of vertical blinds and your very own independent

13   search that you did on the internet, do you have

14   any other sources of information that you used in

15   your report that told you how or where people used

16   vertical blinds in their homes?

17   A.       Well, it included the internet, but also I

18   did visit a number of the home improvement stores,

19   Lowes and Home Depot, to look at how they were

20   selling these sorts of products.

21   Q.       Where are the stores that you visited?

22   A.       In the New Jersey area.

23   Q.       How many stores did you visit?

24   A.       I went to one Lowes and one Home Depot.

25   Q.       And what did you learn from that visit?

1  A.       Consistent information with what I

2  presented here in both the depiction of and

3  description of vertical blinds.

4  Q.       Did you talk to anyone at either Lowes or

5  Home Depot?

6  A.       No, I did not.

7  Q.       So you just went out there and did some

8  field work, and based on your observations you

9  made some -- you formed some opinions as to how

10  and where vertical blinds are used?

11  A.       I incorporated my observations from that

12  and from my internet searching, and confirmed that

13  with Mr. Jankoski.

14  Q.       Does Lowes sell vertical blinds?

15  A.       Yes.  They sell window coverings, a

16  variety of window coverings.

17  Q.       Do they sell vertical blinds?

18  A.       Yes.

19  Q.       What about Home Depot?

20  A.       Yes.

21  Q.       Do they sell Hunter Douglas products?

22  A.       I wasn't paying attention to the actual

23  manufacturers.

24  Q.       Wouldn't that be relevant?

25  A.       No.  Not for the question I was interested

```
 1    in.
 2    Q.       Having visited two entities that sell
 3    window coverings, do you consider that a
 4    scientific sample to base your opinions in this
 5    case?
 6                      MR. WILLIAMS:  Scientific sample of
 7           what?
 8                      MR. JAUREGUI:  Of how vertical
 9           blinds are used.
10                      MR. WILLIAMS:  Objection.  Vague.
11                      Go ahead.
12                      THE WITNESS:  I incorporated that
13           information into other information that I
14           was also gaining, and then spoke with an
15           industry representative that provided very
16           similar information.
17    BY MR. JAUREGUI:
18    Q.       And when did this usage -- is there a
19    period -- strike that.  Is there a period of time
20    when you asked Mr. Jankoski about when -- you
21    know, how is it that people start using these
22    products?  Do you have a specific period of time,
23    or was that 1995?  Was it more recent?  Was it the
24    1980s.
25    A.       We didn't get into a detailed history with
```

1    specific timelines made out.

2    Q.       All right.  Any other -- strike that.  Did

3    you pick up any information, any written

4    literature, any brochures from either Lowes or

5    Home Depot to substantiate your testimony here

6    today that vertical blinds are used -- have

7    certain designated uses?

8    A.       Again, I think you're mischaracterizing

9    what I said.  I'm not saying that there are

10   designated uses.  You also said before that I was

11   saying that they were exclusively used.  That's

12   not what I'm here to testify to.

13   Q.       All right.  I don't mean to

14   mischaracterize you, so please correct me.  Go

15   ahead and answer the question.

16   A.       Just that the -- that often the vertical

17   blinds are situated over, and they have features

18   that are -- that are appropriate for or share

19   unique aspects with the needs to cover tall, long

20   openings of windows, and specifically are often

21   referenced and depicted as being good for or great

22   for patio doors, sliding glass doors.

23   Q.       Do you know if Hunter Douglas has any

24   literature discouraging consumers to place

25   vertical blinds in children's bedrooms?

1    A.       I don't know of any such literature.

2    Q.       You've never seen any such literature?

3    A.       I've never seen any.

4    Q.       Any other sources of information that you

5    saw or consulted with in arriving at your opinions

6    in the case regarding location and usage of

7    vertical  blinds?

8    A.       No.

9    Q.       Did you talk to anyone else from Hunter

10   Douglas or with Mr. Jankoski?

11   A.       No, I did not.

12   Q.       Did you speak with Richard Anderson?

13   A.       I did not.

14   Q.       Do you know who Richard Anderson is?

15   A.       I recognize the name.

16   Q.       Okay.  Isn't he one of the engineers that

17   used to work for Hunter Douglas?

18   A.       I know that he's listed as an employee of

19   Hunter Douglas, but off the top of my head I...

20   Q.       You reviewed his deposition?

21   A.       Yes.

22   Q.       Did you talk to anyone else other than

23   Mr. Jankoski or Mr. Williams about this case?

24   A.       Yes.

25   Q.       Who else did you talk to?

1    A.       Colleagues at Exponent.

2    Q.       Who are the colleagues that you discussed

3    this case with at Exponent?

4    A.       I discussed this case with a scientist in

5    the human factors practice by the name of Vinuta.

6    Q.       Can you spell the name?

7    A.       V-I-N-U-T-A, Rau, R-A-U, Ph.D.

8    I'm sorry.  That's her title.  She's a Ph.D,

9    doctor.

10   Q.       Oh.

11   A.       Doctor.

12   Q.       Dr. Vinuta is she -- is it a she?

13   A.       Yes.

14   Q.       Okay.  Is she the head of human factors?

15   A.       No.  She's -- she's a colleague of mine,

16   co-worker.  She assisted in review of the file and

17   performed some of the work under my direction.

18   Q.       What type of work?

19   A.       Some of the review of depositions to make

20   sure that I had an index such that I could get

21   back to relevant portions more quickly.

22   The literature searches at my request.  Some of

23   the -- the searches for information that I would

24   be interested in I asked her to help with.

25   Q.       Anyone else -- or anything else that

1    Dr. Vinuta did for you in this case?

2    A.        That is a general summary of her duties.

3    Q.        Did you discuss this case with anyone else

4    at Exponent?

5    A.        Yes.  Also Dr. Hailey Nelson.

6    Q.        What's Dr. Nelson's specialty?

7    A.        She is also in the human factors practice.

8    Q.        For what reason did you discuss these case

9    with her?

10   A.        Again, to describe to her some of the

11   information that I would be interested in from

12   deposition testimony so that an index could be

13   created so I could get back to this information

14   more quickly in the future.

15   Q.        Did she author any parts of this report?

16   A.        No, she did not.

17   Q.        Anyone else that you discussed this case

18   with at Exponent?

19   A.        I think that is the people I discussed

20   this case with.

21   Q.        Who's Dr. Ray Rose?

22   A.        Dr. Rose Ray.

23   Q.        Right.

24   A.        Is a statistician at Exponent.

25   Q.        Did you discuss this case with her?

1    A.        I did not.

2    Q.        Did you review her report in this case?

3    A.        I have reviewed her report.

4    Q.        Do you have any opinions with regards to

5    her report?

6    A.        I am impressed with its quality.

7    Q.        Did you rely on her report for any of your

8    opinions in this case?

9    A.        I have not explicitly relied on the report

10   for opinions that I've reached here.

11   Q.        When you say expressively, what do you

12   mean by that?

13   A.        I'm sorry.  Explicitly.

14   Q.        Explicitly.  Okay.  When you say

15   explicitly, what do you mean by that.

16   A.        I don't think that there is a -- I don't

17   believe that that report is a basis that stands

18   alone for any of my opinions.  I think that we

19   handled separate topic areas, topical areas.

20   Q.        Is her report relevant in any way to your

21   report in this case?

22   A.        I'm sure there's relevancy between the

23   issues we're discussing since we're talking about

24   the potential hazard here, but I don't rely on her

25   report to reach my conclusions.

1    Q.     Let's just get something out of the way

2    quickly here.  There are three defendants in this

3    case, Hunter Douglas, Window Covering

4    Manufacturers Association and the Window Covering

5    And Safety Council.  You were retained in this

6    case to do work on behalf of Hunter Douglas; is

7    that right?

8    A.     I was retained by Mr. Williams who

9    represents Hunter Douglas.

10    Q.     Have you worked -- have you done any work

11    with Mr. Williams' office in the past?

12    A.     I have not worked with Mr. Williams

13    before.

14    Q.     Have you ever worked on a window covering

15    case before?

16    A.     I have.

17    Q.     Which case?

18    A.     I've assisted in a human factors analysis

19    on -- on -- I'm not sure of the exact number but

20    on a few different litigation cases.

21    Q.     Tell me what those cases are?

22    A.     I don't know all their names.  I can --

23    Q.     Tell me how many cases.

24    A.     As I said, it's -- it's a number.  I would

25    say around five.

1   Q.      How long ago did you do your work or when

2   is the last time you did your work before this

3   one?

4   A.      Likely to be about a year, maybe more.

5   Q.      Where was that case pending?

6   A.      That case, I believe, was in Florida.

7   Q.      What was the product involved in that

8   case?

9   A.      A horizontal blind.

10  Q.      What was the mechanism of injury?

11  A.      I believe it was a strangulation from the

12  inner cord.

13  Q.      Do you recall what city the case was in?

14  A.      I do not.

15  Q.      That was -- that was not the Napier case,

16  was it?

17  A.      That was the Napier case.

18  Q.      Now, Dr. Ray was also involved in that

19  case, was she not?

20  A.      She was.

21  Q.      Okay.  Did you give testimony in this

22  case?

23  A.      I did not.

24  Q.      Did you give a report in this case?

25  A.      I did not.

1   Q.      What was the nature of the work that you

2   did in that case?

3   A.      I was providing support to a -- another

4   expert in the case.

5   Q.      Who was the other expert?

6   A.      Dr. Chris Wood.

7   Q.      Is Dr. Wood a human factors expert?

8   A.      Yes, she is.

9   Q.      Was any of the recommendations or the work

10  that you did in that case incorporated into a

11  report?

12  A.      The work that I did where I -- I believe

13  were incorporated into a report.  I'm a little

14  hazy on the details of what -- what was eventually

15  produced for the report or for that case as well

16  as -- I'm basing this on memory, so that I just

17  want to clarify that, that this is based on my

18  memory of the issues at hand.

19  Q.      That was a Hunter Douglas window covering,

20  was it not?

21  A.      I believe that was.

22  Q.      You were working for the defense in that

23  case, defendants?

24  A.      I believe that Exponent was retained on

25  behalf of Hunter Douglas in that matter.

1    Q.       Do you have any of your work -- strike

2    that.  Do you have any of the work that you did in

3    that case?  Did you save it in your archives?

4    A.       I did not.  If there was a report

5    produced, I don't know as to its availability, but

6    that might still exist.

7    Q.       Did you generally -- did you generally

8    recall what were your recommendations in

9    connection with your work in that case?

10   A.       I -- again, I don't have specific memory

11   detail enough to...

12   Q.       Did you have any opinions as to whether or

13   not the inner cord from the horizontal blind posed

14   an unreasonable risk of injury to young children?

15   A.       Again, I'd like to clarify that, that my

16   memory is that it was an inner cord, but I'm not a

17   hundred percent sure as to the details of that

18   case or to my specific work in that.  I just want

19   to...

20   Q.       All right.  Any other window covering

21   cases?

22   A.       There were other window covering cases.

23   Q.       Okay.  Are they pending in court?

24   A.       They were, and I'm not -- I can't recall

25   all the names nor can I really recall at this

1    point what status they are at.

2                    MR. WILLIAMS:  I will remind the

3            witness if there are any of these cases

4            that involve consulting on his behalf and

5            has not been disclosed by way of

6            designating him as an expert witness and

7            where he would violate any such

8            confidentiality to let me know or decline

9            to supply that information.

10   BY MR. JAUREGUI:

11   Q.     With such warning, in Exhibit 3 you've

12   identified a list of cases here.

13   A.     Yes.

14   Q.     Any of the window blind cases that you

15   have worked on in the past, are they identified in

16   this case?

17   A.      No, they are not.

18   Q.      Is there a reason why you left out all of

19   the window blind cases that you've worked on in

20   your list of cases attached to Exhibit 3?

21                    MR. WILLIAMS:  Well, I'm going to

22           object to the implication of the question.

23           It's a list of prior deposition and trial

24           testimony.  It's not a list of cases.

25                    THE WITNESS:  This -- what's

164

1               provided in Exhibit 3 is my prior four

2               years of deposition trial testimony.  This

3               was my understanding of what's required in

4               a Rule 26(b), Federal Court.

5    BY MR. JAUREGUI:

6    Q.       Do you specifically know that Rule

7    26(b)(4) only calls for the disclosure of

8    information of cases that an expert witness has

9    worked on for the past four years?

10   A.       That's my understanding of it.

11   Q.       All right.  And if that understanding is

12   mistaken, can you provide me with a complete list

13   of all the cases you have worked on as an expert

14   witness on human factors?

15   A.       I don't know that I can do that.

16   Q.       Why is that?

17   A.       Because there are matters of -- of

18   confidentiality for cases that I am sometimes

19   retained in that I don't know that I can prepare

20   that request.

21   Q.       Do you know whether these cases are

22   pending in court?

23   A.       Some.

24   Q.       Okay.  And what matters of confidentiality

25   were involved in that case?  Are you suggesting

1    that the cases that you were an expert consultant,

2    those cases were sealed by the Court and they are

3    not accessible by the public?

4    A.      I don't know the status of -- well, of

5    course, that's why I'm saying I don't know whether

6    I could compile a list from that standpoint.  The

7    other standpoint for whether or not I could

8    compile such list is, I don't know whether or not

9    recordkeeping-wise I would be able to compile all

10   the cases I've ever been involved with.

11   Q.      Dr. Sala, I'm making a request for you on

12   the record that you provide with a list of those

13   cases the substance of your testimony in each one

14   of those cases, and that you provide that to your

15   attorney.  Your attorney will then determine

16   whether those cases or that information is

17   discoverable for purposes of this case.

18                   MR. WILLIAMS:  We're having a

19              disconnect here.  You want the doctor to

20              provide a list of cases where he testified

21              and the subject of his testimony.  He's

22              told you, he's given you that.  He has not

23              given you something that you've asked for

24              apparently that isn't required by Rule 26

25              that your experts did not provide, which

1    is a list of every case that he's worked

2    on in the past whether or not he's

3    testified or not.  I'm not sure what

4    you're asking him for.

5              MR. JAUREGUI:  Well, let me make

6    that clear.

7  BY MR. JAUREGUI:

8  Q.    I am asking you, Mr. Sala, to provide your

9  attorney with all of the matters that you have

10  been retained as a consultant dealing with window

11  blind cases.

