2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF ILLINOIS

4                    EASTERN DISTRICT

5     - - - - - - - - - - - - - - - - - - -
      JOSE M. PADILLA, AS THE SPECIAL      )
6     ADMINISTRATOR OF THE ESTATE OF       )
      MAXIMILIAN PADILLA,                  )
7                                          )
              Plaintiffs,                  )
8                                          ) Case No.
                                           ) 09 CV 1222
9          vs.                             )
                                           )
10    HUNTER DOUGLAS WINDOW COVERINGS,     )
      INC., WINDOW COVERING MANUFACTURERS  )
11    ASSOCIATION, WINDOW COVERING SAFETY  )
      COUNCIL,                             )
12                                         )
              Defandants.                  )
13    - - - - - - - - - - - - - - - - - - -

14

15                    DEPOSITION OF

16                  JOSEPH F. JANKOSKI

17                  NEW YORK, NEW YORK

18                  October 28, 2010

19                    2:01 p.m.

20

21
      ATKINSON-BAKER, INC.
22    COURT REPORTERS
      (800) 288-3376
23    www.depo.com

24    REPORTED BY:  THOMAS A. FERNICOLA, RPR

25    FILE NO.:  A40A1B4

1

2           IN THE UNITED STATES DISTRICT COURT

3         FOR THE NORTHERN DISTRICT OF ILLINOIS

4               EASTERN DISTRICT

5    - - - - - - - - - - - - - - - - - - -

     JOSE M. PADILLA, as the Special    )
6    Administrator of the ESTATE OF     )
     MAXIMILIAN PADILLA,               )
7                             ) Case No.
                             ) 09 CV 1222
8          Plaintiff,       )
                             )
9        vs.                 )
                             )
10   HUNTER DOUGLAS WINDOW COVERINGS,  )
     INC., WINDOW COVERING MANUFACTURERS )
11   ASSOCIATION, WINDOW COVERING SAFETY )
     COUNCIL,                   )
12                          )
          Defendant.       )
13   - - - - - - - - - - - - - - - - - - -

14

15            Deposition of JOSEPH F. JANKOSKI, taken

16   on behalf of the Plaintiff, at Schiff Hardin, LLP,

17   900 Third Avenue, 23rd Floor, New York, New York,

18   commencing at 2:01 p.m., Thursday, October 28,

19   2010.

20

21

22

23

24

25

A P P E A R A N C E S:

FOR PLAINTIFF

JAUREGUI & ASSOCIATES, P.C.
BY:  ARTURO JAUREGUI, ESQ.
120 W. Madison Street, Suite 400
Chicago, Illinois 60602
Tel:  312.781.9103
Fax:  312.781.9203


FOR DEFENDANT

SCHIFF HARDIN LLP
BY:  JEFFREY R. WILLIAMS, ESQ.
One market, Spear Street Tower, 32nd Floor
San Francisco, California 94105
Tel:  415.901.8763
Fax:  415.901.8701


KING & SPALDING, LLP
BY:  JAMESON B. CARROLL, ESQ.
1180 Peachtree Street N.E., Suite 4100
Atlanta, Georgia 30309-3512
Tel:  404.572.3337
Fax:  404.572.5136

2

3                          S T I P U L A T I O N S

4

5

6          IT IS HEREBY STIPULATED AND AGREED by and between

7     the attorneys for the respective parties herein that

8     this examination may be sworn to before any Notary

9     Public.

10

11          IT IS FURTHER STIPULATED AND AGREED that the filing

12    and certification of the said examination shall be

13    waived.

14

15          IT IS FURTHER STIPULATED AND AGREED that all

16    objections to questions, except as to the form of the

17    question, shall be reserved for the time of trial.

18

19

20

21

22

23

24

25

```
 1                          J. Jankoski                    5
 2     J O S E P H   J A N K O S K I, after having been
 3     first sworn by a Notary Public of the State of New
 4     York, was examined and testified as follows:
 5     BY THE REPORTER:
 6          Q    Please state your full name for the
 7     record.
 8          A    Joseph F. Jankoski.
 9          Q    Please state your current address for
10     the record.
11          A.   3 Stratford Way, Morris Plains,
12     New Jersey.
13               MR. JAUREGUI:  Let the record reflect
14          this is a discovery deposition of
15          Mr. Joseph Jankoski taken pursuant to notice
16          by agreement of the parties and pursuant to
17          the rules of the District Court of the
18          Northern District of Illinois in the Federal
19          Rules of Civil Procedure.
20          Q.   Mr. Jankoski -- is that how you
21     pronounce your last name, by the way?
22          A.   Yes.
23          Q.   I will be asking you a series of
24     questions about an incident relating to the death
25     of Max Padilla who died on April 22, 2008, from
```

```
1                          J. Jankoski              6

2        strangulation by a vertical blind, a

3        Hunter Douglas vertical blind.

4               I have several documents here.  I will

5        try to economize as much as I can.  Hopefully, you

6        will be familiar with most of them so we will not

7        have to be here for six hours because nobody wants

8        to do that.

9               I asked you earlier, by any chance, if

10       you had a copy of your Curriculum Vitae.  You told

11       me that you don't have one, and, of course, I

12       didn't ask for one.

13              If at some point you can provide your

14       attorney with a copy of one, I would appreciate

15       that.

16          A.   Okay.

17          MR. WILLIAMS:  Do you have one that is

18       maintained?

19          THE WITNESS:  Not one that I maintain.

20       I haven't used it.

21          MR. WILLIAMS:  You're entitled to ask

22       for whatever you want, but it's a little

23       unusual for a non-expert witness --

24          MR. JAUREGUI:  I may not need it.  If

25       you've been there for many, many years at
```

```
1                          J. Jankoski                    7
2          Hunter Douglas, then I know where you've been
3          so it may become a moot point.
4          Q.   What is your date of birth?
5          A.   May 26, 1950.
6          Q.   Are you married, sir?
7          A.   Yes, sir.
8          Q.   Do you have any children?
9          A.   One.
10         Q.   How old is your son or daughter?
11         A.   My daughter is 17.
12         Q.   And do you live in New York or
13    New Jersey?
14         A.   I live in New Jersey.
15         Q.   Can you tell me a little bit about your
16    educational background.
17         A.   I have a college degree from Saint
18    Peter's College in Jersey City, and an MBA from
19    Fairleigh Dickinson University also in New Jersey.
20         Q.   Tell me about your employment history.
21    You're currently employed at Hunter Douglas?
22         A.   Yes, sir.
23         Q.   When did you first become employed by
24    Hunter Douglas?
25         A.   The end of 1989.
```

J. Jankoski                                           8

1

2      Q.    Prior to that what employment did you

3  have?

4      A.    I worked for a competitor of

5  Hunter Douglas, Levolor.

6      Q.    In what capacity?

7      A.    I started out as a salesperson and ended

8  up in charge of sales and marketing.

9      Q.    How long were you at Levelor?

10      A.    From 1972 through 1989.

11      Q.    What is the current position that you

12  have at Hunter Douglas?

13      A.    I'm vice-president of merchandising.

14      Q.    As the VP of merchandising, what is it

15  that you do?

16      A.    The title doesn't necessarily reflect my

17  role.  I'm strategic -- how would I say this?  I

18  try to match up consumer demand and retail

19  distribution channels to maximize the brand that

20  we have out on the marketplace.

21      Q.    Is that a position that you hold

22  throughout the country?

23      A.    It's a U.S. position, yes.

24      Q.    That's very broad.  Can you be more

25  specific?  Is it just related to merchandising of

```
                              J. Jankoski                    9
```

1                              J. Jankoski                    9

2        Hunter Douglas products?

3            A.    It's two-pronged.    One is on the retail

4        channels that we do business with, trying to

5        organize them, trying to improve their ability to

6        sell our products through various means of

7        training, of merchandising, projections,

8        marketing, incentives; and the other side of the

9        coin is in the consumer arena where we're trying

10       to locate and stimulate the most likely consumers

11       who could buy our product and get those two groups

12       together.

13           Q.    And when did you become vice-president

14       of merchandising?

15           A.    About five years ago.

16           Q.    What was your position prior to that?

17           A.    I was in charge of the national account

18       group.

19           Q.    What were your responsibilities in

20       connection with that position?

21           A.    Directly manage the national accounts

22       that we had recognized at that time, which was

23       Home Depot, Lowe's, JCPenny, Sears, Montgomery

24       Ward.   Large chains, centralized decisionmaking.

25           Q.    For how long were you the manager of

```
 1                           J. Jankoski                    10

 2       national accounts?

 3              A.    From 1989 through 1995.  Well, excuse

 4       me, 2005.  It doesn't sound right.

 5              Q.    I'm sorry, can we try that again?

 6              A.    From 1989 to 2005.

 7              Q.    Any other positions that you've held at

 8       Hunter Douglas?

 9              A.    No, sir.

10              Q.    Who is the current president of

11       Hunter Douglas?

12              A.    Marvin Hopkins.

13              Q.    Do you know for how long he's been the

14       president?

15              A.    I need to clarify that.  He's president

16       of Hunter Douglas North America.

17              Q.    For how long has he been the president

18       of Hunter Douglas North America?

19              A.    I'm guessing 10 years.

20                    MR. WILLIAMS:  That is your one guess

21              for this deposition.

22              Q.    Yes, no more guessing.

23              A.    No more guessing.

24              Q.    Are there any other divisions of

25       Hunter Douglas outside of North America?
```

```
 1                          J. Jankoski                    11

 2          A.   Yes, sir.

 3          Q.   Where else?

 4          A.   We do business in 100 countries.

 5          Q.   Is the U.S. considered the headquarters

 6    for Hunter Douglas?

 7          A.   No, sir.

 8          Q.   Where is the headquarters considered?

 9          A.   In Rotterdam.  The headquarters is in

10    Rotterdam; the executive office is in Switzerland.

11          Q.   The division here, is it Hunter Douglas

12    North America?

13          A.   Yes, sir.

14          Q.   When was that company incorporated?

15          A.   I don't know.

16          Q.   Do you know where it's incorporated?

17          A.   I don't know.

18          Q.   Can you tell me the locations in the

19    U.S. where Hunter Douglas has manufacturing

20    entities?

21          A.   Today?

22          Q.   Yes.

23          A.   We have a large facility in Broomfield,

24    Colorado.  We also have facilities in Tupelo,

25    Mississippi; Owensboro, Kentucky; Sacramento,
```

<pre>
 1                        J. Jankoski                    12

 2      California; Salt Lake City, Utah; Cumberland,

 3      Maryland.

 4          Q.   You listed five different locations.  Do

 5      any of those locations specialize in -- do

 6      research and development for Hunter Douglas?

 7          A.   We have three groups of research and

 8      development teams.  One would be located in

 9      Broomfield, Colorado.  We have a group that is

10      located in Whitesville, Kentucky, and another

11      gentleman who is located up in Boston.

12          Q.   When you say "gentleman," that's just an

13      individual or a facility, a formal company there?

14          A.   It's a formal company, but there's one

15      gentleman who is in particular the lead R&D man.

16          Q.   Now, does Hunter Douglas manufacture

17      window products in the U.S.?

18          A.   Yes, sir.

19          Q.   Does Hunter Douglas also hire companies

20      to manufacture products for Hunter Douglas?

21              MR. WILLIAMS:  I'll just object to the

22          use of the term "hire."  If you understand

23          it, explain it.

24              MR. JAUREGUI:  Or contract, subcontract.

25          A.   We have an arrangement with fabricators
</pre>

```
1                         J. Jankoski                    13

2        under contractual obligations to fabricate

3        Hunter Douglas products using Hunter Douglas

4        components.

5             Q.   So I take it that any fabricators that

6        Hunter Douglas contracts with, they manufacture

7        the products according to the specifications

8        provided by Hunter Douglas?

9                 MR. WILLIAMS:  Objection, vague.  Go

10           ahead.

11           A.   Yes.

12           Q.   I mean, they have to use the

13       Hunter Douglas components, correct?

14           A.   Correct.

15           Q.   Do you know how many fabricators

16       Hunter Douglas has in the U.S., contracts for the

17       production or manufacture of window covering

18       products?

19           A.   Would it be --

20           Q.   Mr. Jankoski, this is not a memory test.

21       We don't want you to be guessing about anything,

22       so whatever best memory you have at this time,

23       that's appreciated.  If you don't know the answer

24       to any questions, I'm sure your attorney will

25       instruct --
```

```
 1                      J. Jankoski                    14

 2           MR. WILLIAMS:  Don't guess, but qualify

 3      your answer any way you need to.

 4      A.   There's a company, Mill Supply, in

 5 Connecticut.

 6           MR. WILLIAMS:  Are you going to name

 7      them to count them?  Right now the question

 8      is how many are there.

 9      Q.   It will serve both purposes the way

10 you're doing it right now, so that's fine.

11      A.   A company called Tentina on Long Island,

12 Lafayette in Indiana, Beauty View in Wisconsin,

13 Designer Blinds in Nebraska, Gulf Coast in

14 Houston, Kaleidoscope in Detroit.

15      Q.   These are the ones that come to mind at

16 this point?

17      A.   I hope I have them all.

18      Q.   All right.  That's fair.

19           Any of the facilities that are either

20 owned by Hunter Douglas where window manufacturing

21 covering -- window coverings are manufactured --

22 well, first, let's start there.  Which one of

23 those facilities manufacture vertical blinds?

24           MR. WILLIAMS:  Today, you're talking

25      about?
```

```
 1                        J. Jankoski                    15

 2             MR. JAUREGUI:  Yes, today.

 3        A.   Can I back up and add two additional

 4   facilities to the Hunter Douglas organization that

 5   I had failed to mention?

 6        Q.   All right.

 7        A.   Bessemer City, which is in North

 8   Carolina, and there is a facility in Fort

 9   Lauderdale that's fading out.  There is a small

10   facility there.

11        Q.   Well, actually, let me withdraw the

12   prior question that I had put to you before.

13             Is there something different about the

14   manufacture of vertical blinds that would require

15   them to be produced or manufactured at a certain

16   facility?

17        A.   We have two groups of products at

18   Hunter Douglas:  Products that are fabricated by

19   the fabricators, and, in that case, Hunter Douglas

20   sends the fabricator component parts, and they

21   assemble that finished product at their own

22   location.

23             There is another group of products that

24   we ship out completed, and the fabricator in this

25   case turns into a finished product distributor
```

J. Jankoski                                    16

1

2    because we do the production for the fabricator

3    and ship him the finished product.

4        Q.   So with that qualifier, is there a

5    specific facility where vertical blinds are

6    manufactured?

7        A.   Vertical blinds would fall into the

8    first group of products that I had mentioned, and

9    that is they're primarily made by fabricators.  It

10   was an established product that was easily made

11   and easily shipped from a local facility.  So all

12   of the production that was made by Hunter Douglas

13   in that category was produced by a fabricator.

14       Q.   Do you know when Hunter Douglas first

15   started manufacturing vertical blinds?

16       A.   We started in the probably late '80s,

17   early '90s, and it really wasn't a big part of our

18   business until we purchased a company that got us

19   into the business in a bigger way.

20       Q.   And when did that happen?

21       A.   I believe we purchased the company in

22   the early to mid '90s.

23       Q.   And so some time in the mid '90s,

24   Hunter Douglas cranked out the production of

25   vertical blinds?

1                            J. Jankoski                    17

2          A.   We got more serious in the category,

3     yes.

4          Q.   And where was that company?

5          A.   They were in Florida.

6          Q.   Is that the facility in Fort Lauderdale,

7     Florida, today?

8          A.   Remnants of it, I would imagine.

9          Q.   Have you seen photographs of the

10    vertical blind involved in this case?

11         A.   Yes, I have.

12         Q.   As you sit here today, can you tell me

13    whether from looking at those photographs you can

14    tell where that blind was manufactured?

15         A.   I could not tell.

16         Q.   Is there anything, any feature about

17    that vertical blind or its components, that will

18    enable Hunter Douglas to determine the approximate

19    period of time when that blind would have been

20    manufactured?

21             MR. WILLIAMS:   Answer on behalf of

22         yourself.  He asked you the corporation.  If

23         there are other individuals who might know,

24         you can explain that, but he's only here in

25         his personal capacity.

1                          J. Jankoski                    18

2          A.    Personally, I wouldn't know.  Components

3     change over the course of time.  I wouldn't know,

4     you know, when they might be introduced.

5          Q.    The window blind at issue here has

6     embossed or engraved on the end of the rail

7     "Hunter Douglas Window Fashion."  First of all, is

8     that a division of Hunter Douglas?  Does that mean

9     anything to you, or is that just a label that

10    would have been used by Hunter Douglas on any of

11    its products?

12         A.    It would have been a multiple product

13    label.

14         Q.    In the 1990s, mid 1990s, where were the

15    vertical blinds being produced or manufactured for

16    Hunter Douglas?

17         A.    It could have been one of possibly 25

18    different fabricators, and I'm estimating 25.

19         Q.    And, again, you believe that the window

20    blind at issue was manufactured by one of the

21    fabricators?

22              MR. WILLIAMS:   Independent fabricators?

23              MR. JAUREGUI:  One of the independent

24         fabricators that Hunter Douglas contracts or

25         subcontracts with.

J. Jankoski                                    19

1

2        A.    A fabricator, right?

3        Q.    A fabricator.

4        A.    I don't know which one.

5        Q.    And what is it that leads you to believe

6    that this particular blind would have been

7    manufactured by one of the independent

8    fabricators?

9        A.    Because we did not produce finished

10   product vertical blinds as a company.  We sourced

11   that through the fabricators in component form.

12       Q.    Who would have information or who would

13   be the person most likely to have information or

14   to know when this blind, the blind at issue, was

15   manufactured and the location where it was

16   manufactured?

17            MR. WILLIAMS:  If you know based upon

18         the information that you have available to

19         you.

20       A.    I'm not sure there is someone who really

21   could pinpoint that.  It's a difficult question to

22   answer.

23       Q.    Now, from the answers to

24   interrogatories, I know that Hunter Douglas has

25   dealt with either prior lawsuits or complaints

```
1                          J. Jankoski                    20

2          about issues having to do with window cord safety

3          issues.

4                    Is there within Hunter Douglas a

5          department that deals with those issues, like when

6          litigation occurs -- other than the Law Department

7          when litigation occurs, someone like a risk

8          management group within Hunter Douglas?

9              A.   No, sir.

10             Q.   Mr. Jankoski, can you tell me what

11         efforts, if any, you are aware that Hunter Douglas

12         undertook to try to determine:  1) when the blind

13         at issue was manufactured, and the location where

14         it was manufactured?

15             A.   I'm not sure of what has been going on

16         internally to determine, if we could, where it was

17         made.  I don't know.

18             Q.   Would there be someone within

19         Hunter Douglas that would know the answer to that

20         question?

21                    MR. WILLIAMS:  I think that was asked

22             and answered.  Go ahead.

23             Q.   If you know.

24             A.   Again, the person closest to the window

25         covering that we're speaking of is a gentleman by
```

```
 1                          J. Jankoski                    21

 2        the name of Ron Rubinoff.  That would be the only

 3        person that I could think of.

 4              Q.   And if there are where is he located?

 5              A.   In Bessemer City, North Carolina.

 6              Q.   Do you know what his title is?

 7              A.   I think he is a general manager of one

 8        of our divisions.

 9              Q.   Now, you have a facility in Lafayette,

10        Indiana.  Was that facility or has that facility

11        at any time produced or manufactured vertical

12        blinds?

13              A.   Yes.

14              Q.   Now, this incident occurred in Chicago,

15        Illinois, right next to Indiana.  Would it have

16        made sense, I'll say, distribution or from a

17        distribution perspective to supply the Midwest or

18        a place like Chicago with vertical blinds that

19        would have been built in Indiana?

20              A.   It could.  There's also a fabricator who

21        was in Chicago that no longer exists who was there

22        probably, I imagine, in the mid '90s by the name

23        of Acme.  They have since gone out of business.

24              Q.   Did Acme ever manufacture, produce or

25        assemble any vertical blinds for Hunter Douglas?
```

```
1                          J. Jankoski                    22

2          A.    Yes, sir.

3          Q.    And what was the approximate period of

4     time that occurred?

5          A.    I don't recall.  I'd be guessing.

6          Q.    Do you know whether the vertical blind

7     at issue here would have been manufactured and

8     assembled in the United States or would that have

9     been manufactured and assembled abroad?

10         A.    In the United States.

11         Q.    And how do you know that?

12         A.    Because we do not produce vertical

13    blinds offshore to sell them in the United States

14    that I'm aware of.

15         Q.    The Hunter Douglas North America

16    Division, do you know the approximate number of

17    employees it had?

18              MR. WILLIAMS:  Counsel, just for

19         technical reasons, you've used the term

20         "division" several times.  I don't believe

21         Hunter Douglas North America, the corporate

22         structure, is the way you're describing it.

23              If you want to ask him how many

24         employees Hunter Douglas North America, Inc.,

25         has, that's fine.
```

J. Jankoski                                              23

1

2          Q.    Hunter Douglas North America, do you

3     know how many employees there are?

4          A.    Approximately 7,000.

5          Q.    Now, is Hunter Douglas a public

6     corporation or a private corporation?

7          A.    It's publicly traded on the Amsterdam

8     Stock Exchange.

9          Q.    Is it traded here in the U.S.?

10         A.    No, sir.

11         Q.    This will generate a response from

12    Mr. Williams.  Do you know what were the revenues

13    for Hunter Douglas North America for 2009?

14              MR. WILLIAMS:  Relevance objection.

15         Don't speculate.  If you know, you may --

16         A.    Just repeat the question, please.

17         Q.    Yes.  For the year 2009, do you know

18    what were the revenues for Hunter Douglas

19    North America?

20              MR. WILLIAMS:  First of all, is that a

21         publicly-available figure in corporate

22         filings in the Netherlands?

23              THE WITNESS:  We don't split it out by

24         geography.  Well, it might be --

25              MR. WILLIAMS:  My question goes to

```
1                        J. Jankoski                    24

2           whether I'll instruct you not to answer on

3           the grounds that that's proprietary

4           information.

5                There are other legal reasons why it's

6           not relevant, but I'll let you answer it

7           unless there are confidentiality issues.

8                If you want to think about that and talk

9           about that on a break, we can come back to

10          that question, and let Mr. Jauregui know if

11          you will answer it or not.

12          A.   Can I defer?

13          Q.   That's fine.  We will just make a note

14     of it so we don't forget.

15               Well, let me ask you this question.  Do

16     you have any suggestions for plaintiffs in this

17     case of how they can possibly identify when this

18     window blind was manufactured, and where it was

19     manufactured?

20               MR. WILLIAMS:  I'll object on the

21          grounds that that's been asked, and we have

22          given you whatever information we have.

23               Arturo, I will tell you that the

24          witnesses that you've asked to depose in a

25          few weeks in Owensboro and Whitesville will
```

J. Jankoski                                      25

1

2          not be able to give you a date.  Certainly,

3          they'll be able to help you more there based

4          on some of the questions you asked earlier

5          about components and the like.

6          Q.  Mr. Jankowski, I don't want to prolong

7      the deposition.  We have some materials to go

8      through.  If at any time you simply -- that's not

9      your area, you can tell me that.  Somebody else

10     may have a better answer for me.  I'll take that

11     as a good answer.  Okay?

