STUART M. STATLER

esms99@gmail.com
Harbour Road
http://stuartmstatler.com

494 Bay
Mooresville, NC 28117
704.360-2100 [ph]
704.360.4590 [fax]

## *Padilla v Hunter Douglas Window Coverings, Inc., et al*

### EXPERT REPORT

At Plaintiff counsel's request, I am submitting a revised report in this matter, particularly related to concerns addressed by the Court and in view of the fact that previous-defendants Window Covering Manufacturers' Association and Window Covering Safety Council are no longer parties to this litigation. My revised expert report is based on the materials I reviewed, and the specialized knowledge and experience I have, addressed within, in the areas of consumer product safety generally, manufacturer and seller responsibility, risk factors associated with flawed products, the importance and efficacy of both product warnings and product recalls, and the consideration of dangerous products by the U.S. Consumer Product Safety Commission [CPSC]. I served as CPSC commissioner for seven years, from 1979-86, and at all times since have consulted with respect to all these areas with consumer product manufacturers and retailers and in products litigation. Accordingly, this report is also based on my own direct, past involvement with the serious risks to safety posed by faulty household products, including loop-corded window blinds.

### MATERIALS REVIEWED

I have reviewed the materials which you sent me, along with my own file materials on the subject. These include -

- plaintiff's First Amended Complaint;
- responses by the respective defendants, Hunter Douglas, Window Covering Manufacturers Association [WCMA] and Window Covering Safety Council [WCSC] to plaintiff requests for production, and interrogatory requests;
- Oak Forest Police Department report of the incident;


Exhibit B

- photos taken by the police department;
- medical records from Advocate South Suburban Hospital relating to Max Padilla;
- depositions of Police Detective Roberto Frias; Police Detective Rich Belcher; and incident-scene investigator Anthony King;
- depositions of Jose Padilla, father of the deceased Max, and of Ruth Jacqueline Padilla, mother;
- deposition of Peter Rush, former Executive Director of the Window Covering Manufacturers Association and of the Window Covering Safety Council, and WCMA's designated 30(b)(6) witness, together with deposition exhibits;
- deposition of Joseph Jankoski, Hunter-Douglas' Vice President of Merchandising;
- depositions of Richard Anderson, Technical Director, Hunter-Douglas Inc., N.A.; Eugene Thompson, H-D Manager of Research and Development; Chris Rice, H-D Product Design & Development Engineer; Joseph Cammalleri, H-D Operations Manager; Don Fraser, H-D Senior Project Engineer; Oda Brice Kelley, H-D Vice President of Sales for Independent Fabricators; and Ronald Rubinoff, H-D Vice President and General Manager of the Verticals Division;
- deposition and affidavit of Brenda Davis, original purchaser of the subject blind; and deposition of her daughter Mindy Roberts, prior occupant of Padilla home;
- Memorandum Opinion and Order dated 1.19.10 from Judge Robert Dow of the U.S. District Court for the Northern District of Illinois, Eastern Division, denying motion by defendants WCMA and WSSC to dismiss Count IV of the complaint in this case;
- incident reports from the CPSC concerning strangulation risks from window covering cords;
- a series of CPSC Safety Alerts and agency press releases on strangulation hazard associated with window covering cords;
- CPSC's 11 in-depth investigations [IDIs] of strangulation deaths to very young children from window blind cords, and 9 Medical Examiner and Coroner Alert Project [MECAP] reports;
- article from the *Journal of the American Medical Association* [JAMA, June 4, 1997], entitled "Pediatric Window Cord Strangulations in the United States, 1981-1995";
- materials from prior litigation in Anchorage, AK, -*Rountree v WCMA*- also involving strangulation of a child from a looped window cord;
- material from Parents for Window Blind Safety;
- material from National Safe Kids Campaign on window covering cord hazard;
- material concerning both the Window Covering Manufacturers Association and the Window Covering Safety Council, from their websites; and
- miscellaneous case documents.

I reserve the right to amend or supplement this report, as appropriate, to reflect any new information which comes to my attention.

## FACTUAL CONTEXT

On April 22, 2008, 3-year old Max Padilla, who - police investigators surmise - apparently was climbing atop a table in his bedroom, while his parents, Jose and Jacqueline Padilla, were elsewhere in the Oak Forest, Illinois house. Unbeknownst to them, Max became entangled in one of the looped cords attached to the vertical miniblinds. As a result, he died from strangulation.

The blinds were manufactured back in 1995 by Hunter Douglas, which made vertical miniblinds with nylon and chain continuous cords that were looped. The vertical blinds had been purchased many years earlier by Brenda Davis, mother of Mindy Roberts, the previous homeowner. The blinds were not accompanied by a tensioning device for any of the looped cords. Hunter Douglas is a member of the defendant Window Covering Manufacturers Association [WCMA], an industry trade group which represents and promotes the interests of manufacturers, fabricators and assemblers of window coverings, and is responsible for developing and implementing standards for the manufacture of window coverings, including vertical miniblinds and cords. Hunter Douglas is also a member of the defendant Window Covering Safety Council [WCSC], an industry trade association which claims responsibility for educating consumers about window cord safety and promoting the industry's stated commitment to quality and safety of its members' window coverings.

