**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILILNOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE M. PADILLA, as the Special** | ) | |
| **Administrator of the Estate of** | ) | |
| **Maximilian Padilla,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09 CV 1222** |
| | ) | |
| **HUNTER DOUGLAS WINDOW** | ) | **Judge John Z. Lee** |
| **COVERINGS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Maximilian Padilla ("Max") died at the age of three from strangulation after becoming entangled in the metal beaded cord used to operate the vertical window blinds in his bedroom. The window blind was manufactured by Defendant Hunter Douglas Window Coverings, Inc. ("Hunter Douglas") Plaintiff Jose Padilla, on behalf of his son, brings this action against Hunter Douglas, asserting claims of common law negligence and breach of warranty. In anticipation of trial, each party has offered two experts: Plaintiff has offered Stuart Statler and Robert Wright; and Defendant has offered Joseph Sala and Rose Ray. Each party has also filed motions to exclude the experts offered by the other.

After the parties had submitted their briefs, the Court held a hearing on August 20 and August 21, 2013. Wright and Sala testified in person at that hearing, and the attorneys were given an opportunity to argue all four motions. For the reasons stated herein, the Court grants Defendant's motion to exclude the testimony of Stuart Statler and grants in part and denies in part its motion to exclude the testimony of Robert Wright. The Court also grants in part and

denies in part Plaintiff's motions to exclude the testimony of Joseph Sala and the testimony of Rose Ray.

## Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702) and the Supreme Court's seminal case *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). By its terms, Rule 702 allows the admission of testimony by an "expert," someone with the requisite "knowledge, skill, experience, training, or education," to help the trier of fact "understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Experts are only permitted to testify, however, when their testimony is (1) "based upon sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the witness has applied the principles and methods reliably to the facts of the case." *Id.*

*Daubert* requires the district court to act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("we 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

Before admitting expert testimony, district courts employ a three-part analysis: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2)

the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Bielskis*, 663 F.3d at 893-94. The purpose of the *Daubert* inquiry is to scrutinize the proposed expert witness testimony to determine if it has "'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire Co.*, 526 U.S. at 152). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). With these standards in mind, we turn to the parties' motions.

## Discussion

### I.     Stuart Statler

Stuart Statler was appointed to serve as a Commissioner on the United States Consumer Product Safety Commission ("CPSC") from August 1979 through May 1986. During his tenure, he also served as the acting-Chairperson and Vice-Chair of the CPSC. Def. Statler Br., Ex. A ("Statler Report") at 3. Although the precise contours of his opinions are not clear from his periphrastic expert report, it appears that Statler will testify that: the window blind at issue was defectively designed; Hunter Douglas knew of the "foreseeable risk of children being strangled to death" by the looped cords; a safer alternative design was economically practical and technologically feasible at the time of the incident; Hunter Douglas should have affixed a tag warning users of the risks; and Hunter Douglas acted unreasonably and without the exercise of due care by ignoring the attendant risks. *See id.* at 20-21.

Defendant Hunter Douglas now seeks to preclude Statler from testifying as an expert at trial. In its motion, Defendant contends that, despite Statler's tenure at the CPSC, he is not qualified to testify as an expert regarding window blind design and safety. Defendants also argue that Statler's opinions on this topic, as well as his opinion that Hunter Douglas acted unreasonably as a window blind manufacturer, fall short of the requirements of *Daubert*. Because the Court agrees on both counts, Defendant's motion to exclude Statler is granted.

### A.    Statler's Qualifications

Defendant first argues that Statler is unqualified to testify as an expert regarding the topics of window blind design and safety, as well as the commercial and technological availability of alternative window blind designs. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); *see also Tr. of Chi. Painters and Decorators Pension v. Royal Int'l Drywall and Decorating*, 493 F.3d 782, 787-88 (7th Cir. 2007); *Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir. 1990). Here, Statler intends to testify that: Defendant's corded window blinds were defectively designed; other alternatives were reasonably available; the warning labels on the window blinds were inadequate; and Hunter Douglas acted unreasonably and ignored its corporate responsibility by selling corded window blinds and providing inadequate warning labels. *See* Statler Report at 20-21.

Turning first to his opinions regarding the design of the corded window blinds, as Defendants point out, Statler himself admitted during his deposition that he has no practical experience or training in the field of window blind design. Def. Statler Br., Ex. B ("Statler Dep.") 39:1-3. Nor does he have any training as an engineer, which he concedes would be

necessary for him to understand how the physical mechanisms to open and close window blinds operate.

> Q:    Have you ever taken any steps to familiarize yourself with the considerations that are involved in designing specifically the mechanisms used to open and close and raise and lower and tilt window coverings?
>
> A:    I would view that more as the work of any engineer, mechanical engineer probably. But no, I have not undertaken any special analysis in that area. That's not my area of expertise.

*Id.* 39:4-14. Stalter also conceded that he has no experience designing any type of consumer product, let alone window blinds. *Id.* 54:18-20. Nor did he conduct any studies or tests to support his opinion that the blinds were defectively designed. *Id.* 41:18-23.

Invoking *Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999), Plaintiff nevertheless maintains that Stalter is qualified to offer his opinions "based on his extensive experience dealing with consumer product safety," including those related to window blind safety. Pl. Stalter Resp. at 10. For instance, Plaintiff contends that Stalter "was actively involved in the issue of window blind cord strangulation hazards by encouraging organizations such as the American Window Covering Manufacturers Association . . . and the manufacturers of blinds" during his tenure at the CPSC. *Id.* at 9. Plaintiff also states that Stalter "directed the Commission staff to work with the manufacturers and the [Association]." *Id.* But this argument is unpersuasive.

Plaintiff is correct that the CPSC studied incidents of child strangulation associated with looped window blind cords during Stalter's tenure at the CPSC, *see* Stalter Report at 9-10, and that CPSC staff reported their findings to the Commissioners. *See* Stalter Dep. 38:1-15. But, under Rule 702 and Daubert, the Court must decide "whether *this* particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in *this* case." *Kuhmo*, 526 U.S. at 156, 119 S. Ct. at 1178 (internal quotations omitted; emphasis added). The crux of

this dispute rests upon whether the window blind cord that resulted in Max's death was defectively designed and whether alternative designs were reasonably available.

*Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001), is instructive. In *Dhillon*, the Seventh Circuit enumerated a number of factors that an expert should consider when opining that a design is defective and an alternative available, including: "the degree to which the alternative design is compatible with existing systems . . . ; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative designs; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine." *Id.* at 870 (internal quotations omitted). The court further observed that "many of these considerations are product- and manufacturer-specific and cannot be reliably determined without testing." *Id.* Here, the record fails to establish that Statler developed any particular expertise in window blind cord design or the availability of viable alternatives. Instead, Statler's experience with window blinds is limited to his general experience as a CPSC Commissioner from 1979 to 1986 and those instances when the Commissioners were "informed" by CPSC staff about documented incidents involving strangulation of children by window blind cords.[1] Although his experience may allow him to testify as to the actions taken by CPSC regarding corded window blinds and the associated risks, it does not qualify him to testify about

---

[1] In his report, Statler also summarizes publications by the CPSC and others that post-date his departure from the CPSC. It is unclear what, if any, additional expertise Statler can provide in reviewing them and reciting their conclusions to the jury. For example, there is no indication in the record that Statler has developed an expertise in the history of the window blind industry (by, say, publishing books or articles or conducting independent research in this area) or that he ever studied these issues prior to being retained as an expert in this case. *See Minemayer v. B-Roc Representatives, Inc.*, No. 07-C-1763, 2009 WL 3757378, at *5 (N.D. Ill. Oct. 29, 2009) (expert testimony that is "prepared solely for purpose of litigation . . . is to be viewed with some caution").

the appropriateness of the design in question or the economic and technological availability of design alternatives.[2]

The Supreme Court's opinion in *Kumho* does not mandate a different result. The expert in *Kuhmo*, like Statler, testified as to the existence of a defective design (automobile tires, in that case). But, unlike Statler, the expert in *Kuhmo* had a masters degree in mechanical engineering and had worked at Michelin America, Inc., on tire design for ten years. *Kuhmo*, 526 U.S. at 153, 119 S.Ct. at 1176. Statler, on the other hand, has absolutely no engineering or design background and only generalized exposure to window blind incidents while at the CPSC.

