```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3    JOSE M. PADILLA, as the Special  )  Docket No. 09 C 1222
     Administrator of the Estate of   )
4    MAXIMILIAN PADILLA,              )
                                      )
5                      Plaintiff,     )
                                      )
6             v.                      )  Chicago, Illinois
                                      )  August 20, 2013
7    HUNTER DOUGLAS WINDOW            )  10:10 o'clock a.m.
     COVERINGS, INC.,                 )
8                                     )
                       Defendant.     )
9
                            VOLUME 1
10       TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
               BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:            JAUREGUI & ASSOCIATES, by
13                                 MR. ARTURO JAUREGUI
                                   Mr. EDWARD J. SANTIAGO
14                                 120 West Madison Street
                                   Suite 400
15                                 Chicago, Illinois 60602

16   For the Defendant:           SCHIFF HARDIN LLP, by
                                   MR. JEFFREY R. WILLIAMS
17                                 One Market
                                   Spear Street Tower
18                                 Thirty-Second Floor
                                   San Francisco, California 94105
19
                                   RILEY SAFER HOLMES & CANCILA, by
20                                 MR. BRIAN O'CONNOR WATSON
                                   70 West Madison Street
21                                 Suite 2900
                                   Chicago, Illinois 60602
22
                        ALEXANDRA ROTH, CSR, RPR
23                       Official Court Reporter
                        219 South Dearborn Street
24                           Room 1224
                        Chicago, Illinois 60604
25                         (312) 408-5038
```

1     (Proceedings had in open court:)

2          THE CLERK:  09 C 1222, Padilla versus Hunter Douglas

3   Window Covering, for Daubert hearing.

4          MR. JAUREGUI:  Good morning, your Honor.  Arturo

5   Jauregui and Ed Santiago on behalf of the plaintiffs.  Mr.

6   Santiago will be presenting Mr. Wright for purposes of this

7   hearing today.

8          THE COURT:  Okay.  Very good.

9          MR. WILLIAMS:  And good morning, your Honor.  Jeff

10  Williams and Brian Watson, Schiff Hardin, for defendants.

11         THE COURT:  Okay.  Shall we start?

12         MR. SANTIAGO:  Yes, your Honor.  We'd like to call up

13  Dr. Robert Wright.

14         THE COURT:  Good morning, Mr. Wright.  Please stand

15  up, remain standing.

16    (Witness duly sworn.)

17         THE COURT:  Go ahead and take a seat.

18         You may proceed.

19         MR. SANTIAGO:  Thank you, your Honor.  May it please

20  the Court, counsel.

21       ROBERT R. WRIGHT, PLAINTIFF'S WITNESS, DULY SWORN

22                      DIRECT EXAMINATION

23  BY MR. SANTIAGO:

24  Q.  Dr. Wright, can you state your full name and spell it for

25  the record please?

1    A.   Robert R. Wright, W-r-i-g-h-t.

2    Q.   Okay.  Where do you reside?

3    A.   I reside in Charlottesville, Virginia.  Actually Free

4    Union, Virginia, which is a suburb of Charlottesville.

5    Q.   Are you currently employed?

6    A.   Yes, I am.  I work as an independent contractor for our

7    consulting company, which is Lexpert, Inc., L-e-x-p-e-r-t, Inc.

8    Q.   And what is your profession and expertise?

9    A.   I am a consultant in the areas of force analysis and

10   dynamics, which includes accident reconstruction, product

11   design and product safety.

12   Q.   Can you explain to the Court how force analysis and

13   dynamics assists you in reconstructing an accident scene?

14   A.   Well, someone who has expertise in force analysis and

15   dynamics has the ability to study various objects and determine

16   what happens to those objects as forces are being applied, what

17   motions or dynamics these objects will undergo as forces are

18   applied, and then be able to determine what will happen or why

19   it happens in various scenarios.

20   Q.   Is that a title that you have coined yourself?  Or is that

21   something that everyone uses in your profession?

22   A.   I have coined that.  There are other people that use that

23   after I coined it because it's -- it is definitely more than

24   just accident reconstruction.  It is someone who has a lot of

25   educational background in physics, in mathematics and

1  engineering.

2  Q.  You mentioned your work as a reconstructionist.  Can you

3  describe to the Court what your work is as a reconstructionist,

4  what you do?

5  A.  I've been retained to look at hundreds of various types of

6  accidents and accident scenarios involving various products.

7  And what I do as an accident reconstructionist is determine

8  what happened during an event and determine why it happened,

9  and then determine how that accident scenario could have

10  possibly been avoided.

11  Q.  Are any two fact patterns the same in any reconstruction

12  you've done?

13  A.  The fact patterns are always different.  I've done a lot of

14  automobile accidents, a lot of off-road vehicle accidents, a

15  lot of workplace accidents, and accidents involving just

16  household products.  And each scenario is obviously different

17  and unique to itself.  But the pattern or the methodology used

18  is very similar in each accident investigation and analysis.

19  Q.  How long have you been practicing reconstructions?

20  A.  The first litigated assignment that I was given was back in

21  the early 1980s.  So I would say probably in excess of 30 years

22  now.

23  Q.  Okay.  About how many reconstructions have you done over

24  the time?

25  A.  Literally hundreds, probably somewhere close to a thousand.

1    I haven't counted the exact number, but I would say it's very

2    close to a thousand, if not more.

3    Q.   I think you touched upon the idea of a methodology to

4    reconstruction.  Do you have or use a certain methodology?

5    A.   I use what we consider in the field as an accepted

6    methodology, and that is to always visit the accident site if

7    it's still available.  Sometimes the accident site isn't

8    available.  But always visit the accident site.  Always look at

9    any reports that have been written, such as police reports,

10   accident reports.

11        Look at photographs that were taken at the time of the

12   accident, if they exist.  Talk to witnesses if there are any

13   witnesses around.  Look at everything that you can possibly put

14   your hands on.  Every piece of data is needed, and you try to

15   use all the data you can gather anytime you investigate and

16   analyze any type of accident scenario.

17        So the methodology, whether it was this assignment or

18   any assignment, is always the same.

19   Q.   Have you ever taught in any college setting?

20   A.   Yes.  I was from 19 -- well, as soon as I got my Ph.D.,

21   which was in 1975, I was asked to join the faculty at Ohio

22   State, which I did.  That's where I got my Ph.D. was from the

23   Ohio State University in Columbus, Ohio.

24        I joined the faculty and taught for three years at

25   Ohio State, took several years -- actually one year off to --

1    to do some -- to become a visiting professor at Ohio Wesleyan

2    University.  Then I came back to Ohio State and taught in the

3    college of engineering.  I was assistant to the dean in the

4    college engineering, and I held that position from 1979 through

5    1987.

6              And I taught engineering and mathematics courses for

7    the college engineering at the Ohio State University.

8              MR. SANTIAGO:  I may have gotten a little bit ahead of

9    ourselves.  I just -- your Honor, may I approach the witness?

10             THE COURT:  You may.

11             MR. SANTIAGO:  Counsel.

12   BY MR. SANTIAGO:

13   Q.  I'm showing you what's been marked as Plaintiff's

14   Exhibit 1, Doctor.  Can you tell us what that is?

15   A.  This is my most recent copy of my CV, curriculum vitae.

16   And it is current through this month, August of 2013.

17             THE COURT:  Counsel, do you have an extra copy?

18             MR. SANTIAGO:  Yes, I do.  Sorry, Judge.  I'd like to

19   approach the bench as well.

20             THE COURT:  Thank you.

21   BY MR. SANTIAGO:

22   Q.  Can you summarize for us what your educational background

23   is and your training?

24   A.  Yes, I was fortunate enough to receive an athletics

25   scholarship from Butler University in 1960.  And I -- I proudly

1   completed four years at Butler University majoring in

2   mathematics with a minor in physics and chemistry.  And I'm

3   very proud of my alma mater.  Several years ago, they went to

4   the national championship game in basketball.  Actually they

5   went two years in a row.  And I earned my bachelor's degree, as

6   I said, in mathematics with a minor in physics and chemistry.

7          I was offered a fellowship to attend Ohio State

8   University, which I did.  I received my master's in 1967 and my

9   Ph.D. from Ohio State in 1975.  My dissertation combined

10  science, mathematics and engineering.  So I was qualified to

11  teach at the collegiate level in all three areas, which I've

12  done.

13  Q.  Have you ever presented any papers on the issues of

14  reconstruction?

15  A.  Yes, I've been asked on two different occasions to present

16  papers on accident reconstruction.  One was in London, England,

17  and then another one was in Montpellier, France.  I was asked

18  to be one of the featured speakers at the Engineering Systems

19  Design and Analysis Conference in Montpellier to talk in my

20  area of expertise, which was accident reconstruction and

21  reconstructive analysis.

22  Q.  And in that paper, did you present any of your

23  methodologies for reconstructing cases?

24  A.  Yes, I did.  And in my paper, which was published by the

25  American Society of Mechanical Engineers, I presented a paper

1    on accident reconstruction, as I stated.  And I think I have a

2    copy of it in here.  I am looking quickly through my file.

3            Here is a copy.  This is a copy of the brochure that

4    was used for the conference.  And if you look on the second

5    page, there is my picture in the little description of -- of my

6    presentation to the -- to the group that was -- in this group

7    the -- the Engineering Systems Design and Analysis Conference

8    was co-sponsored by many international co-sponsors, which

9    included the Chamber of Mechanical Engineers of Turkey, the

10   National Group in France, the Japanese Society of Mechanical

11   Engineers, the Chinese Society of Mechanical Engineers, the

12   Society of Technicians of Italy.

13           So there were quite a few number of international

14   group of scientific and technical organizations which sponsored

15   this and asked me to be one of their featured speakers.

16   Q.  And your methodologies based -- the one you presented in

17   that paper hasn't changed over the years?

18   A.  No, it hasn't.  And I go through how -- how one would take

19   a look at and analyze various accident scenarios, various

20   different types of accidents, both off-road and on-road

21   vehicular accidents, industrial accidents, various accident

22   types and scenarios.

23   Q.  I just want to make clear for the Court, when you -- I know

24   you summarized the kinds of items you look at as you conduct

25   your reconstruction.  But with respect to actual method, what

1    are you referring to when you -- when you refer to methodology?

2    A.   When I refer to my methodology, it's outlined very clearly

3    in my paper.   And references to other accident reconstruction

4    specialists and experts in the filed are listed in the -- in

5    the pages of references at the end of my paper, which, as I

6    said, was published in the American Society of Mechanical

7    Engineers.

8    Q.   Do you proceed from the beginning or the end of a

9    particular case and work backwards?

10   A.   Well, it's really interesting.   Most accident scenarios --

11   sometimes you start in the middle and work both direction.   In

12   most accident scenarios you have very good documentation at the

13   end.   Photographs were taken when the accident has been

14   concluded.

15         In most cases you have very good documentation at the

16   end.   And then you have to work back to the front to determine

17   what happened and why it happened.   And you use the laws of

18   physics.   You use mathematics, differential equations.   All of

19   the tools that you have at your disposal to obtain and

20   determine in the best possible scenario what did physically

21   occur in this accident and why the accident unfolded the way it

22   did.

23   Q.   Which one of those methodologies did you apply here?

24   A.   I applied --

25   Q.   Start --

1    A.   I applied what I always apply in all of them.  But in this

2    particular case, we know what happened at the end.  So I

3    started at the end and worked backwards to the -- to the front.

4    Q.   Okay.

5    A.   And that's what you do in most accident scenarios that you

6    analyze.

7    Q.   Now, when were you retained in this case?

8    A.   I was retained in November of 2010.

9    Q.   Okay.  And what were you -- who retained you, by the way?

10   A.   Plaintiff's counsel, Mr. Jauregui.

11   Q.   What were you asked to do?

12   A.   I was asked to determine -- to analyze the accident

13   scenario, to determine what happened during this accident, and

14   determine if there were any things that caused or contributed

15   to the accident.

16        And that's usually what I'm asked to do in almost

17   every assignment that I get involved in.  I'm always asked to

18   analyze, to -- to investigate and analyze and then determine

19   what happened and why it happened.

20   Q.   Did you look at any specific items or documents in this

21   part of your reconstruction in this case?

22   A.   Yes, I do that in every case.  And obviously each case is

23   unique to itself.  But in this case, I was able to get the

24   police reports.  I was able to read the depositions of the

25   police officers.  I was able to look at the medical examiner's

1    report.   I was able to read her deposition testimony.

2            I was able to look at photographs that the police took

3    right after the accident.  I was able to visit the accident

4    site.  I was able to inspect the actual subject window blinds

5    that were involved in this accident scenario.  I was able to

6    study the schematics of Hunter Douglas, who was -- who

7    manufactured the blinds.  I was able to study their schematics

8    of how the blinds work, how they operate.

9            I was able to look at a lot of documents that Hunter

10   Douglas has had provided.  I was able to read deposition

11   testimony of quite a few of Hunter Douglas's employees and

12   former employees.  I was able to read the CPSE, the Consumer

13   Product Safety Commission's review on window blinds, window

14   coverings.

15           I was -- basically, as I do in all my investigations

16   and analyses, I try to put my hands on as much data as I

17   possibly and physically can.

18   Q.   And you said you went out.  Did you go out and examine the

19   actual bedroom where this --

20   A.   Yes, on January 20 of 2011, I was able to visit the actual

21   accident site, visit Max's bedroom in the Padilla home where

22   the accident occurred.

23   Q.   Did you --

24   A.   I was able to reinstall the blinds, the physical subject

25   blinds, in the accident room.  I was able to take pictures.  I

Wright - direct                               12

1   was able to take notes and measurements in the room.  And I

2   even have a sheet of my notes that I made on that particular

3   day.

4   Q.  We'll get into each one of those things.  Did you take

5   photographs?

6   A.  Yes, I did take photographs.

7   Q.  Let me show you what's been marked as Plaintiff's Group 4A

8   through C.

9           MR. SANTIAGO:  Your Honor, I have to apologize.  I

10  don't have any other blowups of these.  I can -- may I

11  approach.

12          THE COURT:  You can put them up on the viewer there.

13  You may have to zoom out.

14          MR. SANTIAGO:  I am not sure how to do that.

15          THE COURT:  Why don't you lift the arm all the way up.

16  There you go.

17  BY MR. SANTIAGO:

18  Q.  There is some glare in there, but do you remember what this

19  is about, this picture?

20  A.  Yes, this is a photograph of 16375 Terry Lane in Oak

21  Forest, Illinois.

22  Q.  Did you take this photograph?

23  A.  I took that photograph on January 28 of 2011.

24  Q.  Whose home is this?

25  A.  That is the Padilla home at that address in Oak Forest,

Wright - direct                    13

1   Illinois.

2   Q.   Is -- do you know if this is where the accident occurred?

3   A.   Yes, this is physically the address, the outside of the

4   home, of where the accident occurred.

5   Q.   Why did you take this particular picture?

6   A.   I took that particular picture to show the outside of the

7   house and to show the location of Max's bedroom, the little

8   boy, the three-year-old boy, who was -- who was strangled by

9   the Hunter Douglas blinds.

10  Q.   Can you tell on this photograph what room window that would

11  be?

12  A.   Yes, on the second floor it is the window closest to the

13  door on the second floor.  And it overlooks the driveway and --

14  and the -- Max was trying to look out that window.

15          And I don't know if you wanted to point to the actual

16  window that -- that was the window where that -- yes, that one.

17  That is the window where the accident occurred.

18  Q.   And that's Group Exhibit 4A?

19  A.   That's correct.

20  Q.   I show you Group Exhibit Plaintiff's 4B.  Can you tell me

21  what that is?

22  A.   That is -- I took this photograph.  This is the nightstand.

23  And obviously --

24  Q.   What does it show?

25  A.   It shows the nightstand which Max climbed up on the day of

1    the accident.

2    Q.   Is this his bedroom?

3    A.   This is his bedroom.

4         And to the left is the window, the Hunter Douglas

5    window blinds.  And to the right, just barely you can see is

6    his bed, Max's bed, that existed in that room.

7         And the window, which is covered with the window

8    blinds to the left, is the same window we were looking at from

9    the outside in the previous photograph.

10   Q.   Okay.  Now, it shows some vertical blinds there on the

11   left.  Do you see that?

12   A.   That is correct.

13   Q.   What are those?  Are those the original or some new ones?

14   A.   No, those are the original blinds.  I reinstalled them for

15   my inspection and analysis.

16   Q.   I am going to show you what's been marked as A, Group

17   Exhibit A -- I'm sorry, Group Exhibit 4C.  And can you tell me

18   what this picture is about?

19   A.   This is again in the same room.  And now we're looking out

20   the window.  The blinds are partially open.  And so we're now

21   looking out the window that Max was trying to look out the day

22   that he was killed.

23        And this is, as I said, in his bedroom looking

24   basically to the -- to the south.  So he --

25   Q.   So did you reinstall these blinds?

1   A.   I -- I reinstalled them, yes.   The blinds were taken down

2   after the accident.   But I reinstalled them for my inspection

3   and analysis.

4   Q.   Why was that important to you?

5   A.   It was important for me to get -- as I stated before, to

6   get all the measurements and to get pictures.   I try to take

7   pictures very similar.   If police take pictures, I try to take

8   pictures very similar to what the police had taken.   And the

9   police did take the night of the accident quite a few

10  photographs.

11          And so I tried to take so I get a very good spatial

12  feel of what physically occurred.   So when I look at the police

13  photographs, then I look at my photographs, I know exactly

14  spatially the relationship of what did occur on that particular

15  time of the accident.

16  Q.   And --

17          THE COURT:   Counsel, before you proceed, can I take a

18  look at that --

19          MR. SANTIAGO:   Sure.

20          THE COURT:   -- second photo?

21          MR. SANTIAGO:   These?

22          THE COURT:   Yes.

23     (Brief pause.)

24          THE COURT:   Okay.   Thank you.

25  BY MR. SANTIAGO:

1    Q.   You indicated you also saw police photographs?

2    A.   That is correct.

3    Q.   And what time period did those photographs cover?

4    A.   The photographs -- at least my understanding is that

5    photographs were taken right after the accident, sometime in

6    the evening.  The accident occurred, if I remember correctly,

7    right around 6:00 o'clock, in that time frame.  And the

8    photographs were taken the same day, obviously later in the

9    evening.

10             MR. SANTIAGO:  Judge, I'd like to approach with

11   Group 10, 1 through 4?

12             THE COURT:  Go ahead.

13             MR. SANTIAGO:  Show counsel.

14        I am going to put them on the thing.  I give them to

15   the Judge.

16             THE COURT:  Does the arm go any further?  Does the

17   camera move up any more?

18             MR. SANTIAGO:  I don't know.  Let's see.  It should.

19             THE COURT:  Hold on for a second.

20        (Brief pause.)

21   BY MR. SANTIAGO:

22   Q.   Dr. Wright, looking at Group 10, No. 1 in that group of

23   exhibits.  Can you tell me what this photograph shows?

24   A.   This was taken the night of the accident, right after the

25   accident.  And you can see that this -- it is the same

1   nightstand that I took a picture of in 2010.  Obviously this is

2   in 2008, right the night of the accident.

3   Q.  This is his actual room right after he was strangled?

4   A.  Exactly correct.

5          And you can see that the table shows -- the nightstand

6   shows the -- some dust.  You can see on the nightstand.  You

7   can see that there is a toy knocked over and leaning against

8   the wall.  You can see the chair next to the nightstand has

9   been knocked over.

10         So you can definitely tell that Max, who was only 44

11  and a half inches tall, was not tall enough to look out the

12  window.  I measured the windowsill, and the windowsill is 47

13  inches off the floor.

14         And so he was not tall enough to look out the window.

15  So you could tell he climbed up on the nightstand to look out

16  the window.

17  Q.  I show you Group 10, photo No. 2.  And is this also a photo

18  from the police department?

19  A.  Yes, this is a photograph again at a different angle but of

20  the same nightstand.  And you can see the same toy to the left

21  that has been knocked over during his -- his climbing --

22  Q.  Do you know if there was a lamp on this table at some --

23  A.  Yes, there was a lamp.  You can see the markings of the

24  dust where the lamp was sitting before the accident.

25  Q.  Do you know if -- anyone talking whether that was knocked

Wright - direct                                    18

1   off or --

2   A.  I assumed it was knocked off because it's not on the

3   nightstand when the pictures were taken.  But you definitely

4   can see clear evidence that it was there.

5   Q.  Showing you No. 3 out of that group exhibit.

6   A.  If you would turn it 90 degrees, it would be easier to --

7   that's better.

8           And again, this is the same nightstand again.  It's

9   the same picture.  Nothing has been changed or moved.  You can

10  see the vertical blinds in the upper left-hand corner.  You can

11  see the nightstand and the chair and the toy.  Actually you can

12  see several toys that have been knocked to the floor off the

13  nightstand.

14  Q.  No. 4 from the group, Group 10.  Look at that.  Let's see.

15  A.  This -- this photograph was taken, as I said, by the police

16  the night of the accident.  And you can see it clearly

17  indicates the looped cords that are used by Hunter Douglas to

18  actuate the blinds.

19  Q.  And you can see the -- at the lower right-hand side,

20  that's -- what's this thing here?

21  A.  That is the nightstand that we had several pictures before,

22  that I had taken a picture of when I inspected, and the police

23  had taken pictures the night of the accident.  And again, this

24  is still the night of the accident.  You can see the looped

25  cord, the closed loop, clearly in the center of the picture.

1  Q.  Okay.  Doctor, you indicated you took some measurements as

2  well?

3  A.  That is correct.  I did.  I took quite a few measurements.

4  When you are at the accident site, you don't know always

5  exactly which measurements you are going to need when you get

6  back to do your analysis.  So I try to take as many as I

7  physically can.

8           I also try to take measurements to check to see if the

9  police measurements are accurate.  So -- because the police

10 usually will have some measurements in their accident report.

11 So I always try to check theirs.

12          I sometimes don't take all they take.  But I do spot

13 check theirs and take as many as I think I am going to need.

14          MR. SANTIAGO:  Your Honor, can I approach the bench?

15          THE COURT:  You may.

16          MR. SANTIAGO:  This is Exhibit 2.  I'm going out of

17 sequence.  Apologize.

18 BY MR. SANTIAGO:

19 Q.  Can you tell us what Exhibit 2 is?

20 A.  Exhibit 2, as I indicated, were the notes that I took on

21 January 28 of 2011 at the accident site, which is there in Oak

22 Forest, Illinois.

23 Q.  Now, you took certain measurements.  I am just going to ask

24 you about a couple of them.

25 A.  Sure.

1  Q.  What is this measurement here?

2  A.  That is the height that the windowsill -- the window

3  opening is above the floor.

4  Q.  Why was that measurement important to you?

5  A.  That's important because Max was only 44 and a half inches

6  tall.  And you can see the windowsill is 47 inches above the

7  floor.

8        So when he hears his siblings and his mother outside,

9  he can't look out the window.  He's not tall enough to look out

10  the window because he's only 44 and a half inches and the

11  windowsill is 47 inches off the floor.

12        So to look out to see what they were doing, he had to

13  climb up on something.

14  Q.  Okay.  And this measurement here is the bottom of the

15  window blinds and --

16  A.  Those are the bottom of the slats or the veins of the

17  vertical blinds.  And they are 41 and a half inches off the

18  floor.

19  Q.  Do you know based on the depositions that you read,

20  especially the mother, whether Max was found hanging off the

21  floor or laying on the floor?

22  A.  Max was several inches off the floor.  He was physically

23  hanging when Mrs. Padilla found him in his own bedroom.

24  Q.  Were you able to look at any -- well, let me start with

25  this.

1          The actual blind itself that was involved in this

2   case.  You indicated earlier you got to take a look at it.  I

3   am going to use it here as Exhibit 9.

4          Can you tell us what this is?

5   A.  That is the -- what we call the headrail.  That is what the

6   physical blinds hang from.  That is the mechanism that actuates

7   and supports the vertical veins or slats.

8   Q.  These items here, what are they called?

9   A.  They hold the slats or the veins of the blinds.

10  Q.  Okay.  And how is looking at this important to your

11  reconstruction and opinions?

12  A.  It's -- it's important to determine, first of all, the

13  mechanism of how the blind actually works.  And is there other

14  ways of actuating or working the blinds that would not have a

15  closed loop or a strangulation device.

16  Q.  How is this actuated?

17  A.  This one was actuated with two closed loops, a metal closed

18  loop, a metal chain or metal cord; and a nylon or fabric cord

19  that was also a closed loop.

20  Q.  Looking at Exhibit 9, can you tell the Court where those

21  corded or nylon loops would come from.

22  A.  Yes, the cord, the fabric cord, comes out these two holes

23  and then hangs down in a loop.  And we could see in the police

24  photograph, the loop was very clearly extending down and right

25  near the sill.

1          And then the small rail, there is a metal chain, a

2   beaded chain, or beaded cord, that fits over this wheel that

3   then also actuates or turns that wheel, which turns this rod,

4   which is a splined rod, has a slot in it.  And that splined rod

5   or slot then will actuate or rotate each one of these slots or

6   veins so that you can change the angle of the vein in the

7   window blind itself.

8   Q.  Were you able to determine who designed this particular

9   product?

10  A.  When you say who, I can't tell you individually.  But I can

11  tell you the corporation is Hunter Douglas who designed that

12  particular blind.

13  Q.  Okay.

14  A.  They designed it and manufactured it.

15  Q.  Do you know when this particular blind design was sold?

16  A.  That -- this blind was sold in 1995.  I think in -- in

17  October or November of '95.

18  Q.  And that's based on what information?

19  A.  That's based on the testimony of various individuals that

20  I've had a chance to read.  If I remember correctly, it was

21  Mrs. Davis, if I remember, who purchased the blinds for her

22  daughter's house.  Her daughter lived at this address before

23  the Padillas.  And I think her daughter's name was Mindy

24  Roberts, if I remember correctly.

25  Q.  Did this particular blind come -- at least looking at and

1    examining it, did you notice if there was any warning signs

2    with respect to how this is going to be used in case children

3    were around?

4    A.   No, I found no warnings on it whatsoever.

5    Q.   And you also looked at some alternative designs, is that

6    correct?

7    A.   That is correct.

8    Q.   Can you explain to the Judge what alternative design you

9    looked at to this particular model?

10   A.   Yes.  I -- that's one of my assignments that I always

11   look -- do -- or I always assume as one of my assignments.  Any

12   time I'm looking at an accident scenario, you always look to

13   see how that accident could be avoided.  Is the product

14   defectively designed?  And can the design be -- could the

15   product be designed differently so that it wouldn't be

16   defective, it wouldn't be unreasonably dangerous?  This

17   accident -- could it be designed so this accident would not

18   have occurred?

19   Q.   What did you find?

20   A.   I found, yes, it could have been designed differently.

21   And --

22   Q.   Was there an alternate design available at the time this

23   particular model was designed and sold, or at least at the time

24   it was sold?

25   A.   Exactly.  What is interesting is, many times you find that

Wright - direct                                    24

1    the state of art is such that it could be designed differently.

2    But in this particular case, what I found very interesting is

3    that Hunter Douglas themselves, the manufacturer themselves,

4    had an alternative design which in my opinion was much safer,

5    and in my opinion also easier to use and actuate.

6    Q.   Are you familiar with the PermAssure safety line?

7    A.   Yes, the PermAssure safety system that Hunter Douglas had

8    developed before 1995 is a system that uses a wand instead of

9    the bead and fabric cord that actuates the same mechanism and

10   -- and actuates or works the blind in a very similar manner.

11           MR. SANTIAGO:  May I approach, Judge?

12           THE COURT:  You may.

13   BY MR. SANTIAGO:

14   Q.   Showing you Plaintiff's Exhibit No. 5.  Tell me what those

15   documents are.