12             MR. WILLIAMS:  And what's the basis

13    for that request?

14             MR. JAUREGUI:  Because it is

15    relevant to the issues that we are dealing

16    in this case.  He is holding himself as an

17    and expert in these other cases, and I'm

18    certainly entitled to review what the

19    opinions he has offered in the past in

20    similar cases.

21             MR. WILLIAMS:  Why don't you ask

22    him if he's testified in such cases or

23    prepared reports in such cases as a start?

24             MR. JAUREGUI:  I've done that.

25             MR. WILLIAMS:  No, you haven't.

1      MR. JAUREGUI:  Yes, I did.  Let me

2   ask that again.

3 BY MR. JAUREGUI:

4 Q.  In the cases that you have been retained

5 as an expert in window blind cases, okay, you told

6 me that there were some four or five cases in the

7 past in addition to this one; is that correct?

8 A.  I've been involved in cases and I've

9 provided support on those cases.

10 Q.  And in all of those cases were you only

11 providing support or you were you the primary

12 consultant on the human factor analysis?

13 A.  On the litigation matters I was providing

14 support.

15 Q.  What type of support were you providing?

16 A.  Much in the way of -- that Dr. Rau and

17 Dr. Nelson had been supporting me on this.  I have

18 provided support to the expert to help investigate

19 issues that were pertinent to the case.

20 Q.  Other than the Napier case what other

21 cases -- where were these cases pending?  In what

22 states?

23      MR. WILLIAMS:  The same objection

24   with respect to any cases where there was

25   no expert disclosure where you would be

```
 1              violating any confidentiality.
 2                    THE WITNESS:  Can I take a break to
 3              speak with Mr. Williams?
 4                    MR. JAUREGUI:  You can answer the
 5              question first.
 6                    MR. WILLIAMS:  No.  He wants to
 7              take a break.
 8                    MR. JAUREGUI:  All right.  Well, go
 9              talk to your attorney, then.
10                            -----
11                    (Off the record at 2:05 p.m.)
12                            -----
13                    (On the record at 2:07 p.m.)
14                            -----
15                    MR. WILLIAMS:  Okay.  That break
16              was for the purpose of making sure
17              that Dr. Sala did not step on any
18              confidential matters.  So I don't know
19              whether it makes sense to have the last
20              question read back or for you, Dr. Sala,
21              to simply, make clear what I thought you
22              had before, but try it again, about the
23              nature of your work on any of these cases
24              and what you did and did not do on them.
25                    THE WITNESS:  Sure.  I provided no
```

1          deposition or trial testimony on any

2          window covering matter.  I've provided

3          support on window covering matters in some

4          number of cases aside from this issue

5          we're dealing with here.  I have never

6          been retained as the expert on these

7          matters.  I can only recall the name of

8          one other matter presently to date, but I

9          do not know the status of that case or

10         whether anything had been produced or

11         someone has been named as an expert in

12         that case.  I can find that out and

13         provide that information at a later date.

14         And I've never authored a report in

15         another window covering matter.

16    BY MR. JAUREGUI:

17    Q.    What's the name of the case that you

18    recall?

19              MR. WILLIAMS:  He just told you or

20         tried to that he doesn't know whether it

21         was pending, resolved, whether there have

22         been expert disclosures in the case.

23              MR. JAUREGUI:  He said that he

24         remembered the name of the case.

25              MR. WILLIAMS:  He remembers the

1            name, which he's not going to tell you

2            because he doesn't know whether there was

3            ever an expert disclosure and the

4            consulting work turned into non-privileged

5            expert work.  If it did, he just told you

6            he'll find out and provide that

7            information to you.

8                   MR. JAUREGUI:  All right.  That's

9            fair enough.

10  BY MR. JAUREGUI:

11  Q.     In any of those matters, four or five

12  cases, or matters that you consulted on, other

13  than the Napier case do any of those cases involve

14  a Hunter Douglas product?

15  A.     To the best of my recollection, I don't

16  believe so.

17  Q.     Have you ever been asked by a company to

18  provide advice as to whether or not one of the

19  products should be re-called from the market?

20  A.     I have been engaged by companies to -- to

21  address concerns potentially related to a re-call.

22  I've never been asked to make the decision as you

23  posed the question.

24  Q.     And do you know whether as a result of the

25  advice that you provided in these instances, have

1    any such -- have products been re-called.

2                    MR. WILLIAMS:  Don't violate any

3            confidentiality.

4                    THE WITNESS:  I can't specifically

5            discuss what my work was in those roles

6            and those matters.

7    BY MR. JAUREGUI:

8    Q.      Generally you can cannot tell me whether

9    or not the advice that you gave -- I'm not asking

10   you to disclose the name of the product, I'm not

11   asking you to disclose the name of the client, I'm

12   just asking you, on the basis of the advice that

13   you gave, do you know whether any of the products

14   at issue were re-called?

15                   MR. WILLIAMS:  I'm just going to

16           object.  What possible use could that be

17           to you to know the underlying information?

18                   MR. JAUREGUI:  Well, I'll figure

19           that out in time.

20                   MR. WILLIAMS:  Well, no.  I think

21           sometimes you can figure this out

22           beforehand.

23                   If you're able to answer that

24            question without disclosing any

25            proprietary information, I'm going to let

1           you.

2                        I don't think there should be much

3             of a long leash here, Arturo.  Go ahead.

4                        THE WITNESS:  I can't -- I can't

5             specifically think of an instance where I

6             know how the information I was provided

7             has led to a product being re-called.

8    BY MR. JAUREGUI:

9    Q.      Are you involved in a case right now,

10   against Target?

11   A.      Yes, I am.

12   Q.      Where is that case pending at?

13   A.      Again, I don't know exactly to what degree

14   things have progressed in that case.  I am

15   hesitant to talk about my involvement.

16   Q.      You are involved in that -- is that case

17   pending in the State of Pennsylvania?

18                       MR. WILLIAMS:  Well, he just told

19             you he's involved in litigation against

20             Target.

21                       MR. JAUREGUI:  Okay.  Well, let me

22             probe that for you, then.  Excuse me.

23             Okay.

24   BY MR. JAUREGUI:

25   Q.      Have you been retained as an expert in

1   that case?

2                    MR. WILLIAMS:  Let's start with has

3           he been disclosed as an expert.

4   BY MR. JAUREGUI:

5   Q.      Yes.  Have you been disclosed?

6   A.      I do not know.

7   Q.      Have you prepared a report in that case?

8   A.      I don't know to what degree I have been

9   disclosed in that case.

10                   MR. WILLIAMS:  And as a result of

11          that are you hesitant or not willing to

12          answer any further questions?

13                   THE WITNESS:  Yes.

14                   MR. WILLIAMS:  I think that's

15          appropriate.

16  BY MR. JAUREGUI:

17  Q.      That's fine.  You're being retained in

18  that case but you don't know whether you've been

19  retained purely as a consultant expert versus an

20  expert that that is going to provide testimony at

21  trial; is that correct?

22  A.      I don't know how I -- how I've been

23  retained or to what degree my client will choose

24  to use any of my work in this -- in that case.

25  Q.      Does the letter of engagement in that case

1   delineate what your responsibilities are going to

2   be?

3                    MR. WILLIAMS:  I'll object to that.

4          That's privileged.  The letter can

5          delineate anything it wants to, but until

6          he's disclosed as an expert, disclosed,

7          none of that information becomes

8          accessible to you, or to me for that

9          matter.

10  BY MR. JAUREGUI:

11  Q.      Do you have a practice of saving drafts of

12  your reports?

13  A.      When I provide a draft for a client to

14  review upon their request, then I will -- I will

15  keep that draft.

16  Q.      Okay.  Did you submit such draft to be

17  reviewed by either Mr. Williams or Mr. Jankoski or

18  anyone else from Hunter Douglas in this case?

19  A.      I did provide a draft to Mr. Williams.

20  Q.      Did Mr. Williams comment or ask you to

21  make any changes in that draft?

22  A.      We discussed changes to my report with

23  respect to editing or additional information

24  that -- that he would -- he was interested in me

25  covering.

1   Q.      Okay.  And did you incorporate that

2   information in your report?

3   A.      Where it was appropriate that my area of

4   expertise could comment on it.

5   Q.      What was that information that you were

6   asked to incorporate in your report and you

7   eventually ended up incorporating in your report?

8   A.      I -- I believe that I supplemented some of

9   my discussion as to the discussion of scientific

10  research around warnings.

11  Q.      Any other area?

12  A.      Off the top of my head, that's what comes

13  to mind as the most -- that's what's coming to my

14  mind right now.

15  Q.      If you still have a copy of that draft

16  laying around, can you provide that to your

17  attorney, please?

18  A.      I will.

19              MR. WILLIAMS:  Okay.

20  BY MR. JAUREGUI:

21  Q.      Was there any information in your report

22  when you drafted it was taken out, just yes or no,

23  by either Mr. Williams or anyone else from Hunter

24  Douglas?

25  A.      We had some discussions around commas and

1   periods.

2   Q.      Anything more substantive than just

3   punctuation marks?

4   A.      Nothing that I would consider substantive.

5   No.

6   Q.      How do you categorize the type of work

7   that you do?  Is it mostly geared towards

8   corporations, business entities or individuals as

9   a result of their exposure to products?

10   A.      I would characterize my work as client

11   services.  Whoever clients are approaching us, if

12   I have the appropriate expertise and they are

13   asking me questions that my technical skills can

14   bring -- shed some light on, I will engage myself

15   or engage with that.

16   Q.      Now, the list of cases that you provided

17   us, Exhibit No. 3, how many of these cases were

18   you retained by the plaintiffs' attorneys?

19   A.      On this list there's one.

20   Q.      Which one is it?

21   A.      Hawley v Paschall Truck Lines,

22   Incorporated.

23   Q.      Where is that case listed?  In the middle,

24   top, bottom of the page?

25   A.      That is the listing for deposition date of

1    08/10.

2    Q.      Sir, could you just point it out to me?

3    A.      All right.

4    Q.      What was the issue in that case?

5    A.      The visibility and driver behavior of a

6    motorist.

7    Q.      And you testified on behalf of the

8    plaintiff?

9    A.      Yes.  I was retained by the counsel

10   representing the plaintiffs in the case.

11   Q.      Can you briefly tell me the other cases

12   that you have listed here starting from the top?

13   We already discussed several of them at the

14   bottom, but could you go quickly through them.

15   Lankford versus Skaff engineering?  What type of

16   case was that?

17   A.      That was a warnings case, a failure to

18   warn case related to a device known as a Thumper.

19   Q.      And who retained you in that case?

20   A.      Counsel for Skaff Engineering.

21   Q.      That's the defendant in that case?

22   A.      Yes.

23   Q.      All right.  And you acted as an expert on

24   issued relating to the same thing?

25   A.      Relating to warnings.

1  Q.      Warnings?  What was the outcome of that

2  case, if you know?

3  A.      I don't -- I -- I believe that it settled,

4  but I'm not sure as to the outcome.

5  Q.      The next case is DiRosa versus Asphalt

6  Paving Systems.  Who retained you in that case?

7  A.      Counsel for Asphalt Paving.

8  Q.      What was your role in that litigation?

9  A.      Human factors and warnings related to the

10  backing of a dump truck and the actions of a

11  worker.

12  Q.      What was the outcome of that case?

13  A.      Again, I believing that settled.

14  Q.      Bragdon V Karl R. Johnson Trucking.  Who

15  retained you in that case?

16  A.      Counsel for Karl Johnson and Delbert

17  Degree.

18  Q.      All right.  That's for the defendants.

19  What were the issues and what was your testimony

20  in that case, if you generally remember that?

21  A.      That was related to driver behavior and

22  pedestrian behavior and visibility.

23  Q.      What was the outcome of that case?

24  A.      That went to trial.

25  Q.      What was the verdict?

1    A.      Again, I think this was one of the cases

2    where they split on.

3    Q.      And they shared liability?

4    A.      I believe so.  I don't know what the

5    proper terminology is there.

6    Q.      All right.  Some type of contributory

7    negligence was attached to the finding there.  The

8    next item, Izikoff.  We talked a little bit about

9    that.  And then this other one, you have Bragdon.

10   Again, is that the same case?

11   A.      That was the same case.  That was the

12   listing for my trial testimony.

13   Q.      McLaughlin versus John Kennedy Catholic

14   High School.  Who retained you in this case?

15   A.      Counsel for the high school.

16   Q.      And what was the issue and the nature of

17   your testimony in that case?

18   A.      This was a premises liability.  The

19   plaintiff alleges to have tripped over a gate or a

20   track for a gate that was -- that was claimed to

21   have been left.  This was a scissors gate --

22   Q.      All right.

23   A.      -- that she claims was left in the down

24   state.

25   Q.      What was the outcome of that case?

1   A.      Again, split.

2   Q.      I take it you testified there as a safety

3   expert, a warnings expert?

4   A.      Warnings and walking behavior, visibility.

5   Q.      Okay.  Mendez versus Estwin Manufacturing

6   Company, Inc.  Who retained you in that case?

7   A.      The counsel for Estwin.

8   Q.      What was the issue in that case and what

9   was the nature of your involvement?

10  A.      My involvement was, again, dealing with

11  warnings, a failure to warn claim.

12  Q.      What was the outcome of that case?

13  A.      I believe that it settled.

14  Q.      Rosado versus Onarato.  Who retained you

15  in that case?

16  A.      The counsel for Mr. Onarato.

17  Q.      And what were the issues in that case and

18  what was your testimony?

19  A.      This related to driver perception,

20  reaction, and driver behavior, one motorist versus

21  another.

22  Q.      Was there a resolution in that case?

23  A.      I believe it was a defense verdict.

24  Q.      Jennings versus Starland Ballroom.  Who

25  retained you in that case?

1    A.        Counsel for Starland Ballroom.

2    Q.        What was the issue in that case and what

3    was your testimony?

4    A.        This was, again, a premises liability, the

5    warnings and lighting in a ballroom specifically

6    related to a step.

7    Q.        What was the outcome in that case?

8    A.        I believe defense verdict.

9    Q.        I believe we already discussed the Hawley

10   case.  Kellianne Kelly-Williams versus AT&T.  Who

11   retained you in that case?

12   A.        Counsel for AT&T.

13   Q.        What was the issue and what was your

14   testimony?