12         A.  Yes, sir.

13         Q.  Tell me a little bit about the Window

14     Covering Manufacturers Association.  First of all,

15     what is the Window Covering Manufacturers

16     Association?

17         A.  It's primarily a standards organization

18     for the window covering organization in America.

19         Q.  I understand that formally it was known

20     as the Window Covering Manufacturers Association?

21         A.  Correct.

22         Q.  Hunter Douglas has a relationship with

23     the Window Manufacturers Association today,

24     correct?

25         A.  Correct.

```
1                          J. Jankoski                    26

2          Q.   Now, did Hunter Douglas have a

3     relationship with its predecessor, the American

4     Window Covering Manufacturers Association?

5          A.   I believe they did.

6          Q.   Do you know how far back Hunter Douglas

7     had a relationship with either the America Window

8     Covering Manufacturers Association or the Window

9     Covering Manufacturers Association?

10         A.   I think it goes back to almost the

11    beginning, whenever that was.

12         Q.   Would it be fair to say that

13    Hunter Douglas was one of the founding members of

14    the America Window Covering Manufacturers

15    Association?

16         A.   I'm not sure founding would be a way to

17    describe it.  It might be one of the original

18    members.

19         Q.   Mr. Jankoski, your name appears on

20    several documents of meetings held or sponsored by

21    the Window Covering Manufacturers Association.

22    When did you first start attending those meetings,

23    if you know?

24         A.   For Hunter Douglas, it was 2001.

25         Q.   Are there other people from
```

```
 1                          J. Jankoski                27

 2        Hunter Douglas that also are designated for

 3        Hunter Douglas to attend meetings at the Window

 4        Covering Manufacturers Association?

 5                 MR. WILLIAMS:  Presently?

 6                 MR. JAUREGUI:  Presently.

 7            A.    Yes, there are.

 8            Q.    Let me back up a little bit.  In 1995,

 9        in the mid '90s, do you know who was the person

10        from Hunter Douglas that would have been attending

11        those meetings?

12            A.    O.B. Kelly.

13            Q.    What's Kelly's last name?

14            A.    That's his last name.

15            Q.    Oh, Kelly?  I'm sorry.  What's the first

16        name?

17            A.    O.B.

18            Q.    O.P.?

19            A.    O.B.

20                 MR. WILLIAMS:  "B" as in boy.

21            A.    "O" as in orange.

22                 MR. WILLIAMS:  "Orange" is a lousy word

23        to choose.

24            Q.    Is this person a woman or a man?

25            A.    He's a man.
```

```
1                         J. Jankoski                    28

2              Q.   Is Mr. Kelly still employed at

3        Hunter Douglas?

4              A.   No, he's not.

5              Q.   Is he retired?

6              A.   Yes, he is.

7              Q.   Do you know where he resides?

8              A.   Carolina.  North Carolina.

9              Q.   Do you know when he retired?

10             A.   Around 2000.

11             Q.   Is that right around the time when you

12       would have taken over?

13             A.   Yes.  That's the transition time.

14             Q.   Do you have an understanding as to the

15       reason why Hunter Douglas maintains a relationship

16       or an association or was a member of the Window

17       Covering Manufacturers Association back when you

18       first became affiliated with that entity?

19             A.   Why we would be involved?

20             Q.   Yes.  What does Hunter Douglas get out

21       of association with the Window Covering

22       Manufacturers Association?

23             A.   It's not necessarily what we get out of

24       it.  It's what we put into it.

25             Q.   All right.  What is it that
```

```
                              J. Jankoski                    29
 1
 2      Hunter Douglas puts into it?
 3           A.   We participate in the process of
 4      standards writings, which is the primary purpose
 5      of the organization.
 6           Q.   Now, there's also the Window Covering
 7      Safety Council, correct?
 8           A.   Yes, sir.
 9           Q.   Is that like a sister organization of
10      the Window Covering Manufacturers Association, if
11      we can use that term?
12           A.   You could call it that.
13           Q.   All right.  Do you know who's the
14      president of the Window Covering Manufacturers
15      Association today?
16           A.   Yes, I do.
17           Q.   Who is that?
18           A.   That would be me.
19           Q.   When did you become the president?
20           A.   2005.
21           Q.   How did that come about?  Was there an
22      election held?
23           A.   The existing president left the
24      industry, and I took over for him as the existing
25      vice-president at the time.
```

1                           J. Jankoski                    30

2          Q.    What are your duties as president of the

3     Window Covering Manufacturing Association today?

4          A.    We conduct on an annual basis a product

5     innovation awards competition, and review the

6     output of the industry in terms of their new

7     innovations.  We provide a forum for the industry

8     to showcase their innovation, so we run that

9     event.

10              We are, again, very much involved with

11    the CPSC to develop standards.  That's our primary

12    role, as I mentioned earlier.

13         Q.    Is there an executive director for the

14    Window Covering Manufacturers Association?

15         A.    Yes, sir.

16         Q.    Who is that?

17         A.    Ralph Basami.

18         Q.    Can you spell the last name, please?

19         A.    B-a-s-a-m-i.

20         Q.    And when did Mr. Basami become the

21    executive director of the Window Covering

22    Manufacturers Association?

23         A.    Maybe four years ago.

24         Q.    Do you know how that came about?

25         A.    He replaced a lady who had left.

1                         J. Jankoski                    31

2          Q.    Mr. Peter Rush, is he associated with

3     the Window Covering Manufacturers Association?

4          A.    He's the president of Kellen.  Kellen is

5     the company that we use to manage the association.

6          Q.    Where is Kellen located?

7          A.    They have multiple offices around the

8     world.  They do have an office here in New York

9     City.

10         Q.    So is Kellen a management type

11    organization?

12         A.    Yes, sir.  They have other associations

13    that they also manage.

14         Q.    I understood that as of 2006,

15    Mr. Peter Rush was the executive director of the

16    Window Covering Manufacturers Association.  Is

17    that your understanding?

18         A.    Ralph replaced Caroline Jennings, and if

19    she was not the executive director, then I assume

20    that it was Peter.  I don't know.  I don't recall

21    what their exact titles were at the time.

22         Q.    Do you know who's the executive director

23    of the Window Covering Safety Council today?

24         A.    There are two trustees -- three

25    trustees, I'm sorry.  Three trustees.

1                        J. Jankoski                    32

2        Q.   What are their names?  Do you know them?

3        A.   Tom Merker.

4        Q.   Can you spell the last name, please?

5        A.   M-e-r-k-e-r; Mike Ceinian; and I believe

6   Peter Rush.

7        Q.   Do you know when the three-trustee

8   structure went into effect?

9        A.   There's annual reviews of that, so the

10  last annual meeting was held in conjunction with

11  the trade show that was in March or April of this

12  year.

13       Q.   So that when the structure changed, is

14  that when the three trustees took over the

15  management of the Window Covering Safety Council?

16       A.   There might have been a different group

17  of three, but that was when this group of three

18  were elected in.

19       Q.   All right.  Again, I understood that as

20  of February of 2006, Peter Rush was the executive

21  director of the Window Covering Safety Council.

22  Do you know when he stopped being the director?

23       A.   It must have been when Ralph Basami came

24  in.  I can't speculate.

25       Q.   Do you know what prompted the change in

1                         J. Jankoski                    33

2          the management of the Window Covering Safety

3          Council?

4               A.   The change in the Window Covering Safety

5          Council?

6               Q.   Yes, the management.

7                    MR. WILLIAMS:  Objection.  Misstates the

8               testimony.

9               A.   It's reviewed annually.  It's updated

10         annually.

11              Q.   And what happened during these reviews?

12              A.   An elections was held, and these three

13         were decided on as being the trustees.

14              Q.   All right.  I will speak to Mr. Rush

15         tomorrow.  He will probably be able to answer

16         these questions.

17                   What role has Hunter Douglas played

18         within the Window Covering Safety Council?

19                   MR. WILLIAMS:  Since its inception?

20                   MR. JAUREGUI:  Since its inception, yes.

21              A.   We are an equal member along with other

22         manufacturers, other retailers, other suppliers of

23         components and sales materials, other suppliers of

24         the industry.  It's a multifaceted organization.

25              Q.   What is the primary purpose of the

J. Jankoski                    34

1    Window Covering Safety Council as you understand

2

3    it?

4        A.   It's to get the word out on child

5    safety.

6        Q.   Do you know when the Window Covering

7    Safety Council was created?

8        A.   No.

9        Q.   Would 1994 or thereabouts sound right to

10   you?

11       A.   It would make sense.  It sounds right.

12   I can't recall.

13            MR. WILLIAMS:  Don't speculate.  If

14        you've got a basis, answer it.  If you don't

15        know, somebody else will.

16       Q.   Is Hunter Douglas one of the leading or

17   the biggest manufacturer of window coverings in

18   North America?  And that would include, obviously,

19   the United States.

20       A.   Could you define "big"?

21            MR. WILLIAMS:  Measured by what?

22       A.   Measured by what?

23       Q.   I've seen literature, and we'll go

24   through some of the documents in a minute.  I

25   understood Hunter Douglas was one of the leading

1                          J. Jankoski                    35

2       producers of window covering products measured by

3       the amount of products that they sell on the

4       market by the amount of revenue.  Is that a

5       correct statement or not?

6              MR. WILLIAMS:  That's compound.  Go

7          ahead.

8          A.   That would be a very different

9       measurement, very different measurements.

10         Q.   All right, that's fine.  There are many

11      other manufacturing companies in the United States

12      that manufacture window coverings.  Is that

13      correct?

14         A.   Yes, sir.

15         Q.   Is it a fair statement to say that

16      Hunter Douglas is one of the largest manufacturers

17      of window coverings in the United States?

18             MR. WILLIAMS:  Same objection as

19          mentioned by what he just said.

20         Q.   By any measurement that you'd like to

21      use, by any criteria.

22         A.   If I give you an answer in units or I

23      give you an answer in dollars, they're two

24      different answers.

25         Q.   I'll take either of those or both.

J. Jankoski                                              36

1

2          A.   Well, we're not the biggest in terms of

3     units.  We are among the larger ones with regard

4     to dollars.

5          Q.   If you were to rank the largest window

6     covering producing companies in North America,

7     what would be the pecking order?  Who would be up

8     on top?

9               MR. WILLIAMS:  By units sold?

10              MR. JAUREGUI:  By units sold.

11         A.   Springs, Springs Industries.  The reason

12    I'm thinking here is because the window coverings

13    could be custom made or stock in a box.  They're

14    still a unit.  It's still a unit of product.

15         Q.   That's fine.  If we use the criteria of

16    revenue, who is the largest?

17         A.   In revenue, we would be first and

18    Springs probably would be second.

19         Q.   Do you consider the information that is

20    generated by the Window Covering Manufacturers

21    Association to be a reliable source of information

22    for the window covering industry?

23              MR. WILLIAMS:  Objection, vague and

24         compound.  Go ahead, only if you understand

25         it.

```
 1                        J. Jankoski                    37
 2          A.    Could you repeat it one more time,
 3     please?
 4          Q.    Certainly.
 5                You told me earlier that the Window
 6     Covering Manufacturers Association, one of their
 7     primary objectives is to put out standards for the
 8     window covering industry.  Is that correct?
 9          A.    That's correct.
10          Q.    All right.
11                Now, so the question then is, do you
12     consider the information that is generated or the
13     standards that are put out by the Window Covering
14     Manufacturing Association a reliable source of
15     information for the window covering industry?
16                MR. WILLIAMS:  Same objection.
17          A.    I would say it is a reliable source,
18     yes.
19          Q.    And the reason for that is because
20     Hunter Douglas is a member of the organization?
21          A.    No.
22          Q.    Okay.  You find it reliable for what
23     reason, then?
24          A.    It is the primary source of information.
25          Q.    When it comes to standards?
```

```
1                              J. Jankoski                    38

2              A.    Yes, sir.

3              Q.    What about on the issue of window

4       safety?  Who or what entity do you consider the

5       primary source of information on window covering

6       safety?

7                    MR. WILLIAMS:  Objection, vague.

8              A.    The Window Covering Safety Council.

9              Q.    For how long have you known

10      Mr. Peter Rush?

11             A.    Approximately 15 years.

12             Q.    Then, I take it, you have a business

13      relationship with Mr. Rush?

14             A.    Yes.

15             Q.    And the reason why I ask is because I

16      want to ask you if -- do you socialize with

17      Mr. Rush outside of work, outside of the official

18      role that you have as representative of

19      Hunter Douglas?

20             A.    No, I do not.

21             Q.    How does Hunter Douglas keep itself

22      informed of the developments that are going on in

23      the window covering industry?

24             A.    We participate directly with all the

25      initiatives that are going on.
```

```
 1                        J. Jankoski                    39

 2          Q.   Is the Window Covering Manufacturers

 3     Association a primary source of information as to

 4     the latest developments that are going on out

 5     there in technology that is related to the window

 6     covering industry?

 7          A.   No, I wouldn't say that's the source for

 8     technology.  No.

 9          Q.   Where would be the source of technology?

10     Is that within the industry itself, or is there

11     another entity out there similar to the Window

12     Covering Manufacturers Association?

13          A.   Could you just elaborate on what you

14     mean by "technology"?

15          Q.   Any new improvements that are out there,

16     technology that is being developed in a company

17     such as Hunter Douglas -- would consider whether

18     or not to use it in its products, that kind of

19     thing?

20              MR. WILLIAMS:  You're asking what's the

21          source of information among these companies

22          who are in the business in the industry?

23              MR. JAUREGUI:  Yes, whether or not there

24          are any entities out there where the

25          information is centralized, and if
```

```
 1                           J. Jankoski                    40
 2           Hunter Douglas wants to know what's going on,
 3           Hunter Douglas would go there and get the
 4           information.
 5           A.   There is no common depository for that
 6      type of information.  The only thing that comes
 7      close to that would be where the Window Covering
 8      Manufacturers Associations innovation awards event
 9      on an annual basis comes and brings the products
10      that are ready to go to market, gives that
11      exposure.
12           Q.   When Hunter Douglas wants to bring out
13      an issue, a safety concern issue, do you as a
14      representative of Hunter Douglas bring that issue
15      to the attention of the Window Covering
16      Manufacturers or the Window Covering Safety
17      Council, then that issue gets discussed and it's
18      shared with the rest of the industry, or how does
19      that work?
20           A.   No, not necessarily, no.
21           Q.   How does it work when Hunter Douglas has
22      a safety issue that is effecting -- such as window
23      cord safety, for example?
24           A.   Well, the --
25                MR. WILLIAMS:  Wait, I'm sorry, what's
```

```
1                          J. Jankoski                    41

2           the question?  Repeat it please for me?

3                MR. JAUREGUI:  The question is, when

4           Hunter Douglas has a concern over window cord

5           safety in window covering products, is that

6           an issue that is brought up outside of

7           Hunter Douglas, discussed with other members

8           of the Window Covering Safety Council, or is

9           that primarily handled inside within

10          Hunter Douglas?

11               MR. WILLIAMS:  I have to object.  It's

12          vague and ambiguous.  If you understand it...

13          A.   I can't imagine a concern that we would

14     have that -- I'm not really following the scenario

15     that you're trying to describe.

16          Q.   That's fine.

17               Do you know when the issue of window

18     cord safety first became a concern for

19     Hunter Douglas?  Is there a point in time when

20     Hunter Douglas learned that this was window cord

21     safety -- especially, window cord loop products

22     with outer window cord became a concern for

23     Hunter Douglas?

24               MR. WILLIAMS:  The question changed

25          midstream.  I want to make sure you answer
```

```
1                           J. Jankoski                    42

2              the question.  Window cord safety generally

3              or loop cord?

4                   MR. JAUREGUI:  Let me just withdraw that

5              question.

6              Q.   When did Hunter Douglas first learn that

7      outer loop window cords presented a danger of

8      strangulation to young children?

9                   MR. WILLIAMS:  Objection.  Go ahead.

10             A.   I really don't know since I started

11     there in late '89 or '90 if there was any activity

12     prior to me joining the company.  I wouldn't know

13     when that began.

14             Q.   So you understand that at least since

15     you joined the company back in 1999, that was an

16     issue that Hunter Douglas was already aware of,

17     that loop window cord coverings presented a danger

18     of strangulation to young children?

19             A.   It was '89?

20             Q.   Yes, 1989.

21             A.   Yes, there was.

22                  MR. WILLIAMS:  Don't speculate as to

23             what happened before you got there.

24                  THE WITNESS:  I already said that I

25             don't know what happened before I got there.
```

```
 1                          J. Jankoski                    43

 2        Q.   But I just want to make sure I

 3   understand your testimony here today.  As of 1989

 4   when you came on board and started working at

 5   Hunter Douglas, Hunter Douglas was already aware

 6   that outer window cords that formed loops

 7   presented a potential danger of strangulation

 8   hazard to young children.  Is that a fair

 9   statement?

10             MR. WILLIAMS:  Objection, vague and

11        ambiguous and argumentative in your

12        characterization of the "danger" and

13        "hazard."

14        A.   They were participating in industry

15   activity that addressed child safety at the time.

16        Q.   And is that because Hunter Douglas was

17   aware that there were some safety concerns of

18   strangulation of young children by window covering

19   loop cords?

20             MR. WILLIAMS:  If you know.

21        A.   I don't know.

22             MR. WILLIAMS:  I mean, he's asking you

23        about before you got there.

24        Q.   In 1989 when you got there.

25        A.   I believe we were involved with -- the
```

```
                          J. Jankoski                    44
```

1                         J. Jankoski                 44

2     entire industry was aware of that.

3         Q.   All right.  And you told me before, I

4     mean, you had been involved with the window

5     covering industry for many years, correct?

6         A.   Yes, sir.

7         Q.   Is that since 1975 that you told me?

8         A.   1972.

9         Q.   1972?  That's at the position that you

10     had at Levolor?

11         A.   Yes, sir.

12         Q.   And when you were at Levolor, were you

13     aware as an employee of the window covering

14     industry of the dangers of strangulation by outer

15     loop window cord for young children?

16         MR. WILLIAMS:  Objection, vague as to

17         time.  There's 17 years there that you're

18         lumping together, and also he wasn't an

19         employee of the window covering industry.

20         A.   During my tenure, during the 17 years at

21     Levolor, towards the end of that period, the

22     window covering safety issue became an industry

23     issue.

24         Q.   When you say they became an industry

25     issue, what do you mean by that?

```
1                          J. Jankoski                    45
2          A.   General awareness of the product and
3     potential dangers were being discussed.
4          Q.   Now, in 2008, do you know if the Window
5     Covering Manufacturers Association had any
6     employees?
7          A.   I don't know if we had employees.
8     They're Kellen employees.
9          Q.   And of the Kellen employees, do you know
10    how many Kellen employees were working exclusively
11    for the Window Covering Manufacturers Association
12    in 2008?
13         A.   I don't know.
14         Q.   What about the same question in 2008?
15    Do you know if the Window Covering Safety Council
16    had any employees?
17         A.   I don't know.
18              MR. WILLIAMS:  When you reach a logical
19         break -- it's been a little over hour.
20              MR. JAUREGUI:  Okay.  If you want to
21         take a quick break, that's fine.
22              MR. WILLIAMS:  I'd just like to keep to
23         a schedule.
24              (A recess was taken from 2:59 p.m. to
25         3:05 p.m.)
```

1                          J. Jankoski                    46

2      BY MR. JAUREGUI:

3          Q.   Mr. Jankoski, I understand that you

4      started attending the meetings, I thought you told

5      me, for the Window Covering Safety Council?

6               MR. WILLIAMS:   Manufacturers

7          Association.

8               MR. JAUREGUI:  Yes.

9          Q.   The Window Covering Manufacturing

10     Association around 2007?

11         A.   Yes, when O.B. Kellen left.

12         Q.   If you know the answers to the following

13     questions, you let me know.  At some point there

14     was a retrofit program action plan back in 1995,

15     1996.  Do you recall that?

16         A.   Yes, I do.

17         Q.   All right.  And I understand that the

18     Window Covering Safety Council was specifically

19     created to carry out the wishes of the window

20     covering industry and address the concerns over

21     window blind cord safety.

22              MR. WILLIAMS:   There's no question yet.

23         I'm just waiting for you to form a statement.

24         Q.   Is that a fair statement?

25              MR. WILLIAMS:   Here's where I don't want

J. Jankoski                                    47

1

2          you to speculate as to the intent of others

3          or things like that.  Speak to your personal

4          knowledge only.

5          A.   As I stated before, the Window Covering

6    Safety Council is the group that intends to get

7    the word out to the public, and that would be an

8    appropriate activity for them to participate in,

9    yes.

10         Q.   So you understand, the Window Covering

11   Safety Council was specifically designed or

12   created to deal with safety issues dealing with

13   window covering cords, getting the information out

14   to parents, to the general public?

15         MR. WILLIAMS:  It misstates his

16         testimony.  Go ahead.

17         A.   To increase awareness at the consumer

18   level.

19         Q.   Do you know whether at the time when

20   this awareness or public relations window covering

21   cord safety was being implemented or developed,

22   were there any safety experts that worked with the

23   Window Covering Safety Council and the Window

24   Covering Manufacturers Association?

25         A.   Back in 19 --

```
 1                         J. Jankoski                    48

 2          Q.   Yes.

 3               MR. WILLIAMS:  Finish your clarification

 4          question.  Back in the mid 1990s?

 5               MR. JAUREGUI:  Yes.

 6          A.   I don't recall any expert safety person

 7     or group.

 8          Q.   Do you know whether at that time when

 9     the -- let's use the name because that will

10     shorten it -- can we just call it a retrofit

11     campaign?  Is that fine?  Because I know from

12     1995 -- when did that go into effect?

13          A.   '95 or '96.

14          Q.   Okay.  So let's call it the retrofit

15     '95-'96 campaign.  Do you feel comfortable with

16     that?

17          A.   Sure.

18          Q.   Okay.

19               Do you know whether either the Window

20     Covering Safety Council or the Window Covering

21     Manufacturers Association had any human factor

22     experts that would have worked on the program

23     before the retrofit action plan of '95-'96 was

24     implemented?

25               MR. WILLIAMS:  You're asking about
```

1                          J. Jankoski                    49

2              outside consultants as opposed to people with

3              that expertise in the various companies?

4                  MR. JAUREGUI:  Yes, people that were

5              working directly with the Window Covering

6              Safety Council.

7              A.   I can't recall any.

8              Q.   Now, at the time when the '95-'96

9      retrofit campaign was going on, I understand that

10     Mr. Peter Rush was also providing management

11     services to several other companies.  Were you

12     aware of that?

13             A.   No.

14             Q.   If the Window Covering Safety Council

15     was designed to educate the public about window

16     cord safety, did you have an understanding as to

17     the number of units out there in consumers' homes

18     in the United States that posed problems of

19     strangulation with the outer window blind cords?

20                 MR. WILLIAMS:  I don't understand the

21             preamble.  Objection, vague.

22             A.   I'm breaking down your question into

23     two.