## PERSONAL BACKGROUND and EXPERIENCE

As previously noted, I served for seven years as Commissioner of the U.S. Consumer Product Safety Commission, the federal regulatory panel having exclusive jurisdiction over thousands of consumer products used in and around the home and in recreation. Window blinds constitute one of those products. The CPSC is the *only* federal agency having authority to ensure against unreasonable risks related to all kinds of infant products. I was appointed by the President and unanimously confirmed by the United States Senate, and served as Commissioner from August 1979 through the end of May 1986. I also was acting-Chairman and Vice-Chair of the agency for extended periods.

During that tenure in office, my responsibilities centered on protecting American citizens from unreasonable risks of injury and other product risks. On a daily basis over a period of those seven years, my attention was wholly focused on issues of product safety, which included the risks associated with window blinds.

While serving at the helm of the CPSC, in public meetings, private sessions with affected companies and industries, and in various articles, I explicitly addressed

the critical responsibilities of manufacturers and distributors of consumer products. Both then, and as a consultant and expert witness during all the years since, I have consistently stressed the prime importance of companies actively investigating instances of serious injury or death occurring from their products. I have repeatedly emphasized the pressing need on their part to focus upon improving a product's safety through changes to its design as a first principle. I also have urged firms to fully comprehend and assess a product's risk *before* ever bringing it onto market, to maintain adequate records and files of hazard investigations and assessments, and to timely report safety risks to the CPSC, pursuant to the reporting requirements of the Consumer Product Safety Act [CPSA], 15 U.S.C. 2051 *et seq.*, and the Federal Hazardous Substances Act [FHSA], 15 U.S.C.1261 *et seq.*

At a previous point in time, almost a decade before being appointed as CPSC Commissioner, I served as Special Assistant to the Chairman of the precursor panel to the CPSC, the National Commission on Product Safety [NCPS]. The panel conducted a comprehensive, two-year study [1968-70], at the direction of the U.S. Congress. It recommended to the Congress and the President a broad-based statutory scheme to provide for better protection of Americans against unreasonable risk of injury from products found in and around the home, and in recreation. Among my responsibilities, I supervised several staff investigations into unreasonable hazards needing to be addressed. The panel identified a series of risk concerns which warranted action by manufacturers, importers and retailers, by industry at large, and, as might be necessary, by regulatory or enforcement action on the part of the federal government whenever voluntary, industry remedial efforts proved unsatisfactory or inadequate.

In addition, I wrote and edited the NCPS *Interim Report: Recommending Enactment of the Child Protection Act*, which, as approved by the Congress, extended the scope of the Federal Hazardous Substance Act to cover electrical, mechanical and thermal risks to children. I also served as editor-in-chief of the NCPS *Final Report*, and helped to draft the basic outline for the later-enacted Consumer Product Safety Act. Subsequently, I was privileged to serve as a principal staff member of one of two U.S. Senate committees responsible for recommending enactment of this landmark product safety legislation to the full Senate, which overwhelmingly approved it. The measure was then signed into law by President Richard Nixon.

By way of further background, upon completing my term as CPSC Commissioner, I served as vice-president and partner with the international management consulting firm of A.T. Kearney [1986-89], in charge of product liability and product risk assessment. Much of my work there consisted of advising Fortune 500 and other firms about product risks to help them avoid

downstream liability. Also, I assisted companies and their legal counsel when confronted with a product already sold and in consumer hands which constituted an undue risk or hazard. I counseled them on ways to best recall the product or otherwise mitigate the risks attendant to it. And I would advise companies, often through their outside counsel, as to how -both logistically and strategically- to deal with product risks, particularly in the context of products subject to recall by the CPSC; and then, how best to accomplish such a recall once a company or its counsel determined that was the direction in which they wanted to proceed.

A current copy of my CV is attached, along with a fee schedule and a listing of recent prior testimony I have given at trial or in deposition.

## **DETERMINING WHETHER A RISK IS REASONABLE or NOT**

In weighing product risks, it is never enough to cite injury statistics -whether the figure is large or small- and attempt to determine, on that basis alone, that the risk is either reasonable or unreasonable. The fact that tens of thousands, or even hundreds of thousands of injuries each year are reported from falls on stairs, or from various recreational sports (e.g., football, baseball, rollerblading), do not make those activities or the products associated with them unreasonably dangerous. Neither under traditional common law principles, nor under the Consumer Product Safety Act, do sheer numbers of injuries ever, by themselves, render a product an unreasonable risk.

By the same token, the *absence* of sizeable injury figures does not mean that a product is safe or that it does not constitute an unreasonable risk. For example, many thousands of dangerous products have been recalled over the years, either voluntarily by the manufacturer or compelled by government officials, because of the presence of one or more design or production flaws, or the absence of needed safeguards or warnings, which render a product unreasonably dangerous. Such products may have very few or no actual incidences of serious injury or death yet reported from their use, but their flawed design causes them to have the recognized potential for leading precisely to those results.

Consider, for the moment, the instance of a design flaw affecting an entire line of products. During my tenure as CPSC Commissioner, in the early-1980's vertical convection heaters first made their way onto the American market. They were instantly popular. But before the first death was reported, and with very few reported injuries associated with the product, CPSC engineering and human factors staff identified a series of design flaws which were *capable of causing* severe burns from improper guarding and fires from overturning. As a result, the

entire line of units, from a dozen or more producers, was voluntarily recalled and replaced with units incorporating safer designs which largely eliminated the acknowledged dangers.