Plaintiff also argues that other federal courts have permitted Statler to testify as an expert, and that this Court should as well. But this argument too is unavailing. In one of the cases cited by Plaintiff, *Brown v. Overhead Door Corp.*, Case No. 06-C-50107, 2008 WL 5539388 (N.D. Ill. Dec. 11, 2008), the defendant filed a motion to exclude Statler's expert testimony, which the court treated as a motion in limine. *See id.* 2008 WL 5539388, at *5. In so doing, the court stated that it "expresses no opinion on the merits of [defendant's motion to exclude Statler's testimony]." *Id.* The second case, *Rountree v. Ching Feng*, 560 F. Supp. 2d 804 (D. Alaska 2008), is equally unhelpful. There, the court allowed Statler to testify as an expert, but the scope of his testimony was severely limited to the knowledge that he gained during his tenure as a CPSC Commissioner. *See* Def. Statler Reply Br., Ex. 1, *Roundtree*, Case No. 3:04-cv-00112-JWS, slip op. at 5, 8 (D. Alaska Jun. 17, 2008). The court excluded his testimony as to the

---

[2]     Plaintiff also strenuously contends that "Statler is not offering any of these opinions as a scientific expert" but as a "warnings and safety expert" based upon his experience with product safety risks and "his specialized knowledge as to how manufacturers can and should act forcibly and responsibly to reduce or eliminate these hazards." Pl. Statler Resp. Br. at 5. But, the fact remains that he is offering highly technical opinions regarding the *design* of corded window blinds and the availability of alternative *designs*. As Statler concedes, these matters are beyond his ken.

remaining topics. *Id.* at 5 (excluding opinion that defendant, a trade association, owed a duty to plaintiffs or had failed to adequately warn them).

On the other side of the ledger is *Hayes v. MTD Prod., Inc.*, 518 F. Supp. 2d 898 (W.D. Ky. 2007). The plaintiff in *Hayes* was injured while using a zero turn radius lawn mower. He offered Statler as an expert to opine that defendant's sales of the lawn mower without a rollover protection system was unreasonable and "flew in the face of any viable product safety program." *Id.* at 899. The defendant asked the court to exclude Statler's testimony, and the court agreed, stating:

> Statler does appear to be the "quintessential expert for hire." Statler is well-credentialed, with his service on the CPSC and years of consulting work. However, his expertise in this area is generic; in his report, Statler does not profess to be an expert on riding lawn mowers but on "consumer product safety generally, manufacturer and seller responsibility, and the consideration of dangerous products by the [CPSC]." No objective proof has been provided to the Court that Statler is, for instance, a recognized expert in the field of riding mower safety, or a particular expert on ROPS. Furthermore, Statler's educational qualifications are not those of an engineer, but those of a lawyer.

*Id.* at 901. Here too, although Statler's professional pedigree is impressive, there is no evidence that he is a recognized expert in window blind design or has any particular expertise in that field. Accordingly, the Court bars Statler from offering his opinion as to the reasonableness of the window blind design at issue and the availability of design alternatives.

As for Statler's opinion that the warning labels on the window blinds were inadequate, the Court notes that Statler appears to have some experience evaluating and designing warning labels for consumer products during his tenure as a consultant with A. T. Kearney from 1986 to 1987 and as a product safety and regulatory consultant from 1987 to the present.[3] But again, this

---

[3]     Statler's *curriculum vitae* contains very general references to his work with warnings, noting that among the "areas covered" since 1987 are "labeling" and "warnings," Pl. Br. at 17 ("Statler CV"), and that, as a partner at A. T. Kearney, he "[d]evise[d] advertising, packaging, and warnings to reduce

experience (as far as can be determined by the record) is general at best, and Plaintiff has provided no elucidation as to the specific nature of Statler's experience. What is clear is that he has never designed a warning label for window blinds, Statler Dep. 133:17-22, and did not consider any empirical evidence to support his opinion that the warning labels were inadequate. *Id.* 136:17-137:9. This is not splitting hairs. It is not unreasonable to think that the users of lawn mowers, power tools, all-terrain vehicles, and fireworks (all of which are specifically mentioned in Statler's *curriculum vitae*) would require different types and forms of warning labels than an operator of a window blind. Or perhaps this is not the case at all, but Plaintiff has failed to provide any basis for the Court to believe that Statler's prior experience with warning labels provides him with superior knowledge and expertise regarding the efficacy of warning labels in the context of window coverings or window blinds. *See Lewis*, 561 F.3d at 705 (party offering expert bears burden to show admissibility by a preponderance of the evidence). This failure of proof, coupled with Statler's lack of any formal education or training in the fields of psychology or human factors, renders him unqualified to testify that the warning labels on the blinds were inadequate. *See Moore v. P&G-Clairol, Inc.*, 781 F. Supp. 2d 694, 704 (N.D. Ill. 2011) (Kendall, J.) (expert who had "no background or training in psychology or any field related to the design of warnings" was not qualified to testify regarding adequacy of warnings).

In short, Statler's professional background, while impressive, does not render him an expert capable of assessing the safety and design of Hunter Douglas window blinds, the adequacy of the warning labels on the blinds, or the costs and benefits of implementing any available alternatives. From this, it also follows that Statler is equally unqualified to offer an opinion as to whether Hunter Douglas' actions with respect to the corded window blinds and

---

likelihood of legal claims and adverse judgments." *Id.* at 18. His deposition testimony is also devoid of specific examples or illustrative experiences. *See also* Statler Dep. 131:12-25.

labels were unreasonable, devoid of due care, or contrary to its "safety responsibilities." Statler Report at 22.[4]

## B.    Statler's Methodology

Even assuming, *arguendo*, that Statler is qualified to offer the opinions that he gives, the Court finds his opinions unreliable under Rule 702 and *Daubert* and precludes his testimony on this independent basis. In assessing the reliability of an expert's testimony, Rule 702 requires the district court judge to evaluate whether it "is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). Further, "'*Daubert* offers a non-exclusive list of factors to aid judges in determining whether [a] particular expert opinion is grounded in reliable scientific methodology. Among the factors articulated are: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community.'" *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2013) (quoting *Dhillon*, 269 F.3d at 869). District judges have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. In this case, Statler has failed to demonstrate that he has employed a reliable methodology in arriving at his opinions.

---

[4]      Plaintiff also urges the Court to consider an additional case that is currently pending in Arizona, *Deasey v. Bud's Drapery Den, Inc.*, No. C2011-5784 (Ariz. Sup. Ct. Sept. 12, 2013). Plaintiff claims that, although the Arizona state court barred Statler from testifying as an expert under Rule 702 and *Daubert*, the court nonetheless determined that Statler was sufficiently qualified to offer his opinion on window blinds and that his methodology was both relevant and reliable. As Defendant correctly points out, however, the state court did not go so far as Plaintiff suggests and, in fact, expressed many of the same concerns as the Court does here.