16   A.   This is a document that I received from plaintiff's

17   counsel, that he received from Hunter Douglas, the defendant in

18   this case.  And it is schematics of how the -- the window blind

19   system works and how the perm -- PermAssure -- PermAssure

20   safety wand can actuate and manipulate this blind or very

21   similar vertical blind.

22   Q.   Can you explain to the Judge very briefly how the two

23   compare?  How is it that you could do the same things or the

24   same function with the wand versus the cords?

25   A.   Yes, I will be happy to.

1    Q.  You got two minutes.

2    A.  The -- this particular blind has -- has two mechanical

3    functions.  One is to move the slats open, so you can open from

4    the window or close the slats, so that the window is closed:

5    And in addition, the -- there is that function that allows the

6    slats to be rotated, so that you can have partial light, full

7    light, or no light.

8           And so we have basically two functions.  One is on --

9    the subject line is controlled with a fabric cord, and that

10   moves the slats apart from each other, opening the slats or

11   opening the blinds.  And if you pull in the opposite direction

12   they close.

13          The chain or the beaded system rotates the veins, or

14   the slats, and so that you can change the -- with leaving the

15   blinds closed, you can change the angle from the pretty much

16   vertical to pretty much horizontal.  They -- using exactly the

17   same internal mechanism, which is very uniquely done, and --

18   Q.  Page 7 of Exhibit 5.  Can you look.  Does that illustrate

19   anything you just explained to us?

20   A.  On page 7.  Are you talking about 9477?

21   Q.  Yes.

22   A.  9477.  The -- if you take and attach the -- the wand system

23   and remove -- you don't remove the cords.  The cords still stay

24   inside.  But what -- what you do remove is the external part of

25   the cords, so that the two looped cords are now no longer on

1    the blinds.  And they can now be actuated with the wand

2    rotating or sliding.

3             So what you have done is remove the cords and now can

4    operate using the same mechanism, internal mechanism.  But you

5    can now do the twisting motion by just simply rotating the

6    wand, or the transverse motion by moving the wand horizontally

7    right or left.

8    Q.   Did the wand -- do you know if the wand -- when the wand

9    was designed and sold?

10   A.   The wand was designed probably sometime in the late '80s or

11   early '90s.  I know it was available for sale in 1995, in the

12   early part of 1995.  So the wand, the PermAssure wand, was

13   available before this blind was sold by Hunter Douglas

14   themselves.

15   Q.   Were you able to read any of the Hunter Douglas documents

16   with respect to how they were marketing this particular wand?

17   A.   Yes.  There was -- there was several Hunter Douglas

18   publications.  One is a publication called Inside 2000, talking

19   about their 2000 model line.  And it's on -- on that Bates

20   number 9508, where it says PermAlign and PT 2000 track systems

21   and accessories.

22             MR. SANTIAGO:  Judge, can I approach?

23             THE COURT:  You may.

24             MR. SANTIAGO:  This is Exhibit 6, your Honor.

25   BY MR. SANTIAGO:

1   Q.   I'm showing you what's been marked Exhibit 6.

2   A.   And it's the same as what I have.

3   Q.   Okay.

4   A.   And you can see on page 9508, Bates No. 9508, in the upper

5   right-hand corner 9508, it says PermaShield -- PermAssure

6   Safety 1.  The PermAssure Safety 1 completely replaces the

7   control chain and cord normally found on vertical blinds with

8   one easy-to-use wand.  The wand provides both transverse and

9   rotational vein control, so you never need to think about which

10  chain or cord to pull.  For children, the PermAssure option

11  provides added safety over corded verticals by keeping the

12  controls out of their reach.

13  Q.   Okay.  After reviewing the materials that you reviewed in

14  this case and having examined the vertical blinds that were

15  involved here and looking at the schematics of the Perma wand

16  and the advertising materials, based on your experience as an

17  engineer, as a scientist and as a reconstructionist, were you

18  able to reach any opinions with respect to how this accident

19  occurred?

20  A.   That I have.

21  Q.   And can you -- did you prepare a report with respect to

22  your opinions?

23  A.   Yes, I prepared an eight-page report, which I sent to

24  plaintiff's counsel.  And --

25          MR. SANTIAGO:  May I approach, Judge?

1    THE COURT:  You may.

2    BY MR. SANTIAGO:

3    Q.  Showing you what's been marked as Exhibit 7.  Can you tell

4    me what that is?

5    A.  Yes, this is a copy of my report that I sent to plaintiff's

6    counsel regarding my investigation and analysis and my opinions

7    in this particular assignment.

8    Q.  Are your opinions to a reasonable degree of scientific and

9    reconstructive certainty?

10   A.  They are.

11   MR. WILLIAMS:  I object to that.  That's a compound

12   question.  There are several issues here.  Reconstruction is

13   one.  The product design issues is another.

14   THE COURT:  I understand.  I understand that there are

15   a number of opinions at issue here.  So on that basis, the

16   objection is overruled.  You may proceed.

17   BY MR. SANTIAGO:

18   Q.  Let's talk about your opinions on the reconstruction.

19   What -- what was your opinion with respect to how the accident

20   occurred?

21   A.  It is my opinion, from analyzing all the data that I was

22   able to come up with -- and I have outlined what data that I

23   have used in my analysis -- is that Max, hearing his siblings

24   and his mother outside, he was in his room.  He -- and, well,

25   we can see the outside picture that they were right below his

1   window.

2           He is not tall enough to look out the window to see

3   what the discussion was going outside.  So he opted to climb up

4   onto the nightstand to look out the window.  And as he's

5   looking out the window, the closed loop, which we saw very

6   clearly in the picture taken by the police the night of the

7   accident, was easy for him to get his head through.  Obviously

8   not physically purposefully, but it's simply a physical fact or

9   phenomena of that particular design of the blind.

10          And as he's looking out the window, he slips off the

11  nightstand.  And as he slips off, he ends up strangling himself

12  through that closed loop.

13  Q.  And based on your review of the coroner's report, is that

14  consistent with her report that he strangled on one of the

15  cords?

16  A.  That is correct.  It is -- it is her opinion that he -- he

17  resulted dying from strangulation from the looped cord of the

18  window blind.

19  Q.  And again, just for the Court, the basis of your opinion

20  that he died the way you had reconstructed?

21  A.  The basis of my opinion is many fold.  I -- I've used all

22  the data that I can gather and analyzed it and put it in a

23  sequence.  That's what I do with all of my reconstructions, is

24  to determine beyond a reasonable degree of scientific certainty

25  what physically occurred and how it occurred.  Obviously I am

1  relying on the coroner, the medical examiner.  I am relying on

2  the police, the photographs.  I am relying on the measurements

3  they took.  I'm relying on the measurements I took.

4          I'm relying on studying the mechanics of the blind.  I

5  am relying on looking at other -- other alternatives to the

6  design of the blind.

7          I'm putting all the data together in one, quote,

8  package and putting all the pieces together the best possible

9  way that I can put it together.

10 Q.  Did you have a factual basis from an actual eyewitness who

11 saw exactly what happened?

12 A.  In many cases you do have eyewitnesses that see the

13 accident scenario unfold.  In this case I had no factual

14 eyewitness or no one was taking video of the accident scenario.

15 So I had no factual basis of an eyewitness who witnessed the

16 accident.

17         But I am basing my -- my opinions on all the bits and

18 pieces, all the facts, that I've outlined to you at this point

19 in time, the physical evidence that was -- was documented by

20 the police.  And then I physically measured myself when I

21 visited the accident site, and I examined the blind in detail.

22 Q.  Do you know what human factors is?

23 A.  Human factors is the study -- yes, I do.

24 Q.  Okay.  Do you have any experience in applying human factors

25 principles?

1   A.  Yes, I have quite a bit.  I do not consider myself a human

2   factors expert per say, but I do have quite a bit of experience

3   using various aspects of human factors in my analysis.

4   Q.  Did you bring any of those human factors experiences to

5   bear in this particular --

6   A.  In -- in several aspects I did, yes, I --

7   Q.  How did it help you?

8   A.  Obviously anytime you -- you try to put your hands on as

9   much information as you can and bring it all together in -- in

10  a -- putting all -- as I call it, putting all the pieces of the

11  puzzle together.

12  Q.  Did it help you in determining what Max's motivation would

13  have been?

14  A.  Exactly.  With -- with the commotion or hearing his

15  siblings outside and his mother outside, I am sure that led to

16  his wanting to see what was going on right outside his window.

17  Q.  With respect to the corded vertical blinds involved in this

18  case, you indicated you are familiar with the workings of it

19  and you compared it to the PermAssure wanded version.  Did you

20  reach an opinion with respect to whether the particular design

21  in this vertical blind that was involved in this case was

22  unreasonably dangerous?

23          MR. WILLIAMS:  Your Honor, I object here.  I'll

24  certainly cross-examine.  But if we are offering that opinion,

25  there hasn't been any attempt to lay a foundation with this

1    witness.

2              THE COURT:  This is all voir dire, so you may proceed.

3              MR. SANTIAGO:  He has a basis, Judge.  He's talked

4    about his examination of the particular product itself.

5    BY MR. SANTIAGO:

6    Q.  Let me ask you this:  Doctor, what's your background in

7    design and manufacture?

8    A.  I've -- I've designed lots of products in the past myself.

9    I've taught engineering mechanics and engineering courses at

10   Ohio State.  And I've taught -- in my mechanics courses I've

11   taught various aspects of design, what you should do when

12   you're designing products.

13             So I have quite a bit of product design.  And that's

14   part of my area of expertise.

15   Q.  Are there certain precepts in design, manufacture that you

16   apply across the board to different types of products?

17   A.  To me -- the answer is yes.  And to me, what I've always

18   taught in the classroom is safety is never an option.  If there

19   is a way to design a product to be safer, you always will opt

20   to that -- that aspect.

21   Q.  Are there any other considerations that you would give in

22   making an opinion like that, such as perhaps feasibility and

23   functionality?

24   A.  You always look at -- to make sure the product is

25   functional.  You always look at it that it's feasible.  You

1  always look at it to be cost effective.  You always look at all

2  the aspects of when it comes to design of any product.

3        You set out to do a job when you're trying to design a

4  product.  And then you try to see, how can that job be

5  accomplished?  There are a lot of different avenues.  There

6  is -- and as I always say to my clients, there are a lot of

7  ways of skinning a cat.  The problem is, a lot of them are

8  messy.

9        But, yes, there are a lot of ways of accomplishing the

10  end goal.  And you look at all the different alternatives.  And

11  you try to find out the one that is best, both cost wise,

12  effective, usefulness, all of the above.

13  Q.  Drawing on your experiences with product development, do

14  you have an opinion with respect to whether this particular

15  product design was defective?

16  A.  As -- as it was sold to -- to the Roberts, Mindy Roberts,

17  in my opinion it was defective.  It was defective because it

18  was unreasonably dangerous because there was no need to have a

19  looped cord exposed for an accident that we had here occur.

20  There was -- there are alternatives.  And actually, Hunter

21  Douglas themselves had an alternative to actuate the blind to

22  make it just as useful, just cost effective, and function in

23  just the same manner without having that danger.

24  Q.  When you say, you -- you can't make safety an option, is

25  that based on some sort of engineering precept?

Wright - direct                                              34

1   A.   Yes.   Almost every engineer will tell you that safety is

2   never an option.   And I mention that in virtually every class I

3   taught at Ohio State.   Safety is never an option.   You don't

4   make -- you don't make safety an option.   You incorporate it in

5   the product.

6          If it is cost effective, you incorporate it in the

7   product.

8   Q.   With respect to this particular product, vertical blinds

9   you see here and examined in Exhibit 9.   There were also

10  alternative designs that made it, I guess, safer, or --

11  A.   Absolutely.

12  Q.   Why wouldn't that suffice to make this particular product

13  safe?

14  A.   If -- if it was sold with the PermAssure wand as Hunter

15  Douglas had available in 1995, in my opinion this accident

16  would not have occurred.   We would not be here in this

17  courtroom today.

18  Q.   Do you know if Hunter Douglas was aware of the

19  strangulation risk caused by the corded window blinds?

20  A.   The answer is, from the deposition testimony and other

21  information I gathered from plaintiff's counsel that they

22  gathered from Hunter Douglas, the answer is, yes, they were

23  aware.   The Consumer Product Safety Commission, the CPSC, had

24  been tracking window blind deaths due to children for quite a

25  few years.   And there were quite a few deaths that had occurred

1    before this blind was manufactured and sold.

2    Q.  Have you ever testified or consulted with the Consumer

3    Protection Safety --

4    A.  Yes, I've had several occasions.  The CPSC, the Consumer

5    Product Safety Commission, has -- has asked me to attend quite

6    a few different hearings and meetings involving not window

7    blinds but other products.  And I've even been given an

8    honorarium from the Consumer Product Safety Commission to spend

9    a day with their staff, it was in 1997, to talk about my

10   observations and calculations and analysis when it came to a

11   different product, but safety issues that the CPSC was looking

12   at.

13   Q.  Now, there were other blinds available prior to the

14   vertical blinds.  There were the horizontal blinds, is that

15   correct?

16   A.  Right.  Horizontal or some people call them Venetian

17   blinds, yes.  But those actuate when it comes to a looped cord

18   or changing the angle of the -- of the horizontal slats instead

19   of the vertical slats in a similar manner.  And, yes.  They --

20   Q.  Was the risk posed -- was there any risk posed by those

21   blinds as well?

22   A.  Exactly the same risk, exactly the same risk, because the

23   mechanism is somewhat the same.  Instead of sliding the blinds

24   apart or together, horizontal blind or Venetian blind goes up

25   and down.  And instead of rotating the veins, or horizontal

Wright - direct                                    36

1    blind, you rotate the slats.

2              And so the rotation and the opening are controlled

3    exactly the same manner either with a wand or with cords.  And

4    -- and Hunter Douglas does manufacture horizontal blinds in

5    addition to the vertical blinds.  And the problems with the

6    corded -- the looped cords have existed in both the horizontal

7    and the vertical blinds for years.

8    Q.   Did you perform any functionalities studies on this

9    particular window blind?

10   A.   The -- no, the answer is no.  And the reason I didn't is

11   because Hunter Douglas had already done that.  So there was no

12   need for me to spend my client's time and money to do something

13   that Hunter Douglas had already done.

14   Q.   Did you study how they function at least?

15   A.   Absolutely.  I studied the mechanisms of both the corded

16   control or in the wand control to determine whether they both

17   function in the same manner.  But there was no need to do cost

18   analysis or function studies because obviously Hunter Douglas

19   had already perfected the wand by the time of the manufacture

20   of this particular.

21             So it was no need for me to, quote, rediscover the

22   wheel.

23   Q.   Real quick, within a minute, was -- what was the mechanism

24   of death in this particular case that you were able to reach?

25   A.   According to the medical examiner, it was strangulation.

1    It was death due to strangulation.

2    Q.   Did you -- did you reach your own opinion with respect to

3    the cause of death in this case?

4    A.   That I have, yes.

5    Q.   What is it?

6    A.   Strangulation due to the child being encapsulated around

7    the neck with the closed loop that was hanging down from the

8    blind.  It's part of the actuation mechanism of the blind.

9    Q.   Did you -- when you studied this particular blind, did you

10   determine the weight capacity of the cords, determine whether

11   it could actually strangle someone the size and weight of Max?

12   A.   Yes.  Max weighed 52 pounds at the time of his death.  And

13   the answer is, yes.

14   Q.   I'm not sure if you answered this, but did you have an

15   opinion with respect to whether this product, based on your

16   experience and your examination of it, is an unreasonably

17   dangerous product because of the corded loops?

18        MR. WILLIAMS:  Same objection to the lack of

19   qualifications and foundation.  I'll cross on that.

20        THE COURT:  Noted.

21        You may proceed.

22   BY THE WITNESS:

23   A.   Yes, I have come to a conclusion that it is unreasonably

24   dangerous and a defective product because you can get the same

25   functionality at virtually the same cost with a different

1    mechanism, namely the wand control, instead of a looped cord

2    control.

3    BY MR. SANTIAGO:

4    Q.   Did you have an opinion as to whether Hunter Douglas could

5    foresee this strangulation death involved in this case or any

6    kind of danger involved in strangulation of small children with

7    respect to this product?

8    A.   The answer is, yes, because all the testimony I saw from

9    the Hunter Douglas people is, they were notified by the

10   Consumer Product Safety Commission long before the manufacture

11   and sale of this blind that there were deaths, hundreds of

12   them, occurring from closed-loop window covering devices such

13   as vertical and horizontal blinds.

14   Q.   Just two more questions.  Do you have an opinion or reach

15   an opinion with respect to whether Max's parents were in any

16   way contributory causes to his demise?

17   A.   And I have reached a conclusion.

18   Q.   What's your opinion?

19   A.   That they were not causes or contributory to this accident

20   whatsoever.  Because the blind to an untrained eye or someone

21   who is not aware looks very benign.  I mean, soft nylon cord or

22   very flexible metal cord or chain.  There appears to be no

23   danger in a window blind sitting on the wall.

24            And so to them, sending Max to his room was like a

25   safe haven, appeared to be totally benign and an accident-free

1   area.  So I put no fault to the -- to the mother or father

2   whatsoever.

3   Q.  I think you indicated earlier too that upon examining the

4   blind involved here, you found no warning labels or use labels?

5   A.  I found no labels on it whatsoever.

6   Q.  Do you -- in your research and in all the documents that

7   you reviewed, including the Hunter Douglas materials that

8   you -- were you able to determine whether or not Hunter Douglas

9   sent out with this particular item a warning on strangulation

10  risk posed to small children?

11  A.  I found no documentation whatsoever for the sale of this

12  particular blind to -- to Mrs. Davis or Mindy Roberts, whose

13  house it was being installed, any type of notification that

14  there was a danger using this particular blind.

15  Q.  Based on your investigation in this case and you reviewed

16  the depositions, were you able to determine whether Mrs. Davis

17  was ever offered the alternative safer design with the Perma --

18          MR. WILLIAMS:  I object to that.  There is no

19  foundation, and it's hearsay.

20          THE COURT:  You may proceed.

21  BY THE WITNESS:

22  A.  I have read an affidavit that Mrs. Davis has prepared,

23  stating that Hunter Douglas or their representatives never

24  indicated there was any other design other than this one.  And

25  if she was given an option, at least according to her

1    affidavit, her sworn affidavit, if she was given an

2    alternative, she would have chosen the wand instead of the

3    looped cords.

4              MR. SANTIAGO:  Your Honor, how much time do I have?

5              THE COURT:  You have about a couple minutes if you

6    want to wrap up.

7              MR. SANTIAGO:  Okay.

8    BY MR. SANTIAGO:

9    Q.  Now, all of your opinions, are they based primarily on your

10   engineering background?

11   A.  They're all based on scientific and technical background,

12   yes.  Years in mathematics and physics and chemistry, all of my

13   science and technical background, yes.

14   Q.  And the methodologies that you use in reconstructing cases?

15   A.  That is correct.  And my methodology, as I said, is given

16   very clearly in my paper, which was published by the American

17   Society of Mechanical Engineers.

18             MR. SANTIAGO:  I don't have any further questions at

19   this point.

20             THE COURT:  Okay.

21             MR. WILLIAMS:  May I start, your Honor?

22             THE COURT:  Yes, you may.

23                         CROSS-EXAMINATION

24   BY MR. WILLIAMS:

25   Q.  Dr. Wright, good morning.  How are you?

1   A.   I'm fine.   Thank you.

2            And it's Mr. Williams?

3   Q.   It is Mr. Williams, just as it was when we spent time

4   together in Charlottesville.   It's been a couple years ago now.

5            I have some questions, as you might imagine.   And I am

6   going to start out at the beginning with the report that you

7   issued in this case, which is dated March 18, 2011.   I've got

8   the first page of that on the projector.

9            Are you able to see the monitor?

10  A.   I can see it very clearly right in front of me, yes.

11  Q.   And I have highlighted there the -- at the bottom of the

12  first paragraph, your summary of what Mr. Jauregui had asked

13  you to perform in working on this case, correct?

14  A.   That is correct.

15  Q.   Can you read that please?

16  A.   This is a letter to Mr. Jauregui stating:   You have

17  requested that I do a reconstructive analysis of the accident

18  scenario, determine what happened during that accident, and

19  determine what caused and/or contributed to that accident.

20  Q.   Okay.   That's what you set out to do.

21  A.   That is what I set out to do.

22  Q.   So basically you, as you described it -- and we'll talk

23  about it in a minute.   You -- your background is largely in and

24  your activities in your forensic consulting business have

25  largely been devoted to accident reconstruction.   You spend a

1    lot of time doing that?

2    A.   That is correct, I am.

3    Q.   And in the summary that you just read, you have indicated

4    you were asked to reconstruct the accident, determine what

5    happened during it, which reads to me as another way of saying,

6    reconstruct the accident, and what caused or contributed to it,

7    correct?

8    A.   That's correct.

9    Q.   The factors that came into play.

10   A.   That's correct.

11   Q.   And in this case, you determined that Max was in his

12   bedroom, apparently mounted his nightstand in an attempt to

13   look out the window after having just come in and knowing that

14   his sister was still out there and some other friends.  And

15   that in some way or another in the course of trying to look out

16   the window, using the nightstand as his platform, he must have

17   lost his balance and some way or another fell into the loop of

18   the nylon cord on these window blinds, correct?

19   A.   I don't know if he -- if -- if I wanted  to use the word,

20   fell into it.  As you can see in the police photograph, the

21   loop is pretty open.  There is a lot of cross-sectional area.

22   And so he might have stuck his head, not overtly, but

23   inadvertently stuck his head through that loop looking out the

24   window.

25            And then when he slipped, obviously if the loop is

Wright - cross                                          43

1   already around his head, because it -- it's so easy, as you can

2   see in that photograph, for him to get his head through there,

3   that as he slipped, then that's what caused strangulation.

4   Q.  Okay.  And that's what you concluded and testified to as

5   the reconstruction of this accident, correct?

6   A.  That is correct.

7   Q.  Okay.  There is no mention in that description at least of

8   an evaluation of the design of any products, is there?

9   A.  I think that is -- at least in my opinion, and every time I

10  -- I use an assignment, is if there is a product involved, I

11  always analyze the product to determine whether it's defective

12  or not defective.  And I've worked on lots of products on

13  behalf of defendants in addition to lots of products on behalf

14  of plaintiffs.

15          So I think the last sentence -- at least in my

16  opinion, the last sentence clearly states that I'm looking at

17  the product to determine if there is any defective nature that

18  would cause or contribute to that accident scenario.

19  Q.  Well, in any event, we know that you did attempt to go on

20  and do that here.  We'll talk about that in a minute.  But the

21  initial summary of what you were retained to do is contained in

22  this first paragraph in the last sentence.

23  A.  I think the last sentence clearly indicates that I will

24  look at the product because I want to determine what caused

25  and/or contributed to that accident.

Wright - cross                                    44

1   Q.   Let's look at your background for a few, if we could.

2   A.   Sure.

3   Q.   I received for the first time the updated CV.  And frankly

4   I didn't have time to side-by-side it with the one that we have

5   been provided with in this case.  So if there are any material

6   changes or additions that I skip over in my questioning right

7   now, let me know.  Okay?

8   A.   Okay.  I think the only thing that probably were added in

9   the last two -- I think you took my deposition in either was it

10  2011 or 2012?  I can take a look.

11  Q.   I saw you because I -- I like to answer a question every

12  now and then myself -- it was April 19, 2011.

13  A.   Okay.  So in those two years, I -- I have been retained --

14  I don't know if retained is the right word.  But I have been

15  working with both Grail Engine Technologies and H1 Technologies

16  in addition to my consulting work.  I guess that's still part

17  of consulting.  But it's as -- as part of the design team of

18  each of those entities.

19  Q.   Okay.  So you mentioned that you got your Ph.D. from Ohio

20  State University in 19 --

21  A.   '75.

22  Q.   -- '75.

23       From '67 to '75, you were studying there.  And then

24  you immediately began teaching at the university for the next

25  three years --

1   A.   That's correct.

2   Q.   -- '78, correct?

3   A.   That's correct.

4   Q.   You then went off to Ohio Wesleyan for a year?

5   A.   That's correct.

6   Q.   Returned to Ohio State --

7   A.   In '79.

8   Q.   -- where you were the assistant director of admissions for

9   a year, is that -- excuse me --

10  A.   No, that -- I was assistant director of admissions at Ohio

11  Dominican College for one year.

12  Q.   Okay.  When you came back to Ohio State, you were in the

13  academic dean's office, is that --

14  A.   Right.  I was in the college of engineering.  I was

15  assistant to the dean in the college engineering.

16  Q.   And you were -- remained in Ohio State until 1987, is

17  that --

18  A.   That's correct.

19  Q.   Meanwhile, while you were there, in 1978 you formed an

20  enterprise to operate a retail store, is that correct?

21  A.   That is correct.

22  Q.   And that was Train Station Enterprises, Inc.?

23  A.   That is correct.

24  Q.   What was the nature of that business?

25  A.   The nature of that business was retail operation that sold

1   model trains.

2   Q.   Okay.  And in 1989, did the nature of the business, form of

3   that business, change?

4   A.   No.  What happened was, the manager of the store -- I had a

5   manager who managed or ran the store for -- for myself and

6   other individuals who invested in the store -- wanted to

7   purchase the store from us.  So in -- we allowed -- in 1989 we

8   allowed him to purchase the store.  And at that time we took

9   the purchase price from the store and formed a manufacturing

10  company.

11  Q.   Okay.  And I'm putting on the display screen now the second

12  page of the new CV that was attached today as Exhibit 1.

13  A.   That's correct.

14  Q.   And that indicates 1989 you formed Quality Wright -- Wright

15  spelled the same way as your last name -- Corporation, is that

16  correct?

17  A.   That is correct.

18  Q.   And what was the nature of the business of Quality Wright

19  Corporation?

20  A.   That was a company that manufactured model train and model

21  train components to the retail market.  We had -- we sold to I

22  think about seven or eight different distributors around the

23  world.  And those distributors would sell to hobby shops and

24  other retail outlets, both online and in retail stores.

25  Q.   And that's a business that you maintained an interest in

1   for approximately 21 years --

2   A.   That is correct.

3   Q.   -- 2010?

4   A.   That is correct.

5   Q.   And what happened in 2010?

6   A.   A company called Smokey Valley Railroad Products purchased

7   train station products from us.  So all the injection molds,

8   all of the inventory, all of the design work that we had

9   amassed, was sold to Smokey Valley Railroad Products at that

10  time.  And they were out of Oxford, Mississippi.

11  Q.   Then in addition, this is still while you were at Ohio

12  State --

13  A.   That's correct.

14  Q.   -- you formed a consulting firm, correct?

15  A.   That's correct.

16  Q.   And was that in about 1982?

17  A.   No, actually in '85 when we formed Lexpert, Inc.

18  Q.   Okay.  What were you doing from 1982 to '85 in the way of

19  consulting, if anything?

20  A.   I was -- from '82 to '85, before we formed our company, I

21  was just consulting on my own.  I got a phone call in 1982 from

22  an attorney in Dayton, Ohio, asking if I would take a look at a

23  riding lawnmower to determine what happened in an accident

24  scenario involving a riding lawnmower.  And that was my first

25  consulting assignment.

Wright - cross                                    48

1   Q.   So three years later, 1985, you incorporated under the name

2   of Lexpert, Inc., at that time?

3   A.   That's correct.

4   Q.   And then you remained at Ohio State until 1987, is that

5   correct?