15   A.        Issue related to warnings, supervision.

16   The injury and accident scenario caused by an

17   A-frame sign.

18   Q.        What was the outcome of that case?

19   A.        I believe that was a defense.

20   Q.        All right.  And that comprises the list of

21   cases that you provided to us on Exhibit 3?

22   A.        In addition to the ones we've already

23   discussed.

24   Q.        And there are other cases you have

25   provided trial or deposition testimony; correct?

1    A.        There is one case that I provided

2    deposition testimony in the year 2006.

3    Q.        And it's not listed there.

4    A.        No.  This is just fours years.

5    Q.        I was sidetracked.  I sidetracked myself.

6    I don't have anyone to blame for that.  When I was

7    asking you about the number of defendants in this

8    case, you had told me that you had been retained

9    by Hunter Douglas.  Remember that?

10   A.        I've been retained by Mr. Williams.

11   Q.        Have you ever done any work for the Window

12   Covering Safety Council?

13                  MR. WILLIAMS:  Objection to the

14          form,  litigation, disclosed.

15                  Go ahead and tell him.  However, if

16           you don't know, tell him that, too.

17                  THE WITNESS:  I've provided

18          support, I've -- on a matter, however, I

19          would prefer to check to see the manner of

20          disclosure and get back to you.

21   BY MR. JAUREGUI:

22   Q.        All right.  What about the Window Covering

23   Manufacturing Association?

24   A.        That would be the same answer.

25   Q.        Were you asked to offer any opinions on

1    behalf of the Window Covering Safety Council or on

2    behalf of the Window Covering Manufacturers

3    Association in this report?

4    A.        No, I haven't.

5    Q.        Did you discuss the subject of your report

6    with Mr. Michael Weiss or Mr. Carroll in this

7    case, his co-counsel?

8    A.        I have not.

9              THE WITNESS:  Just going to get a

10          refill.

11             MR. JAUREGUI:  All right.

12                        -----

13                        (Pause)

14                        -----

15   BY MR. JAUREGUI:

16   Q.        Have you ever testified as an expert in

17   the State of Illinois?

18   A.        No.

19   Q.        Of the cases that you have -- you have

20   given deposition testimony or trial testimony, how

21   many of those cases have been in Federal Court?

22   A.        Three of my depositions were in Federal

23   Court.

24   Q.        Three of the depositions were in cases

25   that were pending in Federal Court?

1    A.      Yes.

2    Q.      Were any of those cases tried?

3    A.      One is still active, the other two have

4    settled.

5    Q.      In the case that's still active, I take it

6    there has been no trial yet?

7    A.      There has been no trial yet.

8    Q.      So in the three days where you have been

9    retained as an expert, were you retained as a

10   human factors expert?

11   A.      Yeah.

12   Q.      You have not testified at trial in any of

13   those cases?

14   A.      I have not.

15   Q.      Have your opinions offered in cases where

16   you've been retained as an expert, have been

17   limited or excluded by any court?

18   A.      No.

19   Q.      Have they been challenged?

20   A.      As in like?

21   Q.      Challenged on the basis as in motions in

22   limine.

23   A.      Yes.

24   Q.      Do you recall what was the outcome of

25   those challenges?

1    A.      In any case where that has proceeded to

2    the point of trial or deposition, I believe that

3    they've been -- been successfully defended, I

4    guess.  And --

5    Q.      Your testimony was allowed?

6    A.      Was allowed.  And some are pending and

7    wouldn't be made until the time of trial, I

8    believe.

9                     MR. JAUREGUI:  I just want to make

10           sure that he answered the question.

11   BY MR. JAUREGUI:

12   Q.      Is that you have been retained, you have

13   been involved in other window covering cases, but

14   have you ever given testimony in a trial in a

15   window covering case?

16   A.      I have not been retained as the expert on

17   a window covering case.

18   Q.      Period?

19   A.      Period.

20   Q.      Thank you.  In this case, for purposes of

21   your report, did you review the IDIs, the in depth

22   investigations?

23   A.      Yes.

24   Q.      And did you find any information useful in

25   preparing your work for this case?

1   A.        I think I found that there's consistency

2   with what had been recorded in the number of

3   investigations that were published.  My review of

4   them was consistent with what has been published

5   and discussed in the scientific literature.

6   Q.        Do you know about how many such

7   investigative reports you reviewed?

8   A.        I believe that -- well, I specifically was

9   focusing on the ones from 1982 up through 1995

10  including 1995.

11  Q.        So how many in depth investigation reports

12  have you reviewed?

13  A.        Those are the number of investigative

14  reports.  Whether they were fully classified as

15  what the CPSC would determine an IDI or in depth

16  investigation, I believe there were between 120

17  and 130, rough estimate.

18  Q.        From your view of the 120 or 130

19  investigation reports that you reviewed, this is

20  reports from the Consumer Products Safety

21  Commisison; correct?

22  A.        Yes.  These are the reports that have been

23  produced in this case?

24  Q.        The reports that have been produced in

25  this case?

1  A.        Yes.  The reports referenced in my list of

2  materials that we spoke of earlier.

3  Q.        We reviewed your report before, Dr. Sala,

4  but I don't recall in the materials that you have

5  there containing any independent investigation

6  reports in that material?

7  A.        The -- included in these binders are not

8  the investigative reports.  I -- when we went

9  through the list of materials that were not

10 included in this binders, one of the things that

11 we discussed at that point was the epidemiological

12 investigation reports and supplemental documents

13 that were produced by Hunter Douglas.

14 Q.        Only those that were produced by Hunter

15 Douglas?

16 A.        Yes.

17 Q.        In addition to the investigative --

18 investigation reports or IDIs that Hunter Douglas

19 produced in this litigation, did you review any of

20 the reports from the Consumer Product Safety

21 Commission directly?

22 A.        Not specifically for this case.

23 Q.        So you recall having reviewed about 120,

24 130 reports in reviewing or in preparing your

25 report in this case?

1     A.      Yes.

2     Q.      Out of this report did you see any

3     instance in which there was either a serious

4     injury or a strangulation death that resulted from

5     the interaction of a child from a window covering

6     fitted with a wand?

7                    MR. WILLIAMS:  And no cord or

8          chain?

9                    MR. JAUREGUI:  That's correct.

10                    THE WITNESS:  Based on my

11          recollection as I sit here today, I don't

12          recall that.

13    BY MR. JAUREGUI:

14    Q.      All right.  In all of the literature that

15    you have reviewed, do you have any recollection of

16    any instances of serious injury to young children

17    or strangulation death of a young child that was

18    caused by the wand of a window covering?

19    A.      Well, depends on what you mean by serious

20    injury.

21    Q.      Require hospitalization, suffer brain

22    injury, any -- any type of either -- an injury

23    which require hospitalization or death.

24    A.      I don't have a -- any documentation of

25    what you're speaking of here with me today, and I

1   did not look for any such information related to

2   this case or this matter.

3   Q.      But do you know if -- my question was, to

4   your knowledge, do you know whether or not in the

5   literature that you reviewed whether there are any

6   documented cases, and let's limit it to

7   strangulations, to make it easier, of

8   strangulations of a young child from a window

9   covering fitted only with a wand and no cords?

10  A.      Again, I am not aware of any

11  strangulations for a want only device from any of

12  the materials that I reviewed.

13  Q.      What were you asked to do in this case?

14  A.      I was asked to provide a human factors

15  evaluation as to the design of this product and

16  specifically offering the different control

17  mechanisms for use as well as to evaluate the

18  warnings and safety claims being made in this

19  matter.

20  Q.      And you reached some opinions in this

21  case; correct?

22  A.      Yes.  And also to review the opposing

23  experts and their opinions in the case.

24  Q.      Just get this out of the way.  I know you

25  had some criticism of Stetler's, Mr. Stetler's

1    opinions in the case; correct?

2    A.       I called out some criticisms that I have

3    of his report.  Yes.

4    Q.       Did you have any criticisms of

5    Dr. Wright's report?

6                      MR. WILLIAMS:  I'm going to let him

7             answer the question.  I'm just going to

8             note an objection, that that's a vague,

9             compound question, calls for narrative

10            answer.

11   BY MR. JAUREGUI:

12   Q.       The reason for my questions, in your

13   report you specifically identified some of the

14   disagreements that you had with Mr. Stetler's

15   report.  Your report notes that you reviewed

16   Dr. Wright's report, but I did not see any

17   criticism of his report.  So my question to you as

18   you sit here today, do you have any criticism of

19   Dr. Wright's report?

20                      MR. WILLIAMS:  Same objection.

21                      THE WITNESS:  I would have, if

22            asked specifically about portions of his

23            analysis, where it's appropriate that

24            to -- and there's overlap between our

25            sciences, I might have comment.  But

1          specifically with respect to the issues

2          that -- that I have been asked to address,

3          there was more overlap between Statler's

4          report and my own.

5   BY MR. JAUREGUI:

6   Q.      I don't know how to take that answer, but

7   I'll come back to it in a minute.  Your opinions

8   in this case are contained on Page 14 of your

9   report; is that correct?

10  A.      These are summary --

11  Q.      A summary of your opinions?

12  A.      Yeah.  Summary of my opinions.

13  Q.      You have four different opinions in the

14  case?

15  A.      I -- again, summary.

16  Q.      Summaries of your opinions.  Okay.  Can

17  you read the summaries of your opinions into the

18  record.  First read the first bullet point there.

19  A.      "The response of Hunter Douglas

20  specifically and the window covering industry in

21  general in the mid-1990s to the identification of

22  child strangulation hazards associated with window

23  covering cords and the developmental process

24  engaged in by Hunter Douglas and the window

25  covering industry to address these concerns was

1   reasonable given the accumulated knowledge of

2   these incidents."

3   Q.      Okay.  What is the second opinion or

4   summary of your opinion that you have reached on

5   Page 14?

6   A.      "The product's functionality would be

7   eliminated" -- excuse me -- "would be limited or

8   eliminated for a portion of the intended user

9   population due to human factors issues related to

10  people's capabilities and limitations and the

11  expected use environment for the product if the

12  PermAssure Wand were the only control mechanism

13  available.  Given the human factors relevant to

14  this product and the understanding of the hazards

15  posed by vertical blinds, it was reasonable for

16  Hunter Douglas to have offered consumers options

17  as to the control mechanisms for the subject

18  blinds."

19  Q.      And your opinion, your third opinion, or

20  the summary of your third opinion.

21  A.      "Mrs. Davis and Mrs. Roberts understood

22  the potential hazards associated with cords

23  attached to window blinds.  Despite this

24  understanding, they fail to address this

25  condition.  There is no scientific reason to

1   believe that additional or alternative warnings or

2   safety information would have altered their

3   behavior with respect to the selection, purchase,

4   installation and use of the incident product."

5   Q.      And your fourth opinion or summary of your

6   fourth opinion as contained on Page 14.

7   A.      "Mr. and Mrs. Padilla did not demonstrate

8   safety information seeking behaviors with respect

9   to child safety in general, and that related

10  specifically to window coverings and displayed

11  limited response to acknowledge and obvious safety

12  concern.  There is no scientific reason to believe

13  that additional or alternative warnings or safety

14  information provided with the product would have

15  altered their behavior and averted this incident."

16  Q.      All right.  Thank you for that.  Now, let

17  me ask you a question.  Do you know if Hunter

18  Douglas maintains any data specifically dealing

19  with injuries from its products?

20  A.      I don't know the -- the different data

21  that Hunter Douglas might retain.

22  Q.      Did you ask them if they maintained such

23  data?

24  A.      I did not ask.

25  Q.      Would that be relevant to your inquiry in

1    this case if they had some data that they

2    maintained regarding the rate of incident -- the

3    rate of injury incidents from the product?

4    A.      I had access to information about the

5    hazard in general, and so I'm comfortable with the

6    data that was -- that I had available.

7    Q.      In your report you referenced the 1994,

8    1995 Retrofit Action Plan.  Do you recall that?

9    A.      What do --

10   Q.      All right.  What do you know about the

11   efficacy of the Retrofit Action Plan in terms of

12   addressing the dangers of strangulation of young

13   children from horizontal blinds?

14               MR. WILLIAMS:  Objection.  Vague.

15        What do you mean by efficacy?

16               THE WITNESS:  I actually was going

17        to ask what you mean by efficacy.

18   BY MR. JAUREGUI:

19   Q.      Was it successful?

20   A.      I haven't been asked to evaluate the

21   effectiveness or any of the outcome measures on

22   that action and I'm not prepared to -- to do so.

23   Q.      So you have no opinion on that?

24   A.      Correct.

25   Q.      Do you know what were the approximate --

1   strike that.  Do you know what was the approximate

2   number of window coverings in American homes in

3   1995?

4   A.      I do not.

5   Q.      Do you know what were the approximate

6   number of variable blinds in American homes in

7   1995?

8   A.      I do not have that data on there.

9   Q.      Would that type of data be at all relevant

10  to your opinions in this case?

11  A.      I don't -- I don't foresee that data

12  affecting my opinions in this case.

13  Q.      What is your understanding as to what was

14  the purpose of the Retrofit Action plan of '94,

15  '95?

16  A.      The purpose?

17  Q.      Yes.

18  A.      Of the Retrofit Action Plan?  With the --

19  the intent of the 1994 Action Plan was to address

20  potential hazards associated with children

21  interacting with window coverings.

22  Q.      And was a potential hazard dealing with

23  strangulation?

24  A.      Yes.

25  Q.      Was it directed to a particular product?

1    A.        Window coverings.

2    Q.        Didn't say whether or not it was

3    horizontal blinds as opposed to all types of

4    blinds?

5    A.        Well, I believe that there might have been

6    different recommendations based on the type of

7    blind, but this is generally window coverings.

8    Q.        I may have asked you this when we were

9    reviewing your materials, but do you have an

10   opinion as to whether the danger from the vertical

11   blind with loop cords is a latent and hidden

12   danger versus an open and obvious danger?

13                    MR. WILLIAMS:  Objection.  Vague

14          and ambiguous.

15                    THE WITNESS:  I believe we

16          discussed this a little bit earlier.  And

17          the problem I have in answering some of

18          this question is, again, the

19          characterization that you're using of open

20          and obvious versus hidden and latent.  I

21          think that there's a lot of factors that

22          would go into determining whether or not

23          in a given situation something might be

24          open or obvious to someone.