24                 MR. WILLIAMS:  Tell him it's compound

25             and ask him to rephrase it rather than

```
 1                           J. Jankoski                    50

 2              breaking it down because you might miss

 3              something that he's asking you.

 4              A.    Could you repeat it so I'm clear on

 5      this?

 6              Q.    That's fine.

 7                    The Window Covering Safety Council was

 8      designed to address safety concerns dealing with

 9      window cord.  Is that correct?

10              A.    Correct.

11              Q.    Window covering cords?

12              A.    Correct.

13              Q.    All right.  Do you know the number of

14      units that were in U.S. consumers' homes that

15      presented the type of concerns or safety issues

16      that the industry was trying to address through

17      the Window Covering Safety Council?

18              A.    No, we wouldn't know that.

19              Q.    Does it range in the millions?

20              A.    There potentially are millions.  Not

21      every window covering has a cord, so you would

22      have to calibrate that into the equation.

23              Q.    Let's take a different approach.  In

24      1996, the Window Covering Manufacturers

25      Association in conjunction with the industry
```

```
1                          J. Jankoski                    51

2        members developed one of the first standards.  Is

3        that correct?

4              A.   Yes, sir.

5              Q.   And that became known as the Window

6        Covering Manufacturers eight one hundred point one

7        standard?

8              A.   It was an ANSI process, correct.

9              Q.   And what is your understanding of what

10       that standard required the window covering

11       industry to do?

12                  MR. WILLIAMS:  Objection, vague and

13             compound.  There are a lot of requirements in

14             there.  Go ahead.

15             A.   A standard doesn't require an industry

16       to do certain things.  It is a standard to define

17       product performance.  That particular

18       standard addressed the issue of a looped cord.

19             Q.   Did the standard suggest ways to address

20       the issue of the looped cord?

21             A.   That would be a prescriptive standard,

22       and we have not -- we try to avoid prescriptive

23       standards.  We define what the problem is and

24       allow the industry to address it in a way that

25       fits each individual company's situation.
```

1                              J. Jankoski                    52

2          Q.   So it was a standard, but it was not

3     mandatory.  You would call it a voluntarily

4     standard?

5               MR. WILLIAMS:  No, it misstates his

6          testimony.  Go ahead.

7          A.   The standard is voluntary only from the

8     point of view that the industry voluntarily

9     creates a standard in conjunction with the CPSC,

10    but once the standard is in existence it's

11    mandatory to follow.

12         Q.   So the first standard to address the

13    issue of looped cords -- when was that

14    implemented?

15         A.   I believe it was 1996.

16         Q.   And as you understand it, what did that

17    standard provide for?

18              MR. WILLIAMS:  Objection.  It speaks for

19         itself.  It's a written document and this

20         isn't a memory test for your recollection of

21         every provision of the standard.  If you can

22         summarize it, go ahead, but don't speak

23         beyond what you know.

24         A.   The primary purpose was to address the

25    looped cord issue.

1                        J. Jankoski                    53

2          Q.    Before 1996, were there any standards

3      out there that provided for -- provided guidelines

4      to the window covering industry as to how to

5      address the issue of the looped cord, as you call

6      it?

7          A.    1996 was the first ANSI standard that

8      was provided by the industry.  Prior to that,

9      there were standards but based on more commercial

10     applications of product:  The thickness of metal,

11     the size of cords, used primarily for bidding

12     purposes on large contract jobs.

13         Q.    Prior to 1996 before that standard was

14     implemented, the 1996 standard, did Hunter Douglas

15     have any internal standards or guidelines to

16     manufacture vertical blinds with outer looped

17     cords?

18         A.    Yes.

19         Q.  Do you know what those standards or

20     guidelines were?

21         A.    We produce custom-made window coverings

22     that are made one at a time for customers who have

23     the choice to design it on their own based on the

24     amount of color, style, fabric, control options,

25     width and length to an eighth of an inch.  We

J. Jankoski                          54

1

2      provide a number of options for them to chose

3      from.

4              I wouldn't call it a standard.  We have

5      multiple models for them to choose from, and they

6      make a decision based on their own needs.  We had

7      a product in the marketplace that didn't require

8      cords in that time frame.

9         Q.   All right.  I don't think you answered

10     my question so we'll try it again.

11             Did Hunter Douglas prior to 1996, if you

12     know, before the 1996 standard was implemented,

13     did it have any guidelines or standards that it

14     followed in producing vertical blinds with outer

15     looped cords such as the one at issue in this

16     case?

17             MR. WILLIAMS:  Not necessarily safety

18          standards, but any standards at all?

19             MR. JAUREGUI:  Any standards at all for

20          the manufacture of vertical blinds with

21          looped cords such as the one that we have in

22          this case.

23         A.   Since our fabricators produced the

24     product, there were guidelines on how to produce

25     that product.

1               J. Jankoski                    55

2          Q.    And when you say there were guidelines,

3     where would those guidelines have come from?

4          A.    The organization responsible for the

5     product, in this case, the vertical blind group.

6          Q.    But I thought you told me earlier that

7     when Hunter Douglas used fabricators to fabricate

8     products for them, they would use Hunter Douglas

9     components.  Yes?

10         A.    Yes.

11         Q.    And they would -- also, the fabricators

12    would also manufacture or make the window

13    coverings pursuant to the specifications required

14    by Hunter Douglas?

15         A.    Yes.

16         Q.    All right.  So if Hunter Douglas is

17    providing the specifications to build or

18    manufacture the units, doesn't it follow, then,

19    that Hunter Douglas is also providing the

20    guidelines to follow, the standards to follow; for

21    example, how long the outer cords should be, the

22    type of material, the pull force that the nylon

23    cord or the beaded chain should have?

24         A.    No.  That would be a customer decision,

25    a consumer decision.

1                         J. Jankoski                    56

2          Q.   Sir, you mean to tell me that if the

3     Padillas had ordered the window covering in this

4     case, which they did not, but if they had ordered

5     that, they would have been able to choose the type

6     of cord that they wanted, the strength of the cord

7     in terms of the pound pull force, the type of

8     chain that they wanted, and how long both the

9     nylon cord and the chain should be?

10         A.   They couldn't choose the material, but

11    they could choose the length of the cord.

12         Q.   The window blind at issue in this case

13    had a nylon cord and a metal beaded chain, they're

14    called by the industry, known as outer cords or --

15         A.   Operating cords.

16         Q.   -- operating cords?

17         A.   Yes.

18         Q.   All right, and these are all looped

19    cords that are dangling on one of the sides of the

20    blinds.

21              Is it your testimony here today that it

22    was the customers that decided the length of the

23    cords that should be included in the blinds such

24    as the one that was involved in this case?

25         A.   We give the consumers the option to

1                        J. Jankoski                    57

2        choose the length of the cord they wish.

3        Everything we make is custom ordered, so if they

4        want a cord a specific height, we try to

5        accommodate the consumer's request.  If they don't

6        say anything or they don't have a preference, we

7        would default to a predetermined size based on the

8        height of the window.

9             Q.   And what would be the default size for a

10       blind, a vertical blind such as the one at issue

11       in this case, if you know?

12            A.   It's a formula that measures the

13       distance from the floor to the window sill, and

14       then from the window sill to the top of the

15       product, and the cord length is determined based

16       on the height of a typical adult so that they

17       could access that.  So it would be a variable

18       default based on position of the window on the

19       wall.  We ask for sill height to produce the

20       order.

21            Q.   So it is the height between the floor

22       and the ceiling that determines -- and the size of

23       the blind that will determine the length of the

24       cord?

25            A.   On a default, yes.

```
1                        J. Jankoski                    58
2          Q.   Do you have any sense of in the mid
3     '90s, 1995-1996, the approximate number of
4     vertical blinds with outer cords such as the one
5     at issue in this case that would have been sold by
6     Hunter Douglas?
7               MR. WILLIAMS:  In a given year,
8          1995-1996?
9               MR. JAUREGUI:  The two years.
10         A.   I don't know.
11         Q.   Is that information that is stored
12    somewhere?
13         A.   Not that I'm aware of.
14         Q.   As a percentage of products, do you know
15    what percentage vertical blinds makes of the
16    overall percentage of other nonvertical blinds
17    that are sold and produced by Hunter Douglas?
18              MR. WILLIAMS:  Currently?
19              MR. JAUREGUI:  In the mid '90s.
20         A.   I couldn't recall.
21         Q.   Currently?
22         A.   From Hunter Douglas's production?
23         Q.   Yes.
24         A.   Ten percent or less.
25         Q.   Do you know which is the type of window
```

                              J. Jankoski                    59

1

2      coverings that are most often involved in

3      fatalities, strangulations of children from window

4      cords?

5              MR. WILLIAMS:  Objection, vague and

6          ambiguous.  Go ahead, if you understand it.

7          A.   Stock mini blinds.

8          Q.   Any other type of products that come to

9      mind?

10         A.   No.

11         Q.   As of today, do you know the approximate

12     number of children that have died as a result of

13     strangulation from window blind cords?

14             MR. WILLIAMS:  Objection.  Without him

15         being an expert in causation issues or things

16         like that, you're talking about the total

17         number in which there is a claim that the

18         death was associated with entanglement in a

19         window blind cord?

20             MR. JAUREGUI:  Correct.

21         A.   Just what has been published, what I

22     read, and some of those numbers vary from report

23     to report, so I could go by what the CPSC

24     produces.

25         Q.   What numbers are those?  What are the

```
1                          J. Jankoski                    60

2       numbers, if you know?

3            A.   I looked at it last month, but I don't

4       want to say without being correct.

5            Q.   Was it more than 300?

6            A.   Again, I don't recall the exact number.

7            Q.   If the number of strangulations from

8       vertical blinds is much smaller than the number of

9       strangulations that are caused by other window

10      coverings that are not vertical blinds, can that

11      be explained by the fact that there is a much

12      smarter percentage or number of vertical blinds

13      that are produced in a given year?

14               MR. WILLIAMS:  I'm going to object to

15           that.  That isn't just a math question, but

16           it gets into areas of expertise in terms of

17           human force because you've asked about being

18           caused by.

19               So I will allow you to answer, but I'll

20           caution you not to get into making

21           conclusions that you don't think you're

22           qualified to make.

23           A.   I think the vertical blind arena is a

24      lot larger than the Hunter Douglas piece of it,

25      so, again, there were -- that product was offered,
```

1                          J. Jankoski                    61

2       not only in a custom format, but also in a stock

3       format available at many home centers and still

4       are available at home centers.  So it's a much

5       larger category than the Hunter Douglas portion of

6       it.

7            Q.   I thought earlier you told me that you

8       believe that -- about the production or the

9       percentage number for Hunter Douglas of vertical

10      blinds, it's about 10 percent of the overall

11      production.  Is that correct?

12           A.   Yes.

13           Q.   Do you believe that percentage is

14      representative of the rest of the industry?

15           A.   I believe the industry is larger than

16      that.

17           Q.   Do you have a sense of how much larger?

18           A.   No.

19           Q.   What makes you believe that the rest of

20      the industry is producing a larger percentage of

21      vertical blinds than Hunter Douglas?

22           A.   First is that there are a lot of stock

23      products available to the consumer at very

24      reasonable prices that are premade in a box that

25      are primarily used for patio doors and larger

J. Jankoski                                    62

1

2      windows that are very large sellers in the home

3      center category.

4              There is also a lot of independently

5      owned and operated people producing vertical

6      blinds out there that are not a part of the

7      Hunter Douglas organization.

8          Q.   The Hunter Douglas vertical blind

9      involved in this case, do you have any reason to

10     believe that that was a custom-made blind?

11             MR. WILLIAMS:  Objection.

12         A.   Do I have any reason to believe that?

13         Q.   Yes.

14             MR. WILLIAMS:  Objection, asked and

15             answered.  He has testified that all

16             Hunter Douglas products are custom made, so

17             if there's some other point to that, I don't

18             understand the question.  Objection, vague

19             and ambiguous.

20         A.   Yes, I have reason to believe that it's

21     a custom-made blind, yes.

22         Q.   And what leads you to that conclusion?

23             MR. WILLIAMS:  Same objection.

24         A.   Because we don't make stock products.

25         Q.   Do your fabricators make any stock

```
1                         J. Jankoski                    63

2     products?

3              A.   No, sir.

4              Q.   Do you know if Hunter Douglas had any

5     concerns about the ability of the Window Covering

6     Safety Council to carry out the task of educating

7     the public about window cord safety in the

8     retrofit campaign?

9              A.   No.

10             Q.   Was Hunter Douglas confident that the

11    Window Covering Safety Council had the ability to

12    undertake the retrofit campaign of 1995 and 1996?

13             MR. WILLIAMS:  Objection.  He's asking

14        about the company, not Joe Jankoski.  And you

15        weren't sitting in the seat you're sitting in

16        today, so keep that in mind when you answer

17        the question.

18             A.   I believe so.

19             Q.   Did Hunter Douglas ever, to your

20    knowledge, raise any concerns about the ability of

21    the Window Covering Safety Council to carry out

22    the task of advising the public about the dangers

23    of strangulation posed by looped cords?

24             A.   Could you repeat the beginning of that,

25    please?
```

```
                          J. Jankoski                    64
 1
 2              MR. JAUREGUI:  Could you read the
 3         question please?
 4              (The Record was Read.)
 5         A.   No, sir.
 6         Q.   Do you know what other companies made
 7    out the membership of the Window Covering Safety
 8    Council back in 1995-1996?
 9         A.   It was a combination of retailers,
10    suppliers, manufacturers.  I don't know exactly
11    what the roster was.
12         Q.   Do you know if any of the other members
13    of the safety council raised any concerns about
14    the ability of the Window Covering Safety Council
15    to carry out the task of advising the public about
16    the dangers of strangulation from loop window
17    cords?
18         A.   I'm not aware of any because we were all
19    a part of creating that plan.
20         Q.   Do you know how much -- what was the
21    budget that was allocated to carry out the
22    retrofit campaign of 1995-1996?
23         A.   No.
24         Q.   Do you know how much was the amount of
25    money that Hunter Douglas contributed to carry out
```

J. Jankoski                                          65

1

2      the public information campaign of advising the

3      public about the dangers of window blind cords?

4           A.    I don't have that with me, no.

5           Q.    Did anybody raise any concerns as to

6      whether or not the money that was being allocated

7      to carry out the retrofit campaign was sufficient

8      to meet the demand?

9           A.    We all thought we had a plan that was

10     going to be effective.

11          Q.    Do you have an opinion as to whether or

12     not the manner in which the Window Covering Safety

13     Council carried out the retrofit campaign of 1995

14     and 1996 -- whether that was successfully done?

15          A.    I think it was well executed.

16          Q.    What do you base that on?

17          A.    The creation of web sites to allow

18     consumers to get access to the repair kits free of

19     charge on a 24/7 basis; the establishing of 800

20     toll free numbers to give access to consumers to

21     get free retro repair kits on an as-needed basis;

22     spreading the word out throughout the

23     organizations that are members of the Window

24     Covering Safety Council so that the trade was well

25     aware of what we were doing so that they could get

```
1                        J. Jankoski                    66

2       involved with consumer outreach and local

3       activities.

4                It was the first time this was ever

5       attempted in our industry, and I thought it went

6       pretty well.

7            Q.   Prior to 1995-1996, do you know if the

8       Window Covering Safety Council had been engaged in

9       conducting any retrofit programs in the past?

10           A.   Prior to '96?

11           Q.   1995/1996.

12           A.   I'm not aware of any.

13           Q.   Did that cause any concern to anyone in

14      the industry, including Hunter Douglas?

15           A.   With what regard, concern?

16           Q.   That you had a brand new organization

17      that had no prior experience in handling a

18      retrofit campaign of this magnitude.

19           A.   We were being managed by a company who

20      had association experience and felt comfortable

21      that we were being managed properly.

22           Q.   And who was that organization?

23           A.   That was Kellen.

24           Q.   Kellen?

25           A.   Yes.
```

J. Jankoski                                    67

1

2          Q.   Mr. Jankoski, correct me if I am wrong,

3     I thought that back in 1995-1996 during the height

4     of retrofit campaign, Mr. Peter Rush was

5     affiliated with a management association by the

6     name of Sumner Associates.  Does that ring any

7     bells?

8          A.   Yes, it does.

9          Q.   So when did Kellen come into the picture

10    here?

11         A.   Thank you for refreshing my memory.  I

12    think Sumner was Kellen before Kellen became

13    Kellen.  You know, I don't know exactly when that

14    transition occurred.  They might have changed the

15    name on their door, but we were dealing with

16    Peter Rush from that point on.

17         Q.   So is it your understanding that you

18    were dealing with Kellen or Sumner Associates?

19              MR. WILLIAMS:  In '95-'96?

20              MR. JAUREGUI:  Yes.

21         A.   In '95, I assume now that you've

22    refreshed my memory, it was Sumner.

23         Q.   Do you have a sense of how many

24    employees from Sumner Associates or Kellen were

25    assigned to work exclusively for the retrofit

J. Jankoski                                    68

1

2        campaign of 1995-1996?

3            A.    I don't know.

4            Q.    Did you ever see any data that assured

5        your belief that the Window Covering Safety

6        Council did a good job in educating the public --

7        and by that I mean, did you ever see, like, the

8        number of telephone calls they received on a

9        monthly basis or a weekly basis?

10               Did you ever see any data regarding the

11       number of retrofit kits that were sent out to

12       consumers or to distributors in the industry?

13               Did you see any of that information,

14       again, that would have assured you that things

15       were working out the way Hunter Douglas would have

16       envisioned it?

17           MR. WILLIAMS:  I'm just going to the

18               object to the end of that question when you

19               added your conclusion that would have assured

20               you.  First you asked him whether a lot of

21               things had happened which are historical

22               facts.

23               Whether they would have assured you or

24               not, did you receive any of the things that

25               he asked you about?

J. Jankoski                                              69

1

2          A.   There were reports available to document

3     the amount of kits that were shipped and the

4     amount of impressions that being were made based

5     on various PR campaigns and marketing initiatives.

6          Q.   Were you ever made aware of any concerns

7     that the number of kits that were being sent out

8     were not sufficient to correct the problems with

9     the units that you had out there in households?

10              MR. WILLIAMS:  Objection, vague as to

11         what you mean by correct the problems with

12         the number of units you had out there in the

13         households.  Go ahead.

14         A.   I didn't draw that conclusion that we

15    were underperforming or over performing.

16         Q.   The retrofit kits that were sent out,

17    what was the purpose?  What were the retrofits

18    intended to do?

19         A.   To eliminate a design that was very

20    common especially in the metal blind area where

21    there was a tassel at the end of a looped cord,

22    and underneath the tassel was a knotted -- the

23    cord itself was knotted so the knot plus the

24    tassel formed a natural loop that was free hanging

25    in front of the product.

1                          J. Jankoski                    70

2              The retrofit kit instructed the consumer

3    to cut that tassel and the knot off and to retie

4    the ends of the two remaining cords and attach it

5    to two additional tassels that was in the box, in

6    the bag.

7         Q.   Did the retrofit kit address any issues

8    on how to advise consumers on what to do with the

9    outer looped cords and how to remove the potential

10   for choking or strangulation from looped cords?

11        A.   The outer looped cords?

12        Q.   Yes.

13             MR. WILLIAMS:  I thought he just

14        answered that.

15        Q.   This is just for illustration purposes.

16   I'm showing you a document here which I downloaded

17   from the Internet yesterday, and it's regarding a

18   meeting held by the U.S. Consumer Product Safety

19   Commission.  It's the meetings in April 2004.

20   Just so that we understand each other, when I say

21   a looped cord, is that what you also understand?

22        A.   The product that I was referencing would

23   be the cord that operates the horizontal product.

24        Q.   Again, just for illustration purposes,

25   let me see if I have a -- hold on a second.  Let

J. Jankoski                    71

1

2     me show you the real McCoy here.

3                You've seen pictures of the window blind

4     in this case, correct?  You told me that?

5        A.    Yes, sir.

6        Q.    Sir, I'm going to show you what has been

7     previously marked as Exhibit 3H in this case, and

8     it's a photograph that was taken by the Oak Forest

9     Police Department which investigated this

10    incident.

11                MR. WILLIAMS:  This is 3H?

12                MR. JAUREGUI:  3H and 3I.

13        Q.    I can represent to you, Mr. Jankoski,

14    that if you look at Exhibit 3I, it has two cords

15    to the right of that blind:  One is a metal beaded

16    chain, and one is an nylon cord.  Do you see that?

17        A.    Yes, sir.

18        Q.    Just so that we're on the same page, can

19    we call those the outer looped window cords?  Is

20    that a correct term?

21        A.    As long as I understand what you're

22    referencing, that's fine with me.

23        Q.    All right.  So the question is, the

24    retrofit that was sent out to address the hazards

25    presented by looped cord, how would the retrofit

J. Jankoski                                    72

1
2     had fixed the problem here in this case?

3              MR. WILLIAMS:  Objection.  Go ahead.

4         Q.   What would the retrofit kit advise the

5     consumer to do in this case if they were concerned

6     about the danger of the window blind cords?

7              MR. WILLIAMS:  I'm going to pose the

8         objection that the documents, the publicity

9         documents announcing the terms of the

10        retrofit campaign speak for themselves.  If

11        you want to testify as to your memory, go

12        ahead.

13        A.   I think what I earlier referenced was

14    the repair kit for horizontal products.  There was

15    a repair kit for vertical products, which is

16    what's in the picture.  And they represent a

17    different kind of loop.  It's not a loop that has

18    a knot with a tassel.  It's, as you would call it,

19    a free-operating cord loop.  And to remedy that,

20    there was a different repair kit for a device to

21    provide tension and secure that cord to a surface.

22        Q.   Is that called a tensioning device?

23        A.   That's one way to call it, yes.

24             MR. WILLIAMS:  Objection to the

25        question.

```
 1                         J. Jankoski                    73

 2         Q.   Does it have any other name?

 3         A.   This business has a lot of different

 4    ways to describe a lot of different things over

 5    the years, you know, 15 years worth of language,

 6    but "tension device" is a common term.

 7         Q.   Were the tensioning devices part of the

 8    '95-'96 retrofit plan?

 9         A.   Yes, sir.

10         Q.   So if a tensioning device would have

11    been sent to the Padilla family, what would it

12    have done to the cords here that you see on

13    Exhibit 3I?

14         A.   They would have been -- they would have

15    provided a taughtness to the loop, attach it to a

16    wall or a floor, and render it -- it would

17    eliminate it from being a free-hanging loop.

18         Q.   And in doing that, would that have

19    eliminated the risk of strangulation to young

20    children?

21         A.   We believe so.

22         Q.   If you know, for how long had the

23    tensioning devices been around prior to '95-'96?

24         A.   No.

25         Q.   Have they been around-- were tensioning
```

1          J. Jankoski          74

2     devices such as the one you described earlier for

3     me that would have been containing a retrofit kit,

4     were they available prior to 1995?

5          A.   Yes, I think the drapery industry used

6     them quite extensively as well as being applied

7     to...

8          Q.   Did Hunter Douglas -- I'm sorry, did you

9     finish your answer?

10         A.   Yes, I did.

11         Q.   Did Hunter Douglas use tensioning

12    devices or did it provide tensioning devices to

13    consumers when it sold vertical blinds such as the

14    one at issue in this case?

15         A.   Yes.

16         Q.   Was that included with the materials or

17    components that would have come with the window

18    blind at the moment it was sent to the consumer?