Over many years, product liability cases in both state and federal courts have attested to both those truisms –that mere injury statistics (i.e., frequency of injury) do not mean that a product is an unreasonable risk, and that their absence does not render a product reasonably safe. The legislative history of the Consumer Product Safety Act reflects the notion that frequency of injury alone, without any other consideration, may be an excellent early-alert to an emerging problem; but it does *not* provide the basis for any conclusion about the reasonableness of the risk from any consumer product.

In fact, the driving theme of the National Commission on Product Safety's seminal 1970 *Final Report* – which established the basis and need for both the Consumer Product Safety Act and an independent, regulatory panel to administer it – is that, as a nation, we should not need to await a body count of injuries and deaths from any particular consumer product before corrective action is warranted. As that *Report* forcefully points out-

> "Manufacturers have it within their power to design, build, and market products in ways which will reduce if not eliminate most unreasonable and unnecessary hazards. Manufacturers are best able to take the longest strides to safety in the least time. The capacity of individual manufacturers to devise safety programs, without undue extra cost, has been demonstrated repeatedly in the course of our short history...." [*at* 3]

Forthright action is expected on the part of the manufacturer in the first instance, and by the government as a last resort, to avert what may otherwise be a foreseeable and preventable risk to safety.

Apart from the presence or absence of figures pointing to the frequency of injury, and regardless of how large or small those figures may be, several other factors must be taken into account in determining whether a particular product constitutes a reasonable or unreasonable risk. Many of those factors have been suggested or identified over the years both in judicial proceedings and learned treatises, as well as by the provisions of the Consumer Product Safety Act and its underlying legislative history.

Any listing of those critical considerations would include –

- ➢ As a first principle –as indicated earlier- *whether the design of the product can reasonably be made safer. Whether the product incorporates a design flaw, or a production error, which either directly causes it to be capable of producing needless risks to safety, or otherwise fails to*

*incorporate design features which might avert or significantly reduce known risks when the product is used in an anticipated or foreseeable manner.* To the extent that certain ways in which the product is routinely or even occasionally used -even if unintended- create dangers, what redesign efforts are undertaken to design or guard against just that? It is never sufficient for the supplier simply to accompany the product, or its sale, with educational literature or even on-product cautions or warnings, when reasonable design alternatives are apparent. They are reasonable if they are technically practical and cost-effective in anticipating user behaviors and thereby significantly lessening the risk.

➢ the *severity of the risk(s)* brought about by the product's usage. For example, are the consequences of using the product likely to result in deaths, disfigurations, brain or spinal injury, paralysis, blindness, loss of limb, or other permanent or severe damage? Or, as in the case of the often-cited skateboard or hula hoop statistics for which the frequency figures are large, are the great bulk of reported incidents likely to be minor abrasions, bruises or cuts?

➢ the *vulnerability* of the population affected. Are an appreciable number of the injury incidents occurring to infants, toddlers, or to children generally, who don't have, or are not likely to have either the mental development to understand or appreciate the risk, or the physical ability to deal with it? Or, are they occurring to a largely elder population, or impaired or physically-handicapped population, which for similar reasons is either unaware of the risk or otherwise incapable of dealing with it?

➢ the *functionality* or utility of the product. How much is the product needed? Is it used exclusively or primarily for essential or functional purposes, or for recreational purposes?

➢ the *availability of substitute, similar-use products.* Can, or do other like-products on the market serve the same purposes?

➢ the *availability of alternative designs* for the same product. What design options are available or technologically feasible, and at what added cost, if any, to redress known or anticipated product risks?

➢ the *transparency or latency* of the risk. How well does the consuming public understand or appreciate dangers from the hazard or risk (the likelihood of it occurring): how open or obvious is it, or how hidden? Are users likely to grasp the dangers from ordinary or anticipated usage, and how likely are they to take actions to assuage or mitigate the perceived risk?

- ➢ *comparative safety* considerations, where available. How does the product's safety record compare with other like-products? with other types of products capable of performing similar functions? with other models of the same product, or competitive brands, incorporating alternative, safer designs aimed at redressing known or foreseeable risks?

- ➢ *cost/benefit considerations* of adapting design modifications to redress known or foreseeable hazards. How cost-effective would it be to adopt or implement practical and technologically-available design solutions to the problem at hand?

- ➢ *economic considerations*, such as the approximate number of such products in use, profit factors, market share, product functionality, etc.

- ➢ *alternative means of achieving the safety objective*, while minimizing adverse effects on competition or disruption of the product's production.

- ➢ *responsible practices*, demonstrated in assessing known or foreseeable risks, having a viable product safety program in place for dealing with them, and incorporating policies and/or standards to mitigate or eliminate preventable risk.

These factors are not meant to be exhaustive. The listing is simply intended to show that the determination of whether the risk from a consumer product is reasonable or unreasonable must necessarily take into account an array of complex factors. The rest of this report addresses many of these considerations in the context of what comprises responsible practices on the part of Hunter Douglas concerning the known, foreseeable, and wide-scale risk of serious injury and death from strangulation of infants and toddlers, from nearby vertical window blinds with looped cords.