First, Statler admits that he has not performed any tests related to the safety aspects of corded window blinds. Statler Dep. 41:18-23. Nor did he analyze any of the factors involved in window blind design. *Id.* 39:4-11. In an apt illustration, Statler testified that a break-away window blind cord was a safer alternative design to the traditional corded one at issue here, but he did no evaluation of how the breakaway window blind cord would actually affect the operation and mechanics of the window blinds. *Id.* 129:2-8. Statler's failure to test the alternative break-away window blind cord is particularly troublesome because "'[i]n alternative design cases, [the Seventh Circuit has] consistently recognized the importance of testing the alternative design'" as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony. *Winters*, 498 F.3d at 742 (quoting *Dhillon*, 269 F.3d at 870.) *See also Cummins v. Lyle Indust.*, 93 F.3d 363, 368 (7th Cir. 1996) ("Our cases have recognized the importance of testing in alternative design cases."). In much the same way, Statler seeks to testify that the warning labels on the subject window blinds were inadequate; yet, he did not consider any empirical information to support his conclusion. Statler Dep. 136:17-137:9. Indeed, when asked how he would have designed the warning label, Statler was completely unprepared to propose one. *Id.* 212:4-10.

In response, Plaintiff strenuously contends that "Statler is not offering any of these opinions as a scientific expert" but as a "warnings and safety expert" based upon his experience with product safety risks and "his specialized knowledge as to how manufacturers can and should act forcibly and responsibly to reduce or eliminate these hazards." Pl. Statler Resp. at 5. In so doing, Plaintiff attempts to distinguish between a "scientific expert," whose testimony is "subjected to thorough scientific inquiry," and an "expert with 'specialized knowledge' who can assist the trier of fact." *Id.* at 11. Using this logic, Plaintiff argues that Statler has demonstrated

"professional rigor" by conducting extensive relevant research and using his significant practical experience to render his conclusions in this case." *Id.* at 12. But this argument misses the mark.

As an initial matter, Plaintiff's suggestion that the reliability of "non-scientific" testimony should be assessed by a less stringent standard than scientific testimony is misplaced. Indeed, the Supreme Court in *Kumho* held the opposite, extending the underpinnings of *Daubert* to "non-scientific" expert testimony. *See Kuhmo*, 526 U.S. at 149, 119 S.Ct. at 1175 ("We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702."). *See also Cummins*, 93 F.3d at 367 n.2 ("The basic tasks of the district court remains essentially the same – to ensure that the evidentiary submission is of an acceptable level of 'evidentiary reliability.'"); *Dahlin v. Evangelical Child and Family Agency*, No. 01-CV-1182, 2002 WL 31834881, at *7 (N.D. Ill. Dec. 18, 2002) (noting that, under *Kuhmo*, the "characterization of testimony as 'scientific' or 'non-scientific' . . . does not govern the applicability of *Daubert*"). "The objective of that [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo*, 526 U.S. at 152, 119 S.Ct. at 1176.

As for the methodology that Statler employed to arrive at his opinions, Plaintiff cites to excerpts from Statler's deposition and contends that his methodology "consists mainly of 'some . . . 25 years of consulting experience, 40 years of involvement in consumer product safety . . . also on a published document originally issued by the CPSC . . . in '76-'77 period and then revised again . . . around 2005-2006 . . . – a guideline for manufacturers . . . in terms of good manufacturing practices.'" Pl. Statler Resp. at 12 (citing Statler Dep. 84:23-85:11). The repeated

mantra throughout Statler's deposition and Plaintiff's brief is that Statler relied upon "decades of experience with various consumer products." Pl. Statler Resp. at 12. *See also* Statler Dep. 50:2-7; 85:14-16; 131:17-25. But "a witness who invokes 'my expertise' rather than analytical strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elects. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Perhaps mindful of this hurdle, Plaintiff attempts to give some substance to Statler's methodology by citing to twelve factors that Statler himself lists as "critical considerations" in determining the soundness of a product's design. *See* Pl. Statler Resp. at 12-13; Statler Report at 7-8. Of those factors, however, Statler himself acknowledges that he failed to evaluate a number of them, including the functionality of alternative designs, how the alternative design(s) would affect the product's consumers, as well as the functionality and utility of the subject window blinds. *See* Statler Dep. 129:2-8; 41:18-23.

In the end, it is apparent that Statler's methodology consisted only of reviewing some government publications, a limited collection of documents from this case, and declaring his opinions relying upon nothing but his "extensive" professional experience. He conducted no formal tests or reviewed any empirical data regarding the functionality, technological availability, economic feasibility, and consumer marketability of the corded window blind design as compared to alterative designs.[5] This is not to say that Rule 702 and *Daubert* mandate hands-on testing in every instance, but Statler's methodology is not grounded in the scientific method or susceptible to testing. Nor can Plaintiff cite to any evidence that experts in the product design

---

[5] In this way, *Dewick v. Maytag Corp.*, 324 F. Supp.2d 894, 898 (N.D. Ill. 2004) (Shadur, J.), is distinguishable. There, in addition to reviewing publicly available documents, the expert performed force tests, made calculations using anthropometric data when arriving at his opinion that the product in question was defectively designed. It should also be noted that Judge Shadur precluded the expert from testifying about the availability of alternative designs and the adequacy of warning, because the expert could not explain how he arrived at his conclusions and failed to perform any tests regarding the efficacy of the warnings and did not prepare any alternative warnings. *Id.* at 900.

and safety fields commonly arrive at such opinions in the absence of any testing and based solely on the limited universe of information that Statler reviewed for this case. "This type of unsubstantiated testimony . . . provides no basis for relaxing the usual first-hand knowledge requirement of the Federal Rules of Evidence on the ground that the expert's opinion has a reliable basis in knowledge and experience of his discipline." *Cummins*, 93 F.3d at 369 (internal quotations omitted). Statler's opinions are particularly troubling because they actually lend themselves to hands-on testing and empirical study "such that conclusions based only on personal opinion and experience do not suffice." *Dhillon*, 269 F.3d at 870. It is true that "experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Zenith Elects.*, 395 F.3d at 420 (internal citation omitted).

### C. Statler's Opinion as to Hunter Douglas' Knowledge

For the reasons discussed above, Statler may not testify that the corded window blinds at issue suffered from a design defect, that other alternative designs were reasonably available, and that the design of warning labels on the blinds was inadequate. Statler also opines that Hunter Douglas acted unreasonably and ignored its corporate responsibility by knowingly selling defective window blinds with inadequate warning labels. But because these opinions are predicated upon Statler's opinions as to the design of the blinds and labels, they are similarly excluded. That said, Defendant offers yet another argument to exclude Statler's opinion about Hunter Douglas. According to Defendant, much of Statler's statements as to Hunter Douglas' actions are statements of law and, therefore, inappropriate for expert testimony. The Court agrees that these opinions also are inadmissible.

As a preliminary matter, the Court notes that even a casual reading of Statler's expert report reveals that it "reads less like an expert's unbiased assessment and more like counsel's closing argument." *Hayes*, 518 F. Supp. 2d at 901. In one of many illustrations, Statler remarks, "How many youngsters must suffer entanglement deaths before a manufacturer of looped-cord vertical blinds, or the industry association, acts forcefully to address or eliminate such an insidious hazard?" Statler Report at 20. He continues, "There is no tragedy more jarring than the sudden and needless death of a child. Hunter Douglas knew, over an extended period of time, that a **highly-vulnerable population** namely, infants and toddlers, were *almost always* the victims of these incidents." *Id.* (emphasis in original). In yet another passage, Statler writes, "In the context of a product known almost from the outset to be fraught with the foreseeable risks of children being strangled to death, such conduct [by Hunter Douglas] belies due care." *Id.* In another, "Directly and foreseeably, a flawed, uncorrected vertical blind design by Hunter Douglas . . . compromised safety. As a result, Max Padilla became one more victim of the unresponsive actions and omissions of both Hunter Douglas and the [trade] Association." *Id.* at 21. In the last four pages of his report, Statler states his opinion that Hunter Douglas "knew" about the defective design and associated risks more than a half dozen times. This is not to say that inflammatory language alone would render an expert's opinions *a priori* inadmissible under Rule 702, but it certainly highlights the importance of the trial judge's role as the "gatekeeper" under *Daubert*.