6   A.   That's correct.

7   Q.   You left at that time.  And since then have you devoted

8   your time pretty much entirely to your consulting business as

9   well as your model train business?

10  A.   Well, in the last few years, I have devoted quite a bit of

11  time to both Grail Engine Technologies and H1 Technologies.

12  But, yes, I would say more than half my time from '85 on was

13  spent with Lexpert, Inc., in the consulting area.

14  Q.   Okay.  Now, in addition you indicated that you have

15  published some papers as well.

16  A.   That is correct.

17  Q.   You've been asked to speak at two seminars, present papers

18  at two seminars, that you outlined for us, one in London and

19  one in Montpellier, France, is that --

20  A.   That's correct.

21  Q.   -- correct?

22       And those two were respectively in 1994, I believe, in

23  London, is that --

24  A.   That is correct.

25  Q.   -- one I'm pointing to here.  Accident --

1   A.   That's correct.

2   Q.   -- reconstruction -- is that the accident reconstruction

3   dynamics of ATV accidents?

4   A.   That's correct.

5   Q.   Okay.  And then in 1996, the Montpellier presentation, is

6   the one that we see at the bottom of your CV, accident

7   reconstruction and reconstructive analysis, is that right?

8   A.   That is correct.

9   Q.   Now, those two seminar papers are contained in a list of

10  publications that begin on the preceding page, is that correct?

11  A.   That is correct.

12  Q.   And with respect to those publications, am I correct, Dr.

13  Wright, that they all deal with either ATV and ATV accident

14  reconstructions or some subject related to astronomy?

15  A.   No.  The last paper deals with -- with all kinds of

16  different accident scenarios.

17  Q.   So the Montpellier went beyond ATVs and dealt with accident

18  reconstruction in a more general sense?

19  A.   In lots of different areas.

20  Q.   Okay.  With that qualification, is my characterization

21  accurate?  The rest of your publications deal in some way

22  either with ATVs or astronomy?

23  A.   Yeah, I would say.  I mean, obviously I am looking at the

24  physics of all of those aspects, the -- this -- the technical

25  aspects.  But, yes, I would agree the subject matter would fall

1    into -- mainly in those areas.

2    Q.  Okay.  Now, you've never published in the area of product

3    design, have you?

4    A.  I have designed lots of products, but I never published

5    anything in product design.

6    Q.  My question, publications.  Have you ever published on the

7    subject of product safety?

8    A.  No, I have not.

9    Q.  Have you ever published in the area of human factors?

10   A.  No, I have not.

11   Q.  Have you ever published in the area of bio mechanics?

12   A.  No, I have not.

13   Q.  Or ergonomics?

14   A.  No, I have not.

15   Q.  As you indicated earlier, you did not just do an accident

16   reconstruction here.  We'll talk about that in a little while.

17   But you also performed an analysis or evaluation of what you

18   considered to be the design of this product and whether it was

19   unreasonably dangerous or defectively designed, to use your

20   terminology.  Is that correct?

21   A.  I have done that analysis, yes, that is correct.

22   Q.  Okay.  You were never asked to consider whether Hunter

23   Douglas acted negligently or without reasonable care in this

24   case, were you?

25   A.  I don't remember that question being posed to me.

1    Q.  If I were to pose that question to you today, would you

2    agree with me that you were not asked in this case to express

3    any opinion whatsoever with respect to whether Hunter Douglas,

4    my client, acted negligently or without reasonable care?

5    A.  When you use those terms, those get into what I consider

6    legal terms.  I like to -- my area is math and science, the

7    technical aspects.  I like to look at a product in -- in a

8    technical manner.  And I can tell you whether -- and I might be

9    using the word negligent in a nonlegal manner.

10          I think that they were negligent for going ahead and

11   selling a product when they had a better and safer alternative

12   in -- in their own repertoire, so to speak, you know, that they

13   have already done research and have perfected and manufactured

14   a safer product.  And to me that's negligent.

15          But whether that falls into the legal term of

16   negligence I do not know.

17   Q.  You weren't asked to evaluate that or render an opinion as

18   to whether Hunter Douglas was negligent or, if that's too legal

19   a term, acted without reasonable care in this case, were you?

20          MR. SANTIAGO:  Asked and answered, Judge.

21          THE COURT:  You can go ahead and answer.

22   BY THE WITNESS:

23   A.  I guess not.  I mean, I don't remember being asked that

24   particular question.

25          MR. WILLIAMS:  Your Honor, I have a binder with the

1    depositions in it for your use.  May I approach?

2              THE COURT:  You may.

3              MR. WILLIAMS:  Actually, your Honor, this is the one

4    for you with all four witnesses that we are discussing today

5    and tomorrow.  And pages 210, 211, of Dr. Wright's deposition.

6    BY MR. WILLIAMS:

7    Q.  Dr. Wright, I'm just going to ask you to take a look at --

8    I am going to take advantage of the monitor, the camera here --

9    your deposition testimony taken, as we mentioned earlier, on

10   April 19, 2011, at pages 210 and 211, where I asked you the

11   questions that I am addressing here.

12             Looking down at the bottom of page 210, please read

13   along with me and make sure I read correctly.  My question:

14             You have not been asked in this case to express an

15   opinion as to whether Hunter Douglas acted negligently or

16   without reasonable care, have you?  You simply addressed your

17   definition of what constitutes a defective product and then the

18   accident reconstruction?

19             And your answer was:  Right.  I would leave that up to

20   the attorneys I'm working with, whether they want me to look at

21   negligence.  I was simply looking at what I stated in my first

22   paragraph of my report.

23             Question:  But you haven't looked at whether they were

24   negligent or not?

25             Answer:  I would agree with that, right.  I have not

1    looked at it.

2              Was that your testimony on April 19 --

3              MR. SANTIAGO:  I object.

4    BY MR. WILLIAMS:

5    Q.   -- roughly two years ago?

6    A.   That is correct.

7              MR. SANTIAGO:  My objection is, the first question was

8    compound question.  We don't know what he was answering to.

9              THE COURT:  Overruled.

10   BY MR. WILLIAMS:

11   Q.   Similarly, Dr. Wright, you were never asked in this case to

12   look at the adequacy of the warnings that were provided with

13   these blinds or were not provided, correct?

14   A.   No.  Since there were no warnings -- at least I could not

15   find any warnings in all the testimony I could see.  There were

16   no warnings issued -- I was never asked to address that

17   particular subject about warnings.

18   Q.   Did you ever review any testimony indicating that these

19   blinds would have gone out with warning hangtags on the cords

20   themselves?

21   A.   I do not know one way or the other.  All I know is from the

22   testimony that Mrs. Davis gave and Mindy Roberts gave, that

23   they were unaware -- at least they don't remember any warnings

24   or options whatsoever.

25   Q.   In fact, they didn't recall one way or the other, correct?

1    A.  That is correct.

2    Q.  So they didn't recall -- my question to you once again was

3    whether you recall there being other testimony, and in

4    particular from the Hunter Douglas personnel, that there would

5    have been hangtag warnings that would have gone out on the

6    cords of these blinds in 1995 when they were sold.  Do you

7    remember --

8    A.  I remember -- I remember testimony from Hunter Douglas

9    people.

10   Q.  Okay.  In any event, you were not asked to look at the

11   sufficiency of warnings, the issue of whether adequate warnings

12   were provided in this product, or do anything to analyze the

13   question of warnings in this product.  Is that a fair

14   statement?

15   A.  As I stated before, since there were no warnings that I

16   could see or that were ever delivered with the product, I was

17   never asked to address the subject of warnings.

18   Q.  Okay.  Regardless of reason, that's not something you

19   looked at?

20   A.  I have not looked at warnings in this particular

21   assignment.

22   Q.  Likewise, there isn't any mention in your report of any

23   discussion whether Hunter Douglas breached any warranties to

24   the purchasers, Ms. Davis or Ms. Roberts, is there?

25   A.  I -- I did not address that whatsoever one way or the

Wright - cross                                    55

1    other.

2    Q.   Okay.  Now, what you did do as you have mentioned and

3    discussed with Mr. Santiago is, give some opinions as to the

4    what you referred to as the defective design of these window

5    coverings, correct?

6    A.   That is correct.  I -- I did look at the design of the

7    window coverings or the blinds themselves.  And -- and I

8    have -- have voiced an opinion in that regard.

9    Q.   Okay.  At one point there was a claim based on strict

10   products liability in this case.  And when that was the case,

11   you rendered your report and expressed some opinions as to

12   whether in your opinion these blinds were defectively designed

13   or unreasonably dangerously designed.  I think you used both of

14   those terms somewhat interchangeably.

15   A.   I think I used both of those terms in my report.

16   Q.   Okay.  Now, you hold yourself out as an expert in force

17   analysis and dynamics, right?

18   A.   That is correct.

19   Q.   There is no degree in that subject?

20   A.   I do -- I should take a half step back.  I do not know of

21   any institutions that offer a degree in that area.  But I am

22   not saying that there aren't any.  I have not examined all of

23   the institutions in this country.

24   Q.   I'll take that half step back for you.  You are not aware

25   of any institutions that offer bachelors, masters or doctorates

Wright - cross                                    56

1    in force analysis and dynamics, are you?

2    A.   No, I am not.

3    Q.   There is no professional association or organization of

4    individuals who work in this field, is there?

5    A.   I mean, I know a lot of people now use that area of

6    expertise as their area of expertise.  But I do not know of any

7    society or -- or group of -- or association of individuals that

8    -- that bring that together in that regard.

9    Q.   Okay.  And in fact, it's a trend that you made up after you

10   started your consulting practice, and which you told us at

11   least some other individuals that work in the area of accident

12   reconstruction, as you do, have liked your phrase, your label.

13   And they picked up on it themselves.

14   A.   That is correct.  It is -- it's -- to me the reason I

15   started using that and other individuals use it is, it offers

16   or at least allows the person whom they are working with a

17   knowledge that they have much more scientific and technical

18   background than just accident reconstruction.  They have

19   abilities to analyze much deeper and much more clearly in

20   physics and mathematics, because obviously accident

21   reconstruction is a study of, as I said, forces and motions.

22   And obviously any velocity or motion is a differential

23   equation.

24           So it's math and physics that are being involved in

25   every accident reconstruction.

1   Q.   And it's really your accident reconstruction work and your

2   accident reconstruction expertise that you are trying to

3   describe with a what in your opinion is a better, more specific

4   label, when you use the term force analysis and dynamics?

5   A.   That is correct.

6   Q.   That's -- that's your accident reconstruction summary of

7   what you do.

8   A.   That -- it's more than just accident reconstruction.

9   It's -- it is bringing my technical background, my experience

10  and my education, into play with more than just running a

11  computer program or taking a course like at George Washington,

12  Northwestern University or something along those lines.

13  Q.   Okay.  Now, we've seen your CV and your list of

14  publications.  But let's make a couple things clear.  You never

15  published in any peer review publication an article on the

16  design or safety of any household product, have you?

17  A.   No, I have not published anything in that regard.

18  Q.   More specifically, you never published a course with

19  respect to the design or safety of corded window coverings, is

20  that correct?

21  A.   That is correct, I have not.

22  Q.   The ATMs and the astronomy and the one overall accident

23  reconstruction paper that you presented at Montpellier are the

24  extended publications in professional peer review literature,

25  correct?

Wright - cross                                58

1   A.   I would agree with that.

2   Q.   You don't have any experience with the window covering

3   industry prior to retention in this case, except for the

4   possibility of one or two or three prior cases related to

5   window coverings, correct?

6   A.   I have worked on two or three window covering assignments

7   in addition to this particular assignment.

8   Q.   Okay.  Specifically though, when we took your deposition

9   and you were asked about that, you couldn't recall the nature

10  of any of those cases, correct?

11  A.   I could recall that they were all horizontal blinds.  None

12  of them were vertical.

13  Q.   So this was the first case in which you were working with a

14  vertical blind with the continuous loop operating system,

15  correct?

16  A.   That is correct.

17  Q.   And in particular, you couldn't recall the details of any

18  of the other cases.  You only recall one of them you thought

19  was venued in Oklahoma somewhere?

20  A.   That is correct.  I remember one was -- had the -- the

21  blind had no label on it.  And -- and I know that the attorney

22  I was working with never filed suit because he didn't know who

23  the defendant would have or could have been.

24  Q.   Okay.

25  A.   And I know my deposition testimony has never been given in

1    any window covering case.

2    Q.  Finally, you never designed product or any component used

3    to operate a window blind, have you?

4    A.  Well, I have worked on gears.  I have done gear work.

5    Q.  If they were used in the manufacture or design of a window

6    blind, tell me about them.

7    A.  Well, the gears -- there are gears used in window blinds.

8    I mean, obviously I have not manufactured a gear for window

9    blind, but I have worked on design of gears before.  And gears

10   are used in window blinds.  So --

11   Q.  My question was specific:  Have you ever designed a window

12   blind or window covering product or any component that was

13   intended to be used as part of a window blind operating system?

14   A.  For -- I never designed anything for manufacture of a

15   window blind.

16   Q.  Okay.  Anything for anyone else that was ever put to use,

17   to your knowledge, in a window blind, correct?

18   A.  Well, as I said, I designed gears.  And I know gears are

19   used in the window blinds.  But I don't know if any of my gears

20   ended up in window blinds.  That I -- someone might have

21   jerry-rigged one of them at some point in time.

22   Q.  If they have, it was without your knowledge, correct?

23   A.  That's correct.

24   Q.  You didn't get paid for it, correct?

25   A.  I got paid for my gears, but I don't know if I got paid for

1    putting it in a window blind.

2    Q.   Now, you used to teach, correct?

3    A.   Yes, I taught for quite a few years.

4    Q.   Have you ever taught any course in which the focus was on

5    product safety?

6    A.   I always talk about product safety in the course I taught.

7    But none of them were specific on product safety.

8    Q.   In fact, you never even taken a formal course in product

9    safety throughout your academic career, is that correct?

10   A.   That is correct.  I have not.  I don't even know -- maybe

11   some institutions have courses in product safety.  I know Ohio

12   State didn't in the college engineering.  But there might be

13   some institutions that have course in product safety.  I'm not

14   aware one way or the other.

15   Q.   You're not sure whether any --

16   A.   I am not sure.

17   Q.   -- colleges, universities across this country offer courses

18   that focus on in particular safe design of consumer products?

19   A.   There might be.  I am not aware one way or the other.

20   Q.   Okay.  And since you've been consulting, Dr. Wright, with

21   respect to your consulting and testifying practice, less than

22   ten percent of your cases have involved what you would call

23   household products.

24   A.   I would agree with that, yes.

25   Q.   Now, you mentioned a minute ago the fact that the other

1   cases that you might have worked on, the specifics of which you

2   can't recall, involving window blind coverings -- if you did

3   work on them, they were horizontal products, not vertical

4   products, correct?

5   A.   I know this is the first vertical product.

6   Q.   Now, there is a fundamental difference in how the cords

7   operate on a horizontal blind or window covering as opposed to

8   a vertical blind, correct?

9   A.   I would disagree with that.

10  Q.   Okay.  Let me ask you, with respect to -- let's take your

11  standard set of Venetian blinds, one-inch mini blinds, that

12  have a two-corded cord coming out of the headrail -- excuse me.

13  That cord is used to raise and lower the bottom rail of those

14  blinds, correct?

15  A.   That is correct.

16  Q.   And in fact, we're all familiar with it.  You typically

17  take the cord.  You pull it down.  And if you want to have the

18  bottom rail stay at something other than sitting on the

19  windowsill, you cock the cord to the left or the right.  And

20  that engages a locking mechanism, and the blind stays where you

21  left it.

22  A.   There is a pinch roller in there.

23  Q.   Okay.  And with respect to the two cords that you are

24  holding on to raise and lower, those are not typically used to

25  raise and lower the blinds by means of pulling on one or the

1    other.  You're holding on to both of them together, correct?

2    A.  That is correct.

3    Q.  With respect to a vertical blind of the type that we have

4    here, the two functions that you described, both the opening

5    and vertical blinds can be parted from the middle, or they can

6    go entirely left to right, or vise versa, correct?  Yes?

7    A.  The answer is, yes.  I mean, it's according to the -- that

8    particular blind.  That is correct.  Some of them open and part

9    in the middle, and some open or part from one side or the

10   other.

11   Q.  Those functions involve a moving of one direction of the

12   cord in a continuous motion.  In other words, you don't pull on

13   the two sides of the nylon cord.  You pull on one, and the

14   blinds traverse one way.  And you pull on the other cord, and

15   they traverse back the other way, correct?

16   A.  If you're using a corded or closed-loop system.

17   Q.  That's what we're talking about.

18   A.  Yes.

19   Q.  And similarly with respect to the tilt of the veins or the

20   slats, which is in this case at least operated by the metal

21   beaded chain, same thing.  That's a continuous loop on that

22   chain that you pull one of those directions of loop in one

23   direction to open, and the other one to close, correct?

24   A.  Well, the same is true on a horizontal blind.  If it's a

25   corded system, it is a closed loop that -- that you change the

Wright - cross                                                                63

1    angle slats.  And it's rotated either for or after the --

2    Q.  There are some horizontal systems that use that.  On

3    vertical systems, though, if there is a chain or a cord to

4    operate the tilt of the slats, that's always a continuous loop,

5    what we call, correct?

6    A.  That's correct.

7    Q.  In other words, you can't break it apart or -- and have the

8    blinds still function?

9    A.  No, it's a continuous loop.  And it's a -- of the ones that

10   are corded on a horizontal blinds, at least the ones I looked

11   at previously, it was a continuous loop to change the --

12   because it would feed up and feed back down.

13   Q.  Okay.  Now, Dr. Wright, you haven't done any comprehensive

14   review of incidents either involving Hunter Douglas blinds

15   generally or vertical blinds in particular or even other

16   manufacturers' products in preparing to testify in this case,

17   have you?

18   A.  As I told you, the answer is, I -- I did not do that for

19   the reasons I previously stated to Mr. Santiago.

20   Q.  Okay.  The one thing you did look at, you looked at a

21   November 2004 report that summarized a number of window blind

22   strangulation incidents between the years 1996 and 2002,

23   correct?

24   A.  That's correct.

25   Q.  Do you have any recollection ability to summarize how many

1   of those products for example were vertical blinds?

2   A.   I do not remember the ratio.   I remember vertical blinds

3   were mentioned in that summary.   But I do not remember the

4   ratio.

5   Q.   Same question.   Do you have any recollection or information

6   as to how many of the products summarized in that report

7   involved ones manufactured by my client, Hunter Douglas?

8   A.   I do not remember --

9   Q.   Okay.

10  A.   -- the ratio.

11  Q.   You familiar with Mr. Jankoski of Hunter Douglas?

12  A.   Yes, I remember reading his deposition.

13  Q.   Okay.   And you are familiar if he was one of the

14  individuals involved with the Window Covering Manufacturing

15  Association that participated in that study of strangulation

16  incidents between 1996 and 2002?

17  A.   I remember -- I don't remember in detail.   I have not

18  reviewed that recently.   I reviewed it before I wrote my report

19  but I have not reviewed it recently.

20  Q.   So you don't recall the details of his involvement.

21  A.   I remember the name and that he was employed by your

22  client.   But I don't remember the exact aspect of what he did

23  or did not do in that time period.

24  Q.   Okay.   You haven't done any analysis of strangulation

25  incidents on window blinds, Hunter Douglas or otherwise, prior

Wright - cross                                65

1   to the manufacture of these blinds in 1995, have you?

2   A.   I have looked at the Consumer Product Safety Commission

3   analysis.  I didn't do any myself because I was relying on the

4   CPSC materials.

5   Q.   And have you evaluated those materials of the CPSC to

6   determine, for example, how many vertical blind incidents there

7   were before these blinds were manufactured in 1995?

8   A.   I -- I did not look at the ratio.  I simply looked at

9   whether they were closed-loop incidents.  And that is to me

10  notification that there is a danger when you have a closed

11  loop.

12  Q.   Okay.  We'll talk about the notification of that danger in

13  a minute.  Have you done anything to try to analyze how many

14  incidents had occurred on Hunter Douglas blinds before these

15  blinds were manufactured in 1995?

16  A.   I looked at the manufacturing of window covers all in one

17  fell swoop, because they -- to the consumer it doesn't matter

18  who manufactured.  To the consumer it's important of what --

19  what the dangers are and do the dangers exist and can the

20  dangers be alleviated, and can a safer product be manufactured

21  that results in the same function and usefulness of the

22  product.

23  Q.   Okay.  Now, in this case, as you have already indicated, in

24  fact Hunter Douglas offered a -- an alternative design of this

25  vertical blind product that did not involve any cords or chains

Wright - cross                                66

1    in 1995.  And that was the PermAssure wand, correct?

2    A.  That is correct.

3    Q.  In fact, you've seen internal Hunter Douglas

4    correspondence.  You've seen marketing, promotional materials

5    that make it very clear that that wand was developed and

6    marketed at least in part as a device to make window coverings

7    used in rooms with children safer for children by eliminating

8    the cords and chains, correct?

9    A.  I would agree with that statement.

10   Q.  So there is no dispute in this case before 1995, when these

11   blinds were manufactured, the general risk of strangulation on

12   corded window coverings, if they were accessible to children

13   and children were not supervised adequately, that was a risk

14   that the industry and specifically my client was in the process

15   of addressing, correct?

16   A.  That is a good question.  If -- if your client -- if your

17   client is aware of the dangers, which they obviously were in

18   the literature they put out in developing this product, why did

19   they continue to make available or sell products that were

20   dangerous and defective?  And that is -- I mean, obviously you

21   have to ask your client that question.  I can't answer that

22   question.

23   Q.  I understand you are here and you like to criticize that if

24   you are allowed to.  My question to you is, there is no

25   question that the design of PermAssure wand, to take the

1    example that we are involved with here today, was in large part

2    in response to strangulation risk that Hunter Douglas knew

3    about well before 1995, correct?

4    A.   I would agree with that statement.

5    Q.   Okay.  You understood that Hunter Douglas offered consumers

6    the choice in 1995 of an operating system that utilized cord

7    and chain on one hand, correct?

8    A.   That is correct, on one hand.

9    Q.   Or a wand such as the PermAssure wand, the trademark name

10   for Hunter Douglas, on the other hand, correct?

11   A.   That is correct.

12   Q.   And that was available in October of 1995, when to the best

13   of her recollection Brenda Davis purchased these blinds,

14   correct?

15   A.   And I also am very aware that Ms. Davis was never given

16   that option.

17   Q.   Well --

18   A.   And if she had been given that option, at least in her

19   affidavit she stated she would have chose the wand system, not

20   the cord system.

21   Q.   That's something that I am sure you know there is a dispute

22   about, and we lawyers will deal with that later.

23        What you are aware of is, Ms. Davis gave a deposition

24   in which she said, she couldn't recall if she bought the blinds

25   online or by telephone, correct?

1  A.  I remember her deposition testimony, yes.

2  Q.  And her deposition testimony was, she couldn't even recall

3  whether she went online to buy these blinds or purchased them

4  by phone, correct?

5  A.  She could not recall.

6  Q.  She had no recollection who she spoke to, if she spoke to

7  anyone.

8  A.  That is correct.

9  Q.  If she did it online, she didn't speak to anyone.

10 A.  If she did it online, yes.

11 Q.  And these blinds, whoever she purchased them from, it was

12 not a representative of Hunter Douglas, correct?  Hunter

13 Douglas doesn't sell blinds?

14 A.  That I don't -- I don't know.

15 Q.  So you are not familiar with the fact that my client

16 doesn't sell blinds itself, but it manufactures them for sale

17 by --

18 A.  Distributors.

19 Q.  -- distribution network?

20 A.  I am aware of that, yes.

21 Q.  So whoever Ms. Davis spoke to, if she spoke to anyone at

22 all, it wasn't somebody from Hunter Douglas, correct?

23 A.  Well, if -- if that is -- if that's factually correct, then

24 I would agree with that statement.

25 Q.  Okay.  I represent to you that it is.

Wright - cross                                    69

1           And then subsequent to her deposition, you are aware

2    that Ms. Davis at Mr. Jauregui's request filled out an

3    affidavit saying what you just summarized, that she wasn't

4    aware of the wand option.  And if she'd been aware of it, she

5    would have purchased it.  That's what she said in the

6    affidavit, correct?

7    A.   That's what I read in the affidavit, yes.

8    Q.   Okay.  So you expressed the opinion that the wand option is

9    safer from a child safety standpoint than the cord and chain,

10   correct?

11   A.   That is correct.

12   Q.   But what you haven't done in this case is consider whether

13   it was reasonable for Hunter Douglas to offer consumers the

14   choice as it did in this case?

15   A.   My opinion is that -- is that they should not have offered

16   a choice.  They should have -- once they developed the wand

17   system, they should have made that as their only option because

18   it is to me easier to use.  It's cost effective.  And by most

19   importantly, it is much safer.

20   Q.   Okay.  You agree that there are all kinds of situations in

21   our lives in which there are various versions of different

22   products, some of which are safer for one purpose, and some of

23   which are safer for another purpose, correct?

24   A.   I mean, I guess.  I mean, I never analyzed something in

25   that manner.  But, I mean --

1   Q.  If I drive a Mercedes 500 sedan series as opposed to a

2   Smart Car, I'm going to have more side impact protection in the

3   Mercedes than I am in the Smart Car, aren't I?

4   A.  Yes, but you've chosen the Mercedes I think for other

5   reasons than just that particular.  But I would agree that --

6   that you're going to be more protected in a Mercedes than you

7   are --

8   Q.  Okay.

9   A.  -- Smart Car.

10  Q.  And the question, Dr. Wright, is whether there is ever a

11  situation in which a manufacturer could make available

12  different options on his products, one of which is safer, for

13  example one setting.  One of which, for example, might have

14  more utility in another setting?  Is there ever a situation in

15  which that would be acceptable or that would be reasonable, in

16  your opinion?

17          And you haven't done that in this case, have you?

18  A.  As I said before, I don't think safety should ever be an

19  option.  I mean -- and I have worked in lots of cases,

20  especially automotive cases, where, you know, if you put a

21  safer design in a vehicle, then you put it as an option,

22  that -- that should never be an option.

23  Q.  When --

24  A.  If --

25  Q.  -- function and utility are involved, there can be

1    different levels of safety involved, depending upon what use

2    some product to.  Wouldn't you agree with that?

3    A.  I don't know if I can agree with that.

4    Q.  In any event, in this case, you haven't done a study or

5    analysis to determine whether or not it was reasonable for

6    Hunter Douglas to offer these two options, both the cord and

7    chain for people who wanted it, and the PermAssure wand for

8    people who wanted that option.  You haven't done that here,

9    have you?

10   A.  I have not done any analysis of that product for the

11   reasons I stated to Mr. Santiago.  There was -- there was no

12   need for me to look at cost analysis or feasibility study

13   because your client had already done that.

14   Q.  And in fact, that's -- that kind of makes this unusual for

15   a lot of product cases that you worked on, when you're often

16   talking about whether some other alternative design was

17   feasible or technologically available.  Or the manufacturer

18   should have had some different design.

19        We've got all that here.  We've got the knowledge of

20   the strangulation risk and my client manufacturing a PermAssure

21   wand that you agree eliminates that risk on these window

22   blinds, correct?

23   A.  I would agree with that.

24   Q.  So this case is a little different in that regard than the

25   majority you work on, right?

1    A.  I would agree with that.

2    Q.  Okay.  In this case, recognizing that you'll say safety is

3    not an option, you know, every chance you get, you haven't done

4    an analysis to determine whether it was reasonable, or on the

5    other hand whether it was negligent, for Hunter Douglas to

6    offer consumers both of these choices.  You haven't done that

7    here, have you?