25   BY MR. JAUREGUI:

1    Q.      All right.  You are aware that the United

2    States Consumer Product Safety Commission

3    considers the danger of strangulation caused by

4    window covering cords to be a hidden danger, do

5    you not?

6    A.      I've seen them reference that oftentimes,

7    that it would be considered a hidden.  And it

8    would depend on -- they talk about different cords

9    and different varieties.

10   Q.      And do you disagree with that

11   characterization?

12                   MR. WILLIAMS:  I'll object.

13        That's overly broad.

14   BY MR. JAUREGUI:

15   Q.      Whether the -- do you agree with the

16   characterization by the Consumer Product Safety

17   Commission that the danger of strangulation posed

18   to young children from window blind cords is a

19   hidden danger?

20   A.      I don't think --

21                   MR. WILLIAMS:  Same objection.

22                   THE WITNESS:  I don't think that I

23        can endorse that statement across the

24        board.  I think that -- that at times,

25        given certain situational factors, it may

1          or made not be recognized by the people,

2          and that -- depending on, again, the

3          situational factors, there's usually

4          something to either say that there is

5          reasons for or reasons against them

6          noticing or not noticing whether or not

7          this was a hazard in the environment.

8   BY MR. JAUREGUI:

9   Q.      So you don't agree or you disagree with

10  it?

11  A.      Again, I can't endorse across the board a

12  statement that broad.

13  Q.      All right.  Do you have an opinion as to

14  whether the vertical blinds in issue in this case

15  posed an unreasonable risk of injury, i.e.,

16  strangulation of young children?

17  A.      I believe if we're talking about risk of

18  injury, I think that Dr. Ray is really dealing

19  with -- with the -- with those issues, and I defer

20  to her and her report and her deposition, or her

21  testimony.

22  Q.      So you have no opinion as to whether or

23  not the vertical blind in this case posed an

24  unreasonable risk of injury?

25  A.      Again, I defer to another expert in that

1    matter.

2    Q.       Did you ever see the vertical blind in

3    this case other than seeing it in pictures?

4    A.       In pictures.

5    Q.       Did you ask your attorney if you could see

6    the actual vertical blind?

7    A.       No, I did not.

8    Q.       Would that be important to your analysis

9    in this case?

10   A.       The incident vertical blind, I do not

11   believe that seeing the incident vertical blind

12   would be important to my analysis here.

13   Q.       Why is that?

14   A.       I'm not particularly dealing with issues

15   as to the incident blind versus a -- just the

16   style of the blind.  I'm interested more in -- or

17   my analysis really pertains to the nature of the

18   product and not whether or not the incident one

19   had some particular feature or factor involved and

20   whether there is a specific defect in that instant

21   blind.  That's not what I'm here to deal with.

22   Q.       All right.  Do you know whether or not

23   there was a specific defect in the incident blind?

24   A.       I haven't see any evidence to that effect.

25   Q.       What kind of evidence would you need to

1    see whether or not there was a particular defect

2    in the window covering blind in this case?

3                    MR. WILLIAMS:  Vague.  Ambiguous.

4                    Go ahead if you can.

5                    THE WITNESS:  I really don't see my

6            role pertaining to determining whether

7            there was a particular defect of that

8            incident blind.  That would be -- I don't

9            see how my analysis would -- would be

10           informed, or informed at.

11   BY MR. JAUREGUI:

12   Q.     Do you know what the total number of

13   window coverings Hunter Douglas produced in 1995?

14   A.     I have no specific knowledge of that.

15   Q.     Do you know what was the percentage of

16   vertical window blinds produced by Hunter Douglas

17   in 1995 compared to other coverings that are

18   non-vertical?

19   A.     I believe that there was a reference to

20   that in perhaps Mr. Jankoski's deposition

21   testimony.  And while I can't recall it off the

22   top of my head, I defer to whatever was referenced

23   in that -- that testimony.

24   Q.     Is that data relevant to your analysis in

25   this case, i.e., the number of vertical blinds

1    produced in any given year versus the number of

2    non-vertical blinds for those in a given year with

3    loop cords?

4    A.       I -- I don't believe that -- that number

5    of fluctuations in the number would affect my

6    overall opinions.

7    Q.       We've already talked a little bit about

8    the device, a wand.  You remember that?

9    A.       Yes.

10   Q.       You understand there is testimony from the

11   employees from Hunter Douglas that have indicated

12   that if the blind in issue had been fitted with a

13   wand, it would have eliminated the use of the loop

14   cords and the chain to operate the vertical blind

15   at issue.  Is that your understanding?

16   A.       I understand that to be the testimony.

17   Q.       Do you agree with that?

18   A.       Well, I think that -- that was part and

19   parcel to the design options.  It could be chosen

20   to have the looped cords or to have the wand.

21   Q.       If in 1995 when this blind was

22   manufactured there were other alternative designs

23   that were safer than the vertical blind with loop

24   cords and chains and the cost would have been

25   approximately the same, is this a factor that you

 1   would take into account as a human expert, as a

 2   human factors analysis expert, when analyzing

 3   whether or not Hunter Douglas exercised due care

 4   to warn consumers?

 5                    MR. WILLIAMS:  I'll object.  It's

 6            vague and incomplete hypothetical.

 7                    Go ahead if you think you can take

 8             a stab at it.

 9                    THE WITNESS:  Can you try to

10            rephrase the question.  I think I got lost

11            somewhere in there.

12   BY MR. JAUREGUI:

13   Q.      Does it matter to you as a human factors

14   expert when at the time the blind was manufactured

15   there were other alternative, safer designs

16   equally economical that Hunter Douglas could have

17   used?

18   A.      I believe that -- that I've outlined here

19   today and also in my report, my analysis, based on

20   alternative designs and what the product offerings

21   were.  You are referencing safer designs, and I

22   find that that is a -- that's a -- a -- I can't

23   answer the question that you're posing in that

24   way, because you're using this term safer and I

25   don't know how you are meaning it in the context

1    of this -- this product.

2    Q.       All right.  I asked you earlier if you had

3    seen any incidents in the literature that you

4    reviewed involving the strangulation of a young

5    child from a wand, you know, window covering, and

6    I believe your answer was no; correct?

7    A.       Yes.  I remember this line of questioning.

8    Q.       All right.  So let me ask you the question

9    in this way.  Are you going to testify in front of

10   the jury, if this case goes to trial, and

11   represent to the jury that a window blind a

12   vertical window blind with loop cord chain is as

13   equally dangerous when it comes to the risk of

14   strangulation of young children than the risk of

15   strangulation presented by a window blind fitted

16   with a wand?

17                   MR. WILLIAMS:  Objection.  Vague.

18           I don't know how you strangle on a window

19           blind fitted with a wand, at least how you

20           strangle on the wand.

21                   MR. JAUREGUI:  That's the issue in

22           this case.

23                   MR. WILLIAMS:  That's not the

24           issue.  That's an issue likely to be put

25           to the jury in this case.  We'll disagree

1                    about that down the road.  But your

2                    question, it's vague and ambiguous and

3                    unintelligible.

4                              THE WITNESS:  How you phrased the

5                    question, no, that is not going to be my

6                    testimony, specifically how you phrased

7                    that question.

8    BY MR. JAUREGUI:

9    Q.      What trouble do you have with the way how

10   I asked you that question?

11                             MR. WILLIAMS:  No.  He doesn't have

12                   to tell you what's wrong with your

13                   question.

14   BY MR. JAUREGUI:

15   Q.      Is there something you find confusing

16   about my question?

17   A.      No.  I understood your question.  And your

18   question was whether or not my testimony was going

19   to be what you've stated, and that will not be my

20   testimony.

21   Q.      All right.  Did you consider a vertical

22   blind with loop cords and loop chain to pose a

23   greater or lesser risk of strangulation to young

24   children than the risk of strangulation posed to

25   young children from a vertical blind with a wand?

1              MR. WILLIAMS:  Objection.

2         Incomplete hypothetical.

3              THE WITNESS:  The -- when we're

4         talking about strangulation, the wand

5         mechanism in and of itself -- the wand

6         itself I do not believe would pose the

7         potential hazard for strangulation.  When

8         we're -- you start asking questions

9         broadly and generally about the risk of

10        strangulation related -- one product

11        versus another without further details and

12        without situational factors and without

13        some data to associate with these

14        products, I don't know that I can answer

15        the question.

16   BY MR. JAUREGUI:

17   Q.      All right.  The years 1995 Hunter Douglas

18   has the technology, the knowledge and the ability

19   to produce two vertical-type blinds.  One of the

20   blind is a vertical blind with loop cord and

21   chain, the other blind is with a wand.

22   A.      Okay.

23   Q.      Now, as an expert and human factor

24   analyst, do you have an opinion as to which of

25   those blinds poses a greater risk of strangulation

1    to young children?

2                    MR. WILLIAMS:  Same objection.

3                    THE WITNESS:  Again, I'm not

4            offering opinions as to the risk of

5            strangulation.  What I'm offering opinions

6            to are -- is the reasonableness of

7            providing those as options.  In my

8            analysis, the options made available by

9            Hunter Douglas provide for safer use of

10           the product and provide for accessible

11           option to a wide range of consumers.

12   BY MR. JAUREGUI:

13   Q.      So are you saying that options is more

14   important than safety?

15                   MR. WILLIAMS:  Objection.

16           Argumentative.  Misstates his testimony,

17           and generally just a lousy question.

18                   MR. JAUREGUI:  Well, thank you,

19           Jeff.

20                   MR. WILLIAMS:  Objection.  Lousy

21           question.  Seriously, you know that's not

22           what he just said.  And so the

23           argumentative and misstates his testimony

24           is a sincere objection.

25   BY MR. JAUREGUI:

1    Q.       In your analysis as a human expert, is

2    there any time when the consumer options are

3    overridden by safety concerns?

4                    MR. WILLIAMS:  Same objection.

5              Hopelessly vague, ambiguous,

6              unintelligible, and incomplete

7              hypothetical.

8                    THE WITNESS:  There are, I think, a

9              range of products and situations that I

10             could consider and could reach opinions

11             on.  However, for the issue at hand, I

12             think I've stated my opinions on the

13             options provided by Hunter Douglas in

14             offering to consumers the loop chain and

15             cord and the PermAssure wand.

16   BY MR. JAUREGUI:

17   Q.       And those options were reasonable -- I

18   mean, Hunter Douglas' conduct was reasonable in

19   offering those options to consumers?

20   A.       Yes.

21   Q.       And you are of the same opinion even

22   though at the time when those options were offered

23   by consumers, Hunter Douglas -- it was well known

24   to Hunter Douglas about the risk of strangulation

25   to young children from loop cords and loop chains?

1           MR. WILLIAMS:  Objection.  Vague

2      and ambiguous.  Go ahead.

3           THE WITNESS:  I believe that I've

4      stated today and in my report that the

5      time and based on the knowledge of what

6      was known, the human factors

7      considerations for the design of the

8      product, that it was reasonable to offer

9      the options made available to consumers by

10     Hunter Douglas.

11 BY MR. JAUREGUI:

12 Q.     And is it reasonable in this case if

13 Hunter Douglas is the only one that has

14 information about the risk of strangulation to

15 young children and the consumer does not have that

16 information or knowledge about the risk of

17 strangulation?

18           MR. WILLIAMS:  I'm sorry.  Could I

19     have the question read back.

20                      -----

21           (The court reporter read back the

22     last question.)

23                      -----

24           MR. JAUREGUI:  Before you go on,

25     can you read the previous question and his

1          previous answer, because that's related to

2          his answer that he just gave.

3                              -----

4               (The court reporter read back the

5          requested testimony.)

6                              -----

7               MR. WILLIAMS:  I'm going to object.

8          mischaracterizing the record.  It's vague

9          and ambiguous.

10              And if you still remember it after

11           all this time, or want it read back, let

12           us know.

13              MR. JAUREGUI:  Let's try to start

14          over again.  I think that will probably be

15          best for all of us here.

16  BY MR. JAUREGUI:

17  Q.      Your opinion, or one of your opinions in

18  this case is that you went back and you reviewed

19  the historical information, what was known to

20  Hunter Douglas at the time, the options that were

21  available, in taking into account all of those

22  things, you conclude that it was reasonable for

23  Hunter Douglas to offer to consumers the vertical

24  blinds with the options that it had, one with the

25  cords and the other one with the wand.

1           MR. WILLIAMS:  Same objection.

2           THE WITNESS:  I stand by my stated

3       opinions in the report, which I believe

4       what we're trying to characterize here is

5       that Hunter Douglas is reasonable to offer

6       the options they made available.

7   BY MR. JAUREGUI:

8   Q.      All right.  That's fine.  So let's go from

9   there.  Is it reasonable for Hunter Douglas to

10  continue to offer choices to consumers in making

11  available vertical blinds with loop cords and

12  chains when it knows -- when it knows of the risk

13  of strangulation to young children from the loop

14  cords and consumers do not have the same knowledge

15  as Hunter Douglas has of the risk?

16          MR. KORNARENS:  Objection.  Couple

17      of objections.  Assumes facts not the

18      supported by the record.  It's also vague

19      and ambiguous because I don't know if you

20      want him to include in the his answer the

21      considerations of the safety hazards that

22      would be presented if Hunter Douglas took

23      away the choice cords and chains.  You

24      don't say if that's part of your question.

25          MR. JAUREGUI:  That's not part of

1       my question.  No.

2                   MR. WILLIAMS:  Objections are well

3           taken.

4                   THE WITNESS:  Based on the level of

5           knowledge, the communication, the -- the

6           factors present in 1995 and what was

7           available to and what was being put out, I

8           stand by the opinion that I held in this

9           report that it's reasonable for Hunter

10          Douglas to have made the options available

11          to the consumer.

12                  MR. JAUREGUI:  Actually, let's take

13          a break.

14                              -----

15                  (Off the record at 3:06 p.m.)

16                              -----

17                  MR. JAUREGUI:  Back on the record.

18                              -----

19                  (On the record at 3:14 p.m.)

20                              -----

21  BY MR. JAUREGUI:

22  Q.      All right.  Is the level of public

23  awareness of risk of strangulation relevant to

24  your analysis as a human factors expert?

25  A.      I think that the public awareness is

1    something that I've incorporated into it.  But as

2    far as in this specific case, the issue has not --

3    has not been the basis for the opinions expressed

4    here.