19         A.   Yes.

20         Q.   When did Hunter Douglas start using

21    tensioning devices?

22              MR. WILLIAMS:   If you know, obviously.

23         A.   I don't know.

24         Q.   So as you sit here today, do you know

25    one way or the other whether the window blind at

```
1                          J. Jankoski                        75

2        issue would have contained a tensioning device at

3        the time it left Hunter Douglas's hands?

4                 MR. WILLIAMS:  Without knowing anything

5            else about the consumer's specifications?

6                 MR. JAUREGUI:  Yes.

7            A.   Me personally?

8            Q.   Yes.

9            A.   I would not know.

10           Q.   Do you know who might know the answer to

11       that?

12           A.   No, I don't.

13           Q.   How expensive are these tensioning

14       devices?

15           A.   Less than a dollar.

16           Q.   So did Hunter Douglas embrace the

17       tensioning device as a solution to address the

18       problem posed by the outer looped cord such the

19       one that is contained by Exhibit 3I?

20                 MR. WILLIAMS:  Objection, vague as to

21            what you mean by "embrace."  Go ahead.

22           A.   We included it, and it was -- I guess

23       you can call it embracing.

24           Q.   If you have another word, please.

25                 MR. WILLIAMS:  You made it available,
```

```
 1                      J. Jankoski                      76

 2          correct?

 3                  THE WITNESS:  Yes, we made it available.

 4          Q.    And you made it available because you

 5     thought it would be a good solution to eliminate

 6     the danger of strangulation to young children?

 7                  MR. WILLIAMS:  Only or as one of the

 8          reasons?

 9                  MR. JAUREGUI:  As one of the reasons.

10          A.    As one of the reasons.

11          Q.    All right.  What other reason would you

12     have provided the tensioning devices?

13          A.    Aesthetics.  It looks nicer if it's tuck

14     away.  Practical reasons, why you might not want

15     to vacuum up the cord if it's too long laying on

16     the floor getting entangled with other home

17     furnishings, plants, draperies.

18          Q.    Aesthetic reasons?

19          A.    A combination of aesthetic/practical.

20          Q.    Mr. Jankoski, Exhibit 3I, do you have

21     any knowledge as to whether the length of the

22     cords that are depicted there were necessary in

23     order to operate the mechanism of the vertical

24     blind?

25                  MR. WILLIAMS:  From an engineering
```

1                          J. Jankoski                    77

2           standpoint?

3                MR. JAUREGUI:  From any standpoint.

4           Q.   I mean, did the length -- did the cords

5      need to be that length in order to operate the

6      vertical blind in this case to, you know, open and

7      close the shades and open the slats.

8           A.   I'm sure that there's a variance that it

9      couldn't be changed to, but it would still be

10     operational.

11          Q.   Do you know what that variance would be?

12          A.   The point, we try to make it available

13     to an average consumer, adult consumer, to operate

14     the product as they stand next to it.  So could it

15     be shortened a little bit?  I guess it could.

16     Could it be lengthened?  Yes, it could.  It would

17     provide the same functionality.  Again, it's most

18     of the time a consumer preference.

19          Q.   The window blind that is depicted on

20     Exhibit 3I, if it had had the nylon cord and the

21     metal beaded chain lengths of not more than seven

22     and one quarter of an inch, could you still

23     operate the blinds?

24                MR. WILLIAMS:  Objection, incomplete

25           hypothetical, but go ahead.

J. Jankoski                                   78

1

2          A.    You probably could.

3          Q.    Mr. Jankoski, as you sit here today, do

4     you know what type of written materials,

5     instructions, any type of warranties would have

6     accompanied a vertical blind such as the one that

7     is depicted in 3I?

8          A.    A typical box would have an

9     instructional sheet to show the person how to

10    install it.  It would have a warranty card

11    application, and it might have a packaging slip on

12    the outside to show what was in the box.

13         Q.    Do you know what was the practice of

14    Hunter Douglas in the mid '90s, assuming that's

15    when this unit would have been manufactured, with

16    respect to labeling of the products using warning

17    labels?

18              MR. WILLIAMS:  Again, if you know.  He's

19         not in the vertical blind division.  I'm

20         going to let you answer, but don't assume

21         anything.

22         A.    Minimally, we would have met the ANSI

23    standard that was in place at the time.

24         Q.    Do you know what that standard would

25    have been?

J. Jankoski                                              79

1

2          A.    I don't recall it.

3          Q.    All right.  Based on the knowledge that

4     you have of the industry in the window covering

5     industry, where would be the most logical place to

6     put warning labels on a vertical blind such as the

7     one depicted on Exhibit 3I?

8          A.    There would be a hang tag probably off

9     of one of the cords.

10         Q.    Now, Mr. Jankoski, do you know whether

11    Hunter Douglas has any information to believe that

12    the unit that you see, the vertical blind that you

13    see on Exhibit 3I, was somehow modified or changed

14    in any way from the time it left Hunter Douglas's

15    control?

16              MR. WILLIAMS:  Objection, lack of

17         foundation.  Go ahead.

18         A.    I couldn't tell by the picture.

19         Q.    We know from depositions that have been

20    taken in this case that this unit, Exhibit 3I on

21    Exhibit 3I, was purchased by Ms. Brenda Davis some

22    time in October of 1995.

23              Assuming that information is correct,

24    would the date of purchase give you any idea as to

25    when that unit would have been manufactured?

```
1                         J. Jankoski                    80

2          A.    Our production time through our

3     fabricator network could be -- and, again, it

4     varies by geography, but it could probably take

5     two to three weeks to produce it and ship it.

6               The consumer goes into the store, orders

7     it from the retailer.  The retailer turns around

8     and gives Hunter Douglas the order.  The product

9     is produced.  The day that it is shipped, it is

10    invoiced, and we have, you know, 10-,

11    14-working-day delivery cycles were usual plus the

12    shipping time.

13         Q.    So is it fair to assume that in all

14    likelihood, again, assuming this product was

15    purchased in October of 1995, that the product

16    would have been manufactured or made some time

17    between June of 1995 and October of 1995?

18         A.    That's a fair guess.  Could you

19    repeat -- when was the purchase date?

20         Q.    Yes, I'll be happy to.

21              The purchaser testified that she

22    believes she bought the blind some time in 1995,

23    October of 1995.

24              So, then, the question that I asked you

25    following that was:  Given what you told me, that
```

```
1                          J. Jankoski                    81

2       it would be anywhere from two to four weeks to

3       make this custom order --

4                    MR. WILLIAMS:  I think he said two to

5          three.

6            A.   Okay.  But if she purchased it in

7       October, then the timeline starts from the day she

8       purchased it, not going backwards but going

9       forwards.

10               Because if she made the purchase in

11      October, then we won't get the order until a few

12      days after the purchase.  And we would produce it,

13      ship it.  They would install it.  So the

14      production time actually would take place after

15      the actual purchase, not before the purchase.

16           Q.   I see your point.

17           A.   I wasn't sure if you said purchase or

18      install.

19           Q.   Well, I guess it's a combination of

20      both, because then Ms. Davis testified that they

21      would have installed the product some time around

22      October of 1995.

23               And the reason why we know that is

24      because we used as a point of reference the time

25      her daughter was pregnant, and they were expecting
```

J. Jankoski                          82

1

2     a granddaughter, and they figured that that would

3     have been the time when they would have installed,

4     October of 1995.

5              So if we use that information, however

6     accurate it may be, installation in October of

7     1995, then it would have made sense that that unit

8     would have been produced some time between June of

9     1995 and the time when it was installed?

10         A.   No, that's not true.

11             MR. WILLIAMS:  Hold on.  I've got to

12         object.  You changed the verb from

13         "purchased" to "installed."

14             I think it's safe to say that her

15         testimony is not very clear.  She wasn't that

16         precise.

17             But, in any event, if you use the

18         assumption that it was installed in October

19         of 1995, given the two to three weeks lead

20         time that he told you about, I think the

21         June-to-October time frame that you're asking

22         him about wouldn't be accurate.  It misstates

23         his testimony.

24             MR. JAUREGUI:  All right.  Let's take

25         another crack at it.  All right?

J. Jankoski                              83

1

2          Q.    So if you assume that the purchaser of

3     the blind installed the product, and, actually,

4     the product was installed, according to the

5     purchaser, by herself and her daughter -- let's

6     assume that the product was installed some time in

7     October of 1995.

8               So if it was installed in October of

9     1995, then we have to assume that the product was

10    ordered some time before October of 1995.  Fair?

11              MR. WILLIAMS:  Or in early October 1995.

12         A.    Very early October to the very end of

13    October, that still would have taken place.

14         Q.    Let's work with the month of October as

15    being the installation time.

16              If you use that as a point of reference,

17    is it then fair to assume given that it was a

18    custom order that that product would have been

19    manufactured some time between June of 1995 and

20    October of 1995?

21              MR. WILLIAMS:  Same objection.

22         A.    The answer would be yes.  It's a very

23    wide range.  It wouldn't need to go back to June.

24         Q.    How far would you have to go back?

25         A.    If they installed it at the end of

J. Jankoski                    84

1

2   October, it takes one week to ship it and install

3   it, two weeks to produce it, you're backed up

4   three to four weeks, and that would be the day in

5   which we would assumely get the order from the

6   retailer.

7            Now, the retailer, who knows how long he

8   might have sat on that order?  The consumer comes

9   in a retail store, "This is what I want," the man

10  takes the order.  He could give it to

11  Hunter Douglas that day.  He could give it to us

12  three days from now.  He could give it to us next

13  month.

14           The man might owe us money, and he can't

15  produce -- we wouldn't produce the order because

16  he is on credit hold.

17           I mean, there's a lot of variables in

18  there.  If everything was going, you know

19  according to no problems, a normal production

20  period, you'd back up pretty much maybe a month

21  from the moment it was produced -- I mean, to the

22  moment -- yes, from the moment it's produced to

23  the moment it's installed, but there's a lot of

24  other things that could have delayed that.

25       Q.   Both Ms. Davis, in this case the

```
 1                            J. Jankoski                    85

 2          purchaser of the product, and her daughter,

 3          Mindy Roberts, the beneficiary of the product in

 4          this case, both testified that they had no

 5          recollection of seeing any warning labels on this

 6          product.

 7                    In December of 2002, my clients, Mr. and

 8          Mrs. Padilla, purchased a home from Ms. Roberts,

 9          and they've also testified that after they

10          purchased the house, the window blind was affixed

11          in the place where you see it on those

12          photographs.

13                    They also testified that they didn't

14          make any changes or modifications to the window

15          blind, included any removals of any warnings or

16          labels.

17                    Now, does Hunter Douglas have any

18          information indicating that at the time when this

19          unit left Hunter Douglas's control, it had any

20          warning labels about the danger of strangulation

21          of young children by the cords?

22                    MR. WILLIAMS:  Objection, vague.  Other

23             than the practice he's already described to

24             you of attaching a hang tag, are you asking

25             if he has any other information beyond that?
```

```
1                        J. Jankoski                    86

2              MR. JAUREGUI:  Yes.

3         A.   There could have been a brochure that

4    would address safety as well put in the box.  It's

5    oftentimes in with a lot of other things, and, you

6    know, hopefully it's visible enough to be seen.

7              But it could have been a brochure or

8    some part of the installing instructions that have

9    safety initiatives built into that.  So there were

10   a number of different versions of it.

11        Q.   If you assume that there was some kind

12   of warning label attached to it -- and we don't

13   know that in this case; we don't know that one way

14   or the other -- but if we would assume that there

15   would have been some kind of warning label

16   attached to this unit, it would have been what's

17   known as a tag, as a tag warning label, I believe?

18        A.   It could have been a tag.  It could have

19   been a brochure.  It could have been something put

20   in the box.

21        Q.   And where are the tags normally attached

22   on a unit such as this?  What would they have been

23   attached to, what part of the --

24             MR. WILLIAMS:  Back in 1995?

25             MR. JAUREGUI:  Yes.
```

1                          J. Jankoski                    87

2                MR. WILLIAMS:  If you know.

3          A.   I don't know.

4          Q.   Do you know whether consumers have a

5     habit of removing tags that are attached to the

6     cords because they do not look aesthetically

7     pleasing?  Is that a common concern in the

8     industry?

9          A.   I can't speak for individual

10    initiatives.  I know that roughly 80 to 85 percent

11    of the products that Hunter Douglas produces are

12    professionally installed by trained installers.

13               MR. JAUREGUI:  Sir, sorry to interrupt

14          you.  I have to take a break right now.  I'm

15          expecting a call.

16               MR. WILLIAMS:  Okay.  Let's take a

17          break.

18               (A recess was taken from 4:07 p.m. to

19          4:19 p.m.)

20    BY MR. JAUREGUI:

21          Q.   Mr. Jankoski, we're back on the record.

22    Before we broke, we were talking about the tag

23    warning labels.  At least I believe I understood

24    you -- if I understood you correctly, that a tag

25    label or warning label would have been attached to

J. Jankoski                                    88

1

2    one of the cords of the vertical blind if, indeed,

3    one was attached.

4        A.   That's one option.  Again, we had other

5    means to communicate.  I'm aware of brochures that

6    mentioned the issue of safety that were in the box

7    as well.  Some fabricators used hang tags, some

8    fabricators used brochures.  I'm not sure that

9    there was one method in which it was universally

10   applied.

11       Q.   And then I asked you the question

12   whether or not Hunter Douglas had any knowledge of

13   consumers' propensity to remove the tag labels for

14   aesthetic reasons, and that's where we left off.

15       A.   I've been in a lot of homes lately, and

16   I haven't seen many tags still hanging from window

17   blinds in any home that I'm in, so eventually they

18   wind up by human nature probably being removed.

19            I mean, I don't have any scientific

20   proof of that, but it just -- after you install it

21   and read it, I'm assuming that they would remove

22   it.

23       Q.   All right.  And other than your own

24   personal experience in the industry or, in

25   particular, Hunter Douglas, is that a known

```
1                          J. Jankoski                    89

2         occurrence, that after a while consumers are going

3         to have the inclination to remove the tags for

4         whatever reason, including for aesthetic reasons?

5                  MR. WILLIAMS:  He just answered that.

6              Asked and answered.  Go ahead.

7              A.   I can't speak for the industry.  I'm

8         only speaking for myself.

9              Q.   All right.  Let me take another stab at

10        this.  And I apologize if we are going over

11        questions that I already asked you, but I wanted

12        to make sure that I understand what your answer

13        is.

14                  At the time or some time in the mid

15        '90s, did Hunter Douglas have any standards that

16        it followed to determine the pull force of the

17        cords that it used in its window blind products?

18             A.   I'm not sure I fully understand what you

19        mean by "pull force."

20             Q.   The breakaway point in which you apply a

21        force to the string and then it breaks apart.

22             A.   Before the string itself breaks?

23             Q.   Yes.  What do you call that in the

24        industry?  What is the proper term?

25             A.   Oh, I understand what you mean now.  All
```

J. Jankoski                                    90

1

2    of the components that we provide our fabricators

3    have been retested for wear and performance under

4    very, you know, extreme conditions.

5              A window covering, when you really think

6    about it, is against a piece of plastic.  It could

7    heat up to 300 degrees or get as cold as zero.

8    And the materials that we use, the plastics, the

9    components of it, the fabric, the acrylic, the

10   cords, are all tested against long-term wear, and

11   that's why we're able to provide a limited

12   lifetime warranty on our products and enjoy a

13   reputation for high quality.

14       Q.   Let me take it from a different

15   approach.

16              The breakaway force that is applied to

17   window blind cords such as the one that is

18   illustrated on Exhibit 3I, was there some kind of

19   analysis testing that was done to determine if,

20   for example, the pull force should be 10 pounds,

21   you know, before the window cord breaks?  Should

22   it be 20 pounds?  30 pounds?  That's what I'm

23   trying to get at.

24              MR. WILLIAMS:  Objection.  Just so I

25         myself understand, you're talking about a

J. Jankoski                              91

1
2       continuous cord with no tassel or anything
3       like that?
4           MR. JAUREGUI:  Just like the cords that
5       you have in front of you on Exhibit 3I.
6           MR. WILLIAMS:  Go ahead.
7           A.   In this particular product design, there
8       is not a lot of stress being placed on those cords
9       because you just -- you pull them down, and they
10      rotate through.  So it's not as if the entire
11      weight of the product is being borne by that
12      product.
13          Conversely, if you think of a horizontal
14      blind that might look like the one on the window
15      here, as you pull the cord down, the entire weight
16      of the entire product is being borne by that cord.
17          In the case of the vertical, that's not
18      really how it works, but there is extensive
19      testing that goes into all components before we
20      release them to the field.
21          Q.   Do you know whether if you had a nylon
22      cord or a metal beaded cord with a breakaway pull
23      force of 10 pounds, would the strength of either
24      the nylon cord or the metal beaded chain been
25      sufficient to operate the vertical blind?

```
1                          J. Jankoski                    92

2              MR. WILLIAMS:  Objection, vague.  I also

3          believe it's getting into the engineering

4          principles that are outside of this witness's

5          bailiwick, and I'll caution him not to

6          speculate on that at all.

7          A.    I wouldn't know if 10 pounds is the

8     right number, no.

9          Q.    Do you know whether prior to 1995

10    Hunter Douglas had any concerns about the

11    constitution of the nylon cords in the metal

12    beaded chains in that, when a child got caught up

13    in there, could become strangled if the materials

14    were to the point that even a child of

15    30 pounds -- applying a 30-pound pressure, the

16    cords would not breakaway?

17             MR. WILLIAMS:  Could I have that read

18          back, please.  I did not follow that.

19             (The Record was Read.)

20             MR. WILLIAMS:  Objection, vague,

21          ambiguous and unintelligible.

22    BY MR. JAUREGUI:

23          Q.    Let me tell you what I'm trying to get

24    to, the point, okay?  In this case, the child,

25    Max Padilla, was three years old, weighed
```

J. Jankoski                              93

1

2    52 pounds, and when he was found by his mother in

3    the room, he was suspended from one of the cords.

4            Now, given that information that you

5    have, the question is if the window cords for the

6    vertical blind at issue in this case -- if they

7    had used cords or a beaded chain that would break

8    away once 10-pound pressure is applied to it, then

9    this incident would have never occurred.

10           MR. WILLIAMS:  Wait.  There's no

11       question there.  That was a sentence.

12       Q.   So do you know given that -- so the

13   question to you is, whether Hunter Douglas had

14   information in 1995 about concerns that the

15   composition of the nylon cords and the metal

16   beaded chain were too strong, and that they could

17   increase the risk of strangulation when children

18   became entangled in the cords?

19           MR. WILLIAMS:  I object to the preamble

20       as an incomplete hypothetical based on

21       assumptions that are demonstratively false

22       and outside of this witness's bailiwick.

23           Do you know whether Hunter Douglas had

24       concerns before 1995 about the chain or cord

25       material being too strong?

J. Jankoski                                    94

1

2          THE WITNESS:  Personally, I would not.

3      It would be an issue that the engineers would

4      be discussing, and I wouldn't be privy to

5      that.

6          Q.   Is Hunter Douglas still manufacturing

7      vertical blinds such as the one that is depicted

8      in Exhibit 3I?

9          A.   We make vertical blinds that are

10     probably similar.  I don't know if they match up

11     directly with that product.  We've made changes

12     and improvements on it over the years.

13         Q.   Were there any changes made to the

14     length of the cords?

15         A.   Again, the length of the cord is a

16     consumer option that we, to this day, acknowledge

17     the fact that we are a custom-made product.

18         Q.   I have a stack of documents in front of

19     you, Mr. Jankoski.  They are labeled in some type

20     of chronological order, so let's see if we can

21     follow it through, then.

22             I am going to ask you to look at Bates

23     stamp document M-120.

24             MR. WILLIAMS:  M-120 is mid-document.

25         Is that correct?

J. Jankoski                                    95

1

2          MR. JAUREGUI:  That's right.  The

3     document starts on page 1 of 3, and it's an

4     analysis of fatal incidents associated with

5     window covering cords between 1996 and 2002

6     offered by the Consumer Products Safety

7     Commission on November 2004.

8          If you need to reference any other parts

9     of the document to identify it, please go

10    ahead and do that.

11         MR. WILLIAMS:  I'm sorry, did you say

12    it's page 3?

13         MR. JAUREGUI:  One of three.

14         MR. WILLIAMS:  One of three, sorry.

15    Q.   Referring your attention to page 120,

16    Bates stamp M-120, it's page 18 of that

17    document -- are you there with me --

18    A.   Yes, sir.

19    Q.   -- there are two bullet points on that

20    document.  Is that correct?

21    A.   Yes.

22    Q.   And it states there -- well, why don't

23    you go ahead and read the first sentence there so

24    that we can put things into perspective here.

25         MR. WILLIAMS:  So you want him not to

J. Jankoski                        96

1

2          review the document to see if he recalls

3          this?

4               MR. JAUREGUI:  I want him to do that.

5          Q.   Have you done that?  You can take as

6     much time as you want.

7               MR. WILLIAMS:  So the question to you

8          now, I believe, is:  Do you ever recall

9          seeing this document before?

10              MR. JAUREGUI:  It starts on page 1 of 3.

11         A.   I recall seeing it way back when.

12         Q.   And the question that I have -- I'm

13    referring your attention at M-120.

14         A.   Yes, sir.

15         Q.   All right.  The second bullet there.

16              I should note that if you look at

17    page 119, it's part of the recommendations there

18    on paragraph 9.  Do you see that there?

19         A.   Yes.

20         Q.   And right below that there, it says,

21    "CPSC believes that the Window Covering

22    Manufacturers Association should consider revising

23    current requirements in the voluntarily standard

24    to remove any potential for these foreseeable

25    circumstances to occur."  Do you see that there?

J. Jankoski                    97

1

2          A.    Yes, sir.

3          Q.    That says specifically, and it has four

4     bullet points.  Do you see that?

5          A.    Yes.

6          Q.    Now, I'm interested in the bullet point

7     number 3, the second sentence there.

8          A.    Uh-huh.

9          Q.    It says, "A requirement that eliminates

10    the operating cord or limits the length of the

11    exposed cord to 7.25 inches would prevent the

12    possibility of cord manipulation into hazardous

13    loop and products that use a cord lift control

14    system."  Do you see that there?

15         A.    Yes, sir.

16         Q.    All right.  The commissioner here is

17    recommending that the cords should be limited to a

18    length or exposed length of seven and a quarter

19    inches, correct?

20              MR. WILLIAMS:  Well, the documents speak

21         for itself, and he didn't author it, so I'm

22         not going to have him tell you what the

23         commission said beyond what you can read,

24         which doesn't add anything.

25         Q.    So that document states they're

J. Jankoski                              98

1

2    recommending -- part of their recommendations in

3    this analysis, a fatal accident, dated November 4,

4    2004, that they are recommending for the industry

5    to start using cord lengths of seven and a quarter

6    inch for certain blinds.  Is that correct?

7         MR. WILLIAMS:  Same objection, the

8            document speaks for itself.  But, Arturo, to

9            be fair, I'm going to direct you back to the

10           beginning under recommendations that you

11           read, that starts out by saying, "The CPSC

12           staff believes that WCMA should consider

13           revising current requirements."  And then it

14           lists four things worth considering.  And I

15           don't think it's fair to characterize that,

16           even though it's not a document, as a

17           recommendation.