## APPLICATION OF EXPERIENCE TO THE MATTER AT HAND

### What Was Known About the Risk?

At least as far back as 1981, while I was serving as CPSC Commissioner, staff of the agency's Epidemiology Directorate informed fellow Commissioners - along with Hunter Douglas and other window covering manufacturers, and the public at large - about documented incidents involving strangulation of children under 5 years of age. Staff specifically identified looped cords on window coverings as one of the causes most frequently associated with child strangulations. As was routine for all other hazard information accumulated by the staff, the Commission - concerned about an especially vulnerable population of very young children - directed that these strangulation results be shared with Hunter Douglas, a leading

manufacturer, others window covering manufacturers, and their industry trade group. At the time, that industry association was the American Window Covering Manufacturers Association [AWCMA]. since re-named the Window Covering Manufacturers Association [WCMA]. The Commission's purpose in doing that was to alert each company and the entire industry to the overall dimensions and scope of this risk which may not have been previously understood. It was also to enlist the support of manufacturers and suppliers, and their designated trade association, in promptly addressing this critical safety concern.

Characteristically, according to Commission staff study, these strangulation deaths from looped window cords occur when young children – usually under 3 years of age – are, like Max Padilla, in areas or places their parents deem safe, as in their bedroom or in a crib. The youngsters often climb or reach up and get any looped exterior cords or beaded chains down from the cleats or hooks, which hold them in place. Alternatively, some children reach for the looped *inner* cord of the window covering. Staff also noted that the deaths tend to be silent, in that the youngsters, when strangled and their air supply cut off, are unable to call out for help. Further study by the CPSC identified that in about 85% of cases documented by staff, parents were actually at home when the incident occurred. Parents or caregivers often are assisting another child or doing household chores, believing their child to be at rest and safe.

Having called upon the window covering industry to address the problem soon after it was identified, the CPSC continued to document incidents of such strangulation over the decade of the 1980's. Yet, there was not any discernible action forthcoming on the part of Hunter Douglas and other individual manufacturers or suppliers, or their trade association. By 1985, reported child strangulations from window covering looped cords and chains were averaging about 10 per year. In conjunction with the AWCMA – WCMA's predecessor in name – the Commission and the trade association issued an end-of-the-year warning to the public expressing their joint concern about accidental death and injury to young children who became entangled in cords for window coverings, and urging that parents be alert to this emerging hazard. By 1991, the annual toll had doubled, to more than 20 such deaths. Yet, corrective action, even in the face of a known hazard, was not forthcoming either by Hunter Douglas which was a leading manufacturer, or by the rest of the window covering industry.

By 1994, the CPSC was experiencing increased media and public concern about these recurrent and foreseeable child strangulations. The Commission continued to believe that the hazard was largely preventable. Yet window covering producers, led by Hunter Douglas, were not facing up to their responsibility to adequately address or eliminate the risk. Accordingly, the CPSC signaled its intention to force action if the industry did not do so on its own. As a result of the

10

CPSC's actions. in the absence of individual company leadership, the re-named Window Covering Manufacturers Association committed to undertake a corrective action to make window coverings already in American homes safer. The Association led a standards-setting effort to make future production of corded, horizontal window coverings safer, so as to eliminate the principal flaws of their looped design, which tended to exacerbate the hazard.

As to the CPSC's corrective action component. WCMA volunteered to work with the Commission, through its offshoot –the Window Covering Safety Council. The WCSC was explicitly established, as a result of WCMA efforts, to carry out the agreed-upon Voluntary Corrective Action Plan of September, 1994 [*see* Rush/WCMA Deposition]. The Association's stated commitment under the Plan was to lessen the likelihood of pull-cord child strangulations, by advising parents and consumers generally to eliminate the loop in two-corded *horizontal* blinds by (i) cutting the cord above the tassel: (ii) removing the equalizer buckle: and (iii) adding a safety tassel at the end of each cord which was being made available, without charge. from the industry association. But nothing was said or done under the Plan –no advice to parents or the public– about the strangulation risks attendant to looped cords used either as *inner* supports for horizontal blinds or as outer pulls for *vertical* blinds.

As to the second commitment - initiating a standards effort - the WCMA undertook to establish itself as a certified standards-setting organization pursuant to procedures established by the American National Standards Institute [ANSI]. In the interim, pursuant to the Corrective Action Plan, the association agreed to encourage manufacturers to take steps –again, limited to pull-cord strangulations related to horizontal blinds, and not addressing inner cord or vertical blind incidents. The association agreed to encourage elimination of the loop altogether on two-corded horizontal blinds manufactured after January 1, 1995. And, upon being certified by ANSI, the association -again through its Safety Council- undertook to develop a voluntary, industry standard, for ultimate approval within the ANSI process, covering *all* window covering pull-cords in blinds and mini-blinds. For reasons never explained by the WCMA, looped pull cords in vertical blinds. as well as the looped, inner cords were not effectively addressed in that standards process, and left uncorrected in terms of future production in the final 1996 version of the ANSI-approved standard. [*see* WCMA A100.1-1996, Standard for Corded Window Covering Products]. Also conspicuous in its omission from the "Warnings" section of that standard is any warning, or any reference at all, concerning the lesser, albeit still daunting strangulation risks associated with looped, inner cords on horizontal blinds and with the looped outer pulls found on vertical blinds.

The WCMA undertook to lead that standards process "to develop American National Standards for window covering products." At that time, the CPSC was aware of some 170 strangulations from both pull-cords and inner cords occurring between 1981 and 1995. The agency had directly communicated that information to all known manufacturers including Hunter Douglas, and to the WCMA as well. That amounted to about one child death each month. Within two years, in a seminal 1997 article appearing in the prestigious *Journal of the American Medical Association* [JAMA], researchers reported that the number of children who strangle in window cords had been materially *under-reported*. The study found that "about half" (49%) of such deaths went unreported to the CPSC. It estimated that the total number of such child strangulation deaths from 1981 through 1995 actually stood at 359. "These figures mean that nearly one child is strangling in window cords every two weeks," the JAMA article reported. Almost all of these deaths (93%), the research found, involved children 3 years old and younger.