First, it is apparent that Statler's conclusion as to Hunter Douglas' "knowledge" is based only upon his review of CPSC reports, many of which were issued after Statler had left the agency, as well as his reading of the Hunter Douglas depositions in this case. The Court is not persuaded based on the record that Statler is in a better position than the jury to assess Hunter

Douglas' subjective intent. In fact, according to Statler himself, "even the most casual review of the available in-depth investigations, and literature on the subject, would have revealed [Hunter Douglas'] oversight." Statler Report at 14. Given Statler's scant analysis, allowing him to testify as to Hunter Douglas' intent would not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), and "would be little more than telling the jury what results to reach." *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, No. 97-C-5696, 2004 WL 783356, at *6 (N.D. Ill. Jan. 28, 2004) (internal quotation omitted). *See Isom v. Howmedica, Inc.*, No. 00-C-5872, 2002 WL 1052030, at *2 (N.D. Ill. May 22, 2002) (excluding expert opinion that defendant "consciously disregarded" and was "grossly indifferent" to risk of injury).

In addition to opining about Hunter Douglas' subjective knowledge, Plaintiff also offers Statler to testify that Hunter Douglas acted with "an absence of reasonable or due care" and showed a "reckless disregard for child safety." Statler Report at 19-20, 22. In short, Plaintiff would have Statler testify, "[H]ad Hunter Douglas, as a leading producer of vertical window blinds – literally, a household name – conducted its affairs in a manner more consistent with due care to addressing what it knew to be the danger of loop-corded window blinds of any kind, it is decidedly more likely than not that 3-year old Max Padilla would *not* have died." *Id.* at 24 (emphasis in original). The reason for this opinion is straightforward – Plaintiff is suing Hunter Douglas under a negligence product liability theory.

Under Illinois law, "a product liability action asserting a claim based on negligence, such as negligence design, is based upon fundamental concepts of common law negligence." *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154 (Ill. 2011). "As in any negligence action, a plaintiff must establish the existence of a duty, a breach of that duty, an injury that was proximately caused by that breach, and damages." *Id.* In the context of product cases, Plaintiff

must also demonstrate that "either (1) the defendant *deviated from the standard of care* that other manufacturers in the industry followed at the time the product was designed, or (2) that the defendant knew or should have known, *in the exercise of ordinary care*, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity." *Blue v. Envtl. Eng'g, Inc.*, 828 N.E.2d 1128, 1141 (Ill. 2005) (emphasis added).

Although Rule 704(a) has eliminated the prohibition barring expert opinions on "ultimate issues," the Court "must nonetheless analyze whether an 'expert' opinion . . . would assist the jury and if so, whether its probative value is outweighed by its danger of unfair prejudice." *Dahlin*, 2002 WL 31834881, at *3 (citing Fed. R. Evid., Advisory Committee Notes). In *Isom*, the district court precluded an expert from testifying that the defendant "conscious disregarded" and was "grossly indifferent" to the risk of injury and that the product at issue was "unreasonably dangerous," because the expert was not "any more qualified than an ordinary juror to draw these inferences." *Isom*, 2002 WL 1052030, at *2. Similarly, in *Steadfast Insurance*, the district court held that an expert could not testify that a defendant had acted in "bad faith," "with improper motive," or with "ill will," for the reason that the "experts are in no better position than the jury to assess [the defendant's] subjective intent." *Steadfast Ins.*, 2004 WL 783356, at *6. *See also Dahlin*, 2002 WL 31834881, at *5 (prohibiting expert from testifying, *inter alia*, that defendant's conduct proximately caused plaintiff's injury). Here, in support of Plaintiff's claims, Statler intends to testify that Hunter Douglas acted with "an absence of reasonable or due care" or showed a "reckless disregard for child safety." As in *Isom* and *Steadfast*, however, Statler is in no better position than the jury to arrive at this conclusion after consideration of all relevant facts.

For the reasons stated herein, the Court grants Defendant's motion to exclude Statler's expert testimony in its entirety.

## II.     Robert Wright

Plaintiff also offers Robert Wright as an expert witness.  Wright purports to be an expert in the field of "Force Analysis and Dynamics," which includes accident reconstruction, product design and product safety.  Def. Wright Br., Ex. A ("Wright Report") at 1.  According to Wright, "[a]n individual who has the expertise in Force Analysis has the ability to analyze various objects and determine what will happen to those objects if forces are applied and what motions (if any) will occur as a result of those forces."  *Id.*; Def. Wright Br., Ex. B ("Wright Dep.") 48:7-12.  Here, Plaintiff offers Wright to provide two primary opinions.  First, Wright intends to give his opinion as to the events that led to Max's death on April 22, 2008, based upon an accident reconstruction analysis.  *Id.* at 4-5.  Second, Wright intends to testify that the window blinds were "defective and unreasonably dangerous and its defect caused and/or contributed significantly to the accident that resulted in the death of Maximillian Padilla."  *Id.* at 7.

Defendant requests that Wright's testimony be barred altogether on the grounds that:  (1) Wright is not qualified to testify as an expert on window blind design and safety; and (2) Wright's opinion regarding the design of the window blinds, as well as his reconstruction of the accident, are both unreliable.  For the following reasons, the Court grants Hunter Douglas' motion in part and denies it in part.  Wright is barred from testifying that the window blind at issue was defectively designed; however, he may testify how the mechanisms used in corded and non-corded window blinds to open and close the blinds operate.  Wright may also testify regarding the results of his accident reconstruction analysis.

## A.    Wright's Qualifications

Hunter Douglas contends that Wright is unqualified to testify as an expert on the adequacy of the design of Defendant's window blinds.   It does not contest Wright's qualifications in the area of accident reconstruction.  Based upon the record, the Court concludes that Wright is not qualified to testify as to whether the corded window blind was defectively designed.  Wright's skill and education, however, render him sufficiently qualified to testify as to the mechanical features of Defendant's looped cord and wand-operated window blinds.

First, it is clear that Wright possesses the necessary education, skill, and experience to offer his opinion on how the different types of blinds operate mechanically.   Wright has a bachelor's degree in Mathematics with a minor in Physics and Chemistry from Butler University. He also earned a Master of Science degree and a Ph.D. from Ohio State University in a joint program involving mathematics, science and engineering.  *See* Wright Aff. at 1.   Additionally, Wright has served as a faculty member at the Ohio State University, where he taught a variety of courses in the areas of math, science, and engineering and has published a number of scientific and technical papers for technical societies and textbooks.  *See id.*   For the purposes of this case, he reviewed the design schematics of the window blinds as well as the blinds themselves to determine how corded and non-corded blinds operate.  Wright Dep. 114:7-14.  Accordingly, to the extent that Wright will be offered to testify regarding these limited issues, as a trained engineer and physicist, he is qualified to do so.

Despite Wright's technical qualifications, however, Wright does not have any specialized experience, education, or training relating to product design and safety, in general, or window blind design in particular.   For example, Wright has never taken any formal courses in product safety.  Wright Dep. 120:17-121:4.   Nor has he taught any classes focusing on product design.

*Id.* 80:8-20. Wright has not designed any products, except for model trains, off-road vehicles and combustible engines. *Id.* 80:21-81:9. And his consulting experience consists primarily of accident reconstruction analysis, with less than 10 percent of assignments dealing with household products. *Id.* 120:17-121:4.

For his part, Wright testified that the field of "force analysis and dynamics" includes product design "because many products have forces that have to react within the product to make them work." *Id.* 119:23-120:6. Under this rationale, however, the design of every product, whether an automobile, a computer, or an airplane, would come within Wright's expertise. Without more, Wright's generalized experience in physics and engineering are insufficient to provide him with the specialized knowledge necessary to testify that the Hunter Douglas window blind was defectively designed. *See Martinez v. Sakurai Graphic Sys. Corp.*, No. 04 C 1274, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007) ("Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge.") (citing *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992)). Wright also had a vague recollection of working on one or two cases involving window blinds, but admitted during his deposition that he was "guessing" and was "not sure about" those matters. *Id.* 63:13-24. In sum, Plaintiff has not demonstrated that Wright possesses superior knowledge, skill, experience, or education in the fields of window blinds or household product design and safety. Wright is thus barred from testifying as to whether Defendant's looped cord window blinds were defectively designed.