8    A.  I have -- I have looked at -- I -- I guess my answer would

9    be, yes, I have in that I've looked at the feasibility of both

10   products, the mechanics of both products, the usefulness of

11   both products, and have come to the conclusion that one product

12   is unreasonably dangerous; the other is not.  And they are both

13   manufacturing wise, cost effective wise, utility wise,

14   virtually the same.  Why would your client go ahead and

15   continue to manufacture something that is more dangerous?  That

16   is my conclusion.

17           So I have, I guess, done a study in that manner or an

18   analysis in that manner.  And so the answer is that I have.

19   Q.  I am going to ask the Court and counsel to refer to page

20   171, 172, of your deposition, Dr. Wright.  And beginning at

21   line 12, page 171.  I am going to -- actually, I will read the

22   questions, and I'll let you read the answers here.  Is that

23   okay?

24   A.  That's fair enough.

25   Q.  So my question at page 171, line 12 was:  You mentioned

Wright - cross                                    73

1    several occasion -- on several occasions your safety is not an

2    option mantra, and I want to ask you a question about that.  Is

3    there ever a situation in which a manufacturer could make

4    available two different options on one of its products, one of

5    which was safer in some situations, one of which was more

6    useful to more people and safer in other situations, where it

7    would be justifiable for you for the manufacturer to offer

8    both?  Or does the manufacturer have an obligation to determine

9    which of these options is the safest on balance and only make

10   that available?

11          And after objection by Mr. Jauregui, your response

12   at -- well, I went on to say:  Do you understand the question?

13          And your answer at line 2 of page 172 was?

14   A.  I understand the question.

15          MR. SANTIAGO:  Your Honor, I have an objection.

16   That's improper cross-examination impeachment.  He didn't deny

17   that, that question.  I am not sure why he's cross-examining

18   him.

19          MR. WILLIAMS:  Yes, he did.

20          THE COURT:  I actually think he did.  So go ahead.

21   BY THE WITNESS:

22   A.  I understand the question, and we would have to examine

23   each product and each situation for me to make a statement one

24   side or the other.

25   BY MR. WILLIAMS:

Wright - cross                                    74

1   Q.   You have to look at how the product was used, who used it,

2   what type of configurations it could be used in, things like

3   that, correct?

4   A.   And I said:  I would have to agree with that, yes.

5   Q.   You haven't done that here, have you?

6   A.   And my answer is:  I've looked at it, and in residential

7   situation the answer is that the wand is -- in my option is the

8   way to go.

9   Q.   Actually, the wand in my opinion is the way to go, correct?

10  A.   That is correct.

11  Q.   Question:  I understand your opinion.  But you made no

12  study in this case, have you?

13  A.   And I said:  I have not done a study in that case.

14  Q.   In this case?

15  A.   In this case.

16  Q.   You say:  Right.  In that manner of question I have not

17  done a study, correct?

18  A.   Let's see.  I have not done a study in that case, is what I

19  said.

20  Q.   So that was your testimony, and that was truthful in your

21  deposition in 2011 correct?

22  A.   That's correct.

23  Q.   Okay.

24  A.   And the more I have thought about your question since then,

25  I -- I am still stating what I stated then is what I state now

1   in that now I think that my analysis is that I have been able

2   to look at it in more detail in the interim time.  And my

3   answer is that -- that they should not have anything available.

4   I mean, I have had a chance to think about it and analyze it

5   more in that length of time.

6   Q.  Well, we understand that's what you would like to testify

7   to here today.  I am asking you questions about the work that

8   you did in the report prior to your deposition that I was

9   entitled to depose you on.  And that was -- because this case

10  is taking a while, that was two years ago, correct?

11  A.  That is correct.  And my answer is still the same.

12  Q.  Have you ever supplemented your report in writing?

13  A.  No, I have not.

14  Q.  Okay.  Now --

15  A.  I don't think there is any changes in my report -- in my --

16  there is no changes in my opinions as I have stated now as what

17  was in my report.  There has been no changes.

18  Q.  Okay.  You didn't consider whether it would have been

19  reasonable for Hunter Douglas to offer both the chain and the

20  wand as we just saw in 1995.  But that's something that could

21  be done, correct?

22  A.  I mean, obviously lots of things can be done.

23  Q.  One of the things you have to look at is how various in

24  this case vertical window blinds are used.  For example, how

25  tall the window is, correct?

1    A.  I mean -- I mean, you have to look at lots of different

2    situations.  I'm -- I'm not arguing that.

3    Q.  You have to at least evaluate whether there are situations

4    in which a cord or chain was necessary to operate the blinds or

5    more convenient for certain individuals, older people, things

6    like that.  You have to at least look at that in doing such an

7    analysis of whether it was reasonable to offer both options, or

8    whether a manufacturer such as Hunter Douglas should have

9    completely wiped out the cord and chain option and only offered

10   the wand.

11           You have to evaluate that, would you not?

12   A.  Well, you have to evaluate it.  But I think the evaluation

13   is that the dangers that are involved with the -- with a closed

14   loop system, whether it's chain or nylon cord, is too high a

15   risk.

16   Q.  We understand that's your --

17   A.  And again, if you get into a big situation where you got

18   really tall blinds, maybe electronically controlled is the way

19   to go versus -- because obviously you are getting bigger and

20   heavier type of equipment.

21   Q.  Do you know whether those were offered back in the mid-

22   1990s as well?

23   A.  I do not know one way or the other.  All --

24   Q.  Specifically by Hunter Douglas?

25   A.  I do know that Hunter Douglas for this particular window

1  blind had the wand system available.  And that would have

2  eliminated our being here today if they had offered and sold

3  the -- the wand system to Mrs. Davis.

4  Q.  In any event, you haven't taken a look at how consumers use

5  vertical blinds, in what context, to evaluate the different

6  types of uses, the different types of people that use them.

7  You haven't done any systematic analysis of that, have you?

8  A.  I have not done that.

9  Q.  Okay.  You're not a biomechanic, correct?

10  A.  I have used biomechanics in some of my analysis, but I

11  don't consider myself a biomechanic.

12  Q.  Nor do you consider yourself trained formally in

13  ergonomics, correct?

14  A.  That is correct.  I do not consider myself trained in this

15  area, even though I use ergonomics in a lot of my analyses.

16  Q.  And I think I'll get the same answer.  Even though you use

17  it, you have no formal training in the area of human factors,

18  how people interact with various products, do you?

19  A.  I use human factors a lot of times, but I'm not -- I don't

20  consider myself as a human factors per se.

21  Q.  Have you ever done a statistical analysis to determine how

22  frequent these accidents are, whether it's on window blinds

23  generally or Hunter Douglas products in particular?

24  A.  I've done lots of statistical analyses.  But I have not

25  done any in this particular assignment because all of those

1   have been done before, as I stated earlier.

2   Q.  Do you know how many corded window coverings products by

3   people who know better than you and I -- by their estimate

4   there are in American homes today?

5   A.  I am sure there is thousands.  I am sure there is hundreds

6   of thousands.

7   Q.  Have you heard billion?

8   A.  I have not -- I do not know the number.  I know it's

9   probably quite a few.

10  Q.  Would you have any reason to quarrel with people in the

11  industry who estimate there are currently somewhere in the

12  order of a billion corded window coverings in use in America?

13  A.  I am sure that the number of window coverings would

14  approach that number.  I don't know how many would be corded

15  versus wand operated.

16  Q.  My question is corded.

17  A.  I have no idea what the number is.

18  Q.  Now, you mentioned state of the art briefly in your

19  testimony with Mr. Santiago.  Did you do any type of historical

20  analysis to see if there were any manufacturers in 1995 who had

21  completely eliminated cords and chains on vertical blinds?

22  A.  I did not do that.  That was not part of my assignment.

23  Q.  In fact, to your knowledge, was not Hunter Douglas on the

24  leading edge in offering PermAssure wand as an option in lieu

25  of cords and chains for people who wanted it?

1   A.   That I do not know.   I do know they had it available.   And

2   I stopped -- I stopped looking and working in that area when I

3   found out Hunter Douglas, the defendant, themselves had a wand

4   available.

5   Q.   Did you look to see whether any other manufacturer preceded

6   them in that regard?

7   A.   I did not look to see if anyone.   I just knew that the

8   state of art was such.   So I did not bother to look any

9   further.

10  Q.   And once again, state of the art about the viability, the

11  feasibility, all those things go into an alternative design.

12  You understand that's not an issue here.   We were

13  manufacturing, designing and making available cordless wand-

14  operated vertical blinds in October of 1995, when these blinds

15  were purchased, correct?

16  A.   That is correct.   I am aware of that.   And that is part of

17  my opinion.   And that's a reason my opinion is -- as stated is

18  that state of art was such, and all feasibility studies and the

19  manufacturing were already accomplished by the time of

20  manufacture of this blind.

21  Q.   On the subject of state of the art, do you know whether

22  there were any industry safety standards for the safe design

23  and manufacture of corded window covering products in 1995?

24  A.   I'm not aware one way or the other.   I stated that earlier

25  in my deposition.

Wright - cross                                              80

1   Q.  Do you know whether there is such a thing as a safety

2   standard for corded window coverings?

3   A.  There probably is.  There is usually ANSI standards for

4   lots of thing.  I usually don't look at standards when I get

5   involved because I look at what -- when I do an investigation

6   analysis, I look at what's available, what can be done, how it

7   can be designed, how the accident can be avoided.  I am

8   interested in -- in the accident scenario, why it was caused,

9   and could that cause be avoided.

10       Very rarely do I look at standards.  Sometimes I do,

11  because the standards are -- most of the time are voluntary,

12  and most of the time they are minimal.  Most of the time they

13  have very little bearing on the accident themselves.

14  Q.  Well, in this case, you haven't looked at the ANSI

15  standard.  In fact, you couldn't tell me the designation of the

16  number of the ANSI standard that specifically relates to corded

17  window coverings.

18  A.  That is correct.  I have not looked at the standards in

19  this assignment.

20  Q.  And if I were to represent to you that the first one of

21  those standards was promulgated in conjunction with the CPSC

22  and with the Window Covering Manufacturers Association working

23  hand in hand with the CPSC first promulgated in 1996, the year

24  after these blinds were manufactured, you wouldn't know one way

25  or the other, would you?

Wright - cross                                    81

1  A.  I would say that sounds very reasonable because the CPSC,

2  since I worked with the CPSC before on many occasions, they

3  usually are working hand in hand with various manufacturing

4  groups to institute standards.  So I would say that that seems

5  very reasonable to me to my --

6  Q.  So in this case you never took the trouble to go look to

7  see whether there was a safety standard or whether one had been

8  promulgated since then relating to this product?

9  A.  Again, I am trying my best not to spend my clients' money

10 where -- in situations where it doesn't need to be spent.  So

11 the answer is, I am -- I am -- since it didn't bear on my

12 opinion and it was not part of my analysis, I didn't want to

13 waste my client's time and expenses in that manner.

14 Q.  Are you aware one way or the other whether the current

15 updated ANSI standard related to corded window coverings still

16 allows cords and chains on vertical window blinds?

17 A.  I do not know one way or the other.

18 Q.  Dr. Wright, I just got a few minutes left.  With respect to

19 your accident reconstruction that you spent most of your time

20 on with Mr. Santiago this morning, you didn't do any studies or

21 tests to determine how this accident occurred, did you?

22 A.  What do you mean studies or test?

23 Q.  For example, a surrogate study?

24 A.  A what?

25 Q.  A surrogate study.

Wright - cross                                                    82

1    A.   Survey study?

2    Q.   Surrogate study.

3    A.   No.

4    Q.   To get a child to try and manipulate things in a certain

5    way.

6    A.   Oh, a surrogate study.  No, I did not.

7    Q.   You didn't do any study with dolls?

8    A.   No, I did not.

9    Q.   You didn't do any animations?

10   A.   I have not done any -- I have done many animations, but not

11   in this assignment.

12   Q.   In terms of your opinion that Max became entangled in this

13   window blind cord by virtue of falling off the nightstand, you

14   basically said it's your feel for what happened based upon the

15   police report, the photos, the examination of the house and

16   things like that, correct?

17   A.   All the physical evidence that I was able to get my hands

18   on, both physically measuring myself, physically looking at

19   photographs that I took and the police took, and examining the

20   blind and the situation, looking at the cross-sectional area of

21   the cord, the length of the cord, as measured by the police,

22   that is to me the most likely scenario.  And I would say that

23   that's physically what happened to a reasonable degree of

24   scientific certainty.

25   Q.   And you understand, there is no dispute in this case that

1    Max became entangled on this nylon window blind cord and died

2    by virtually strangulation.  That's accepted, correct?

3    A.   I -- at least in my opinion that's what physically

4    happened.

5    Q.   There's no --

6    A.   I don't know if you and your client have accepted that.

7    But that is my opinion what physically happened.

8    Q.   There is no suggestion of parental misconduct or abuse,

9    correct?

10   A.   I do not know what you or your client are claiming in that

11   regard.

12   Q.   You never heard of any such suggestion, have you?

13   A.   One way or another I have not heard.

14   Q.   And in particular, you realize that the only question that

15   really has been in this case with respect to how the accident

16   occurred was whether Max was leaning over and holding onto the

17   cord to try and balance himself as he looked out the window, or

18   whether he fell into the loop of the cord without manipulating

19   it himself, correct?

20   A.   My opinion, as I stated earlier, is that he -- he's leaning

21   over to the window, probably moving the slats one way or the

22   other so he can look out the window.  And as he's doing that,

23   his head enters that loop, which clearly shows is more than

24   large enough for his head to enter as he looks out the window.

25   Q.   And you simply thought he entered it without having held

1   onto it beforehand?

2   A.  I don't think he held onto it beforehand.

3   Q.  And that's the only issue that to my knowledge has arisen

4   in this case.  And your conclusion that he fell into it without

5   physically manipulating it or holding it open, for example, was

6   what we already talked about, and that was your feeling that

7   that was the most likely scenario.

8   A.  That is correct.

9   Q.  No studies or tests that I could ask you about were

10  performed, correct?

11  A.  In this assignment I don't feel that there was any need for

12  any -- any of those -- for -- because of the design of the

13  product.  So the answer is, since it was no need for any of

14  those studies, I did not do any.

15  Q.  In your report you didn't even express an opinion as to

16  whether he became entangled in the cord or the chain, did you?

17  A.  I think as I stated to you in my deposition, I think each

18  is very physically possible.  I think the more likely one, as I

19  stated in my deposition, is the nylon looped cord for the

20  reasons I gave in my deposition.  And that is that the

21  cross-sectional area is much larger.  It's easier for his head

22  to get in there.

23          And then also the medical examiner felt that it was

24  the -- the fabric cord, not the beaded chain.

25  Q.  We saw this photograph in the handful that Mr. Santiago

Wright - redirect                    85

1    directed your attention to earlier, sir.  And that's the

2    photograph that the police investigator took after the accident

3    and for which the best evidence that we have is that the window

4    blind and the cord had not been manipulated since Mrs. Padilla

5    extracted her son from the cord, correct?

6    A.  That is my understanding.

7    Q.  So this is the best photograph that gives us the

8    contemporaneous perspective of where the cord and the window

9    blind and in particular the nightstand that you think was the

10   platform that Max used were located on the date of the

11   accident, correct?

12   A.  That is correct.

13        MR. WILLIAMS:  Okay.  Dr. Wright, I think I used up my

14   time.  Thank you very much.

15        Thank you, your Honor.

16        THE WITNESS:  Thank you.

17        THE COURT:  Any redirect?

18        MR. SANTIAGO:  Just a couple questions.

19                    REDIRECT EXAMINATION

20   BY MR. SANTIAGO:

21   Q.  Doctor, at the beginning of your cross-examination, you

22   were asked about what you were asked to do in this case.  And

23   in particular, were you asked to evaluate whether or not the

24   window blind in this case was defective?

25   A.  And my answer is, yes, I was.  After talking to plaintiff's

1   counsel on the phone, and then talking to him in person when I

2   investigated and analyzed the accident scenario, it has always

3   been my opinion and part of my assignment to determine what

4   caused the accident.  And since it was a product involved in

5   the accident scenario, was that product defective.  And if it

6   was, was the defects causative or contributed to that accident.

7   Q.  And in fact, he showed you page 1 of your report and showed

8   you that language, which he asked you about whether it included

9   deciding whether this was unreasonably dangerous.

10          I want you to look at the report on page 3.  I'm going

11  to put it up as well.  And the top paragraph, can you read that

12  as well?

13  A.  Yes.  On page 3 of my report, which was dated March 18 of

14  2011:  I will use accident reconstruction and reconstructive

15  analysis to explain to the Court and jury why and how this

16  accident occurred.  I will also explain how the defect in the

17  design and manufacture of the vertical blinds caused and/or

18  contributed to the accident and Maximilian's Padilla's death.

19  I will also, if asked, discuss the opinions and findings of

20  other individuals who have been retained to give expert

21  opinions in this matter.

22  Q.  Thank you.

23          You were also asked about the danger, strangulation

24  danger, that's posed by horizontal blinds versus vertical

25  blinds.  I believe you had some familiarity coming into this

1  with horizontal blinds at some point.

2  A.  That is correct.

3  Q.  Is there a difference in the threat of -- of -- or

4  strangulation threat or risk with either of those blinds?

5  A.  If you have a --

6           MR. WILLIAMS:  Objection.  That's incomplete

7  hypothetical.

8           THE COURT:  Can you restate please?

9  BY MR. SANTIAGO:

10  Q.  Does it matter to you, Doctor, whether the danger of

11  strangulation from window covering cords comes from horizontal

12  or vertical blind?

13           MR. WILLIAMS:  Same objection.

14           THE COURT:  Objection overruled.  You can answer that.

15  BY THE WITNESS:

16  A.  If or since they were -- since both blinds are mounted on

17  the wall and have a closed loop and the closed loop is strong

18  enough to support the weight of a youngster, the risk of death

19  or -- or severe injury is just as great whether it's a

20  horizontal or vertical blind.

21  BY MR. SANTIAGO:

22  Q.  And I think I have asked you this earlier.  You touched

23  upon it on cross-examination, your so-called mantra that safety

24  is never an option.  Where does that derive from?

25  A.  That is taught in most engineering courses.  And every --

1    every course I taught in engineering mechanics when I was

2    teaching at Ohio State, I always would use that as a mantra to

3    the future designers, future engineers, that safety is never an

4    option.  If you can design a product to be safer, then that's

5    the alternative you take.

6    Q.  Assuming that new design doesn't affect functionality and

7    is feasible, correct?

8    A.  That's right.  You have to make sure it's cost effective,

9    that it's physically feasible, and that the product is not

10   diminished in its utilitarian value.  But if you can accomplish

11   that and still make a product safer, you always go with the

12   safer route.  Safety is never an option.

13   Q.  In this case, that's what you have.  You have an alternate

14   design that completely eliminated the risk.  Hence it makes the

15   prior design unreasonably dangerous.  Is that your opinion?

16           MR. WILLIAMS:  Objection, that's leading.

17   BY THE WITNESS:

18   A.  That is --

19           THE COURT:  Sustained.

20   BY MR. SANTIAGO:

21   Q.  So in this case, what was your opinion with respect to this

22   vertical blind, given the fact that there was a viable and

23   functioning alternative?

24   A.  My opinion is that since there was a safer alternative,

25   that Hunter Douglas themselves had even analyzed, designed and

1   manufactured, then that was an option that Hunter Douglas

2   should have made available to all of its customers.  And as I

3   stated earlier, if we had the wand and the Perma -- PermaShield

4   wand and not the looped cords, we would not be here in the

5   courtroom today.

6           MR. SANTIAGO:  I have no further questions, your

7   Honor.

8           THE COURT:  Okay.  I actually have some questions

9   before we break for Mr. Wright.  Some basic questions, just so

10  I understand.

11          With regard to how -- so the blinds at issue here,

12  they open centrally, is that correct?

13          THE WITNESS:  That's correct.

14          THE COURT:  And so if the wand system were to be used,

15  would the wand only be used on one side?  Or how would the wand

16  system work?

17          THE WITNESS:  The way Hunter Douglas -- I mean, you

18  can design it however you want.  And --

19          THE COURT:  No, I understand that.  But --

20          THE WITNESS:  The Hunter Douglas system, the wand

21  would -- the wand would sit on one end.  And then you would

22  slide the wand in the system.  And as you would slide it to the

23  middle, the both sets would come to the middle.

24          Or you could have it so that -- that you simply go

25  right to left or left to right.  You can have it do whatever.

1          With the mechanism as we have here, the wand would sit

2     at in this case the right-hand side.  And you would then move

3     the wand to the center to close it.  And then the rotation of

4     the wand would change the angle of the slats.

5          THE COURT:  Okay.  Now, when in response to questions

6     from counsel about alternative designs, one of the things you

7     mentioned was that cost effectiveness is something that you

8     have to consider --

9          THE WITNESS:  Absolutely.

10          THE COURT:  -- in considering alternate designs.

11          Did you do an analysis of the cost effectiveness of

12     the Hunter Douglas' -- your proposal that Hunter Douglas offer

13     only the PermAssure wands?

14          THE WITNESS:  I have -- I have not done cost analysis

15     because the cost system on both are virtually the same.  I

16     mean --

17          THE COURT:  I guess my question is, how do you know

18     that?

19          THE WITNESS:  Well, simply looking at -- since I have

20     done manufacturing before, looking at -- at what the difference

21     is, the mechanism is the same in the headboard.  The slats are

22     the same.  The gear is the same.  Everything is the same.

23          The only difference is, you have the cost of the wand

24     versus the cost of the extra chain and the cost of the cord.

25     So there is -- there is very little difference in total cost of

Wright -                                          91

1    the system, one versus the other.

2              THE COURT:  And I guess my question is more specific

3    than that, is how do you know that?

4              THE WITNESS:  I guess I know that from being in

5    manufacturing myself and what things cost.  And once you get

6    into mass production, how -- what are the costs.  I mean,

7    obviously you now have a wand.

8              And the design of the wand is very unique in that you

9    don't need a lot of different-length wands.  The way they

10   design the wand is, they put a hollow end, which is very unique

11   and very ingenious, and then a long wand.  And if you want the

12   wand shorter, you cut the handle off, cut the length that you

13   want, and turn the handle over and stick it back in.  And that

14   way you don't have to manufacture eight or nine different

15   wands.  You only manufacture one wand, and then you can make it

16   whatever length you want.

17             So cost wise there is very little difference.  I'm not

18   saying they're exactly the same.  But looking at the design of

19   the product and the way they've gone about designing, there is

20   very little difference in cost overall.

21             THE COURT:  In the record that you reviewed, did you

22   review any documents or testimony about how much it costs to

23   make the wand versus the cord system?

24             THE WITNESS:  I have not seen anything in any of

25   the -- in any aspect I have not seen anything one way or the

1    other in that regard.

2           THE COURT:  You also testified today that in your

3    opinion the dangers of the closed loop system was too high a

4    risk.  And my question is, what if any risk analysis did you do

5    in arriving at that conclusion?

6           THE WITNESS:  I have not done any risk analysis in

7    that my opinion -- and I've looked at lots of different

8    accident scenarios.  I'm not limiting this just to window

9    blinds.

10          But in my opinion, if you can design a product and you

11   can avoid one death, then that is worth doing.  If the

12   functionality -- if the costs are not that much different and

13   the functionality is the same, then if you can avoid one death

14   then that is worth changing and making the safety the only

15   option.

16          I mean, one death is still one death.  I mean, one

17   death is too high, at least in my opinion.

18          THE COURT:  If you assume that the cost, the costs of

19   the two alternatives are different, is that something that you

20   would have to consider to determine whether or not that would

21   change your risk assessment?

22          THE WITNESS:  The answer is, I guess -- I mean, that's

23   a tough question in that --

24          THE COURT:  That's why I am asking.

25          THE WITNESS:  If the cost -- if the costs are only a

1   few dollars, then it would not change my opinion.  If the costs

2   are thousands of dollars, then this would change my opinion.

3        I can tell you, being in manufacturing, looking at

4   this, analyzing hundreds of accidents, the costs are only going

5   to be a few pennies per blind.  I can't say they will be

6   identically the same because I know that chain is not the same

7   price as a plastic wand.  And I know that the -- that the gear

8   mechanism that the wand uses is a little more than this -- the

9   wheel that the chain fits in.

10        But with that caveat, everything else is identically

11  the same.  So we're talking a few pennies, 20 cents, 30 cents,

12  per blind difference one way or the other.  To me that is to me

13  virtually zero.  And death, one death, is not worth 20, 30

14  cents.

15        THE COURT:  Now, you referred to looking at various

16  CPSC reports regarding the blinds at issue.

17        THE WITNESS:  Right.

18        THE COURT:  And I recognize that you reviewed those

19  reports.  But other than those reports, have you done any

20  statistical analysis or risk assessment on your own separate

21  and apart from those reports?

22        THE WITNESS:  And the reason -- I said, no, I have

23  not.  And the reason I didn't do it is because I didn't want to

24  spend my client's time and money on something that I already

25  had available.  I had Hunter Douglas' analysis they'd done

1    themselves, their development that they'd done themselves for

2    their own wand system.  And I looked at the CPSC data that the

3    federal government has done.

4            And so there was no need for me to spend my time and

5    my client's money to do something that would be, quote,

6    rediscovering the wheel.  So to answer your question, no, I

7    have not.

8            THE COURT:  The record that you reviewed, did Hunter

9    Douglas -- was there a study actually done by Hunter Douglas,

10   an incident report or study of statistics of some kind?

11           THE WITNESS:  I don't remember anything Hunter Douglas

12   did when it came to the accident, statistical analysis.  I know

13   the CPS has done a really good statistical analysis and

14   analyzed.  And I know that we have another individual working

15   on this assignment who was the former chairman of the CPSC.

16   And I talked to Stuart Statler numerous times.

17           But what Hunter Douglas did on various accidents I am

18   not aware of.  I know I looked at their developmental aspects

19   when it came to the development of this.  I know I've read the

20   deposition testimony of quite a few of their employees on

21   whether they were aware of the death -- deaths that the CPSC

22   was making them available.

23           I do not know what they did independently in that

24   regard.

25           THE COURT:  Okay.  And turning to your opinion as to

1    what happened regarding Max, Maximilian, in this case.  Did you

2    do -- I understand you looked at the photos, and you looked at

3    the reports.

4           Did you review or consider any alternative scenarios

5    that may have resulted in the end result?

6           THE WITNESS:  No.  I was -- any time I look at any

7    accident scenario, I look at all kind of possible -- I even put

8    that in my paper, which I delivered to the -- to the conference

9    which was published by American Society of Mechanical

10   Engineers.  And that is, you look for the obvious scenarios,

11   and then you look for the non-obvious because many times the

12   non-obvious are the ones that really physically describe.

13          I've had some really unique and interesting accident

14   scenarios.  I mean, they're all tragic.  Don't get me wrong.

15   But some really unique.  And some are almost impossible to

16   figure out until you finally do figure out how it all fell in

17   place.

18          This one was pretty straightforward when it came to

19   the scenario of describing the accident.  But I did look at all

20   kinds of different alternatives.  Looking at he wasn't tall.

21   Maybe he was trying to jump up.  Or maybe he was trying to do a

22   chin-up.  He was too little to actually pull himself up, only

23   being three years old, 52 pounds.

24          So you look at -- obviously you look at the evidence

25   that the chair has been tipped over, the toys have been knocked

1   off, the lamp has been knocked off, so you know that he was

2   physically on that table at some point in time.

3         Now, whether he parted that thing?  I don't know he

4   parted that thing.  I think he's parting the veins to look out

5   the window, and his head gets in the loop as he's parting the

6   veins.  And then when he falls off the table, the loop is here.