5    Q.      So is public awareness, consumer awareness

6    in this case of the risk of injury, that's

7    something that would not be relevant to your

8    report in this case?

9    A.      No.  That -- that's -- I don't believe

10   that that's true.  That's not what I was trying to

11   express.

12   Q.      Okay.  I'm sorry.  Go ahead.

13   A.      The -- in this case I have considered some

14   that -- that -- that information with respect to

15   the incident at hand.  For example, with respect

16   to Mrs. Roberts and Mrs. Davis, at the time of

17   purchase they were very much well aware of these

18   hazards.  And so their actions and decisions were

19   informed based on the information that they had,

20   and their actions were performed and their

21   behaviors incorporated in this information.

22   Q.      So for purposes of your analysis, you took

23   specifically into account the awareness of

24   Miss Davis and Miss Roberts, one -- the one -- the

25   purchaser and then the other one, the owner of the

1   home where the blind was installed.

2   A.      And also the installers.

3   Q.      The installers.  Okay.  So I guess you

4   consider public awareness relevant to your

5   opinions in this case as a human factor analyst?

6   A.      I don't think that that's just what I

7   stated.

8   Q.      Okay.  It's late.  We're going to get to

9   your opinions, specific portions of your opinions

10  in one second.  Do you consider yourself to be an

11  expert in the field of engineering?

12  A.      No.

13  Q.      Do you have any training in the designing

14  of window coverings, and in particular, vertical

15  blinds?

16  A.      In the design of them?

17  Q.      Yes.

18  A.      No.

19  Q.      Have you ever designed a window covering?

20  A.      And, I'm sorry.  Going back to that,

21  you're talking about the mechanical or engineering

22  design of window coverings?

23  Q.      Yes.

24  A.      No.

25  Q.      All right.  Have you ever designed a

1   window covering?

2   A.      I have not designed a window covering.

3   Q.      And are you familiar with the operating

4   mechanism of the vertical blind with a loop and

5   chain?  Strike that.  We covered those issues.

6   Do you have any experience or expertise in the

7   manufacture of window coverings?

8   A.      Manufacturing, no.

9   Q.      Do you have any experience or knowledge in

10  the distribution and marketing of window

11  coverings?

12  A.      No.

13  Q.      To your knowledge, do you know if Hunter

14  Douglas does any product safety testing to

15  evaluate the risk of strangulation to young

16  children from vertical blinds prior to marketing

17  and distributing vertical blinds in 1995?

18  A.      Aside from testimony in the case I have no

19  source of knowledge about testing programs or

20  considerations for Hunter Douglas in this design.

21  So, no.

22  Q.      Would testing about the risk of

23  strangulation from loops of window and blind cords

24  be relevant to someone such as yourself in a case

25  of this nature?

1    A.      What do you mean by testing?

2    Q.      Yeah.  Testing of the risk of

3    strangulation to young children.

4    A.      Again, I'm having difficulty with the idea

5    of testing of the risk of strangulation.

6    Q.      In 1995 there were already reports that

7    children were being strangulated from window

8    covering cords; correct?  You agree with that

9    statement?

10   A.      Yes.

11   Q.      All right.  Given what Hunter Douglas knew

12   in 1995 about the risk of strangulation, was it

13   reasonable for Hunter Douglas not to have done any

14   testing to evaluate the risk of injury of young

15   children from vertical blinds fitted with loop

16   cord and a loop chain?

17                    MR. WILLIAMS:  Objection.  Vague,

18           ambiguous, incomplete hypothetical.

19                    THE WITNESS:  What do you mean by

20           testing?

21                    MR. JAUREGUI:  Testing about the

22           safety of the product, the likelihood of

23           injury of young children.

24                    MR. WILLIAMS:  What kind of

25           testing?

1           MR. JAUREGUI:  There was testing

2       about the risk of injury, the likelihood

3       that young children will be entangled or

4       strangulated from the loop cords from

5       the -- from vertical blinds.

6           THE WITNESS:  I think that this

7       is -- again, I'm having difficulty with

8       the way that you're phrasing the question

9       or you're asking the question.  Testing

10      the risk of strangulation hazard, I don't

11      know what you're getting at there.  Then

12      you start talking about the likelihood of

13      this happening or -- and really, at 1995 I

14      think that Hunter Douglas was taking the

15      role with the CPSC and with the Window

16      Cord Manufacturing Association -- Window

17      Covering Manufacturing Association in

18      researching and investigating this issue.

19      So I don't -- I'm just having some

20      difficulty in your characterization and

21      asking of the question.

22 BY MR. JAUREGUI:

23 Q.     Okay.  So your understanding, you're not

24 aware of any testing that was done by Hunter

25 Douglas prior to the manufacture of the vertical

1    blind at issue with regard to the safety and the

2    risk of strangulation that loop cords from

3    vertical blinds pose to young children?

4                    MR. WILLIAMS:  Same objection.

5                    THE WITNESS:  Again, I -- I -- what

6            are you talking about?  The testing for

7            the risk of strangulation.  I don't know

8            what you're referencing there.

9    BY MR. JAUREGUI:

10   Q.    To your knowledge, was there any testing

11   done to evaluate the safety of vertical blinds

12   with loop cords as it relates to the exposure of

13   children coming into contact with vertical blinds

14   with loop cords?

15                   MR. WILLIAMS:  Objection.  Vague

16           and ambiguous as to time.

17                   THE WITNESS:  I believe that there

18           was investigations into this issue, but as

19           you're phrasing with the testing of the

20           safety with respect to the number of

21           children coming into exposure, I don't

22           know what testing you might be referencing

23           or even what that might look like.  So,

24           no, I'm not aware of any testing of that

25           sort.

 1   BY MR. JAUREGUI:

 2   Q.      I'm referring to any kind of testing that

 3   you're aware of.

 4   A.      I am not aware and I do not know the full

 5   range of testing that Hunter Douglas may have

 6   employed with respect to vertical blinds, and I

 7   don't know if any of that would fit the

 8   description of what you're trying to explain to

 9   me.

10   Q.      Do you have an opinion as to whether or

11   not it was foreseeable for Hunter Douglas -- I'm

12   sorry.  Do you have an opinion as to whether or

13   not it was foreseeable for Hunter Douglas a child

14   may come into contact and suffer a strangulation

15   injury from the window covering cords?

16               MR. WILLIAMS:  Objection.  Vague

17          and incomplete hypothetical.  And to the

18          extent that you're asking about

19          foreseeable and not at least reasonably

20          foreseeable, it's not designed to lead to

21          the discovery of admissible evidence.

22   BY MR. JAUREGUI:

23   Q.      Do you have an opinion?

24   A.      I think that Hunter Douglas -- can you

25   actually -- I'm sorry.  Can you actually --

1    Q.       Let me just -- yeah.  As a human factor

2    expert, a human factors expert, is foreseeability

3    of an injury from a product relevant to your

4    opinions?

5                   MR. WILLIAMS:  He has several

6              opinions.  I don't think that's something

7              you can lump together, so I'll object that

8              it's vague and compound.

9    BY MR. JAUREGUI:

10   Q.       Just generally, foreseeability of injury.

11   Is foreseeability of injury from a consumer coming

12   into contact with a product, is that something

13   that is relevant to an expert such as yourself in

14   human factors analysis?

15                  MR. WILLIAMS:  Same objection.

16                  THE WITNESS:  I think that some of

17             the -- some of these issues are --    are

18             -- it's difficult to -- to address the

19             question as you're posing it because this

20             is part and parcel to some of the ideas of

21             warnings and safety information in

22             general.  In general, safety information

23             is provided along with the product to

24             encourage safe use recognizing that there

25             are hazards that can be associated with

1          the product.  So when you ask a blanket

2          statement about foreseeability and then

3          try to say this is related to the unsafe

4          nature of a product, that's -- that's not

5          necessarily something that I can endorse

6          or that I -- it's very difficult for me to

7          answer a question that you speak of in

8          that way.

9     BY MR. JAUREGUI:

10    Q.     All right.  Did you ask, in your

11    conversations that you had with Mr. Jankoski, when

12    Hunter Douglas first became aware of the risk of

13    strangulation of young children from window

14    covering cords?

15    A.     I don't remember posing that question to

16    him.

17    Q.     What is your understanding as to when

18    Hunter Douglas first became aware that window

19    coverings with loop cords present a hazard of

20    strangulation to young children?

21                    MR. WILLIAMS:  Objection.  Vague.

22                    THE WITNESS:  I think in my report

23          what I outlined was a fairly detailed

24          history of this sort of knowledge

25          coming -- becoming available to the

```
 1                industry as well as to government

 2                agencies.  And, so, you know, I think that

 3                the time frames that I have referenced

 4                here with when this information was

 5                becoming available in the '80s with

 6                respect to ligature and the types of

 7                different hazards posed to children by a

 8                variety of products, this is probably the

 9                development of the knowledge within that

10                industry and to manufacturers in that

11                industry.

12      BY MR. JAUREGUI:

13      Q.        So sometime in the 1980s?

14      A.        And that would be based on my review of

15      this -- this -- the history of this accident

16      analysis and what I presented here.  Certainly I,

17      as I discussed with you, I did not specifically

18      ask that of Mr. Jankoski.  And so if there is

19      separate information that he might have from being

20      in that field, certainly, you know, I wouldn't

21      dispute that.  But based on historical records,

22      this is when the -- these hazards and knowledge

23      about these hazards was becoming brought to life.

24      Q.        Can you agree with me that prior to 1995,

25      the date when this vertical blind was
```

1    manufactured, Hunter Douglas already knew or

2    should have known that children can become

3    strangulated from loop cords of window coverings?

4                    MR. WILLIAMS:  I'm going to object

5            to that on the grounds that it's vague and

6            ambiguous with respect to what type of

7            knowledge you're inquiring about.

8                    Go ahead if you understand it.

9                    THE WITNESS:  I believe that

10           there's evidence in this case that these

11           are -- the -- the overall hazard pattern

12           is something that by that time was being

13           considered, and there's testimony that was

14           known and then was being incorporated into

15           their practices.

16   BY MR. JAUREGUI:

17   Q.      All right.  Did you ask Mr. Jankoski or

18   anyone else at Hunter Douglas if at the time when

19   the vertical blind at issue was manufactured, did

20   it have any alternative designs that would reduce

21   or eliminate the risk of strangulation of young

22   children from loop cords and loop chains?

23                   MR. WILLIAMS:  Objection.  Other

24           than the ones they were already offered or

25           including those?

 1    BY MR. JAUREGUI:

 2    Q.        Including those.

 3                    MR. WILLIAMS:  Did you ask --

 4                    THE WITNESS:  I did not ask

 5            Mr. Jankoski about that during our

 6            conversation.

 7    BY MR. JAUREGUI:

 8    Q.      And at some point did you become aware in

 9    1995 at the time when this window blind was

10    manufactured whether or not there were alternative

11    designs that would have reduced or eliminated the

12    risk of strangulation of young children with loop

13    cords and chains?

14                    MR. WILLIAMS:  Objection.  I don't

15            think that question made any sense.  So,

16            vague and ambiguous.

17                    THE WITNESS:  I believe I detailed

18            in my report and I've talked about here

19            today the different options that were

20            being made available at that time.

21    BY MR. JAUREGUI:

22    Q.      And one of those options was the vertical

23    blind with a wand; is that correct?

24    A.        Yes.

25    Q.        In your report you also talk about a

1    tensioning device, you make reference to such a

2    device.  What is your understanding of what a

3    tensioning device is?

4    A.       My understanding of a tensioning device is

5    a -- an implement that holds taught or provides

6    tension to the loop.

7    Q.       And what is the purpose of using a

8    tensioning device?

9    A.       To reduce the potential hazard of

10   strangulation.

11   Q.       Did you know whether at time the vertical

12   blind at issue left the control of Hunter Douglas

13   it contained a tensioning device?

14   A.       I do not know.

15   Q.       If it didn't contain a tensioning device,

16   do you have an opinion as to whether or not Hunter

17   Douglas acted negligently in any way by not

18   including a tensioning device with the vertical

19   blind at issue?

20                   MR. WILLIAMS:  Objection.  Vague.

21           I think you asked him about Hunter

22           Douglas' possession.  It goes through a

23           retailer.  And secondly, I don't know

24           whether you're asking whether optional

25           tensioning device is part of your question

1              or not.  So vague and ambiguous.

2                      THE WITNESS:  Can you repeat your

3              question?

4                      MR. JAUREGUI:  Can you read back

5              that question, please?

6                              -----

7                      (The court reporter read back the

8              pending question.)

9                              -----

10                     THE WITNESS:  I don't know that

11             that's going to be offering opinions as to

12             negligence or saying -- incorporating

13             negligence.  But with respect to whether

14             or not a tensioning device was included

15             with this or was optional, I can -- the

16             actions of Hunter Douglas in offering this

17             I think still provides for a product that

18             can be used safely.

19     BY MR. JAUREGUI:

20     Q.      Even if no tensioning device was shipped

21     with the vertical blind at the time it left Hunter

22     Douglas' control?

23     A.      Based on -- based on factors of how the

24     product is being used and where it's being used,

25     yes.

1    Q.      What information is your understanding

2    that Hunter Douglas had as to where the vertical

3    blind at issue was going to be installed?  In what

4    part of the house?

5                    MR. WILLIAMS:  What time?

6                    MR. JAUREGUI:  The time when it was

7          purchased.

8                    MR. WILLIAMS:  By the Davises?

9                    MR. JAUREGUI:  Yes.

10                    MR. WILLIAMS:  From some other

11          entity?  Objection.  Vague.

12                    THE WITNESS:  I -- I don't know

13          of -- what information Hunter Douglas may

14          or may not have been -- had in their

15          possession as to the purchase decision of

16          any specific entity.

17   BY MR. JAUREGUI:

18   Q.      So you have no information as to the

19   location and usage intended for this particular

20   blind; is that correct?

21                    MR. WILLIAMS:  Objection.

22          Misstates his testimony.

23                    THE WITNESS:  I don't have any

24          knowledge of Hunter Douglas' knowledge as

25          to the location that the subject blinds

1          would have been used in when originally

2          purchased by the original purchaser.