18        MR. JAUREGUI:  All right.

19        Q.   With that modification there, I'm trying

20   to get to another question, okay.  That's not my

21   question yet.  I'm just pointing out to you that

22   in November 2004, the Consumer Products Safety

23   Commission was making a recommendation that on

24   certain blinds, the length of the cord should be

25   limited to seven and one quarter of an inch.

```
 1                        J. Jankoski                    99

 2       Okay?  You're with me so far?

 3              MR. WILLIAMS:  No, no, you're not asking

 4          a question, but you're saying the commission,

 5          rather, is recommending seven and a quarter

 6          inch cords.  I'm taking issue with your

 7          characterization and saying I don't think

 8          that's fair.

 9              MR. CARROLL:  This is not an objection.

10          Arturo, you may want to ask him, because

11          this is not the kind of cord they're talking

12          about, when it says "control lift system,"

13          that's what it means.  They're not talking

14          about a continuous lift cord.  Why don't you

15          ask him that, because this recommendation

16          didn't relate to the particular blind.

17              MR. JAUREGUI:  Both of you have not let

18          me go to my next question.  I will move on to

19          the next question.

20              MR. WILLIAMS:  Please ask him a

21          question.

22              MR. JAUREGUI:  All right.

23          Q.   At some point the commission was

24       suggesting or recommending that the industry start

25       using cord lengths for certain blinds, and they
```

```
1                        J. Jankoski                  100

2        were limiting the length of the cords to seven and

3        a quarter of an inch.  Okay?  That's all.  That's

4        just a statement from the document.  Correct?

5                MR. WILLIAMS:  That's what it says?

6                MR. JAUREGUI:  Yes.

7                MR. WILLIAMS:  I object that you're

8            misreading the document.

9                You can answer that question.  Do you

10           understand the question?

11               MR. JAUREGUI:  There's no question right

12           now.

13               MR. WILLIAMS:  Well, there was.  If

14           you're retracting it, I'm happy.

15           Q.   There's a statement there that at some

16      point the commission was recommending that for

17      certain blinds, the industry should consider

18      using -- it was a recommendation -- cord lengths

19      or exposed cords to seven and one quarter of an

20      inch.  Okay?  If we can just get there in one

21      piece -- okay.

22               Now, the question that I have to you is,

23      do you know where that seven and one quarter of an

24      inch recommendation comes from?

25               MR. WILLIAMS:  I object to the
```

```
1                        J. Jankoski                    101

2          characterization as a recommendation.  Go

3          ahead.

4          A.   I believe it is referencing the neck

5     circumference of a particular aged child.  It

6     actually states so in the footnote on page 18.

7          Q.   Do you know why the commission was

8     recommending, according to the paragraph 9 there,

9     that window covering manufacturers should

10    consider -- do you know why they were making that

11    recommendation to the Window Covering

12    Manufacturing Association?

13          MR. WILLIAMS:  Objection.  It calls for

14          speculation.

15          A.   I don't know why they would do it, but I

16    believe the industry has given it some serious

17    consideration, and there is the reality of, would

18    a 7 3/4 inch cord represent a hazardous loop, and

19    the answer would be probably not.

20               Conversely, though, what is the

21    practicality of having a window covering that has

22    a 7 1/4 inch operating cord when most of the

23    people in America would need a stepladder to get

24    up to address the cord and maybe would introduce a

25    whole set of other issues that could be equally as
```

J. Jankoski                                      102

1

2    dangerous, it didn't seem to make...

3              This was a prescriptive suggestion.  And

4    as we opened it up, we're trying to come up with a

5    product performance standard that says, this is

6    what the product needs to do, and allow us as an

7    association of manufacturers to address that in a

8    way in which the answer could be reached, but not

9    necessarily with one answer.

10             It doesn't seem to make a lot of

11   practical sense, although in theory it makes --

12   you can understand why they might do that, but

13   look at the window right here in this room, if

14   this was only 7 inches high, we wouldn't be able

15   to operate the product.

16        Q.   So the suggestion or the recommendation

17   as it is made here by the Window Covering --

18             MR. WILLIAMS:  The Consumer Products

19        Safety Commission.

20        Q.   -- Consumer Product Safety Commission

21   was designed to minimize the ability of a child to

22   get his head caught up in there and become

23   strangled?

24             MR. WILLIAMS:  Objection.  It calls for

25        speculation and the document speaks for

J. Jankoski                                      103

1

2          itself.  I think you've answered the

3          question.

4               A.   According to the statement, it said that

5          length of cord would prevent the possibility of

6          cord manipulation.  That was their statement.

7               Q.   Before November 2004, did Hunter Douglas

8          consider using continuous loop cords such as the

9          one you see on Exhibit 3I of lengths not exceeding

10         7 1/4 inch?

11              A.   Yes.

12              Q.   And having considered the use of cords

13         not to exceed 7 1/4 inch, did Hunter Douglas at

14         some point start to use cords that were 7 1/4 inch

15         in length for continuous loop cords?

16              MR. WILLIAMS:  Did Hunter Douglas start

17          to use that at some point?

18              MR. JAUREGUI:  Yes.

19              A.   Unless the consumer specifically asks

20         for it, we would make it, if they wanted it.

21         Since, again, everything we do is custom made, if

22         the consumer asks for it, we would give it to

23         them.  Again, if they don't, we would default to

24         something that would be different than 7 1/4 inch.

25              MR. WILLIAMS:  Keep your voice up.

```
1                        J. Jankoski                    104

2          Q.   Does Hunter Douglas make any products,

3     in particular, vertical blinds, with continuous

4     loop cords with lengths of 7 1/4 inch?

5               MR. WILLIAMS:  He just answered that.

6          Q.   Or that's only the consumer reports

7     side?

8          A.   Yes, sir.  If the consumer requests it,

9     yes.

10         Q.   Now, currently, there are other safer

11    alternatives to window cords.  Is that correct?

12              MR. WILLIAMS:  Wait, vague and

13              ambiguous.  Safer than what?

14              MR. JAUREGUI:  Safer than corded

15              products.

16              MR. WILLIAMS:  As a general proposition,

17              go ahead, if you understand the question.

18         A.   There are many, many products on the

19    market today that severely reduce the risk of

20    strangulation.  Some have cords, some of them do

21    not.

22         Q.   There is such thing as cordless products

23    now?

24         A.   Yes, sir.

25         Q.   And what is that, essentially?
```

```
1                              J. Jankoski                    105

2           A.    A shudder has no cords.  A roller shade

3       with a string roller system that you just pull

4       down has no cords.

5               We have pleated shades and honeycomb

6       shades that have no exposed cords.  They are built

7       inside of the product, and you can't get at them,

8       but you're allowed to just take the product

9       yourself and manipulate it down to a length and

10      leave it so there are no exposed cords.

11              Again, the definition of cords, there

12      may be cords, but they are not accessible cords.

13      And there's a significant difference between --

14      you know, we say cordless products, but there is,

15      in fact, a cord inside there somewhere to make it

16      work, but it's not accessible to the consumer so

17      it's referenced as a cordless product.

18              We have products that are motorized that

19      require no corded manipulation, and they could be

20      either motorized by a battery-operated system,

21      they could be motorized by a hardwire system where

22      an electrician can come in, or they could be

23      operated where you just plug them in the wall like

24      an appliance.

25              We have products that have retractable
```

```
 1                          J. Jankoski                    106

 2        cords so that no matter how long the product --

 3        when you pull the cord down to lift the product

 4        up, our system now has a retractable device so

 5        that the cord retracts back into the headrail and

 6        stays at a fixed height regardless of what

 7        position the product is in.  So we have quite a

 8        few products on the market.

 9             Q.   What's a window covering pull safety

10        device?  Are you familiar with those?

11                  MR. WILLIAMS:  A window covering pull

12             safety --

13                  MR. JAUREGUI:  Pull safety device, yes.

14             A.   Pull safety?

15             Q.   Yes.

16             A.   I don't know.

17             Q.   Can you take a look at document

18        Hunter Douglas 1042 to 1045.  They will be later

19        on towards the end of that package somewhere in

20        there, the beginning of one of those, HD1044.

21                  MR. WILLIAMS:  That is our production.

22             Not 1042, the first document inside that

23             rubber band.

24             A.   Okay.

25             Q.   Have you seen this document before,
```

```
1                          J. Jankoski                    107

2      Mr. Jankoski?

3           A.   I don't recall, but I must have seen it

4      since it is a document that comes out of our PR

5      agency, Lou Hammond, and I reviewed most of those.

6           Q.   Now, I am looking for a date on this

7      document.  Do you see a date somewhere?

8           A.   April 24, 2002.

9           Q.   Referencing your attention to the first

10     page of that document, the basics, can you read

11     that first sentence, please?

12          A.   "An important part of raising children

13     is careful supervision of activities" --

14          Q.   I'm sorry, the basics, the bottom

15     paragraph there.

16               MR. WILLIAMS:  Under the heading basics?

17               MR. JAUREGUI:  Yes, basics.

18          A.   "Keep cribs, furniture, and other

19     objects that can be climbed on away from windows

20     and use window locks to lock open sash windows to

21     a safe height preventing them from being opened

22     any further."

23          Q.   What are these recommendations aimed at

24     doing?

25          A.   Educating the adult in a home of the
```

```
1                        J. Jankoski              108

2         many things that may or may not be obvious to them

3         with regard to child safety.

4              Q.   In this document, it states on the

5         following page, according to the U.S. Consumer

6         Product Safety Commission and the Window Covering

7         Safety Council, an estimated 194 children have

8         died as a result of accidental strangulation from

9         window coverings.  Do you see that there?

10             A.   Yes, sir.

11             Q.   Is there some common trait or mechanism

12        of injury by which children are being exposed to

13        these strangulation hazards?

14                  MR. WILLIAMS:  Objection, vague and

15             ambiguous.

16             Q.   By that I mean, there are two things

17        that you are recommending, that they keep cribs

18        and furniture and other products that can be

19        climbed on.  Okay?

20             A.   Uh-huh.

21                  MR. WILLIAMS:  Yes or no.  You have to

22             avoid the things with M's and H's in them.

23             A.   Yes.

24             Q.   Now, is it because cribs, when they are

25        kept close to window blinds, young children may
```

J. Jankoski                        109

1
2    have a tendency to play with the cords and become
3    entangled with them?  Is that one of the reasons?
4         A.   That's certainly one of the reasons,
5    yes.
6         Q.   And it also suggests that furniture and
7    other objects that can be climbed on, to keep them
8    away from windows?
9         A.   That's the recommendation here.
10        Q.   All right.  So at least as of
11   October 24, 2002, Hunter Douglas was aware of the
12   propensity of young children to climb onto
13   furniture and become untangled in window
14   coverings.  Is that a fair statement?
15             MR. WILLIAMS:  April, not October 24,
16        2002.  For the record, you said October.  I
17        think you meant April.
18             MR. JAUREGUI:  I thought I said April,
19        but April of 2002.
20        A.   Yes.
21        Q.   And is this something that
22   Hunter Douglas had known for some time prior to
23   2002?
24             MR. WILLIAMS:  Was what something?
25             MR. JAUREGUI:  The fact that small

```
1                          J. Jankoski                    110

2            children have a propensity to climb onto

3            furniture and other items and become

4            entangled on cords, on window coverings.

5                  MR. WILLIAMS:  There's a compound --

6            A.    I think anyone who has a child will

7       realize that they're pretty inquisitive, and they

8       get into places they might not be designed for.

9       And this is really a good dose of common sense.

10                 And as you can see from the document,

11      we're also addressing a menu of other things.  We

12      are trying to do a public service, again, trying

13      to create awareness.

14                 You had mentioned earlier how many other

15      windows that are out there that are, you know,

16      potentially dangers.  This was one of the attempts

17      that we have made and continue to make to bring

18      the issue to the front of the minds of the

19      consumers.

20                 Unfortunately, you know, the reality is

21      if you see a bottle of bleach on the table, you

22      take it away before your child comes in.  If you

23      see knives or an opened, you know, window, you

24      take care of that.  But sometimes when you see a

25      nice looking window covering, it doesn't translate
```

```
 1                              J. Jankoski                    111

 2        to potential danger.

 3                    And if you have the wrong product that

 4        you purchased or a product that is an older one

 5        that is out of spec, then most consumers don't

 6        associate the danger.  And this is an attempt to

 7        bring more awareness to that matter.

 8            Q.   And the propensity of children, young

 9        children, to climb onto furniture and get caught

10        up in the window cords, that is something that is

11        certainly foreseeable; if the window blinds are in

12        a room and a child climbs onto furniture in an

13        effort to try to look out the window, it is

14        foreseeable that the child might be tangled up in

15        the cords?

16                    MR. WILLIAMS:  Hold on.  I'm going to

17              object.  It's compound.  You talked about the

18              propensity of children to climb on furniture,

19              but then you go on to say and to become

20              tangled in window cords.

21                    I think the propensity or likelihood,

22              whatever you want to call it, of those two is

23              very, very different, and I object that the

24              compound question doesn't separate them.

25                    Go ahead, if you understand it.
```

1                    J. Jankoski                    112

2          A.   I wouldn't say foreseeable.  It's

3     possible.  I mean, foreseeable is a little

4     stronger in terms of its likely to happen.  We are

5     trying to reduce the likelihood of that happening.

6          Q.   In your mind what is the difference

7     between something being possible from occurring

8     and something being foreseeable?

9          A.   In my mind, foreseeable is going to be;

10     will, in fact, actually happen down the road; and

11     potential may or may not happen.

12          Q.   And the U.S. Consumer Product Safety

13     Commission has put out similar information out

14     there, right, in terms of how is -- the most

15     common likelihood that children are getting

16     tangled up in window blind cords, one of them

17     being children climbing after toys or other

18     furniture and becoming entangled in window blinds.

19     I mean, the industry has known that for a number

20     of years, correct?

21               MR. WILLIAMS:  What's the question?

22          That the CPSC has put information like that

23          out, or that the industry has known that as a

24          whole?

25               MR. JAUREGUI:  Both.

```
1                         J. Jankoski                    113

2              MR. WILLIAMS:  Objection, compound and

3         also asks for speculation.

4              Listen to the question.  If you can't

5         answer it, tell him.

6         A.   I'm not sure what the question was.

7         Q.   That's fine.

8              The Consumer Products Safety Commission

9    publishes data about strangulations of children

10   from window blind cords, correct?

11        A.   Periodically, they do that.

12        Q.   And Hunter Douglas is made aware of

13   those publications, right?  I mean, you get that

14   information from the Consumer Product Safety

15   Commission as a member of the industry?

16        A.   We don't get it directly, sir.  We get

17   it through the association.

18        Q.   Through the Window Covering Safety

19   Council?

20        A.   Through the Window Covering

21   Manufacturing Association.

22        Q.   As you sit here today, what are the most

23   common causes that children die from

24   strangulations or the most common methods when

25   young children die from strangulations from window
```

1                          J. Jankoski                    114

2      blind cords?

3              MR. WILLIAMS:  Objection, vague.

4          A.   Is there more than one method of

5      strangling?

6          Q.   I'm just using your document that you

7      have in front of you here.  You're recommending

8      that cribs should be kept away, furniture and

9      other objects that can be climbed on should be

10     kept away from windows, so why is Hunter Douglas

11     making these recommendations?

12             MR. WILLIAMS:  Asked and answered.

13         A.   Just simply to create consumer awareness

14     that if, in fact, they have a toddler, and they

15     have a product with excessive cords, then they

16     need to understand what's happening in their

17     house.

18         Q.   I want you to take a look at page 1043

19     there.  It says somewhere there in the second full

20     paragraph:  "We join these esteemed organizations

21     in educating consumers about the dangers of window

22     covering cords," said Joe Jankoski, a member of

23     the Window Covering Safety Council and corporate

24     vice-president of merchandising for

25     Hunter Douglas.  All right?

```
1                      J. Jankoski                    115

2              Now, can you read the next statement,

3      please?

4          A.   "Hunter Douglas was the first

5      manufacturer to respond with a solution to the

6      problem and has consistently taken a leadership

7      position within the industry with regard to the

8      potential hazards of window covering cords."

9          Q.   Can you tell me how is it that

10     Hunter Douglas was the first to respond with a

11     solution to the problem?  What was the solution?

12         A.   We were addressing in this particular

13     time frame the looped cord that I had described to

14     you in horizontal products, and we developed a

15     breakthrough tassel.

16              Instead of having a cone-shaped tassel,

17     we created a tassel that had two parts to it so

18     that it would break away almost to your prior

19     description of releasing if there was pressure

20     placed in the loop.  That breakaway tassel then

21     was the first of its kind to be used in the

22     industry.

23         Q.   I thought that part of the retrofit

24     campaign of '95-'96, one of the recommendations

25     was that for continuous loop cords, they were
```

```
1                          J. Jankoski                    116

2          recommending for consumers to cut the cord and

3          then attach like the bell at the end of each cord?

4                A.    That's correct.

5                Q.    Is that correct?

6                A.    Yes, sir.

7                Q.    That was part of the retrofit campaign?

8                A.    For the horizontal, yes.  For the

9          vertical product, there was a different...

10               Q.    For the vertical product, it was the

11         tension that we spoke about?

12               A.    Yes, sir.

13               Q.    And the breakthrough safety tassel,

14         that's what you were describing to me earlier?

15               A.    What I described earlier was the

16         problem, and how you have a tassel under a cord

17         with a knot on it that has a loop that's very,

18         very firm.

19               This breakaway tassel, instead of having

20         one continuous loop, we cut it, make it two

21         pieces, but we join them together with one tassel

22         that looks like the old one, and consumers can

23         identify and grab one cord and pull it down.

24               But in any case where there was an

25         insertion of a head with any pressure, it pops
```

```
1                          J. Jankoski                    117

2        away and turns into two separate cords.

3                The convenience here is that, not only

4        did it deliver a safety element to the product,

5        but it made it easier for the consumer to operate

6        the product because she was able to grab one cord

7        and pull the product up and down versus having to

8        grab two cords.

9                And you almost never grab the two cords

10       at the same space, so the blind would always go up

11       crooked.  And it was an inferior way, if you will,

12       of operating the product.

13               So this was a solution that we thought

14       had merit from a safety position and from a

15       practical operational position.

16         Q.    All right.  And on that same page, 1043,

17       HD1043, it says, "In addition, Hunter Douglas

18       introduced a PermAssure Safety Wand, a fiberglass

19       wand that is a single control replacing both the

20       cord and the chain and the vertical blinds that

21       limit access children have to it for enhanced

22       safety."

23         A.    That's correct.

24         Q.    Now, my question to you, sir, is, this

25       is an improvement that was made for vertical
```

```
1                         J. Jankoski                    118

2      blinds?

3              A.   Yes, sir.

4              Q.   Do you know when the safety wand became

5      available?

6              A.   I don't recall.

7              Q.   Was that a technology that was developed

8      by Hunter Douglas?

9              A.   I don't recall who developed it.

10             Q.   Do you know whether the safety wand was

11     a technology available some time in 1995-1996?

12             A.   I believe it was.

13             Q.   If that technology was available in the

14     mid '90s, is there a reason why it was not used on

15     the vertical blinds such as the one that is shown

16     on Exhibit 3I?

17             MR. WILLIAMS:   A reason other than

18             consumer specs?  I mean, objection.  It's

19             vague because he's told you that.

20             A.   It was used.  It was used.

21             Q.   It was used?

22             A.   Yes.

23             Q.   And is there a reason why it wasn't used

24     in this particular vertical blind 3I, Exhibit 3I?

25             A.   The only reason would be the consumer
```

1                              J. Jankoski                    119

2          chose not to buy it.

3               Q.   What is the function of the safety wand?

4               A.   The safety wand does -- it does two of

5          the operating systems in one.

6                    To operate a vertical blind, the vanes

7          traverse left to right or part from middle, and

8          the louvers themselves rotate to provide you with

9          different angles for the sun and privacy.  The

10         wand takes the place of both cords.

11                   In Exhibit 3I, the chain operates the

12         tilt, and the cord operates the traverse.  In this

13         case, the ward replaces both of those cords, and

14         if you want to traverse the vanes, you take the

15         wand and you spin it --

16               MR. WILLIAMS:  Not traverse.

17               THE WITNESS:  I'm sorry.

18               A.   If you want to rotate the louvers, you

19         take the wand and you spin it, and the louvers

20         will rotate.  And if you want to traverse, you

21         just hold the wand and you walk it across the face

22         of the product and bring it to the other side

23         manually.

24               Q.   So the use of the wand essentially

25         eliminates the use of cords on a vertical blind

```
1                          J. Jankoski                      120

2          such as the one on Exhibit 3I?

3              A.   That's correct.

4              Q.   And by using a wand on a vertical blind

5          such as the one on Exhibit 3I, you eliminate if

6          not minimize the danger of strangulation by the

7          cords?

8              A.   There are no cords, so by default, yes.

9              Q.   So you eliminate the danger of

10         strangulation because there are no cords.

11         Correct?

12             A.   Yes, sir.

13             Q.   So your testimony here, sir, today is

14         that some time in 1995 or when this product would

15         have been sold and manufactured, that the cords

16         were specifically provided at the request of the

17         consumer?

18             A.   Yes.

19             Q.   And is it your testimony here, and you

20         would tell that to the jury here today that,

21         knowing that the household where the blind was

22         going to be installed had young children, that if

23         they had been advised of the dangers of window

24         blind cords to young children, that

25         notwithstanding that information, they would have
```

1                              J. Jankoski                      121

2          still chosen the corded product?

3                  MR. WILLIAMS:  Wait.  Objection.  I

4              believe that calls for speculation.  Are you

5              asking him what the Roberts/Davises would

6              have done?

7          A.   Yes.

8          Q.   The question again is that if the

9      purchaser of the blind had been fully advised of

10     the dangers posed by window blind cords, that

11     notwithstanding those warnings, that they would

12     have still chosen to go with that option rather

13     than choosing the safer option of a vertical

14     window blind equipped with a wand to operate the

15     blind?

16                 MR. WILLIAMS:  Objection.  It calls for

17             speculation.  I don't understand the

18             question.