As the CPSC itself reported in publicly announcing the study's results, "According to the study, there are two common ways children strangle in these cords. Infants in cribs near windows get tangled in the looped cords while sleeping or playing; and toddlers, trying to look out a window, climb on furniture, lose their footing, and get caught in the window cords." While the research reported significantly more deaths due to pull-cords than inner cords, tellingly, the two typical scenarios which the Commission identified above applied equally, regardless whether a pull cord or inner cord was the precipitating cause of a child being strangled, and regardless whether the window coverings were of a horizontal or vertical type.

The study went on to note: "The mortality rate from window cords makes them *among the greatest threats to children three years old and younger*. Other products that present a strangulation hazard to children in the home and have been redesigned include strings on pacifiers, recliner chairs, accordion-style baby gates, and electric garage doors." The report further noted that 86% of the window coverings involved in the incidents were venetian blinds or mini-blinds; and that 9% were venetian-type *vertical* blinds.

With an estimated 85 million units of corded window coverings sold each and every year by this industry, and an estimated 850 million units all told in American homes, the known and foreseeable hazard of so many previously sold, uncorrected units went largely unaddressed by Hunter Douglas and other individual producers, and by the WCMA. In the interim, the CPSC was conducting in-depth investigation [IDIs] and reporting back to the industry on an ongoing toll of child strangulations. In 1999, the Commission commenced a new investigation of window blind deaths, this time focusing on inner cord loop entanglements.

Only then, again under pressure from the CPSC, did Hunter Douglas and other window blind manufacturers begin to undertake, in 2000, a second Corrective Action Plan to broadly warn the public about inner cord strangulations, and to immediately include a stop cord to reduce the possibility of that inner cord being pulled upon and entangling a young child. Also, the WCMA, in its standards-setting role, began a review of the existing WCMA-initiated ANSI-sanctioned industry standard. But a comparable change in the standard itself did not become effective until November 2002 – a two-year delay which the Association, in testimony by Peter Rush, attributed to the cumbersome nature of the ANSI voluntary standards process.

During that interim, the Commission reported anew that, since 1991, it had received reports of another 160 child strangulations associated with cords on window blinds, of which 140 strangulations involved outer pull cords and 20 involved the inner cords which run through the blind slats. The WCMA's review of its existing (1996) standard, with the CPSC's urging, ultimately led the Association, as the standard's sponsor and developer, to include coverage of inner cord loops, notably without reference to looped cords on vertical blinds.

### What Was Done About the Risk...and What Wasn't ?

At least one other, significant fact is omitted from the chronology of window cord strangulations just discussed. Back in 1990, the then-American Window Covering Manufacturers Association –WCMA's predecessor- received a letter dated September 5, 1990, from Toni Griesbach [*see* Rush/WCMA Deposition from *Roundtree v WCMA*, Exhibit 6]. She was an attorney from St. Louis, Mo., who had represented a family whose 18-month old son was killed –back in October, 1986- when he was entangled in a inner or support cord on the back of a woven-wood shade. Ms. Griesbach stated that she was writing to the Association to expand its efforts to warn the public about the dangers posed by *all* looped cords on window coverings. She explicitly pointed out that limiting the warnings to horizontal pull cords "may be misleading." As for the family she was representing, they were very much aware of the danger of pull cords and had "in fact, placed the crib at the opposite end of the window from where the pull cord was located." Their child became entangled, instead, in the support or *inner* cord on the back of the woven shade, well out of view of the parents or anyone else.

Attorney Griesbach's letter letter urges the Association "to discuss these issues with its members *and recommend that they take action immediately.*" Hunter Douglas was a leading member of the WCMA at the time. As a matter of fact, in the critical 1994-95 period when the Association assumed overall responsibility

for addressing the child strangulation hazard, Hunter Douglas' own Vice President for Sales, O.B. Kelley, served as nothing less than *President* of the WCMA - in overall charge of the group.

During the prior decade of the 1980s, as child deaths from window cord strangulation were mounting, Hunter Douglas either dismissed or overlooked the significance of the in-depth incident investigations conducted by CPSC staff. Had the company done otherwise, it would have realized that - while the bulk of such incidents involved looped, outer pull cords on *horizontal* blinds and shades, not all of them did. Some were identified as arising from looped cords/chains on *vertical* units (and still others involved the looped, inner support cord at the rear of the window covering). If Hunter Douglas had undertaken that kind of rudimentary assessment of the risk information available to it by the end of the '80s and early into the '90s, the company would have been aware of the scope and extent of the involvement of looped cords in virtually all instances of such strangulations, including those involving vertical blinds.

Hunter Douglas is an industry leader both in terms of numbers of units sold and influence within the WCMA. Yet, from the outset, the company ignored its responsibility to fully assess and address the complicity of looped cords in child strangulations. And as a key leader within the WCMA, Hunter Douglas was also wanting. The company was remiss helping to promote a 1996 standard which did not adequately address the lethal risk to young children associated with looped cords in vertical blind strangulations. Even the most casual review of the available in-depth investigations, and literature on the subject, would have revealed that oversight. That, of course, assumes that Hunter Douglas was not itself already acutely aware of the hazard of looped cords used in any manner, guise, or configuration. That such cords were dangerous to infants and children *because they were looped.* Hunter Douglas chose – for reasons known only to company officials – to limit its focus to horizontal pull cords. They left the problem of *other* looped cords largely unaddressed in the period before – and even after- the subject vertical blind in this litigation was made and marketed in 1995.