At the same time, however, the Court finds that Wright's technical expertise and education render him qualified to present a portion of his testimony to the finder of fact. Specifically, Wright can aid the jury in understanding how the looped cord window blinds

operate differently than the wand-operated blinds, and how the physical properties of the two window blind systems differ.

**B.      Reliability of Wright's Design Defect Opinions**

In addition to challenging Wright's qualifications, Defendant argues that Wright should not be allowed to offer his opinion on whether its window blinds were defectively designed because the methodology he employed is unreliable.  The Court agrees and bars Wright from offering his design defect opinions on this independent basis.

In determining whether an expert's testimony is reliable, Rule 702 requires that the district court judge conclude that the testimony "is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).  Furthermore, as noted previously, in making this determination, the Court should consider "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Winters* (quoting *Dhillon*, 269 F.3d at 869).  Here, Wright seeks to testify that Defendant's looped cord window blinds were defectively designed because, at the time the blinds were sold, Defendant had already created alternative, wand-operated window blinds that Wright believes are safer.  As a result, he concludes that Hunter Douglas should have sold only the wand-operated blinds and taken the corded blinds off the market completely.  However, the methodology that Wright utilizes in reaching his conclusions does not pass the reliability test under Rule 702 and *Daubert*.  For this additional reason, Wright is barred from testifying as to whether Defendant's looped cord window blinds suffer from a design defect.

As mentioned, "'[i]n alternative design cases, [the Seventh Circuit has] consistently recognized the importance of testing the alternative design'" as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony. *Winters*, 498 F.3d at 742 (quoting *Dhillon*, 269 F.3d at 870.) Furthermore, experts seeking to offer their opinion in alternative design cases must also consider: "'the degree to which the alternative design is compatible with existing systems . . . ; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative designs; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine.'" *See Dhillon*, 269 F.3d at 870 (quoting *Cummins*, 93 F.3d at 369).

Here, Wright admits that he did not rely on or refer to any studies, scientific literature, learned treatises, or engineering references in forming his opinions. *See* Wright Dep. 195:8-14; 205:17-22; 207:1-12. Nor did he review any industry standards related to the window blinds industry. *Id.* 208:9-17. Wright also acknowledged that his opinions regarding Defendant's looped cord window blinds have not been subjected to peer review or accepted within the engineering or scientific community. *Id.* 206:15-25. Perhaps more significantly, Wright failed to conduct any of the specific analyses outlined in *Dhillon*. As Defendant points out, Wright has failed to test whether the wand-operated window blinds could function properly on tall windows, nor has he assessed whether wand-operated blinds could sufficiently work in different settings on a variety of window shapes. *See id.* 138:16-139:1; 156:2-14. In addition, Wright did not conduct any tests to measure whether consumers would have a more difficult time operating the wanded blinds as opposed to the loop cord blinds. *Id.* 139:24-140:6. Wright also failed to consider how the consumer public would respond to Defendant only offering the wand window

blinds, and what the consumers would be willing to pay for such window blinds.  *Id.* 149:15-24; 206:8-14.  In short, Wright admits that he has not conducted any studies relating to the wand-operated blinds' "practical hands-on functionality . . . marketing . . . how people use them, how they select them . . . [and] human factor studies."  *Id.* 205:5-16.  Finally, during the August 20 hearing, he stated that he had not reviewed any information comparing the costs of corded blinds with alternatives and had not conducted any risk assessment analysis comparing the different products.

In his opposition to the motion, Plaintiff primarily relies on his belief that *Dhillon* is inapplicable in this case.  According to Plaintiff, Wright's testimony is distinguishable from the testimony offered in *Dhillon* because Wright "is not proffering an alternative design but rather opinion that a wanded vertical blind is safer than a corded vertical blind."  Pl. Wright Resp. at 9. Plaintiff adds that Wright need not consider such factors as marketability or consumer preference because wanded blinds have been available in the marketplace as an alternative since 1995.  *Id.* Plaintiff's argument might have legs if Wright were to conclude that Hunter Douglas should be offering wand-operated blinds *in addition to* corded blinds.  But Wright intends to testify that Hunter Douglas should be offering wand-operated blinds *in place of* corded blinds.  That is the very definition of an alternative design theory, and Wright did not perform the evaluations that he himself concedes must be done in an alternative design case.

> Q:    Is there ever a situation in which a manufacturer could make available two different options on one of its products, one of which was safer in some situations, one of which was more useful to more people and safer in other situations, where it would be justifiable for . . . the manufacturer to offer both . . . ?
>
> A:    I understand the question, and we would have to examine each product and each situation for me to make a statement one side or the other.

Q:     You would have to look at how the product was used, who used it, what type of configurations it could be used in, things like that, correct?

A:     I would agree with that, yes.

Q:     You haven't done that here, have you?

A:     I've looked at – in a residential situation, the answer is that a wand in my opinion is the way to go.

Q:     I understand your opinion, but you've made no study in this case, have you?

A:     I have not done a study in that case.

Q:     In this case.

A:     Right, in that manner of your question, I have not done a study.

Wright Dep. 171:14-172:18.

Based upon these factors, Plaintiff has failed to demonstrate that the methodology employed by Wright in arriving at his conclusions that the corded window blinds were defectively designed and that Hunter Douglas should only have sold wand-operated window blinds meets the reliability requirement of Rule 702 and *Daubert*.   Accordingly, the Court bars him from testifying as to these matters.

**C.     The Reliability of Wright's Accident Reconstruction Opinion**

Lastly, Defendant argues Wright should be prevented from offering his opinion on how Max's death occurred because Wright's accident reconstruction analysis is also unreliable under *Daubert*.   Specifically, Defendant alleges that Wright's accident reconstruction is based on "unsupported speculation and conjecture."   *See* Def. Wright Br. at 14.   On this point the Court disagrees.

Defendant contends that there are no factual bases that support Wright's accident reconstruction, and that he has not sufficiently eliminated other possible scenarios. *See id.* at 15. Plaintiff, however, correctly retorts that Wright relied on several pieces of data while reconstructing Max's accident. For example, Wright reviewed the deposition testimony of a number of witnesses in this case, including Jose and Ruth Padilla, the report of the incident prepared by the local police department, and a number of photographs taken immediately after the time of the incident. Wright Report at 3. He also conducted a personal inspection of the site and interviewed the Padillas. *Id.* Additionally, during the *Daubert* hearing, Wright provided a detailed account of his physical inspection of the room and its contents, as well as the myriad of measurements that he took of the room. He also discussed how he used the data and his extensive experience in accident reconstruction, a field in which Defendant does not dispute Wright's qualifications, to recreate what he concludes to have been the most plausible scenario that led to Max's death. Based upon the record, the Court finds that his accident reconstruction methodology is sufficiently reliable to be offered at trial. Accordingly, the Court denies Hunter Douglas' motion to preclude Wright's accident reconstruction testimony.

## III. Joseph Sala

Joseph Sala is a member of the Human Factors Practice group at the consulting firm, Exponent Failure Analysis Associates. Pl. Sala Br., Ex. 1 ("Sala Report") at 1. As a Senior Managing Scientist at Exponent, Sala studies "how the capabilities and limitation of people interact with the products, equipment, and systems in their environment, and how this interaction affects safety." *Id.* In this case, Defendant has asked Sala to analyze the design and safety of corded and wand-operated window blinds from a human factors perspective. In the end, Sala offers four opinions in this case: (1) Defendant's response to safety concerns over looped

window blind cord in the mid-1990's was reasonable in light of the information available at that time; (2) it was reasonable for Defendant to continue offering window blinds with looped cords as an option because, in certain environments, such blinds are more suitable than their wand-operated counterparts; (3) additional and/or alternative warning labels on the subject window blinds would not have caused the blinds' original purchasers to either not purchase the blinds in the first place or to use them differently; and (4) based on Mr. and Mrs. Padilla's prior behavior regarding child safety, there is no scientific reason to believe that additional or alternative warning labels would have altered their behavior and prevented the accident. *Id.* at 14.