7   That's the most likely scenario.  That is what physically I

8   think did occur in this accident scenario.  And obviously that

9   puts all the pieces of the puzzle together.

10        And if you can put in -- anytime you do an accident

11  reconstruction, if you put all the pieces together and there is

12  no loose pieces, no pieces left out, no factual information

13  that is not accounted for, then usually that's a fairly

14  accurate, if not totally accurate, description of how the

15  accident unfolded on that particular fatal day.

16        THE COURT:  So, Mr. Wright, what is your opinion how

17  he got onto the side table?

18        THE WITNESS:  My opinion is that he climbed up on that

19  little chair that was there which was next to his bed.  And he

20  climbs up on the table.  Then he parts -- and as he falls he

21  knocks the chair over, because if you notice there was that

22  little chair that had been knocked over.  That is probable.

23        He could have -- he could have climbed on his bed and

24  then onto the nightstand.  But since that chair was right there

25  tipped over, that to me is a piece of evidence that he used

1    that little chair to climb up on the table to look out the

2    window.

3              THE COURT:  Could he have just climbed on the chair to

4    try to look out the window?

5              THE WITNESS:  He could have done that.  But I don't

6    think -- if he did that, I don't think the stuff on the table

7    would have gotten knocked off.  I think -- I think the chair

8    probably still wasn't high enough for him to look out or for

9    him to get a good view.  And so I think then he chair to the

10   table, and then is leaning out to look.  Because now when he's

11   on the table, he is physically high enough that the windowsill

12   will be about where his chest is.  And now he can look out

13   clearly to see the activity outside the window below.

14             THE COURT:  Okay.  Those are all the questions that I

15   had.  Is there any follow-up from counsel?

16             MR. WILLIAMS:  None here, your Honor.

17             MR. SANTIAGO:  None.

18             THE COURT:  Okay.  Very good.  So let's take a break

19   before we proceed with the arguments as to Mr. Wright as well

20   as to Mr. Statler.  So it's approximately 12:30.  Let's take an

21   hour break to 1:30.  And then we will reconvene at that time.

22             Thank you.  You may step down.

23             MR. JAUREGUI:  Judge, can I ask the Court a question?

24   Dr. Wright has to catch a plane around 4:00 o'clock.  Is he

25   excused?

1          THE COURT:  He's excused.

2          MR. JAUREGUI:  Thank you.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.

5      (Hearing recessed until 1:30 o'clock p.m. of the same day.)

<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   JOSE M. PADILLA, as the Special  )  Docket No. 09 C 1222
     Administrator of the Estate of   )
 4   MAXIMILIAN PADILLA,              )
                                      )
 5                    Plaintiff,      )
                                      )
 6            v.                      )  Chicago, Illinois
                                      )  August 20, 2013
 7   HUNTER DOUGLAS WINDOW            )  1:35 o'clock p.m.
     COVERINGS, INC.,                 )
 8                                    )
                      Defendant.      )
 9
                            VOLUME 1
10          TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
                 BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:           JAUREGUI & ASSOCIATES, by
13                                MR. ARTURO JAUREGUI
                                  Mr. EDWARD J. SANTIAGO
14                                120 West Madison Street
                                  Suite 400
15                                Chicago, Illinois 60602

16   For the Defendant:           SCHIFF HARDIN LLP, by
                                  MR. JEFFREY R. WILLIAMS
17                                One Market
                                  Spear Street Tower
18                                Thirty-Second Floor
                                  San Francisco, California 94105
19
                                  RILEY SAFER HOLMES & CANCILA, by
20                                MR. BRIAN O'CONNOR WATSON
                                  70 West Madison Street
21                                Suite 2900
                                  Chicago, Illinois 60602
22
                       ALEXANDRA ROTH, CSR, RPR
23                       Official Court Reporter
                        219 South Dearborn Street
24                            Room 1224
                        Chicago, Illinois 60604
25                          (312) 408-5038
</pre>

1      (Proceedings had in open court:)

2          THE COURT:  We will now proceed to oral argument with

3   regard to defendant's motion to exclude testimony of Robert

4   Wright.  As set forth in the schedule, defendants will go first

5   for 20 minutes, then plaintiff 20 minutes, and then defendant's

6   rebuttal five minutes.  It's their motion.

7          MR. SANTIAGO:  Your Honor, if I may approach.  We have

8   one other item we'd like to bring up before we discharge Dr.

9   Wright.  It has to do with the prices.  I knew you asked him

10  about that.  He had in fact testified about prices in his

11  deposition.  He just didn't recall it.  There is a price list.

12         I'd just like to put him up to answer those questions

13  that you had for him in terms of the differences in the prices

14  that you have that as part of the --

15         THE COURT:  Is it in the deposition?

16         MR. SANTIAGO:  It's -- the price list is actually part

17  of the stipulated documents in the pretrial order.  It's

18  Exhibit No. 103.  It's the price list.

19         THE COURT:  Can I see?

20         MR. SANTIAGO:  Sure.

21     (Brief pause.)

22         THE COURT:  Okay.  So you want to recall Dr. Wright

23  for the limited purpose of asking him questions about that

24  document?

25         MR. SANTIAGO:  Yes, sir.

1          THE COURT:  Okay.  That's fine.

2          Mr. Wright, you can step up.

3      (Witness takes the stand.)

4          THE COURT:  Mr. Wright, you are still under oath.

5          THE WITNESS:  Thank you.

6          THE COURT:  Proceed.

7      ROBERT R. WRIGHT, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8                REDIRECT EXAMINATION (Resumed)

9  BY MR. SANTIAGO:

10  Q.  Dr. Wright, you were asked by the Judge several questions

11  concerning the differences in pricing between the vertical

12  corded blinds and the PermAssure wanded blinds.  And I

13  understood you did not know what the answers were.  You

14  couldn't -- you didn't remember what the pricing was.

15          Do you recall that at some point in time as part of

16  your deliberations and consideration you got a copy of the

17  track -- Hunter Douglas vertical tracking component price list?

18  A.  Yes, I remembered seeing the price list.  But when the

19  Court was asking me what the difference of the prices were, I

20  couldn't remember them.  But I did go back and take a look at

21  them, and -- and I now am able to tell the Court what the

22  difference of the prices are.

23          MR. SANTIAGO:  Okay.  Your Honor, may I?

24  BY MR. SANTIAGO:

25  Q.  I have given you what's been marked as Plaintiff's Exhibit

1    103.  Can you tell me what that document is?

2    A.  This is a price list from Hunter Douglas for the vertical

3    blinds.  And it is the 1996 track and component price list,

4    effective January 1, 1996.  And it is Bates stamps down at the

5    right-hand corner of 9582 confidential.

6    Q.  And does it include the component price list for both

7    vertical wanded blinds and corded blinds?

8    A.  Yes, it lists the prices of the various component parts

9    that both blind systems use.

10          MR. SANTIAGO:  Your Honor, if you'd like to ask the

11   questions since this is your question.  I can ask him, or if

12   you prefer to do that?

13          THE COURT:  Mr. Wright, this is something that you

14   reviewed and considered in arriving at your opinions in this

15   case?

16          THE WITNESS:  That is correct.  As I stated earlier, I

17   couldn't remember the prices, but I knew they were very small.

18          THE COURT:  Anything further?

19          MR. WILLIAMS:  Just a question or two, your Honor, if

20   I may?  If counsel is done?

21          MR. SANTIAGO:  I will ask him real quickly what the

22   prices are.

23   BY MR. SANTIAGO:

24   Q.  What are the -- according to this particular price list,

25   what are the component parts of the vertical corded blinds

1  assembly versus the corded blind assemblies?

2  A.  Well, everything stays the same.  The only difference is

3  you remove the chain and some of the cord and replace it with

4  the wand assembly and the wand itself.  And so you would

5  eliminate roughly 14, 15 cents per cord per chain and replace

6  it with a wand, which is at a retail price of $3.  And the

7  assembly is worth -- is retailed at 3.50.

8           Now, when you get into manufacturing costs -- these

9  are the retail costs.  When --

10  Q.  Just with respect to the retail cost, that's the difference

11  in price between the corded and the wanded blinds?

12  A.  At retail price the difference is a little more than $6.

13  Q.  Okay.  And wholesale?

14  A.  Well, you don't worry about wholesale price.  What you

15  worry about is manufacturing price.  When we manufactured our

16  products, a product that sold for 2.95, $3.  Cost is 25 cents

17  to manufacture.

18           So -- so basically we're looking at $6, in that

19  ballpark, retail.  So you're looking at less than a dollar per

20  unit that's being manufactured.

21           MR. SANTIAGO:  I don't have any further questions,

22  your Honor.

23           THE COURT:  Okay.

24                    RECROSS-EXAMINATION

25  BY MR. WILLIAMS:

1    Q.  Mr. Wright, you referred to this as a retail price.  Who if

2    at all do you understand this price list to be for?

3    A.  It came from Hunter Douglas.  I assume since it says

4    tracking component price list, it is a retail price list.

5    That's what I assume.

6    Q.  So your understanding is that this is a price list for the

7    consumer, and these reflect prices that would be involved if

8    you purchase the chain and cord on one hand versus the

9    PermAssure wand on the other?

10   A.  If you wanted to replace one with the other, that would be

11   my assumption.  I -- I know nothing other than what I see on

12   the price list.

13   Q.  Have you looked at the entire document, of which this

14   document is a page?

15   A.  This was -- this was the -- this came with some other

16   documents when it came to installation and -- and what -- what

17   the installer is supposed to try to do.  And I read through all

18   of that document.  So -- but I do not -- when it came to --

19   this is the only thing I saw when it came to prices.

20   Q.  Do you know what this document is part of, what kind of a

21   price list?  Do you recall the cover page of this document?

22   A.  This was the top sheet of the document I saw.

23   Q.  So you don't know whether this is a price for the retail

24   customer as opposed to for the fabricators who make Hunter

25   Douglas branded products?  You don't know one way or the other?

1  A.  That I do not know.

2  Q.  You haven't even bothered to find out whether this is a

3  retail price versus a manufacturer's price to the fabricator?

4  A.  If -- I can tell you this, this is a price list.  And I can

5  tell you that whatever price is on here, the manufacturing

6  price will be less than what is on here.

7  Q.  Do you know whether this is the price that Hunter Douglas

8  charged for these components to its independent fabricators who

9  manufacture this product?

10  A.  It might be.  I do not know.

11  Q.  Are you even familiar with the fact that Hunter Douglas

12  sells component parts for products that it designs to

13  independent as well as wholly owned fabricators?

14  A.  I'm aware that they subcontract some of their blind

15  manufacturing out.  Yeah, I am aware of that.

16  Q.  Subcontract is your term, right?  You've never seen a

17  subcontract because that's not what they do.

18  A.  That's the term I would give it.

19  Q.  They have a system -- strike that.

20         Do you know whether in fact it's even the case that

21  Hunter Douglas has a system by which both independent and

22  wholly owned fabricators manufactured products with the Hunter

23  Douglas label on them?

24  A.  That I'm aware.  That's the reason I call it a

25  subcontractor.  That's my terminology.

1  Q.  And then in turn, are you aware that the products were

2  sold, every one made to order, nothing off the shelf, by a

3  series of independent dealers and distributors?

4  A.  That's my understanding.

5  Q.  Those dealers and distributors would take an order from the

6  customer and place that order not with Hunter Douglas but with

7  one of these fabricators, correct?

8  A.  That is my understanding.

9  Q.  Hunter Douglas designed the products that bore its name and

10  also manufactured the components which it would then sell to

11  fabricators such as the one in this case.

12  A.  That's my understanding.

13  Q.  And do you know whether this in fact is the price list that

14  Hunter Douglas provided to its fabricators saying, if you want

15  one of our PermAssure wands, or if you want one of our cords

16  and chains, here is the cost to you?  Do you even know one way

17  or the other?

18  A.  That I do not know one way or the other.

19       I just -- this does give us a ballpark idea what the

20  difference in the costs are.

21  Q.  So with respect to what counsel is drawing your attention

22  to, the PermAssure wand --

23  A.  That's correct.

24  Q.  -- we looked down into the bottom half of that first

25  section, cord, chain and wand.  And we see 30-inch PermAssure

1    wand in white and ivory.  And we see a unit price for each of

2    $3.  Is that correct?

3    A.  That's correct.  And you buy them in lots of ten.

4    Q.  And so a lot of ten would cost, whoever this price applies

5    to, $30?

6    A.  That's correct.

7    Q.  Then you look up at the plastic chain at the top.  And you

8    see that that's a 14 cent item, is that correct?

9    A.  That's correct.

10   Q.  And with respect to the cords, do you see a price for

11   those?

12   A.  I -- I couldn't find the actual nylon cord here.  But maybe

13   it is here.

14   Q.  In any event, it could be on the preceding page because

15   this is not the first page of that document.

16          So in any event, if you replaced the cord and chain,

17   if you assumed that each of them cost 14 cents, you would be

18   eliminating 28 cents cost to the fabricator if that is who this

19   price list is for.  You would then be adding $3 onto that

20   fabricator's cost to manufacture these products, correct?

21   A.  That is correct.

22   Q.  For a net increase of roughly $2.75 or 72 cents, correct?

23   A.  That's correct.

24   Q.  Are you aware, Dr. Wright, that when the PermAssure wand

25   was first offered as an option by Hunter Douglas' fabricators

1  and dealers that from the beginning of that time, 1995, to the

2  present it's always been a no-cost option?

3  A.  I am -- wasn't aware one way or the -- I know the Court was

4  asking me what the difference of the cost was.  And this was my

5  best estimate after looking at this what the actual difference

6  of the cost between the two were.

7  Q.  You never bothered to determine whether there was any

8  difference in cost to the consumer to get the wand versus the

9  cord and chain in the course of your work in this case, did

10  you?

11  A.  I assume they were very close to the same price, but I did

12  not know the difference.

13  Q.  And you didn't take any steps to find out that answer, did

14  you?

15  A.  As I stated before, answer would be, no.

16          MR. WILLIAMS:  Okay.  No further questions, your

17  Honor.  Thank you.

18          THE COURT:  Okay.  Anything else?

19          MR. SANTIAGO:  No further questions.

20          THE COURT:  You may step down.  Thank you.

21      (Witness excused.)

22          MR. WILLIAMS:  If the Court please, are you ready?

23          THE COURT:  Yes, thank you.

24          MR. WILLIAMS:  Your Honor, thank you for the

25  opportunity today, first of all.  I think this is an important

1    couple of days in this case.

2         So let's take one witness and one subject at a time.

3    With respect to Dr. Wright, I think there are two things to

4    keep in mind in evaluating his testimony and whether he meets

5    the Daubert Kumho Tire requirements to testify as an expert in

6    this case.

7         One is, he is an accident reconstructionist.  He's got

8    a different name for it.  He holds himself out as someone

9    qualified in -- I lost track of that.

10        Force effects and --

11        THE COURT:  Force analysis and dynamics.

12        MR. WILLIAMS:  Force analysis and dynamics.  And

13   that's his name for what he does.  But it's accident

14   reconstruction, as he acknowledged in his testimony.  That's

15   what Dr. Wright does.

16        The second thing to keep in mind here is that this

17   lawsuit as it comes up to trial involves two claims.  One is

18   for negligence, and one is for breach of warranty.  And there

19   is no strict products liability claim pending in this lawsuit

20   any longer.

21        When you take a look at his testimony, as I will do in

22   the next 19 minutes, you need to divide it into two areas:  The

23   accident reconstruction and the testimony that he will give if

24   he is allowed to do so with respect to the product's design,

25   for lack of a better shorthand term.

1     I'm going to talk about the accident reconstruction

2  end of things first.  I don't think it's any question that

3  Dr. Wright has the general background, qualifications to

4  qualify as an expert witness in the area of accident

5  reconstruction generally.

6     With respect to this case, to me the only issue is

7  whether or not he has applied the principles from that field of

8  expertise in a way that meet the Daubert standard and can be

9  evaluated by the Court and evaluated by the jury and held up to

10 some standard to see whether it passes muster or not.

11    I don't think he has.  He acknowledges in his

12 deposition that basically it's his feel that the accident

13 occurred in the way that he says it does.  And if I were your

14 Honor, I might be wondering, what's the accident reconstruction

15 issue in this case?  And let me see if I can cut through and

16 clarify that.

17    There is no dispute in this case that Max became

18 entangled on the nylon cord of this window blind, and in all

19 likelihood did so as a result of climbing up on that

20 nightstand, and whether swinging, whether attempting to look

21 out the window or doing something had a horrible trip and fell

22 into the loop of that nylon cord.

23    There was a question at the beginning of this case,

24 which counsel for plaintiff was pursuing in discovery quite

25 vigorously.  And that is whether it was the beaded chain or the

1   nylon cord that was the mechanism of injury and death here.

2   That question was answered for once and for all by the medical

3   examiner who said without any doubt, the ligature marks around

4   his neck made it clear that it was the nylon cord and not the

5   beaded chain.  You would see perforated style ligature marks if

6   it were the chain.

7         And that was an issue because Mrs. Padilla, even

8   though she told the police officer that she had extricated Max

9   from the cord, since that initial date had maintained that, no,

10   it was the chain.  I don't think there was much of an issue

11   there.  I don't think it was terribly relevant.  But it was

12   pursued in discovery.

13         So when Dr. Wright was retained there was a question

14   about how -- how the accident occurred, which had been the

15   mechanism of his injury.  Dr. Wright, even though it's not in

16   his report, now agrees and concedes it's more likely the nylon

17   cord.  And other than that, there aren't going to be accident

18   reconstruction issues presented to the jury in this case.

19         But on that subject, I believe Dr. Wright is generally

20   qualified.  I believe his opinion though is speculative because

21   he can't articulate what he did other than rely on his general

22   expertise and have a feel for the fact that Max fell into the

23   cord somehow while leaning over as opposed to holding onto it.

24         If he were allowed to testify, it should only be on

25   that limited area.  And on that subject my position to you is

1    that it's -- it's a close call.  I think the feel testimony

2    does not meet Daubert.  I think that is not the kind of rigor

3    that the Court is supposed to apply.  But it's a close call and

4    that's all I need to say about that.

5            To me the more fundamental issue in this case is the

6    testimony that Dr. Wright will give, if allowed, with respect

7    to the design of this product.  And as you have heard this

8    morning, I think it's pretty clear, Dr. Wright wants to be able

9    to testify that this product was defectively designed and

10   unreasonably dangerous.  And that's an opinion that he almost

11   seems to assume in his report.

12           There is no explanation that that's part of his

13   assignment in the assignment of the report.  He tells you that,

14   well, that's typically what he does when he's asked to

15   reconstruct an accident is determine whether a defective

16   product was the cause of an accident.  And in this case, that's

17   what he did.  And when he summarizes his opinions in his

18   report, the defect in the design of this product is almost

19   taken as a given.

20           And what he's testified to in deposition is that as

21   soon as Mr. Jauregui retained him, told him he had a case

22   involving vertical window blinds, and told him that there was a

23   cord on it, he had already formulated his opinion that those

24   blinds were defectively designed, period.  He needed do nothing

25   more.  And as I think is clear today, he hasn't done anything

1   more.

2          Now, that would be problematic even if this were a

3   strict products liability case.  If it were a case in which the

4   claim is that under the law of Illinois the product met the

5   definition of a defectively designed product, then perhaps

6   Dr. Wright's testimony, as cursory as it is, might at least be

7   relevant.  But in addition to not being qualified under Daubert

8   and Kumho Tire, its not even relevant to this case because the

9   claim here is negligence.  Plaintiff has to prove that Hunter

10  Douglas behaved, acted in a way that was negligent, that didn't

11  meet the applicable standard of care in designing and

12  manufacturing these window blinds.

13         It's important to note what I was just discussing with

14  Dr. Wright, that Hunter Douglas doesn't sell window covering

15  products.  Every Hunter Douglas product is made to order.  And

16  what Hunter Douglas does is design those products, and that it

17  manufactures the components.  It has extrusion factories that

18  manufacture everything from headrails to slats to wands.  And

19  it manufactures those components.

20         And then it has a system of both independent and

21  wholly owned fabricators around the country who compete with

22  each other.  And those fabricators compete by making themselves

23  available to the independent dealers and distributors who sell

24  Hunter Douglas products.

25         And so the way someone such as Brenda Davis gets a

1    Hunter Douglas product, Hunter Douglas branded product, is to

2    go to one of those independent retailers, say, I've got a

3    window this size and I want this style of window covering.  And

4    I want it in this color.  And I want a cord and chain as

5    opposed to a wand, and makes a number of choices that the

6    retailer then communicates to one of these fabricators who's

7    competing for the retailer's business.

8         And those fabricators then take the order.  And they

9    either go to their warehouse or place an order with Hunter

10    Douglas for the components and manufacture the product.  They

11    then turn around and ship it to the dealer, who then delivers

12    it to the consumer, such as Brenda Davis.

13         So Hunter Douglas -- this is a little bit of a

14    digression.  But this business about Dr. Wright claiming that

15    Brenda Davis wasn't told about the availability of the wand

16    because they have to concede that we were making it available

17    at that time.  Their argument is that she wasn't made aware of

18    the wand at that time.

19         As you may or may not know, we have a motion in limine

20    with respect to her testimony there.  It's not only negative

21    hearsay, as I call it.  It's not what somebody said.  It's what

22    somebody didn't say.  But she doesn't know who didn't say it.

23    And in any event, we know it wasn't Hunter Douglas.  So there

24    is some inadmissible testimony out there that we'll deal with

25    when the time comes.

1    But the point is that this product is designed and

2 basically the components of which manufactured by Hunter

3 Douglas.  That's what it does.  And so that's the conduct.  And

4 it's the design that we -- that we say is the fair issue in

5 this case.  And this is an unusual case in that it's not your

6 typical defectively designed or negligently designed product

7 case, where plaintiff and his or her expert come in, as Dr.

8 Wright has sort of done here, and say, aha, there is another

9 way you could have made this that was technologically feasible

10 and would have done the job, and it wasn't too much more

11 expensive.  And you should have done that as opposed to what

12 you were doing.

13    Here we -- we'll stand up from the beginning of trial

14 and say very loudly how much we are concerned with child safety

15 and how many of the features that we sell today, including the

16 PermAssure wand in 1995, were developed because of the

17 strangulation risk to young children that we know exists with

18 corded window covering products.  There is no question about

19 that.

20    There are all kinds of questions about which types of

21 products were initially identified as being the problematic

22 ones, and they weren't horizontal blinds for reasons that we'll

23 go into eventually but don't need to today.  But in any event,

24 Hunter Douglas is standing up and say proudly, we have these

25 safety options for you.  But they are options.

1          And the question in this case and the potential

2    relevance or lack of relevance of this witness goes to whether

3    it was reasonable to offer both, because we offered the cord

4    and chain, and we offered the wand.  There are other safety

5    devices such as the tension device that we haven't even talked

6    about today.

7          But Dr. Wright would come in and say, simply because

8    safety is never an option, if you got a wand, then you always

9    have to sell that.  And you can't sell any other options.

10   Okay.  I'll take my chances on cross-examination with him at

11   trial if I have to, if he's done an analysis of whether we were

12   negligent or not.  But he hasn't even done that.  And that's

13   why his testimony on the subject of the design of this window

14   covering has to be excluded.

15         There is no analysis.  There is no evaluation as you

16   asked him of the rate of injury or death of the number of

17   incidents compared to how many products are out there.  Dr. Ray

18   will testify to that and we'll talk about her tomorrow.  But

19   he's done no evaluation of that.  He's done no evaluation of

20   whether there are consumers who, A, prefer the cord and chain

21   option.  And I can represent to you that today with multiple

22   safety cordless options available, motorized, wand, a third of

23   the vertical blinds that are sold today people still want the

24   cord and chain for all sorts of reasons, legitimate reasons.

25   They relate to utility.  They relate to function.  You've got a

1    tall window covering.  You got a couch in front of it.

2         Dr. Wright can say all he wants that there is no

3    effect on utility.  I can say all I want that he is wrong about

4    that.  But for purposes of today the point is, he's never done

5    an analysis of that such that I could cross-examine him on it.

6    And that's what he has to have done in order to be allowed to

7    testify in front of the jury.

8         If he hasn't done the analysis, if under the Chapman

9    versus Maytag case, Seventh Circuit case that we cited in our

10   brief -- if he hasn't done an analysis using some scientific

11   method and, you know, different types of engineers and

12   different types of scientists, Daubert and Kumho, the Courts

13   have recognized that there isn't a template that you can apply

14   to every case.  And that's also true, and that's also fair

15   comment.

16        But whatever your discipline is, you have to apply

17   whatever the best available scientific method is to arrive at

18   your opinions or conclusions.  And in this case, Dr. Wright has

19   done none of that.  He has not evaluated risk utility.  He

20   hasn't evaluated how unsafe this is.  He says something we all

21   can agree with; and that is, you know, we don't want anyone to

22   lose a life.  But we don't ban bicycles, and we don't ban

23   baseball bats, and we don't ban automobiles.  Everything in

24   life involves evaluation -- not everything.  Many things in

25   life involve evaluations of risk and benefit.

1      And to have a fair argument in front of a jury on the

2 question of whether it was reasonable under the negligence

3 claim for Hunter Douglas to have continued to sell the cord and

4 chain as an option when it had the PermAssure wand, there has

5 to be such an analysis.

6      Dr. Wright has never done one.  He simply wants to be

7 allowed to testify that because one option is safer than the

8 other, that the less-safe option should not be allowed to be

9 offered, that the consumer should not have a choice.  And once

10 again, if there were an analysis of whether, well, Mr.

11 Williams, the -- I've looked at it.  I don't think the utility

12 of the cord and chain is great enough to outweigh the risk.  Or

13 I don't think that there is a functional difference between the

14 wand on the one hand and the cord and chain on the other, then

15 I'd be able to say, okay, Dr. Wright, tell me what you have

16 considered in reaching that opinion so that I can cross-examine

17 you and understand it and have the Judge and jury understand

18 it.

19      He has done none of that here.  We went through

20 everything that he didn't do.  He's not a biomechanic, human

21 factors engineer, ergonomic expert.  He's done no analysis of

22 how many of these window coverings there are out there.  He's

23 certainly done no analysis of how many injuries occur on

24 vertical blinds versus horizontal blinds.

25      There is a difference in the operating systems on

1    those, so that it's -- it's harder to design the continuous

2    loop out of a vertical blind than it is a horizontal blind.

3    Horizontal blind, you may see those tassels at the bottom.  And

4    back 30 years ago, there often were continuous loops on

5    horizontal blinds.  And then the CPSC identified strangulation

6    hazard in the 1980s.

7         And Hunter Douglas was the one that came up with the

8    safety fix that the CPSC blessed and said, this is what we want

9    you to do on horizontal blinds.  And that is what's called the

10   break-away tassel, the break-through safety tassel, where you

11   have two cords coming out of the headrail.  They don't need to

12   go up and down continuously.  They are just being pulled

13   together to pull that bottom rail up.

14        And so Hunter Douglas came up with basically two half

15   tassels that click together.  One cord goes into one; one goes

16   into the other.  And if a child gets in the middle of it, three

17   our four pounds of pressure cause it to break apart.  And that

18   was the fix in 1995 that was implemented in the first voluntary

19   retrofit campaign that the industry did.

20        The point is, there are differences between vertical,

21   and horizontal blinds in that way.  You can't have something

22   that breaks apart on a vertical blind because you always have

23   to be able to apply pressure.  If something broke apart with

24   three pounds of force it wouldn't work.  So something like the

25   wand is an excellent option for a lot of uses.