3    BY MR. JAUREGUI:

4    Q.      All right.  Mr. Jankoski did tell you that

5    it was his understanding that vertical blinds are

6    most of the use in sliding doors or other common

7    areas.  Is that --

8    A.      That they're often used and that

9    particular features of the product fit well for

10   that environment.

11   Q.      All right.  Let me ask you a question

12   about the publications that you list on your CV.

13   Can these publications be accessed online?

14   A.      Many of them can.

15   Q.      All right.  Do you have copies of these

16   publications at your disposal?

17   A.      Some of them I do.

18   Q.      All right.  Now, on two or three instances

19   I saw you were quoting yourself, unless there's a

20   different Sala that you quoted in your report.

21   A.      Can you point me to that?

22   Q.      If you take a look at Page 2.  For

23   example, the last sentence in the first paragraph

24   starts with, "The results and evolving base of

25   knowledge..."  You see that?

1    A.       Yes.

2    Q.       In parentheses you have, "Sala, et al,

3    2010."  Is that you?

4    A.       Yes, that is.

5    Q.       What are you quoting there?

6    A.       That would be the citation which is one,

7    two, three, four, fifth citation under

8    publications, Sala, Nichols, Muhammad, Lakhiani,

9    Rauschenberger, Lackianni and Wood.

10   Q.       What page are you on?  Seventeen?  Did you

11   say page 17?

12   A.       No.  It's publications in my CV after the

13   list of materials.  There you go.

14   Q.       All right.  What item is it.  Oh, I see

15   it.  Sala --

16   A.       Nichols, Muhammad, Lakhiani,

17   Rauschenberger, Lackianni and Wood.

18   Q.       And what is the title of that article?

19   A.       Government Warnings Safety Information, A

20   Comparison Of Interagency Regulations and

21   Guidance.

22   Q.       And what was your role in that -- was that

23   a study or just an article?

24   A.       It was a review article.

25   Q.       A review of the literature?

1   A.        A review of literature.  And as indicated

2   by the title of the guidance and regulations

3   offered by different agencies within the United

4   States government.

5   Q.        What was the intended audience in that

6   publication?

7   A.        Other warning scientists.

8   Q.        Was that article peer reviewed?

9   A.        It was.  It was reviewed for inclusion in

10  a conference and also in a book.

11  Q.        Is it going to be included in a book or

12  was it?

13  A.        It already -- the book is out.

14  Q.        And is the title of the book reflected

15  here?

16  A.        Advances In Human Factors, Ergonomics And

17  Safety In Manufacturing And Service Industries.

18  Q.        What was your role in this study?

19  A.        I was an author of the article, or the

20  chapter.

21  Q.        Can you be more specific?  There were

22  three different authors.

23  A.        No.  There were a number of different

24  authors.

25  Q.        A number of different authors.  Was there

1   some specific task that you had in connection with

2   this article?

3   A.      I compiled it, I wrote it.  I requested

4   work from others.  I incorporated other's work and

5   provided authorship to the article.  The role of

6   the authors -- we worked on this together.  It was

7   a collaborative effort.

8   Q.      Seems to me you did all the work.

9   A.      No.  They all had a hand in the authorship

10  of the paper.

11  Q.      All right.  You included multiple

12  materials in the two binders that you have there.

13  I did not see a copy of this article in there, or

14  did we miss it?

15  A.      No.  No.  That wasn't included in there.

16  Q.      Can you provide your attorney with a copy

17  of that article?

18  A.      Certainly.

19  Q.      Any of the publications that you rely

20  upon, do any of them have to do specifically with

21  the issue of window covering safety?

22  A.      Can you repeat that?  I'm sorry.

23  Q.      Yeah.  In any of the publications that are

24  listed in the materials attached to your

25  Curriculum Vitae, are any of those publications

1    specifically related to the issue of window

2    covering safety excluding the reports from the

3    U.S. Consumer Product Safety Commission?

4    A.      Yes.  You asked about the ones on my CV or

5    the --

6    Q.      The ones on your publications on your CV.

7    Yes.

8    A.      No.  None of them are.

9    Q.      Have you ever published anything related

10   to the issue of safety as it relates to window

11   coverings?

12   A.      I don't believe I have.

13   Q.      Do you agree that the exposure of the

14   population to the risk of strangulation is a

15   vulnerable population, i.e. children from zero to

16   five years old?  Would you consider that a

17   vulnerable population?

18                   MR. WILLIAMS:  Objection.  Vague.

19                   THE WITNESS:  Can you rephrase the

20        question?

21   BY MR. JAUREGUI:

22   Q.      Yes.  Children that are zero to five years

23   old, do you consider that segment of the

24   population to be a vulnerable population when it

25   comes to the risk of injury by strangulation from

1    window covering cords?

2                    MR. WILLIAMS:  Objection.  Vague as

3            to what you mean by vulnerable.

4                    Go ahead.

5                    THE WITNESS:  Can you define what

6            you mean by vulnerable?

7    BY MR. JAUREGUI:

8    Q.      A population not able to comprehend the

9    risk of injury.

10   A.      The -- I would -- I would agree that the

11   ages you're referencing has a lesser understanding

12   of hazards in general and certainly as it relates

13   to window cord strangulation.

14   Q.      At the time of his death Max was about

15   three years old.  Do you have an opinion as to

16   whether or not Max was able to appreciate the risk

17   of strangulation from the vertical blind cords?

18   A.      I -- I do not believe that Max would have

19   the developmental and cognitive capacity to fully

20   appreciate that hazard.

21   Q.      So he would not have been able to

22   appreciate the risk or the hazard posed by the

23   window blind cords?

24   A.      Specifically, as you were talking about

25   his interaction with them, I -- I doubt that he

1    would.

2    Q.      So I take it you don't place any

3    contributory fault on the part of Max for his

4    death?

5    A.      I would not offer any -- be offering any

6    opinions as to the actions of Max in this case.

7    Q.      You are, however, offering an opinion

8    regarding the conduct in this case of the

9    installer and the purchaser of the vertical blind?

10   A.      What do you mean by conduct?

11   Q.      On Page 14, the third bullet point, you

12   indicate that both Miss Davis, who purchased the

13   blind and helped to install the blind at the home

14   of her daughter, Miss Roberts, they both

15   "...understood the potential hazard associated

16   cords attached to the window blinds."  And then

17   you go on to note that, "Despite this

18   understanding, they failed to address this

19   condition."  What do you mean by that statement,

20   the second statement, that "Despite this

21   understanding, they failed to address this

22   condition."  What would you have expected them to

23   do?

24   A.       This does not necessarily, as you're

25   stating it, lead to my expectations of their

1    behavior.  Are you saying what I would expect them

2    to do?  This is a statement of what they -- they

3    retained the product in their home in the state in

4    which it had -- they originally installed it.  So

5    this is more of a statement of their knowledge of

6    the hazard and their continued use of the product

7    with it in that state and their comfort level in

8    their use of the product in that state.

9                    MR. WILLIAMS:  There's no opinion

10        so far.

11                    THE WITNESS:  There's no opinion in

12        there.

13                    MR. JAUREGUI:  There's no opinion

14        in there.

15                    MR. WILLIAMS:  Not in those first

16        two sentences.

17   BY MR. JAUREGUI:

18   Q.      Move on to the third sentence.  And I take

19   it that's the opinion there, that "There is no

20   scientific reason to believe that additional or

21   alternative warnings or safety information would

22   have altered their behavior with respect to the

23   selection, purchase, installation, and use of the

24   incident product."

25   A.      Correct.

1    Q.      All right.  Did you review Miss Davis'

2    affidavit?

3    A.      Yes.

4    Q.      And do you disagree with what she states

5    in her affidavit?

6                    MR. WILLIAMS:  She states more than

7         one thing, so you have to be specific.

8    BY THE COURT:

9    Q.      Do you have a copy of her affidavit?

10   A.      I do not have it with me.  If you provide

11   it to me, I'll be happy to review it again.

12   Q.      Can you tell me what specific scientific

13   information you rely upon to reach the conclusion

14   that the behavior of Miss Davis or Miss Roberts

15   would not have been altered in this case?

16   A.      The articles that we've referenced before

17   relating to behavior and scientific understanding

18   of behavior with regards to safety information,

19   that is the basis, the underlying basis for the

20   statement as to there's no scientific reason to

21   believe that additional or alternative warnings

22   or safety information would have altered their

23   behavior combined with the -- the facts and

24   evidence in the case.

25   Q.      On Page 2 of her affidavit, Paragraph 7,

1    she states that, "Because the vertical blind was

2    going to be installed in a child's room, if I had

3    been given the option of a vertical blind without

4    cords, for safety reasons, I would have chosen to

5    purchase a vertical blind that could be operated

6    with a wand."  Now, this statement contrasted to

7    what you state here, does that contradict the

8    opinions that you assert in this case?

9                    MR. WILLIAMS:  Does her

10           statement --

11                    MR. JAUREGUI:  Yes.

12                    MR. WILLIAMS:  -- contradict his

13            opinion?

14                    MR. JAUREGUI:  Yes.

15                    MR. WILLIAMS:  If you understand

16           that.

17                    THE WITNESS:  Might I read this?

18           Thank you.  That statement does not change

19           my opinion in this matter.

20   BY MR. JAUREGUI:

21   Q.     Why is that?

22   A.     Because the deposition testimony is very

23   clear that Mrs. Davis and -- Mrs. Davis was

24   familiar with the product, that she was familiar

25   with the hazard, that she was comfortable with the

1    product, and, again, as we've covered in the --

2    the discussion over what scientific research shows

3    us is that one's perception post hoc of what one

4    would have done when faced with safety information

5    is often quite different than actual behavior.

6    She acted upon and based on a full knowledge of

7    the product she was ordering that she was

8    comfortable with, and I hold, as I stated, that

9    there is  no scientific reason to believe that

10   additional or alternative information would have

11   changed her behavior.

12   Q.     So all of the scientific studies, the

13   articles that we've reviewed, would nullify her

14   affidavit in this instance basically saying that

15   if she had been made aware there was an option of

16   a vertical blind with a wand, that for safety

17   reasons she would have chosen the vertical blind

18   with the wand.  You're saying that in light of the

19   scientific evidence you reviewed for this case,

20   that statement doesn't hold any water here?

21   A.     Can you --

22                MR. WILLIAMS:  Objection.  Vague

23        and ambiguous.

24                THE WITNESS:  Can you read back the

25        question?

1                           -----

2                  (The court reporter read back the

3          last question.)

4                           -----

5                  MR. WILLIAMS:  Objection.  Vague.

6          Go ahead.

7                  THE WITNESS:  I -- the -- I -- I'm

8          not suggesting that -- that the research

9          be taken to nullify a statement made.  I'm

10         not disputing that she made that

11         statement.  However, based on the

12         scientific understanding of people's

13         assessment of their own behaviors in

14         retrospect and when thinking about their

15         behaviors and people's responses to safety

16         information, I believe that based on her

17         level of knowledge and sophistication with

18         the product, that she is over-estimating

19         her compliance with the available safety

20         information.

21     BY MR. JAUREGUI:

22     Q.     Okay.  In your opinion does Miss Davis

23     bear any fault for Max's death in this case?

24                  MR. WILLIAMS:  I'll object.  That's

25         outside the scope of the work that

1            Dr. Sala has been asked to perform in this

2            case.  He hasn't been asked to assess

3            fault to the Robertses or Davises.

4                      THE WITNESS:  I would leave

5            determination of fault up to a jury for

6            whatever they would like to consider in

7            this case.  I am rendering opinions as to

8            what the availability of safety

9            information and based on scientific

10           evidence and the evidence available in

11           this case what I would expect with respect

12           to their behavior.  But that's not a

13           judgment of fault with respect to the

14           Davises or Robertses.

15    BY MR. JAUREGUI:

16    Q.     What is the basis of the information that

17    you relied upon to make this same determination as

18    to Miss Roberts' conduct in this case?

19    A.     She also -- there is -- there is an

20    acknowledgement of the hazard and her actions with

21    respect to the hazard and her comfort with the --

22    the product and how she used the product and how

23    she had the product in her house.

24    Q.     Are you aware of any modifications that

25    were made to the blind after it left the control

 1   of Hunter Douglas?

 2   A.        At what time frame?

 3   Q.        At any time after it left the control of

 4   Hunter Douglas.

 5   A.        After the incident, I believe a piece of

 6   the cord was cut.

 7   Q.        All right.  So in between the that time it

 8   left the control of Hunter Douglas and prior to

 9   the date of this incident.

10   A.        I'm not aware of any modifications to it.

11   Q.        Do you know whether window blinds such as

12   the one at issue in this case are considered home

13   fixtures?

14   A.        Home fixtures?

15   Q.        Yes.

16               MR. WILLIAMS:  Objection.  Vague.

17         What do you mean by that?

18               THE WITNESS:  I don't know if I've

19         heard them characterized in that way.

20   BY MR. JAUREGUI:

21   Q.        Is it foreseeable for the purchaser or the

22   installer of this product -- strike that.  You're

23   not commenting in your report, at least I didn't

24   see that, of what role, if any, the distributor or

25   the retailer of this product had in this incident;

1    correct?

2    A.        I didn't include anything that refers to

3    that.

4    Q.        Now, the Padillas have testified in this

5    case, both Mr. and Mrs. Padilla testified in this

6    case, that if they had seen any warnings attached

7    to the blind telling them about the danger of

8    strangulation of young children, that they would

9    have gotten rid of the blind.  Yet you conclude in

10   your report essentially no amount of warnings

11   would have changed their behavior in this case, is

12   that fair?

13   A.        There is no scientific reason to believe

14   that additional or alternative warnings or safety

15   information provided with the product would have

16   altered their behavior and averted this incident.

17   Q.        All right.  What is your understanding as

18   to the type of warnings that accompany the blind

19   in this case?

20   A.        There is -- well, we don't know, I think,

21   what specifically accompanied the blind.  There is

22   deposition testimony that warnings would have been

23   included with it.  There's deposition testimony

24   from a Hunter Douglas representative saying that

25   they would have included warnings either on frame

1    rail on hang tags, and Miss Davis, I believe,

2    testifies as to being very familiar with the hang

3    tags believing that they all came with them or --

4    and also testifying that there was a warning

5    present on the -- the frame rail of the blinds.