19         A.   We hope with the right information

20     they're going to make the right decision for

21     themselves.  We have a very aggressive training

22     program for our retailers to let them know what

23     the options are so they can communicate that to

24     the consumers.  And I don't know what happened

25     during that particular transaction.

```
1                          J. Jankoski                    122

2          Q.   From a cost-analysis perspective, what's

3     more expensive, to fit a vertical blind with the

4     chain and the nylon cord such as the one that you

5     have on Exhibit 3I, or to fit it with a wand?

6          A.   I don't know.

7          Q.   If you look at the following page on

8     HD1044 on top with the paragraph, it talks about a

9     technology here.  Let me just read that so I'm not

10    making anything up.

11               "In 1996, Hunter Douglas had developed

12    the first safety device specifically designed for

13    window covering with continuous cord loop systems

14    such as the Silhouette, Nantucket, and the

15    Vignette window shadings, the cord tensioner."

16               Does that technology include the

17    vertical blinds?

18         A.   Yes.

19         Q.   Both the tensioner, that would cover

20    both types of windows?

21         A.   Yes.

22               MR. WILLIAMS:  I'm sorry, the cord

23         tensioner referenced here?

24               MR. JAUREGUI:  Yes.

25         Q.   It says at the end of that paragraph
```

```
 1                        J. Jankoski                 123

 2      that the cord tensioner is standard on all

 3      Hunter Douglas window coverings with loop systems.

 4      Do you know when that became the standard?

 5           A.   I don't.

 6           Q.   Sir, I want you to take a look at

 7      page 1240, HD1240.  Have you seen this document

 8      before?

 9           A.   No, sir.

10           Q.   All right.  Do you want to take a minute

11      to review it?

12                MR. WILLIAMS:  Did you say no?

13                THE WITNESS:  I did not.  I've never

14           seen it.

15           Q.   All right.  Have you had an opportunity

16      to review it?

17           A.   Yes, I did.

18           Q.   All right.

19                My first question to you is on the

20      second full paragraph there.  I was asking you

21      questions earlier about that, and I just couldn't

22      find the information then.

23                Can you read that first paragraph,

24      please?  The second paragraph there?

25                MR. WILLIAMS:  Hold on.  Arturo, even
```

1                          J. Jankoski                    124

2          though he's said he's never seen this before,

3          and this can't refresh his recollection, you

4          want to ask him some questions about it

5          anyway?

6          MR. JAUREGUI:  Yes.

7          A.   "Hunter Douglas, the nation's leading

8    manufacturer of window covering products, takes

9    pride in the fact it has been at the forefront of

10   efforts to reduce the dangers posed by window

11   cords to small children.

12          "'Hunter Douglas has consistently taken

13   a leadership role within the window covering

14   industry with regard to the potential hazards of

15   the window covering cords,' says Kelly, who is the

16   vice-president of sales for Hunter Douglas."

17          Q.   The first question to you is regarding

18   here.  It states that Hunter Douglas, at least as

19   of 1997, was the nation's leading manufacturer of

20   window covering products.  Is that a correct

21   statement?

22          MR. WILLIAMS:  Objection.  Vague as to

23          what's meant by "leading manufacturer."  Go

24          ahead.

25          A.   I think we like to take license

J. Jankoski                                    125

1

2    sometimes and say that we are the leaders.  We

3    believe we are based on a number of things, but

4    leading is not just about sales volume.  It's

5    about innovation.  It's about supply chains, and,

6    you know, that's our opinion.

7         Q.   That's fine.  And I don't want to

8    prolong this line of questioning, but is that an

9    accurate statement?

10        A.   No, we believe we're the leader.

11        Q.   Okay.

12             Paragraph number 4.  It states, "In

13   1995, Hunter Douglas created the PermAssure (TM)

14   Safety Wand for vertical blinds which replaces the

15   cord and chain and can easily be kept out of a

16   child's reach."

17             To your knowledge, do you know when in

18   1995 Hunter Douglas started to use the wands on

19   its products, on vertical blinds?

20        A.   I think you're taking this statement

21   literally.  We didn't replace it, per se.  We

22   added it to the line.  This is descriptive copy to

23   let people who are reading this understand what it

24   does.  The product was added to the mix.  It

25   wasn't replacing the existing system.

```
 1                          J. Jankoski                    126

 2              MR. WILLIAMS:  I don't think his

 3         question asked you that.  I think it was just

 4         when in 1995 did the PermAssure Wand come

 5         into...

 6         Q.   If you know.

 7         A.   Oh, I don't know.

 8         Q.   All right.

 9         A.   Sorry.

10              MR. WILLIAMS:  That's okay.

11              MR. JAUREGUI:  Let's take a quick break.

12              (Recess taken from 5:13 p.m. to 5:19

13         p.m.)

14    BY MR. JAUREGUI:

15         Q.   Mr. Jankoski, please take a look at

16    document M-130, which should be towards the

17    beginning of the documents there on the left side.

18    I am going to ask you if you have seen that

19    document before.

20         A.   I don't recall.

21         Q.   Do you want to take a look at it and see

22    if it refreshes your memory?  Does that refresh

23    any memories?

24         A.   Vaguely.

25         Q.   All right.  Let's try document Bates
```

1                              J. Jankoski                        127

2       stamped M-130 to 131.  It appears to be minutes of

3       a meeting.  Do you agree with that?

4              A.   That's what it looks like.

5              Q.   Minutes of a meeting held by the U.S.

6       Consumer Product Safety Commission, and the

7       subject of that meeting is the Window Covering

8       Manufacturer Association Technical Meeting on

9       Window Covering Cords.

10             A.   Yes, sir.

11             Q.   And that was held on January 27, 2005?

12             MR. WILLIAMS:  Are you asking if he has

13             got a recollection of the meeting, or are you

14             just asking him to agree that you're reading

15             this correctly?

16             MR. JAUREGUI:  Yes.

17             Q.   Do you agree?  It is a document for a

18      meeting that was held on January 27, 2005.  Is

19      that correct?

20             A.   That's what the document says.

21             Q.   And you were present at that meeting.

22      Is that correct?

23             A.   That's what the document says.

24             MR. WILLIAMS:  Okay.  This is an

25             important -- you know, I mean, it's not a

1                     J. Jankoski               128

2       technical distinction.  You're reading

3       something.  You've attended a lot of

4       meetings.

5           You may assume somebody wasn't making

6       stuff up, but the question to you is, do you

7       have a recollection of attending a meeting on

8       this subject at which these things were

9       discussed on that date?

10          THE WITNESS:  Again, vaguely.  I've been

11      through many technical meetings over the

12      years.  I don't remember this specific one.

13          MR. WILLIAMS:  So you don't remember

14      this specific one?

15          THE WITNESS:  I remember being out in

16      Los Angeles having a technical meeting.

17      That's about where I'm drawing the line.

18         Q.   Now, I take it that in your position as

19   representative of Hunter Douglas, you have

20   attended many meetings such as the one that you

21   have in front of you sponsored by the U.S.

22   Consumer Product Safety Commission dealing with

23   technical issues on window covering cords.  Is

24   that a fair statement?

25        A.   That's a fair statement.

```
1                        J. Jankoski                    129

2          Q.   And this is one of the meetings?

3    According to the minutes, you were present at that

4    meeting?

5          A.   Correct.

6               MR. WILLIAMS:  According to the minutes,

7          the document speaks for itself.  I don't want

8          to keep making that objection.  I want you to

9          get your questions out.

10              MR. JAUREGUI:  He doesn't remember much,

11         but I am trying to get there.

12              MR. WILLIAMS:  But you can't refresh a

13         witness's recollection with a document he

14         hasn't seen before.

15              MR. JAUREGUI:  All right.  We're going

16         to move on, otherwise we're going to be here

17         too long.

18         Q.   Now, there were a series of incidents,

19   19 fatal window covering cord incidents that were

20   discussed at that meeting from the document

21   itself.  That's what it says, right?

22         A.   Yes.

23         Q.   And it identifies three main hazards and

24   areas associated with cords involved.  Is that

25   correct?
```

```
 1                        J. Jankoski                  130

 2              MR. WILLIAMS:  Is that what it says?

 3              MR. JAUREGUI:  Yes.

 4         Q.   That's what the document says?

 5              MR. WILLIAMS:  Can I have a running

 6         objection that the document speaks for

 7         itself?

 8              MR. JAUREGUI:  I'll take it just to move

 9         on.

10         A.   That document highlights three main

11    hazard scenarios.

12         Q.   All right.  One of those scenarios under

13    number 1 is continuous cord or beat loop that does

14    not have a tensioner.  Correct?

15         A.   Yes, sir.

16         Q.   All right.

17              Number 2, inner cords; and 3, loops

18    formed by manipulation of the cord, correct?

19    Those are the three scenarios that are discussed

20    there?

21         A.   That's correct.

22         Q.   Now, the continuous cord or beat loop,

23    that does not have a tensioner.  Do you know what

24    specific type of window blind product that was

25    referring to, and would that have included
```

```
 1                          J. Jankoski                    131

 2        vertical blinds such as the one that we have at

 3        issue here?

 4              A.   It could very well have included

 5        vertical blinds.

 6              Q.   All right.

 7                   Now, the third paragraph contains a

 8        statement that you made at that meeting, so why

 9        don't you go ahead and read that statement, and

10        then I'll ask you a question.

11              A.   "Joe Jankoski and Caroline Paul

12        emphasized that voluntary standard action will

13        effect future products but will not effect the

14        millions of products that are currently in

15        consumer use.

16                   "It is essential that efforts to

17        increase consumer awareness regarding the hazards

18        and the availability of retrofits be continued."

19              Q.   Having read that statement, does that

20        accurately quote what you said at that meeting?

21              A.   Again, my recollection of the meeting is

22        such that I probably did say that because this

23        is -- forget about a meeting, this is a personal

24        belief that I have.  And I would say it in every

25        meeting, that we have a two-pronged issue in this
```

131

J. Jankoski                                      132

1
2   industry:  One is new product production; and the
3   other is the existing inventory of window
4   coverings that are in the marketplace today that
5   need to be addressed through awareness.
6           So I've always had the position, and
7   sometimes I speak louder than maybe people want me
8   to, but the point is I'm all for and we're very
9   much participatory in the new product standards,
10  but at the same time we need more awareness
11  efforts being placed or as much as we can.
12          I don't know if more is enough, but a
13  maximum amount of awareness in terms of the
14  activity that goes on to make people aware of
15  what's happening with the blinds they have, yes.
16      Q.   Fair enough.
17          When you made that statement on
18  January 27, 2005, and you indicated that
19  voluntarily standard action would not effect
20  future products --
21          MR. JAUREGUI:  Strike that.
22      Q.   -- that voluntarily standard action will
23  effect future products but will not effect the
24  millions of products that are currently in
25  consumer use, can you qualify in any way the word

1                          J. Jankoski                    133

2        "millions," you know, what you had in mind?  Was

3        it 20 million?  30 million?  80 million?

4             A.   You know, I guess you can come at it a

5        lot of different ways, whether or not mine is the

6        right way or not, but if there are -- I mean, you

7        take a very basic concept of 100 million

8        households in the United States.  How many windows

9        does a household have?  Do the math, and that's

10       probably coming up short.

11              You know, that's not really taking into

12       consideration the types of homes people have, how

13       many homes they do have, but there is a lot of

14       them.

15            Q.   Let me throw this number at you.  I read

16       somewhere in one of these documents that in 2000,

17       the Consumer Products Safety Commission believed

18       that approximately 80 million window covering

19       units were being sold every year.  Does that

20       number sound accurate or close to the

21       neighborhood?

22            A.   I wouldn't quarrel with that.

23            Q.   All right.  And so I take it from this

24       statement, the voluntarily standards that the

25       industry was adopting, those were forward in the

                              J. Jankoski                    134

1

2      future.  It would not effect the products that

3      were already in consumers' homes?

4           A.   No, that's why the Window Covering

5      Safety Council was established to do.

6           Q.   All right.  That's the second part of

7      the question, then.

8                The only tool, then, that the window

9      covering industry has to reach consumers with

10     potentially dangerous products is through public

11     relations outreach to the public, trying to

12     educate the public about the dangers of window

13     blind cords?

14          A.   Through the Window Covering Safety

15     Council, and that's one method.  The other method

16     would be the individual activity that every single

17     company initiates on their company.

18               You know, we're members of an

19     association.  However, the activities that we

20     have -- and I brought some of these documents here

21     with Hunter Douglas that someone had uncovered for

22     me, but it shows you what we're doing without

23     anything to do with the association.

24               So there's multiple pronged efforts

25     being placed.  It's Hunter Douglas plus it's all

J. Jankoski                                    135

1

2       of the other members of the industry -- are doing

3       things on their own.

4            Q.   Let's use this particular case as an

5       example.  The purchaser, Ms. Davis, said that she

6       never received any information about the dangers

7       of window blind cords to young children.

8                 Her daughter, Mindy Roberts, the owner

9       of the home where the vertical blind was

10      installed, also testified that she never received

11      any information from the Window Covering

12      Manufacturing Association, the Window Covering

13      Safety Council.  By the way, they didn't even know

14      what those entities were, or Hunter Douglas.

15                The victims in this case, the Padillas,

16      both Mr. and Mrs. Padilla, also testified that

17      they never received any information from the

18      Window Covering Safety Council, the Window

19      Covering Manufacturers Association, or

20      Hunter Douglas about the dangers of window blind

21      cords to young children.

22                Now, given that the Padillas did not

23      install the product, they purchased the home from

24      someone else, they moved into their house, the

25      window blind has become a fixture of their home,

J. Jankoski                                    136

1

2     there were no warning labels of any type, how are

3     they supposed to know how to protect their

4     children from the dangers of window blind cords?

5              MR. WILLIAMS:  Okay, this is not

6          intended to be argumentative, but are you

7          asking him how are they supposed to get

8          information from some outside source other

9          than common sense and things of that nature?

10             MR. JAUREGUI:  Yes.

11        A.   We have a fairly aggressive campaign.  I

12    only wish that they did get the message.  I'm not

13    sure that our effort and our campaign is

14    guaranteeing 100 percent awareness, but we're

15    doing a lot in the area of that.

16             I can rattle off some of the things that

17    we're doing.  It wasn't just one dimensional.

18    There were web sites.  There were events.  We have

19    created cartoons like Superbaby and put it on

20    YouTube.

21             Actually, this past two years ago, we

22    had it over at the Colts football game on the

23    Jumbotron, which you wouldn't think about looking

24    at child safety, but we were able to do that.

25             In the Hunter Douglas world, we had Lou

```
1                          J. Jankoski                    137
2          Hammond here a minute ago.  We have an ongoing
3          campaign for PR releases of stories.  I feel very
4          bad that they didn't hear our message, but it
5          wasn't for a lack of trying.
6               Q.   The retrofit campaign of 1995-1996, did
7          that have a point at which it ended?
8               A.   No, sir.  It still is available today.
9                    As of this year, we're averaging 10,000
10         repair kits shipped to consumers each and every
11         month, of which, I would say, roughly 15 to
12         20 percent of those repair kits are specifically
13         for vertical blinds.
14              Q.   What's the percentage?  I'm sorry?
15              A.   Roughly 15 to 20 percent.
16              Q.   And where are these numbers from, the
17         10,000 requests for retrofit kits?
18              A.   That comes out of the Window Covering
19         Safety Council.
20              Q.   Are these retrofit kits provided to the
21         consumer free of charge or is there a cost?
22              A.   They're free of charge.  You can access
23         them through a web site or through 800 toll-free
24         numbers.  And at the moment, the industry has got
25         five straight repair kits depending on the product
```

```
 1                          J. Jankoski                    138

 2      that you have.  We've expand it to cover as many

 3      potential scenarios as possible.

 4          Q.   Do you know what the Hispanic population

 5      in the United States was in 2008?

 6          A.   No, sir.

 7          Q.   I know that you brought some materials.

 8      Let's just go through them quickly.

 9               These are materials that we had not seen

10      before, but it appears to be materials related to

11      Hunter Douglas's efforts in publicizing window

12      safety.  Is that a fair summary?

13          A.   Yes.  We do that through our retailers.

14      All of these tools are handed to our retailers so

15      that they could use them on a local level.

16               And what we have done in our web site,

17      we make these available for people who want to

18      order them up or download them.  That's the only

19      direct contact we have with consumers, only

20      through our web site.

21               Everything else is done through our

22      dealers because they're the local representation

23      for our brand.  And they're selling our product.

24      And they're installing the product.  And they are

25      giving the consumer advise of what to buy.
```

1                          J. Jankoski                    139

2          Q.   I'm sure I'll be getting copies of these

3      documents from your attorney at some point, but

4      the question to you is some of these are materials

5      do not have any dates.  Do you know when these

6      materials would have been distributed to the

7      public?

8          A.   Some of them do have dates, but a lot of

9      them do not, and unfortunately we didn't have --

10     we don't keep everything that we produce.  We

11     don't have enough room in our buildings.

12              These happen to come from one of our

13     people who work off site not in our office.  She

14     happened to be -- she discovered them this week

15     knowing that I was going to be here.  I didn't

16     even see them until this week.

17              MR. WILLIAMS:  This is a question for

18          Arturo's benefit.  Do you believe that it's

19          likely that all of these dates from 2000 and

20          later, all of the ones do have dates?

21              THE WITNESS:  I would say most of them

22          are from 2000 on, because anything before

23          that I wouldn't know who has copies.

24         Q.   Can you tell me who is the person that

25     discovered these documents?

139

```
 1                          J. Jankoski                    140

 2          A.   Donna Lobosco.

 3          Q.   And who is she?

 4          A.   She is the manager of our advertising

 5     agency, the manager of our advertising.

 6          Q.   So as you sit here today, you do not

 7     know one way or the other whether any of those

 8     materials would have been distributed in the

 9     Chicago area any time prior to April 22, 2008?

10          A.   Well, for example, this is a kit that

11     came out in 2000 because it was linked into the

12     elections.

13               MR. WILLIAMS:  Joe, I'm sorry, for the

14          record, when you say "this," you're holding

15          up an envelope.

16          Q.   Can you describe that, sir?

17          A.   It's a retailer kit called "Hip Hip

18     Hooray."  It's vote for safety -- "vote safety

19     first," I'm sorry, and it's a kit that contains

20     materials for retailers to use in their stores to,

21     again, promote window covering safety.

22               It has buttons.  We have advertising

23     mats that our dealers could use in their local

24     newspapers and put their own names on it.

25               We have point of sale material that they
```

J. Jankoski                                                     141

1

2      can hang materials from product to alert consumers

3      of that.

4            We have postcards that they can send old

5      consumers that they had that they would like to

6      update people to say, you know, what you might

7      want to come in and look at some child-safe

8      products.  These are for existing customers.

9            We had big banners.  We also had

10     materials to alert consumers.  And we did this in

11     a case where there it was a election thing, so we

12     made it look like a ballot, but, again, bringing

13     attention to the products that have no cords so

14     that they can make informed decisions.

15           This was just a very -- you know, an

16     early kit.  The kits today have to go out in a UPS

17     box because they have much more material than this

18     does.

19           By the way, every single October we

20     sponsor a thing for our retail community called

21     Window Covering Safety Month, and it's an attempt

22     to bring super focus to this issue.

23           Currently, the one that we're running

24     right now, Hunter Douglas has waived the surcharge

25     for any kind of likewise product, we subsidize it

J. Jankoski                                        142

1

2      totally to get more people aware to buy it, more

3      sellers to sell it.

4              And that has been a very successful

5      venture for us because we see -- although we don't

6      recognize one month as being safety month, we do

7      change dealer behavior during a month.

8              When they get used to doing something a

9      certain way, we see that carrying over after the

10     promotion is over, and they continue to sell the

11     products that we like them to sell in the area of

12     safety.  So, again, a multiple initiatives going

13     on every single month.

14         Q.   I take it that Hunter Douglas dedicates

15     a certain amount of money to spend on doing

16     education outreach efforts to the public to advise

17     the public about the dangers of window safety?

18         A.   Yes, sir.

19         Q.   Do you know how much Hunter Douglas

20     would have set aside for outreach efforts to

21     educate the public about the dangers of window

22     blind cords?

23             MR. WILLIAMS:  During what period?

24             MR. JAUREGUI:  2008.

25         A.   I'd have to really look at that to split

```
1                           J. Jankoski                    143

2        it out because we don't necessarily look at it

3        that way.

4               There's two ways to achieve that goal.

5        One is through advertising.  We subsidize

6        retailers.  Every one of our retailers gets a

7        co-op program so when they spent a dollar, we give

8        them a dollar, it works together.  We give them

9        materials to use.

10              And now because it's 2008, we no longer

11       give them pieces of paper.  There's a whole

12       advertising agency online that we run for them

13       that they could actually download all sorts of

14       materials, customize it with their name on it,

15       download their picture.

16              If they don't likely their logo, we even

17       change the logo.  They can create their own

18       materials locally.

19              We also run national advertising that

20       addresses safety.  But the second wing of that, if

21       you will, is our PR effort, which is very

22       important because it's not an advertisement.  It's

23       a story that we place in newspapers, in magazines.

24              We referenced the Lou Hammond

25       organization earlier.  They're the company here in
```

J. Jankoski                    144

1

2     New York that specializes in that area for us.

3             And I can tell you that in the area of

4     window blind safety and child safety, we're

5     probably averaging about 30 million reaches to

6     consumers on an annual basis with stories that

7     we've placed in newspapers written by someone

8     else.  We write the stories.  They take the credit

9     for it.

10            We've been on radio.  We have television

11    spots that we run as public service

12    advertisements.  I've personally been on a few of

13    the radio spots.  I'm the child expert, and we

14    talk about -- I'm interviewed with someone, and

15    this goes to hundreds of syndicated radio programs

16    around the country.

17            So between the paid advertising and the

18    seated PR, we have quite an extensive reach per

19    year.

20       Q.   So do you know in terms of paid

21    advertising how much money Hunter Douglas spends

22    on any given year, like, for example, 2009?

23       A.   It's a number we really don't want to

24    publish, but it's -- you know, it's a proprietary

25    number.

```
1                        J. Jankoski                    145

2              Our retailer co-op alone, just leave it

3         at that, you know, the money that we work in

4         conjunction with a retailer is in excess of

5         $9 million, which means for every dollar we spend,

6         they're spending a dollar, so there's -- you know,

7         there's $18 million worth of localized advertising

8         alone.  That's not with any kind of umbrella

9         support that we provide on TV and magazines.

10            Q.   Do you have a way to determine what

11        regions of the country the specific amounts of

12        money go to, certain regions; for example, the

13        Midwest?  The Chicago area?

14            A.   On certain programs, yes; on certain

15        initiatives, no.  When we match a dealer's money,

16        yes.  I know exactly where that dealer's located,

17        and I could actually pin it to a map.

18              When we're putting an ad in -- you know,

19        if we run an ad on television that hits the Today

20        Show, you know, it appears in all major metro

21        areas.  But, you know, unless I can get their

22        ratings from way back when and ascertain how much

23        coverage we might have had in 2008 -- but I don't

24        have it off the top of my head.

25            Q.   Is there a separate budget that
```

```
 1                        J. Jankoski                    146

 2        Hunter Douglas uses to advertise or to reach the

 3        Spanish-speaking public in the U.S.?

 4            A.   No.  It's built into our overall

 5        marketing program.

 6            Q.   The materials that you showed me

 7        today -- and we can identify them; at some point

 8        they'll get Bates stamped -- again, do you have

 9        any information one way or the other as to whether

10        or not these materials would have been distributed

11        in the Chicago area?

12            A.   There's a good chance that if we have

13        done some translations, which in this case there's

14        one of our ads.  This brochure itself has been

15        totally translated to Spanish.

16               What we do is we will make it available

17        to our dealers and say, we have a Spanish ad, we

18        have a Spanish brochure, who wants it?  And those

19        people who are doing business in those markets

20        always raise their hand and ask for it.

21               So we typically get a lot of coverage in

22        the larger markets -- New York, Chicago, Los

23        Angelos, San Antonio -- a lot of those places

24        where there's a very heavy Spanish market.  Again,

25        we push it through the dealer so it appears on a
```

```
1                           J. Jankoski              147

2        local level.

3             Q.   Mr. Jankoski, I've asked you this

4        earlier, and I don't know if I got an answer to

5        this question.  I'll ask it again because this may

6        become relevant at some point when and if this

7        case goes to trial.

8                  For the year 2000, what was the amount

9        of revenue that was generated by

10       Hunter Douglas from sales of blinds in the

11       United States?

12            A.   In the year 2000?

13            Q.   2009.  I'm sorry.

14            A.   2009?

15            Q.   Yes.

16                 MR. WILLIAMS:  Is that proprietary

17            information?

18                 You know, my objections to the

19            discoverability of financial information, you

20            know, having been made for the record,

21            without waiving that objection, we can

22            provide that information to you under the

23            appropriate confidentiality stipulation and

24            not make it part of this transcript, which I

25            think will be easier.
```

1                        J. Jankoski                    148

2              MR. JAUREGUI:  That's fine.  That's

3         acceptable to me.  I need to know as part of

4         this litigation -- I don't need to publish it

5         to the whole world, but I think it's a

6         relevant issue for this litigation, and

7         especially for the years 2008-2009.