In the testimony of its officials, Hunter Douglas repeatedly refers to at least two devices -both of which the company produced from at least as early as 1990 (and likely before) - to address the hazard of looped cord child strangulations. <u>First,</u> was the development of a control wand or "wand tether" as it is referred to by Product Design and Development Engineer Chris Rice [*see* pp.11-13]. He relates: *"The wand tether was a new design where the cord was brought down the wand and then fastened onto the wand using what we call the tether, which is a little weighted device that was screwed to the wand. What that did was enabled us to keep the cord very tight against the wand to prevent cord loops from being formed."* He further notes that the wand tether "contains the cord to keep it taut."

But for whatever reason, according to Mr. Rice, Hunter Douglas only offered this technology on its "Paramount" series of vertical blinds, and not on its "PT-2000" series, to which the subject unit from the Padilla household belongs.

The safety benefits of the wand over looped cords are even more strikingly described in the deposition of Eugene Thompson, Manager of Hunter Douglas' Research and Development Office. He explains that, under certain circumstances, use of the wand as a vertical blind control can render any pull cord altogether unnecessary. It can literally replace the looped cord which lies at the core of child strangulations [*see* pp.18-19]. Mr. Thompson also sheds light on a related question. He is asked, in his deposition [at pp.35-36] whether – in light of the known complicity of looped cords in child strangulations- -there were discussions within Hunter Douglas to eliminate these cords entirely. His response is telling: *"I don't remember the date, but essentially there was – **a cordless vertical venetian blind has been available since the late-'80's anyway, if not before.** So I guess the answer is yes, we did discuss – the thought process was there about eliminating cords, obviously, because we had products that eliminated cords."* [emphasis added].

That observation is buttressed by the testimony of Richard Anderson, Technical Director for Hunter Douglas, Inc. of North America, and formerly Senior Vice-President of Hunter Douglas. Similarly, asked whether he made any recommendations within the company to address the issue of risk of child strangulation from looped, continuous cords, he recalls: *"Sometime in the early or mid-'80's, a prime part of all of our product development improvement efforts from that time forward involved eliminating or minimizing that hazard."* [see pp 92-93] Referring to the *"alternative methods of operating these vertical blinds,"* Anderson admits, ***"all of which would have been safer than an untensioned cord loop."*** [*id.*, emphasis added]

So an alternative, safer design was economically practical and technologically feasible - *and available* on comparable vertical blinds sold by Hunter Douglas in 1995 (and as much as a decade earlier) to keep support cords taut or even to eliminate them entirely. Nonetheless, the company did not apply that safer design to, or offer it in the unit which ended up in Max Padilla's bedroom. Hunter Douglas had all the means at its disposal to provide, across the board, a much safer, non-looped cord design than that found in the Padilla home, but it did not.

Second, for many years prior to the 1995 manufacture of the subject vertical blind, Hunter Douglas made and offered tensioning devices for its looped cords. The purpose of the device was "to mount the cord to prevent the cord loop from being created," according to Chris Rice. He then elaborates: *"The reason we used cord tensioners was to prevent a loop from being created by putting tension on*

*the cord. We found that if you cannot pull the cord free and create a loop, you can eliminate the hazard that is potentially there."* [*see* pp.42-43] Unquestionably, as Mr. Rice and other Hunter Douglas officials affirm, tensioners are an essential safety device if they are properly installed and used. By providing tautness to any looped cords and eliminating any loose-hanging cord loops on blinds, they can substantially reduce the risk of child strangulation.

Further evidence of the role and importance of tensioning devices is provided by the testimony of Hunter Douglas' Technical Director, Richard Anderson. Asked about the purpose of tensioning devices, he responds, *"Make the product operate better."* Asked if such devices make the product safer, he answers, *"Yes, it does make it safer...because the cord's not loose; it is under tension. It's difficult, if not impossible, to make a standing loop."* And he concludes by answering *"That's right"* to the observation that the absence of such a loop *"thereby minimizes or decreases the risk of strangulation to young children"* [*see* p. 73].

Why then, did the subject 1995 Hunter Douglas vertical blind, responsible for Max Padilla's death, come without an accompanying tensioning device? Does Hunter Douglas only offer tensioning devices as an option at a extra cost *–as an add-on -* to its sales of vertical blinds? Must an original purchaser like Ms. Brenda Davis - if a tensioner was even offered during her transaction – have to pay a separate and additional amount for such an essential feature which can make an otherwise hazardous product reasonably safe? Who decides whether the tensioner will be included in the sale – the retailer, the installer, or the customer? [ Hunter Douglas' VP for Sales, O.B. Kelley testifies it was *the retailer* at pp.81-82] Why is that even an issue, when a leading manufacturer like Hunter Douglas could end all discussion by simply making sure that tensioning devices necessarily accompany any sale of *all* its window coverings? And that they be duly installed in *all* instances?