In his motion to bar Sala's testimony, Plaintiff argues that Sala's testimony is inadmissible under *Daubert* because his opinions will not assist the trier of fact, lack sufficient facts and data, and are not the product of reliable research methods or the scientific method. As discussed below, the Court bars Sala from testifying as to the first opinion; however, the Court finds that Sala's qualifications and methodologies with respect to the remaining opinions are sufficient to satisfy the requirements of Rule 702 and *Daubert.*

### A. Sala's Opinion Regarding Defendant's Historical Response

In its opposition to Plaintiff's motion, Defendant states that, "[i]f the Court grants Hunter Douglas's motion to exclude the testimony of Mr. Statler and Dr. Wright on [whether Hunter Douglas's historical response to the risks of corded window blinds was reasonable], then Dr. Sala's testimony will not be necessary on this subject." Def. Sala Resp. at 7. Because the Court has barred Statler and Wright from testifying as to this issue, the Court deems the first opinion offered by Sala as withdrawn by Defendant.

## B.    Sala's Opinion Regarding Continued Sales of Corded Alternative

In his second opinion, Sala concludes that Defendant was reasonable in continuing to offer consumers the option of looped cord-operated window blinds even after it became aware that such blinds pose a risk of strangulation. *See* Sala Report at 14. This is so, according to Sala, because the "functionality [of window blinds] would be limited or eliminated for a portion of the intended user population due to human factors issues related to people's capabilities and limitations and the expected use environment for the product if the [wand] were the only control mechanism available." *Id.* Plaintiff argues that Sala is not qualified to arrive at this opinion and that, to the extent that he is qualified, his opinion is not the product of reliable research methods, is based upon insufficient facts and data, and will not aid the jury. These arguments are unpersuasive.

As for Sala's qualifications, the scientific discipline of "human factors" studies "the limitations and capabilities of people as they use products, systems and equipment in their environments." Def. Resp., Sala Aff. ¶ 4. According to Sala, the field of human factors "has fundamental underpinnings in the areas of psychology . . . [and] considers the interaction between a person, a product, and a specific environment and how this interaction between a person, a product, and a specific environment and how this interaction is influenced by a human's abilities, limitations, perceptions, knowledge, and pattern behaviors."[6] *Id.* Human factors differs from product engineering because "a design engineer might evaluate operating mechanisms by considering how the parts of the device are composed, interact with one another,

---

[6]    A number of major universities have Human Factor departments and programs and a general description of the field can be found at their websites. *See, e.g.,* University of Iowa (http://www.uidaho.edu/class/psychcomm/humanfactors); North Carolina State University (http://psychology.chass.ncsu.edu/psg/); University of Buffalo (http://www.ise.buffalo.edu/ graduate/phdhf). Such programs may apply for accreditation from the Human Factors and Ergonomic Society (https://www.hfes.org//Web/Default.aspx).

and allow for a product to function in a certain way." *Id.* ¶ 6. In contrast, a human factors expert "investigates how a person's perceptions, information processing, and physical capabilities and limitations affect the way users interact with window coverings." *Id.*

Plaintiff does not claim that "human factors" is not a legitimate field of scientific inquiry. Nor does Plaintiff challenge Sala's qualifications as an expert in the area of human factors.[7] Instead, Plaintiff argues that Sala should be not permitted to testify as to whether it was reasonable for Hunter Douglas to sell corded window blinds along with wand-operated window blinds because Sala "lacks expertise in designing, marketing, or manufacturing window blinds." Pl. Sala Br. at 6. This argument may have some merit if Sala's opinion were directed at the engineering or design of the window blinds, but this is not the case. As Sala testified during the *Daubert* hearing, his opinion is that it was reasonable for Defendant to offer both choices to its customers *from the human factors perspective*.[8] Accordingly, the Court finds that Sala is qualified to offer his second opinion at trial.

---

[7] Sala received a bachelor's degree in Psychology from Rutgers University and a master's degree as well as a Ph.D. in Psychology and Brain Sciences from John's Hopkins University. In addition, Sala has published numerous articles in the field of psychology and cognitive neurosciences in a variety of scientific journals and has consulted on a number of matters involving human factors methodologies. Finally, Sala has served as a peer reviewer for scientific journals in the areas of neurosciences and human factors and is a member of the Society for Neurosciences, the Human Factors and Ergonomics Society, and the Association for Psychological Science. *See* Pl. Sala Br., Sala's *Curriculum Vitae*.

[8] Sala's use of the word "reasonable" in this context is unfortunate because it has the potential to create jury confusion. As noted above, to prevail at trial, Plaintiff must show that Defendant's product created an unreasonable risk and that Defendant failed to exercise ordinary care. During the *Daubert* hearing, Defendant's counsel acknowledged that Sala was offering his opinion based upon his human factors analysis. Accordingly, to alleviate the risks of jury confusion, Sala should avoid using the term "reasonable" or "unreasonable" when providing his second opinion at trial. Instead, he can testify that, based upon his human factors analysis, Defendant's decision to offer the corded window blinds along with the wand-operated blinds "made sense" or "was justified" (or other such comparable terminology).

Next, Plaintiff contends that Sala's opinion was not the product of reliable research methods.[9] Plaintiff's sole basis for this argument is Sala's consideration of a strength test analysis conducted in the United Kingdom. *See* Pl. Sala Br. at 11. This argument is not well-taken. As Sala testified during the *Daubert* hearing and his deposition, in addition to the UK study, Sala considered numerous other scientific articles that analyzed the relative mobility, dexterity, and strength of populations of varying age, as well as disabilities, to determine whether such populations would be able to operate wand-operated window blinds. Pl. Sala Br., Ex. 2 ("Sala Dep.") 81:1-82:22; 83:5-18; 84:4-22; 85:8-20. In conjunction with this data, Sala also evaluated the manner in which vertical blinds are typically used by inspecting blinds at retail stores, reviewing sales material related to vertical blinds on the internet, and discussing the market for vertical blinds with a Hunter Douglas representative. *See id.* 13:5-14:2; 148:1-10; 149:5-19 152:10-24.

Nevertheless, Plaintiff also argues that Sala's second opinion is unreliable because it is based upon insufficient data. According to Plaintiff, Sala's admission that he did not test the precise amount of strength needed to operate different types of vertical window blinds or examine the specific blinds at issue dooms his analysis. *See* Pl. Sala Br. at 7.

In response, Sala notes that Plaintiff's characterization is too simplistic because "each installation and use environment would lead to a unique combination of factors that would affect the amount and application of force required to operate the window coverings." Sala Aff. ¶ 8. He continues, "[e]valuating the usability of this product for portions of the population relies on more than simply an understanding of whether or not the user is capable of producing a requisite force. Specifically, questions as to whether a product is usable by the range of intended user

---

[9] Plaintiff, however, does not challenge the second opinion on the basis that Sala failed to apply scientific methods and principles in performing his analysis. *See* Pl. Sala Br. at 11-15.

population must consider how the operation might contribute to or be affected by fatigue, how it might be altered by or lead to compensatory actions and how it might lead to increased difficulty." *Id.* The Court finds Sala's explanation persuasive. In any event, Plaintiff does not challenge the methodology used by Sala to form his second opinion, and whether an expert considered all of the relevant factors goes to the weight to be afforded the expert's opinion, not its admissibility. *See Daubert*, 509 U.S. at 596; *Lees v. Carthage Coll.*, 714 F.3d 516, 526 (7th Cir. 2013); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000); *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000).