1    But Dr. Wright hasn't seen fit.  And saving his client

2    money is a nice thing to repeat over and over.  But it doesn't

3    change the fact that he didn't do things that he needed to have

4    done, that he has to do, in order to be qualified to give an

5    opinion as to whether Hunter Douglas continued selling of the

6    chain and cord as an option when it had already developed the

7    wand, which we say is better in child situations if -- if the

8    window will accommodate it, was negligent or not.

9    And no matter how much plaintiff wants to blur the

10   line and hold onto its strict liability claim, even though

11   there isn't one in this case, it is a distinction that has

12   meaning.  It's a distinction that the Court needs to keep in

13   mind.

14   Dr. Wright's testimony is basically a one size fits

15   all.  He hasn't looked at Hunter Douglas' conduct.  Everything

16   he said on the stand could have been true for Levolor or

17   Springs or any other manufacturer of window covering products.

18   There was no evaluation of how long it took Hunter Douglas to

19   develop the wand, the time and money that was spent doing that,

20   whether it should have developed it sooner than it did.

21   None of that was addressed in this case.  And you

22   can't have an evaluation of whether Hunter Douglas acted

23   reasonably in response to the strangulation risk that began to

24   be understood in the '80s -- in the '80s and '90s without such

25   an analysis.

1    He is an engineer.  But he's done no analysis of how

2  the wand affects the function and utility.  He simply says he

3  doesn't think it affects it, as though saying it makes it so,

4  and it doesn't.  There are ways in which it does affect

5  utility, which are very easy to understand.  But Dr. Wright

6  simply won't look at those.  But most importantly for this

7  motion's purposes, hasn't looked at those.

8    THE COURT:  Mr. Williams, let me ask you this:  Why

9  did Hunter Douglas continue offering the option of the corded

10 loop option?

11   MR. WILLIAMS:  You will hear at trial a great deal of

12 testimony about that.  Basically it's because the wand cannot

13 be used.  They have -- show you pictures.  They have vertical

14 window blinds that is 15 feet tall, that are set with couches

15 or sofas in front of them.  You cannot have a wand that you can

16 get the leverage on to effectively operate those.

17   It goes from everything such as that extreme example

18 to the 85-year-old -- I use my mother as an example -- woman

19 with arthritis and Parkinson's, who can't lift her arm above

20 her head to operate a wand, and for whom pulling a cord or

21 chain is a much easier thing to do, and who doesn't have small

22 children or pets around the house to present a risk to.  So

23 that risk-utility analysis comes into play.

24   And as I say, this PermAssure wand was fairly new in

25 1995.  It was out there.  You'll see the sample book.  You'll

1  see the literature from Hunter Douglas' CEO to the fabricators

2  in 1994 and 1995 announcing the wand and saying, get the word

3  out because this is a really great development from the child-

4  safety standpoint.

5  But with 18 years of that wand and other safety

6  devices existence behind us, today we continue to have a third

7  of the people who want the cord and chain.  It just -- it --

8  it's the only thing some people can use.  It's the preferred

9  thing for other people to use.  And there is a great deal of

10  time and money put into educating and making sure that this

11  independent dealer network advises people about the options and

12  about, you know, are you going to have this in a room with

13  young children and things like that.

14  So people make choices, and they continue to do that.

15  And that's why you continue to see new vertical window blinds

16  when you start paying attention to them after seeing a case

17  like this one that have cords and chains on them.  It is not a

18  one size fits all.  It is a -- it's an improvement in consumer

19  product safety by virtue of having the options.

20  THE COURT:  Okay.  Very good.  Thank you.

21  I will give you another minute to wrap up.

22  MR. WILLIAMS:  That's all I'm going to need, your

23  Honor.  You interrupted me at just the right time.

24  I think the upshot is that on the question of the

25  product's design and specifically whether Hunter Douglas was

1    negligent in continuing to offer the cord and chain option,

2    Dr. Wright doesn't provide the jury with any admissible

3    testimony that will help them decide that question.  He simply

4    will come in and say that a wand is less capable of strangling

5    a child than a cord and chain are.  And we can all agree to

6    that.  There is not going to be any dispute about that at

7    trial.

8            With respect to the question of whether it was

9    reasonable for Hunter Douglas to continue to make both options

10   as well as others available to consumers, he's done no

11   analysis.  He's applied no rigor.  There is no scientific

12   method on which I or anyone else can cross-examine him.  And

13   for that reason he doesn't meet the standard, the minimal

14   requirements, of Daubert and Kumho Tire.  And at least on that

15   subject, setting aside the accident reconstruction topic as I

16   did earlier, at least on the subject of the design and Hunter

17   Douglas' negligence or lack of negligence, he is not qualified.

18            THE COURT:  Thank you.

19            MR. SANTIAGO:  Thank you, Judge.

20            I am not sure where he got all these facts, the ones

21   presented today.  The Court has a very limited record with

22   respect to what Dr. Wright said.  And they concede that they

23   put out there a bad product with the good product.  No question

24   about it.  They own up to it.

25            But you have to see how these mechanisms work in the

1    real world.  Otherwise they'll just slip one by you.  It's like

2    them selling two guns.  One gun is extremely safe because it

3    has no bullets.  You can have that.  But we'll also give you

4    one with a bullet.  And you can take your chances with it.  And

5    one day you might blow your head off.

6          That's the kind of scenario they're proposing.  And

7    they don't have an excuse for it.  They never produced any

8    documents to us that explained to us, explained to our expert,

9    why it is they proceeded to continue to produce this hazardous

10   strangulation device.  It's no question it's dangerous.

11         But you need someone like Dr. Wright to explain to the

12   jury how the mechanisms operate.  You need to have him explain

13   to the jury how it is it came about that this poor young child

14   got strangulated.  It can hold his weight.  That's how strong

15   that nylon cord is.  It can open up in a loop and grab a

16   child's neck as he's falling off a dresser.

17         He has to be able to say those things.  And there is

18   no question, as a reconstructionist he is qualified to make

19   those determinations.  He uses a methodology that's

20   bulletproof.  He published it.  He uses it all the time.  He

21   used it in this case.  The jury should be allowed to hear that.

22         If they want to assail his credibility, those, you

23   know -- they are fine.  They can do that.  But this does not

24   take him out of the Daubert analysis.  He is in every sense of

25   the word Daubert qualified.

1    Now, I don't know what case law they have in -- again,
2    they say it's okay to offer a product that has a strangulation
3    risk to children, even if the alternative feasible product is
4    completely available and eliminates the risk of strangulation.
5    The case law that I know of in Illinois says that that would
6    prove an unreasonably dangerous product under the risk utility
7    test.  That's -- that's why we are here, Judge.  They violated
8    the law.  And you have to have someone like a Dr. Wright to
9    explain why it was not an acceptable risk and how it actually
10   functions.

11   Under Federal Rules of Evidence 702, Judge, an expert
12   is one who has specialized knowledge from skill, experience,
13   training or education.  He's got plenty of experience on
14   product design and his experience in life with these types of
15   reconstructions and analysis to offer the opinions that he has
16   in this case.

17   And I'll tell you what, Judge.  I go one further.  I
18   pointed it out.  On page 3 in his opinion he actually does and
19   understands that the reason why he's being asked to be in this
20   case is to explain how the defect in the design and manufacture
21   of the vertical window blinds caused and/or contributed to the
22   accident of Maximilian Padilla's death.

23   He has testified to that.  That's not a given by these
24   guys.  The defendant doesn't agree to that, so we have to prove
25   it.  They want to attack him.  That goes to the weight of the

1   evidence.  That doesn't bar him under Daubert.

2           THE COURT:  Counsel, it seems to me, though, that at

3   least from what I understand today, that what they are -- what

4   defendant is challenging is his opinion that the product is, as

5   you say, unreasonably dangerous, as opposed to unreasonable

6   risk, in light of the availability of the alternative.

7           And doesn't an expert -- when an expert tries to

8   determine or assess whether a risk is unreasonable, doesn't an

9   expert have to weigh the costs and the benefits of whatever

10  issue it is that they are trying to assess?

11          And so, for example, you know, one can say that

12  seatbelts in cars make them more expensive, right?  And so I

13  suppose that back in the day or someone could argue, I don't

14  think successfully, that we should all take the risk of not

15  having seatbelts because it makes cars cheaper.  And no one

16  would argue that -- one could argue, no, that's an unreasonable

17  risk because the risk of driving without a seatbelt outweighs

18  whatever cost benefits there may be with a car without -- or

19  not having seatbelts in the car.

20          But in any sort of risk assessment, doesn't an expert

21  have to consider both the costs and the benefits of both

22  alternatives?  And my other follow-up question is, did Dr.

23  Wright do that here?

24          MR. SANTIAGO:  Well, he did to some degree.  But I

25  tell you what.  The case law doesn't require that in a

1    situation where you have a fully vetted alternative design that

2    cures the defect.  That's the issue.  All the case law that we

3    know of in Illinois at least says that if you got a better

4    product, you better use it.  If it's feasible and it's been

5    vetted already and it's out there, then you don't really have

6    to put up that kind of proof.

7            It's in cases you get in trouble with these.  You see

8    it in these cases where the expert is proposing an alternative

9    design that he found with respect to another set of goods.

10           This is a product that's custom made for that

11    particular issue.  The Perma wand addresses the hanging risk.

12    They don't even deny it.  They want you to say, oh, that's

13    okay.  It's a walk in the park.  It's not.  It killed a boy.

14    It will continue to kill children.  And if it's continued to be

15    sold without a warning or without -- you know, it has to be

16    taken out because it's unreasonably dangerous by definition

17    under the case law and in this state.  That's -- that's my

18    position.

19           And with respect to risk analysis, why would Dr.

20    Wright sit there and second guess Hunter Douglas and their

21    development of this product?  It took time to bring this

22    development -- this product to the market.  Done their own

23    marketing analysis, everything.  They found it feasible to sell

24    it.

25           And if you look through the brochure, Judge, we read

1  some of it to you.  This is going to replace these problems.

2  This is going to replace those cords.  You can replace it

3  across the board on all the other kind of blinds you have

4  corded loops.  You have that kind of situation, Judge.  And

5  it's not addressed in the case law.  That's by definition an

6  unreasonable product.  It has to be completely eviscerated.

7             THE COURT:  Okay.  And I guess the question is, my

8  question is, whether or not that's something that this expert

9  considered and reviewed.  So in other words, did he review all

10  the different model lines that Hunter Douglas has and all the

11  different scenarios?  Did he review the studies about whether

12  or not in the long term Hunter Douglas could even sell the

13  wands or what that effectiveness would be?

14            I mean, is that the type of analysis that Dr. Wright

15  did?  Or did he -- as defendants claim, did he look at the

16  mechanism of the cords, look at the resulting death and the

17  risk, look at the fact that there was something else available

18  and say, aha, that's basically all I need for my testimony that

19  it's an unreasonably dangerous product?

20            And if that's what he did, I guess my question

21  becomes, is it your position that is enough?

22            MR. SANTIAGO:  That is enough, Judge, and that's

23  enough for the jury because the jury can come to their own

24  conclusion on that.  They can argue to -- to the dogs come back

25  that it's a reasonable product.  Well, let them prove that.

1      I mean, in all the cases that we read, defendants have

2  the right to prove whether or not there was a -- whether it was

3  less feasible or, you know, whether -- you know, whatever they

4  want to put on the table, they can.  The jury is going to have

5  to make that determination.

6      But Dr. Wright has a right to say his opinion based on

7  his engineering background, his design experience, on

8  examination of the product, and say outright, everything else

9  has been said and done about this, this is a bad product.

10      THE COURT:  I think that -- you know, and in the

11  papers, in plaintiff's response, they talk about how Dr.

12  Wright's opinion is that the wand is safer than the cord.

13  Okay?  And, you know, as I sit here, I think that Dr. Wright

14  probably is qualified to offer that opinion that it's safer.

15  Okay?  I don't know if there is a dispute about that, but I

16  think he looked at the mechanism.  He looked at the way it

17  works.  He looked at the brochures for the PermAssure and

18  compared that to the mechanism in the blinds at issue.

19      And based upon his engineering and mathematical

20  background, he concluded that the mechanism could work.  The

21  wand could work on these shades.  That it's technically

22  feasible to work on these shades.  It will do what the -- it

23  will be equivalent function, right, for these shades, and that

24  it's safer.

25      MR. SANTIAGO:  Right.

1    THE COURT:  But I think isn't that a bit different

2  from saying, and from that I conclude that Hunter Douglas was

3  unreasonable by offering other consumers a choice in which

4  device to use?  Isn't that a different opinion or an opinion

5  that requires a different type of analysis?

6    MR. SANTIAGO:  Well, he -- he has the qualifications

7  and the background and basis to make -- to have that opinion,

8  Judge.  The jury has to decide for itself and defendant can

9  argue the contrary view of that.  But he's allowed to do that.

10  He has a basis for that opinion.  He has a basis in his -- in

11  teaching engineering all those years.

12    This is part of their mantra.  If you can produce a

13  product that's safer than the previous one and if it's feasible

14  and it's cost effective and doesn't change functionality, by

15  definition then it makes the previous product unreasonably

16  dangerous.  That -- and you see that in all the cases.  It

17  didn't just jump into the case law, Judge.  Some engineers,

18  somebody said it.  And he's just bringing -- you know, this is

19  what they do.  They look at these products, and they make those

20  decisions.

21    Now, the jury is entitled to hear that.  And anything

22  else goes to the weight of his testimony.  And that's -- that's

23  part of the give and go in these cases, Judge.

24    THE COURT:  So let's talk about the cost effectiveness

25  aspect.  That's something that was talked about in testimony.

1    And Mr. Wright was called back up to talk about that a little

2    bit.

3         So he looked at the document that -- or you asked him

4    about spelling out some of the costs and relative costs and

5    what not.  And then he talked about how, given his

6    manufacturing background, he has some sense of that.  At least

7    that's what he purports.

8         Other than that, did he do any other analysis as to

9    the respective costs of the two options?  Cost of

10   manufacturing, cost of limitation, cost of sales?

11        MR. SANTIAGO:  Right.  As he testified to, Judge, he

12   didn't have to.  He assumed that implicit in the fact that

13   Hunter Douglas was promoting and selling the wanded blind as a

14   substitute, as a replacement, complete replacement, for the

15   vertical -- for the vertical corded blinds.  He can assume

16   that.  Why would he recreate the wheel?  I think he actually

17   also said that.

18        THE COURT:  So he assumed that because Hunter Douglas

19   was willing to do it, that it was somewhat cost effective for

20   them.

21        MR. SANTIAGO:  They were promoting it as such.  This

22   is -- this is the next best thing in -- in the evolution of

23   these blinds.  State of the art now.

24        THE COURT:  Okay.  As far as his assessment of risk,

25   he talked about relying upon the CPSC reports.  And then he

1    referred to some documentation about Hunter Douglas.  Do you

2    know what he was referring to there?

3         MR. SANTIAGO:  I am not sure as we talk right now,

4    Judge, I'm not sure what you are referring to.

5         THE COURT:  Okay.

6         MR. SANTIAGO:  I could ask my colleague.

7         Do you know?

8         MR. JAUREGUI:  Thanks, your Honor.

9         Yes, Mr. Wright was also talking about specific

10   documents that were produced by Hunter Douglas, which involved

11   some of the products, some of the Hunter Douglas window blind

12   coverings, which had been involved in incidents.  But I guess

13   one of the most important aspects of his testimony, and the

14   reason why this case is a little bit different, is because you

15   have an agency that is mandated by law to assess the risk of

16   injury, and the U.S. Consumer Product Safety Commission.  And

17   they have done hundreds of these analyses.  They review

18   hundreds of these cases.  And in their analysis, they -- not

19   only they conclude that this was a dangerous product.  But they

20   also touch on the very issue of foreseeability, the way how

21   these children have been getting injured.  And to find that

22   Hunter Douglas knew of that information, all of that is

23   analysis that became part of his opinions and he incorporated

24   in this case.

25        THE COURT:  Okay.  Thank you.

1          Getting back to the alternative.  So I just want to

2     make sure what your position is.  It's your position that once

3     the PermAssure wand was made available, that Hunter Douglas had

4     a legal obligation to stop selling the other alternative and

5     offer only the wands to anyone that wanted to buy its products?

6          MR. SANTIAGO:  They were -- they were liable for any

7     future injury that might result from the use of that corded

8     blind that resulted in death or injury.

9          THE COURT:  Well, whether or not -- but that basis of

10    liability would -- your theory of that basis of liability is

11    that they were unreasonable in not offering only the wand

12    product for all of their blinds.

13         MR. SANTIAGO:  Right, yes, absolutely.  And that

14    dovetails into the issue of negligence because part of

15    negligence you have to show that there was unreasonable danger

16    in the design of the product.

17         THE COURT:  So if a customer, taking a hypothetical

18    example.  Say the proverbial person with arthritis that Mr.

19    Williams provided.  If that person wanted for their own

20    purposes to get the cord, your position would be, as of the

21    time the PermAssure wand was offered, that they should have

22    said, no, you cannot have that cord.  We only make the wand

23    available.

24         MR. SANTIAGO:  Right, that's -- that's -- that's the

25    best decision in an array of decisions, because they had a

1   couple of other devices there that slightly reduced the risk of

2   strangulation.  They had some other tensioning devices.  Dr.

3   Wright will talk about this.  In the interest of economy, I

4   didn't ask him about those things here.  But his position would

5   be that those are good, but not good enough because you have

6   the wand that does everything.

7           But if you are going to have a situation where someone

8   really needs that, then you sell the tensioning device.  But

9   you never sell the wand ever with just the hanging loops.

10  That's just unacceptable when you have three other different

11  versions of it that can improve safety and one that eliminates

12  it completely.

13          THE COURT:  Okay.  Thank you.

14          MR. SANTIAGO:  Thank you.

15          THE COURT:  Mr. Williams, you have a short rebuttal.

16          MR. WILLIAMS:  Yes, your Honor.  We'll make it short.

17          If I may be of assistance, your Honor, I think with

18  respect to your question about what Dr. Wright -- the only

19  thing that he notes in his report or said in his deposition

20  that he reviewed in the way of information concerning other

21  incidents is something that was attached as Exhibit 9 to his

22  deposition.  It's referred to at page I think 3 of his report.

23  It's the analysis of fatal incidents associated with window

24  covering cords from 1996 to 2000.

25          This is all after our manufacturing.  But still that's

1    what it was.  And this was something that I referred to in my

2    questioning with him.  It was a joint effort between Window

3    Covering Manufacturing Association and the CPSC, to go back and

4    look at literally every -- CPSC has this database.  You may be

5    familiar with it.  The NEISS database.  Refers to National

6    Electronic Injury Surveillance System.

7            And the CPSC has a tool that is far more powerful than

8    any manufacturer in terms of identifying hazards in consumer

9    products.  They have random -- not random.  They have

10   specifically selected emergency rooms around the country,

11   hundreds of them, that they get information on.  Every

12   admission to those ERs involves a questionnaire.  And if there

13   is a consumer product involved in the accident, that makes its

14   way to this database.  So the CPSC using this database was the

15   one who was first able to say, hey, we have an issue here with

16   respect to strangulations that are occurring, and we want to do

17   something about it.

18           So each of those incidents the CPSC creates what's

19   called an IDI, an in-depth investigation.  So this document

20   that I am rambling around and referring to that Dr. Wright

21   cited as the only prior incident document that he relied upon

22   is this analysis of certain number of IDIs, all of which post-

23   date the manufacture of these blinds in 1995.  But that's what

24   it is.

25           You have articulated a question, and you didn't get an

1   answer to it.  Dr. Wright will come in, if allowed, and say

2   that the cord and chain is less safe than the wand.  We don't

3   need him to say that because that's what we say, because that's

4   why we developed the wand, to provide the option to people who

5   had children, wanted to eliminate cords for any reason.

6        Dr. Wright, his aha, his, did this blind have a cord

7   and chain?  Yes, it did.  Aha.  That blind is defective.

8   That's the classic example of the hindsight of someone coming

9   into a lawsuit.  There is a hundred percent risk of injury or

10  death when you had an injury or death.

11       Of course, if the Padillas had not had a cord and

12  chain on this window blind in this home on this day, Max

13  couldn't have been strangled on that.  That's not the analysis.

14  You asked the right questions.  You got non-responses from Mr.

15  Santiago because the fact of the matter is, Dr. Wright hasn't

16  done that analysis.  He can stand up and argue all he wants

17  about the merits of offering both versus eliminating the cord

18  and chain.  But his statements of what the law is is simply

19  wrong.

20       He says the case law says, if you got a better

21  product, you have to use it.  No.  Then there would be no need

22  for the risk utility.  There would be no need for the risk

23  benefit analysis.  That's what you are weighing.  There would

24  be no weighing necessary if every time there is a marginal

25  increase in the safety of a product, you throw out the

1    bathwater.

2            That's not the law in Illinois.  That's not the law

3    anywhere.  And the law here is, you do have to evaluate.  And

4    once again, negligence is a little bit different.  But in

5    general, the principles of risk and utility would still come

6    into play, in this case in a negligence lawsuit.  And whatever

7    Mr. Santiago might want to say or what I want to say, Dr.

8    Wright hasn't done that evaluation.

9            THE COURT:  What about the argument that plaintiff

10   poses that basically, you know, look, this is an option that

11   Hunter Douglas was offering everyone free of charge anyway.

12   So, of course, if Hunter Douglas -- if it wasn't economically

13   feasible for them to do so, they wouldn't do it.  So clearly

14   it's cost effective.  You know, on a cost benefit analysis it's

15   worthwhile for them to do it or it wouldn't harm them to do it

16   because otherwise why would they offer that option to everyone?

17   That's basically the gist of their argument.

18           MR. WILLIAMS:  Because it harms my mom who has to get

19   up on the stepladder to operate the vertical blinds in her

20   apartment with a wand if she can't have that cord and chain

21   that get down to her height.  Because there are people, a wide

22   array of them, who need, want a different option.

23           The cost -- the cost issue is such a red herring here.

24   That's an issue in cases where a manufacturer has failed to

25   make a change.  Or, you know, the old argument that would have

1    cut any profits by $2.50, and you, therefore, didn't make the

2    change because you didn't want to loose those $2.50 window

3    blind.

4           That's not what we're doing here. We've got a more

5    expensive safety option that we're offering at no charge. We

6    are offering choices. And that argument completely ignores, as

7    they want to do, the question of whether or not consumers have

8    the right to have a choice of different options. Some of them

9    are just going to be for convenience. Some of them may be for

10    esthetics. They don't have children around, and they like the

11    look of a cord and chain hanging down instead of a wand. But

12    some definitely may be for safety and utility reasons as well.

13           And so the question in this case, which we are

14    prepared to argue about and cross-examine about at trial, is

15    whether that decision by Hunter Douglas, which by the way every

16    other manufacturer is there or behind us in that regard --

17    whether that was reasonable or not. But Dr. Wright hasn't done

18    an analysis. He has not --

19           THE COURT: So what sort of analysis should he have

20    done for him to offer an opinion like that?

21           MR. WILLIAMS: The one that you asked Mr. Santiago

22    about. He should have at some level. And if he doesn't do it

23    at the level that Dr. Ray did in her analysis, at some level at

24    least look at how much of a risk there is. We know the risk is

25    severe. You know, death or serious injuries. So we know the

1    severity is potentially great.

2            What he doesn't look at, has no idea about, he is

3    suggesting there might be hundreds of thousands of corded

4    window coverings in this country when there are probably a

5    billion, couldn't be a clearer indicator of how little he's

6    looked at this.

7            I mean, if there is ten fatal incidents per a thousand

8    corded window coverings, that's one level of risk.  If there

9    are a hundred 40 per billion window coverings, that's a

10   different level of the risks.  Okay.  We'll argue about that.

11   And we'll decide, get in front of the jury, whether that's a

12   risk worth continuing to allow people to make for themselves,

13   as opposed to taking it away.

14           But he hasn't done that evaluation.  He has no idea

15   how risky it is.  Like I said, his is the 100 percent risk

16   factor.  He comes in after an accident and says what's very

17   easy to say; and that is, this accident wouldn't have happened

18   if there had been a wand on those window blinds.

19           The last point, your Honor, is, it's -- I think

20   probably goes beyond the Daubert qualifications of Dr. Wright.

21   But what you didn't hear him say with all of his talk about the

22   Consumer -- he called protection, Consumer Product Safety

23   Commission, is that cords and chains under the standard that

24   the CPSC is involved in implementing in 2013 are still allowed

25   in these products.  CPSC steps in and bans products all the

1    time.  They have not done so here.  There have been safety

2    improvements.  The options that are offered, the tension

3    devices the consumers can have.  All of those things go to make

4    the products safer.  But this product is still capable of being

5    sold today.  And CPSC certainly knows how to step in if it says

6    there -- it's unreasonably dangerous, as Mr. Santiago would

7    have you believe.

8              Thank you, your Honor.

9              THE COURT:  I gave defendants a little more time.  I

10   am happy to give you a couple minutes, couple more minutes as

11   well.

12             MR. SANTIAGO:  Your Honor, just one point, Judge.  I

13   believe that just because the Consumer Product Safety

14   Commission does not issue a recall doesn't take him off the

15   hook with respect to producing a safer product.  That's a

16   unique obligation of all corporations that are manufacturing

17   products for sale to general consumers.  They are the

18   preeminent watchdog group with respect to product design.

19   They've raised holy hell with this.  And they were able to get

20   at least something done.  But it's still not enough.  And that

21   responsibility is borne by Hunter Douglas in this case, Judge.

22             Thank you.

23             THE COURT:  Thank you.  Thank you.  I will take the

24   motion under advisement.

25             Let's take a quick five-minute break before we proceed

1    to the arguments as to Stuart Stalter.

2            MR. WILLIAMS:  Thank you, your Honor.

3        (Brief recess.)

4            THE COURT:  We will now proceed to arguments as to

5    defendant's motion to exclude testimony of Stuart Stalter.

6            MR. WILLIAMS:  Thank you, your Honor.  I am assuming I

7    am going first?

8            THE COURT:  You are.  You have 30 minutes.  And then

9    plaintiff will have -- Mr. Jauregui, you will have 30 minutes,

10   and then rebuttal for five minutes.

11           MR. WILLIAMS:  This motion presents several different

12   issues, but they both arise out of the Daubert and Kumho Tire

13   decisions, addressing this Court's obligation to serve as a

14   gatekeeper for expert witness testimony.

15           Stuart Statler -- and it's Statler, not Stalter -- is

16   not an engineer.  He is a lawyer.  He is a former commissioner

17   of the Consumer Product Safety Commission.  And he is being

18   called to give testimony that in part is no longer relevant in

19   this case and in part is without any foundation under Daubert.

20           It's important to take a step back and look at this

21   case to understand Mr. Statler's role in it.  When he was

22   retained by counsel for plaintiffs, the Window Covering

23   Manufacturers Association and Window Covering Safety Council

24   were still defendants in the case.  Mr. Statler has been

25   retained to and in previous cases has given testimony relating

1    to the Consumer Product Safety Commission, how it interacts

2    with manufacturers in general, associations such as the WCMA

3    and the WCSC in particular.  And he's largely been allowed to

4    testify just in that area, certainly as it relates to the area

5    of consumer products and window blinds in particular.

6          The WCMA and WCSC are no longer in this case.  They

7    moved for and got summary judgment a couple of years ago.  So

8    when you look at his report, you see a good deal of it has to

9    do with their conduct, and in particular the implementation of

10   the retrofit campaigns and the safety standards which he --

11   which he criticizes.

12         Those are not issues in this case.  There is no claim

13   in this case under plaintiff's negligence or breach of warranty

14   theory having to do with retrofit campaigns or safety

15   standards.  The claims here that remain are only against Hunter

16   Douglas.  And he is not someone who's qualified to offer

17   opinion testimony.