6    Q.      Assuming there was a hang tag that

7    accompanied this product at the time it left

8    Hunter Douglas' control, do you think that warning

9    would have been sufficient to alert the Padillas

10   about the danger of strangulation from the window

11   covering cords?

12                   MR. WILLIAMS:  Objection.  Vague

13           and incomplete hypothetical.

14                   THE WITNESS:  Depending on the --

15           it's very difficult to talk about the

16           warning as you've phrased the question.

17   BY MR. JAUREGUI:

18   Q.      I'll tell you what.  Let's just withdraw

19   that question, leave it on the side for a moment,

20   and go back to the issue of warnings.  Do you know

21   the text of the actual warning that you referenced

22   in your testimony earlier as to what specific type

23   of warning would have been included?

24   A.      No.  That -- to my knowledge, that has not

25   been -- that has not been produced in this case.

1    Q.      Have you ever seen any documents relating

2    to or depicting the type of warning that would

3    have been included with this variable blind types?

4    A.      For this specific blinds I'm not aware of

5    that information.

6    Q.      You are aware, are you not, that the hang

7    tags that you discussed earlier were not meant to

8    be permanent?

9    A.      I wouldn't disagree with that.

10   Q.      If the hang tag was the only notice or

11   warning that would have accompanied this product

12   and somewhere along the line the hang tag is

13   removed by somebody other than the Padillas, how

14   are the Padillas supposed to know about the risk

15   of strangulation from window coverings?

16   A.      I think that there is a number of

17   potential sources for that sort of knowledge

18   including the average programs from Consumer

19   Product Safety Commission, from the Window Cord

20   Covering -- or Window -- Window Covering

21   Manufacturing Association, the -- pediatricians,

22   hospitals, child safety texts or publications or

23   parenting publications, news, TV.  There's been a

24   great deal of effort as documented to try and put

25   this information out for interested parties that

1    are seeking it.

2    Q.      If the information is so readily available

3    as you make it out to be, then are the Padillas

4    uniquely situated that they just failed to read

5    that information or are they in the same situation

6    as the parents of the other 359 children that have

7    lost children through death from strangulation?

8                    MR. WILLIAMS:  Objection.  It's

9           argumentative and it's an incomplete

10          hypothetical.

11                   THE WITNESS:  I think that you

12          can't mix the numbers you're talking about

13          and the Padillas.  You're talking about

14          the Padillas being in 1995.  And this

15          number of 300 that has been referenced

16          elsewhere would be over a time period that

17          includes time before 1995, before any of

18          those efforts that I've been discussing

19          even came about.

20   BY MR. JAUREGUI:

21   Q.      So what are you saying here?

22   A.      That --

23   Q.      That the Padillas should have been exposed

24   to more information than the parents were -- than

25   the parents up in 1995 that would have been

1   exposed to that type of information?

2   A.      I'm -- I was attempting to address the

3   question that you asked, which was relating

4   Padillas to this -- to the parents of the

5   hypothetical 300 children that you had referenced

6   beforehand.

7   Q.      All right.  Do you know if the Window

8   Covering Manufacturers Association or the Window

9   Covering Safety Council ever sent any information

10  to the Padilla household advising them of the risk

11  of strangulation?

12  A.      I don't know of any direct communications

13  between WCMA and the Padillas.

14  Q.      Is it -- do you know of when at the time

15  when children, their -- when parents take their

16  children to the pediatrician, whether the risk of

17  strangulation from window coverings is something

18  that is routinely discussed between pediatricians

19  and parents?

20  A.      I don't have a -- I don't have the data as

21  to the frequency, but I know that it is a topic

22  that is included in information handed to parents

23  and is part of the safety information that

24  pediatricians share with parents.

25  Q.      Do you know for a fact whether in this

1   case Max's pediatrician discussed the risk of

2   injury from cord strangulation with Max's parents?

3   A.        I'm only privy to the information that's

4   been provided by the Padillas in that matter.

5   Q.        And child safety texts, what are those

6   things?

7   A.        There are a number of books and magazines

8   and articles that are geared towards expecting

9   parents that address issues of safety concerns of

10  a developing child.

11  Q.        Do you know whether or not any of those

12  books or magazines are published in Spanish?

13  A.        Yes.

14  Q.        They are?

15  A.        Yes, they are.

16  Q.        Do you know whether any of those books or

17  magazines were sold in and around the area where

18  the Padillas resided?

19  A.        I would say that yes.

20  Q.        Did you understand that in this case the

21  police were summoned to the Padillas' residence

22  within the hour after the incident occurred?

23  A.        I'd have to review the specific time

24  frames, but I have no reason to doubt that.

25  Q.        I represent to you they were there within

1   the hour after this incident occurred.  Were you

2   aware the police officer specifically noted in the

3   report that there were no types of warnings found

4   on the blind?

5   A.      I could review that, but to -- I'll review

6   that to -- to --

7   Q.      Okay.  I represent to you that the police

8   report states that the vertical blind had no

9   warnings attached to it.  If that is the case,

10  then other than reviewing all these various

11  publications or sources that you told me earlier,

12  is there any other way how you would expect the

13  Padillas to learn about the risk of strangulation

14  from the vertical blind at issue?

15                  MR. WILLIAMS:  Other than the

16          physical condition of the blinds

17          themselves?  What he's testified to

18          already?  It's an incomplete question.

19          It's vague.

20                  Go ahead.

21                  THE WITNESS:  Well, the sources

22          that I testified to, the publications,

23          doctors, hospitals, also I think that to

24          many -- to some portion of the population,

25          inspection of the condition, inspection of

1              the blinds would identify that as a

2              potential hazard.  Certainly this is

3              something that Mr. Padilla testifies to

4              during other situations, and to

5              acknowledging things that although he was

6              not provided any specific warning about,

7              recognizes on his own as being a safety

8              hazard and testifies to taking steps to

9              address.  So there is a potential of

10             recognizing the loop formed by a hanging

11             cord as a safety hazard.

12   BY MR. JAUREGUI:

13   Q.     In your report for this case did you take

14   into account as a factor the severity of the risk

15   posed to young children?

16   A.     How so?  Can you be more --

17   Q.     Yes.  Being severity meaning it could lead

18   to death.

19   A.     When you say did I take into account --

20   Q.     That the severity of the risk of

21   strangulation to young children from window blind

22   cords?

23   A.     With respect to --

24   Q.     To the opinions you have in this case?

25   A.     To all the opinions.

1  Q.      With respect to -- yes.  All the opinions?

2              MR. WILLIAMS:  Objection.  I don't

3         understand the question.  Vague.

4         Compound.

5              THE WITNESS:  I believe that my

6         opinions take into account the fact that

7         the potential hazard has a severe

8         consequence.

9  BY MR. JAUREGUI:

10  Q.      And did you take into account that the

11  vulnerability of the population, i.e., small

12  children?

13  A.      I believe that I have incorporated the

14  idea of childhood and development into my

15  opinions.

16  Q.      And in this case you do not place any

17  blame on Max for his death?

18  A.      Again, I'm not going to be offering

19  opinions or characterization of Max's behaviors or

20  cognitions or actions in this matter.

21  Q.      All right.  Let me try this again.  The

22  issue of open and obvious, do you have an opinion

23  as to whether or not the danger that was posed to

24  Max by vertical blind was open and obvious?

25  A.      The -- the -- can you define open and

1   obvious for me?

2   Q.      If you see a child that climbs on top of a

3   table, it is obvious to anyone seeing that child

4   that if that child falls off of the table, that

5   he's going to be become injured.  So when I --

6   A.      In that respect, then, yes.  I think that

7   if anyone was to see a child with their head in a

8   window cord, that would be open and obvious to

9   that being a strangulation hazard, as you posed

10  open and obvious.

11  Q.      All right.  But you say that somebody is

12  supposed to see a child with their head inside the

13  loop.  In this case the Padillas have never seen

14  Max attempt to look out of the window or playing

15  with the window blind cords.

16  A.      True.  But at the same time, the idea is

17  you're posing open and obvious of a child falling

18  off of a table.  I don't think that I would

19  initially think of the table as a danger to

20  children.  I would think if posed to me if a child

21  was standing on there and fell off, would it be

22  dangerous, the answer might be open and obvious as

23  opposed if a -- someone considered a child being

24  within that loop that is there and one can see,

25  then, yes, that is an open and obvious hazard as

1    it's being represented here today.

2    Q.      So I take it, then, you are of the opinion

3    that the risk of strangulation to young children,

4    specifically in this case to Max from the loop

5    cord and loop chain, you would not agree it was a

6    hidden danger?

7    A.      I think you're misrepresenting -- I'm not

8    using terminology hidden and open and obvious.

9    I'm trying to work in with how you're asking the

10   questions of me today.  And the idea of a hidden

11   danger, if you're asking whether or not people

12   would have knowledge, we can address those --

13   those questions.  And there's deposition testimony

14   from the Padillas that they never considered that

15   and they did not know of it.  That is specific to

16   this instance.

17   Q.      All right.  So that's fine.  So in light

18   of the fact that the Padillas were never aware of

19   the danger of strangulation from the window blind

20   cords, do you have an opinion as to whether or not

21   the danger posed to Max by this vertical blind was

22   a hidden danger?

23   A.      I have no reason to dispute their

24   testimony that they did not know or did not

25   consider that as a hazard.

1    Q.      Is the knowledge of the risk of

2    strangulation posed by loop cords -- let me start

3    again.  Is the manufacturer's knowledge of risk of

4    strangulation by window covering cords relevant to

5    your analysis in this case?

6                    MR. WILLIAMS:  Objection.  Vague,

7          incomplete hypothetical.

8    BY MR. JAUREGUI:

9    Q.      Let me withdraw that question.  The

10   knowledge that Hunter Douglas had about the risk

11   of strangulation to young children from loop cords

12   and loop chains, is that knowledge relevant to

13   your opinion in this case?

14   A.      I think I've incorporated that into my

15   opinions.  That's been part of my -- my report.

16   Q.      Can you tell me where specifically?

17   A.      Well, I've discussed that through various

18   portions of the report.  And, for example, in

19   talking about the fact that in the time frame of

20   1995, Hunter Douglas' statements from the

21   deposition testimony said that they included

22   warnings as to child hazards.  That's -- that's

23   acknowledgement of Hunter Douglas incorporated

24   that knowledge.

25   Q.      All right.  And I believe you used an

1  example to indicate that the Padillas' behavior in

2  this case indicated that they would have not

3  altered the behavior if there had been additional

4  warnings in this case and decided to -- the fact

5  in Max's room there was a TV set somewhere.  Do

6  you recall that?

7  A.      I recall the deposition testimony.  Yes.

8  Q.      So what is the relevance of the Padillas

9  allowing their son, in this case, to have a TV set

10  in the room?

11  A.      That's not my point.  That's -- I think

12  that as you've stated it, that's not the relevant

13  portion.

14  Q.      So what's the relevant portion?

15  A.      The relevant portion, and what I speak of

16  in my report and what I tried to explain, is that

17  Mr. Padilla testifies as to having a concern as to

18  his son's safety with respect to this TV being on

19  a counter and over his son, and that he would

20  routinely take care of it, he would say.  And I

21  think that -- that his observation and attribution

22  of a safety hazard to that situation was well

23  founded.  There's a rich history of television

24  falls from heights onto children resulting in

25  severe and deadly consequences.  However, the

1    action of the continually pushing it back or

2    taking care of it in some manner did not -- was

3    not something that befit the ultimate end result.

4    Rather than removing it or placing it, putting it

5    somewhere where such an interaction couldn't

6    occur, or fixing it in some way so that it could

7    not tip over and fall, he would routinely take

8    care of.  This is very similar to something like a

9    window blind and some hazard that might be posed

10   by a looped cord.

11   Q.      So Mr. Padilla's handling of the TV in

12   Max's room, what does that tell you about

13   Mr. Padilla's knowledge of the window blind cord?

14   A.      It is not informing me as to his knowledge

15   of window blind cords.

16   Q.      Okay.  Did you know how big the TV set

17   was?

18   A.      No.

19   Q.      Did you know how high it was?

20   A.      It was over his head, he says.

21   Q.      Okay.  All right.  Do you know where the

22   TV set was located on top of, what item?

23   A.      I can look for the reference as to what

24   item it was.  I defer to his deposition testimony.

25   Q.      All right.  I believe it was a chest.  Do

1    you know how high that piece of furniture was?

2    A.        Again, there's reference to over his head.

3    Q.        Do you know whether Max had any means of

4    reaching to -- to the TV and pulling it over his

5    head?

6    A.        Well, I think that there would be -- there

7    would be means for him to do that.

8    Q.        Do you know if Max had any step ladders or

9    chairs or high chairs that would enable him to

10   climb and access the TV set?

11   A.        There do appear to be a number of items in

12   that room that could be used to be stood upon to

13   reach heights.

14   Q.        Are you speculating here that because

15   Mr. Padilla did either not secure the TV set or

16   remove it from the room, that that particular type

17   of conduct transfers to the risk of strangulation

18   from the window covering cord and it doesn't

19   matter how many warnings, labels, or the like,

20   would have been affixed to the product, that his

21   conduct would have been the same, in other words,

22   that he would not have done anything about the

23   risk of danger posed by the loop cord?

24                      MR. WILLIAMS:  Objection to the use

25          of the term speculating.  He testified to

1          his opinion in this regard.

2                   Go ahead and answer the question

3                   THE WITNESS:  I'm using -- using

4          the available deposition testimony as data

5          to inform my analysis of what to expect

6          from Mr. Padilla's behavior if presented

7          with the warning information.  I'm using

8          this as one piece of data to -- in

9          evaluation and formation of this opinion

10         as a basis for this opinion.  It reflects

11         to me Mr. Padilla's response to safety

12         concerns.  It is one piece of that that is

13         coupled with behaviors of Mr. and

14         Mrs. Padilla in other respects to the

15         availability of safety information and

16         their seeking of that information.

17   BY MR. JAUREGUI:

18   Q.     What behavior on the part of Mr. Padilla

19   do you have in mind here?

20   A.     Well, there is -- there is information

21   that neither have consulted with any sort of

22   publication or sought information as to child

23   safety issues from these outside sources.

24   Q.     Is Mr. and Mrs. Padilla different from the

25   rest of the American population  when it comes to

1    seeking that information about safety issues?

2    A.       In some respects they very well might be.

3    Depends on what populations we're talking about.

4    Q.       They may very well might be.  What do you

5    mean?