8              MR. WILLIAMS:  So I'm going to finish

9         discussing that.  I'll tell you, we didn't

10        cover this off the record during any of our

11        breaks.  I'll finish discussing it, and if we

12        agree that it's acceptable to provide it that

13        way, we will.

14             MR. JAUREGUI:  All right.

15        Q.   Does Hunter Douglas have any way of

16   tracking down its consumers?

17        A.   Only if they opt into our world.  We

18   have a promotion that we run.  We give them an

19   opportunity to get rebates.  So if they buy

20   Product A, we say we will give you $50 back.  If

21   you send in a rebate form, we get it.  We know who

22   you are.  We write you a check.  We send it to

23   you.  We know who you are.

24             The other way to do that would be to

25   have someone who has filled out a warranty card

J. Jankoski                                149

1
2       and wants to document the fact that they purchased

3       the product, and they go into our database as

4       having a warranty card.

5              The third way in which we can pick those

6       people up would be if they call us up to ask for

7       help directly, and we will walk them through a

8       solution and potentially send them free of charge

9       some parts or some information that they're

10      requesting.

11         Q.   So if someone buys a Hunter Douglas

12      product from one of your retailers, any retailer,

13      you know, Target, Home Depot, any of these places

14      that sell your products, does Hunter Douglas have

15      any information from the consumer like an address,

16      a telephone number, any data relating to the

17      consumer?

18         A.   Again, where they actually opt into

19      something we have put out there and volunteer that

20      information, yes.  We don't do business with

21      Target.

22             We don't have Hunter Douglas in the

23      stores at Home Depot or Lowe's -- are these

24      largest boxes that would have databases that we

25      could possibly get access to.

```
 1                           J. Jankoski                    150

 2              Our primary method of distribution is

 3      through a very small mom and pop retailer or a

 4      decorator who doesn't have database data that can

 5      be transferred around.  They just don't have that.

 6         Q.   That's fine, but my question is any

 7      retailer, a consumer purchases a Hunter Douglas

 8      product, does Hunter Douglas know who that

 9      consumer is?

10              If Ms. Davis here purchased the window

11      blind from "X" retailer, does Hunter Douglas get

12      any information about the name of the purchaser,

13      the telephone number, the address, any sort of

14      that information?

15         A.   On occasion, yes.  It's not every

16      consumer.  And, again, they have to fill out the

17      warranty card.

18              If they just purchase the product, go

19      home, and they're happy, and we never hear from

20      them again, I mean, we don't know who they are.

21              But if they purchase because it's a

22      promotion, and there's a rebate attached to it, or

23      they fill out a warrant card, or if something

24      breaks, they call us up, send me a piece, we keep

25      that on record, but it only is -- pretty much the
```

```
 1                           J. Jankoski                    151

 2        data that we have on consumers is probably three

 3        years old at best.  That's probably the most

 4        accurate stuff.

 5                  We used to do it the old fashioned way

 6        with paper, and it was not a way which could be

 7        sustained so we switched to computerization about

 8        three or four years ago.

 9           Q.   So if there is a danger that has been

10        identified or a defect -- and I know you don't

11        like that word -- with one of Hunter Douglas's

12        products, that Hunter Douglas becomes aware of it

13        and wants to take corrective action, how does

14        Hunter Douglas notify the consumer if

15        Hunter Douglas doesn't have any information from

16        the purchaser?

17                  MR. WILLIAMS:  I'm objecting to the use

18             of the term "defect" or "danger" as being

19             vague.  Go ahead.

20           A.   We don't have a way to do that.

21           Q.   Okay.

22                  Sir, I want you to take a look at

23        document 841.  It looks like this somewhere there

24        in the end.  If you look at it, it should be

25        towards the end of the package.  This is M-841.
```

J. Jankoski                                    152

1

2       All right.  We're all there?

3            A.   Yes, sir.

4            Q.   Mr. Jankoski, this is a document that I

5       believe was produced to us by the U.S. Consumer

6       Product Safety Commission in response to a Freedom

7       of Information request, and it's relating to a

8       fatality involving -- no, let me rephrase that.

9                 It relates to an incident involving a

10      Hunter Douglas product.  If you want to take a

11      minute to go through it, please do that, because I

12      do have some questions about it.

13           A.   Okay.

14                (Document review.)

15           Q.   In the interest of time, if you allow me

16      to get you to the particular page so that we can

17      move long here, on page number 4 it has product

18      identification.

19           A.   Yes, sir.

20           Q.   All right.  According to the description

21      of the product, it says that the brand is

22      Hunter Douglas.  As per the complainant, the model

23      names are Vertical, Silhouette, Duet, and Tahoe.

24      The manufacturer is Hunter Douglas, One Duet Way,

25      Broomfield, Colorado, 820, 9805.  The blinds were

```
                              J. Jankoski                    153
1

2      manufactured for Hunter Douglas by Bytheway's,

3      2750 Redding Avenue, Sacramento, California.

4              Was Bytheway's one of the entities that

5      was producing window blinds at some point for

6      Hunter Douglas?

7          A.   Yes, sir.  They were one of the

8      independent fabricators that eventually we

9      purchased, and I don't recall what the date of

10     that purchase was.

11         Q.   I want you to take a look in the same

12     document.  Go to Bates stamp M-860.  M-00860.

13         A.   Okay.

14         Q.   All right.  Do you know what that

15     document is?

16         A.   A document that describes our limited

17     lifetime warranty.

18         Q.   And if you can read the first paragraph,

19     what does that warrant entail and what are the

20     requirements for the warranty to remain in effect?

21         A.   "Hunter Douglas, Inc., warrants that its

22     Hunter Douglas brand window fashion products will

23     be free from defects in material and workmanship

24     for as long as the original retail purchaser owns

25     the product or as otherwise set forth below,
```

1                          J. Jankoski                    154

2       provided that such products were properly

3       installed in residential dwellings, and such

4       products were made or assembled exclusively from

5       Hunter Douglas materials and components."

6            Q.   Is the position of Hunter Douglas that

7       the window blind at issue was free from defects at

8       the time when it left its hands and control?

9                 MR. WILLIAMS:   In materials and

10           workmanship?

11                MR. JAUREGUI:   Yes, and components.

12                MR. WILLIAMS:   I object.  Lack of

13           foundation.

14           A.   For this specific product?

15           Q.   No.  I'm talking about the window blind

16      at issue here, the one involving Max Padilla.

17           A.   Oh, I'm sorry.

18                MR. JAUREGUI:   Let me withdraw that.

19           I'm trying to jump ahead here because the

20           hour is very late, but let me do this.

21           Q.   Is this the type of warranty that

22      Hunter Douglas normally uses with its products?

23           A.   Something very similar.  This is an

24      updated version, but the free-from-defect

25      positioning that we have has always been part of

J. Jankoski                                    155

1

2      our warranty.

3          Q.   Would that have been part of the

4      warranty back in 1995 when the window blind at

5      issue may have been manufactured?

6          A.   I don't know specifically, but I would

7      assume that -- it's not a good way to do that, but

8      we've always been standing behind our product from

9      defects, yes.

10         Q.   So I take it that if you look at the

11     warranty here, that Hunter Douglas's position is

12     that at the time when the window blind at issue

13     left its control, that it was free from defects,

14     any defect?

15             MR. WILLIAMS:  Yes, that is our

16         position, but you've been referring to a

17         document that talks about defects in

18         materials and workmanship, and its confusing,

19         Arturo.

20             MR. JAUREGUI:  That's fine.

21         Q.   Is it the position of Hunter Douglas

22     that at the time the window blind at issue in this

23     case left its control, that that window blind was

24     free from defects in materials and workmanship?

25         A.   That is our position on every product we

```
1                        J. Jankoski                    156

2       ship.  In most cases, since its custom ordered, we

3       have an inspection that we look at.

4              This is not a production line that has

5       hundreds of things coming off the same.  Every one

6       that we make is unique, and every one that we

7       produce and put in a box is measured and checked

8       for defects prior to it being put in the box, so I

9       would say that that would be a position we do

10      take.

11         Q.   Okay.  Is there a reason why -- before

12      1995 and 1996 when the retrofit action plan went

13      into effect, why Hunter Douglas did not take

14      action before 1995-1996 to address the issue of

15      strangulation by the continuous loop cords?

16              MR. WILLIAMS:  Objection, misstates the

17           evidence, argumentative.  Go ahead, though.

18         A.   Our position has always been we're

19      pursuing the safest products possible.  Our

20      activities really have nothing to do with the CPSC

21      and what they've mandated or what the association

22      has made as a standard.

23              We have been active in this without

24      their help, without their assistance.  That's what

25      put us in the position that we are in.
```

J. Jankoski                                          157

1

2           And these materials that -- you know,

3     the development of these product devices, if you

4     think about them, take a little bit of time to

5     develop and work.

6           And when they showed up on the

7     marketplace in 1995, I can assure you that they've

8     been worked on for quite a few years before that

9     before we can be launched.

10          So we've always had a very aggressive

11    R&D effort to make sure our product safer.  It's

12    always been that way.

13       Q.   Are there any documents that would

14    reflect on Hunter Douglas's activities in relation

15    to making window blinds safer, including the

16    vertical blinds such as the one at issue in this

17    case prior to 1995?

18       A.   There might be, but I don't know.  I

19    wouldn't know.

20       Q.   If those documents exist who would have

21    knowledge of those documents?

22       A.   So I'm clear, is this documents like

23    marketing materials or is this internal?

24       Q.   Any type of documents that would reflect

25    on Hunter Douglas's activities to address the

J. Jankoski                                      158

1

2    danger posed -- the danger of strangulation posed

3    to young children by window blind looped cords.

4        A.    That might be a better question to ask

5    our R&D and engineering staff.  They might have

6    information.

7        Q.    You are not aware of any such

8    information?

9            MR. WILLIAMS:  No, he said documents he

10           wasn't aware of.

11       A.    Yes.  I don't know.  I don't have

12   knowledge of that.

13       Q.    Take a look at document 1559.

14           MR. WILLIAMS:  M or HD?

15           MR. JAUREGUI:  HD.

16       Q.    Sir, have you seen this document before?

17       A.    No, sir.

18       Q.    It's a letter from the U.S. Consumer

19   Product Safety Commission addressed to

20   Mr. Hopkins.  Is that correct?

21       A.    Yes, sir.

22       Q.    And that's dated February 1996?

23           MR. WILLIAMS:  February 6, 1996.

24           MR. JAUREGUI:  February 6, 1996.

25       Q.    Do you see that there on top right next

```
1                          J. Jankoski                      159

2        to certified mail?

3             A.   Well, that's a stamp.  I don't see it

4        written in the letter itself, though.

5             Q.   All right.

6                  Are you there at 1559?

7             A.   Yes, sir.

8             Q.   This is regarding a product manufactured

9        by Hunter Douglas, and the specific concern that

10       was being raised is a continuous loop pleated and

11       cellular window coverings.  Do you see that there?

12            A.   Yes, sir.

13            Q.   All right.  And it is bringing up an

14       incident regarding a second child strangulation

15       death associated with a Duet model.  Do you see

16       that there?

17                 MR. WILLIAMS:  Counsel, I think you need

18            to have my stipulation to have a running

19            objection.  The document speaks for itself,

20            and this witness has no personal knowledge.

21                 So assuming you accept that, I have that

22            objection to these questions.

23                 MR. JAUREGUI:  I accept.  I accept it.

24                 MR. WILLIAMS:  The question is do you

25            see that --
```

J. Jankoski                                    160

1

2          THE WITNESS:  Yes, I do.

3      Q.   Do you know what action, if any,

4   Hunter Douglas took to address the concerns of the

5   U.S. Consumer Product Safety Commission with

6   regards to the issue of continuous loop cords?

7      A.   I have no idea what happened in this

8   particular case.

9      Q.   Are you aware of any action having been

10  taken by Hunter Douglas in response to this letter

11  from the Consumer Product Safety Commission?

12     A.   No, sir.

13     Q.   Take a look at page 1678, and that will

14  probably be HD.  Are you there at 1678,

15  Mr. Jankoski?

16     A.   Yes.

17     Q.   All right.  Have you ever seen this

18  document before?

19     A.   No, sir.

20     Q.   On page 1678, the top paragraph, it

21  states that the Hunter Douglas quality assurance

22  procedures require that 90 percent of tassels

23  break apart at less than or equal to 3 and a half

24  pounds, and 100 percent of tassels break apart at

25  a force of less than or equal to 4 pounds.  Do you

J. Jankoski                    161

1
2     know what that's referring to?

3              MR. WILLIAMS:  First of all, does that

4          refer to pounds per foot as you read it?

5          LBF?

6              THE WITNESS:  I'm not familiar with what

7          "LBF" stands for.

8              MR. WILLIAMS:  Okay.  I'm sorry.  Back

9          to his question.

10         Q.   The question, does that --

11         A.   The way I read that --

12             MR. WILLIAMS:  Let him ask you a

13         question.

14         Q.   Does that information mean anything to

15     you?  Earlier, you and I were talking about the

16     strength of the cords, and that seems to be

17     addressing that issue.  So the question is, does

18     this information mean anything to you?

19         A.   Well, it's not the cord.  It's the

20     breakaway piece.  It's where the two tassels come

21     together and break away.  It's not the cord, but

22     it's the strength of the two plastic pieces that

23     come together.

24         Q.   All right.

25         A.   That's what this is referring to.

1                          J. Jankoski                    162

2          Q.   Okay.  And do you know when that

3     technology -- this is dated March 25, 1994.  Do

4     you know when Hunter Douglas was using that

5     technology?

6          A.   I don't recall.  We talked about it

7     earlier.  There was a date, you know, mid '90s.

8          Q.   Is this something that engineers in

9     Hunter Douglas might be in a better position to

10    address?

11         A.   Yes.

12         Q.   Take a look at document HD1680.  Have

13    you ever seen this document before?

14         A.   No, sir.

15         Q.   Let me just ask you two quick questions

16    on that.  It appears to be an agreement between

17    Hunter Douglas and the sellers of a patent to

18    purchase the safety tassel patent.  Okay?

19         A.   Yes.

20         Q.   All right.  Do you know whether at any

21    time Hunter Douglas considered using the safety

22    tassel device for the cords of vertical blinds.

23         A.   Probably not because, again, the

24    construction of that product doesn't support a

25    breakaway system.  The cords are rotated, not

```
1                         J. Jankoski                    163

2       pulled.

3            Q.   So it would not have worked in the

4       vertical blind mechanism?

5            A.   I don't see how it could.

6            Q.   We're moving quite along.  That's fine.

7       Thank you.

8                 This is an internal document from

9       Hunter Douglas from a sales and marketing

10      bulletin.

11           A.   What page are you on, sir?

12           Q.   I'm sorry.  That's 1327, HD1327.  Have

13      you seen this document before?

14           A.   I don't recall.

15           Q.   You know what?  Then we'll skip it.

16                Sir, I want you to go to document

17      HD1651, please.  My question to you is, have you

18      seen this document before?

19           A.   No, sir.

20           Q.   Do you need a minute to review it?

21           A.   Yes.

22                (Document review.)

23           Q.   If I can ask you a question at this

24      point?

25           A.   Yes, sir.
```

```
1                    J. Jankoski                    164
2        Q.   This document appears to be an agreement
3    regarding window covering cord safety, and someone
4    drafted this contract to be signed by the U.S.
5    Consumer Product Safety Commission and the Window
6    Covering Safety Council.
7             To your knowledge, do you know whether
8    any such agreement was entered into between the
9    U.S. Consumer Product Safety Commission and the
10   Window Covering Safety Council?
11       A.   I was not aware of any formal agreement.
12       Q.   Take a look at page 1650.  It's the
13   document before that.  Have you seen this document
14   before?
15       A.   No, sir.
16       Q.   This document is a letter from
17   Ira DeMarcus, and it's addressed to someone at
18   Sidley Austin and also Chris Outlaw.  Does Chris
19   still work at Hunter Douglas?
20       A.   Yes, sir.
21       Q.   It is discussing a deal that should be
22   made between the Window Covering Safety Council
23   and U.S. Consumer Product Safety Commission.
24             As someone that has been involved in the
25   window covering industry for the years that you
```

164

J. Jankoski                165

1

2    have, did you ever hear any discussions of the

3    Window Covering Safety Council entering into some

4    kind of deal with the U.S. Consumer Product Safety

5    Commission?

6         A.   No, sir, I have not.

7         Q.   Now, there are many records there that

8    indicate a frustration on the part of the Consumer

9    Products Safety Commission in the ability of the

10   window covering industry to respond to the

11   mounting deaths of young children from window

12   blind cords.

13        Do you know whether the Window Covering

14   Safety Council was created in an effort to try to

15   dissuade the Consumer Product Safety Commission

16   from taking mandatory action against the window

17   covering industry?

18        MR. WILLIAMS:  Let me object to the

19        preamble to that and your characterization of

20        the frustration of the Consumer Product

21        Safety Commission.  I think the question is

22        argumentative.  Go ahead, if you understand

23        it.

24        A.   I was not aware of that, no.

25        Q.   Do you know if anyone at Hunter Douglas

165

1                          J. Jankoski                    166

2       would have been aware other than Mr. Outlaw?

3            A.    I wouldn't know.

4            Q.    Now, does Hunter Douglas have any

5       employees that lobby on its behalf before

6       legislative bodies, such as Congress, for any

7       state and local governments?

8            A.    Currently?

9            Q.    Yes.

10           A.    We have a group that's talking to the

11      national fenestration board.  That's not the

12      correct title.  It's the fenestration group

13      that -- we are trying to pursue Energy Star

14      ratings, energy recognitions to associate with our

15      product to make it part of the -- you know, the

16      Energy Star initiative, if you will, and it has to

17      start with this fenestration board.

18                 Again, I don't have the exact title of

19      that organization, but we have someone involved in

20      that to try to pursue that.

21           Q.    But do you know in 1995 and 1994 whether

22      Hunter Douglas had any members of its staff or

23      someone hired on its behalf to try to lobby

24      Congress to dissuade the commission, the U.S.

25      Product Safety Commission, from moving forward

J. Jankoski                    167

1

2      with the safety standards that they were trying to

3      push in 1995 and 1994?

4           A.   I'm not aware of any.

5           Q.   Do you know the person within

6      Hunter Douglas that is most knowledgeable about

7      the issue of warnings and placement of labels on

8      Hunter Douglas products?

9           A.   I don't believe there is one person.

10          Q.   Is there a division?

11          A.   We're organized in a very decentralized

12     fashion.  Every product has its own management

13     group, product group, and they send their product

14     downstream to a bunch of different fabricators, so

15     it's very decentralized.

16          Q.   All right.

17               Mr. Jankoski, can you take a look at HD

18     1491?  Have you seen this document before,

19     Mr. Jankoski?

20          A.   No, sir.

21          Q.   Have you ever heard of the seminal study

22     conducted by the Journal of American Medical

23     Association in 1997?

24          A.   Not particularly, no.

25          Q.   You never heard about this study?

J. Jankoski                                    168

1

2      A.   I have never seen this document, and I

3   barely -- I don't have any good recollection of

4   the study, no.

5      Q.   You don't recall this document, the

6   study from JAMA, the Journal of America Medical

7   Association, having been discussed at any point in

8   any of the meetings that you attended with the

9   Window Covering Safety Council or the Window

10  Covering Manufacturers Association?

11     A.   Not that I recall.

12     Q.   All right.  Do you know whether or not

13  the JAMA study of 1997 would have been discussed

14  within Hunter Douglas?

15     A.   I don't recall it being discussed.

16     Q.   I'll just tell you here -- I'll just

17  read you one sentence here, the conclusions.  If

18  you're with me, you can read along.

19          "The window covering cords represent a

20  substantial strangulation hazard compared with

21  other potentially harmful household products that

22  were modified based on voluntarily standards to

23  mitigate the risk to injury."

24          This is in 1997, and the premise of the

25  study was that window cords represented a serious

```
1                          J. Jankoski                      169

2         hazard to young child, and also they believed that

3         the number of deaths between 1981 to 1995 were

4         underrepresented by some 49 percent.

5                   Again, you've ever seen this study?

6         You've never seen these statistics?

7              A.   No.

8                   MR. WILLIAMS:  Asked and answered.

9              Q.   Take a look at HD1511, please.  Do you

10        see the diagram there?

11             A.   Yes, sir.

12             Q.   Was this part of the retrofit campaign

13        still or was this some separate activity all

14        together?

15             A.   It looks very similar to what would be

16        in the retrofit kit.  Those diagrams look very

17        similar to what might be in the kit to describe

18        what to do with these tassels once you get them.

19             Q.   And one of the recommendations was to

20        cut off the single tassel there and split it into

21        two.  Is that correct?  That's what the diagram

22        says?

23             A.   Yes.

24             Q.   Sir, take a look at HD1515.  Now,

25        there's a Design D that's shown on that page,
```

J. Jankoski                                          170

1

2    HD1515.  Is that what you were trying to describe

3    for us before when we were talking about the

4    breakthrough safety tassels?

5         A.   Yes, sir.  These are the two pieces that

6    fit together.

7         Q.   And that would have replaced -- that was

8    intended to replace what?

9         A.   A single tassels with the cord tied

10   together.

11        Q.   Can you take a look at HD1544, please.

12   Just let me ask you, have you ever seen this

13   document before?

14        A.   I can't recall.

15        Q.   And who is O.B. Kelly?

16        A.   He was the gentleman at Hunter Douglas

17   who was heading up the safety initiative.

18        Q.   If I ask you questions, I think they'll

19   get through with this document quicker.  It's

20   dated October 15, 1996.  Is that correct?