Instead of finessing such a core issue of child safety and delegating the decision to someone else, Hunter Douglas had it within its power to, in effect, make tensioners a necessary component of whatever window covering it was selling. Simply stated, *you can't have one without the other*. In their testimony, Hunter Douglas officials repeatedly claim tensioning devices to be highly effective from a safety standpoint. If that is indeed the case, cord tensioners need to be sold part and parcel with any purchase of a vertical blind (or *any* looped cord blind, for that matter). Without such a device, the product is flawed from a safety perspective, and dangerous to young children. With it, deaths from strangulation can be averted. In this day and age, it would be akin to selling a new car with air bags or seat restraints as an option. Or like selling a circular saw with guarding as an option. Air bags and seat restraints are essential to ensuring the safe performance of any automobile. So too is a guard in ensuring the safe performance of a circular

saw. In the same vein, a tensioning device should never be optional – it is essential to ensuring the safe performance of vertical blinds with all too-inviting looped cords.

Here, again, Hunter Douglas had in place a technology which was economically practical and technologically feasible. And it was fully available. It just didn't come, as it should have, as an incorporated safety feature of the Hunter Douglas' blinds involved in this case. In not doing so, Hunter Douglas was providing a product with a needless risk to the most vulnerable of infants and toddlers – a risk that the company had every means at its disposal to remedy by providing tensioning devices as a condition of sale for any blinds it produced, vertical or horizontal. But, knowing as much as the company did about the strangulation risk to young children from looped cords, inexplicably, Hunter Douglas chose not to do so.

One other concern that arises from the testimony of Hunter Douglas officials involves the critical issue of company testing. Eugene Thompson, head of the Research and Development Office, in response to a question, testifies that, in his capacity, he was NOT "aware of any testing Hunter Douglas would have done on the vertical blind involved in this [Padilla] incident, or similar blinds, with respect to the ... risk of strangulation by the window cord blinds" [see pp.44-45] If that is correct, it is a serious indictment of the company's procedures for assuring customers and the public that its window coverings are safe.

Moving on from substantive and design considerations to warnings, in not acknowledging the array of looped cord risks, Hunter Douglas failed to adequately *warn* about that risk. The company owed that duty to parents and caregivers, and to the parents of Max Padilla. Instead, the bland cautionary language Hunter Douglas used is deafeningly silent as to any vertical blind risk which parents need to know about. The language reads: "Young children can become entangled and strangle in cord or bead loops. Use safety devices to reduce access and to eliminate loops." But that caution begs the question: What safety devices? If they are so important, why don't they accompany the sale of the product as a necessary means of assuring its proper and safe functioning? What types of looped cords in what types of window coverings – horizontal? vertical? or both?

Parents and caregivers need to have ready access to conspicuous and succinct language, explicitly warning about any looped cord hazard, which Hunter Douglas, the WCMA, and the entire window covering industry knew about at least since the early-1980's. Certainly by the time in 1995 when Hunter Douglas produced the subject vertical blind in this case, and in 1996 when the WCMA

A101.1 standard took effect, the looped-cord strangulation risk in vertical blinds was well-known by all segments of the industry. But just as certainly, such a warning was nowhere to be found – not in either year. And what language *was* adopted by Hunter Douglas and the WCMA, was not present in any shape or form –no warning whatsoever – on the vertical blind in Max Padilla's bedroom.

In testimony in this case, Hunter Douglas says that it routinely used hang tags on vertical blinds to communicate its warnings [*see* testimony of HD Operations Mgr, Joseph Cammalleri at pp.25-31], and also, adhesive caution labels [see testimony of Ronald Rubinoff, HD Vice President and General Manager at pp.30-31.] But neither was present on the subject Padilla blind. The police investigation of the incident did not reveal any product warnings either in the form of a hang tag affixed to any cord, or any printed label on the blind's PT-2000 head railing, or elsewhere. A warning either was never attached, or it was attached and fell off or was removed at some point in time. How? why? by whom? We'll never know.

What we *do* know is that the purchaser of the subject vertical blind, Brenda Davis, testifies that she has no recollection of any warning whatever –hang tag or adhesive label- appearing on the unit when she received it. As for the Padillas – like so many others who move into homes with window coverings already in place – they were especially vulnerable to the absence of any warnings. They hadn't bought the vertical blind in Max's room; they were obviously not present when the blind was installed; and they had no role whatsoever in any possible removal of a hang tag or adhesive label warning, if one had ever initially accompanied the blind or not. The absence of permanency for the warning meant that the Padilla family never even had a chance of getting the important safety message which Hunter Douglas says it intended to convey. In that sense, they were literally in the dark about the dangers of looped cords in Max's room.

Actually, the top Hunter Douglas official in charge of the Vertical Blinds Division, Ronald Rubinoff, testifies that *"**the hang tag was designed to be removed** – it was not intended to be a permanent, you know, document hanging from the shade"* [see pp.30-31, emphasis added]. What is certain is this: if so important a message is to be communicated, surely Hunter Douglas could have devised a far more effective means for assuring the *permanency* of that message. Hang tags and adhesive labels often come off in transit or during installation of blinds. To counter that, Hunter Douglas was certainly capable of devising a means for long-term or permanent affixing of that warning onto its window coverings. But it did not do so.

Whatever reasons Hunter Douglas may have had for approving or acquiescing to these failures to communicate a critical warning about a known hazard, such actions, at the very least, reflect an absence of reasonable or due care.