Plaintiff's final objection is that this opinion would not aid the jury in understanding the evidence in this case because "the conclusion – that older people or people with disability may have difficulty operating corded systems – is within the common sense of the jury." Pl. Sala Br. at 6-7. As noted above, an expert's testimony must "assist the trier of fact in understanding the evidence or to determine a factual issue." *Bielskis*, 663 F.3d at 893-94. Furthermore, "[e]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Elaborating on its argument, Plaintiff states that "[i]t does not take an expert to explain to the jury that as a person ages, his or her strength and dexterity decreases because this is part of common human experience." Pl. Sala Br. at 7. But Sala does not merely seek to testify as to how the strength and dexterity of human beings vary with age and disability. Rather, Sala's opinion relies on his human factors expertise to explain how certain individuals and environments may make looped cord window blinds preferable to other types of blinds. As Sala writes in his report, "[j]ust as a single style of window covering may not be appropriate for all users, the same is true for the mechanism used to control and adjust the blind. For instance, the

Wand places additional demands on a user that may present difficulties for specific populations or in specific environments that the nylon pull cord and beaded chain option does not." Sala Report at 9. While the jury may understand the human aging process generally, the Court nonetheless believes that Sala's analysis will aid the jury in understanding how people choose to purchase certain products, and why looped cord blinds may be suitable for specific environments and people.

### C.    Sala's Opinion As to Roberts and Davis

In addition to the above two opinions, Sala also reviewed the depositions of Mindy Roberts, the prior owner of the Padilla's home and original purchaser of the window blinds, and her mother, Brenda Davis, who assisted Roberts in purchasing the blinds. From this, as well as other factors, Sala concludes that "[t]here is no scientific reason to believe that additional or alternative warning or safety information would have altered their behavior with respect to the selection, purchase, installation, and use of the [blinds]." Sala Report at 14.

Plaintiff objects to the admissibility of this opinion, claiming that Sala did not apply scientific methods and principles reliably in reaching his conclusion. *See* Pl. Sala Br. at 13-15. In reality, Plaintiff's argument is simply that Sala's third opinion is not consistent (at least, in Plaintiff's eyes) with the testimony offered by Roberts and Davis in this case. Be that as it may, based upon Sala's report and his deposition testimony, it is clear that Sala considered the depositions of these women, as well as a number of other depositions taken in this case. *See* Sala Dep. 10:4-22. Furthermore, Sala considered a number of scientific articles in the field of cognitive psychology that discuss human behavior in response to product warnings. *Id.* 88:19-89:21.

Again, Plaintiff does not challenge Sala methodology, but only his conclusions. Such arguments are more appropriately made to the jury at trial, rather than in a *Daubert* motion to the Court. *See Cummins*, 93 F.3d at 368 ("the [*Daubert*] focus must be solely on principles and methodology, not on the conclusions they generate").

### D. Sala's Opinion as to The Padillas

In his fourth and final opinion, Sala states that the "[t]here is no scientific reason to believe that additional or alternative warning or safety information provided with the product would have altered [Mr. and Mrs. Padilla's] behavior and averted this incident." Sala Report at 14. Sala believes this, because the "Padillas did not demonstrate safety information seeking behaviors with respect to child safety in general and that related specifically to window coverings, and displayed limited response to acknowledged and obvious safety concerns." *Id.*

Plaintiff asks the Court to strike this opinion, arguing that Sala failed to apply scientific methods and principles in this analysis. Pl. Sala Br. at 11-13. But again, Plaintiff does not quarrel with Sala's qualifications to offer this opinion. Nor does Plaintiff contest his methodology. Rather, Plaintiff's objection is based on Sala's purported failure to consider all of the evidence that Plaintiff deems relevant. *See* Pl. Sala Reply at 4 (noting that the "contention that Dr. Sala's conclusion is unreliable is not premised on the reliability of Dr. Sala's academic sources; it is premised on the insufficient facts provided to Dr. Sala.").

Here, based upon a review of the deposition testimony, Sala believes that the Padillas have shown a tendency to ignore safety hazards of which they were aware. As an example, Sala points to the risk created by a television that was placed on a dresser in Max's room. According to Sala, although Mr. Padilla recognized the risk and "was always taking care of it," *see* J. Padilla Dep. 86-87, there was no evidence on the record showing that Mr. or Mrs. Padilla had

actually fixed the situation by either removing the TV or securing it to a wall. Sala at Report 13. From this and other data, Sala concludes that there is no reason to believe that alternative or additional warning labels on the blinds would have altered the Padilla's behavior or prevented Max's death. *See id.* As Sala testified during the *Daubert* hearing, the scientific literature indicates that such behavior is not uncommon among the general population.

Plaintiff contends that this analysis is unreliable because: (1) Sala incorrectly assumes that the television was hanging over Max's head when, in fact, it was in the corner; (2) there is no evidence as to the size of the television; and (3) it is unclear how long it had been in Max's room. Pl. Sala Br. at 12. But, again, Plaintiff fails to demonstrate how these three factors diminish the reliability of Sala's methodology. The fact is Sala did review the deposition testimony of the Padillas. For example, Sala notes that: Mr. Padilla did not read parenting magazines regularly, *see* J. Padilla Dep. 89-90, Mrs. Padilla failed to look up safety information prior to becoming pregnant, *see* R. Padilla Dep. 71, and neither Mr. nor Mrs. Padilla ever spoke to their pediatrician about child safety issues, *see id.* 70-71. To the extent that Sala relied on certain information from the depositions while not considering others, this goes to weight of his testimony and not its admissibility. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119-20 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility") (citation omitted).

Furthermore, the Court notes that, even if the television had been positioned in the corner of the room, as opposed to directly above Max, this fact alone does not render Sala's conclusion unreliable. Indeed, Mr. Padilla himself testified that he still viewed it as a safety concern and was worried that it would fall on Max. *See* J. Padilla Dep. 33:16-19; 85:7-10. Undeterred,

Plaintiff also argues that even if the television supports Sala's opinion, the fact that Mr. Padilla promptly removed all the window blinds from his house after Max's accident "shows the behavior of a concerned and responsible parent who very much cares about the safety of his family." Pl. Sala Br. at 13. But whether the Padilla removed the window blinds because they were concerned it would cause more harm (as Plaintiff argues) or because they were mourning the horrendous loss of their son (as Defendant suggests) is an issue for the jury to decide. It does not cause this opinion to fail under Rule 702 and *Daubert*.

As an additional matter, the Court notes that Plaintiff makes no mention of the other facts and sources that Sala employs in forming his opinion as to the Padillas. For instance, in his report, Sala refers to several professional studies related to humans' interaction with warning labels. Sala Report at 12-13. Among them, Sala cites to a number of scientific publications that describe the factors that are relevant to assessing the efficacy of warning labels. Sala Report at 12, 17-18. These sources, which have been subject to peer review and are generally accepted in the professional community, are the types of sources upon which experts in the field commonly rely. *See also* Sala Aff. ¶ 10 (citing scientific literature). For these reasons, the Court denies Plaintiff's motion to exclude Sala's opinion regarding the Padillas.

## IV.    Rose Ray

Rose Ray is a Principal Scientist in the Statistics and Data Sciences department at Exponent. Pl.'s Ray Br., Ex. A ("Ray Report") at 2. Ray has a bachelor's degree in Psychology and a Ph.D. in Statistics from the University of California, Berkeley. Prior to her current employment, which began in 1988, Ray taught statistics courses at Berkeley, Northwestern University, and the University of California at San Francisco. *Id.* at 1. Ray's experience focuses

on "data analysis and the application of statistical epidemiological methods to business environments." *Id.* at 32.