18         On top of that, as other courts have recognized, a

19   problem with Mr. Statler is his difficulty in refraining from

20   basically being an advocate and giving argument.  He writes

21   reports.  And if allowed to testify, he testifies in a way that

22   is more appropriate for counsel in closing argument than it is

23   for an expert witness.  And so he's been limited in that

24   regard.  Okay.

25         Who is he?  He is a former CPSC commissioner.  He

1  acknowledges he is not an engineer or a scientific expert of

2  any sort.  So right off the bat he admits that he doesn't have

3  the engineering background, qualifications, for example, to

4  perform the sort of risk benefit analysis that's necessary to

5  evaluate whether Hunter Douglas' conduct in this case was

6  reasonable.

7          He has background, and he arguably has expertise in

8  how the CPSC functions.  That's why in the unpublished Rountree

9  decision that plaintiff's counsel cited to you for proposition

10 for which it does not stand, that I will talk about in a

11 minute, but which we attached to our reply brief, he was

12 allowed to testify with respect to matters dealing with the

13 safety standards that the CPSC created with the WCMA and the

14 WCSC who were also parties in that case.  Other than that, his

15 testimony was largely limited and excluded.

16         But those safety standards, as I said, are not an

17 issue here.  WCMA and WCSC are no longer part of this.  So the

18 Court has to determine if he meets the standard under Daubert

19 and Kumho Tire with respect to what's left of his testimony as

20 it relates to Hunter Douglas.  And clearly it does not meet

21 that standard.

22         With respect to the design of the blinds, he was asked

23 questions about that in his deposition.  And at page 3947 of

24 his deposition -- this was cited in our opening brief, your

25 Honor -- he was asked whether he had any background in

1    designing window blinds.  He said he did not.  He's never taken

2    any steps to familiarize himself with the operating systems to

3    understand how different types of blinds are raised and

4    lowered.  He is not an engineer of any sort.  He is not a

5    scientist of any sort.  He is not comfortable or qualified in

6    his words to testify with respect to the operating mechanisms

7    that the cord or the chain or the wand or some other device

8    controls.

9          So in his analysis I lumps together horizontal blinds

10    and vertical blinds.  But he acknowledges that he has no

11    experience to allow him to answer questions about what the

12    differences are between them or how those products perform.

13          He's not a product designer.  He's never designed a

14    product that was taken to market.  He's never taught design in

15    any school.  He has no training in human factors.  He's never

16    designed a warning to go on a vertical window covering or any

17    other product.

18          And most importantly, he's -- and this goes to what we

19    were talking about with Dr. Wright a minute ago.  He's done no

20    studies, for example, of consumer usage of window coverings,

21    consumer preferences or other safety aspects that could be

22    related to the question of whether cords and chains should be

23    completely eliminated on all window blinds, as opposed to made

24    available alongside other safer options such as the wand.

25          THE COURT:  Mr. Williams, let me ask you this.  And I

1    will ask plaintiff's counsel too.  What do you think he is

2    actually going to testify at trial?

3            MR. WILLIAMS:  I tried to parse that out because so

4    much of his report -- you know, we used the WCMA and Hunter

5    Douglas and other members of the industry.  And I believe, your

6    Honor, to answer that question, if you look towards the

7    conclusion of his report, you will get an idea, the page 20 --

8    if you like a copy and don't have it in front of you, your

9    Honor, I'll be happy to, but I'll put it on the --

10           THE COURT:  I have it.

11           MR. WILLIAMS:  -- whatever the improved version of the

12   Elmo is called.

13           I think that first paragraph is as good an answer to

14   your question as I can come up.  And I am speculating somewhat.

15   As you see he says in his fashion:  The prolonged inaction of

16   both Hunter Douglas and the WCMA in the face of child

17   strangulations from vertical blinds reflects a flawed response.

18   In the context of a product known almost from the outset to be

19   fraught with a foreseeable risk of children being strangled to

20   death, such conduct belies due care, giving his legal opinions

21   there.

22           Moreover, it contravenes principles of responsible

23   practice amongst manufacturers and by the association which

24   purports to represent them, as a result safety was seriously

25   compromised, both in theory and in fact.  An unsuspecting

1    three-year-old was needlessly allowed to strangle and die from

2    the wholly foreseeable chain of events set in motion by this

3    kind of systemic disregard for safety at all levels and over

4    such a long period time.

5          I really can't summarize for you any better what I

6    think he would say if allowed to testify.  And as this

7    paragraph, which is admittedly only a portion of his report,

8    but as this summarizes, clearly one of the things that he has

9    offered to criticize in the past and been allowed to sometimes

10   and not other times, is the inaction or the slow action of

11   manufacturers to the strangulation hazard generally, and the

12   hazard on specific products in particular.  Because that's an

13   issue in some cases where you have a product that, you know,

14   doesn't have a safety component or is missing some feature,

15   he's offered testimony that the manufacturer should have known

16   sooner about strangulation risks and should have acted more

17   quickly.

18         Here I have a harder time imagining what he -- what

19   the relevance might be of this because of the difference in

20   this case that we've been talking about this morning; and that

21   is, the wand was offered.  It was not just in development.  It

22   was in manufacture.  It was in the sales books.  It was

23   available to any consumer who wanted it.

24         And so whether Hunter Douglas should have had it in

25   1992 or 1995 isn't material.  It was available when these

1    blinds were purchased and ordered and sold.  So I -- I am

2    concerned because what Mr. Statler has shown a propensity for

3    doing in the past is coming in and giving sort of a narrative

4    monologue criticism of the WCMA and various individual

5    manufacturers.  And in this case he will do it, if allowed,

6    with respect to Hunter Douglas.

7         I'm glad you will ask that question because I am

8    wondering myself exactly what he would be offered to testify,

9    because he admits that he can't do and hasn't done any sort of

10   the risk utility, risk benefit analysis that you were asking

11   Dr. Wright about.  So he doesn't add anything there.

12        He has experience at the CPSC.  Once again, in this

13   case it's really interesting because so many issues present in

14   more typical products liability cases aren't involved here

15   because of the presence of this alternate design.  In other

16   words, none of the should have done this early or you were too

17   slow about going about this are present here because plaintiffs

18   have to concede.  Brenda Davis could have bought a set of

19   vertical window blinds with a wand in 1995.

20        So they are left to argue, as we talked about, that

21   the options should not have been made available.  He hasn't

22   done any analysis to determine or to evaluate whether it was

23   reasonable to continue to give that option.  He simply will

24   criticize the WCMA, and SC and sort of lump Hunter Douglas in

25   together with them.  And I am sure he will, if allowed, come in

1   and give an opinion that the cords should have been taken off

2   of this blind and only should have been sold with the wand, or

3   some other cordless option.  But he has demonstrated that he

4   doesn't have any basis for offering expert testimony to support

5   that.

6           He will -- pages 8 and 9 of our brief, he acknowledges

7   that he hasn't done any study or any testing that we could ask

8   him about in the way of risk benefit analysis.  And the final

9   subject that he seems to want to touch on in his report is the

10  issue of warnings.  And the -- on that subject, I asked him

11  whether he had an opinion as to what warnings should have been

12  on the product or where it should have been.  And he didn't

13  have such an opinion.  He had not formulated a warning.

14          I asked him in his deposition what one should say?  He

15  asked for a five-minute break.  He scratched something together

16  and told me that that was the first he thought about it, and it

17  wasn't as good as he like.  But the important thing was, he

18  hadn't -- he hadn't done that before rendering his report and

19  reaching his conclusions.

20          So he'll try to come in and testify as he has here.

21  And I think the best place to look is to the other courts that

22  have addressed Mr. Statler before, because they have been

23  confronted with similar issues.  And we cited one of those

24  courts in our moving papers, the Hayes versus MTD Products

25  case.  That's a Western District of Kentucky case in 2007.

1    It's at page 10 of our brief.

2            And Mr. Statler's testimony was completely excluded

3    there.  We set forth in a block quote the Court's reasoning,

4    and I won't take the time today to read the whole thing.  But

5    it basically says what you need to understand; that is, Statler

6    does appear to be the quintessential expert for hire.  It notes

7    his qualifications.  He's got a pedigree, went to Amherst, went

8    to Harvard law school.  He was on the CPSC for a number of

9    years.

10           So qualifications for something are certainly not

11   deniable.  I mean, he's got -- he's got experience and

12   expertise.  And it's probably in the area of how the CPSC works

13   and how it works with various manufacturing and trade

14   organizations, as well as individual manufacturers.  But where

15   it doesn't get him is to an evaluation of the reasonableness of

16   the conduct of someone such as Hunter Douglas in offering the

17   options that it offered.

18           And so we cited that case, the Hayes case, in our

19   moving papers.  In their opposition, the plaintiffs came back

20   and announced that Hayes case was misleading, and it involved a

21   different type of product.  And in fact, that Mr. Statler had

22   been offered to testify and had been allowed to testify in

23   couple of other cases.

24           In their brief at page 7 they stated:  Mr. Statler's

25   testimony meets the requirements set forth in Rule 702 because

1    he is qualified, his testimony is reliable, and will assist the

2    jury like in the Rountree and Brown cases.  Okay.  So let's

3    take the Rountree and Brown cases.  Let's take the Brown case

4    first.

5            In that case, the Court found that the motion to

6    exclude Mr. Statler was premature.  It was -- under local rules

7    a motion should be made in limine with the final pretrial

8    order, and that was not yet due.  And the Court denied the

9    motion to exclude him without prejudice stating the Court

10   expresses no opinion on the merits of these motions, which can

11   be refiled with minimal effort as part of the final pretrial

12   order.  That was the ruling in the Brown case they cited.

13           Then they cite the Rountree case, and that was also a

14   window blinds case.  It was brought against the Window Covering

15   Manufacturers Association, Window Covering Safety Council, and

16   a Chinese manufacturer, the Ching Feng, C-h-i-n-g, F-e-n-g,

17   Blinds Industry Company Limited.  And in that case, Dr.

18   Statler's testimony was aimed at the Window Covering

19   Manufacturers Association and Window Covering Safety Council.

20           So as was the case here when we started out, those two

21   organizations were in the case.  And the Court in an opinion

22   that we -- that's not published but plaintiffs referred to it

23   and represented that it held that he was qualified to testify.

24   So to correct that misstatement, we attached it to our reply

25   brief.  And you have it in front of you.

1       And basically the Court goes through a good analysis
2   there of all of the legal conclusions that somebody owed the
3   plaintiffs a duty, and that the duty was breached, that Mr.
4   Statler would offer, if allowed, but was not going to be
5   allowed to testify to because they went beyond the scope of
6   proper expert testimony.

7       And the Court in that case found that he was entitled
8   to testify as to the relationship between the WCMA and the
9   members of the industry.  He was entitled to comment generally
10  on the nature of the safety standards, again that are not at
11  issue in this case.  And specifically noted that he may have
12  helpful knowledge of customs and practices pertaining to the
13  development of safety standards.  So that's all well and good.
14  He was allowed to testify to that.

15      He was precluded from conjecturing as to the jury and
16  the Court noted that an instruction may need to be given to
17  limit some of his comments.  But to the extent that the WCMA
18  was arguing Rountree, that Statler had to conduct an
19  investigation beyond what he had in front of him, the Court
20  said that's fair game for cross-examination.

21      The Court finally noted that the inflammatory
22  statements contained in his report, which we see almost
23  verbatim copies of sometimes and in our report would be
24  excluded.  He characterizes the WCMA as a sham organization and
25  a facade.  The Court said that's not admissible.

1    He characterized the plaintiff and the decedent in

2 that case as one more victim of the WCMA's negligence.  In this

3 case if you turn to page 20, on the screen, the unsuspecting

4 three-year-old was needlessly allowed to strangle from the

5 wholly foreseeable chain of events set in motion by the

6 systemic disregard for safety at all levels and over such a

7 long period of time.

8    Your Honor, that's the best I can tell in terms of

9 what Mr. Statler will say if he is allowed to testify in this

10 case.  And because his expertise is specific to his role on the

11 Consumer Product Safety Commission, and because none of those

12 issues are present in this case, he should be completely

13 precluded from testifying unless there is an offer of some area

14 that's relevant to this case that I simply can't see.

15    The plaintiff's representation to your Honor that he

16 had been found qualified to testify in the Rountree and Brown

17 cases is simply not the case.  It was not slightly off, but it

18 was simply not a true statement.  They misrepresent the

19 holdings in those cases.  There aren't cases that they can cite

20 to that explain how Mr. Statler could have expertise relevant

21 to this lawsuit.

22    And the fact of the matter is, he is a lawyer and a

23 former commissioner who wants to come in and argue that we had

24 a duty and breached it by allowing a choice of these operating

25 systems.  And if there were a basis methodology of any sort --

1    and once again, I want to reinforce what I said earlier.  I

2    don't claim that, you know, an expert can't come from the CPSC

3    and his background.  Everybody isn't a materials scientist or a

4    chemist that can apply nice, simple, easy-to-follow

5    methodologies for guys like me.

6         But there has to be some rigor.  There has to be some

7    scientific method of whatever science or discipline the expert

8    is operating in that you can say, here is my standard.  Here is

9    my methodology.  Here is how it's validated.  Here is how I can

10   show you it's generally accepted in the relevant scientific

11   community.  And here is how I apply it to this case.

12        If Mr. Statler is allowed to testify, he will come in

13   and give opinions as far ranging as the Court allows him to.

14   And even limiting him at trial won't cure the problem because

15   there is nothing -- there is no basis for a fair cross-

16   examination of him.  He will simply try to out-argue me, and he

17   very well might succeed.

18        THE COURT:  What is your understanding of what he did?

19        MR. WILLIAMS:  In this case?

20        THE COURT:  Yes, prepare his --

21        MR. WILLIAMS:  In terms of looking at this case

22   specifically?  Not much.  He doesn't do a lot case by case.  We

23   have not provided you with copies of his reports from different

24   cases.

25        THE COURT:  I mean, he reviewed the CPSC documents

1   related to the issue of blinds and the strangulation risk,

2   didn't he?

3           MR. WILLIAMS:  He had some familiarity with it because

4   it was starting when he was still on the commission.  What he's

5   done, if you look at his report at page -- bottom of page 1, he

6   listed materials reviewed.  He sort of did a usual here is the

7   file, pleadings, depositions, discovery responses, police

8   reports, and then a series, bottom page 2 -- and if you like a

9   copy of his report, don't have it, I will be happy --

10          THE COURT:  I have it right here.

11          MR. WILLIAMS:  Okay.  A series of CPSC safety alerts

12  and agency press releases on strangulation hazard associated

13  with window covering cords.  And then the CPSC's 11 IDIs,

14  strangulation deaths, and nine medical and coroner reports.

15  It's not clear from what period those are.  An article, a

16  well-known article, from JAMA in 1997.  Material from a

17  website, parents for window blind safety.  That's it.

18          But when you try to take what he was given by counsel

19  for plaintiff and how he looked at it and what he used it for

20  in this case, it's hard to find much besides the two-paragraph

21  factual context that you see on page 3.  He summarizes the

22  incident and when the blinds were manufactured, and that they

23  didn't have a tensioning device.  And then he goes into his

24  personal background and experience.

25          So he does a very cursory summary of the facts

1    specific to this case.  And as you can see, and without --

2    maybe a little bit pejorative.  It's not intended to be

3    sarcastic.  Without belaboring it, beginning at page 3,

4    personal background, experience, he goes into that for a couple

5    pages and then launches right into his consideration of the

6    design of the product.  He has a listing of considerations for

7    the design that frankly at page 7 and 8 might have been helpful

8    if Dr. Wright had applied these.  Looking at whether a design

9    can be made safer, severity of the risk, comparative safety of

10    the product, cost benefit considerations.

11          He didn't apply those in any scientific or rigorous

12    way here, but at least he acknowledges them and acknowledges

13    that these are something that an engineer should do.  But as he

14    himself says, he's not an engineer.  He's simply identifying

15    what's been suggested by others over the years as factors that

16    should be considered in evaluating the safety of a product.

17    And then he goes into his historical what was known about the

18    risk and all that.

19          And I suppose playing devil's advocate, I could see

20    him having some -- if he were reined in and if the inflammatory

21    and the argumentative stuff was kept out, I can see him perhaps

22    having some role in chronicling the development of knowledge

23    about the strangulation hazard of corded window blinds if there

24    were an issue as to whether or not a different design should

25    have been arrived at sooner.  In other words, if somebody was

1  too slow or somebody is being criticized for not offering a

2  product.

3       But since that's not the case here, since Hunter

4  Douglas offered the PermAssure wand, he doesn't criticize the

5  fact that they offered it.  He acknowledges that it would have

6  prevented the accident in this case, and it was a very

7  significant safety break-through.  And all he's left to argue

8  is that basically, as Dr. Wright would, that the option should

9  not have been made available to consumers.

10       And whereas Dr. Wright's big problem is, he's never

11  done the analysis to determine what the risks are, what the

12  benefits are, and do any balancing that you have to do in

13  deciding whether someone is negligent or not, in Mr. Statler's

14  situation, I don't think he'd be qualified to do that from an

15  engineering standpoint by his own admission.

16       So he pays lip service to the factors.  He doesn't

17  apply them anyway.  If you go through his report, you will see

18  that after he recites them, he basically goes into his argument

19  section of his report.

20       And so I think, and I am sure what your Honor -- I am

21  not sure.  What I suspect, your Honor, one of the things you

22  are wondering is, you know, if Wright doesn't testify on the

23  subject and Statler is not qualified to, who will?  And that is

24  a problem that I see too.  But it's not a problem that can be

25  resolved by, you know, cutting it in half or allowing some

1   testimony to come in if it doesn't meet standard Daubert.

2          And for different reasons, Mr. Statler doesn't meet

3   the Daubert standard because whatever opinions he may wish to

4   give -- and I am anxious to hear them clarified in a minute --

5   whatever he may wish to give, he isn't an engineer.  He is not

6   entitled to give any opinions on the issues that are relevant

7   to the jury in this case, whether Hunter Douglas was reasonable

8   in continuing to offer the cord and chain option as well as the

9   wand option.

10          And so I -- even aside from his argumentative problems

11   that the courts have recognized in other cases, I have a hard

12   time imagining what he could add to this case that he is

13   qualified to testify to.

14          THE COURT:  Okay.  Thank you.

15          I will start off with the question that I asked --

16          MR. JAUREGUI:  Certainly.

17          THE COURT:  -- Mr. Williams, which is, what is he

18   going to testify to at trial?

19          MR. JAUREGUI:  Mr. Statler is a renowned safety and

20   regulatory expert.  And in this case he will be offering

21   opinions that the blind at issue was unreasonably dangerous for

22   a number of reasons, including irresponsible corporate

23   practices; the issue of warning signs, that it had insufficient

24   warning signs.  So those are the primary duties, and I will

25   touch upon each one of those during my presentation, Judge.

1          THE COURT:  Go ahead.

2          MR. JAUREGUI:  I heard primarily two reasons as to why

3  Mr. Statler should not be allowed to testify.  One, because he

4  is a lawyer; and two, because he appears to be too much of a --

5  has too much passion when he advocates for the issue of safety.

6          I think Mr. Williams givers the Court very little

7  credit that if your Honor were to allow him to testify, that he

8  is going to be totally getting out of hand, and he will be

9  uncontrollable.  While I believe initially that he is qualified

10  to offer his testimony on every single issue that he touches

11  upon his report, if the Court finds that there is some issues

12  that may sound inflammatory, such as the sentence Mr. Williams

13  highlighted, then it can either be rephrased or it can be

14  redacted.  Those are issues that we can deal with.

15          But to keep him out of this case as an expert, as a

16  safety expert, I can hardly think of a person who has dedicated

17  his entire professional life to the issue of safety issues,

18  including a seven-year term that he serves as a commissioner at

19  the United States Consumer Product Safety Commission,

20  regulating the very same problems which are at issue in this

21  case and which he notes in his report that he was fully aware

22  when this issue first began to arise in the early 1980s.  I

23  don't know who would qualify as a safety expert to talk about

24  the issue of these blinds, Judge.

25          Under Illinois law, a product can be proven to be

1    unreasonably dangerous using the following determination:

2    Whether the manufacturer's conduct was reasonable.  The

3    question is whether in the exercise of ordinary care the

4    manufacturer should have foreseen that the design would have

5    been hazardous to someone.  That's Jablonski versus Ford Motor

6    Company.  That's controlling Illinois Supreme Court law instead

7    of Illinois as to what constitutes unreasonable dangerous

8    product.

9             Now, Mr. Statler has looked --

10            THE COURT:  Give me the citation for that.

11            MR. JAUREGUI:  Yes, your Honor.  It is 955 N.E.2d,

12   1155, 2011.

13            I am going to retract for a minute, and I'll come back

14   to that case in just a second, Judge.  First I do want to

15   apologize to the Court because there is a miscited, the

16   proposition in Brown.  Mr. Williams is correct, and we concede

17   that Mr. Statler was never officially clear or declared that he

18   could testify as an expert in that case.  The Judge left that

19   issue open for the appropriate time at trial when motions in

20   limine would be filed.  Mr. Statler never got to testify in

21   that case because it settled two weeks shortly after the Judge

22   had deferred on that issue.

23            As to the issue of the Rountree case that I want to

24   clear up to, in that case -- we cited that case for the

25   proposition that Mr. Statler has significant experience that he

1    worked extensively in the area of window blind covering safety

2    issues.  And those issues came to bear in that case.

3           They filed a motion in limine in that case.  And the

4    Judge was fully aware at the time -- this is a case, the

5    Rountree case -- it's a case that was decided after the Hayes

6    case.  And it is important to know that the holding of that

7    case, thank you to the courtesy of Mr. Williams here, on page

8    10 of the opinion that he provided, it says:

9           While Statler's legal conclusions and inflammatory

10   remarks of the type discussed above would be excluded,

11   wholesale exclusion of Statler's testimony is not appropriate

12   here.  Even though the district judge in Hayes found that the

13   Statlers appeared to be the quintessential expert for hire,

14   they find that an expert testifies for money does not

15   necessarily cast doubt on the reliability of his testimony.

16          Furthermore, in Hayes, Statler was prepared to offer

17   opinions regarding lawnmower safety, a topic which I think is

18   not relevant in this case.  That is the only case that

19   defendants have pointed out in which Mr. Statler has been

20   excluded in over his 40 years that he has been going around the

21   country offering opinions as a safety expert.

22          This is not a lawnmower case.  Lawnmowers are not

23   found in the bedrooms of children.  This is a case about a

24   window blind, that it was dangerous at the time it left the

25   manufacturer's hands.

1          Now, there -- the credentials of Mr. Statler and his

2     experience are set out in the first pages of his report where

3     he extensively details the appointment to the U.S. Consumer

4     Product Commission, the type of work that he did while he was a

5     commissioner there.  The fact that he was one of the first

6     persons that was involved in drafting the underlying work that

7     later on became -- excuse me.

8          He wrote and edited the report for the interim report

9     recommending the enactment of the Child Protection Act.  That

10    was back in the early '80s, Judge.  On page -- that's at page 4

11    of his -- of his report.

12         On page 5, in addition to all the work that he had

13    done in the U.S. Consumer Product Safety Commission, Mr.

14    Statler also noted in the -- on page 5, there the first

15    paragraph, of the type of work that he has done as a partner

16    and consultant at the A.T. Kearney from 1986 to 1999.  And in

17    his -- in that capacity, he was in change of product liability

18    and product risk management, much of his work consisted of

19    advising Fortune 500 and other firms about product risk, help

20    them avoid downstream liability.  He also assisted companies

21    and their legal counsel when confronted with a product already

22    sold and in consumer's hands which constituted a new risk and

23    hazard.

24         We are not offering Mr. Statler as a scientific

25    expert.  His knowledge is not a scientist.  He is not an

1   engineer.  We know that.  We are offering him as an expert

2   under Daubert as a person who possesses specialized knowledge

3   due to his or her skill, experience, training and education,

4   that will assist the trier of fact to understand the evidence

5   or determine the facts in issue.

6          That is by virtue of the work that Mr. Statler has

7   done as a member of the U.S. Consumer Product Safety

8   Commission, the extensive work that he has done in the area of

9   product safety, consulting on various cases, consulting with

10  companies.  That gives him the specialized knowledge that under

11  Daubert in -- that under Daubert qualifies him to testify

12  before the Court.

13         Now, what did he do in this case?  What is it exactly

14  that he do in this case?  What did he look at to determine that

15  the window blind covering was unreasonably dangerous?  I think

16  there is some misunderstanding as to whether or not he is

17  offering opinions on the issue of design.  And let me clear

18  that up.

19         On page 5 of his report, the heading, Determining

20  Whether a Risk Is Reasonable or Not, there are several factors

21  that Mr. Statler took into account.  Those factors are laid out

22  in detail on page 7 of his report.  First, whether the design

23  of the product can be -- reasonably be -- be safe.  Whether the

24  product incorporates the design or a production error which

25  either directly causes it capable of producing needless risk to

1   safety or otherwise fails to incorporate design features which

2   might avert or significantly reduce known risk.

3          Now, that is an objective factor that he applied to

4   this case.  And one of the things that he did, whether or not

5   this product was unreasonably safe, he went back and looked at

6   the data from the U.S. Consumer Product Safety Commission.  And

7   the U.S. Consumer Product Safety Commission is reliable data

8   because all the experts have relied on that data.

9          One of the things that he found was that consistent

10  reasons in 1980s, the danger of strangulation from window blind

11  covering has been recognized as one of the most pernicious and

12  dangerous -- and dangerous, unreasonably dangerous, that young

13  children face.  Now, that is well documented.  Hunter Douglas

14  knew about it.  They have been -- Hunter Douglas was one of the

15  founding members of the United -- of the Window Coverings

16  Manufacturers Association.  They were also a founding member of

17  the Window Covering Safety Council.

18         So whatever information filtered between the U.S.

19  Consumer Product Safety Commission and those two entities,

20  Hunter Douglas was made aware of that.  Between 1994 and 1995,

21  Mr. -- the vice president of sales for Hunter Douglas, he was

22  the president of the Window Covering Safety Council.

23         So all of the information about the defects, the

24  history of strangulations, it was known to Hunter Douglas.

25  Mr. Statler went back and looked at the history of that data

1    and then assessed whether in light of that knowledge it was --

2    whether or not Hunter Douglas took the necessary actions to

3    correct risk.  And as he went back and started looking at the

4    data, Mr. Statler concluded that it did not, that Hunter

5    Douglas did not, even though they knew about the known risk of

6    strangulation to young children, that they failed to correct

7    the risk because they did not correct the problem.

8            They knew that -- you know, let me address this issue

9    here.  The risk of strangulation in this case comes from the

10   cords, period.  Whether they are from horizontal blinds,

11   vertical blind, Venetian blind, any type of blind.  If the cord

12   is too long to allow for the formation of a loop where a child

13   can get his head caught in, then that is -- that is the risk

14   that we are addressing in this case.

15           I know that defendants in this case are trying to make

16   that distinction.  There is no distinction.  For purposes of

17   the danger, in assessing whether or not the risk was an

18   unreasonable risk presented to unsuspected young children,

19   there is no difference here.  A cord is a cord.  It doesn't

20   matter whether it comes from a horizontal blind or a vertical

21   blind.

22           Another factor that Mr. Statler considered, the

23   severity of the risk.  Well, I think Mr. Williams has

24   acknowledged that the risk is very severe because it's either

25   serious bodily injury or death.  We know from the reports from

1    the U.S. Consumer Product Safety Commission that over a hundred

2    and 70 children had died as of 1996.  And then the Journal of

3    Medical Association did a ground-breaking study indicating that

4    the number of deaths had been under-estimated.  And they

5    estimated that the number of deaths was approximately 359

6    deaths from strangulation from window blind cords.