6    A.       There are segments of the population that

7    when they are going to have children, will

8    actively seek the sort of safety information or

9    will engage in some form of assessment of the

10   hazards in the environment.

11   Q.       Are you talking about college educated

12   folks?

13   A.       I'm not --

14                   MR. WILLIAMS:  Is your question

15        only about college educated folks?

16   BY MR. JAUREGUI:

17   Q.       Let me withdraw that.  Does the level of

18   education have anything to do with the knowledge

19   of -- the consumer's knowledge about issues of

20   safety around the house?

21   A.       I -- I don't have specific data to speak

22   to that.  However, also, I wouldn't want to imply

23   that non-college educated people are not able to

24   seek information or to ask for safety information.

25   I don't want that to be on the record, either.

1    Q.       It won't be on the record.  With that

2    clarification, other than Mr. Padilla's behavior

3    as he dealt with the TV, is there any other

4    concrete example that you can tell me that

5    Mr. Padilla did or the manner in which he behaved

6    to support your conclusion, that no amount of

7    warnings would have been of assistance in this

8    case?

9    A.       Again, I would just point to the lack of

10   safety information seeking behavior with respect

11   to the Padillas.  And that does, in my opinion,

12   does transfer over to their information seeking in

13   the -- with respect to warnings on the product as

14   well.

15                   MR. WILLIAMS:  Can we take a break

16          sometime soon?

17                   MR. JAUREGUI:  I'm getting ready to

18          wrap it up.

19                   MR. WILLIAMS:  Just a five-minute

20           break and then we'll come back.

21                   MR. WEISS:  I'll call back in five

22          minutes.

23                   MR. JAUREGUI:  Okay.

24                   -----

25                   (Off the record at 4:30 p.m.)

1                          -----

2                 (On the record at 4:35 p.m.)

3                          -----

4                 MR. JAUREGUI:  All right.  We're

5            back on the record.  Ready?

6    BY MR. JAUREGUI:

7    Q.        You told us in this case, in light of the

8    behaviors exhibited by Mr. And Mrs. Padilla, you

9    conclude that there's no scientific reason to

10   believe that additional or alternative warnings or

11   safety information provided with the product would

12   have altered their behavior and averted this

13   incident; correct?  That's your opinion, that's

14   what it says on Bullet Point No. 4?

15   A.        Yes.  I wrote Bullet Point No. 4.

16   Q.        All right.  And you still stand by it?

17   A.        Yes, I do.

18   Q.        If indeed that is true that no amount of

19   warnings would have altered the outcome in this

20   case, doesn't that make a stronger case for Hunter

21   and Douglas to produce products such as vertical

22   blinds with a wand instead of continuing to use

23   loop holes and a loop chain?

24   A.        I don't agree.

25   Q.        Okay.  Which part do you disagree with?

1           MR. WILLIAMS:  You asked him

2        doesn't that mean, and he basically said

3        no.

4           MR. JAUREGUI:  Okay.  He's going to

5        explain that.

6    BY MR. JAUREGUI:

7    Q.      You don't agree with that?

8    A.      I do not agree with that.

9    Q.      And why don't you agree with that

10   statement?

11   A.      Because I don't think that you can take my

12   statement as to -- in this specific instance for

13   the failure of Mr. And Mrs. Padilla to engage in

14   the information-seeking behavior that would

15   result in a warning provided with the product to

16   have been seen and followed.  I don't think that

17   can and the condition of the product as it stood

18   in this instance, I don't think that can be used

19   as evidence to suggest that only the wand is a

20   safe option.  That's not what I have stated.  I

21   have stated my opinions with regard to the options

22   and designs available at the time of the

23   institute -- at the time of the sale and purchase

24   of these blinds, and I stand by those opinions

25   that there are -- that these products with chains

1    and loops or the wand can be used in safe manners.

2    Q.       So if I put in my question the option with

3    the wand and also the option of the tensioning

4    device, is that -- is that the extent of options,

5    alternative designs that were available in 1995?

6    A.       My understanding based on deposition

7    testimony, those were the options provided with

8    this style of blinds.

9    Q.       Do you have an opinion as to whether or

10   not the vertical blind in issue had been fitted

11   with a tensioning device at the time this incident

12   occurred, whether the outcome could have been

13   changed?

14   A.       Again, I'm not offering -- I haven't been

15   asked to address and I haven't attempted to

16   address the causation issues in this case.

17   Q.       I asked you earlier what information did

18   you have to make the opinion or to assert the

19   opinion that vertical blinds, is your

20   understanding from speaking with Mr. Jankoski and

21   from the research that you did on the internet,

22   that vertical blind are generally are installed in

23   areas where there are sliding doors or where there

24   are large doors.  Is that -- am I paraphrasing you

25   correctly there?

1   A.      They are often -- they're often installed

2   in that fashion or that application, and that

3   there are features that make them attractive for

4   that sort of an application.

5   Q.      Okay.  Did you know whether prior to 1995

6   Hunter Douglas had any knowledge the consumers

7   were installing the vertical blinds with loop

8   cords in children's bedrooms?

9   A.      I would -- I don't want to speak for

10   anyone in the company as to what their specific

11   knowledge at the time was.

12   Q.      Did you know whether or not prior to 1995

13   there was an indication that consumers were

14   installing the vertical blinds with loop holes and

15   loop chains in children's bedrooms?

16   A.      I believe that the vertical blinds were

17   being installed in bedrooms.

18   Q.      If I were to show you -- I just happened

19   to run into this last night, what is known as an

20   IDI, an In Depth Investigation Report, which was

21   produced by the defendants in this case, Bate

22   Stamp Padilla HD-2912.

23   A.      Um-hum.  This is --

24               MR. WILLIAMS:  There's no question

25       pending.

1    BY MR. JAUREGUI:

2    Q.      Is this one of the IDI reports that you

3    told me you had reviewed earlier?

4    A.      I don't have the list or the complete case

5    numbers available to me, but it does look similar

6    to the ones I would have reviewed.

7    Q.      This is an incident that occurred on

8    June 10th, 1991, if I'm reading that correct.  You

9    see the date there on the left side there on the

10   left box?

11   A.      Yes.

12   Q.      All right.  And if you go to Page 2913,

13   description of the accident, it indicates that the

14   incident occurred in the victim's room; right?

15   A.      Um-hum.

16   Q.      All right.  Is that a yes?

17   A.      Yes.

18   Q.      All right.  So does this indicate at least

19   as early as 1991 consumers were installing

20   vertical blinds in their children's rooms?

21            MR. WILLIAMS:  If things are

22         reported factually correctly here?

23            MR. JAUREGUI:  Yes.

24            THE WITNESS:  Yes.  That's what I

25         testified to, that I have no doubt that

1          vertical blinds were being installed in

2          bedrooms.

3   BY MR. JAUREGUI:

4   Q.      All right.  Does this report in any way

5   contradict the conversations that you had with

6   Mr. Jankoski as to his understanding of what is

7   the most prevalent use of vertical blinds, use and

8   application of vertical blinds?

9   A.      It does not contradict my discussion or

10  conversation or the information gained during my

11  conversation with Mr. Jankoski.  And I'd just like

12  to again reiterate that you're saying most

13  prevalent.  That was not how I characterized our

14  conversation or what we discussed.  I am not

15  trying to say, and I said this before, that they

16  are never used in other applications, rather, that

17  they are often used for tall or long window banks

18  and have features that make them desirable for

19  those applications and applications specifically

20  like patio doors and sliding doors.

21  Q.      Thank you.  And in your report I believe

22  you go on to note these are common areas where the

23  children can be supervised all the time.

24  A.      No.  That is not what I say in my report.

25  Q.      What is it that you say in your report

1   with regards to common areas?

2   A.      I state that it would be reasonable to

3   expect that they'd be installed in common areas in

4   the home.

5   Q.      And why is that reasonable expectation

6   relevant to your report in this case, if it is?

7   A.      Because for those applications, you would

8   expect a different set of interactions, different

9   set of exposures and a different set of

10  supervision in those situations.

11  Q.      And how are the interactions with the

12  product different when the product is installed in

13  that child's bedroom?

14  A.      Well, if it's installed in a child's

15  bedroom, then there's -- part and parcel to that

16  is there would be a child around it.  Also, in

17  bedrooms, in children's bedrooms oftentimes those

18  are areas where people would -- would institute

19  more control over the environment and rely less on

20  supervision to control accidental injuries.  Also,

21  there's a whole range of different sorts of

22  furniture and devices that would be placed in

23  that -- that room.  All those would factor into

24  what might be an appropriate choice for a window

25  covering in that room.

1   Q.      Are you aware of the -- any re-calls of

2   window covering from the Consumer Product Safety

3   Commission?

4   A.      I'm sorry?

5                   MR. WILLIAMS:  Any what?

6   BY MR. JAUREGUI:

7   Q.      Any window covering re-calls from the

8   Consumer Product Safety Commission?

9   A.      Are you referencing the re-call to repair?

10  Q.      No.  Generally, are you aware of any

11  window covering products being re-called by the

12  Consumer Product Safety Commission in the last

13  five years?

14  A.      Yes.

15  Q.      And do you have an understanding as to the

16  reason why these products have been re-called?

17  A.      Well, I haven't reviewed it.  In

18  preparation for this deposition, one I'm thinking

19  of most recently would be Roman shades.

20  Q.      Do you know what was the mechanism of

21  injury or the reason why those Roman shades were

22  re-called?

23  A.      Again, I'd rather not try to characterize

24  it here having not reviewed it specifically for

25  this deposition.

1    Q.      Would those re-calls or the reason why

2    those re-calls were effectuated relevant to your

3    decisions in this case?

4    A.      I did not incorporate --

5                   MR. WILLIAMS:  His opinions in this

6          case?

7    BY MR. JAUREGUI:

8    Q.      Your opinions in this case.  Thank you.

9    A.      Again, I didn't review that information in

10   reference to this case.

11                  MR. JAUREGUI:  Just give me one

12         minute.

13                          -----

14                  (Off the record at 4:48 a.m.)

15                          -----

16                  (On the record at 4:52 p.m.)

17                          -----

18   BY MR. JAUREGUI:

19   Q.      All right.  Do you intend to offer any

20   opinions in this case as to the relative costs of

21   a vertical blind with a loop cord and a chain such

22   as the one involved in the incident compared to

23   the price of a vertical blind fitted with a wand?

24   And we're talking about the time period of 1995.

25   A.      No, I do not.

1  Q.      When did you -- when did you first become

2  aware of the risk of strangulation for window

3  blind coverings?

4  A.      I can't remember a specific time frame for

5  when -- when I became aware of that potential

6  hazard.

7  Q.      Was that before you got hired by Exponent?

8  A.      Yes.

9  Q.      You look younger than Jeff, so I will ask

10 you this question.  Do you have young children?

11 A.      Yes, I do.

12 Q.      Do you have any window coverings at home?

13 A.      Yes, I do.

14 Q.      What type of window coverings do you have

15 at home?

16 A.      A variety of window coverings.

17 Q.      Do you have any covers with loop holes?

18 A.      Yes, I do.

19 Q.      Have you made any modifications to those

20 loops cords as a result of what you may know about

21 the risk of strangulation from window cords with

22 regard to children?

23 A.      No, I have not.

24 Q.      And what ages are your children?

25 A.      They are five, three and fourteen months.

1    Q.      All right, Doctor.  Have we gone over your

2    report in this case?  Are these the -- all of the

3    opinions that you intend to offer in this case are

4    included in your report; is that correct?

5    A.      Except as to response to questions asked

6    of me and to rebut any opinions that might appear

7    from Plaintiff's experts as they are being

8    proposed through ongoing discovery testimony.

9    Q.      All right.  I did not ask you one other

10   question.  How much have you billed Mr. Williams

11   for the time you have expended on this case?

12   A.      I am not currently aware of the total

13   amount.

14   Q.      What's the last invoice that you saw in

15   this case?

16   A.      I believe that there is only one invoice

17   in this case, and I have not reviewed it, and I

18   don't believe that's been sent out yet.

19   Q.      Do you have any idea of the amount of

20   hours that you have spent on this case including

21   your time today in this deposition?

22   A.      I'd be guessing at the number of hours.

23   Q.      Give me an educated guess.

24            MR. WILLIAMS:  Give him an educated

25        estimate.

1            THE WITNESS:  I would say I have

2      probably spent probably between 30 and 40

3      hours.

4            MR. JAUREGUI:  All right.  Thank

5      you much for your time, and I'm done.

6            All right, Mike.  It's your turn.

7            MR. WEISS:  I have no questions.

8      Thank you.

9            MR. WILLIAMS:  I do want a copy,

10       please, index, and e-tran.

11            MR. JAUREGUI:  I'd like a regular

12      and condensed, index, DVD or CD copy,

13      electronic.

14            MR. WILLIAMS:  We have plenty of

15      time, so we will read and sign.  Why don't

16      you send it to me and I will forward it to

17      him.

18                      -----

19            (Deposition concluded at 5:00 p.m.)

20                      -----

21

22

23

24

25

1  STATE OF _____)
                                          )  ss:
2  COUNTY OF _____)

3

4

5

6

7          I, the undersigned, declare under penalty

   perjury that I have read the foregoing transcript
8
   and I have made any corrections, additions or
9
   deletions that I was desirous of making; that the
10
   foregoing is a true and correct transcript of
11
   testimony contained therein.
12
           EXECUTED this _____day of _____,
13
   _____, at _____, _____.
14                   (City)                (State)

15

16

17
                        _____
18                      Joseph B. Sala, Ph.D.

19

20

21

22

23

24

25

272

1                     REPORTER'S CERTIFICATE

2

3        I, Bonnie Smith, RPR No. 1627, Registered

4    Professional Reporter, certify:

5        That the foregoing proceedings were taken before

6    me at the time and place therein set forth, at which

7    time the witness was put under oath by me;

8        That the testimony of the witness, the questions

9    propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter

12   transcribed;

13       That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15       I further certify that I am not a relative or

16   employee of any attorney of the parties, nor

17   financially interested in the action.

18       I declare under penalty of perjury under the

19   laws of Pennsylvania that the foregoing is true and

20   correct.

21       Dated this 5th day of August, 2011.

22

23

24                     BONNIE SMITH, RPR No. 1627

25   (Signature requested)