21             MR. WILLIAMS:  Same objection as before.

22        A.   That's what the document shows.

23        Q.   And if you look at the paragraph in the

24   middle, the third sentence or so that starts

25   "CPSC's," do you see that there?

```
 1                            J. Jankoski                       171

 2              A.    Yes.

 3              Q.    The Consumer Product Safety Commission's

 4        complaint is that the window covering safety

 5        information program has not generated enough

 6        coverage for the tie-down devices for the last

 7        four months?

 8                    Now, are these --

 9                    MR. WILLIAMS:  No, that was the

10              beginning of another sentence.

11                    MR. JAUREGUI:  Yes.

12              Q.    Let me just ask you a question here and

13        pause here for a minute.  Are these the tie-down

14        devices that would have been used on the vertical

15        blinds such as the one here at issue?

16                    MR. WILLIAMS:  Again, Counsel, he didn't

17              write this letter, and he hasn't seen it.  I

18              really think it's unfair to ask him to

19              speculate as to what somebody meant in a

20              letter he has never seen before.

21                    So you may have some sense of the

22              context, but if you don't know what's meant

23              by the author, you don't know.

24              Q.    Do you know what were the tie-down

25        devices that are referred to in that document?
```

```
1                          J. Jankoski                    172

2          A.    No.

3          Q.    Take a look at document HD1548.  In the

4     interest of time, again, that is a document from

5     the Window Covering Safety Education and

6     Information Program dated October 15, 1995, to

7     June 15, 1996.

8               MR. WILLIAMS:  I don't know that it's

9          dated that.  It refers to that, apparently.

10              MR. JAUREGUI:  It refers to those dates.

11         I stand corrected.  Up on the upper left

12         corner, it has the date of October 21, 1996.

13         Q.    My question to you, sir.  I asked you if

14    you had any information to rely upon for your

15    belief that the Window Covering Safety Council had

16    done a good job in implementing the retrofit

17    campaign of 1995-1996.

18              In the second paragraph here, the second

19    sentence, it states, "From October 15, 1995,

20    through June 15, 1996, approximately 5,000

21    consumer calls were logged on the toll-free number

22    leading to the distribution of 45,000 safety

23    tassels, brochures and posters."

24              My question to you is, given those

25    numbers and given the number of older window
```

1                    J. Jankoski                    173

2      blinds in consumer homes, do we have a match here?

3      Is there a match with the number of units, order

4      units needing repairs, and the number of calls

5      that were being received by the Window Covering

6      Safety Council?

7              MR. WILLIAMS:  Okay, I've only got about

8          five objections to that question, so hold on

9          for a second.

10             It lacks foundation.  He's testified he

11         doesn't recall seeing this before.

12             You prefaced a question with a reading

13         of this statistic, and you're asking him to

14         assume without any knowledge of whether he

15         had a basis for doing so or not that these

16         figures are accurate.

17             And, finally, I don't know what you

18         mean, so I guess the objection is vague and

19         ambiguous when you say "is that a match."

20         Q.   Did you understand the question or not

21     subject to all of those objections?

22         A.   Well, you're inquiring about the

23     effectiveness of this campaign.

24         Q.   Okay.

25             MR. WILLIAMS:  Do you understand his

J. Jankoski                                        174

1

2        question?  I don't want you to give a speech.

3        I want you to understand his question.

4              THE WITNESS:  I understand, and I will.

5        A.   Since the beginning of it also states

6    that the effort did generate 9.7 million parts of

7    circulation with 36 million impressions, I guess

8    the question is if you lead the horse to water,

9    does he drink?

10             There's no guarantees we can provide

11   consumer behavior.  Clearly, you know, could the

12   number be bigger?  Of course, and it should be

13   bigger.  However, this was the first, I think,

14   attempt at even bringing this up at a consumer

15   level.

16             The numbers that we have today are far

17   better than this only because we have been working

18   at it for longer and probably have more efficient

19   ways to get the message out.

20             But I can't find myself going back to

21   1995 and saying this was a failure, this was short

22   of expectations because this is the first time we

23   ever did it.

24        Q.   All right.  Fair enough.  I just wanted

25   to bring that information to your attention so

```
1                         J. Jankoski              175

2      that we can put it into context in light of the

3      questions that you and I were talking about

4      earlier before.

5              Take a look at HD 1575, please.  I only

6      have one question for you, and that's on the first

7      page.  So if I could just ask you that, unless you

8      want more time to review the document.

9              MR. WILLIAMS:  Well, do you know whether

10         he has seen it before, or not?

11             MR. JAUREGUI:  Well, I'm going there.

12         That's part of the questions.

13             MR. WILLIAMS:  Well, then you've got two

14         questions.

15             MR. JAUREGUI:  Well, that's the first

16         one.

17             MR. WILLIAMS:  That's what I mean.

18             MR. JAUREGUI:  All right.

19             MR. WILLIAMS:  Let him ask you the first

20         question.

21             THE WITNESS:  Okay.

22      Q.   Have you ever seen this document before?

23      A.   No, sir.

24      Q.   All right.  Do you know who

25   Margaret Feinstein is?
```

```
 1                            J. Jankoski                    176

 2          A.    Yes.

 3          Q.    Who is she?

 4          A.    She used to be in the Hunter Douglas

 5     marketing department.

 6          Q.    Now, this letter was written according

 7     to the information on September 5, 1996, from the

 8     letter, right?  We can agree to that?

 9               MR. WILLIAMS:  Same objection, running

10               objection as to the document speaks for

11               itself.

12          A.    Yes.

13          Q.    The second paragraph of that letter, can

14     you please read that?  You are a better reader

15     than I am.

16          A.    "At the outset, Hunter Douglas must

17     strongly reiterate that continuous looped cord

18     products as Hunter Douglas markets them do not

19     pose a substantial product hazard.

20               "In addition to eliminating potential

21     harm to younger children from those cords,

22     Hunter Douglas provides a warning card with each

23     product that states the following."

24          Q.    All right.  Now, this is in 1996, and I

25     take it that in 1996 that's the position of
```

```
1                         J. Jankoski                177

2       Hunter Douglas, that its products with continuous

3       loop cords as Hunter Douglas markets them did not

4       pose a substantial product hazard, correct?

5            A.   May I double back?

6            Q.   Sure.  Yes.

7            A.   My apologies.  When I looked at the name

8       Margaret Feinstein, I really believed I was

9       reading Miriam Feinseth --

10              MR. WILLIAMS:  I was going to say --

11           A.   -- who was the person I thought was

12      writing this.  I don't know who this person is.

13              And we had a person, Miriam Feinseth,

14      who was our marketing person who has since passed

15      away, but I don't know who this person is.  I have

16      never heard of her.  I'm sorry about that.

17           Q.   And so a quick question -- that's fine.

18      The record will stand corrected.

19           A.   Okay.  My apologies.

20           Q.   That's fine.  And my question for you,

21      this is a position that was being taken by

22      Margaret Feinstein, who apparently was an attorney

23      for the Dickstein Shapiro Morin & Oshinsky law

24      firm in Washington.  Is that correct?

25           A.   That's what it appears to be.
```

```
1                          J. Jankoski                    178
2          Q.   You've dealt with attorneys before,
3     right?
4          A.   Sparingly.
5          Q.   That's a bad question.
6               MR. WILLIAMS:  Always with a smile on
7          his face.
8          Q.   This position or the proposition that in
9     1996 Hunter Douglas was taking was that its
10    continuous looped products did not pose a
11    substantial product hazard.
12              That's a position or a statement that
13    would have not been made by Margaret Feinstein
14    without authorization from Hunter Douglas.  Is
15    that a fair statement?
16              MR. WILLIAMS:  Objection.  That goes
17         well beyond my running objection.  That calls
18         for speculation.  He has no basis for knowing
19         that unless he has got knowledge of that, and
20         he said he doesn't know anything about the
21         letter.
22         A.   I really don't know who she is and who
23    authorized her to write this.  I have idea.
24         Q.   At the time when Ms. Feinstein wrote
25    this letter, was she acting on behalf of
```

```
1                            J. Jankoski                    179

2          Hunter Douglas or not?

3                    MR. WILLIAMS:  Same objection.

4               A.   I don't know who she is, and I've never

5          heard of the firm she works for.

6               Q.   Take a look at HD1741, Mr. Jankoski.

7          Have you seen this document before?

8               A.   I can't recall.

9               Q.   It's a document that was produced to us

10         by the Consumer Product Safety Commission.

11                   Again, is there someone here in

12         Hunter Douglas that handles information such as

13         the one contained in this document when a fatality

14         occurs involving a Hunter Douglas product?

15              A.   It would be Chris Outlaw.

16              Q.   Can you spell the last name?

17              A.   O-u-t-l-a-w.

18              Q.   What's Chris's title?

19              A.   He is one of our in-house attorneys.

20              Q.   So in your capacity as the

21         vice-president, is it, of marketing --

22              A.   Yes, sir, merchandising.

23              Q.   -- merchandising, you do not get to see

24         this information?

25              A.   No.
```

J. Jankoski                                    180

1
2       Q.   Are you made aware of it at some point
3  by other people within Hunter Douglas?
4       A.   The only time I would see something like
5  this would be in conjunction with a Window
6  Covering Manufacturing Association analysis of
7  trends, but that would be the only time.
8       Q.   Take a look at document HD1760.
9       A.   I'm sorry, 1760?
10      Q.   Yes.  Again, just so that we move along
11  here, the hour is very late, this appears to be --
12  this is a fax cover sheet from Renee at the U.S.
13  Consumer Product Safety Commission, correct?
14      A.   Yes.
15      Q.   And that is addressed to Hunter Douglas?
16      A.   Yes.
17      Q.   Jason Throne, T-h-r-o-n-e.  Does
18  Mr. Throne still work at Hunter Douglas?
19      A.   Yes, he does.
20      Q.   All right.  There is a remark that is
21  made there, and it reads, "Ready to begin your
22  retrofit program.  Call me."  Attached to that
23  memorandum is another fatality involving a
24  Hunter Douglas product.  Have you ever seen this
25  document?

```
1                          J. Jankoski                    181

2          A.    No, sir.

3               MR. WILLIAMS:  Just for the record,

4          Counsel, a fatality is not attached.  A

5          document of two pages and some photographs

6          that's a summary of an incident from its

7          context, at least, identified as a

8          Hunter Douglas product is attached with no

9          more verifying information.

10              MR. JAUREGUI:  All right.  Well, up on

11         top, it just said the cause of death was

12         listed as affixation, so that's why I used

13         the word "fatality," that the child died.

14              All right, give me just one minute and I

15         should wrap it up in five minutes.

16         Q.    Sir, if you can please take a look at

17    document M-800.  It should be in the first stack

18    of documents.  It's a document about 30 pages

19    long.  It looks like this.

20         A.    I've got it.

21         Q.    Again, to assist in the process here,

22    this document was produced to us by the window

23    covering -- by the consumer protection commission,

24    and it relates to an incident that occurred in

25    Northbrook, Illinois, on March 2, 2001.  My
```

J. Jankoski                                    182

1

2    question to you is, have you ever seen this

3    document before?

4         A.   No, sir, not that I'm aware of.

5         Q.   I'm going to ask you a couple of

6    questions there.  Can you look at M-803?

7         A.   Yes.

8         Q.   These were vertical blinds that,

9    according to the report that you have in front of

10   you, were purchased on November 11, 1996, at

11   Glenview Paint & Glass in Glenview, Illinois.  Do

12   you see that there, 803?

13        A.   Yes, sir.

14        Q.   All right.  Now, Glenview Paint & Glass,

15   was this one of the independent retailers that

16   sold Hunter Douglas blinds?

17        A.   Although I'm not familiar with

18   Glenview Paint & Glass personally, we currently

19   sell to, I'll estimate, 25,000 to 30,000

20   individual retailers like them.  So that's a good

21   possibility, but, then again, there's too many of

22   them for me to recall his particular status.

23        Q.   Given that this blind was distributed in

24   Northbrook, Illinois, do you know where this

25   product would have been manufactured?

```
 1                          J. Jankoski                    183

 2               MR. WILLIAMS:  Are you asking him to

 3          assume it was sold by this place in

 4          Northbrook, Illinois?

 5               MR. JAUREGUI:  That's what the report

 6          says.  I'm going by the report.

 7               MR. WILLIAMS:  He didn't write the

 8          report.

 9               MR. JAUREGUI:  I understand that.  I'm

10          asking him to assume that.

11               MR. WILLIAMS:  Okay.  So if it were sold

12          from that place, where would it be

13          manufactured?

14               MR. JAUREGUI:  Yes.

15          A.   I couldn't guess.

16          Q.   Take a look at 834 which is also

17     attached to the document, M-834.  Have you ever

18     seen this document before?

19          A.   No, sir.

20          Q.   It's a letter from Mr. Ronald Rubinoff.

21     Do you see that there?

22          A.   Yes.

23          Q.   Does he still work for Hunter Douglas?

24          A.   Yes.

25          Q.   What is his current position?
```

```
1                          J. Jankoski                184

2          A.    Vice-president and general manager of

3     the window decor division, I think it is now.

4          Q.    I think if you look at the first

5     paragraph, it says that "I am the general manager

6     of the Hunter Douglas Window Decor Division which

7     produces the materials and components from which

8     Hunter Douglas vertical blinds are made."

9                So is the Hunter Douglas Window Decor

10    Division the division where all vertical blinds

11    are made?

12                MR. WILLIAMS:   In 2001 or today?

13                MR. JAUREGUI:   In 2001.

14         A.    They're not made there.  They originate

15    there.  He is in charge of the -- in his division,

16    there are a number of products.  Vertical blinds

17    are one of his products.

18                He takes those components and sends them

19    to those fabricators that we had mentioned

20    earlier, and that's how the products become

21    produced out in the field at the fabricator level.

22    He is at a component level sending parts in boxes

23    to fabricators.

24                You take the order.  Now, he's a dealer.

25    He gives you the order.  You make it up based on
```

J. Jankoski                                        185

1

2       what he wants, and I feed you the parts.  It's a

3       two-step distribution system.

4              So Ron is in charge of the vertical

5       blind program that comes to fruition through the

6       selling of component parts to fabricators.

7          Q.   The reason why I'm asking this is

8       because this case is very similar to our case in

9       terms of Hunter Douglas's inability to provide

10      information as to where the window blind was made

11      or who manufactured it.

12              MR. WILLIAMS:  No question.  It's a

13         comment.

14              THE WITNESS:  Okay.

15         Q.   I'm going to ask you two questions about

16      two documents that are here, and that may help us

17      to summarize the rest of the questions and perhaps

18      help us wrap it up.

19              Take a look at M-99 which will be at the

20      beginning of the materials.  All right.

21              If you look at M-99 and M-122,

22      Mr. Jankoski, these appear to be meetings, I take

23      it, sponsored by the U.S. Consumer Product Safety

24      Commission, and the subject is WCMA Technical

25      Meeting and Window Covering Safety, and your name

```
1                          J. Jankoski                    186

2      appears as attending some of these meetings.

3              I take it that if I were to ask you

4      questions about each of the meetings that you were

5      present at, you would have no specific

6      recollection of these meetings, and your attorney

7      will probably tell us that the document speaks for

8      itself?

9              MR. WILLIAMS:  No, don't assume that.

10          You've asked him a lot of questions about

11          documents that aren't meeting minutes where

12          there wasn't a meeting that he attended to

13          which I objected.

14              Even though he didn't author this, you

15          can show him minutes of a meetings and for

16          starters ask if he has seen these before.  It

17          may refresh his recollection.

18              MR. JAUREGUI:  All right.

19      Q.   M-99, do you have a recollection -- have

20      you ever seen this document before?

21              MR. WILLIAMS:  The minutes.

22      A.   No.  No, sir.

23      Q.   All right.

24              Now, when you attend meetings such as

25      the one at M-99 --
```

```
1                          J. Jankoski                    187

2              MR. JAUREGUI:  Actually, strike that.

3         Q.   This is a conference call.  Someone

4    generated a memorandum from this conference call,

5    correct?

6         A.   It appears that Carolina Paul is the

7    source of this one.

8         Q.   And was there a custom and practice in

9    place back in 2004 and presently today that if

10   there's a conference call such as the one here in

11   this document, that some type of minutes of the

12   conference call or meeting would be generated and

13   sent to the participants?

14              MR. WILLIAMS:  A conference call by the

15         CPSC and industry?  I mean, you just said

16         conference calls.  Within the company?

17              MR. JAUREGUI:  Here, a conference call.

18         Let's just limit that question to the

19         conference call.

20              MR. WILLIAMS:  Is there a custom and

21         practice by whom?

22         Q.   This is a conference call that took

23   place on April 30.

24              MR. JAUREGUI:  I'll withdraw the other

25         question.
```

J. Jankoski                                    188

1

2          Q.   A conference call that took place on

3     April 30, 2004, is that correct?  The document

4     tells us that, correct?

5          A.   Yes.

6               MR. WILLIAMS:  Same as my previous

7          running objections.

8          Q.   All right.  Now, when you participated

9     in conference calls such as this, was it the

10    practice to send minutes or a summary of what was

11    discussed during the conference call to the

12    participants in the conference call?

13         A.   Not necessarily.

14         Q.   All right.  In this instance they did

15    send you a copy of a memo that was generated from

16    this conference call, correct?

17         A.   I don't recall getting this one.

18         Q.   All right.  Your name is listed there,

19    correct?

20         A.   It appears I attended the meeting.

21         Q.   You participated in the conference call,

22    correct?

23         A.   The conference call, yes, sir.

24         Q.   All right.  Who is Joseph Kovak, if I'm

25    pronouncing that right, that's on page 101?

```
 1                        J. Jankoski                   189

 2          A.   Page 101?

 3          Q.   Yes.

 4          A.   Joseph Kovak, he is a Hunter Douglas

 5    employee in the R&D research.

 6          Q.   Research and development?

 7          A.   Yes, sir.

 8          Q.   Is he still employed by Hunter Douglas?

 9          A.   Yes, he is.

10          Q.   What facility does he work out of?

11          A.   Broomfield.

12          Q.   M-132, the April 6, 2005, meeting.

13    Subject, WCMA technical meeting and window

14    covering cords.  Apparently, the meeting --

15               MR. JAUREGUI:  Strike that.

16          Q.   -- the correspondence is on the U.S.

17    Consumer Product Safety Commission's letterhead.

18    Do you recall being present at this meeting?

19          A.   Not specifically.  It was in conjunction

20    with the show.  I was in town so I assume I'm

21    there.

22          Q.   So you have no recollection of being

23    there?

24          A.   On April 6, 2005, on this particular

25    day, in this particular case, not really.
```

1                            J. Jankoski                    190

2          Q.   So if we look at these documents,

3     Mr. Jankoski, such as this documents from minutes

4     of meetings where your name appears on these

5     documents -- I understand that you may have

6     difficulty remembering whether or not you were

7     there, but can we assume that the documents are

8     correct at least in terms of indicating the people

9     that were present at the meeting on that given

10    day?

11              MR. WILLIAMS:   If he didn't author it, I

12         don't know how you can ask that, so I'll

13         simply object to it.   It calls for him to

14         speculate.

15         A.   I would see no reason why it would be

16    incorrect.

17         Q.   All right.   The Consumer Product Safety

18    Commission or whoever is running this meeting on

19    window covering safety, they're not going to put

20    your name in a meeting that you were not present.

21    Is that fair?

22              MR. WILLIAMS:   Same objection.

23         A.   I hope not.

24         Q.   All right.   Mr. Jankoski, some time

25    during the course of this litigation, on behalf of

1                          J. Jankoski                    191

2       Mr. Padilla and Ms. Padilla, we requested or sent

3       out a request under the Freedom of Information Act

4       to the U.S. Consumer Product Safety Commission

5       asking them for any correspondence between

6       Hunter Douglas and the commission.

7               The commission did not provide that

8       information to our office because Hunter Douglas

9       objected to the information being disclosed to

10      plaintiff's counsel.

11              Can you think of any reason why

12      Hunter Douglas would object to the disclosure of

13      communication between Hunter Douglas and the

14      commission to plaintiff's counsel?

15              MR. WILLIAMS:  Number 1, it calls for

16          speculation.  Don't speculate.

17              Number 2, it inaccurately characterizes

18          the partial objections that were sustained.

19          Plenty of documents were produced.  Go ahead.

20          A.   In my position, I wouldn't know why that

21      would be.

22          Q.   Have you ever seen the pictures of the

23      victim in this case Max Padilla?

24          A.   No, sir.

25          Q.   Are you familiar with the trademarks

```
 1                         J. Jankoski                    192

 2        that are left from strangulation by window blind

 3        cords?

 4              A.   The standard ligature marks?

 5              Q.   Yes.

 6              A.   I've seen some of them on the IDI's that

 7        we've reviewed.

 8              Q.   Do you know whether Hunter Douglas has

 9        any evidence or information that would contradict

10        the manner of death of Max Padilla as described by

11        the coroner's report in this case?

12                   MR. WILLIAMS:  I object.  Lack of

13                foundation.  If he's familiar with the

14                coroner's report, then he can tell you.

15              A.   I would not have any knowledge of that.

16                   MR. JAUREGUI:  All right.  I don't have

17                anything else.

18                   MR. CARROLL:  No questions.

19                   MR. WILLIAMS:  Off the record.

20                   MR. JAUREGUI:  I will take a mini and an

21                e-mail transcript.

22                   MR. CARROLL:  The same.  You can give

23                believe a full as well.

24                   MR. WILLIAMS:  I'd like a mini and the

25                full and the e-mail, please.
```

```
1                          J. Jankoski                    193

2              We won't waive signature, so make it

3         available to me, and I'll provide it to the

4         witness, please.

5              And then finally, Arturo, just to button

6         this up, I will have copied, Bates stamped,

7         and sent to you and Jamie as well as -- well,

8         I guess we don't need it for the court

9         reporter.  He didn't mark it as an exhibit,

10        he didn't mark anything, the documents that

11        were produced today.

12             MR. JAUREGUI:  That's fine.

13             (Time noted:  7:07 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          J. Jankoski                      194

2        STATE OF _____)
                                              ) ss:
3        COUNTY OF _____)

4

5

6

7               I, the undersigned, declare under penalty

8        of perjury that I have read the foregoing

9        transcript, and I have made any corrections,

10       additions or deletions that I was desirous of

11       making; that the foregoing is a true and correct

12       transcript of my testimony contained therein.

13              EXECUTED this _____ day of _____,

14       20 _____, at _____, _____.
                        [City]                [State]

15

16

17                   _____
                      JOSEPH F. JANKOSKI
18

19

20       Subscribed and sworn to before me

21       this _____ day of _____, _____.

22

23       Notary Public in and for said

24           County and State

25

```
1                        J. Jankoski                    195

2       WITNESS:  JOSEPH JANKOSKI

3       EXAMINATION                          PAGE

4       By Mr. Jauregui                        5

5

        EXHIBITS (Not Attached)
6
                              PLAINTIFF'S
7       NUMBER                DESCRIPTION        PAGE

8                              (NONE)

9

10                             DEFENDANT'S
        LETTER                DESCRIPTION        PAGE
11
                               (NONE)
12

13

        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
14
                               (NONE)
15

16

17      INFORMATION TO BE SUPPLIED:

18                             (NONE)

19

20

21

22

23

24

25
```

```
1                        J. Jankoski                    196

2

3                        CERTIFICATION

4

5             I, Thomas A. Fernicola, a Notary Public,

6       do hereby certify that the witness(es) whose

7       testimony is hereinbefore set forth was duly sworn

8       by me; and that the within transcript is a true

9       record of the testimony given by said witness(es).

10            I further certify that I am not related to

11      any of the parties to this action by blood or

12      marriage; and that I am in no way interested in the

13      outcome of this matter.

14            IN WITNESS WHEREOF I have hereunto set my

15      hand this 8th of November 2010.

16

17            _____

18            Thomas A. Fernicola, RPR

19

20

21

22

23

24

25
```