Under the circumstances in this litigation, the collective failings of Hunter Douglas involve inordinate delay in addressing the strangulation hazard, sticking to a flawed product design, and using a flawed product warning. These actions pointedly led to a failure to correct the demonstrable risk of child strangulations from looped cords in vertical blinds. All the while - for the entire decade before 1995 when Hunter Douglas produced the subject vertical blind in this case – the company was a major manufacturer and industry leader. And in all that time, Hunter Douglas itself did not adequately address the looped-cord strangulation risk. Those failures necessarily increased the risk of harm to unsuspecting young children. As such, for all the reasons discussed, the conduct of Hunter Douglas reflects disregard for child safety at all levels.

## CONCLUSION

In the context of a product known almost from the outset to be fraught with the foreseeable risk of children being strangled to death by looped window covering cords, the conduct of Hunter Douglas belies due care. As a result, safety was seriously compromised. An unsuspecting 3-year old strangled and died from the wholly foreseeable chain of events set in motion by this kind of systemic disregard for safety, at all levels and over such a long period of time.

Hunter Douglas unquestionably knew, from very early on, about the specific hazard to infants from the looped cords of window coverings of all kinds. Yet the company steadfastly failed to adequately address the hazard, first during the decade of the 1980's, and through most of the decade of the 90's - at least for vertical blinds. Hunter Douglas was obligated to make sure that their blinds are fit for the purpose for which they are intended, and that they do not pose an unreasonable risk of injury.

Hunter Douglas knew, over an extended period of time, that a *highly-vulnerable population* -namely, infants and toddlers- were *almost always* the victims of these incidents. The company had access to the injury reports routinely compiled by the CPSC, annually, over each of the 25 years preceding this incident. Those reports identified these youngest of children as the most likely victims of incidents involving looped-cords strangulations from both horizontal and vertical blinds.

Hunter Douglas also knew that, to the parents of young children (and to the children themselves), *the nature of this hazard was hidden or latent.* It was definitely not open and obvious. In the ongoing injury reports that the company

received from the CPSC, repeatedly, parents, grandparents and parent surrogates related that the incidents occurred "suddenly," "unexpectedly," and "without warning." They occurred at a time and in a place where the parent or caregiver believed the child to be safe and did not even have an inkling of any danger. From previous injury reports (if not from their own safety analysis), Hunter Douglas and the industry association knew that window covering cords and chains *which are looped* definitively cause strangulations of nearby infants and toddlers. Parents and others entrusted with their care most often don't know that. Here, the parents had no idea of the danger that the looped cords of their vertical window coverings presented - a hazard that could lead to death. And *did* lead to the strangulation death of Max Padilla. But Hunter Douglas *did know* about that needless risk.

Hunter Douglas knew that the looped-cord *design* of its vertical window blinds was directly tied to the occurrence of these incidents – just as with its horizontal blinds. Hunter Douglas' responsibility is to make safe products, fit for the purpose intended. The company had a responsibility to materially improve a product design which company officials knew to be flawed. Instead, Hunter Douglas permitted a demonstrably unsafe looped design for vertical blind cords to persist, even after the company - after many long years of inaction and delay – had already identified that same looped-cord design on horizontal blinds as a hazard.

It was reasonably foreseeable that a flawed, uncorrected looped-cord design was failing to adequately redress a known danger. Hunter Douglas *failed to follow responsible manufacturing and marketing practices* to precisely identify and adequately warn against the risk, and to redesign the product so as to address the principal causative factor – namely, looped cords. The company also failed to bring about a recall of this looped-cord hazard. Bottom line, Hunter Douglas failed to devise a viable solution to a danger well-known - certainly by 1995 (the year of manufacture of the subject vertical blinds) - both to company officials and to an entire industry.

Hunter Douglas allowed this looped cord and looped beaded-chain design to persist for vertical blinds in the face of repeated reports of the grievous danger and risk to young children *specifically from this cause. There were alternative designs available* and actually in use, such as control wands, instead of looped cords. There were known safety devices –even for looped cords – such as tensioning devices which, Hunter Douglas officials openly acknowledge, materially reduced the risk, if properly installed. Tensioners should have been offered as part and parcel of the sale of the blinds themselves. But Hunter Douglas did not do that. As a result, Hunter Douglas acted in disregard of the safety risks to the most vulnerable of populations.

For most of the two decades spanning 1980-2000, as a leading producer of both horizontal and vertical blinds, Hunter Douglas failed to meet its safety responsibilities. Particularly as to vertical blinds, the company ignored the risk of infant strangulation from the very same unsafe looped nylon cord and looped chain design which already had been targeted, years earlier, on its production of horizontal blinds. Same problem. Same flawed design. Same consequence, albeit there were *fewer* child strangulations associated with vertical blinds. Why? Because the production of vertical blinds was, according to company officials, only about one-tenth of that of other window coverings. So throughout that decade of the '90's, Hunter Douglas did not correct the flawed design in its vertical blinds, even though that looped cord/chain design presented the very same strangulation risk for vertical blinds as the company *had already acknowledged* for its horizontal units.

Hunter Douglas is a leading producer of vertical window blinds –literally, a household name. Had the company conducted its affairs in a manner more consistent with due care in addressing what it knew to be the danger of loop-corded window blinds of any kind, the incident that resulted in the death of 3-year old Max Padilla could have been avoided.

In my professional judgment as a product safety and risk consultant for more than a quarter century, if Hunter Douglas had, instead, simply engaged in responsible manufacturing and marketing practices from the standpoint of safe product design and effective warnings against looped cords, this foreseeable consequence was entirely preventable.

September 17, 2013                                  Respectfully submitted,

                                                    Stuart M. Statler

Enclosures:
  CV
  Recent Testimony
  Fee Schedule