Here, Defendant seeks to have Ray testify as to the relative risk of injury and death to children associated with window blinds compared to other household products and appliances. *See* Def. Ray Resp. at 1. Specifically, Ray will testify: (1) the risk of fatality associated with window shades, venetian blinds, and indoor shutters for children ages 0 to 3 is similar to the risk of fatality associated with other common household products; (2) the risk of hospitalized injury associated with window shades, venetian blinds, and indoor shutters for children ages 0 to 3 is similar to the risk of fatality associated with other common household products; and (3) the overall rate of fatality to children ages 0 to 3 associated with window shades, venetian blinds, and indoor shutters has been decreasing in the period 1990-2007. Ray Report at 8.

Plaintiff moves to exclude all three opinions. As for the first and second opinions, which compare the risks to children from window blinds and other household products, Plaintiff contends that Ray's opinions are unreliable and will not assist the jury because the comparators are not sufficiently similar. With respect to the third opinion, Plaintiff argues that it "adds absolutely nothing to assist he jury in understanding the issues in this case." Pl. Ray Br. at 11. For the reasons below, the Court grants Plaintiff's motion as to the first and second opinions, but not as to the third.

## A.      Ray's Comparative Risk Analysis

First, Plaintiff argues that the Court should bar Ray's first and second opinions under *Daubert* because household items, such as buckets, chairs and coins, are not sufficiently similar to window blinds to provide a meaningful comparison in this case. The Court agrees.

According to Defendant, Ray is offered "for the very limited purpose of comparing the relative risk of a child being injured or killed in an accident involving a window blind cord, with the risk of such an accident involving other common household products to which children are routinely exposed." Def. Ray Resp. at 2. Accordingly, Ray compares "the risk of hospitalized injury or fatality to children ages 0 through 3 years" posed by window shades, venetian blinds, or indoor shutters, to that posed by generally available household products, including doors, windows, tables, sofas, and beds. *See* Ray Report at 3-4. In selecting the items, she "tried to choose household items that were going to be available in essentially every household so that it would be fair to assume that every child aged zero to 3 would have some exposure to that household items." Pl. Ray Br., Ex 2 ("Ray Dep.") 125:17-21. "Other than that, that was pretty much it." *Id.* 126:4. After comparing the different products' relative risks, Ray concludes that the "risk of fatality or of non-fatal hospitalized injury associated with 'Window Shades, Venetian Blinds or Indoor Shutters' as compared to the other products is similar in the three time periods considered." Ray Report at 5.

To satisfy *Daubert*'s reliability requirement when performing a comparative analysis of this type, an expert must "select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (quoting *Donnelly v. R.I. Bd. of Governors for Higher Educ.*, 929 F. Supp. 583, 591 (D.R.I. 1996)). Moreover, the expert bears the burden of establishing that the different products being compared are sufficiently similar to one another. *See Premium Plus Partners, L.P. v. Davis*, 653 F. Supp. 2d 855, 867-68 (N.D. Ill. 2005).

The *Premium Plus Partners* case is illustrative. There, the plaintiff's expert sought to compare "the price behavior of 30–Year Treasury Bonds around the time period of the cancellation with the price behavior of other treasury instruments around the time of their cancellation." *Id.* at 863. The court concluded, however, that the expert had "failed to provide an adequate explanation for his assertion that other instruments compared by him such as the 4–Year Treasury Note and 7–Year Treasury Note are sufficiently similar to the 30–Year Treasury instruments to offer a meaningful comparison." *Id.* at 867-68. As such, the court granted the defendant's motion to strike the expert's comparative analyses. *See also State Farm Fire and Cas. Co. v. Electrolux Home Prod., Inc.*, No. 3:08-CV-436, 2013 WL 5770343 (N.D. Ind. Jun. 17, 2013) (finding comparative risk analysis did not comport with *Daubert* because expert compared two different types of data regarding dryer fires). Here, Defendant has not demonstrated how pails, doors, windows, and other household products are sufficiently similar to window blinds to offer a meaningful comparison.

In response, Defendant argues that Ray's comparative analysis opinions should be admitted because "the jury in this case will be asked to decide whether there was an unreasonable danger in the design of this particular product: vertical window blinds that utilize a cord to open and close them." Def. Ray Resp. at 3. However, this argument is unavailing for several reasons.

First, Ray acknowledges that her study considered the entire CPSC product category "Window Shades, Venetian Blinds or Indoor Shutters." Ray Report at 3. Ray did not review or analyze the safety statistics specifically with respect to corded vertical blinds, such as those at issue. Without the ability to disaggregate the statistics for the "Window Shades, Venetian Blinds or Indoor Shutters" category, the statistics have little to no relevance to this case.

Furthermore, the lack of any analysis of the comparability of window coverings, on the one hand, to other household products, such as buckets and pail, chairs, windows, sofas and coins, on the other hand, is similarly fatal. Consider, by way of example, Ray's comparison of the window covering product category with water buckets and pails. Ray's report notes that between 1994 and 1995, a little less than 0.5 child deaths per 100,000 were attributable to buckets and pails. Ray Report at 6. During that same period, there were approximately 0.25 to 0.30 child deaths per 100,000 attributable to window coverings. *Id.* at 7. At first glance, this comparison has some superficial appeal; however, one must remember that, in the context of Plaintiff's negligent design claim, the jury must consider "a balancing of the risks inherent in the product design with *the utility or benefit derived from the product*." *Jalonski*, 955 N.E.2d at 1154 (emphasis added). Similarly, when considering Plaintiff's strict liability design-defect claim, the jury may consider, among other things, "the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility." *Id.* Here, Defendant does not explain how a manufacturer of a bucket would be able to eliminate its "unsafe character" without impairing its usefulness or the attendant costs of eliminating such risks. Nor is there any study as to whether children have different levels of access to water buckets and pails or the different ways in which children interact with buckets and pails as compared to window blinds.[10] Without such comparative information, the

---

[10] When asked whether window blinds had any similarities with household items, Ray testified:

> Q: Of all the products that you chose here . . . do any of those products have any similarities with a vertical blind with looped cords?
> . . .
> A: They're similar in the sense that they're common household products. They're similar in the sense that children can receive serious or fatal injuries associated with these products.
>
> Q: Any other similarities that you can think of?

numbers presented by Ray are, at best, irrelevant and, at worst, potentially misleading. Perhaps it is not surprising then that Defendant has not cited to any court that has permitted similar statistical testimony from an expert witness in a product liability case. Accordingly, the Court bars Ray from offering her first and second opinions at trial.

**B.      Decreasing Fatality Rate**

Lastly, Plaintiff moves to exclude Ray's third opinion that the fatality rates of young children resulting from their interaction with window blinds has decreased over time. In its brief, Plaintiff argues that Ray's third opinion is inadmissible because it will not aid the jury, but will instead confuse it. *See* Pl. Ray Br. at 11-12. Plaintiff does not challenge Ray's qualifications or her methodology, nor does Plaintiff contend that the information is irrelevant.[11] Rather, the sole basis for Plaintiff's objection is that Ray has failed to explain why the numbers have declined. But Ray's response is not surprising given that her expertise is in statistics, not product safety. In any event, Plaintiff's argument is insufficient to bar Ray's third opinion under *Daubert*, and Plaintiff's motion is denied with respect to this opinion.

## CONCLUSION

For the reasons set forth above, Defendant's motion to exclude the testimony of Stuart M. Statler is granted; Defendant's motion to exclude the testimony of Robert R. Wright is granted in part and denied in part; Plaintiff's motion to exclude the testimony of Joseph B. Sala is granted in part and denied in part; and Plaintiff's motion to excluded the testimony of Rose M. Ray is

---

        A:  No.

Ray Dep. 127:12-128:7.

[11]      Plaintiff's brief does include one conclusory sentence that Ray's third opinion fails to meet the standards of Rule 702 and *Daubert*, but the Court need not consider such undeveloped arguments. *See Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 291 n.1 (7th Cir. 1988) (holding that a party that fails "to offer any substantive argument or case law citation in support of their assertion" waives its argument).

granted in part and denied in part.

IT IS SO ORDERED on this 6th day of February 2014.

_____
John Z. Lee
United States District Judge