7           Now, that is information that was produced by Hunter

8    Douglas.  They had that information in their archives, and they

9    were aware of that information.

10          The vulnerability -- the vulnerability of the

11   population, children.  No one has suggested here that little

12   three-year-old Max had fault in this accident, because they

13   can't.  I do not know what kind of fault they are going to

14   implicate here to the Padillas.  But the only aspect of the

15   case that Mr. Statler considered is the nature of the risk.  Is

16   that an open and obvious danger?  Or is it a latent defect?

17          Again, the United States Consumer Product Safety

18   Commission has labeled window covering cords -- window covering

19   blind cords as the fourth -- it ranks as the No. 4 hidden

20   hazard to young children.  So if it's a human hazard, it's a

21   latent defect.  That is something that Mr. Statler considered

22   in making the determination of whether or not this was an

23   unreasonably dangerous product.

24          The functionality of it.  Functionality is the same.

25   Vertical window blind serves the same function as a horizontal

1  blind.  The availability of another design.  That answer --

2  that -- the question to that answer has been given by Mr.

3  Williams.  He admits, it's a safer design.  We -- Hunter

4  Douglas made that design specifically because it was safer.

5  That's our argument in this case.  What doesn't make sense is

6  why they continue to sell both products at the same time.

7  Whatever the motivation was.

8         The availability of an alternative design.  That's

9  something that we already have here.  That answer has been --

10 that question has been answered here.

11        THE COURT:  Let me ask you something.  So Mr. Statler

12 reviewed the documents produced in this case as well as CPSC

13 data.  He came to the conclusion that the product was

14 unreasonably dangerous.  And I guess the question is, why isn't

15 that something that the jury can do?  Why do we need him to do

16 that?

17        Isn't that -- if we present or if you present the same

18 information to the jury, the CPSC data, what Hunter Douglas

19 knew or did not know about the -- what they knew about the

20 strangulation and what happened, the risks involved, what does

21 Mr. Statler add to this when a jury can review those documents

22 and come to that decision as well as he can?

23        MR. JAUREGUI:  Because Mr. Statler brings a unique

24 perspective that is derived from his training, experience and

25 education and years of work that he did at the U.S. Consumer

1    Product Safety Commission.  He knows how these things work.  He

2    organized hearings for congressmen, for senators there.  He

3    prepared testimony for them.  He conducted investigations.  He

4    is the -- he is in a very unique position here to explain to

5    the jury what is the historical background of the risk of

6    window covering cords, and how the industry has responded at

7    every turn of the way, and whether or not the response from the

8    industry was reasonable in light of what it did, whether or not

9    there was a responsible corporate practice.

10            THE COURT:  And how is he going to -- on what basis

11   and experience will he be able to testify whether or not a

12   responsive industry was reasonable or unreasonable?  I guess my

13   question is, you know, what about his regulatory authority --

14   by the way, he was a commissioner, right --

15            MR. JAUREGUI:  That's correct.

16            THE COURT:  -- in the early 80s.

17            MR. JAUREGUI:  That's right.

18            THE COURT:  And so it was way before a lot of the

19   studies came out and what not.  And so he is basically doing

20   historical review of these documents.

21            And I presume at some point he has an answer to why

22   the CPSC hasn't instructed or forced the industry to go to the

23   wand altogether.  I presume that's a question that was

24   answered.  And he has I presume some answer for that.

25            But my concern is, what about his work as a

1  commissioner makes him more qualified than the jury to assess

2  reasonableness?

3          MR. JAUREGUI:  Well, Judge, again, his

4  qualifications -- the danger that comes from window covering

5  blinds and the determination of whether or not this is an

6  unreasonably dangerous product under Illinois law, it has to be

7  gauged against the historical background of what a corporation

8  has been doing.  What did Hunter Douglas know in 1995 when they

9  sold --

10         THE COURT:  But you can put on that case, can't you?

11  No one is saying that you can't put on what Hunter Douglas

12  knew.

13         MR. JAUREGUI:  But I can certainly do that, Judge.

14  But I'm not an expert on regulatory issues.  Mr. Statler can --

15  he can answer the question as to why is it that in 1995, for

16  example, the U.S. Consumer Product Safety Commission did not

17  order a recall on all the windows.  And he will tell you that

18  at the time the window -- the U.S. Consumer Product Safety

19  Commission was desperate to have some action.  There are some

20  documents that we are going to introduce during the course of

21  trial that the window covering industry -- they were trying to

22  cut a deal.  They had drafted an agreement.

23         THE COURT:  And so his conclusion that the CPSC was

24  desperate to get some sort of action, what is that based on?

25  Is that based on his review of the documents?

1          MR. JAUREGUI:  It is based on his experience because

2     he knows about the inner workings of the window -- of the U.S.

3     Consumer Product Safety Commission.  The reason why they did or

4     did not recall.

5          THE COURT:  Well, okay.  So I just want to make sure I

6     understand.  He is not going to testify to facts.  He is not

7     going to testify as to what took place while he was there.

8     That's not going to be the only -- that's not going to be the

9     limit of his testimony, right?

10          You are going to ask him to talk about what he thinks

11     happened even when he wasn't there?

12          MR. JAUREGUI:  That is true, Judge.  But I need him to

13     explain what is the function of the U.S. Consumer Product

14     Safety Commission.  How is it that the U.S. Consumer Product

15     Safety Commission is charged by law to regulate products that

16     are considered unreasonably safe.  What is the historical

17     background.  What is the reason for doing that.  He can bring

18     that experience to this courtroom to educate the jury.

19          THE COURT:  And I am not saying, and that all -- you

20     know, that all makes perfect sense to me.  If he wants to

21     explain the regulatory framework, the regulatory background, if

22     he even wants to explain what information CPSC had with regard

23     to this, and how it was published.  But you want him to do more

24     than that.  You want him to -- from that, from those factual

25     predicates, you want him to then draw the ultimate conclusion

1  that the industry, frankly here Hunter Douglas, the only

2  defendant, behaved unreasonably in responding to those

3  concerns.  And that's what I am focusing on.

4        All that other stuff previous to that, I don't think

5  there is any -- I don't think you are getting much fight from

6  Hunter Douglas, you know, on whether or not he's qualified to

7  talk about that.  It's really that last thing.

8        And frankly when I do read his report, his report does

9  kind of -- you know, his whole report is permeated with

10 characterizations of that ilk throughout his report.  And so my

11 question is, what specifically about his experience at CPSC

12 allows him to draw that conclusion that it's -- that the

13 industry practice is unreasonable?

14       For example, did he compare it to the reaction of

15 other industries in other types of similar situations?  Did

16 he -- and if so, what is that?  I don't see that in his report.

17 What does he base it on other than just kind of his gut

18 instincts, if it is that, that the response is unreasonable.

19       MR. JAUREGUI:  Well, Judge, on -- find the right page,

20 your Honor.

21       THE COURT:  For example, perhaps, you know, there is

22 other things I suppose he could have done if he didn't do it.

23 And maybe he did.  I don't know.  But, for example, he could

24 have said, well, you know, a similar industry is this industry.

25 And in fact, as soon as CPSC had out those notices, by gosh, in

1    that industry they completely changed their way.  You know, and

2    in comparison this industry didn't.

3         Or, you know, as CPSC commissioner, we were asked to

4    apply certain factors, determine whether or not we are going to

5    issue a recall and when we weren't.  And this is what those

6    factors were that I used in my role as CPS commissioner.  I

7    have reason to believe that's what they continued to use

8    because whatever guidelines haven't changed.  And, therefore,

9    in applying that to here, I believe as follows.

10        But I just don't -- I don't see that in his report.

11        MR. JAUREGUI:  That is exactly the kind of experience

12   that he brings to the courtroom and to the jury.  The

13   experience that he had in regulating other dangerous products

14   and how the Consumer Product Safety Commission dealt with those

15   industries as they were regulating those products, how the

16   industries responded once these issues or flaws were brought to

17   their attention.  And then to compare that to the manner in

18   which Hunter Douglas has reacted or has been reacted since the

19   issue was brought to their attention.  And they -- he then made

20   the determination.

21        The jury cannot make that determination as to whether

22   or not Hunter Douglas acted within -- as a responsible

23   corporation and responded to those issues.

24        THE COURT:  Okay.  But then the question is, what

25   other industries did he look at?  What did he compare it to?

1    Again, it's not in his report.  It's unclear to me if he did --

2    No. 1, whether or not he actually did that analysis.  And,

3    No. 2, if he did do that analysis, where in the expert report

4    that he talks about that analysis.  Because again, it's a long

5    expert report.  So perhaps I am missing it.

6         MR. JAUREGUI:  Well, let me -- Judge, if I can direct

7    your attention to page 4, the first full paragraph there.  That

8    answers part of your question.  While serving at the helm of

9    the CPS --

10        THE COURT:  You have to read more slowly.

11        MR. JAUREGUI:  I'm sorry.  Let me start again.  Do you

12   have a copy of that report there, your Honor?

13        THE COURT:  I do.  I have everything right here.

14        MR. JAUREGUI:  Then I don't need to do that.

15        THE COURT:  You might do it.  It might help her out.

16        MR. JAUREGUI:  I have extra copies here.  So let me

17   just do that.  I have a hard copy, Judge, if you like one.

18        THE COURT:  I am fine.

19        MR. JAUREGUI:  All right.  Page No. 4, first full

20   paragraph:  While serving at the helm of the CPSC in public

21   meetings, private sessions, with affected companies and

22   industries, and in various articles I explicitly addressed the

23   critical responsibilities of manufacturers and distributers of

24   consumer products, both then and as consultant and expert

25   witness during all those years since I have consistently

1    stressed the prime importance of the companies actively

2    investigating instances of serious injury or death occurring

3    from their products.  I have repeatedly emphasized the pressing

4    need on their part to focus on improving product safety through

5    changes to its design as a first principle.

6          I have also urged firms to fully comprehend and assess

7    a product's risk before ever bringing it onto the market, to

8    maintain adequate records in files of hazard investigations and

9    assessments, and to timely report safety risks to the Consumer

10   Product Safety Commission pursuant to the reporting

11   requirements of the Consumer Product Safety Act.

12         Now, that is the kind of expertise that he is very

13   uniquely positioned to educate the jury as to what is it that

14   goes on when there is a defective product.  What is the

15   specific action that the commission -- that the Consumer

16   Product Safety Commission takes, and whether or not the

17   responses from the companies are in line with the requirements

18   of the regulatory framework of the commission.  That is very --

19   it's very specialized knowledge that Mr. Statler has from the

20   years he spent as commissioner at the U.S. Consumer Product

21   Safety Commission.

22         I can't do that for the jury.  I cannot educate the

23   jury on those issues.  I might be able to pull out some of the

24   reports from the -- about children that have been strangulated.

25   But I cannot tie it up for them.  I need Mr. Statler to explain

1    to the jury, okay, how many -- how many of these strangulations

2    occurred prior to 1995?  What did the industry know at the

3    time?  How did the industry react in respond to those deaths

4    and strangulations?

5         I can't.  Only Mr. Statler can do that because he has

6    both the regulatory framework.  He has the expertise.  He dealt

7    with these issues as a commissioner.  And he's uniquely

8    positioned to address those issues to the jury, Judge.

9        (Brief pause.)

10        MR. JAUREGUI:  There is -- some of the other documents

11    that Mr. Statler looked in his report include an exhibit number

12    that has been proffered and identified for -- on our pretrial

13    memorandum, Exhibit No. 27.  And this exhibit is instructible.

14    So because it is a short memo from the U.S. Consumer Product

15    Safety Commission to Jason Throne.  Mr. Throne at the time was

16    an attorney for Hunter Douglas.

17        And in the remarks section it says:  Ready to begin

18    the retrofit program.  Call me.

19        Attached to that, it is a description of an IDI, an

20    in-depth investigation report, involving a Hunter Douglas

21    product with a continuous loop cord.  That is dated July 13,

22    1995.  I need Mr. Statler to explain these issues to the jury.

23        We spoke earlier about the issue of hidden hazards.  I

24    need Mr. Statler to address the issues of why this incident

25    happened and why is it that Mr. and Mrs. Padilla are not at

1    fault in this case.  The defendants are -- have arguments, and

2    they -- at the time of closing they will be asking for some

3    type of contributory negligence.  I need Mr. Statler to explain

4    to the jury why this was a hidden hazard, what was it that made

5    this product particularly dangerous.  He knows that from his

6    experience from the work that he did as a U.S. -- as a

7    commissioner, Judge.  I can't do that for the jury.

8         THE COURT:  Does he know that because of his work as a

9    commissioner?  Or does he know that because he read the CPSC

10   documents that say that?

11        MR. JAUREGUI:  It's both.

12        THE COURT:  That's a 2004 document.  By that time he

13   was long gone from the commission, right?

14        MR. JAUREGUI:  It is both, Judge.  And the document

15   that I showed you, it was -- which one was that?  That was

16   1995, I believe, July of 1995.

17        Yeah, the hidden hazard, that's a 2004 document,

18   Judge.  You are right in the sense that he was gone there from

19   the commission at the time that occurred.  Previous document

20   that I showed to the Court is a memorandum from the U.S.

21   Consumer Product Safety Commission to one of the attorneys at

22   Hunter Douglas.  And that involves an incident that occurred

23   before 1995.

24        And again, why do we need Mr. Statler?  Because he

25   needs to explain what was going on with the industry at the

1    time this instance were occurring.  What was the U.S. Consumer

2    Product Safety Commission.  And whether or not the actions that

3    industry was taking in response to this knowledge and the

4    request from the U.S. Consumer Product Safety Commission --

5    whether those actions were reasonable and in line with

6    corporate practices, Judge.

7              THE COURT:  I took up a lot of your time questioning.

8    So you can go ahead.

9              MR. JAUREGUI:  I will try to wrap it up, Judge. Thank

10   you.

11             THE COURT:  You an use some more time.

12             MR. JAUREGUI:  I have noted the industry has been long

13   aware of this incidence.  This is a document that was produced

14   by Hunter Douglas.  It's a -- an incident that occurred on

15   December 1, 1983, where a child hanged himself from a window

16   blind cord.  This is again a document produced by Hunter

17   Douglas, shows us that as going back as far as 1983 they knew

18   that these incidents were occurring.

19             Something earlier about the deal that the Window

20   Covering Manufacturers Association and the Window Covering

21   Safety Council was trying to reach with the -- with the

22   Consumer Product Safety Commission.  This is a letter from Ira

23   B. Marcus, and it is addressed to a Michael Nemeroff Esquire,

24   Sidley Austin, and Chris Outlaw, associate counsel to Hunter

25   Douglas.

1    And the gist of it is on the first paragraph:  I

2   believe it would be extremely desirable to have an agreement

3   regarding the deal the Window Covering Safety Council, Inc.,

4   information, in parenthesis, open paren, the Safety Council, is

5   trying to strike with the U.S. Consumer Product Safety

6   Commission.  Such an agreement could give the commission the

7   comfort of knowing that the safety council was contractually

8   obligated to carry out the program it will be announcing and

9   publicizing.

10    This was about the retrofit campaign that Mr. Williams

11   alluded to earlier.  I can't do this.  I don't have the inner

12   workings, the knowledge what was going on at the commission.

13   Mr. Statler can explain this to the jury.

14    Another document that Mr. Statler reviewed.  February

15   6, 1996, a letter from the U.S. Consumer Product Safety

16   Commission.  It involves a product by Hunter Douglas of a

17   30-month year old child that hung herself, going back to 1994.

18   This is all relevant information before the event at issue

19   occurring in this case on -- in -- before the window blind --

20   I'm sorry -- before the window blind was sold in this case in

21   October of 1995.

22    Some of the documentation again, that Mr. Stuart

23   reviewed, May 3, 1995.  It's an internal memorandum from Hunter

24   Douglas from Marvin Hopkins, the president of Hunter Douglas.

25   And they are announcing that within the last two months

1    introduce a PermAssure safety and available on all vertical

2    blinds.  And we continue to seek new solutions to reduce -- and

3    we continue to seek new solutions to reduce potential accidents

4    with all our products.

5              THE COURT:  I think I got the point.

6              MR. JAUREGUI:  All right.  Let me try to wrap it

7    upper, Judge.

8         (Brief pause.)

9              MR. JAUREGUI:  Hunter Douglas in their -- in their

10   response to our motion, they cited a couple cases which I don't

11   think are relevant to this case.  One of them is the Small

12   case.  And that case involved an expert, rather experts.  It

13   involved a person that had been exposed to some chemicals and

14   they were offering testimony of two doctors.  And the Court

15   concluded that they did not meet the scientific standards to

16   qualify as experts.

17             Hunter Douglas cites that in support of the brief to

18   exclude Mr. Statler.  Again, we are not offering Mr. Statler as

19   an expert -- as a scientific expert.  Therefore, this case is

20   not applicable to our case.

21             THE COURT:  What is Mr. Statler going to say to the

22   question of why didn't the Consumer Protection Safety

23   Commission then act and just outlaw the cords from the

24   industry?

25             MR. JAUREGUI:  There are specific regulations, and

1    that will be a subject of our motion in limine.  The bylaw, it

2    specifically states:  The failure of the U.S. Consumer Product

3    Safety Commission to take action against a manufacturer does

4    not exclude -- does not protect them or insulate them from

5    liability under state law.

6         So it is not sufficient, and they cannot hide, they

7    cannot run and say, well, we didn't have to do anything in this

8    case because the U.S. Consumer Product Safety Commission told

9    us not to do that.  Or because in 1995, the biggest risk that

10   we were facing was horizontal blinds.  And, therefore, even

11   though the vertical blinds posed the same danger, we didn't

12   have to do that because specifically they didn't tell us that

13   we had to agree that.  It doesn't work.  They still had a legal

14   obligation to address a known defect.  If the manufacturer knew

15   it existed, they should have known that.

16        That's the same reason why there is an ongoing duty

17   under Illinois law to continue to provide warnings of a

18   product.

19        THE COURT:  To be clear, I am not saying that that

20   absolves the defendants in any way.  What I am trying to get at

21   is, presumably Mr. Statler is being offered because of the

22   experience as a commissioner.  He has come to the conclusion

23   now that it all should have been outlawed.  And so the natural

24   question at least to me would be to ask him, well, why does he

25   think it wasn't.  And I am wondering whether he has an answer

1   to that.

2          MR. JAUREGUI:  Well, I am sure he will offer his

3   opinion on that issue, Judge.  I don't know what -- what

4   opinion he will offer.  I can only speculate that one of the

5   things that he is going to tell you is the commission was

6   trying to do whatever it could with its limited resources.  And

7   the fact that they didn't issue straight a law to outlaw these

8   blinds is because they at least felt some level of comfort that

9   the window covering industry was attempting to do something,

10  rather than not doing anything.

11         Let me just take a quick look.  I think I am just

12  about done here, Judge.

13      (Brief pause.)

14         MR. JAUREGUI:  I want to address one issue to the

15  Court very quickly.

16         THE COURT:  Yes, brief.

17         MR. JAUREGUI:  Consumer preferences.  Much has been

18  done about that issue, and we will address that issue more

19  detail with one of defendant's experts.  But the issue of

20  whether or not Hunter Douglas was justified in offering the

21  window blind with the wand as an option, and what consumer --

22  whether little grandmother needs to climb on top of the ladder.

23  There is absolutely no data that Hunter Douglas has produced

24  during the course of this litigation.  Either it doesn't exist.

25  If it exists, I haven't seen it.

1          So they, Hunter Douglas, is in the best position to

2     accumulate that data and to determine what are the consumer

3     preferences.  It doesn't exist.  So they cannot come here and

4     tell the Court, oh, for a group of people it is best for them

5     to use the -- they prefer the chain and the nylon cord.  That

6     data doesn't exist.  There is sheer speculation.  There is

7     absolutely no basis for the representations to the Court.

8          Judge, I think that, you know, the list of items that

9     I was referring to during the course of my presentation, that

10    appears in -- that has been incorporated in a book that has

11    been published.  And it's on the list of publications.  I will

12    just put this here to make it quicker.

13         Preventing accidental injury.  Accountability for

14    safer products by anticipating product risks and use of

15    behaviors.  Appears in a handbook of human factors litigation.

16    CRC press December 2004.  Those factors that Mr. Statler has

17    relied to reach his conclusions here that this was an

18    unreasonably dangerous product are relied upon by other experts

19    in the field.

20         And of course the last issue that we did not talk

21    about is the issue of warnings.  There were no warnings on this

22    case.  Whatever warnings there were, if there were any in form

23    of a hangtag, he will testify and will educate the jury that

24    those hangtags were not sufficiently -- did not constitute

25    sufficient notice to educate the consumer about the dangers of

1    strangulation because the hangtags were designed to be removed.

2            Their witnesses have testified to that.  They were not

3    permanent.  They were -- they were inserted on the -- on one of

4    the cords.  And the consumers could simply remove it.  If that

5    was -- and there is no proof that even one of these hangtags

6    was attached to this window blind.

7            So if they didn't have that here, and you have a

8    latent risk, then how are people supposed to know?  How are Ms.

9    Davis and Ms. Roberts supposed to know?  How are the Padillas

10   supposed to know who bought the house seven years later from

11   them?

12           THE COURT:  And what -- aside from this prior

13   experience as a commissioner, what did Mr. Statler do to

14   analyze the issue of the sufficiency of the hangtag?

15           MR. JAUREGUI:  I'm sorry, Judge.  I missed the

16   question.

17           THE COURT:  What analysis did he do to come to his

18   opinion about the hangtags, other than relying upon his

19   experience as a commissioner?

20           MR. JAUREGUI:  It's the testimony of Hunter Douglas.

21   Hunter Douglas testified that -- I think it was Mr. Rubinoff

22   if I am not mistaken.  I took his deposition some two years

23   ago.  And I was asked, were there any window -- are you aware

24   of any warnings that Hunter Douglas was using at the time?  And

25   he said, well, I am aware that there were some hangtags that

1    were used.  But they were not intended to be permanent.

2          So if they are not permanent, those are not

3    sufficient.  It doesn't constitute a valid warning.  Now, Mr.

4    Statler again derived from his experience from the -- again,

5    the Consumer Product Safety Commission and from the work that

6    he has done as a safety consultant in his testifying many other

7    cases on the issue of the sufficiency of the warnings.

8          THE COURT:  Okay.  Very good.  Thank you.

9          Mr. Williams, we are over our allotted time.  I

10   apologize to the parties about that.  But so you have five

11   minutes.

12         MR. WILLIAMS:  And I think I can do it in that, your

13   Honor.  I was also going to say with no witness here, I'd

14   rather finish today.  But if you and staff would like to get

15   away --

16         THE COURT:  No, no.  Let's --

17         MR. WILLIAMS:  Let me do it in five.

18         I don't think I need to say much because I think

19   Mr. Jauregui said most of what I wanted to.  They desperately

20   want you to let Mr. Statler come testify even in some limited

21   way, so that he can come in and advocate for them.

22         You didn't get answers to any of the questions of what

23   he added.  He's done no analysis.  He hadn't thought about

24   warnings until I asked him about warnings at his deposition.

25   The suggestion that he needs to testify to explain to the jury

1    memos from the CPSC written after he left there, press releases

2    issued after he left there, correspondence between parties that

3    don't involve him, doesn't need much to tie it up in a ribbon.

4    He not only isn't needed for that.  He wouldn't be qualified to

5    testify as to any of the examples that Mr. Jauregui just gave

6    you.

7          They want him to come in.  They want him to give his

8    industry is a bad guy speech.  And I am -- I want to remind

9    counsel as well as the Court that this is a case against Hunter

10   Douglas.  They would like to talk about the industry.  There

11   are many ways in which that will be relevant, but this is a

12   case against my client and my client alone.

13         And the areas in which he has experience don't relate

14   to the issues in this case.  Mr. Jauregui read to you from the

15   Rountree opinion.  And he read to you how even though another

16   Court had found Statler to be the quintessential expert for

17   hire, in this particular case Rountree window blinds were

18   involved, not lawnmowers.  And so he was going to be allowed to

19   testify in some limited areas.

20         Where Mr. Jauregui stopped was what the Court in

21   Rountree said he could testify to.  Next sentence says:  The

22   interaction between WCMA and CPSC, the organization for which

23   Statler served as commissioner, provides support for admission

24   of some of Statler's testimony here.  That's what they would

25   have allowed him to testify to had that case gone to trial.

1        The -- we heard a couple of things that we hadn't

2   heard before.  All of the documents that he will attempt to

3   explain and give his light to.  But at one point he said, Mr.

4   Jauregui said, he brings his specialized knowledge as a former

5   commissioner of the CPSC who will assist the trier of fact and

6   will give the opinion that the window blind was unreasonably

7   dangerous.

8        Every single question you asked after that having to

9   do with what analysis did he do, what did he look at, did he

10   evaluate injury statistics, did he consider warnings, the

11   answer to each of those was a non-answer.  He hasn't done any

12   of those things because that's not the kind of expert he is.

13        He is an advocate, and they want him to come in on a

14   limited basis and then see what he can -- see what he can do.

15   And that's -- that's why we are here today.  Daubert and Kumho

16   Tire don't allow for that.  And it doesn't take a very careful

17   gatekeeper to keep Mr. Statler out.

18        He -- he has a very narrow area of expertise.  It

19   doesn't relate to the question of whether Hunter Douglas once

20   again, last time for today, was negligent in continuing to

21   offer both the cord and chain as well as the wand option in

22   1995.  And none of the things that you saw on the projector,

23   none of the reading from his report, changes the fact that

24   there wasn't a single thing that you asked, how does he bring

25   his expertise to, that counsel could answer.

1      Most of the things that he would call him to testify

2 to apparently are exactly as your Honor said, things that the

3 jury can evaluate.  If the jury decides, based upon the number

4 of strangulations on window blinds generally, Hunter Douglas

5 window blinds, Hunter Douglas vertical window blinds, was such

6 that there was a great enough risk that Hunter Douglas should

7 not have made that option available -- that's in the numbers.

8 That's in the reports that both sides have and will be

9 submitting and will be putting in front of the jury.  And they

10 can evaluate that.

11      We will attempt to give them some perspective through

12 our experts, in particular Dr. Ray, that the jury can interpret

13 that and come to their own conclusions.  Dr. -- Mr. Statler's

14 spin on Hunter Douglas this and the industry was slow to do

15 that, just doesn't add anything.  And the risk of his

16 prejudicing and inflaming the jury if he is allowed to testify

17 is too great.

18      His testimony should be excluded in its entirety.

19      THE COURT:  Thank you, counsel.  Thank you both.

20 Thank you, all of you actually, more than both, very much

21 today.  And I really appreciated the examination as well as the

22 arguments.  They were all very helpful.  And the questions that

23 I asked were questions that I had.

24      So I am glad I got answers to all of them.  And we

25 will see you tomorrow at 10:00 o'clock, where the roles will be

1   reversed.  And then we will see where we go from there.

2           Thank you.

3           MR. WILLIAMS:  Thank you, your Honor.

4      (Hearing adjourned until the following day, August 21,

5       2013, at the hour of 10:00 o'clock a.m.)

6                           CERTIFICATE

7           I HEREBY CERTIFY that the foregoing is a true, correct

8   and complete transcript of the proceedings had at the hearing

9   of the aforementioned cause on the day and date hereof.

10

     /s/Alexandra Roth                        6/4/2018
11  _____      _____

12   Official Court Reporter                    Date
     U.S. District Court
     Northern District of Illinois
13   Eastern Division

14

15

16

17

18

19

20

21

22

23

24

25