1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    JOSE M. PADILLA, as the Special  )  Docket No. 09 C 1222
     Administrator of the Estate of   )
4    MAXIMILIAN PADILLA,              )
                                      )
5                         Plaintiff,  )
                                      )
6               v.                    )  Chicago, Illinois
                                      )  August 21, 2013
7    HUNTER DOUGLAS WINDOW            )  10:00 o'clock a.m.
     COVERINGS, INC.,                 )
8                                     )
                          Defendant.  )
9
                              VOLUME 2
10        TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
             BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:          JAUREGUI & ASSOCIATES, by
13                               MR. ARTURO JAUREGUI
                                 Mr. EDWARD J. SANTIAGO
14                               120 West Madison Street
                                 Suite 400
15                               Chicago, Illinois 60602

16   For the Defendant:          SCHIFF HARDIN LLP, by
                                 MR. JEFFREY R. WILLIAMS
17                               One Market
                                 Spear Street Tower
18                               Thirty-Second Floor
                                 San Francisco, California 94105
19
                                 RILEY SAFER HOLMES & CANCILA, by
20                               MR. BRIAN O'CONNOR WATSON
                                 70 West Madison Street
21                               Suite 2900
                                 Chicago, Illinois 60602
22
                        ALEXANDRA ROTH, CSR, RPR
23                        Official Court Reporter
                        219 South Dearborn Street
24                              Room 1224
                        Chicago, Illinois 60604
25                            (312) 408-5038

Sala - direct                                    189

1          (Proceedings had in open court:)

2              THE CLERK:  09 C 1222, Padilla versus Hunter Douglas

3    Window Coverings, for Daubert hearing.

4              MR. JAUREGUI:  Good morning, your Honor.  Appearing

5    for the plaintiff, Arturo Jauregui and Ed Santiago.

6              MR. WILLIAMS:  And good morning, your Honor.  Jeff

7    Williams and Brian Watson for Hunter Douglas.

8              THE COURT:  Good morning, counsel.

9              So today we will proceed considering plaintiff's

10   motion under Daubert to exclude testimonies of Joseph Sala as

11   well as Rose Ray.  First we will address the motion as to Mr.

12   Sala.  And as set forth in my schedule, defendants will have 60

13   minutes to voir dire Mr. Sala.  Plaintiffs will then have 60

14   minutes.  And defendants will have ten minutes redirect.

15             So you may proceed.

16             MR. WILLIAMS:  Thank you, your Honor.  At this time we

17   would call Dr. Joseph Sala to the stand.

18             THE COURT:  Please remain standing.

19        (Witness duly sworn.)

20             THE COURT:  You may proceed.

21         JOSEPH SALA, DEFENDANT'S WITNESS, DULY SWORN

22                      DIRECT EXAMINATION

23   BY MR. WILLIAMS:

24   Q.  Dr. Sala, will you please state your name for the record?

25   A.  Joseph Sala.

1    Q.   And what do you do?

2    A.   I am a human factors scientist.

3    Q.   And where do you practice your occupation?

4    A.   At the company known as Exponent.

5    Q.   And what is Exponent?

6    A.   Exponent is a scientific and engineering consulting firm.

7    Q.   And how long have you been with them?

8    A.   I have been with Exponent for approximately eight years

9    now.

10   Q.   And in what city?

11   A.   In Philadelphia.

12   Q.   You understand that we are here today for what we refer to

13   shorthand as a Daubert hearing with respect to your proposed

14   testimony in this case, on a motion that plaintiffs have filed

15   with respect to it, is that right?

16   A.   Yes.

17   Q.   Okay.  What I'd like to do, Dr. Sala, is start out by

18   asking you to take us through briefly your educational

19   background, in particular as it relates to your field of

20   expertise.

21          MR. WILLIAMS:  And, your Honor, if I may publish and

22   offer to counsel and the Court a copy of what I marked as

23   Exhibit 1, Dr. Sala's CV?

24          THE COURT:  That's fine.

25          MR. WILLIAMS:  Would your Honor like a copy?

1          THE COURT:  Yes, please.

2    BY MR. WILLIAMS:

3    Q.  So, Dr. Sala, this is something probably best handled by

4    you without the need for too many questions.  But as I say, I'd

5    like you to focus on your post high school education and

6    background leading to your employment as a human factors

7    scientist.

8    A.  Certainly.  My educational career began at Rutgers

9    University, Rutgers College, in New Jersey.  I achieved a

10   bachelor's of arts in psychology and a bachelor's of science in

11   administration of justice from that institution.

12          Following a one-year hiatus, I then attended Johns

13   Hopkins, or I was admitted to Johns Hopkins University to the

14   psychological and brain sciences department, where I obtained

15   both my master's and did my doctoral research, obtaining a

16   Ph.D. in cognitive neuroscience.

17          Following my time at Johns Hopkins, I pursued post-

18   doctoral studies and was granted a national research -- excuse

19   me -- national research service award to continue my -- my

20   post-doctoral education and training under a professor that was

21   at Stanford University, and continued my research in cognitive

22   neuroscience.

23   Q.  How long were you at Stanford?

24   A.  I was at Stanford for approximately a year and a half.

25   Q.  Okay.  And so that takes us up until 2005, is that right?

1    A.   Approximately, yes.

2    Q.   Okay.  Have you published during the course of your career?

3    A.   Yes, I have.

4    Q.   And in particular, have you published in the field of

5    generally speaking human factor science?

6    A.   Yes, since -- since my time in graduate school, I have

7    actively published in a variety of journals and presented at

8    conferences, both national and international conferences.

9    Q.   And how many publications in which you were the author or a

10   co-author are contained in your current CV?

11   A.   Roughly around 30.

12   Q.   Okay.  Are there any in particular -- and as I said we are

13   going to go through this quickly -- that bear in particular

14   detail on the subjects that you have been asked to consider and

15   offer opinion testimony on here?

16   A.   Yes.  I have published a number of articles on warnings,

17   warnings compliance research, looking at either the prevalence

18   of on-product warnings across either products themselves or

19   voluntary standards.  I have published on the -- the advice and

20   recommendations and sometimes requirements of various

21   governmental agencies as it -- as it relates to the

22   presentation of risks.

23         I have published on the various types of designs

24   available for warnings, whether to communicate something

25   through -- or the benefits and detriments of trying to

1  communicate safety information either through text or through

2  text list sorts of designs.  And then additionally, I've

3  investigated people's behavioral response and acknowledgment of

4  warnings.

5  Q.  Have you ever published any papers with regard to the role

6  of human factors and the design of consumer products?

7  A.  Yes, I have.

8  Q.  And can you direct our attention to representative example

9  of them.

10  A.  Certainly.  If you look it's I believe the third -- the

11  third citation down.  Now it's the fourth or fifth, Sanders,

12  Wood and Sala citation, human factors engineering for medical

13  devices.  This was a book chapter that I co-authored which

14  involved incorporating human factor science and human factors

15  engineering into the design of medical devices.  How a medical

16  device manufacturer may go about considering the field of human

17  factors and the important aspects of the user into the actual

18  design of their product.

19          Now, we authored this chapter in 2006.  However, it's

20  not on my -- my CV yet.  We have just updated this chapter and

21  done a significant revision to it, which is -- which will be

22  published I believe this -- later this year.

23  Q.  Okay.  What is ergonomics?

24  A.  Ergonomics is very akin to human factors.  It's another --

25  think basically it's used almost interchangeably with the field

Sala - direct                                        194

1    of human factors.  It's the fit of the user into the

2    environment, and the appropriateness of certain products and

3    how -- what -- what products afford a user.

4    Q.   Have you published in the area of ergonomics to the extent

5    there is any difference there or distinction between human

6    factors and ergonomics?

7    A.   I think that they are largely synonymous.

8    Q.   Okay.  So you said you were at Stanford until roughly 2005.

9    During the course of your career, have you become a member of

10   any professional organizations, in particular ones that are

11   relevant to your qualifications here?

12   A.   Yes.  I have -- through my career I have been a member of a

13   number of professional affiliations, like the Society of

14   Neuroscience and the Association of Psychological Sciences.

15   These are organizations that our field contributes to --

16   psychology and cognitive neuroscience contributes to human

17   factors.

18          But since joining Exponent and since leaving academia,

19   I've also joined professional societies, such as the Human

20   Factors and Ergonomics Society, the Society for Risk Analysis.

21   And again missing from this professional affiliation but also

22   the Society for Automotive Engineering, because obviously there

23   is a lot to consider with respect to human factors in driver

24   behavior, driver perceptions, in vehicle systems.

25   Q.   Okay.  After you got out of Stanford or finished your

Sala - direct                                      195

1   fellowship there, what did you do next?

2   A.   Following Stanford I took employment with Exponent.

3   Q.   And was that in Philadelphia originally?

4   A.   No.  The headquarters for Exponent is in Mendel Park, which

5   is luckily the same town as Stanford.  I went and worked at the

6   Mendel Park office for approximately a year and a half.

7   Q.   And then made the move to Philadelphia?

8   A.   Correct.

9   Q.   And what is your position in the Philadelphia office of

10  Exponent?

11  A.   I am a principal scientist in the human factors practice as

12  well as the office director for the Philadelphia office.

13  Q.   Okay.  Do you currently do any lecturing or teaching of any

14  sort?

15  A.   Yes, I do.

16  Q.   And what does that involve?

17  A.   On a yearly basis I lecture at Drexel University.  This is

18  a class in the human factors aspects of medical device design.

19  I give a lecture alongside the human factors staff of the FDA,

20  Food and Drug Administration.  Together we discuss and give

21  lecture to a class of engineering students on how to

22  incorporate human factors into the design of medical devices,

23  and what the basics are that they need to consider and know

24  from -- as engineers without the scientific training in my

25  discipline.

Sala - direct                                              196

1   Q.  We don't have a medical device at issue in this case.  But

2   can you -- I am going to use the words summarize and briefly

3   frequently in the next hour.

4           Can you briefly describe for us how human factors is

5   involved in the design of medical devices?

6   A.  Sure.  The design of medical devices, the human factors

7   aspects are very similar to the human factors aspects in design

8   of many other devices.  I -- its crux.  It's considering the

9   user, the needs, the limitations, and where a product is going

10  to be used in the actual design.

11          So if you have a medical device -- and what we tell

12  the students is that you want to know attributes of your user.

13  You want to know who you're serving with your design and

14  consider that.

15          You might be interested in the age of your user

16  population.  If it's a medical device that is serving certain

17  diseased population, you want to know what constraints that

18  disease places on the person.  And you want to know previous

19  history of failures so that you can consider these in the

20  design.

21  Q.  Okay.  Are those principles in general ones that also you

22  brought to bear on your analysis in this case?

23  A.  Yes.

24  Q.  So you joined Exponent in Mendel Park in 2005.  You made

25  the move to Philadelphia in 2007, is that right?

Sala - direct                              197

1    A.   Approximately, yes.

2    Q.   And you've been there ever since?

3    A.   Yes.

4    Q.   Okay.  How do you spend your time at Exponent?  Is it all

5    consulting for litigation like we are doing here today?

6    A.   No, approximately two thirds of my time is involved in

7    assessing human factors aspects of accidents that have

8    happened, and oftentimes litigation.

9    Q.   And what's the other third comprised of?

10   A.   The other third is consulting largely with manufacturers as

11   to how to incorporate human factors into the design or the

12   consideration of their products that they are either bringing

13   onto the market or already have on the market.

14   Q.   Okay.  So you're working directly with manufacturers or

15   potential manufacturers of products including consumer

16   products?

17   A.   Yes.

18   Q.   Okay.  Have you ever been involved in advising clients with

19   respect to products that either relate to children or have

20   anything to do with safety of children?

21   A.   Yes.  One of my areas of focus and particular areas of

22   expertise is in fact child products and child safety.  I have

23   consulted on the design of a range of child products.  I --

24   including products that are meant to aid in -- in child safety,

25   like cabinet latches and toilet seat covers, devices that you

Sala - direct                                    198

1    can add to your home to help control the environment.

2              Also I have consulted on devices such as car seats,

3    the design of car seats and aspects of car seats.  The --

4    finally also for -- certain of my consultation is related to

5    toys and what product children entertain themselves with, to

6    make sure that there are no hazards that are un -- are not

7    considered.

8    Q.   Okay.  Now, have you ever consulted with respect to the

9    physical design, the mechanical workings, of any window

10   covering products?

11   A.   No, I have not.

12   Q.   Have you ever provided advice with respect to warnings on

13   window covering products?

14   A.   Yes, I have.

15   Q.   And can you describe without disclosing, you know -- didn't

16   involve Hunter Douglas, correct?

17   A.   No, it did not.

18   Q.   Can you describe without disclosing your client the nature

19   of your work in that area?

20   A.   Certainly.  I worked with a window covering manufacturer to

21   review the product inserts and the safety information that they

22   included with their product, hoping to perhaps streamline their

23   presentation of information, as well as to provide additional

24   information in their installation instructions, whether it be

25   instructions that would aid the user, but also effect the

Sala - direct                                                 199

1    safety and installation of the product.

2    Q.  When was this, what year?

3    A.  That was approximately, if my memory serves, around 2008.

4    Q.  Okay.  All right.  You described yourself as a human

5    factors scientist.  And in connection with the purpose of

6    today's proceedings, I've asked you to come prepared to

7    describe for the Court exactly what's involved in your

8    discipline in general, and then in particular how you applied

9    the scientific methodology of human factors to your work in

10   this case.

11         Is that a fair summary?

12   A.  Yes.

13   Q.  And have you at my request prepared something to assist the

14   Court and counsel in that process?

15   A.  Yes, I have.

16         MR. WILLIAMS:  Your Honor, I am told at this time I

17   should request that you toggle us to laptop input.  And I will

18   get off the camera.

19      (Brief pause.)

20         MR. WILLIAMS:  Your Honor, I have marked as Exhibit 3,

21   even though we can all see it, I have hard copies for counsel

22   and the Court, of a 12 page PowerPoint presentation that Dr.

23   Sala would use.  Would you like a copy?

24         THE COURT:  Yes, please.

25         MR. WILLIAMS:  Your Honor, I just realized I in

1   setting up today neglected to hand this to counsel ahead of

2   time.  I am going to wait for a second and give him a chance to

3   look through it and see if he has any questions before we get

4   started.

5        (Brief pause.)

6             THE COURT:  By the way, for future reference to both

7   sides, these screens that counsel have at the podium as well as

8   the witness are touch sensitive.  So witnesses can either mark

9   on them or indicate by just touching.  It will also show up if

10  they want to highlight particular parts of the document.

11            The one caveat I have is that for the witness screen

12  for some reason, because of the way it's calibrated, you have

13  to touch about half an inch to the left of where you actually

14  want the mark to be.  I have --

15            THE WITNESS:  Product of a human factors expert.

16            THE COURT:  I have run across this numerous occasions

17  at trials and at hearings.  So just keep this in mind as we

18  proceed with the case and the trial of this case.

19            MR. WILLIAMS:  I am glad it's the witness's and not

20  counsel's.

21            MR. JAUREGUI:  Your Honor, I had a chance to peruse

22  this PowerPoint presentation that Mr. Williams is about to use.

23  I wish to inform the Court, as Mr. Williams correctly points

24  out, I have never been provided with a copy of this document.

25  I don't think it is fair to me at this point that he is going

1    to be using this document.

2            Specifically somewhere along page 7, there is a

3    document there that says:  Human factors considerations for

4    vertical blinds.  And it contains some information here.  I had

5    asked him during his deposition whether or not he looked at any

6    data and studies, any work related to window coverings as they

7    relate to the use of vertical blinds.  And he said no.

8            So now this is totally new that is being thrown at us

9    at the last minute in a very surprising manner.

10           MR. WILLIAMS:  Your Honor, it was thrown at them about

11   five minutes later than I should have.  We got much more

12   quantity of information from them yesterday that they used.

13   Didn't object to it.  If he has any concerns as we go along, I

14   am happy to have him object to or cross-examination.

15           But this is for the Court's purpose, not a jury.

16           THE COURT:  And, yes.  The whole purpose of yesterday

17   and today was purpose of voir dire.  And so it really is

18   basically all an offer of proof as to what the parties think

19   the expert will testify to, and then an opportunity for the

20   other side to cross-examine as to qualifications and the

21   Daubert issues that arise from those expert opinions.  And so

22   that's why we are doing it now as opposed to before a jury at

23   the jury trial.

24           I think that for my purposes it's useful to have

25   counsel present whatever information they think supports their

Sala - direct                                      202

1    position.  And then the other side can have an opportunity to

2    cross-examine.  However, I am going to, of course, allowing --

3    just by simply allowing an exhibit to be used or testimony to

4    be taken for purposes of the proffer does not mean at all that

5    I am determining that it can be presented to the jury during

6    the trial.

7              This again is for my benefit so that I can assess the

8    issues raised by the parties in their motion.

9              MR. WILLIAMS:  Thank you, your Honor.

10   BY MR. WILLIAMS:

11   Q.   Dr. Sala, if you would, taking a look at the first of the

12   12 slides that I think you prepared for us today.  Could you

13   explain for us in your words what human factors science is, and

14   in particular, because I really do want to tie this hour that

15   we have to this case, what role human factors plays in the

16   design of consumer products.

17   A.   Certainly.  What I have listed here is a fairly concise

18   definition of human factors.  Basically that the human factors

19   is the scientific study of how our capabilities and limitations

20   affect the way in which we use products, and how that can

21   affect the safety, that this definition is fairly dense, and I

22   can attempt to unpack it in the next few slides.

23   Q.   Okay.

24   A.   So first off, the -- as the definition states, human

25   factors is a scientific study.  There is science behind human

Sala - direct                                                    203

1    factors.  It's -- this science is rooted in behavioral

2    sciences, like the kind that I have been professionally trained

3    and educated in.  Cognitive and experimental psychology.  And

4    it has a history that as a field, put together under the human

5    factors rubric, dates back to World War II.

6           The military where it was having issues where well-

7    trained, long-trained pilots were crashing when attempting to

8    land fighters, fighter jets.  But the jets were passing all of

9    the mechanical sort of investigations.  And they couldn't

10   explain the failure due to any mechanical cause.

11          They approached cognitive psychologists to help

12   understand how the cockpit environment, including their

13   displays, the stresses involved in flying this new type of

14   plane, could affect the ability of fighter -- of the pilots to

15   land their plane safely.

16   Q.  So basically this is a field of study specifically known as

17   human factors that's a creature of the last 60, 70 years?

18   A.  Yes.

19   Q.  Okay.  Are there any governmental organizations and

20   particular ones that are concerned with safety that use human

21   factors in the work that they do?

22   A.  Yes, nearly all the governmental agencies will employ human

23   factors scientists to assess how the user affects safety with

24   the product or products that they are in -- interest in.

25   Notably the Consumer Product Safety Commission, the CPSC,

Sala - direct                                                    204

1    employs human factors staff and have them on projects to assess

2    the safety of products, to perform investigations into hazards

3    associated with products.  And then also to look at root causes

4    or mediation to potential hazards.

5    Q.  So there are permanent full-time human factors scientists

6    on staff at the CPSC and this other --

7    A.  Yes, there --

8    Q.  -- organizations that -- I'm sorry.  And these other

9    organizations you listed?

10   A.  Yes.  And there have been for -- for decades.

11   Q.  Okay.  So talk to us a little bit, if you would, about the

12   role that human factors plays in the design of products.

13   A.  Certainly.  So as I said, this science is concerned with

14   how the user interacts with product.  And when thinking of the

15   user, we have to understand that we are limited -- we have

16   ability, but we also have limitations in a variety of ways.  I

17   mean, we are limited through our perceptual, how we take in

18   information, whether that be auditory or visual information, or

19   tactile information.

20          We're also limited in -- by our motor skills.  How --

21   how far we can reach.  Our body size plays into how well we fit

22   into environment.  What we can reach, where we can reach to.

23   As well as our physical strength will relate to what we can

24   operate.

25          Now, often overlooked is also the -- in motor skills

Sala - direct                                    205

1   is one's dexterity.  We can -- we might be able to move our arm

2   in a ballistic sort of a fashion.  But control over fine motor

3   skill is very different.  And that is a different ability in

4   which different portions of the population may be more or less

5   limited.

6           And then finally we're also limited in our cognitive

7   abilities.  Our information processing system is -- is one that

8   is also investigated by cognitive psychologists.  And this

9   relates to how we take in information, how we incorporate that

10  into our memories or expectations or familiarity with -- with

11  systems and environments and product, and how we use that

12  information to change our behavior.

13  Q.  And so how do you take those physical cognitive

14  considerations and apply them to the design of a project in

15  general?

16  A.  Well, oftentimes studies like that in that application, I

17  think it's the -- the marker of usability.  And what we look at

18  is a product and what that product affords the user, what they

19  -- how they can use it, and whether or not the different sorts

20  of modes of interaction, either display, its control

21  mechanisms, even its placement -- how that relates to how the

22  user can be expected to interact with that and how that might

23  relate to safety.

24          We -- we are concerned with things like what

25  population is going to be using this product?  How familiar is

Sala - direct                                               206

1    the person with the product?  What is the environment for its

2    use?  What is the range of environments for its use?

3           And then finally, what expectations does the -- does a

4    user bring to the product?  What do they already know about it?

5    What do they assume they know about it when they are attempting

6    to interact with it?

7    Q.   Okay.  Have you -- in doing the study of your science up to

8    the work in this case, have you reviewed and relied upon

9    literature on the subject of human factors?

10   A.   Yes, I have.

11   Q.   Now, if counsel wanted to question you or cross-examination

12   you or test some of the conclusions that you reached in this

13   case, for example, are there publications that you rely upon

14   that discuss the usability concept that you just described?

15   A.   Yes, there are.

16   Q.   And you relied upon those in reaching your conclusions in

17   this case, among other things?

18   A.   Absolutely.

19   Q.   Okay.  Now, what types of matters have you been consulted

20   in?  The two thirds of your practice that is involved in

21   forensic litigation related consulting, can you give us an

22   overview of the types of products that you've been involved

23   with?

24   A.   I have been involved with a variety of products, many

25   consumers products, different types of appliances, different

1    types of home products, window blinds and window coverings as

2    well.  And then also, as I have stated, a number of child

3    products, strollers, bouncy seats, different sorts of

4    environments where you expect to find a child.

5    Q.   Have you been involved in cases where you were asked to

6    consider the usability of certain types of products and their

7    designs?

8    A.   Yes.

9    Q.   Have you also been involved in cases and qualified as an

10   expert witness to testify in cases where warnings or safety

11   information were one of the issues?

12   A.   Yes.

13   Q.   Okay.  And you understand both of those are in some fashion

14   at issue in this case, correct?

15   A.   Yes.

16   Q.   Okay.  Now, you have been asked to look at a couple of

17   different issues in this case.  And once again, for purposes of

18   keeping us on track and framing the issues that you're going to

19   continue to talk about today --

20           MR. WILLIAMS:  What I'd like now to do, your Honor,

21   is -- I hate to do it, but I am going to ask if I toggle back

22   to the camera for a second, and then go back to the slide show.

23   And I have marked as Exhibit 2 a copy of Dr. Sala's report.

24   And I will offer it to your Honor.

25           And do you have a -- if I may approach, your Honor?

Sala - direct                    208

1           THE COURT:  You may.

2    BY MR. WILLIAMS:

3    Q.  Dr. Sala, is Exhibit 2 a copy of your report in this case?

4    A.  Yes, it appears to be.

5    Q.  What's the date of this report?

6    A.  June 30, 2011.

7    Q.  Okay.  We are going to skip back to the end of your report,

8    the next to last page, page 14.  And I'm going to display it on

9    the screen.

10          Do we see on page 14 a summary of the opinions that

11   you reached after your review of this case?

12   A.  Yes.

13   Q.  Okay.  Now, what I'd like to do before we talk about each

14   of those opinions is briefly summarize them.  The first one

15   addresses the response of Hunter Douglas to the general issue

16   of the child strangulation hazard on window blind cords in the

17   time period before the manufacture of these blinds.  So not

18   focusing on these blinds, but in general in 1980s and 1990s,

19   you looked at how Hunter Douglas responded to this hazard, the

20   identification of this hazard, and did an evaluation of whether

21   you thought its response was reasonable and appropriate,

22   correct?

23   A.  Yes.

24   Q.  And basically you understand, because I told you, that I

25   asked you to do that because an expert for the plaintiffs, Mr.

Sala - direct                                    209

1    Statler, has given some opinions in the same area.

2    A.   Yes, I believe that was the impetus for the -- for that

3    investigation.

4    Q.   Okay.  Then the second bullet point, which to me is

5    probably the most important, I asked you to do an evaluation of

6    the product in this case, and the question in particular of

7    whether with respect to the vertical blinds at issue in this

8    case, Hunter Douglas' decision to offer options with respect to

9    how to operate those blinds -- and to be specific, both the

10   cord and chain option on the one hand and a safety wand,

11   PermAssure wand if you want to call it that on the other

12   hand -- from 1995 forward, but in particular 1995, and whether

13   that decision was a reasonable and safe way, correct?

14   A.   Correct.

15   Q.   And your opinion with respect to that issue is contained in

16   the second bullet point?

17   A.   Yes.

18   Q.   Finally, the third and fourth bullet points both deal with

19   the issue of warnings and safety information, correct?

20   A.   Correct.

21   Q.   With respect to the third bullet point, did I ask you to

22   evaluate the plaintiff's claim in this case that if some

23   different information had been provided by someone to the

24   original purchasers of these blinds, a woman named Brenda

25   Davis, that she would have behaved differently, done something

Sala - direct                                    210

1    differently, purchased a different product.  Have I asked you

2    to evaluate that based upon all of the facts in this case and

3    your training?

4    A.   Yes, from the human factors science standpoint.

5    Q.   And that involved the issues you talked about about

6    behavioral sciences and how people respond to warnings and

7    information and various stimuli, correct?

8    A.   Correct.

9    Q.   And then finally on the fourth bullet point, did I ask you

10   to do an analysis of the plaintiffs' claim in this case that

11   had there been some warnings, additional information, provided

12   to Mr. and Mrs. Padilla, who were not the original purchasers

13   of these blinds, that they would have behaved differently or

14   done something differently that might have reduced the risk for

15   this accident.

16         Have I asked you to look at that claim as well?

17   A.   Yes.

18   Q.   So that's the fourth bullet point, correct?

19   A.   Correct.

20   Q.   Does that fairly frame the issues that you -- upon my

21   request in this case?

22   A.   Yes.

23         MR. WILLIAMS:  Your Honor, if I could ask to toggle

24   back to the PowerPoint presentation.

25   BY MR. WILLIAMS:

Sala - direct                                                    211

1   Q.   Okay.  With respect to the first bullet point conclusion

2   that we just looked at, Dr. Sala, the what I call historical

3   response, tell us what you set forth on the next slide.

4   A.   Well, in order to evaluate this from a human factors

5   standpoint and from a scientific standpoint, I was interested

6   in gathering and putting forward a historical perspective and a

7   data-driving identification of the injury pattern and the

8   response through the years in question.  And in order to -- to

9   assess, as Mr. Statler contended, that -- that even a -- a

10  glancing at this data would have -- would have illustrated the

11  hazards that were present.

12            And to do so, I reviewed the original documentation

13  and reports from the CPSC related to strangulation and

14  identified that in 1981 the CPSC identified that window cords

15  were associated with strangulation events.  But the CPSC staff

16  at that point had also stated that this -- this potential

17  hazard was not amenable to design changes, and recommended that

18  the course of action that should be undertaken is to educate

19  the public and increase the consumer awareness.

20  Q.   When you say the CPSC said it wasn't amenable to a design

21  solution, what's the basis for that statement?

22  A.   Well, in 1981, there was a research investigation put

23  forward by the CPSC.  They had received information of child

24  strangulations for eight years and had -- had referred to these

25  and gone into depth as to what was involved with the -- those

Sala - direct                            212

1    strangulations.  In culmination, they put together a report.

2    And in that report they specifically state that it was not

3    amenable to that.

4         I -- if you like, I can refer to the report to get the

5    exact language.

6    Q.  Can you pull it out and give us a citation and author and a

7    date please?

8    A.  The report -- the report is a memorandum with the subject

9    of Infant Strangulations.  It is written by Terri, that's

10   T-e-r-r-i, Rogers, who is the project manager for Children's

11   and Recreational Products Program, Office of Program

12   Management, with the CPSC.  And specifically on page 2, he

13   writes -- or she writes, I apologize:  Some products that were

14   frequently involved in strangulation accidents do not appear

15   amenable to product design changes or elimination as a

16   potential strangulation risk.  Many are not children products

17   and serve other useful purposes in households.  Examples of

18   these products include drapery and blind cords, ropes, strings

19   and cords not otherwise specified, electrical cords and

20   bedding.

21   Q.  Okay.  So that's 1981.  And the CPSC at least at that time

22   was focusing on education to increase consumer awareness, as

23   you succinctly state in your slide?

24   A.  Yes.

25   Q.  So let's move forward to mid-1980 time period.  We know

Sala - direct                                                213

1   there was a significant press release from the CPSC and the

2   industry together sometime in 1985, correct?

3   A.  Correct.

4   Q.  What -- what went on then?  What was happening and what was

5   evolving?

6   A.  Well, as the CPSC continued monitoring strangulation

7   events, they began to investigate more.  And they teamed and

8   partnered with industry at this point.  They approached the

9   industry, and they shared with the industry some of their data.

10          Now, what I think is important to understand what the

11  CPSC is that as a watchdog of consumer product safety.  They

12  have access to databases and they maintain databases of child

13  or actually anyone's injury but particularly child injuries

14  with respect to consumer products.

15  Q.  And what's that database referred to?  Or you said there

16  are databases, multiple.  What are they, and what are they

17  called?

18  A.  There are a few.  The one significant one is the National

19  Electronic Injury Surveillance System, otherwise known as the

20  NEISS database.  Now this is a statistical sampling of hospital

21  emergency rooms.  I believe it's approximately a hundred or a

22  hundred and one hospital emergency rooms from across the

23  country.  They're divided and categorized into strata as to how

24  large a population and what sort of population they serve.

25  Q.  So is there demographic diversity?

Sala - direct                                214

1   A.   Correct.

2              And from this sampling, they take in and they -- they

3   process every injury that is seen in the emergency room and

4   gather information related to the age of the person involved,

5   what type of injury, what the diagnosis was, the status of the

6   injury, or whether or not the person was treated and released.

7              They also take in information as to what products, up

8   to two products, that are associated with that injury.  And

9   then also a brief narrative to help fill in the blanks as to

10  what might have happened at the time of the injury.

11  Q.   Now, with respect to certain accidents that make their way

12  into the NEISS database, does the CPSC in some cases go further

13  and do investigations into those accidents?

14  A.   Yes.  One of the -- one of the goals of the NEISS database

15  is to provide nationally representative estimates of injury.

16  However, additionally, when the CPSC is investigating, or

17  particularly interested in a type of accident, like window

18  coverings and strangulations, they will also choose to

19  investigate further certain incidents that have come to their

20  attention through the NEISS database.

21             And when they do that, they call those in-depth

22  investigations, or IDIs.  This is where they send an

23  investigator out into the field.  They often will interview or

24  visit the accident site.  They will talk with either the first

25  responders, the people involved, the coroner if it's a

1   fatality.  And they will issue a report laying out as many

2   details at possible, and at times offering opinions as to what

3   various causes or contributing factors there were.

4   Q.  Okay.  So by the mid-1980s, when this press release came

5   out, educating the public or adding to the notification and

6   awareness of window blind cord hazards, what was the focus of

7   industry and CPSC on what the issues were and how to attack

8   them?

9   A.  Well, at this time, the CPSC and the industry in review of

10  this data were developing an understanding of how these

11  incidents happened and what the most likely accident scenario

12  were.  And what often was found was that these incidents were

13  occurring in bedrooms.  They were occurring when a child was in

14  a crib and they gained access to what was typically horizontal

15  or mini blinds and the pull cords of mini blinds.  These were

16  either instances where a child would put their head through a

17  formed loop or wrapped the cord around their neck somehow, and

18  then either fall or move into a position where they couldn't

19  get the -- themselves out of.

20          In immediately addressing this, they again focused on

21  recommendations to parents to try and keep children away from

22  the cords.  The idea was to keep cribs and child furniture away

23  from windows and window coverings, to investigate cord

24  management techniques, wrapping cord up.  Even something like

25  putting a safety pin or safety -- clothes pin around the cord

Sala - direct                                       216

1    was suggested, so as to keep the cord itself out of the reach

2    of the child if they couldn't otherwise position the child away

3    from the cord.

4    Q.   Okay.  Then moving into the 1990s, did Hunter Douglas and

5    others begin to appreciate that something more than the

6    education needed to be done in order to address the

7    strangulation hazard posed by certain types of window blinds?

8    A.   Yes.

9    Q.   What went on in the early 1990?

10   A.   In the early 1990s, there was significant efforts from both

11   the CPSC and the industry working in partnership to develop an

12   engineering fix to -- or engineering solution to this overall

13   accident pattern.  And they investigated ways to do so, coming

14   up with a retrofit campaign in order to address the most

15   significant of the concerns, which was the horizontal blinds in

16   children's bedrooms.

17        The suggestion was to use what's known as a break-away

18   tassel at the -- where cords that were -- controlled the

19   horizontal blinds came together, so that if a child were to put

20   their neck into this -- this area and then rest their weight on

21   it, the weight that was concentrated where that -- that

22   break-away tassel was would give way and the child would be

23   released.

24   Q.   Now, you mentioned horizontal blinds were the focus.  Why

25   was that?  We heard a lot yesterday and throughout this case of

1    what's the difference between a cord on a horizontal blind and

2    a cord on vertical blind.  As you reviewed the history and the

3    information from Hunter Douglas as well as the CPSC, in your

4    words, what if anything differences are there between

5    horizontal and vertical blinds, and why were horizontals the

6    focus of the effort in 1990s?

7    A.  I think that there are probably a number of reasons why the

8    horizontal blinds were the focus and -- and honestly rightfully

9    so given the data that was available at the time.  When one

10   looks at the -- the underlying data, I've gone back.  I

11   reviewed the IDIs that were available in this time frame.  And

12   I reviewed the -- the sorts of analyses that were being

13   performed and put forward by these organizations.

14        The pattern that really does evolve is that these

15   horizontal blinds, they were the ones involved in the vast

16   majority.  I believe the -- in approximately 86 percent of all

17   of the -- the strangulation events it was a -- it was a

18   horizontal blind.

19        There are a number of reasons why this might be.  I do

20   believe that -- that horizontal blinds are the most represented

21   in the marketplace.  But then also they are -- they were the

22   ones that were most frequently placed in bedrooms near these

23   cribs where children were gaining access to them.

24        Now, finally also I believe that part of the issue as

25   to the focus was that there was a design -- a design fix in

Sala - direct                                             218

1    sight for this type of a product.  The break-away tassel was

2    well suited for the horizontal blind and would address the vast

3    majority of the strangulation events.

4    Q.  Did it affect the utility of horizontal blinds in any way?

5    A.  No.

6    Q.  So when the safety tassel was developed -- by the way, do

7    you know what company developed that?

8    A.  I believe that Hunter Douglas was involved in the

9    development of that tassel.

10   Q.  When that tassel was developed, was it one that could be

11   applied to all horizontal blinds without affecting their

12   utility?

13   A.  Yes, all horizontal blinds, yes.

14   Q.  Okay.  So there was a retrofit campaign in the 1994-1995

15   time frame involving horizontal blinds in which the break-away

16   tassel was made available for free to any consumer, and all new

17   products began to be manufactured with it, correct?

18   A.  Correct.

19   Q.  Education campaign continued, correct?

20   A.  Correct.

21   Q.  And then not long after 1994 comes 1995.  Of course that,

22   we know, is when the blind at issue in this case, the vertical

23   blind, was manufactured.

24        What was Hunter Douglas doing in particular with

25   respect to looking at the hazard -- because even though it

1    involved fewer products, many fewer products, you know, there

2    were cases that had been reported involving strangulations on

3    vertical blind cords, correct?

4    A.   Correct.

5    Q.   What did Hunter Douglas do?

6    A.   Well, my understanding is that by April of 1995, Hunter

7    Douglas had developed a solution to the -- to this potential

8    hazard as well.  They developed the PermAssure wand, which

9    eliminated the looped cords or the continuous loop cord in the

10   vertical blinds.

11   Q.   Okay.  So we are going to move now away from the historical

12   review.  Does that essentially summarize what you looked at and

13   the bases for your opinions that Hunter Douglas was acting

14   reasonably in responding to the strangulation hazard generally

15   in the '80s and '90s?

16   A.   Yes.

17   Q.   Now I asked you to turn to your second opinion, and that is

18   the one that it was reasonable, prudent and safe for Hunter

19   Douglas to offer consumers the choice in 1995 when the

20   PermAssure wand came out of either the wand or the cord and

21   chain, right?

22   A.   Yes.

23   Q.   Tell us what you did in performing that analysis and what

24   you relied upon.

25   A.   Certainly.  Now I think that again, it's -- it's worth

Sala - direct                                                     220

1    looking at the differences that we have for something like the

2    horizontal blind and the vertical blind.  And that's really

3    what the human factors considerations comes down to here.  The

4    vertical blinds are a different product.  And they have

5    different needs and they have a different environment.  And we

6    have to consider these things when we are -- when we are

7    determining whether or not an engineering solution is

8    appropriate for the product.

9           With the horizontal blind, the control mechanism -- a

10   user will approach the blind.  They will reach out and grab the

11   cords or cord, depending on how many cords are coming down.

12   They will be joined by this break-away tassel.  And user will

13   operate them by pulling down continuously on it.

14          And then to release or to lower the blinds, they would

15   pull on it again and raise the cords.

16   Q.   So all the cords are moving together in the same direction

17   all the time?

18   A.   Yes.  And consistently the force is being applied in a

19   single direction on these cords.

20   Q.   What's the difference with the vertical products?

21   A.   Now with the vertical product, we have a continuous loop

22   that feeds through the entire mechanism.  And so as one reaches

23   to maybe move the slides -- or move the veins from the left to

24   the right, one will grab the cord and pull it down, feeding the

25   cord -- the rest of the cord back into the control mechanism.

1    Now, to then operate in the other direction, one grabs the

2    other side of this and pulls on the same cord.

3             A break-away tassel or positioning the -- a break-away

4    tassel would limit the -- or actually remove the utility of

5    this product because as one pulls on one side of it, they would

6    be pulling and activating the break-away tassel.  And the

7    product would no longer be usable.

8    Q.   You would have much more than three or four pounds of

9    pressure below the tassel at some point, and that will cause it

10   to break apart?

11   A.   Correct.

12   Q.   So that explains why the break-away tassel wasn't a fix for

13   the loop on vertical products.  You understand that Hunter

14   Douglas developed and introduced the PermAssure wand in the

15   spring of 1995, correct?

16   A.   Yes.

17   Q.   But they continued to offer for sale vertical blinds if

18   consumers chose with the cord and chain, correct?

19   A.   Yes.  And once again, that relates to the utility and the

20   functioning of the product.

21   Q.   Okay.  Why?  Why -- because that's if not the big issue --

22   I think it is the big issue -- is a key issue in this case.

23   Why was it reasonable?  Why was it prudent?  Why was it

24   consistent with safe practices to continue to make that option

25   available to certain consumers?

Sala - direct                                    222

1    A.   Certainly.  So the wand places demands on that control

2    mechanism that otherwise wouldn't be there for users.  So

3    again, when we are trying to decide -- to look at the human

4    factors consideration in design of a product, we are looking at

5    who the users might be.  We're looking at what size they are,

6    how far they might be able to reach, where they might be able

7    to reach to, how strong or what sort of mobility issues they

8    might have, how dexterous they might be, how good they are in

9    fine motor control, and whether or not they would likely have

10   any disabilities or diseases that would limit these.

11        Additionally, we're interested in what is the range of

12   these uses.  And for many of these things, how is these -- how

13   do these aspects change with the development or with age of a

14   person.

15        The other side of this that we would consider, aside

16   from just who's expected to use the product, is the environment

17   that it's going to be used in.  Now, vertical blinds are going

18   to most often be placed in living rooms or over sliding glass

19   doors, where there is a large bank of windows.  What that is

20   often associated with is furniture, constraints on the

21   environment, that might limit the available space for either

22   someone to reach or someone to move around in order to -- to

23   reach to the control mechanisms.

24   Q.   Have you elected a couple of photographs from catalogs and

25   the internet that simply provide examples of what you're

1   talking about when you talk about the environment of vertical

2   blinds?

3   A.  Yes, yes.  These are examples of -- or photographs of where

4   one might find vertical blinds and the types of vertical

5   blinds, a range of vertical blinds that might be in a home

6   environment.  And what is -- what I'd like to highlight with

7   these is that the environment here is going to be very varied

8   and place demands on a user.

9          If a user were to approach a vertical blind and have

10  the control mechanism be the wand, the PermAssure wand, they

11  would have to reach for and access that wand and then move with

12  that wand the entire length or run of how they wish to open the

13  blind.

14         So for instance, in one of these images, if this was a

15  blind that had a control mechanism at its left edge, and I

16  am -- in particular I am considering the lower right image

17  here.  If one were to approach that wand, they would need to

18  grab it and then walk the entire length and possibly behind

19  that couch in order to open that blind fully.

20         Now the other aspect of the PermAssure wand was that

21  the tilt mechanism or the tilting of the veins was accomplished

22  through a twisting motion with the wand.  And that is a fine

23  motor skill.  That is something that you require not a simple

24  ballistic motion as you would with possibly opening them, but

25  something that requires fine motor control.  And each of these

1   constraints places a demand on the potential user.

2   Q.   Okay.  Now, you talked about the environment just now.

3   Before that you were talking about the -- the limitation on the

4   individuals.  Are there published peer review studies that you

5   rely upon in forming your opinions that there are significant

6   segments of the population that would not be able to utilize,

7   even on a small window that wasn't very high, the wand to

8   operate it?

9   A.   Yes.

10  Q.   And have you produced in conjunction with your file in this

11  case to plaintiff's counsel copies of those studies to be able

12  to be cross-examined on?

13  A.   Yes.

14  Q.   Are those the types of studies that human factors

15  scientists such as you routinely rely upon in doing evaluations

16  such as the one you done in this case?

17  A.   Yes, they are.

18  Q.   Now, Dr. Sala, with respect to your opinion that it was

19  reasonable, prudent and safe for Hunter Douglas to continue to

20  offer consumers this choice in 1995, is that a unique situation

21  in which a manufacturer properly offers consumers the choices

22  of various products, one distinction among them possibly being

23  relative levels of safety?

24  A.   No, I don't believe its -- it's unique.

25  Q.   Have you seen that before?

Sala - direct                                    225

1    A.  Yes, indeed.

2    Q.  Can you give us a couple examples?

3    A.  One example would be related to -- to car seats, child car

4    seats.  There is a range of options.  There are a number of

5    different styles and types of car seats.  There is rear facing

6    car seats, forward facing car seats, booster seats.  And the

7    idea is that as your needs and as the child's needs change, you

8    take into consideration which ones might be appropriate for

9    your usage.

10          Now, the sciences is fairly clear on this that the

11   rear facing child seat provides the greatest crash protection.

12   This is something that -- that could be found throughout a

13   number of years of research.  However, the -- we still offer

14   other types of car seats all the way up to booster seats which

15   are basically just repositioning the child into the vehicle's

16   own restraint system.

17          We currently have -- and there are products on the

18   market that allow for children of significant size and age to

19   be seated in some of these -- these five-point harness

20   restraints.  Yet people will produce and will make choices to

21   use other restraint systems.  And that is something that --

22   that is considered a reasonable line of products.

23   Q.  Considered reasonable by you and others who are involved in

24   everything from that industry to the Consumer Product Safety

25   Commission?

1   A.   Yes, and also the federal government.

2   Q.   Okay.   Now, so for example, if -- if a manufacturer of car

3   seats were required under the law, as has been suggested, to

4   make available for consumers and only make available the safest

5   possible car seat that could be manufactured for a child of a

6   certain size, if that were the case and they would not be able

7   to offer booster seats or forward facing seats with less than

8   five point harnesses, things like that, correct?

9   A.   Yes.

10  Q.   In your opinion, those situations, though, involved

11  reasonable balancing of risks, and the decision to offer

12  consumers choice there is a reasonable one, correct?

13  A.   Correct.

14  Q.   And have you concluded in this case that the choice being

15  offered by Hunter Douglas of the various operating mechanisms

16  on this set of blinds produced in 1995 was prudent, safe and

17  reasonable as well?

18  A.   Yes.

19  Q.   Okay.   I'm going to ask you to pivot one more time.   I am

20  going to tell you that by my watch we have about eight minutes

21  left together.   And we need to stay on track.

22          So can we turn now to the science of warnings and the

23  analysis that you've done here.

24  A.   Yes.

25  Q.   What's involved -- when you say, science of warnings.

1    That's the heading on your first slide.  What do you mean by

2    that?

3    A.   Well, human factors addresses warnings information from a

4    scientific perspective.  There has been 40-plus years, four

5    decades, of empirical research on people's response to warnings

6    and on warnings in general.

7             One of the key areas that we investigate is the likely

8    effectiveness or the -- what is the behavioral response to

9    warnings.  And our scientific investigations largely allow us

10   to built frameworks of the conditions and the situations in

11   which one would expect -- or one would expect behavioral change

12   or what would be more or less likely to affect behavior change

13   with response to warnings.  And we use this information to

14   extrapolate or predict human behavior.

15   Q.   And in the litigation context, do you look at that because

16   you often are presented with a claim that if some different or

17   additional warning had been presented, then an accident would

18   have been prevented?

19   A.   Yes, that's -- that's typically the impetus, and that's the

20   hypothesis, that additional information would have led to

21   different behaviors.

22   Q.   And as part of that analysis, in your opinion, is it

23   necessary to look not only at whether in theory there could

24   have been a better warning, but even if there had been what the

25   likelihood is that that would have affected the behavior of the

Sala - direct                    228

1   people involved?

2   A.   That's where we turn to the science, yes.

3   Q.   So let's continue on with your next slide.

4   A.   What we have learned over the years is that warnings

5   have -- they can do certain thing.  If you provide safety

6   information, and your expectation is that it's going to change

7   behavior, the role of the warning, what warnings really do is,

8   they can present this information.  You can present it in a

9   clear fashion.  You can present it where -- where a user might

10  need to access it.  And you can try to be as concise and

11  understandable with this information as possible.

12        But what a warning can't do and what a warning does

13  not do is, it does not compel behavior.  You can't design

14  effectiveness into a warning.  The effectiveness of a warning

15  is dependent upon the person's or the receiver's response to

16  that warning, what they choose to do with that information and

17  how they would either change or modify the behavior in response

18  to it.

19        What we know from the science is that there are a

20  number of factors that make this very difficult to achieve and

21  often will not.  And specific factors that include previous

22  benign experience with the product, familiarity with the

23  product, the amount of effort that would be involved in taking

24  that behavior, and also one's own perception of control over

25  the hazard.

1  Q.  Have I asked you to give a couple of examples of peer

2  reviewed published studies that demonstrate the points that you

3  are talking about?

4  A.  Yes.

5  Q.  Okay.  Can you turn to those?

6  A.  Certainly.  This -- this first example is from a study

7  where subjects were asked to interact with a hammer.  And they

8  had a fairly simple task.  They needed to start a pilot hole in

9  a piece of wood with a hammer and nail.

10       Now, the original study had presented a warning on

11  this hammer, and there were various warnings that were

12  presented.  One of them says, caution, do not proceed further.

13  Ask for instructions before you continue this operation.  It is

14  important that you do not use this hammer to strike.

15       Now, in the actual experiment, no subject saw this

16  warning.  No subject noticed it or complied with this warning.

17  Q.  It was located on the handle of --

18  A.  Yes, it was right on the handle of the hammer.

19       Interestingly when people were asked, when they were

20  presented with this idea that you were going to be presented

21  with this hammer with this warning on it, and it was asked,

22  would you comply with this warning, approximately half the

23  people said, yes, I would comply with that warning.

24       When asked if others would comply with this warning,

25  they -- slightly fewer percentage of people said that on -- in

Sala - direct

1    total about half the people would comply with this warning.

2    Yet when you compare that to the actual compliance rate, zero

3    percent of people complied with this warning.

4    Q.   Okay.  Is -- have studies like this been done across

5    product types?

6    A.   Yes, indeed.

7    Q.   And what types of products?

8    A.   Well, the big finding is that these sorts of results with

9    respect to warnings are not dependent on the product type.

10   They cut across numerous products, consumer products, work

11   environment, work products.  Everything from jigsaws and

12   intersection stop signs to car seats and child restraints.

13   This has been shown many times over and over that people

14   oftentimes will not notice the warning.  When they do notice

15   it, they largely do not comply with it.

16          Yet asked in the abstract of whether or not they would

17   or others would, they often endorse that, yes, they would

18   comply with that warning.

19   Q.   Okay.  And our examples, in particular some of the studies

20   that you have referred to today and others that you rely upon

21   been provided by you as part of your file in this case to

22   plaintiff's counsel?

23   A.   Yes.

24   Q.   Okay.  So to summarize with respect to the issue of

25   warnings, what does the research tell you that is relevant to

1   your analysis in this case?

2   A.  Well, for -- as a summary and relevant to this case is that

3   oftentimes users do not even notice on-product warnings, even

4   when those products -- or those warnings are conspicuous, when

5   they involve formatting elements that people would think would

6   make them more conspicuous.  Color, bold lettering, larger

7   lettering.

8           When warnings are actually noticed, the compliance

9   rates are typically low.  People tend not to follow the

10  warnings, especially on products that are familiar to them,

11  that they've had benign experiences with in the past, and that

12  they feel that they would have control over otherwise.

13          And then finally, importantly, people don't understand

14  their own behaviors with respect to -- they don't have an

15  insight as to what their behavior or other behaviors would be

16  in response to safety information.  Largely they overestimate

17  what their own compliance and what other's compliance would be

18  with posted warning information.

19  Q.  And is that relevant to your analysis of whether some

20  different or additional warning, despite what people say they

21  would have done if they had received it -- what in fact if any

22  different behavior that would have prompted?

23  A.  Yes.

24          MR. WILLIAMS:  Okay.  Your Honor, if I could indulge

25  you one more time to go back to the camera on the display, I'll

1    wrap up.

2    BY MR. WILLIAMS:

3    Q.  As we discussed at the outset, Dr. Sala, your last two

4    points relate to the general subject of warnings.  In the

5    interest of time, I am not going to touch on the one relating

6    to Ms. Davis because I don't think it's as important.

7              With respect to Mr. and Mrs. Padilla, though, you have

8    expressed the opinion they did not demonstrate safety

9    information seeking behavior.  And that your conclusion is that

10   there is no scientific reason to believe that either additional

11   or alternative warnings or safety information provided with the

12   product would have altered their behavior.

13             Are you saying that they are bad parents?

14   A.  No.

15   Q.  Are you criticizing them in terms of the household that

16   they ran or the love and care and attention they gave their son

17   Max?

18   A.  No, not at all.

19   Q.  Is this conclusion that you reached based solely on nothing

20   specific or personal to the Padillas other than factual

21   information about other things that were around the house, for

22   example the television that Mr. Padilla said he was concerned

23   about falling on Max but didn't do anything about?

24             Is that the basis of your opinions with respect to

25   bullet point No. 4?

                              Sala - direct                        233

1    A.  Yes, I pulled from their testimony in the evidence facts

2    that -- that align them with the typical response to these

3    warnings, and certainly did not put them outside of what you

4    would expect from the scientific literature.

5    Q.  So they are not unusual.  They don't have to be unusual in

6    order to be in a class of people that additional warnings in

7    all likelihood wouldn't have made any difference to?

8    A.  Correct.

9    Q.  Dr. Sala, to wrap up, with respect to each of your four

10   opinions in this case, did you have sufficient data to form

11   each opinion, in your view?

12   A.  Yes.

13   Q.  Did you, in forming each of these opinions, use reliable

14   principles and methods of the science of human factors?

15   A.  Yes.

16   Q.  And have you applied those principles and methods to the

17   facts of this case in particular in reaching each of these

18   conclusions?

19   A.  Yes.

20   Q.  So fair to say, you applied the scientific method of human

21   factors to your analysis in this case in reaching each one of

22   these four opinions?  And I'm lumping them together only in the

23   interest of time.

24   A.  Yes.

25           MR. WILLIAMS:  Thank you very much.

1          Thank you, your Honor.  Those are all the questions I

2     have.

3          THE COURT:  Thank you.

4          As a matter of timing, I just want to let counsel know

5     that today I do have a previous engagement at noon.  And so we

6     are going to take a break during your examination at noon until

7     1:00.  And then we'll come back and you can continue your

8     examination at that time.

9          MR. JAUREGUI:  That's fine.

10          MR. WILLIAMS:  Thank you, your Honor.

11          Dr. Sala, are you good on water?

12          THE WITNESS:  I am.  Thank you.

13                        CROSS-EXAMINATION

14     BY MR. JAUREGUI:

15     Q.  Good morning, Dr. Sala.  How are you?

16     A.  I am doing well.  Thank you.

17     Q.  Good to see you again.

18          You indicated earlier that you had a doctorate in

19     cognitive neuroscience?

20     A.  Yes.

21     Q.  And on your -- and the report that you prepared for this

22     case, you indicate you had a doctoral in experimental

23     psychology.  Is there a difference between the two?

24     A.  The -- I believe the actual doctorate degree just says

25     doctor of philosophy.  The nomenclature of the topic area is

Sala - cross                                235

1    really related to what the program offered.  And it was the

2    psychological and brain sciences.  I studied cognitive

3    neuroscience, experimental psychology, cognitive psychology.

4              There is many sorts of disciplines covered by that

5    department.

6    Q.   My question is very simple.  So is your degree -- is your

7    doctorate in experimental psychology?

8    A.   That's what I studied.

9    Q.   That's what your diploma says?

10   A.   Again, as I stated, the diploma just says, doctor of

11   philosophy, and the department that I got it from.

12   Q.   What department was that?

13   A.   Psychological and brain sciences.

14   Q.   And experimental psychology, is that an area of study that

15   is pretty much -- is the field of experimental psychology -- is

16   that a field that is pretty well settled and established?

17   A.   I think that is -- like many scientific disciplines, it's

18   evolving.

19   Q.   It's evolving area.

20   A.   Yes.

21   Q.   Now, Doctor, you're not a -- you are not an engineer, is

22   that correct?

23   A.   Correct, I'm not an engineer.

24   Q.   And for purposes of this case, you did not do any

25   independent studies, is that fair?  Is that a fair statement?

Sala - cross

1   A.   Independent studies, no, I don't believe I did any

2   independent studies.

3   Q.   So you relied on information, other studies that other

4   people have done.  But specifically you did not do any studies

5   such as any ergonomic studies?

6   A.   I did not perform any sort of experimental studies where I

7   would bring people into a laboratory, no.

8   Q.   All right.  Now, the company that you work for, how long

9   have you worked for them?

10  A.   Approximately eight years.

11  Q.   How many employees are at Exponent, approximately?

12  A.   I believe we have somewhere on the order of three or 400

13  full-time consultants.

14  Q.   Is that a national company or is it worldwide?

15  A.   We are international.

16  Q.   International.  Okay.

17           And is Exponent primarily a company that does

18  consulting for corporations?

19  A.   We are a scientific and engineering consulting firm.  We'll

20  work on behalf of clients that retain our services.  Oftentimes

21  it's companies.  Sometimes in this -- in situations like this

22  it's law firms that are representing parties in a lawsuit.

23  Q.   Okay.  In this case you are working for a corporation,

24  right, Hunter Douglas?

25  A.   Well, I have been retained on behalf of counsel, or by

Sala - cross                                    237

1    counsel on behalf of Hunter Douglas, yes.

2    Q.   Now, Doctor, you have not published any articles or studies

3    relating to the issue of strangulation from window blind cords,

4    is that correct?

5    A.   I don't believe I have.

6    Q.   And you have never designed any window coverings, is that

7    correct?

8    A.   I have never designed actual window coverings, no.

9    Q.   And you did not have any experience in manufacturing window

10   coverings, correct?

11   A.   I do not.

12   Q.   And you have no experience in the marketing or distribution

13   of window coverings, correct?

14   A.   I have no experience in marketing in general.

15   Q.   You do not have any information one way or the other

16   whether Hunter Douglas did any testing on the safety as it

17   relates to the strangulation of young children from the cords

18   of the vertical blind at issue in this case?

19   A.   I'm sorry.  Can you repeat the question?

20   Q.   Yes.  You have no information as to whether Hunter Douglas

21   conducted any testing relating the strangulation to young

22   children from the cords of vertical blinds?

23   A.   I -- I'm limited to what has been discussed in this case as

24   far as the -- what Hunter Douglas' activity have been.  And I'm

25   not aware of any sort of testing, as I think you're referring

Sala - cross                    238

1    to.

2    Q.  Did you ever ask for whether or not such information

3    exists?

4    A.  No, I -- my historical analysis was limited to the

5    information that was available and the role that Hunter Douglas

6    took in those efforts.  But otherwise I didn't ask any sort of

7    more internal or private sort of work.

8    Q.  Would that have been relevant to your inquiry here, whether

9    or not there had been any testing done relating to the risk of

10   the injury to young children from vertical cord blinds?

11   A.  I don't know how that would have affected my analysis.

12   Q.  Would not have been relevant?

13   A.  I don't think that that would affect my analysis, no.

14   Q.  Doctor, I want you to take a look at your resume -- not

15   your resume.  Your report for this case.  We are going to do

16   that again fairly quickly as to follow Mr. Williams' mode of

17   operation here.

18          I need you to take a look at starting on page

19   number -- page No. 4.  There is some markings.  You can

20   disregard that.

21          Have you essentially -- one of the -- one of the first

22   opinions in this case is the conduct or the response of Hunter

23   Douglas was reasonable in light of what was known at the time.

24   Is that fair?

25   A.  I believe that's similar to what I was stating before, yes.

Sala - cross                                      239

1   Q.  And so you traced back the history to beginning in 1981,

2   correct?

3   A.  Yes.

4   Q.  And you cited the information that you used for the -- in

5   support of your historical research, correct?

6   A.  Yes.

7   Q.  And in fact, if you go from page No. 4 to page No. 5,

8   essentially you continue to do the same historical background,

9   what was going on in the industry, the how -- what information

10  was known.  You take a look at the data from the Consumer

11  Product Safety Commission.  You documented in there how the

12  Consumer Product Safety Commission was reacting to that

13  information, how that information was being shared with the

14  window covering industry, correct?

15  A.  I believe so, yes.

16  Q.  All right.  And on page No. 6, it's pretty much you

17  continue with the same exercise, except now you're dealing with

18  a different period of time.  Now, you are dealing with a

19  retrofit campaign from 1995 to 1996, is that fair?  That's on

20  top of the first paragraph?

21  A.  Yes, this continues the sort of historical analysis that --

22  Q.  All right.  Then --

23  A.  The historical analysis that was performed.

24  Q.  And you continue to detail that pretty much

25  chronologically, what was going on in the industry in the

Sala - cross                                    240

1  middle of the page.  You indicate a study from the -- a 1997

2  study, Journal from the American Medical Association article,

3  is that correct?

4  A.  Yes.

5  Q.  And it breaks down the percentages of how children were

6  being strangulated from window covering cords, fair?

7  A.  Yes.

8  Q.  And you continue the same analysis on page 7, is that

9  correct?  Chronological historical background that you did.

10  Now you are into August 2002, a recall of the blinds for

11  horizontal blinds, correct?

12  A.  I believe that is covered here.

13  Q.  All right.  And on page 8 of your report, again you

14  continue to -- you concluded that is the end of your report,

15  your review of the historical data on the first paragraph,

16  correct?

17  A.  I believe that finishes the section.

18  Q.  And the first paragraph deals with a Window Covering

19  Manufacturers Association or the Window Coverings Safety

20  Council and what they were doing in terms of the work that they

21  were doing in connection with the Consumer Product Safety

22  Commission, correct?

23        MR. WILLIAMS:  Objection, vague.  I'm not sure.  I'd

24  like to follow where he is referring to, please.

25        MR. JAUREGUI:  On top of the page.

1           MR. WILLIAMS:  The four lines?

2    BY MR. JAUREGUI:

3    Q.   This four lines top of the page, essentially you're

4    documenting in there or you're chronicling the work the WCMA or

5    WCSC -- they were interacting with the commission.  And you --

6    and you cited there a 1994 article, correct?

7    A.   1994 release, yeah.

8    Q.   All right.  So if you go back to page 4 of your report just

9    for one quick minute there, I see that you start citing the

10   information at footnote No. 25.  The information that -- your

11   historical chronicling of that information.

12   A.   That -- that is the first footnote in --

13   Q.   That's the first footnote.

14           And then if you go all the way to page No. 8, your

15   last footnote associated with that summary is footnote No. 50,

16   correct?

17   A.   Yes.

18   Q.   All right.  So essentially you went back in history, and

19   you look at the data.  You look at the information.  And you

20   made a determination that what was known at the time by the

21   industry and how Hunter Douglas reacted in response to the

22   information that was known, that Hunter Douglas acted

23   reasonable in their actions in responding to the danger posed

24   by window covering cords.

25           Is that a fair statement?

Sala - cross                                    242

1    A.   The -- the historical data that -- the data that was

2    available at the time, the -- these publications, the IDIs that

3    I reviewed, yes, these served as a data source for me to

4    consider in that evaluation.

5    Q.   So -- and at the end of the day, you are telling the Court

6    here that essentially Hunter Douglas did what everyone else in

7    the industry was doing.  They did whatever the commission asked

8    them to do.  And because they did what they were asked to do

9    and because on the basis of the information that they knew at

10   the time, that the conduct of Hunter Douglas was reasonable in

11   light of that information?

12            MR. WILLIAMS:  Even in this setting I will object to

13   that.  That misstates his testimony, your Honor.

14            THE COURT:  You can go ahead and answer.

15   BY THE WITNESS:

16   A.   I don't agree that that's what I would --

17   BY MR. JAUREGUI:

18   Q.   Please go ahead.  If you disagree with that, what part of

19   the question do you not agree with?

20   A.   I think that when you first phrased the question, you said

21   what I would be stating is that since they were doing

22   everything else.  I -- not putting into that context, I look at

23   the data available, the development of this knowledge over

24   time, how it came about, what available information there was,

25   and make determinations that based on that data, what were the

Sala - cross                                          243

1    reasonable options and what were the -- what would be the

2    likely focus.

3              Hindsight being 20/20, and you see all of this data at

4    once and you know what was eventually done, that's not how the

5    designed process actually works.

6    Q.  I am not suggesting that.  Okay?  What I'm asking you is,

7    as of 1995, let's take 1995.  Hunter Douglas knew by 1995 that

8    since 1981 window covering cords were acting -- or causing the

9    strangulation of young children.  Fair statement?

10   A.  That children were strangling in window cords.

11   Q.  Yes.

12   A.  In 1995, yes.  This was -- this was something that they

13   were considering.

14   Q.  Okay.  So by 1995 they already had a history of knowledge

15   of prior incidents of strangulation of young children by window

16   covering cords, correct?

17   A.  By 1995 they had -- yes, they -- they had understood the

18   hazard.  And they had worked before 1995 to come to that

19   understanding and to design solutions to it.

20   Q.  And one of those solutions that Hunter Douglas arrived at

21   by early 1995 is to respond to the danger of strangulation they

22   developed a vertical blind with a wand?

23   A.  Yes, in 1995, I believe April.  By April 1995 they

24   developed the PermAssure wand.

25   Q.  That's right.  And it was April 1995.

1          And you understand that the blind at issue was

2    manufactured or sold sometime in October of 1995?

3    A.  Yes, that's my understanding.

4    Q.  All right.  And you are testifying here that

5    notwithstanding the knowledge that Hunter Douglas had about the

6    historical data in the more than a hundred 70 strangulations

7    that had taken place up to then, that Hunter Douglas was

8    reasonable in the conduct by continuing to manufacture and

9    design and market to the public a vertical blind that contained

10   loops, the very same danger that had been identified by the

11   Consumer Product Safety Commission and that Hunter Douglas

12   acknowledged that it existed.

13   A.  I -- I -- I believe that we covered that, that I have

14   reached opinions as to the reasonableness of the decision to

15   offer the option of the continuous loop control as well as the

16   PermAssure wand on vertical blinds at that time.

17   Q.  And that was reasonable for Hunter Douglas to do?

18   A.  Yes, I believe that's my opinion.

19   Q.  So if the Consumer Product Safety Commission did not tell

20   Hunter Douglas that they should do something about a problem

21   that Hunter Douglas already knew was causing deaths of children

22   by strangulation, as a human factors expert you are okay with

23   that?  You are not having any problems with that?

24   A.  I -- I -- I don't agree with that statement.  I'm having

25   difficulty following your question.

Sala - cross                                    245

1   Q.  All right.  One second.

2           Did the Consumer Product Safety Commission ever order

3   Hunter Douglas to recall any of its products?

4   A.  I don't know offhand if there is a specific recall.

5   Q.  If the Consumer Product Safety Commission had told Hunter

6   Douglas that it should recall its vertical blinds, then you

7   wouldn't have any problem as to -- strike that.

8           Doctor, with the work that you have interacted with

9   with the Consumer Product Safety Commission, I take it that you

10  are familiar with the Consumer Product Safety Act?

11  A.  The Consumer Product Safety Improvement Act?

12  Q.  Yes.

13  A.  Yes.

14  Q.  And what does the act generally do?

15  A.  The Consumer Product Safety Improvement Act generally

16  strengthens the role that CPSC had and some of the means they

17  had to either enforce or to investigate products.

18  Q.  Now, is it your testimony before the Court here that

19  because Hunter Douglas complied with the standards as were

20  known at the time, or the mandates that were issued by the

21  Consumer Product Safety Commission, as it relates to the design

22  and manufacturing of window covering cords, that Hunter Douglas

23  complied and did everything that it could do and acted

24  reasonably?

25  A.  Can I have the full question read back.

Sala - cross                                    246

1              THE COURT:  Go ahead.

2          (Record read as requested.)

3    BY THE WITNESS:

4    A.  I -- I may not disagree with the front portion and the

5    statements of that.  But I don't believe that that is the

6    ultimate deciding factor as to my opinion as to the

7    reasonableness of the response.  I have looked at the

8    development of this knowledge separate from just simply what

9    the Consumer Product Safety Commission was, in your words,

10   telling the industry to do.

11             It's the independent analysis of this data and this

12   history that has led me to my opinions.

13   BY MR. JAUREGUI:

14   Q.  Let me show you the section from the Consumer Product

15   Safety Act at Section 2515 USC 2074, Section A:  Compliance

16   with consumer product safety rules or other rules or orders

17   under this act shall not relieve any person from liability at

18   common law or under a state's statutory law to any other

19   person.

20             Section B says:  The failure of the commission to take

21   any action or commence a proceeding with respect to the safety

22   of a consumer product shall not be admissible in evidence in

23   litigation at common law or under the state's statutory law

24   relating to such consumer product.

25             Now, in light of that what I just read to you,

Sala - cross                               247

1   Doctor -- well, let me first ask you, do you disagree that that
2   is the state of the law?
3   A.  I am not a legal expert.  I have no opinion on the state of
4   the law.
5   Q.  All right.  And so I want to make sure I understand your
6   testimony here.  Again, are you saying that because Hunter
7   Douglas complied with all the directives from the Consumer
8   Product Safety Commission that they complied with the
9   standards, as they were known at the time, that because they
10  did all of those things, that they should not be held
11  accountable because they acted reasonable?
12  A.  That is not my testimony.
13  Q.  So what is your testimony then?  I am not getting it.
14          MR. WILLIAMS:  That's argumentative.  To summarize
15  what he doesn't get is not a proper question.
16          THE COURT:  You can answer the question to the extent
17  you can relay what your opinion is.
18  BY THE WITNESS:
19  A.  Following my human factors review and the -- of the
20  historical data as to what was going on in the time frame at
21  issue, the available information on child strangulations, the
22  considerations being given by various entities at the time, I
23  have come to the opinion that the time frame of the response
24  and the response issued was reasonable.
25  BY MR. JAUREGUI:

1  Q.  All right.  Now, essentially you and Mr. Statler looked at
2  the same information, correct?
3  A.  I can't -- I can't tell the Court what Mr. Statler
4  considered or how he considered and what depth he considered
5  it.
6  Q.  You reviewed his report, did you not?
7  A.  I did.  And I -- as I stated before, there is a statement
8  in there that even a cursory or even a -- I believe it was --
9  even the most casual review of the available in-depth
10 investigations and literature on the subject he feels would
11 have revealed the risk associated with -- or the risks
12 associated with window words.  And I decidedly disagree with
13 that after my review.
14 Q.  So you -- I mean essentially, you disagree.  You come to --
15 after you reviewed the historical data from the U.S. Consumer
16 Product Safety Commission, and the actions of the industry was
17 taken in response to that data, that information was available
18 at the time, you have concluded that Hunter Douglas acted
19 reasonably in providing the -- in responding to that
20 information.  And two, that Hunter Douglas acted reasonably in
21 continuing to make available to the public window blinds one
22 with the -- one with the cords and the other one with the
23 blind?
24 A.  And developing the PermAssure wand, yes.
25 Q.  Now, did you look at the severity of the risk as part of

Sala - cross                                    249

1   your analysis here?

2   A.   Did I consider the severity of the risk?

3   Q.   Yes.

4   A.   Yes.

5   Q.   And what did you find out about this severity of the risk?

6   A.   Well, I -- I believe that the -- that the severity is

7   strangulation, is a fatality.

8   Q.   Okay.  Did you consider the vulnerability of the

9   population, that we are dealing with young children here?

10  A.   Yes.

11  Q.   And where does that appear in your report?

12  A.   This is -- this is a general understanding of the hazard

13  and what it is that we are speaking of when we talk about

14  window cord strangulations.

15  Q.   And so you told us you consider also availability, that

16  there was a different design available, and Hunter Douglas

17  acted reasonably in offering the wanded design because of the

18  utility function?

19  A.   Yes, I believe if I'm understanding your statement

20  correctly, yes, I agree.

21  Q.   Did you consider as part of your analysis in determining if

22  Hunter Douglas' conduct was reasonable, that the issue that you

23  were dealing with was latent?  The danger was a latent danger

24  from window covering cords?

25  A.   I'm sorry.  Can you --

Sala - cross                    250

1   Q.  Yes.  Did you take into account the nature of the danger of

2   strangulation from window covering cords was a latent defect?

3   A.  I am not sure what you mean by latent defect.

4   Q.  Something that is not open and obvious, something that is

5   not apparent.

6   A.   I think that that might be an arguable point.  I think that

7   there is data that suggests portions of the population do not

8   appreciate the potential hazard.  I think there's been many

9   efforts to increase that.  And depending on the time frame

10  you're talking about, there is information available about the

11  general -- the knowledge of the hazard.

12  Q.  All right.  And do you know what the Consumer Product

13  Safety Commission tells you about that issue, whether or not

14  this is considered a hidden or latent danger?

15  A.   Yeah.  Yes, I believe that they used those terms in various

16  time frames to talk about whether or not portions of the

17  population are knowledgeable of this hazard.

18  Q.  In fact, let me put this on the screen for you.  These are

19  reports I take it that you are familiar with and used from the

20  CPS, or press releases that are issued from time to time by the

21  commission.  You've seen this before, correct?

22  A.  I've seen this or a similar press release before.

23  Q.  All right.  I want you to concentrate on the highlighted

24  portion there that I have in the middle of the page.  And it

25  reads:  Each year 33 point million people are injured by

Sala - cross                                    251

```
1     consumer products in the home.  Some hazards are from products

2     the agency has warned about for years.  Others come from new

3     products and technologies.  To keep Americans informed of

4     dangers, the CPSC has identified the top five hidden home

5     hazards associated with products that people may be using every

6     day, but are unaware of the dangers that they can cause.  These

7     home hazards are often unseen or unnoticed by consumers.

8            On the next page it writes, window covering cords as

9     the top -- as No. 4 hazard, hidden hazard.  And it states:

10    Average of 12 deaths annually from window cords.  To the right

11    it reads:  Children can strangle on window drapery and blind

12    cords that can form a loop.  Parents should use cordless blinds

13    or keep cords and chains permanently out of reach of children.

14    Consumers should cut looped cords and install a safety tassel

15    at the end of each pull cord or use a tie-down device and

16    install inner cord stays to prevent strangulation.  Never place

17    a child's crib or play pen within the reach of a window blind.

18           Now, do you disagree with --

19    A.  Can you leave that up there, if you are going to ask me a

20    question?

21    Q.  I can do better.

22           MR. JAUREGUI:  Can I approach the witness?

23           THE COURT:  You may.

24    BY MR. JAUREGUI:

25    Q.  You can take a look.  You want to see it?
```

Sala - cross                           252

1   A.  No, just if you are going to continue asking me a question

2   following the statement, I just wanted it on the screen.

3   Q.  Sure.  I'll put it up.

4          Now, you understand that the U.S. Consumer Product

5   Safety Commission is charged by law to determine whether or not

6   a product constitutes an unreasonable risk of injury, yes?

7          MR. WILLIAMS:  That misstates the law, your Honor.  I

8   object to that.

9          THE COURT:  Why don't you ask him a question.

10  BY MR. JAUREGUI:

11  Q.  Is one of the functions of the Consumer Product Safety

12  Commission to determine whether a product constitutes an

13  unreasonable risk to a consumer?

14  A.  I think that the -- the -- I am not an expert in the law in

15  the exact functioning or role of CPSC.  I know that CPSC does

16  serve as a watchdog function on consumer product safety and

17  will often work with industry to identify hazards and work with

18  industry to recall or to mitigate hazards.

19  Q.  So you're not an expert on the law, the inner workings --

20  strike that.

21         You're not an expert on the inner workings of the

22  Consumer Product Safety Commission, correct?

23  A.  I don't claim to be an expert on the regulations that

24  govern the CPSC or the structure within the CPSC, no.

25  Q.  You think a consumer -- do you think a commissioner that

1   spent seven years as a members of the commission would have

2   that type of understanding in regulatory framework to

3   understand what it takes to determine whether or not a product

4   is unreasonably dangerous?

5   A.   I don't think that's my determination --

6           MR. WILLIAMS:  Objection.  Calls for speculation.

7           THE COURT:  You can answer.

8   BY THE WITNESS:

9   A.   I don't think that's my -- my determination to make.

10  BY MR. JAUREGUI:

11  Q.   So you are not going to answer the question?

12  A.   I don't know what expertise other people may or may not

13  have and how it might be relevant to any of the issues that are

14  being discussed.

15  Q.   All right.  At any rate, for purposes of the analysis that

16  you did in this case and determining that Hunter Douglas acted

17  reasonably in light of the information that it had, you did not

18  take into account the fact that the danger posed by window

19  coverings is a latent danger, a hidden hazard?

20          MR. WILLIAMS:  Misstates his testimony.

21          THE COURT:  You can answer that question.

22  BY THE WITNESS:

23  A.   I don't believe that is accurate.  I certainly consider it

24  in my analysis, the information available about people's

25  knowledge of this hazard and the efforts made to raise this

Sala - cross                                    254

1   awareness.

2   BY MR. JAUREGUI:

3   Q.  If people don't know about a hazard, how can they guard

4   against it?

5   A.  Oftentimes people will take on behaviors that guard against

6   a hazard without explicit knowledge of the actual hazard.  But

7   with respect to the issue at hand, there were a number of --

8   there is a number of sources one can go to to find this

9   information.

10  Q.  Doctor, we'll get to the studies in a minute.  I know you

11  have them in your report.

12          Now, Dr. Sala, based on the same historical data you

13  considered, did you believe that a jury can also decide for

14  itself that Hunter Douglas acted reasonably by adopting and

15  marketing safer designs like the PermAssure wand blinds, even

16  as they continued to sell the corded vertical blinds?

17          MR. WILLIAMS:  Objection, incomplete hypothetical.

18          THE COURT:  Hold on for a second.  I will let the

19  witness go ahead and answer the question.  I will take it for

20  what it's worth.

21          THE WITNESS:  Can you read back, please?

22          THE COURT:  Go ahead.

23      (Record read as requested.)

24  BY THE WITNESS:

25  A.  No.

1  BY MR. JAUREGUI:

2  Q.  Why is that?

3  A.  I think that -- I don't think that that is the -- I don't

4  think that the jury would be able to reach a conclusion as to

5  the issues at hand without a more complete understanding and

6  scientific understanding of the historical analysis, as well as

7  the human factors analysis, that goes into the reason --

8  whether or not it was reasonable to continue to offer a -- a

9  corded loop option for control in addition to the PermAssure

10 wand.

11 Q.  All right.  Thank you.

12      You have other opinions in this case, is that right,

13 Doctor?  Let's take a look at your second opinion here.

14      The product functionality.  In your second opinion on

15 the second bullet, page 14 of your report, you are -- you have

16 concluded that if Hunter Douglas offers only one product -- let

17 me just read.  I don't want to mess up your -- I don't want to

18 get an objection from Mr. Williams here.

19      What is in summary fashion your second opinion as

20 represented in this second bullet point?

21 A.  That from a human factors standpoint it was reasonable to

22 offer both the corded -- corded loop control mechanism as well

23 as the PermAssure wand for the vertical blinds in question.

24 Q.  Can you tell me what kind of data or studies did you look

25 at to reach those conclusions?

Sala - cross                                    256

1   A.   Certainly.  So a number of the studies I looked at related

2   to -- to people's capabilities and limitations with respect to

3   their abilities to reach their mobility, their physical and --

4   their physical capabilities with -- in regards to fine motor

5   controls, and also research on the -- what's known as the

6   universal -- universal design, which is the principle behind

7   trying to design products so that they are universally

8   accessible to the aging population, as well as to -- to persons

9   with disabilities and with diseases.

10  Q.   If I understand -- if I understood, if we were to summarize

11  some of the studies that you relied upon and you look at

12  various studies, the basic premise -- the basic premise of some

13  of those studies are as we age we lose the ability to do

14  certain things.  Fair enough?

15  A.   I think that's consistent.  It's a generalization, but that

16  certainly is consistent with findings.

17  Q.   All right.  Do you think that a jury will not be able to

18  understand as we age we lose the ability to do certain things?

19  I mean, I can't do the things that I used to do when I was 30

20  years old.  Do you think a jury will not be able to understand

21  that?

22          MR. WILLIAMS:  Objection, calls for speculation.

23  BY THE WITNESS:

24  A.   I believe --

25          THE COURT:  Hold on.  Go ahead.  You can answer.

1   BY THE WITNESS:

2   A.  I believe that I'm going to be speaking to the jury about

3   how these -- these facts and how they relate to the design of

4   products and how it relates to human factors design of

5   functionality and usability with -- with products.

6   BY MR. JAUREGUI:

7   Q.  All right.  Fair enough.  Let's talk about what you did

8   specifically in this case.  You told me when I took your

9   deposition -- and you remember that, right?  I took your

10  deposition?

11  A.  I remember you taking my deposition.

12  Q.  All right.  If I remember correctly, you told me that you

13  had done essentially four things.  See if I can remember them.

14  One, you went out to stores and you look at displays of window

15  coverings.  You went into Home Depot, and you went to Lowe's

16  store, correct?

17  A.  I believe that we discussed when I went to Home Depot and

18  to Lowe's to look at displays of --

19  Q.  Do you remember doing that, right?

20  A.  Yes.

21  Q.  Okay.  And that was part of the research that you were

22  doing to substantiate your opinions in this case, correct?

23          MR. WILLIAMS:  Misstates his testimony.  To reach his

24  opinions, not substantiate.

25          THE COURT:  Well, he can answer the question.

                              Sala - cross                    258

1              Go ahead.
2    BY THE WITNESS:
3    A.   That is one of the things that I engaged in in order to
4    inform myself and to inform my opinions.
5    BY MR. JAUREGUI:
6    Q.   All right.  And how long did that take?  You went to these
7    two stores.
8    A.   Again, I -- I don't have that clear of a collection as I
9    sit here today.  And I don't want to misstate my testimony.
10   Q.   Did you have -- strike that.
11             Did you take any notes?  Did you chart your
12   observations of the numbers of window covering blinds that you
13   looked at and what their specifications were?
14   A.   No, I don't believe that I took notes.
15   Q.   All right.  You also told me that you spoke to a
16   representative of the industry.  Do you recall that?
17   A.   I recall -- I recall speaking to a representative from
18   Hunter Douglas.
19   Q.   When you said -- we'll get to the Hunter Douglas
20   representative in a minute.
21             You told me that in addition to visiting two stores,
22   that you had spoken to a representative of the industry, aside
23   from Hunter Douglas.  And we'll get to Mr. Jankoski in a
24   minute.
25   A.   I don't have a clear recollection of the testimony that you

1  are -- you are with referencing.  If --

2  Q.  Okay?

3  A.  -- you like to show me it, I'll --

4  Q.  We can go on.

5        So you went and looked at two stores, Home Depot and

6  Lowe's stores.  You also did some research online on the

7  internet, did you not?

8  A.  I -- yes, I -- I went on the internet.

9  Q.  And you looked at some pictures of window covering blinds,

10  is that correct?

11  A.  Yes.  I did investigate online how or where vertical blinds

12  were most often depicted.

13  Q.  I'm sorry?  You --

14  A.  Were often depicted.

15  Q.  And I am going to show you the exhibit that I was

16  complaining about earlier.  Is this one of the pictures that

17  you looked at from your research on the internet?

18  A.  No.  I believe that the -- the pictures here are from

19  the -- from passages, the Hunter Douglas document that was

20  produced in this case.

21  Q.  When did you get these pictures?

22  A.  These pictures, I am not positive when first the -- the

23  document was passed along to me.

24  Q.  All right.  At any rate, so how long did it take you to do

25  the research that you did on the internet to look at vertical

Sala - cross                                        260

1    blinds and other blinds?

2    A.   Again, I don't have an estimate, as I sit --

3    Q.   Did you -- I'm sorry.

4            Did you document in any way the kind of research and

5    your observations as a result of doing that search on the

6    internet?

7    A.   Yes, I believe that I printed out as PDFs maybe just

8    printed out the web pages that I visited.  I believe that I

9    brought those with me to my deposition.

10   Q.   Okay.  And what -- what did that information show, if

11   anything?  What did it tell you about people's preferences,

12   consumers' preferences, for using one type of vertical blind

13   versus another?

14   A.   I don't believe that I used those images to address that

15   issue.

16   Q.   So what did you use the images for?

17   A.   The images similar to these were depicting the types of

18   windows in the environment in which a window vertical blind is

19   used.

20   Q.   Okay.  And those pictures, your understanding, vertical

21   blinds with cords are most often used in a setting in homes

22   known as common areas?

23   A.   I think that they are consistent with -- with the idea that

24   vertical blinds are often located in common areas and on large

25   bank of windows or sliding doors.

1    Q.  And in fact, the photograph that we have displayed on the

2    monitor there, it shows some of the uses of vertical blinds,

3    correct?

4    A.  Yes, I believe that the images are -- there are three

5    images of vertical blinds.

6    Q.  All right.  So --

7            THE COURT:  Counsel, we have to break here in a little

8    bit.  So I don't know whether this is a good stopping point, or

9    whether you want a couple more questions.

10           MR. JAUREGUI:  I think this would be a good stopping

11   point, Judge.

12           THE COURT:  Okay.  I am sure we will be able to

13   restart right where we left off.

14           Very good.  So let's go ahead and take our lunch break

15   now.  We will reconvene at 1:00 o'clock.

16           MR. JAUREGUI:  Okay.  Thank you, Judge.

17           THE COURT:  You may step down until then.  And please

18   don't discuss your testimony with anyone in the meantime.

19   Thank you.

20           THE WITNESS:  Thank you.

21        (Hearing recessed until 1:00 o'clock p.m. of the same day.)

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   JOSE M. PADILLA, as the Special  )  Docket No. 09 C 1222
     Administrator of the Estate of   )
 4   MAXIMILIAN PADILLA,              )
                                      )
 5                     Plaintiff,     )
                                      )
 6           v.                       )  Chicago, Illinois
                                      )  August 21, 2013
 7   HUNTER DOUGLAS WINDOW            )  1:00 o'clock p.m.
     COVERINGS, INC.,                 )
 8                                    )
                       Defendant.     )
 9
                            VOLUME 2
10          TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
               BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:          JAUREGUI & ASSOCIATES, by
13                               MR. ARTURO JAUREGUI
                                 Mr. EDWARD J. SANTIAGO
14                               120 West Madison Street
                                 Suite 400
15                               Chicago, Illinois 60602

16   For the Defendant:         SCHIFF HARDIN LLP, by
                                 MR. JEFFREY R. WILLIAMS
17                               One Market
                                 Spear Street Tower
18                               Thirty-Second Floor
                                 San Francisco, California 94105
19
                                 RILEY SAFER HOLMES & CANCILA, by
20                               MR. BRIAN O'CONNOR WATSON
                                 70 West Madison Street
21                               Suite 2900
                                 Chicago, Illinois 60602
22
                       ALEXANDRA ROTH, CSR, RPR
23                       Official Court Reporter
                        219 South Dearborn Street
24                            Room 1224
                        Chicago, Illinois 60604
25                          (312) 408-5038
```

Sala - cross                                   263

1        (Proceedings had in open court:)

2              THE COURT:  So when we took your reak, you were about

3    40 minutes into your voir dire.  And so I will go ahead and

4    provide you with 20 minutes from here on out when you start.

5    And then with that, let's continue with the examination.

6              MR. JAUREGUI:  Thanks.

7              THE COURT:  Mr. Sala, I want to remind you that you

8    are still under oath.

9              THE WITNESS:  Yes.

10             JOSEPH SALA, DEFENDANT'S WITNESS, DULY SWORN

11                   CROSS-EXAMINATION (Resumed)

12   BY MR. JAUREGUI:

13   Q.  Hi, Mr. Sala.

14             When we left off we were talking about the things that

15   you had done to prepare your opinion on the -- on the second

16   point and your second opinion.  And that is -- find my place

17   here -- whether or not it was reasonable for Hunter Douglas to

18   continue to offer both blinds to consumers.

19             And you had told us that you had gone to visit two

20   stores.  We went over that.  And we were at the point where I

21   had asked you and you had told me that you spoken to an

22   industry representative.

23             Do you recall that?

24   A.  I remember we just discussed that.  And I had represented

25   that to my recollection I had only spoken with a Hunter Douglas

1    representative, and I didn't remember my exact testimony over

2    that.  During the lunch I did review the deposition testimony

3    where I think you -- that you were referring to.  You had asked

4    me if I had consulted and talked with anyone.  And I did say an

5    industry representative.

6         We later went on and talked about my conversation.

7    That was actually with Mr. Jankoski from Hunter Douglas.  So I

8    believe the confusion here is, when I referenced that in the

9    deposition they were one and the same.  The industry

10   representative was the Hunter Douglas representative.

11   Q.  Okay.  Fair enough.  We can move on.  Thank you for that.

12        Did you ask Mr. -- Who is Jankoski, Mr. Jankoski?

13   A.  He -- he is employed by Hunter Douglas.  Off the top of my

14   head I can't remember his exact title.

15   Q.  Is he one of the vice presidents?

16   A.  He very well might be.  I'm not positive.

17   Q.  And so you talked with him.  And after you talked to him,

18   he confirmed your understanding that vertical blinds are most

19   often used or are better designed to be used in common areas --

20   better designed to be used in common areas?

21   A.  Well, he -- that was the crux of our conversation was how

22   vertical blinds are used, where they're used.  And he provided

23   information to that effect that, yes, vertical blinds are most

24   often employed in either common areas or sliding glass doors,

25   large banks of windows.  That because of how they operate, they

Sala - cross                                                    265

1    are not particularly well suited to windows that open in a

2    vertical fashion, information such as that.

3    Q.   So is -- do you know if Mr. Jankoski has a background on

4    human factor analysis?

5    A.   I am not positive what Mr. Jankoski's background or

6    education and training is.

7    Q.   Did you ask Mr. Jankoski whether or not he had looked any

8    data when he offered to you that information that you just

9    relayed to us?

10   A.   The particulars of the conversation and the -- if there

11   were precise mentions of data sources, I don't recall at this

12   time.  He -- my understanding is that he has been employed by

13   Hunter Douglas and involved in the design of window coverings

14   for a number of years.  And he's relating to me his experience

15   and understanding of the industry.

16   Q.   Did you ask whether or not there were any studies that

17   Hunter Douglas had done indicating whether consumers in fact

18   had more propensity or a tendency to use vertical blinds in

19   common areas than other areas of the household?

20   A.   I don't recall if I asked that specific question or not.

21   Q.   Do you know if there is any such data reflecting on the

22   consumer preference for use of vertical blinds at the house?

23   A.   I am not aware of the type of data that you are

24   referencing.

25   Q.   All right.  Would that have been relevant to your opinion

Sala - cross                                                        266

1    in this case?

2    A.  Well, I -- the issue was something I certainly considered

3    and tried to gather data, tried to consult with industry

4    sources.  Mr. Jankoski -- I also examined the availability of

5    these products, depictions of these products.  And given the --

6    the information I was provided, I came to a conclusion that

7    that -- that is consistent with all sources of those

8    information, that vertical blinds are typically in the common

9    rooms, these large banks of windows, sliding glass doors.  And

10   that would be the typical environment for them.

11   Q.  But you never seen any data reflecting that -- that

12   consumer preference study?

13   A.  The consumer preference for that?

14   Q.  Yes.

15   A.  I am not aware of any.

16   Q.  And you did not do any independent studies to determine

17   whether or not in fact people have a preference for installing

18   vertical blinds in common areas versus other areas of the

19   house?

20   A.  I -- I did not perform a preference study, no.

21   Q.  All right.  So as I understand it, then you only have four

22   things that you did in arriving at your conclusion that

23   vertical blinds are more commonly used or more frequently used

24   in common areas of the house.  No. 1, you went to Home Depot

25   and Lowe's, and you looked at the -- Lowe's and you looked at

Sala - cross                           267

1    the display of window coverings, correct?

2    A.   That is one of the things I did, yes.

3    Q.   No. 2, you also looked at the internet, and you looked at

4    some pictures.  And the pictures that you looked, you saw the

5    depiction of vertical blinds being used in common areas.  Fair?

6    A.   I -- I looked at the depictions and also the product

7    offerings, yes.

8    Q.   And then you had a conversation with Mr. Jankoski.  And he

9    essentially confirmed what you had already formulated in your

10   mind, that indeed consumers who purchased vertical blinds,

11   those vertical blinds are more often than not installed in

12   common areas.  Fair?

13   A.   I -- he also provided data that was consistent with -- with

14   that --

15   Q.   What --

16   A.   -- consistent with my -- what I expressed in my report.

17   Q.   Can you please tell the Court specifically what type of

18   data he provided to you?

19   A.   Data, information.  He provided the same information as I

20   relayed earlier, that because of the functioning of these

21   blinds, they are particularly well suited for oversized

22   windows, for large banks of windows, for sliding glass doors.

23   And that typically they are employed in common rooms of the

24   house where you would have these sorts of installations.

25   Q.   Did he give you a percentage of the number of vertical

Sala - cross                                    268

1   corded blinds that are used in consumers' homes in common areas

2   versus the percentage of the wanded vertical blinds that are

3   used in non-common areas?

4   A.   The -- I'm sorry.  Which blinds are we comparing there in

5   our percentages?

6   Q.   Window vertical blinds with cords and vertical blind with a

7   wand.

8            MR. WILLIAMS:  Vague at least as to time.  I am not

9   sure when we are talking about.

10  BY MR. JAUREGUI:

11  Q.   At any time.

12  A.   During that conversation he did not.  I don't recall him

13  sharing that with me.

14  Q.   So he just gave you some information?

15  A.   He provided me with information about the -- where and how

16  vertical blinds are typically installed.

17  Q.   The time when Ms. Davis in this case, the lady who

18  purchased the blinds, whether she was asked where she intended

19  to place the blind?

20           MR. WILLIAMS:  Objection, vague.  Asked --

21           THE COURT:  Overruled.

22  BY MR. JAUREGUI:

23  Q.   Did you ask Mr. Jankoski -- let me withdraw that question.

24           Do you know whether or not anyone asked Mrs. Davis at

25  the time when she purchased the blind where she intended to

Sala - cross                                                    269

1   place them?

2          MR. WILLIAMS:  Assume someone spoke to her.  The

3   testimony is that she doesn't recall if anyone did speak to

4   her.

5          THE COURT:  I think the question is whether he is

6   aware of any.

7          You can answer that question.

8   BY THE WITNESS:

9   A.  I am not aware of any information to that effect.

10  BY MR. JAUREGUI:

11  Q.  Are you aware of any data, any information, marketing

12  information, from Hunter Douglas indicating that these vertical

13  blinds should be installed on -- in common areas rather than

14  bedrooms?

15  A.  Are you asking whether there is information that -- that

16  they should be installed in one location versus another?

17  Q.  Yes, whether you had ever seen that information.

18  A.  I haven't seen anything like that.

19  Q.  So what is the scientific basis of your opinion to arrive

20  at the conclusion that vertical blinds are more often installed

21  in the homes in common areas in the house?

22  A.  The basis for -- for that -- for that conclusion would be

23  the data that I gathered with respect to my own investigation,

24  my investigation of product offering in stores that sell window

25  coverings, in speaking with an industry representative, a

Sala - cross                                    270

1    Hunter Douglas representative, that had experience with this --

2    with this industry.  And also in looking at this product

3    offering, vertical blinds, how it was being sold and

4    represented on the internet.

5    Q.   In 1995 what information did you have as to where and how

6    vertical blinds should be installed?

7    A.   I can't state that in 1995 I had that information.  I don't

8    remember.  Don't recall at that time.

9    Q.   So you really had no basis to formulate that opinion other

10   than your visits to the store, your research on the internet,

11   and your conversations with Mr. Jankoski?

12         MR. WILLIAMS:  Objection, vague.  Which opinion are we

13   talking about now?

14   BY MR. JAUREGUI:

15   Q.   The second opinion, your opinion that vertical blinds are

16   most commonly installed in common areas.

17         MR. WILLIAMS:  We are mixing and matching.  That's --

18         MR. JAUREGUI:  It's -- let me withdraw that question.

19   BY MR. JAUREGUI:

20   Q.   You did significant research here, according to what you

21   just told us.  And one of the opinions that you formulated in

22   your mind was that vertical blinds are more commonly used in

23   common area.  Is that fair?

24   A.   That is part of my analysis.  That's part of my

25   understanding of the use of the product.  I don't think that I

Sala - cross                                    271

1    have phrased that as summary opinion in this case.

2    Q.  All right.  But you used that information to determine what

3    type of interaction a user would have with that product, did

4    you?

5    A.  Well, that was a piece of information that was relevant.

6    And the use of this product in those sorts of environments was

7    one of the things that would factor into the -- the analysis of

8    this.  But the -- that's not the sole basis.

9    Q.  All right.  You are a scientist, correct?

10   A.  Yes, I am.

11   Q.  So if someone tries to replicate your study, how would they

12   go about doing that?

13          MR. WILLIAMS:  Objection, vague.

14   BY MR. JAUREGUI:

15   Q.  Your findings that vertical blinds are more commonly used

16   in design for use in common areas.

17   A.  I think that somebody could replicate that in -- by using

18   similar methods, by using methods of observation, by cataloging

19   instances in which these products are offered, and how they are

20   depicted.  In the speaking with industry representatives that

21   have experience and gathering their knowledge.

22   Q.  But you didn't do such study here, right?  You did not

23   document your findings in any way, shape or form?

24   A.  I believe that we are -- we are speaking about my -- my

25   analysis now.  And we spoke about it at deposition.  I

1    incorporated it into my report.

2    Q.   Fair enough.  We will move on.

3         Now, in your second opinion, what is the essence of

4    your second opinion, Doctor?  So I do not misrepresent your

5    testimony here.

6    A.   I believe you have asked me about the second opinion.  And

7    I think that what I stated previously was that given a human

8    factors evaluation, it was -- and from a human factors

9    perspective, it was reasonable for Hunter Douglas to offer both

10   the continuous loop control mechanism as well as the PermAssure

11   wand at the time of manufacture of -- at this point.

12   Q.   Did you do any ergonomic studies to determine which

13   vertical blind is easier to use in this case, the one with the

14   wand versus the one with the cords?

15   A.   I think that my human factors evaluation and when you

16   consider the human factors evaluation --

17   Q.   No, with all due respect --

18        MR. WILLIAMS:  Excuse me.  May he be allowed to answer

19   the question please, even if counsel doesn't like the answer?

20        THE COURT:  Why don't you go ahead and ask him the

21   question again.

22   BY MR. JAUREGUI:

23   Q.   The question is, did you do any ergonomic studies in

24   comparing the usage between a vertical blind with cords versus

25   a vertical blind with a wand?

Sala - cross                                                        273

1   A.   I performed the human factors analysis of the two different

2   types of products.

3   Q.   And where is the data?

4   A.   The -- I explained my analysis earlier.  I explained the

5   analysis in deposition.  And I also explained it in my report.

6   I -- this is an evaluation of the different control mechanisms,

7   the barriers to use that each may have given the environment

8   and the users.  These involve -- these express which design

9   mechanism may or may not be easier for a variety of user

10  populations to use under given situations.

11  Q.   All right.  Did you hire a group of people of different

12  ages to perform the functions and evaluate whether for a

13  90-year-old person it would be easier to use the vertical blind

14  with a wand versus a 90-year-old person being able to use the

15  blind with a cord and chain?

16  A.   That type of a -- of an experiment or study that you are

17  explaining is not necessary.

18  Q.   In doing your analysis that you did in this case, how many

19  vertical blinds did you take into account to do the comparative

20  analysis of vertical blinds with cords versus a vertical blind

21  with a wand?

22  A.   I compared the types of interactions that would be required

23  for vertical blinds with wands versus vertical blinds with

24  cords.  Such an evaluation and human factors analysis does not

25  require an actual physical model of this.  In fact, there are

Sala - cross                                    274

1    such a range of products and range of ways in which it might be

2    installed, that it would limit the utility of any one given

3    study as you're describing it.

4          Rather what the -- the human factors field and the

5    publications within it and the research within it give our

6    considerations to the types of interactions that one is

7    expected to have, and where these interactions express

8    limitations for certain user populations or in certain

9    environments.

10   Q.  Doctor, I don't have much time.  What data specifically do

11   you have to reflect on your opinions that there are certain

12   limitations for certain segments of the population if Hunter

13   Douglas is only to produce vertical blinds with a wand?

14   A.  There are a number of sources that I cite in my report and

15   I brought with me to deposition.  I have them here.

16   Q.  All right.  Doctor, let me just --

17         MR. WILLIAMS:  Excuse me.  Could he please be allowed

18   to finish his answer.

19         THE COURT:  You can go ahead and finish that answer.

20   BY THE WITNESS:

21   A.  One of the sources is older adult data.  This is a

22   compendium of physical limitations in size, reach and strength.

23   It catalogs the abilities of the older population, how this

24   changes over time.  And also the proportion of certain aspects

25   of the population that have either disabilities or are aging to

Sala - cross                                          275

1    the point of disability.

2            There is also a document, the universal design file,

3    which is a -- a book or an article that is -- is put forward as

4    how to consider the aspects of user population, specifically

5    related to aging and diseased or disabled persons.  And how to

6    consider with specific reference to mobility, arm reach,

7    strength, auditory and visual perception, a variety of the

8    types of capabilities and limitations from the human factor

9    science.

10           There is also additional information that I have as to

11   the change in people's abilities over time with respect to

12   strength, and importantly the fine motor skills of someone.

13   There is an article in the Journal of Neurology, critical

14   decline in fine motor hand movements in human aging, that

15   catalog the types of detriments one would expect, and how this

16   is different for a ballistic action which might be a reach of

17   one's arm and gross motor movement in one direction, versus

18   something that is manipulated about the fingers in a twisting

19   motion like use of a wand to adjust the tilt of the veins.

20   Q.   Doctor, do any of the studies have anything to do with

21   window covering blinds, with the operation of window covering

22   blinds?

23   A.   Yes, I just explained how they would have relevance to the

24   operation of --

25   Q.   Okay.  Did any of those studies deal directly with the

Sala - cross                                   276

1    force that is necessary to operate a window blind with a wand

2    versus the force and the dexterity and the mobility that is

3    required to use a window blind with cords?

4    A.   None of these studies were directly on window blinds.

5    Q.   And for this -- for this case, to support your opinions,

6    you did not do an independent analysis to determine what type

7    of force, what type of mobility, what type of dexterity, is

8    necessary for someone to use in order to be able to operate

9    either of the blinds, did you?

10   A.   I stated what I did with respect to the analysis of the

11   blinds, in the functionality and operation of the blinds,

12   vertical blinds, in general with respect to the two different

13   control mechanisms.  I also stated that I did not bring people

14   in to do an experimental study with any single design.

15        MR. JAUREGUI:  Judge, I am going to ask that you can

16   indulge me for a few minutes.  I am trying to move as fast as I

17   can.  But I am getting very long answers.  That's fine.  He is

18   entitled to answer the questions.  But the Court would indulge

19   me --

20        THE COURT:  Sure.

21        MR. JAUREGUI:  -- couple minutes here.  Thank you.

22   BY MR. JAUREGUI:

23   Q.   One of the studies that you used was a study that was done

24   in the UK, right, the United Kingdom, the plate force.  Do you

25   recall that?

Sala - cross                                                277

1   A.  Yes, I believe that some of the data was collected in the

2   United Kingdom.

3   Q.  All right.  Do you know whether that study has ever been

4   used in any court of law in the United States?

5   A.  I have to -- off the top of my head, I don't know whether

6   it was used in a court of law.

7   Q.  So as I understand it, the study when you and I talked

8   about it in your deposition, individuals were asked to apply

9   some force to a plate or a device.  Is that fair?

10  A.  You are describing a typical means of collecting force and

11  strength data.

12  Q.  And that study, that work, was done in a controlled

13  environment, was it not?

14  A.  Yes, oftentimes when we are collecting this sort of data,

15  it's done in some sort of controlled environment.

16  Q.  You have never seen the vertical blind in this case, have

17  you?

18  A.  The incident blind?

19  Q.  Yes.

20  A.  No, I have not.

21  Q.  And you never asked the blind -- that you could see it?

22  A.  I've never seen it, no.

23  Q.  And you don't know how the size of it is, do you?

24  A.  Well, I -- we have measurements from the record.

25  Q.  Okay.  So I tell you 70 inches, the head railing is 70

Sala - cross                                                              278

1    inches long.  All right.

2            I'm going to stop with that.  You criticize -- rather

3    your opinion on bullet point No. 3, you indicate basically that

4    Ms. Davis and Ms. Roberts understood the potential hazards

5    associated with the cords attached to the window blinds.  And

6    according to your scientific research, that no amount of

7    information or warnings could have altered their behavior in

8    this case, is that correct?

9    A.  It states there is no scientific reason to believe that

10   additional or alternative warnings or safety information would

11   have altered their behavior.

12   Q.  All right.  As you sit here today, do you know for a fact

13   whether or not the blind at issue had any warnings of any type

14   at the time it was sold to Ms. Davis?

15   A.  I think that there is testimony that it did.  However, the

16   warnings associated with it haven't been produced.

17   Q.  I'm sorry.  I didn't catch your last?

18   A.  The hangtag that was stated would have accompanied it has

19   not been produced.

20   Q.  All right.  And you've never seen any warnings that Hunter

21   Douglas was using in 1995 on vertical blinds, have you?

22   A.  I have not seen -- I have not seen that warning, no.

23   Q.  Best case scenario that we have here is, Mr. Rubinoff

24   testified that he believed that Hunter Douglas was using a

25   hangtag.  Do you remember that?

Sala - cross                        279

1   A.  I believe that's the testimony, yes.

2   Q.  And Mr. Rubinoff also testified that the hangtag was not

3   permanent, that it was designed to be removed?

4   A.  Yes.

5   Q.  And in fact, Ms. Davis testified that she didn't recall

6   whether or not it had any signs.  But if it had any signs, any

7   hangtags, that she would have removed them.  Do you recall

8   that?

9   A.  Yes, I remember that testimony.

10  Q.  And she also said if the headrailing had had any warnings,

11  as long as they didn't show it she would have left them alone?

12  A.  I think she said that if it didn't show she would have left

13  them alone.

14  Q.  You don't have any reason to doubt her testimony, do you?

15  A.  With regards to her testimony and those factual references?

16  No.

17  Q.  And you know that at the time when the police investigated

18  this incident shortly after it occurred, the window covering

19  involved in this case had no warnings of any type, correct?

20  A.  My understanding is that it didn't have a label on it.

21          THE COURT:  Counsel, I will give you about five more

22  minutes.

23          MR. JAUREGUI:  Okay.

24  BY MR. JAUREGUI:

25  Q.  So if the window blind had no cords -- had no warnings at

1    the time that it was sold to Ms. Davis of the danger of the

2    strangulation hazard, how is she supposed to know about the

3    danger?

4            MR. WILLIAMS:  Misstates the testimony that he just

5    referred to.  So it's an incomplete hypothetical.

6            THE COURT:  You can go ahead and answer the question.

7    BY THE WITNESS:

8    A.   Can you restate the question?

9    BY MR. JAUREGUI:

10   Q.   If the subject blind had no warnings at the time that it

11   was sold to Ms. Davis, how is she supposed to know about the

12   danger of strangulation from window covering cords?

13   A.   Well, I believe that Ms. Davis testifies that she was aware

14   of this, and that she was aware through a variety of sources

15   she mentioned, that she had seen it on the news, that it was

16   common sense -- she gives a number of reasons in her own

17   deposition as to why she was aware of this hazard.

18   Q.   All right.  Ms. Davis issued an affidavit in this case.

19   You are aware of that, correct?

20   A.   I am aware of that.

21   Q.   And in that affidavit she stated, she was not -- she was

22   never offered an option of a vertical blind with a wand.  That

23   if that option had been offered to her, for safety reasons she

24   would have chosen the blind with the wand.  And you dispute

25   that.  You did not agree with that?

1    A.   As I state in my opinion, there is no scientific reason to

2    believe that such information would have led to a behavior

3    change.

4    Q.   And that's based on your studies that you produced?

5    A.   That's based on the warning studies that I referenced

6    before, the culmination of the science behind behavioral

7    change, and the provision of safety information, as well as her

8    testimony at deposition and some of the things that she -- she

9    made reference to, how she used and what she already knew, and

10   her familiarity with the product.

11   Q.   And basically the third opinion and fourth opinions are

12   pretty much the same, except that you are dealing now with Mr.

13   and Mrs. Padilla, is that right?

14   A.   I think that they both -- they are both addressing the

15   allegation that additional information would have changed these

16   opinions.

17   Q.   Okay.

18   A.   Or would have changed their behaviors.  I apologize.

19   Q.   Let me get to the point here.  Objectively the only fact

20   that you have in this case to tell this Court that no amount of

21   warnings would have altered the behavior of the Padillas and

22   the outcome in this case is a television set that was in Max's

23   room, isn't that right?

24   A.   No.

25   Q.   I'm talking about facts.  The only fact that you have in

Sala - cross                                    282

1  this case is the television set that was in Max's room.

2  A.  No, that's one example from their testimony that puts them

3  in line with the scientific literature as to people's

4  compliance with warnings.  But there is additional information.

5  Q.  All right.  And you state in your opinions, in your

6  analysis of this case, that because Max was concerned about the

7  TV falling in Max's room, and they failed to remove the TV from

8  his room, that that shows how they would have reacted to

9  warnings had there been any warnings on the window blind.

10 Is -- that's essentially the connection you are making here,

11 correct?

12         MR. WILLIAMS:  Misstates his testimony.  Go ahead.

13 BY THE WITNESS:

14 A.  I don't think that that characterizes what -- how I used

15 that information and what I say with that information.

16 BY MR. JAUREGUI:

17 Q.  What significance to you is the fact that there was a TV in

18 his room and the TV was not removed from the room?

19 A.  I -- it demonstrates that his behaviors and actions are

20 consistent with those that you would expect from the public at

21 large, the people in which the studies have been -- have been

22 conducted.  There is no evidence in the record that makes the

23 Padillas in any way out of the ordinary with respect to how

24 people notice and behave in response to warnings.  In fact,

25 when you look, it lines them -- it aligns them more with the

Sala - cross                                          283

1   subjects in the studies where warnings were either not noticed

2   or not complied with.

3   Q.  So because of that, you reached the conclusion that in this

4   case no amount of warnings would have altered the behavior of

5   the Padillas, and the outcome would have been the same,

6   correct?

7   A.  I believe that I stated my opinions in my report, and I

8   have read it into the record here today, that there is no

9   scientific reason to believe that additional or alternative

10  warnings or safety information would have altered their

11  behavior.

12      MR. JAUREGUI:  I am almost done, Judge.  I promise

13  you.  One last question here.

14  BY MR. JAUREGUI:

15  Q.  Now, essentially what you did here is the phenomenon of

16  inattentive blindness.

17  A.  That is a cognitive term that I think can help illustrate

18  to people how it might be that very conspicuous and obvious,

19  quote unquote, obvious things that are in front of us might

20  escape our actual perception.

21  Q.  And in fact, that's one of the studies that you relied in

22  formulating these opinions in this case?

23  A.  Well, it's something that I referenced in order to explain

24  that phenomenon that I just described.

25  Q.  And so it is essentially the failure of people to perceive

Sala - cross                                    284

1   their surroundings and the way how they respond to?

2   A.  That -- that -- that is covered by that.

3   Q.  All right.  In that study --

4           THE COURT:  You are running out of time.  You promised

5   me one question a while ago.

6           MR. JAUREGUI:  This is the question.  This is --

7   BY MR. JAUREGUI:

8   Q.  I am going to show you, Doctor, the study that you

9   referenced -- that you referenced in your opinion.  And it

10  says:  Unresolved questions.  The research describing this book

11  is incomplete.  It raises more questions than answers.  And the

12  explanations we provide are not fully adequate.  Nevertheless,

13  we choose to describe it now rather than wait for a fuller

14  understanding, because that understanding may never be

15  achieved, at least not in the near future.  And the phenomenon

16  of inattentional blindness seems sufficiently important so that

17  the interest in it ought not to depend on the particular theory

18  employed to explain it.

19          Isn't the fundamental principle of inattentive

20  blindness is that people have to see what is the study in this

21  case, you know, looking at a dot or a square on the computer

22  screen, and they failed to see it.  And then they label that as

23  if it's there in the studies, people should see it.  If they

24  don't see it, then you use the theory of inattentive

25  perceptions?

Sala - redirect                          285

1   A.  You are describing -- this -- this quote is taken from a

2   chapter in a book, and it describes some of the very early

3   research.  I believe the first research that describes this

4   phenomenon.  But there has been -- there has been work since

5   then as well that helps to characterize when and how this

6   phenomenon occurs.

7            And there are other studies, ones that I have already

8   referenced, that -- that describe this as well.

9   Q.  If the Padillas did not know that the risk of strangulation

10  existed in the window covering cords because it was latent,

11  what are they supposed to do?

12           MR. WILLIAMS:  Objection, that's argumentative.

13           THE COURT:  Sustained.

14           MR. WILLIAMS:  -- question for this witness.

15           THE COURT:  Sustained.  Any more questions?

16           MR. JAUREGUI:  No.

17           THE COURT:  Counsel, you have ten minutes for

18  redirect.

19           MR. WILLIAMS:  Thank you, your Honor.

20                      REDIRECT EXAMINATION

21  BY MR. WILLIAMS:

22  Q.  Dr. Sala, just a few things to touch on.  Let's go

23  backwards in order.  And I am taking the most recent first.

24           Specifically this issue with respect to the

25  information that you have in particular from Mr. and Mrs.

1    Padilla's depositions about their behavior and in particular --

2    I am not a scientist, but your scientific term is, safety

3    information seeking behavior or the lack of it.  Was it simply

4    the presence of a TV in Max's room that was of relevance to

5    you?

6    A.  No, no.

7    Q.  What did Mr. Padilla say about that that was important to

8    you?

9    A.  Well, there is various portions of his testimony that

10   relate to information seeking both his and actually Mrs.

11   Padilla's as well.  They describe a number of their actions and

12   behaviors through their pregnancies and birth of their children

13   that -- that that -- that are -- that would place them into a

14   category of non-information seeking.  They give a number of

15   different citations within the testimony that describe how they

16   did not seek additional information.  They didn't consult with

17   physicians or pediatrics about safety concerns or issues in

18   having a child.

19        They did not consult with any sort of outside source

20   for common safety issues in childhood or infancy.  The -- when

21   asked about the types of -- the types of controls over the

22   child's environment that they employed, I believe the -- the

23   response related to trying to make sure that there were not --

24   there were not outside pests or insects that were allowed in

25   the summer to be around the children.  But no reference or no

1   mention to the typical source of control devices that help to

2   protect children from injurious scenarios.

3           And finally, the television and the nightstand

4   demonstrates a -- both a response to one's own safety concern

5   and examples from the literature.  The TV was a safety hazard

6   that Mr. Padilla had evaluated and come up with on his own.  It

7   was one that he himself had assessed as a safety concern in the

8   room.

9           And when asked what he -- he said that he would take

10  care of it.  He was constantly concerned over it.  But the

11  actions he took were not to remove it or to remove the hazard

12  in and of itself, do something of a permanent nature, but that

13  he would just take care of it.

14  Q.  He testified that he appreciated the risk, always worried

15  about it, yet never did anything about it?

16  A.  Correct.

17  Q.  Okay.  The question that you got about Ms. Davis, the

18  purchaser of these blinds.  You are aware of her testimony that

19  she didn't know if she bought these blinds or this blind on

20  line or by telephone.  And in any event, even in the affidavit

21  that counsel requested that she sign, makes no reference to an

22  individual that she spoke to.  She simply says, and without any

23  more context, that she wasn't made aware of any option of the

24  wand.

25          Even if you assume all that to be true, and even if

1    you assume that she did in fact speak to some independent

2    dealer and wasn't provided with that information, do you

3    believe, based upon the information that you have and what you

4    just testified to, that she would have behaved any differently

5    if she had been told of that option?

6    A.   No, I do not.

7    Q.   And you explained the reasons for that?

8    A.   Yes.

9    Q.   Do you need to bring a group of 90-year-olds or any portion

10   of the population in to do an evaluation of the relevant

11   ergonomic factors that go into your opinion that there are

12   certain situations in which a wand is simply not a viable or

13   perhaps even safe option for operating vertical window blinds?

14   A.   No, I do not.

15   Q.   Other than seeing how manipulating yourself a wand, a cord,

16   a chain, and gaining an understanding of how vertical blinds

17   are used, do you need anything more in order to apply

18   principles of human factors to determine whether or not there

19   is some part of the population that will either prefer or

20   perhaps even need to have the cord and chain option available

21   to them?

22   A.   I base that on my education, training, experience, and the

23   available research studies in human factors.

24   Q.   Okay.  Now, with respect to the suggestion that the jury

25   knows that as people get older they get less strong.  They get

Sala - redirect                    289

1    perhaps less dexterous.  And the suggestion that you don't add
2    any value or any expertise in helping a jury understand that.
3    You answered counsel's questions that you believe you did bring
4    value to that.

5        Can you explain why that is.  Why should you be
6    allowed to testify and explain to a jury those facts?
7    A.  Certainly.  I think that this is under-appreciated by -- by
8    lay people, the relevance of actual study, actual observation
9    of use.  These are principles in human factors that allow us to
10   incorporate expertise into the design, and that's something
11   that the typical or layperson does not have as a background or
12   as a perspective.

13       This is -- I think, if you allow me, there is a
14   passage in the universal design file, one of -- one of the
15   sources that I cite, that explains this.  In a -- in their
16   introduction in the history of universal design, it's written:
17   These demographic changes result in a population that is older
18   and more disabled than many realize.  And these trends
19   continue.  The limitations imposed by products and environment
20   designed and built without regard to these needs and rights of
21   all Americans citizens are significant but often unrecognized.
22   Q.  Okay.  Final point, Dr. Sala.  You were asked some
23   questions, I think, about what you did to determine what
24   percentage of vertical blinds are used in common area rooms
25   versus other room.  First of all, you know from this case and

1   there are other instances that it's not exclusively for common

2   rooms.  They can be used in bedroom, correct?

3   A.  Correct.

4   Q.  And in this case you simply noted, I think -- it turned

5   into an opinion somehow, but you noted that more often vertical

6   blinds will be used in common area room and frequently on over-

7   sized windows.

8         Does it matter to any of your opinions in this case

9   whether 60 percent or 80 percent or for that matter 30 percent

10  of vertical blinds are used in common area rooms, such as

11  living rooms and dining rooms or elsewhere?

12  A.  The exact breakdown and percentage is not the issue here.

13  It's the use of this product and the fact that this is a common

14  environment for use.  That's what affects its functionality and

15  its usability.

16  Q.  Final question.  Is there anything about a study

17  originating out of the United Kingdom that makes it not

18  relevant to you as a human factors scientist?

19  A.  Certainly not with respect to hamstring.

20        MR. WILLIAMS:  Thank you very much.

21        Thank you, your Honor.

22        THE COURT:  All right.  Thank you.  I have some

23  additional questions for Mr. Sala.

24        Mr. Sala, in response to questions by defense counsel

25  regarding the first bullet point, that is the first opinion, as

Sala -                                    291

1    to Hunter Douglas' actions during the time that -- your

2    historical analysis, for lack of a better word.  You said that

3    your opinion -- actually you were asked the question and you

4    answered in the affirmative, whether it was your opinion that

5    the actions taken by Hunter Douglas were reasonable, prudent

6    and safe.

7            Now, in my estimation, those three words mean

8    different things.  Do they mean different things to you?

9            THE WITNESS:  The --

10           THE COURT:  I'm focusing most on the third, safe.  You

11   are not -- are you offering an opinion -- I didn't think you

12   were, but are you offering opinion that the actions of Hunter

13   Douglas during that time were safe, versus being reasonable or

14   prudent?

15           THE WITNESS:  I think that it's -- the opinion work

16   supports mostly be -- be reasonable.  Now, if it's phrased in

17   the way that the -- it provided a reasonable degree of safety

18   for the inclusion of that option, certainly I think that that

19   is supported in a reasonable sort of calculation for that

20   opinion.

21           THE COURT:  So I just want to make sure I understand.

22   So when you mean that the actions were safe, is what you mean

23   that when you take safety considerations into account as well

24   as the other things that you took into account, the actions

25   were reasonable?

Sala -                    292

1              THE WITNESS:  Yes.

2              THE COURT:  So it's not your opinion that the actions

3    themselves were safe.  But the actions were reasonable when you

4    considered safety as one of the factors.

5              THE WITNESS:  Yes.

6              THE COURT:  I just want to be clear as to what he will

7    or will not testify to.

8              MR. WILLIAMS:  That's a very good questions, your

9    Honor.

10             THE COURT:  Secondly, with regard to your review of

11   the historical data, and by historical I mean the CPSC data,

12   the reports in the '90s, '80s, '90s, as you discussed.  You

13   said that in addition to reading the materials, you did your

14   own independent analysis of historical data.

15             What sort of independent analysis did you do?

16             THE WITNESS:  I have reviewed the actual in-depth

17   investigations, so the underlying data that the CPSC was

18   working off of in their investigations and cataloging.  I have

19   also reviewed, I am familiar with it, both the timeline and

20   sequence of it as well as the content.

21             THE COURT:  So other than just reviewing the

22   underlying data, did you do any other sort of independent

23   analysis that would implicate your expertise?

24             THE WITNESS:  I'm sorry.  Can I --

25             THE COURT:  Sure.  Anyone can review the data.  You

1    know, for that matter, the attorneys can review the reports.  I

2    can review the reports.  The jury can review the reports as

3    well as the underlying reports.

4           When you say independent analysis, did you do anything

5    else other than reviewing the reports?

6           THE WITNESS:  Well, I think that -- that one of the

7    things to appreciate there is that these in-depth

8    investigations and that underlying data come through as not

9    a -- not necessarily summary, but individual pieces of

10   information throughout the report.  And what I've done is

11   actually catalog them and tallied them and looked at them

12   for -- from the standpoint of what sort of pattern or analysis

13   emerges when you look at these, either standing back all at

14   once or in a cumulative fashion.

15          It's also you need to understand some of the database

16   and intricacies of the database itself.  What type of

17   information is entered into different databases, how it's

18   gathered, how it's gathered over time, because that has

19   changed.  And as this -- this -- this hazard has -- the

20   understanding of it has developed over time, so too have some

21   of the reporting mechanisms for it.

22          And so when evaluating, what you could extract from

23   the database at a time, you do need the experience or the

24   expertise in those databases and in that sort of analysis.

25   That's something that I've been doing for -- for years since

Sala -                                      294

1    I've been at Exponent.

2              THE COURT:  And so that would help you to kind of

3    decipher what the data means.  What independent analysis did

4    you do to then come to the conclusion that the actions were

5    reasonable?

6              THE WITNESS:  Well, I put this into perspective of the

7    hazard and its understanding.  So one of the things is that --

8    that is at issue is the idea that -- or at least as being

9    expressed in some of the opposing expert reports that I was

10   asked to evaluate, was that a -- a -- forget the actual term,

11   but a cursory review of this data would have revealed other

12   hazards.  And that should have been focused or received more

13   attention.

14             And when you look at this data, what was available

15   from it as it was developing, and you understand the focus of

16   that and what the data is -- actually the underlying data is

17   telling you, you can evaluate whether or not a response to that

18   and whether or not the focus on something like horizontal

19   blinds or pull cords was reasonable given the factors of what

20   data you have available, what impact it would have had on the

21   underlying hazard, and what control mechanisms or what sort of

22   engineering solutions you would have immediately available to

23   you and what you need to focus on maybe at a later date or

24   separately from that.

25             THE COURT:  Okay.  And what you're at least telling me

1    is that that's -- you did all that analysis in coming to -- you

2    looked at the alternatives that were available at the time, the

3    technology that was available at the time, as well as all the

4    other things that you mentioned, when you came to your

5    conclusion that the actions of Hunter Douglas were reasonable?

6          THE WITNESS:  That's work that I engaged in to reach

7    that opinion.  Also before this matter, I have been engaged in

8    researching this area and child hazards.  And I was familiar

9    and have had familiarity with these databases and with this

10   data before this -- this incident.

11         I incorporated some of the -- the knowledge that I

12   gained through my exposure to these databases and this -- this

13   potential hazard, but then focused it with respect to the issue

14   related to vertical blinds, and focused it with respect to the

15   time frame that we are discussing here.

16         THE COURT:  Now, with regard to the fourth bullet

17   point, that is your opinion as to the Padillas.  Is there a

18   standard protocol that one uses in your field when you try to

19   assess whether or not a particular individual would be prone to

20   regard or disregard the warning, a warning sign, as opposed

21   to -- well, let me ask you that first.

22         THE WITNESS:  So there are models put together, and

23   there are frameworks.  I cited one in my report.  I included

24   that article in the materials and referenced it.  And it walks

25   through many of the things I discussed here today, that you

1    look at how the information was conveyed, what information was

2    available.  But then you look at the personal -- the personal

3    factors and -- of the receiver of that information, and the

4    product that that person would be receiving it from.

5           And based on that comparison to the available data and

6    what we know about the individual person, we could extrapolate

7    from the scientific research to people's behavior and come up

8    with a -- an estimation of whether there is scientific reason

9    to believe whether or not additional information would have

10   changed people's behavior.

11          THE COURT:  Can you refer me to that protocol you are

12   talking about?

13      (Brief pause.)

14          THE WITNESS:  So the article that I was specifically

15   referencing here is the article, What Is a Warning and When

16   Will It Work.

17          THE COURT:  Okay.  I guess what I am trying to get at

18   is, when you are -- because I know you testified about the

19   general research in the area of warnings and whether or not

20   people comply and statistical analysis.  But I guess I am more

21   focused on when you are trying to -- what I for lack of a

22   better word diagnose an individual, right?  Perform a study on

23   individuals.  Say basically this individual is -- this

24   individual in my scientific estimation just won't obey any

25   warning signs.

1          Are you familiar with any protocols that set forth

2     how -- what steps a clinician is supposed to take to try to

3     arrive at such a diagnosis or conclusion?

4               THE WITNESS:  And I think that that --

5               THE COURT:  I think this talks more about kind of

6     factors to look at, right?  I am wondering more about

7     procedures.

8               THE WITNESS:  And I -- sorry to disagree.  But the

9     article does set forth the framework of the relevant factors to

10    consider and in a procedural manner.  And so with knowledge of

11    that and the scientific literature that backs that, I do

12    believe that that is the procedure and the -- the model or

13    framework that I followed to reach the -- or to apply what we

14    know in this case to the available research and literature.

15         Also just I'm not reaching opinion that no safety

16    information would ever affect the Padillas' behavior.  I am

17    addressing this with the additional alternative information

18    that's being suggested too that would have been included with

19    the blind as they existed in their home.  It's -- I am not

20    saying that the Padillas would never follow or act safely in

21    any capacity across a range of products, but rather trying to

22    apply it to this instance.

23              THE COURT:  So what you are saying -- and let me ask

24    you this question:  So are you saying that in this case what

25    you'll testify to is that the Padillas -- had there been a

Sala -                     298

1    warning on the vertical blinds, that the Padillas had the type

2    of -- personalities probably isn't the right word, but are the

3    type of people that would have disregarded whatever warnings

4    would have been on the vertical blinds?

5              THE WITNESS:  I think that -- that what my testimony

6    would be is that had there been a warning on there,

7    situational, environmental and personal factors relevant to the

8    Padillas would lead to my scientific opinion and my scientific

9    evaluation that they would not notice or heed that warning.

10             THE COURT:  And that's based upon your background as

11   well -- aside from your background from your review of their

12   depositions?

13             THE WITNESS:  Review of their depositions, review of

14   the scientific literature surrounding warnings, my experience,

15   education, training.

16             THE COURT:  Okay.  There was one other question I had.

17   You said that Mr. Padilla recognized that the TV in the room

18   posed risk.  What is your understanding as to what was the risk

19   that he was concerned about?

20             THE WITNESS:  I believe that he referenced that he was

21   afraid that the TV would fall on his son.  Now also again, this

22   is related more to the perception of risk.  Turns out that is a

23   reasonable hazard to be concerned about.  I think even in the

24   hidden hazards that -- that were presented on that screen, one

25   of them was TV falls and tip-overs.

```
1          But the point was that -- that this was a perception
2     of risk he had himself, he had developed, and his response to
3     it as testified.
4               THE COURT:  Any follow-up questions from counsel?
5               MR. JAUREGUI:  Yes, Judge.
6               THE COURT:  No?
7               MR. JAUREGUI:  No.  That's fine.
8               THE COURT:  Okay.  You may step down.  Thank you.
9               THE COURT:  All right.  Let's now proceed to arguments
10    as to the motion.  Plaintiffs will have 20 minutes, defendants
11    20 minutes, and then plaintiffs will have five minutes
12    rebuttal.
13              MR. WILLIAMS:  Your Honor, if I may have 30 seconds, I
14    think Dr. Sala is going to depart the courtroom, not stick
15    around.
16              THE COURT:  Okay.
17       (Brief pause.)
18       (Witness excused.)
19              MR. JAUREGUI:   May it please the Court, you heard
20    the testimony from Mr. Sala.  I will comment briefly as to the
21    second, third and fourth opinions, and -- and then proceed with
22    the argument.
23              There is no doubt Mr. Sala is qualified to testify as
24    an expert.  It's -- I don't think that's an issue here.  The
25    issue is whether he is testified as an expert in this
```

1   particular case.  He certainly has many credentials.  His

2   report on this case has more citations than a law review

3   article.  The question --

4               THE COURT:  Depends on the law review article.  But go

5   ahead.

6               MR. JAUREGUI:  That is true.  If it's from Harvard,

7   could be longer.

8               The question remains whether the methodology that he

9   used in this case meets the standard of Daubert in the Seventh

10  Circuit.  And I submit to the Court that it doesn't.  You know,

11  the reason why I asked Dr. Sala about the basis for his opinion

12  on the functionality of the product, because it's important,

13  the study that he had done to determine whether if Hunter

14  Douglas knew about a known risk, a deadly risk, whether it was

15  reasonable for Hunter Douglas to continue to offer it to

16  consumers, both options.

17              And Dr. Sala concludes that it was reasonable for

18  Hunter Douglas to continue to do so because if Hunter Douglas

19  only offered the wand with the -- excuse me -- the vertical

20  blind with the wand, it would have limited the usage of the

21  population, because there is some limitations that would

22  inhibit the use.  And his understanding is that most of the

23  vertical blinds are designed for use in the common areas.

24              There is a reason why he is using that information and

25  why that is his theory, because in common areas he figures,

1    well, if the family is in the family room, you know, a child is

2    not supposed to be unattended.  There's supposed to be someone.

3    There is parental supervision.  People are supposed to be

4    watching him there.

5         If on the other hand, the blinds are installed in a

6    child's room, then his understanding is that -- and it's Hunter

7    Douglas' understanding that he is trying to sell to the Court

8    here that they are really not designed for -- for usage in a

9    kid's room.  And the reason why they don't want to go there is

10   because, you know, children can be left unattended in the

11   bedroom.

12        And the question, the ultimate question, that we need

13   to ask in this case is, if a parent -- if the parents, in this

14   case the Padillas, who clearly loved their child, if they

15   cannot have -- if they do not feel their child is safe in their

16   own bedroom, then I don't know what -- whether -- where they

17   are going to get that sense of safety about the safety of the

18   child.

19        The issue here is whether or not the Padillas were

20   aware of the risk.  It was a latent defect.  It's a latent

21   risk.  The Consumer Product Safety Commission has already

22   adjudicated that issue.  Dr. Salas has relied on the data from

23   the commission.  But yet, he disagrees on the categorization

24   from the commission on that issue, even though that is by law

25   what the commission is charged with.

1    He has not taken that into account.  He said, what he

2    does for purposes of the analysis is that he goes out there.

3    And whether or not the use of this product is limited to a

4    certain segment of the population -- and he has to go to the

5    functionality of the product.  Okay?  It's a legal theory.

6    It's a legal grounds to allow someone to testify on this issue.

7    I understand that.

8    The problem that we have with that opinion is that I

9    tried to press him, and the Court heard his answers.

10   Essentially he did three things -- well, four things.  He went

11   to Home Depot.  He went to Lowe's store.  He went on the

12   internet.  And he talked to Mr. Jankoski.

13   I asked him whether or not he had done any independent

14   studies, ergonomic studies, in this particular case to

15   determine how is it that a functionality of a window blind is

16   used or affected by different segments of the population, in

17   this particular case.  There are no studies.  Hunter Douglas

18   doesn't have that data.  If anybody should have that data, it

19   would be Hunter Douglas before they put it out.

20   I mean, if they're saying, well, you know, this is

21   designed for common room areas, you know, certainly there is no

22   evidence that has been brought to light on that issue.  Yet

23   that is one of -- that is the research that he did on this

24   case.  That is not scientific research.  I tried to ask him, if

25   someone tries to replicate your research, what would they have

1    to do?  I doubt that anybody can do that because practically

2    what we would have to do in order to replicate that is to get

3    into his head.  He didn't take any notes.  He didn't know what

4    data.  The Court doesn't know what data he got from -- from

5    Lowe's or from Home Depot.

6          So there is absolutely no information on that issue.

7    There is no basis for that opinion.  And that opinion, that

8    work that he did, the methodology that he used to get to his

9    opinion that because the functionality of the product is

10   affected, there is no basis for that.

11         He doesn't know how much force it takes to operate a

12   wanded blind versus one that is corded.  And if he is going to

13   stand here before the Court and say, there are some limitations

14   that accompany a vertical blind with a wand, then he better be

15   prepared to show the Court what kind of data he is relying on.

16   There is none of that stuff.  He didn't show any data.  So his

17   methodology is not supportive of his opinion in this case, on

18   that opinion.

19         The issue of whether or not any -- let me read from

20   that.  The last sentence of his fourth opinion:  There is no

21   scientific reason to believe that additional or alternative

22   warnings -- I don't know what he's talking about here.  That

23   statement is assuming in their alternative that the window

24   blind already had some warnings.  Or additional, in addition to

25   what?

1    You know, your Honor saw the headrail of the window

2  blind.  There are no warnings.  If there was a warning, if we

3  want to give the benefit of the doubt here to Hunter Douglas,

4  and there is no factual basis for that -- but let's just assume

5  that at the time when it left the control of Hunter Douglas or

6  the fabricator that made his blind, that it had a hangtag.  We

7  know from representatives of Hunter Douglas, Mr. Rubinoff

8  specifically, that the window blind -- that the tag, the

9  warning, was designed to be removed.

10    So if that's the only warning and it is removed, it's

11  installed at a home.  Five, seven days -- five, seven years

12  later the Padillas buy that house.  The window blind is in

13  perfect working order.  They have no reason to remove it.  They

14  begin to use it.  They have never seen any warnings.  They

15  never received any literature from Hunter Douglas.

16    Ms. Davis did not receive any warnings from Hunter

17  Douglas saying, hey, by the way, as time as gone on, now we

18  have learned that there are these problems with our blinds.

19  They never received any warnings from the Window Covering

20  Safety Association or from the Window Covering Manufacturing

21  Association.

22    There is no evidence that either Ms. Davis, Ms.

23  Roberts, the owner of the house, or the Padillas ever received

24  any data.  Yet what does he do?  Looks at a TV.  And he says,

25  because of the way how Mr. Padilla or the Padillas interacted

1  with the TV, that tells him -- he's transferring that

2  information had if there been any warnings it would have not

3  altered the outcome of this case.  That's just sheer

4  speculation.  There is absolutely no basis for that.

5       THE COURT:  Didn't he also say that he reviewed the

6  depositions and testimony about whether or not they used other

7  safety devices to kind of childproof their home?

8       MR. JAUREGUI:  I believe he did that, Judge.  I

9  believe he testified as to that.  But the particular object --

10 the only objective object that we have in this case is the TV.

11 And when I asked him -- not here but when I asked him in his

12 deposition, he didn't know how big the TV was.

13      He was aware that neither of the Padillas had ever

14 seen little Max trying to reach out for the TV.  They tried to

15 keep it away from him.  And in fact it was away from his bed.

16 It was not like it was over his head.  I mean, they took

17 whatever precautions.  As they related, as he related to the

18 TV, they took whatever precaution they thought was appropriate.

19      Now, what Mr. -- what Dr. Sala does not tell the Court

20 is that after this incident occurred, the Padillas removed all

21 the window blind coverings from their house.  And that is a

22 critical issue here because if they did that, that means that

23 contradicts his whole testimony in this case, because then that

24 tells you that they -- that once a danger became known to them,

25 they reacted to it.  They took action.  And what is it that

1  they do?  They removed the window blinds.  They had no reason

2  to do that before.  Why?  Because they had no idea that it

3  presented a danger to the child.

4       He is not an engineer.  He's never designed any window

5  coverings in this case.  So he really doesn't have the

6  qualifications to support his opinions in this case.

7       The issue of Ms. Davis and Roberts, you know, the

8  issue of warnings are pretty much applicable.  The arguments

9  that I made to the Court are pretty much applicable also as

10 to -- as to their argument.  Ms. Davis, you know, they're

11 saying -- he's saying -- it's important to know that he's

12 saying that Hunter Douglas was -- acted reasonably in offering

13 to consumers both options.

14       Ms. Davis is telling the Court that she was never

15 given that option.  So if she's never given that option, then

16 the conduct of Hunter Douglas here is not reasonable.  They

17 cannot prove and there are no documents here that at any given

18 point she was given the option to choose one of those two

19 blinds.  And in fact, she said that if given that option, she

20 would have chosen the one with the wand.

21       How am I doing on time, Judge?

22       THE COURT:  She says that in her deposition or in her

23 affidavit?

24       MR. JAUREGUI:  In her affidavit.

25       THE COURT:  So tell me about this affidavit.  Tell me

1    about these affidavits.  So did the people -- so I take it

2    there are -- there are how many affidavits?

3           MR. JAUREGUI:  There is -- well, in her affidavit for

4    Ms. Davis, only one affidavit.  And during the course of her

5    deposition, those questions were not asked.  Counsel had

6    opportunity.  They were not asked.

7           THE COURT:  They weren't asked by either side?

8           MR. JAUREGUI:  Either side.

9           So I spoke with Ms. Davis, and I asked her, look, this

10   is -- this is the posture of your deposition here.  If -- and

11   she -- and I asked her, if you had been given an option with a

12   wand, would you have chosen it?  She said, absolutely, I would

13   have chosen that.  So that is her affidavit.

14          I know that counsel has raised issues about, you know,

15   being hearsay and all these things.  But she will be here to

16   testify.  In fact, they already booked her flight to come in

17   and testify for the trial.  So she will be here.  So counsel

18   will have every opportunity to cross-examine her on those

19   issues.

20          As to the first, you know, whether or not Hunter

21   Douglas acted reasonably in light of the information, the

22   historical background, what was going on at the time, the

23   standards available, the state of technology, all of those

24   things, that's a little bit difficult for me to comment on it

25   because I think Dr. Sala made the perfect case to permit Mr.

1    Statler to testify as an expert in this case.

2                THE COURT:  Well, let me ask you this.  I guess the

3    other question would be, why doesn't Mr. Statler suffer from

4    the same infirmities that you believe that Mr. Sala suffers

5    from with regard to the first opinion?

6                MR. JAUREGUI:  Judge, that's why I premised my point

7    that there is not much that I can say about his opinions on

8    that issue.

9                THE COURT:  It seems -- would you agree that it seems

10   that they both would rise or fall together with regard to that

11   particular opinion?

12               MR. JAUREGUI:  To some extent I do agree with the

13   Court, Judge.  But there are some things, some additional

14   things, that Mr. Statler did in this case that Dr. Sala say

15   that he did but I did not see it, like considering the risk of

16   injuries, severity of the injury, the vulnerability of the

17   population, and all of these factors that Mr. Statler went on

18   to testify about.  And even though Dr. Sala said that he did

19   that, I don't see the data for that.  I did not see any

20   reference in his report to those issues.

21               THE COURT:  You still have five, six minutes.

22               MR. JAUREGUI:  All right.  I am ahead for once.

23               THE COURT:  You don't have to use all the time.

24               MR. JAUREGUI:  I realize.  I am just checking my notes

25   here.

1    THE COURT:  You have an opportunity to rebut, too,

2  so --

3    MR. WILLIAMS:  Or cede it to your opponent.

4    MR. JAUREGUI:  I reserve whatever time I have for

5  rebuttal.

6    THE COURT:  Very good.

7    MR. WILLIAMS:  Thank you, your Honor.

8    Let me start with something that I didn't think I

9  would be starting with on the argument on Dr. Sala, your

10  question about Brenda Davis' affidavit.  You keep hearing it.

11  I don't know if you've seen our motion in limine with respect

12  to it.  Let me take a minute and a half to put it in

13  perspective.

14    In deposition what she did testify to, as I've said or

15  mentioned in a couple questions, was that she didn't recall

16  where she bought the blinds, who she bought them from, the

17  manner by which she bought them, whether it was online or

18  telephone, and certainly didn't recall speaking to anyone since

19  she didn't know whether she bought them online or not.  So she

20  established that she has no recollection of the circumstances

21  of that transaction.

22    After that deposition counsel realizes that there is

23  an issue in the case, or he thinks there is an issue in the

24  case, that it would be helpful to be able to say that she

25  wasn't offered an option of this wand at the time she purchased

1    them because the wand was made available, and that's a problem

2    for their case.

3           So he goes back to Ms. Davis, asked her if she'll sign

4    an affidavit stating that she -- and she -- it's very careful.

5    She doesn't say that she spoke to anyone.  She doesn't identify

6    who she spoke to or who it was that she spoke to who should

7    have offered her a wand, had a duty to offer her a wand, or

8    anything.  She simply says, I was never offered a wand.  Of

9    course, she doesn't say as part of this transaction that I

10   can't recall anything about, including whether it was online.

11          So the hearsay problem here isn't Ms. Davis.  Ms.

12   Davis can be here in flesh and blood.  That's not the hearsay

13   problem, and our motion in limine addresses it.  It's her

14   attempt, or counsel's attempt, to have her testify that there

15   was a transaction, and that she recalls enough of it that she

16   can say somebody didn't offer her a wand.

17          First of all, she doesn't know if there was an in-

18   person or telephone transaction, but most importantly, she

19   cannot identify the speaker.  And it's not the speaker who said

20   something; it's a speaker who didn't say something that they

21   want to say should have; and that is, you got a wand as an

22   opinion.

23          THE COURT:  But, Mr. Williams, that seems like a

24   perfect opportunity for cross-examination of Ms. Davis here

25   when she is in court.

1        MR. WILLIAMS:  It is if she is allowed to testify, but

2   I can't imagine how she could testify, your Honor, to what she

3   has in her affidavit because the first question asked of her, I

4   will be up objecting on the grounds that it's hearsay.  She is

5   offering the absence of a statement from an unidentified party

6   who's not in court and couldn't even be made to come to court

7   because we can't tell who it is.

8        So no ability to cross-examine the person that she

9   wants to say is the important speaker or non-speaker here.

10  That's the issue with respect to Ms. Davis.

11       So we are here on a Daubert hearing for Dr. Sala, and

12  I'll try to turn back to that.

13       I will address the warnings issues at the end, partly

14  counsel's comments, partly your Honor's questions.  All any

15  expert can do, if they are found to be qualified on a subject

16  such as this, is talk about what the literature says.  We can

17  say about how people would likely respond.  You have to

18  identify the population.  You have to say it's fair to include

19  the Padillas in this population of people who these studies

20  tell us see, do not strike with this hammer, and a hundred

21  percent of the time go ahead and strike with the hammer and

22  ignore the warning.  That's all he can do.

23       If he is qualified and if he's applied the rigor to

24  the analysis to determine that these studies are relevant, then

25  all he or anyone else can say is that it is a matter of

1   probability that the Padillas fall within the group of people

2   who have been studied, who have been shown not to heed warnings

3   or to only heed warnings to this extent.

4           The suggestion that you can make such a claim personal

5   to the Padillas is not how human factors or frankly other

6   psychological and social sciences work.  And they make

7   predictions.  And all they can do is say, this is what people

8   likely would have done.

9           The reason that's an issue in this case, and it is in

10  any failure to warn case, is because of the ease with which a

11  plaintiff can come in and say, hey, lousy warning.  No warning.

12  Should have been a better warning.  And if so the accident

13  wouldn't have happened.

14          If they prove that the warning was inadequate, that's

15  half of the game.  But the other half of the game is causation.

16  And that's where -- even though the burden should be on the

17  plaintiff to prove, and if there had been a better warning I

18  would have behaved differently.  But the testimony on that

19  subject is usually a fairly self-serving, of course I would

20  have done something differently.  It's not supported by any

21  experts.  No testimony from -- from their experts.

22          So it's incumbent upon me, the defense in the case

23  such as this, to come in and ask for an expert to evaluate.

24  Say, okay, is this reasonable or not?  If there had been a

25  different warning, you know, play devil's advocate.  If there

1   had been another warning here, would that likely have affected

2   these people's behavior.  His opinion is that it's not.  The

3   only question here for today is, has he applied the scientific

4   method of his science in the proper manner to get there.

5        And on that subject, I have to say that counsel

6   doesn't have much of a sense of irony.  After hearing from

7   Dr. Wright yesterday, who basically upon being given his

8   assignment in this case and asking what kind of blind it was

9   and being told it was a vertical blind with a continuous loop,

10  announced and concluded that it was a defective and

11  unreasonably unsafe product.  To suggest that what we heard

12  from Dr. Sala here about how he went about his task somehow

13  doesn't meet the scientific method, to me is pretty remarkable.

14  He came prepared to not only describe in a general way that he

15  relied upon research.  But I asked him to bring with him

16  examples so he can cite them to counsel, show them to your

17  Honor what he did consider.

18       And beyond the examples that he has, he's cited

19  publications, provided them to counsel in his report and in his

20  deposition.  So they have an ability to cross-examine him on

21  those, and that's fair game for trial.

22       But the question here is, is he qualified to testify

23  at trial?  And on the warnings issues, which I will lump

24  together for sake of brevity, I think it's clear that he has

25  done -- he is the only expert in the case who has done the

1   research and applied the scientific methodology in order to

2   form his opinions.  And counsel can cross-examine him.  But I

3   think Dr. Sala jumps way over the bar set by Daubert for the

4   admission of his testimony in that regard.

5           With respect to your question about opinion No. 1 --

6           THE COURT:  Actually, before we get there, can I

7   interrupt my own question?

8           MR. WILLIAMS:  Absolutely.

9           THE COURT:  With regard to opinion No. 2, I believe

10  that Mr. Sala said that what he was testifying was that it was

11  reasonable for Hunter Douglas.  And I just want to make sure I

12  am clear what he is talking about.

13          When he said it was reasonable for Hunter Douglas to

14  have offered consumers options as to the control mechanisms for

15  the subject blinds, I thought he testified that it was

16  reasonable for Hunter Douglas from a human factors perspective

17  to offer consumers options as to the control mechanisms for the

18  subject blinds.  Is that an accurate description of what his

19  testimony is going to be?

20          MR. WILLIAMS:  I'm going to ask the question back to

21  you because I want to make sure I understand --

22          THE COURT:  Well --

23          MR. WILLIAMS:  -- qualifying from a human factors

24  perspective.

25          THE COURT:  Well, or is he concluding that as a legal

1    matter it was reasonable, for example, for Hunter Douglas to

2    have offered consumers options as to control mechanism for the

3    subject?

4           MR. WILLIAMS:  I think I understand, and I think it's

5    a third maybe in between.  I think he is saying that from a

6    responsible manufacturer's standpoint, it was reasonable to do

7    so.  He doesn't presume -- I am very careful to keep experts

8    such as him away from legal conclusions, because I don't think

9    that's where they belong.  I think where he provides his value

10   to the case is that he brings the human factors discipline of

11   course.  But that discipline encompasses matters related to the

12   safety of consumer products, among other things.

13          So as an expert in the safety of consumer products,

14   looking at a manufacturer who supplies consumer products, it's

15   his opinion that based upon his expertise it was reasonable for

16   them to do so.  He's not involved or didn't get involved in

17   this case in matters of cost or things like that.

18          But as I said before, that's -- those are issues that

19   are common in products liability cases.  They are not here

20   because we manufactured the product that plaintiffs are saying

21   we should have manufactured.  They're left to argue, we

22   shouldn't have continued to offer this other product.  And he's

23   explained why with his human factors background it was

24   reasonable for a manufacturer to make that available to

25   consumers.

1          And I think once again, he is the only expert who's

2     applied any rigor at all to that analysis.  He doesn't, you

3     know, recite the safety is not an option, one death is too

4     many, and all the nice, easy truisms that don't help us get to

5     where we need to go in a case with complicated issues that

6     involve safety and risk and balancing of those, which we do on

7     an everyday basis.  And I wasn't going to not get to point

8     No. 2, because I think that's his most important opinion.

9          With respect to point No. 1 and your question about

10    whether Mr. Statler and Dr. Sala and their proffered opinions

11    on the -- what I call the historical reasonableness of the

12    conduct or lack thereof up until '95 were responsible.  Here is

13    why I will suggest that while I agree that they're close in

14    that regard, I don't think it's because of the quality of the

15    analysis.  I think it's because of how relevant that testimony

16    is.

17         In other words, the jury here is looking at a product

18    that was sold in 1995 and Hunter Douglas' conduct as it relates

19    to that product.  Frankly, to give an extreme example, I don't

20    think it would be relevant if Hunter Douglas were the worst

21    actor in the world on some other subject.  Let's say they made

22    axles for 18 wheelers or something like that. I don't think how

23    they behaved in that regard would be relevant to this case

24    unless that behavior carried over or affect it here.

25         Same thing on the historical window blind discussion.

1   It's -- it's relevant to the extent that it's tied in and there

2   are interrelated issues of safety.  But once again, we're not

3   sitting here explaining why we didn't get around to offering a

4   wand in '95 because we were too busy with the horizontal blind

5   problem, the much bigger problem, before then.  We had the

6   PermAssure wand in 1995.

7           So there isn't any delay.  There isn't any way, why

8   didn't you get around to it sooner at issue here.  And so I

9   think really the testimony about the reasonableness of their

10  conduct is sort of a good-citizen area of testimony that is of

11  limited use, I would say, here.

12          Having said that, I think Dr. Sala has given a closer

13  look to that.  The CPSC experience, which is the only thing

14  that Mr. Statler brings to a case like this, isn't relevant

15  here.  It's -- this is not a case involving the workings of the

16  CPSC and their relationship with Hunter Douglas or industry.

17  He is a lawyer.  He is not a scientist of any sort.  And he is

18  the first to admit it.

19          And so that's why, and that's all I will say, about

20  why I think you could allow Dr. Sala to testify on the first

21  point and still find that Mr. Statler, especially with the

22  inflammatory and argumentative background -- not just

23  background but nature of his report, brings to bear on that

24  issue.

25          THE COURT:  Is there a dispute as to admissibility of

1   the CPSC reports?

2           MR. WILLIAMS:  The IDIs?

3           THE COURT:  And the various reports that Mr. Sala and

4   Mr. --

5           MR. WILLIAMS:  I am going to generalize and say, no,

6   because -- but I'm going to go on and say, there isn't much of

7   an issue with respect to notice or any of those things.  The

8   parties and the experts and the underlying witnesses for Hunter

9   Douglas or some of the witnesses plaintiff may call may have a

10  dispute about how many and how to characterize some of those

11  incidents.

12          And I think my humble suggestion is that when it comes

13  time for trial, you're going to have a judgment call to make as

14  to how much of that is relevant, because we're not disputing.

15  We were working on the strangulation risk and developing the

16  PermAssure wand, among other things.  So there is no dispute

17  that there were enough incidents, it's whether 110, 170 or 15

18  years or something in between.  There were enough incidents on

19  different products.

20          And one thing I want to say because it hasn't been

21  highlighted.  We're talking about products generally.  The

22  overwhelming, overwhelming, majority of those are nothing to do

23  with Hunter Douglas.  But because of the similarity of the

24  products, we acknowledge they have some relevance with respect

25  to notice.

1    But once again, notice in this case is a very minor

2    issue, if it's an issue at all.  We were working hard on this

3    safety device, and we got it out before Ms. Davis purchased it.

4    THE COURT:  And I guess I should be more specific

5    about my questions.  Is there a dispute between the parties as

6    to admissibility when it comes to, for example, hearsay or

7    authenticity or any of those objections with regard to the CPSC

8    documents?

9    MR. WILLIAMS:  Not of authenticity.  Hearsay, it

10   depends.  There is a lot of information in them.  And some of

11   that information is not only summary but incomplete.  And so

12   if, for example -- I'm trying to answer your question.  Please

13   don't feel like you are cutting me off.  Or do cut me off if I

14   am not getting it.

15   But there are some areas of information where if a

16   witness, for example, tried to come in and characterized it and

17   say, there is 45 incidents out of the 110 that involved

18   continuous loop cords on vertical blinds, then we would have an

19   issue I am sure because there are going to be places where that

20   information is so incomplete that the hearsay objection is

21   going to be appropriate.

22   THE COURT:  I see.

23   MR. WILLIAMS:  I am talking big pictures, kind of

24   broad brush.  It's generally accepted by both parties.

25   THE COURT:  Okay.  I interrupted you.  Go ahead.

1          MR. WILLIAMS:  I think that says what I need to say on

2    Point No. 1.  I did forget to mention one thing on the warnings

3    issue with respect to the Padillas.  And again, this is more

4    for trial, but counsel brings it up.  So I think I need to

5    respond to it.

6          He contrasted what he called the sheer speculation

7    from Dr. Sala, patiently and carefully tried to explain the

8    basis for his opinion that the Padillas probably would not have

9    heeded any additional information, and how he came to that

10   opinion.  That's dismissed as sheer speculation.  And then the

11   single thing that counsel points to to support his claim that,

12   in fact, they were safety-heeding individuals was that after

13   their son died by strangulation on a window blind cord, they

14   actually removed other window blinds from the house.

15         That to me is sadly not information that is helpful or

16   relevant.  Of course, you can't imagine anybody ever leaving

17   some products that either posed a risk or brought back memories

18   of losing a child like this around their house.  That is not

19   information that casts doubt on Dr. Sala's qualifications under

20   Daubert to express his opinion on the warnings issue.

21         Finally, opinion No. 2, that it was reasonable for

22   Hunter Douglas to continue to offer the product.  In response

23   to your question, I was really interested in that question and

24   Dr. Sala's response.  It's a great question, at the risk of

25   sounding like I am pandering.

1        But reasonably safe is what is an issue in this case.

2   And whether Hunter Douglas behaved in a manner that was

3   reasonable entails in this case whether they behaved in a

4   manner that was safe or reasonably safe.  And in -- because I

5   asked that question, as I am sure you noticed, more than once

6   with that string of adjectives.

7        And I do equate them.  If they are not identical, I

8   think they are quite close in this case.  And I didn't mean to

9   make it a compound question because I think plaintiffs are

10  going to argue in this case that Hunter Douglas did not act in

11  a reasonable manner, that they -- another way of saying that is

12  that they provided an unreasonably dangerous product.  So I

13  think they -- those issues are linked.

14       In asking him his opinions, I was intending to ask him

15  whether he believes that they behaved in a reasonably safe

16  manner.  And -- but I think your question clarified that.

17       I don't think there could be a more careful analysis

18  and one that applies to scientific methodology than what Dr.

19  Sala went through in reaching his opinion.  He did it step by

20  step.  He didn't get his first phone call from me and say, aha,

21  this is a reasonably safe product, as Dr. Wright did on the

22  other side.

23       He took his time.  He looked at and added to his

24  database of knowledge in reviewing additional IDIs beyond what

25  he had already looked at in work before this case to

1    familiarize himself with a lot of those details down in the

2    grass, with respect to the ways in which children have been

3    injured and died on window blind -- corded window blind

4    products.

5              And after doing that, and after explaining his

6    methodology and after citing the literature that he relies upon

7    so that counsel has an opportunity to fairly examine him on

8    cross-examination and poke and prod and challenge, he reaches

9    the opinion that he does that it was a reasonably safe thing,

10   all things considered, for Hunter Douglas to continue to offer

11   these two options.

12             That's what this case is about.  Dr. Sala is the only

13   witness who has even begun to do a careful analysis there.  And

14   I think what counsel's relegated to doing to try and chip away

15   at that is instructive.  He spent ten minutes on the fact that

16   he went to Lowe's and talked to somebody from Hunter Douglas

17   and looked at some online brochures, on the issue of how common

18   it was for vertical blinds to be used in common areas.  It's a

19   more common place.  It's a factor, but it's a fairly small one

20   in his opinions in this case.

21             But it's clear that there aren't other areas in which

22   Dr. Sala is subject to cross-examination, because he has taken

23   such care.  He has so painstakingly gone about doing his job in

24   this case.  And while I don't think it takes the contrast with

25   Dr. Wright to make that point, I think the fact that we heard

1    from them on back to back days makes it very well.

2           So those are the four points.  I tried to limit myself

3    and Dr. Sala's testimony to the issues that are presented here

4    today.  It's hard to, you know, stay away from the merits a

5    lot.  I don't think we've been entirely successful in that

6    regard.

7           With respect to Dr. Sala, he is, of course, supremely

8    qualified.  But it's not just his qualifications that make him

9    a witness entitled to testify certainly on the second, third

10   and fourth points.  And I concede that the first one is one --

11   an interesting one for you to consider.

12          But it's not his Johns Hopkins and Stanford pedigrees

13   that I rely upon here.  More significantly, it's how he went

14   about his business.  And I think he demonstrated today in the

15   limited time that we had that he did that in a way that far,

16   far exceeds the gate that needs to be cleared in order to

17   qualify under Daubert and Kumho Tire, and that he should be

18   allowed to testify at trial.

19          THE COURT:  Okay.  Thank you.

20          Rebuttal?

21          MR. JAUREGUI:  The studies that Dr. Sala relied upon

22   have nothing to do with the danger that window covering blinds

23   present in this case.  It has nothing to do with that issue.

24          It is interesting in this case that Dr. Sala was

25   trying to emphasize in his review of the historical data that

1   most of the incidents in this case have occurred -- or come as

2   a result of strangulation of kids from horizontal blinds.

3   Plaintiffs here are not making that distinction as to whether

4   the danger comes from a horizontal blind, from a vertical

5   blind, from any kind of blind.

6        Plaintiffs' argument in this case is that the vertical

7   blind was defective and it wasn't safe, and it was not

8   reasonable for Hunter Douglas to continue to offer that option

9   because of -- because it contained a looped cord.  And looped

10  cords is danger here.  I want to make sure that that's the

11  emphasis in this case.

12       The last sentence in his opinion that given the human

13  factors, whether or not this product and the understanding of

14  the hazards posed by vertical blinds it was reasonable for

15  Hunter Douglas to have offered consumers options as to the

16  control mechanism of the subject blinds.  I think what the

17  Judge was getting at on that issue is whether or not this is in

18  fact a legal conclusion.  And I believe it is.

19       I think the reasonableness issue, whether or not it

20  was reasonable for Hunter Douglas, that is within the province

21  of the jury.  And that is for the jury to determine whether

22  against that backdrop of history, what they knew, when they

23  knew it, how they reacted -- whether or not in light of that

24  knowledge that they had, the severity, the risk, the number of

25  kids that have died, whether or not it was reasonable for

1    Hunter Douglas to continue to offer both blinds.  And that's an

2    issue for the jury to decide.  That's a factual issue.

3          We have one major difference that permeates the

4    analysis of his opinions.  And he has to base his opinions on

5    facts, the facts of this case.  And the facts of this case are

6    that we have a vertical blind that had a hidden danger.  Every

7    witness that I questioned, and we took quite a number of

8    depositions, they either pretended not to know what a hidden

9    danger is or what an open danger is.

10         But by the end of the day, that doesn't matter because

11   the Consumer Product Safety Commission knows what a hidden

12   danger is.  And at the end of the day, that's what caused this

13   tragedy here.  It is the insufficiency of warnings, the lack of

14   adequate warnings, and the fact that this was a latent defect.

15   That's what's at issue in this case.

16         And in his analysis, Dr. Sala does not take into

17   account the latency of the risk.  He just, I -- my opinion is

18   as reflected in my report.

19         I really have nothing else to add at this point.  I

20   will stop here.

21         THE COURT:  Okay.  Thank you.

22         Let's take a five-minute break before we proceed with

23   arguments as to the Daubert motion with respect to Rose Ray.

24         MR. JAUREGUI:  Can we make it ten, Judge, so I can get

25   my act together here.

1        THE COURT:  Yes, you are doing double duty today.

2        MR. JAUREGUI:  Thank you.

3        THE COURT:  Ten minutes.

4     (Brief recess.)

5        THE COURT:  So let's proceed with argument as to

6  plaintiff's motion with regard to the defense expert Rose Ray.

7  You may proceed.

8        MR. JAUREGUI:  Thank you, Judge.

9        At the outset, I want to advise the Court that we

10 acknowledge that Dr. Rose is a highly qualified statistician by

11 training, education and otherwise.  And again, the issue is

12 whether her qualifications meet the methodology that is

13 required of the Court.  And as a gatekeeper I am going to

14 suggest to the Court that she does not, and her testimony

15 should be kept out.

16       There are a number of problems with her analysis in

17 this case.  And essentially, what she was asked to do was to

18 assess the risk of injury from common household products to the

19 risk of injury to window coverings and other products from the

20 commission.

21       If Dr. Rose is allowed to testify in this case, I

22 don't think that plaintiffs would ever be able to prevail on a

23 products case.  This is a kind of case where there have been

24 over 359 deaths by now of child strangulations from window

25 covering cords, a dangerous product.  The fundamental problem

1    that we have with the analysis of Dr. Ray is that in comparing

2    window covering cords to the items that she used in her

3    analysis, she didn't consider many of the issues that are

4    before the Court.  And let me just list the items that she

5    compared window covering cords to.

6            They are essentially 11 items that she used in her

7    analysis to determine that the risk of injury, the risk of

8    fatality associated with window shade, Venetian blinds and

9    indoor shutters with children ages zero to three is not

10   elevated when compared to the risk of fatality associated with

11   other common households.

12           THE COURT:  Can I request that when both counsel read

13   from a text, please slow down because --

14           MR. JAUREGUI:  I'm sorry again.

15           THE COURT:  It happens to everyone.  It's a very

16   natural thing because everyone has the document in front of

17   them.  And so the inclination is just to get through it.  I

18   understand that.  I do that a lot too, as my court reporter

19   will let you know.  But if you could just, everyone, if you can

20   just slow down when you are reading something, that would be

21   very helpful.

22           MR. JAUREGUI:  I have been warned, Judge.  Thank you.

23           MR. SANTIAGO:  Put it on the overhead too.

24           MR. JAUREGUI:  So the items -- the items that Dr. Rose

25   uses in her analysis are, No. 1, doors other than glass doors;

1    No. 2, glass doors, chairs, windows, sofas or couches, bathtubs

2    or showers, tables, coins, stairs, steps, ramps and landings.

3    No. 10, beds including bedsprings, bed frames, mattresses,

4    bath -- bassinets or cradles, cribs, and toddler beds.  And

5    No. 11, bucket or pails.

6              THE COURT:  I'm sorry.  What is No. 11?

7              MR. JAUREGUI:  Buckets or pails.

8              THE COURT:  Got it.  Thank you.

9              MR. JAUREGUI:  The first question that the Court would

10   ask in this case is, what in the world do any of those items

11   have anything to do with a window covering blind?  When I took

12   the deposition of Dr. Rose, I asked her many questions.  I

13   asked her, for example, whether or not any of these items had

14   any similarities with window blind cords.  And her answer was,

15   no.

16             When it came to doors, and I will go through a few of

17   these items, the questions that she was asked:  Do you know

18   whether any of these doors had any strings?  I think she may

19   have answered, well, some doors may have strings.

20             Do you know whether any of the doors that you used in

21   your study constitute an unreasonable risk of injury?  She said

22   she did not take that into account.

23             Do you know if the doors that you use in your analysis

24   in this case, whether or not they contain any latent defects?

25   She didn't.  Any latent dangers?  She said she didn't take that

1    into account.

2         When she was asked whether or not any of the doors had

3    ever been recalled by the Consumer Product Safety Commission,

4    she says that none of the objects that she used in her analysis

5    had ever been recalled, except perhaps for certain cribs.  Some

6    may have been recalled at some point.

7       (Brief pause.)

8       MR. JAUREGUI:  When she asked whether or not any of

9    the doors that she analyzed, whether or not they had any

10   defects, she said she didn't look at that.

11        I asked her questions as to each one of the items,

12   glass doors, chairs, windows, sofas, couches, bathtubs.  And

13   her answer was always the same, that the only basis for using

14   these items was because they were items that were commonly

15   found in the home.  No other justification for using her

16   analysis.

17        A statistician has to be able -- or has to be required

18   by a court of law to use a statistical -- if she is going to do

19   a comparative risk analysis, there has to be some kind of

20   similarity in the products that she is comparing.  None of the

21   items that are here have absolutely anything to do with the

22   issues that are before the Court.

23        I asked her if her analysis that she had used in this

24   case had ever been used by any court of law.  And her answer

25   was, no.

330

1          In preparing for this hearing, Judge, I was concerned

2     that when I read her opening brief, oh, my god, we didn't cite

3     a single brief, a single case, in challenging her opinions

4     other than Daubert and Kumho.  And when I read defendant's

5     opinions, defendant's answer to our brief, there is not a

6     single case that they cite in support of the proposition for

7     the reason that Ms. Rose should be allowed to testify in this

8     case.  There are no cases.

9          This is the first time that Dr. Rose is intended to

10    use this type of analysis in a defected products case, to say

11    that because the -- because there is a higher rate of injury

12    from common household products, that that is a justification in

13    this case.  I don't understand exactly what she is trying to

14    justify.  But the comparison that she is trying to do here is

15    that essentially the window covering blinds are not dangerous

16    because when you compare the risk of injury to other common

17    household items, the risk of injury is not elevated.  As is the

18    risk of injury is not elevated; therefore, you know, the window

19    covering blind, the issue in this case, did not constitute an

20    unreasonable risk of injury.

21         She does not deal with the issue -- I asked her, you

22    know, whether or not any of the items that she used in her

23    analysis presented any type of unreasonable risk of injury.

24    And she says that's not important to her analysis.

25         So she is comparing items that most of the items --

1    any parent would know, any member of the jury would know, that

2    if a child gets on top of a chair and the child falls down,

3    that's an open and obvious danger.  I think most of the jurors,

4    most members of the jury, would be able to understand that any

5    risks that stem from any of these items are open and obvious.

6            She has used in her statistical analysis, however, to

7    say that because there are more injuries that occur because

8    more children, thousands of children, are injured, are

9    hospitalized or died when they come -- when they interact with

10   any of these products, that therefore her analysis as a

11   statistician is saying that there is -- the window covering

12   blinds do not represent a higher risk of injury.  And if they

13   don't represent a higher risk of injury, therefore, you know,

14   the conclusion must be that they are not unreasonably

15   dangerous.

16           The problem that we have with that analysis, Judge, is

17   that it's going to confuse the jury.  It is utter confusion.  I

18   don't know how the jury is going to read that.

19           The issue here under Illinois law is that it doesn't

20   matter how many cases you have.  If there is an unreasonable

21   risk of injury, if you have an unreasonable dangerous product,

22   and the manufacturer knew about that risk at the time when it

23   left his control, then that is sufficient basis for the

24   plaintiff to establish that the product was unreasonably

25   dangerous.

1    Now, when we asked her whether or not any of the
2    products could be made safer, well, a chair is a chair.  It has
3    four legs.  I don't know how many more legs you can put on it
4    to make it safer.  None of those products that she uses in
5    her -- in her analysis had the option of making those products
6    safer, was there a component that these products would be
7    safer.
8    We have here a situation where the window covering
9    blind was defective, at least by plaintiff's allegations,
10   because of the loop cords.  And we have an alternative here
11   that it would have been a lot safer if Hunter Douglas had only
12   offered that alternative to the consumers at this point.  That
13   is not something that she took into account.
14   THE COURT:  As part of the proposed -- what is the
15   jury instruction going to ask the jury to look at when it
16   considers whether or not Hunter Douglas acted reasonably?  This
17   is a negligence design case, right?
18   MR. JAUREGUI:  That's correct.
19   THE COURT:  So the jurors have to consider obviously
20   first of all it's in the framework of common-law negligence,
21   duty to breach thereof, and injury.  Is a jury instruction
22   going to instruct the jury that they should consider a number
23   of factors to determine whether or not the defendant acted
24   reasonably or unreasonably?
25   MR. JAUREGUI:  Well, I didn't bring the jury

1   instructions with me, Judge.

2           MR. SANTIAGO:  Judge --

3           MR. JAUREGUI:  Mr. Santiago was the drafter of that

4   jury instruction.

5           MR. SANTIAGO:  There is one jury instruction that's

6   disputed.  And it essentially says, the plaintiff may establish

7   that a product is unreasonably dangerous by showing that there

8   was a reasonably feasible alternative that didn't change

9   functionally, blah, blah, blah.  Almost like the risk utility

10  analysis.

11          They haven't proposed an alternative to it, but they

12  object to it.  They don't think it's a proper statement of the

13  law in Illinois.  We do.  And I know there are other ones out

14  there that we can probably use as well that might inform the

15  jury as to the different elements, because there are elements

16  that the Court -- and most of them center around, by the way,

17  whether the alternative design was feasible and cured the

18  problem altogether.

19          THE COURT:  So the one proposed by the plaintiff is

20  based upon the utility --

21          MR. SANTIAGO:  Right.  But in Illinois, though, Judge,

22  we can use that, and we can use another -- there is another.

23          MR. JAUREGUI:  Consumer expectation.

24          MR. SANTIAGO:  Consumer expectation test.

25          THE COURT:  I --

1      MR. WILLIAMS:  But that's a strict products liability

2  test.  That is not a negligence test.

3      MR. SANTIAGO:  That's disputed.

4      THE COURT:  I know it's disputed.  I think the Seventh

5  Circuit has spoken on that pretty recently on whether or not it

6  is only for strict product liability or whether or not it can

7  be -- it has some utility in the negligence design case.

8      MR. SANTIAGO:  The modern risk utility test takes

9  elements of that in it under even Jabonski (phonetic).

10     THE COURT:  And I don't mean to get us off on a side

11 track here.  And I know that we will address jury instructions

12 when the time comes.  I am just trying to figure out what the

13 jury is going to be asked to consider when it makes its

14 determination of whether or not the actions were reasonable.

15     And frankly, in certain cases, the jury isn't supposed

16 to be given any instruction as to reasonableness because I

17 think the thought is that that is something the jury needs to

18 assess based upon the jury's own common experience.

19     But again, it was just -- I was just in the process of

20 thinking about it.  And the argument kind of raised that,

21 raised that in my mind.

22     Mr. Williams, do you have something to add?

23     MR. WILLIAMS:  Yes, to jump in really quickly and

24 interrupt and give Mr. Jauregui some more time to help you

25 focus on that.  There are competing jury instructions on this

1   issue.  With respect to our jury instruction, we have one that

2   says, plaintiff has the burden of proving negligence in the

3   design of the product in one of two alternative ways.  The

4   first is deviation from the standard of care.  And the second

5   is that we should known -- knew or should have known in the

6   exercise of ordinary care that the product was unreasonably

7   dangerous, which is language that you heard a lot from Dr.

8   Wright yesterday and would hear from Mr. Statler as well, and

9   Mr. Santiago argued to your Honor yesterday.  I will address

10  that in a minute.

11          But with respect to Dr. Ray, the reason I jump up and

12  interrupt is, her proposal, her proposed testimony, goes to the

13  question of reasonable safety, reasonable risk.

14          THE COURT:  I understand that's defendant's argument,

15  and you will have a chance to voice that.  Thank you.

16          MR. SANTIAGO:  One other thing, Judge, that's not one

17  of the elements that's considered in the risk utility test.

18  Rate of injury is not -- I've never seen it in the case law.

19  But I could be proven wrong.

20          MR. WILLIAMS:  We are --

21          THE COURT:  I --

22          MR. WILLIAMS:  -- jury instruction with rate of injury

23  in it, your Honor.

24          THE COURT:  I look forward to discussing that issue

25  when the time comes.

336

1          MR. JAUREGUI:  Judge, I -- we would not have any

2    problems with Dr. Rose's testimony in this case if she had gone

3    out and talked to Hunter Douglas and said, you know, what is

4    the rate of injury with the products that you offered to the

5    consumer?  What kind of data do you have?  How many people --

6    how many kids have been strangulated from vertical blinds?  How

7    many people have been strangulated from any of your products?

8          And then if she had compared that, the data, the data

9    of strangulation from vertical blinds to strangulations from

10   horizontal blinds, Venetian blinds, or any other type of blinds

11   that have a cord, we would be okay because then Dr. Ray would

12   be using a -- an appropriate comparative analysis of like

13   products.  She has not done that here.

14         I consider getting a statistician to rebut her

15   testimony.  But I didn't think it would be wise to spend the

16   money on that because the issues -- the comparisons that she is

17   making in this case, that the rate of injury from products that

18   have nothing to do with a product that has a hidden risk, that

19   the U.S. Consumer Product Safety Commission has already labeled

20   it as such, it's totally inappropriate, Judge.  There is just

21   no basis for that opinion.

22         There is -- she may have all the statistical

23   background.  She may have the scientific background.  But her

24   methodology does not apply to this case.  This is not a case

25   where she should be allowed to testify.

1          We have other problems with the sampling that she

2     chose also.  She has limited the size of her sample in this

3     case to children between zero to three years of age.  The

4     commission -- most of the studies in the commission did use the

5     age bracket of zero to five years because that's where most of

6     the strangulations occur within that age bracket.

7          She also limited her study here, her sampling, her

8     statistical sample, to the period of between 1990 and 2007.

9     There are many other strangulations, at least a hundred other

10    strangulations, that have taken place prior to 1990.  She did

11    not take those into account.  And the reason why she didn't

12    take those into account, there are a couple.  They are twofold.

13         One was that prior to 1990, she didn't think that the

14    Consumer Product Safety Commission had good data keeping.  And

15    two, she -- she just felt that it was more relevant to use that

16    data here for this type of analysis.

17         So the question is then, if she is not using products

18    that have any similarity whatsoever to the -- to the window

19    covering cord, she is not using an appropriate sampling as a

20    statistician because she has not chosen the -- all the -- all

21    of the -- all of the data that we know of as of today that is

22    available from the Consumer Product Safety Commission, then

23    that's really not a valid statistical analysis that she is

24    trying to use in this case.

25         Now, she also mentioned -- mentions in her report that

1   the number of fatalities have been decreased in the recent

2   years.  But she doesn't explain why they are being decreasing.

3   Is it because now there are more vertical blinds with wands out

4   there?  And that would be an important factor to consider.

5   Whether or not the increase of vertical blinds with wands --

6   whether or not that has decreased the risk of the injury in

7   this case, the rate of injuries in this case.

8           I asked Dr. Ray in her deposition whether or not she

9   had any idea of how many vertical blinds with looped cords,

10  such as the one at issue in this case, are in American homes

11  today.  She had absolutely no idea.  She doesn't know how many

12  vertical blinds with cords are out there in American homes.

13          And I asked her, would that kind of number statistics

14  be relevant for you when evaluating the risk of injury?  Her

15  answer, no.  Why is that?  Because my study is for the risk of

16  injury associated with window shades and Venetian blinds, not

17  specific to vertical Venetian blinds.

18          THE COURT:  Did she look at window shades and blinds

19  generally?  Or did she focus on -- did she focus at all on say

20  ones with looped cords or vertical blinds or ones in bedrooms

21  versus living rooms?

22          MR. JAUREGUI:  According to her report and her

23  testimony, she said that she focused on window shades and

24  Venetian blinds, but not specifically -- not specifically

25  vertical blinds.  So generically I guess she was saying that

1    she looked at all the window coverings in one swoop.

2         Judge, at this point I am going to reserve whatever

3    time I have left for rebuttal.  The arguments that we laid out

4    in our opening brief and our reply brief I think for the most

5    part adequately address our challenges to Dr. Ray's -- not to

6    her qualifications but rather to the methodology that she used.

7    That's simple.  I know, I am not using most of my time, and I

8    know the Court doesn't have any problem with that.

9         But the issue is that the items that she is using are

10   not even remotely similar to the -- to window coverings and

11   the -- whether or not any of those items pose a risk of

12   strangulation, any recalls, whether or not they had any

13   defects, whether or not the danger is open and obvious.  None

14   of those issues are relevant.

15        And because of the -- you know, for all of those

16   reasons, the analogy, the extrapolation that she's trying to

17   make from the rate of injury from chairs, tables, beds, has

18   absolutely nothing to do as to whether or not the particular

19   window covering in this case is unreasonably dangerous or was

20   unreasonably dangerous at the time it was sold to Ms. Davis.

21        THE COURT:  Okay.  Thank you.

22        MR. WILLIAMS:  Thank you, your Honor.  Good afternoon.

23        It's hard to know where to start on Dr. Ray.

24   Plaintiffs are contending in this case that Hunter Douglas was

25   negligent because it continued to manufacture what they contend

1    was an unreasonably unsafe product when a safer product was

2    available.  We heard ad nauseam from Dr. Wright yesterday and

3    you will hear throughout this trial the claim that Hunter

4    Douglas was at fault here, liable here, for continuing to

5    manufacture the corded window coverings.  And that's how this

6    case has evolved.

7        When it started out, before plaintiff realized that

8    Hunter Douglas did manufacture the PermAssure wand and make it

9    available at this time, the claim was that we had done nothing.

10   Now when they learned that we in fact had that option, they

11   shifted course and made the argument that we had an obligation

12   to provide only the safest product.

13       Mr. Santiago stood up yesterday before you and argued

14   very vehemently that the law in Illinois is that a manufacturer

15   has an obligation to provide consumers with the safest product

16   it can.  And Brian and I sat there and made note to go back and

17   correct the record on that.  And the -- there are a raft of

18   cases.  I'll direct your Honor's attention to a handful of

19   them, recently in -- actually Illinois Supreme Court case back

20   in 1979, Kerns versus Engelke, E-n-g-e-l-k-e, 76 Ill.2d, 154 at

21   page 166, the Court sets forth the rules:

22       Our decision must not be construed as holding that the

23   absence of the safest design is unreasonably dangerous as a

24   matter of law.  A manufacturer is not required to produce a

25   product which represents the ultimate in safety.  Citing a

1    string of cases that came before then.

2         More recently, the Court of Appeals in Illinois in a

3    1988 decision, Cornstrubble versus Ford Motor Company, 178 Ill.

4    App. 3d at 20, at page 32, summarized the law in Illinois as

5    follows.  And this is particularly applicable in this case

6    because the cause of action involved there was also a

7    negligence cause of action.

8         The Court said:  Under a theory of negligence, a

9    manufacturer does not have the duty to provide the safest

10   product, but only a reasonably safe product.  Dr. Harrenstien,

11   one party's expert, the plaintiff's expert -- Dr. Harrenstien's

12   testimony did not establish defendant's failure to exercise

13   reasonable care in designing in that case the gas tank step

14   system in question, steps up and down to the cab of a big rig.

15        And this Court, Judge Norgle, back in 1996 in the case

16   of Navarro versus Fuji Heavy Industries Limited, 925 F.Sup.

17   1323, Northern District, of course, Eastern Division, in a

18   decision that involved both a ruling on a Daubert challenge as

19   well as a motion for summary judgment, Judge Norgle granted

20   summary judgment to the defendant and summarized the law in

21   Illinois as follows:

22        The duty to manufacture reasonably safe products

23   demands neither the safest design possible, nor a design

24   incapable of causing injury.  Again, citing other Illinois

25   cases for that proposition.

1          Counsel simply misrepresents the law in Illinois.  And

2    the reason that Dr. Ray is in front of you this afternoon is

3    because she has been asked by us to address a very limited,

4    very focused question.  The jury is going to be asked to decide

5    whether this product's design, the corded, continuous-loop cord

6    operating system on this vertical blind, was an unreasonably

7    dangerous product.

8          That involves weighing.  That involves balancing.

9    That involves having a context.  And to give the jury any

10   opportunity to figure out what a reasonably safe versus an

11   unreasonably safe product is, a comparative risk analysis is

12   appropriate.  I -- I --

13         THE COURT:  Mr. Williams, let me ask you this:

14   Could -- Dr. Ray, I think it is?  Could Dr. Ray include in her

15   elements of comparative risk analysis the risk of getting into

16   an auto accident, or the risk of being hit by lighting, or the

17   risk of being, I don't know, hit by a baseball attending a

18   baseball game -- I mean, all those things are risks that we

19   face when we go out into the world.

20         Why would -- is it your position that those risks

21   could also be included in an analysis of comparative risk

22   because those are things that people and the jury will know

23   about and will give them an ability, according to defendant's

24   theory, to weigh that risk with the risk at issue here

25   purportedly.  Is that defendant's position?

1          MR. WILLIAMS:  If I understand the question, your

2     Honor, at least no in part.  I will walk through in a minute

3     some of the risk analyses that she could do that she has

4     specifically not done because she doesn't believe they are

5     relevant for this case.  She is focused on products, consumer

6     household products, that a child is likely to be exposed to.

7     She has driven it down as narrowly as possible to make it

8     relevant to this lawsuit.

9          Going for a walk, being hit by lightning, are risks in

10    everyday life.  But we don't evaluate whether a manufacturer of

11    that lightning was negligent or not.  And so that's not

12    something that she would have to consider.

13         She also doesn't think it's relevant to consider for

14    these purposes risks that a child age zero to three wouldn't be

15    exposed to.  She is limited to that, because that's the --

16    that's the comparison basis.  And I'll talk in a minute about,

17    this isn't Dr. Ray's invention.  The CPSC does this all the

18    time, compares different types of products because of their

19    potential exposure to the same population in determining what's

20    a reasonable level of risk or not.

21         Plaintiffs want to simply say, 110 or 170 deaths and

22    this is terrible and every one is awful.  And, therefore,

23    without more you should find Hunter Douglas negligent by

24    putting on the market basically a product that could cause this

25    type of an injury or death one time.  And if we are not allowed

1   to put in perspective, and they can cross-examine the heck out
2   of her, but put in perspective the level of risk posed by
3   corded window coverings when compared to other products that
4   people have experience with and have the ability to compare
5   these window coverings to, then we are basically at their mercy
6   to come in and say, because Max Padilla died, therefore, this
7   product was unreasonably dangerous.
8          THE COURT:  But don't juries -- I mean, don't juries
9   make reasonable determinations all the time, every day, in this
10  building without the aid of any sort of comparative risk
11  analysis?  As I understand it, what you are trying to do here
12  is, what you are saying is, look, juries need to get a -- they
13  need to have provided some perspective on what the risks of
14  death are in comparison to the product at issue, versus other
15  products that they would come into contact with, right?
16         MR. WILLIAMS:  Good characterization.
17         THE COURT:  And so it's not -- when in that context,
18  the chances of a zero to five year old being hit by a car would
19  be, quote unquote, as relevant as their suffering injury due to
20  a chair at the house because the sole basis for her opinion is
21  to provide -- according to defendant, is to provide the jury
22  with a comparative basis of risk of things that they know that
23  children would be exposed to.
24         So in that sense, in context of that argument, any
25  risk that a child of zero to five would be exposed to would be

1    relevant because it would arguably give the jury an additional

2    comparator.

3        MR. WILLIAMS:  You might argue it be relevant.  I

4    would say that it's less relevant than what we've done here.

5    And we've done a much more narrow focused approach.  Dr. Ray

6    has at my request -- and as I'll just in a minute.  Every --

7    every step of the way I asked her to take the most conservative

8    position, assume the variables that place the greatest weight

9    in the category of injuries we are talking about here.

10        For example, counsel says she didn't limit it to

11    vertical blinds.  That's because counsel is saying that a loop

12    is a loop is a loop.  And in general the risk of corded window

13    coverings is such that that's what you should look at.  So I

14    instructed her, don't choose the small subset of vertical

15    blinds.  Use all of the corded window coverings, which gives

16    you the largest number of injuries and deaths, which gives you

17    the highest incidents, so that it would not be vulnerable to a

18    complaint like that.

19        And sure you can say at some level it gives the jury

20    some perspective to say, well, let me compare corded window

21    coverings to my child walking to the bus stop in the morning to

22    go to school.  And aside from the fact that three year olds,

23    you know, don't typically walk to the bus stop by themselves to

24    go to school, the reason I -- not so much I didn't ask her to.

25    But she -- she does this all the time and does this in court

1    all the time, as I will correct in a minute.

2             The reason that she doesn't want and doesn't think

3    it's appropriate to do that broad a comparison is because she

4    thinks the more -- the more focused it is on products that are

5    available to be purchased and sold and consumers have choices

6    with respect to, the more relevant it is to a product case that

7    we are involved in here today, where consumers likewise are

8    going out into the marketplace, making choices, and -- and

9    making decisions based upon what they think is best for them

10   and their families.

11            THE COURT:  Okay.

12            MR. WILLIAMS:  And I -- really given your concern

13   there, I am going to ask the Court to liberally interrupt me

14   because I want to answer your concerns.  I don't want to stay

15   off them.  If you got things you want me to focus on, I want to

16   do that.

17            Let me try to --

18            THE COURT:  Okay.  At that invitation, if she focuses

19   on blinds generally, which includes uncorded blinds,

20   wouldn't -- I mean how is that relevant to this case?  Because

21   couldn't that -- that can work in -- that can work the numbers

22   either way.  We don't know which way.  And so why is that

23   analysis relevant or helpful to the jury here?

24            MR. WILLIAMS:  Not uncorded.  Did you mean horizontal

25   versus vertical?

1      THE COURT:  Yes.

2          MR. WILLIAMS:  Once again, because it maximizes the

3   incident rate.  In other words, it takes the plaintiff's

4   argument that it's too fine a distinction, Mr. Williams, or

5   Hunter Douglas, to make between a vertical blind cord and a

6   horizontal blind cord.  You heard about the different functions

7   but, yes -- to play devil's advocate and take their argument,

8   for all it's worth.  If you had two products, both of which had

9   continuous loops, and one had these slats and one had these, it

10  doesn't make any difference.  That cord sitting there is the

11  same roughly level of risk.

12         So she included all of the data to include the

13  hundreds that would have been scores and not hundreds if she

14  had limited it to vertical blinds, so as to not to be unfair.

15  I mean, I am very sensitive to the -- there are three kinds,

16  you know, lies, damn lies and statistics complaint.  And I

17  wanted to make sure that she was extremely cautious and

18  extremely deferential to, you know, the plaintiff's position in

19  this case in the assumptions that she made.

20         So every step of the way, as I will try to

21  demonstrate, she assumed all products, not just these, let me

22  respond right now, to the only zero to three year old

23  population.  The CPSC has statistics.  Five, six years old is

24  about as old as we see these tragedies occur to.  It's

25  typically children between zero and three.  Max was three.

1    You -- once again, if you took a population of zero to
2    five, that is going to be fewer four and five year olds getting
3    involved in injuries, which is going to produce a lower rate.
4    And, therefore, you are going to skew the incident rate
5    downward.  So I asked her to focus on the population of zero to
6    three, A, because that's a population that includes Max
7    Padilla; and B, because that gives the highest incident rate.

8    Including any more years, counsel's argument that she
9    should have included more, I wish he would have told me that
10   before she did her report, because the incident rate would have
11   been lower.

12   So that's another example of the ways in which she in
13   part at my direction, in part because that's what she does, was
14   very careful to only rely on the most pristine data and make
15   assumptions that were in her opinion fair or more than fair in
16   this case.

17   THE COURT:  Let me ask you another question.

18   MR. WILLIAMS:  Sure.

19   THE COURT:  Putting aside the question about whether
20   or not they are fair comparators.  When you look at what the
21   jury is going to be asked to determine, the jury is going to be
22   asked to determine with regard to the blinds at issue here,
23   right, was Hunter Douglas reasonable or unreasonable?  Okay.
24   And part of that is looking at the risks of the incidents of
25   mortality and injury.  The other side will be looking at costs,

1   feasibility, functionality all those things that we talked

2   about.

3          How does knowing one number, that is the risk, of a

4   totally unrelated product, right, devoid of any sort of

5   analysis as to functionality, costs, feasibility, with regard

6   to those products, help the jury decide reasonability with

7   regard to the blinds?

8          MR. WILLIAMS:  Simply because it's a matter of common

9   experience.  I understand your point, and it would be more

10  perfect if they knew how much it cost to manufacture one kind

11  of chair versus another kind of chair or one kind of glass door

12  versus another.

13         THE COURT:  Simply because in one aspect -- and we can

14  talk about hypotheticals.  Hypothetical A, you know, a risk of,

15  I don't know, .003 percent, right, might be reasonable.  But

16  another hypothetical for another product that might be

17  completely unreasonable.  And so how does giving that number in

18  and of itself help the jury make a reasonable determination

19  with regard to this case?

20         MR. WILLIAMS:  Because the jury has a background, a

21  basis for in common experience evaluating, okay, how much safer

22  could you make a bathtub?  Or how much safer could you make a

23  bucket or pail.  More children drown in buckets or pails, not

24  bathtubs, buckets or pails, than die on window coverings.

25         A jury has a basis for saying, a glass door, if it's

1  going to be glass, if you can see out of it, can only be made

2  so safe.  So they have a common experience there to take those

3  incident rates and say, hey, you know, we need chairs.  So even

4  though that's a high number, you know, to me it's -- it's

5  reasonable that we continue to have those.

6       But it's -- if we don't have this kind of information

7  through Dr. Ray, the plaintiffs are going to come in here and

8  try to put blinders on every member of this jury and have them

9  focus on one window blind and one little boy who's now

10 deceased, and the tragedy that one family has endured and say,

11 looking backwards to 1995, Hunter Douglas sold this product

12 that ended up producing this result.

13      And if they are allowed to do that without our ability

14 to -- basically it's fleshing out, your Honor, what you touched

15 on yesterday with Dr. Wright; and that is, there is risk in

16 many things we do.  And there are tradeoffs.  And there are

17 very few things that are perfectly safe.

18      Dr. Wright has no idea how frequent the rates of

19 injury are here.  Part of the need for Dr. Ray is, you heard

20 him yesterday.  He doesn't know if there is a hundred thousand

21 or hundreds of thousands, he said, or a billion.  He had no

22 idea.  It wasn't important to him.  He wants to come in here

23 and say, one death is too many.  And, therefore, a product that

24 caused one death is a defectively designed and unreasonably

25 dangerous, negligently designed product.

1          Dr. Ray is really critical to our ability to say,

2   let's look at the whole picture.  Let's be fair.  And as I say,

3   she will -- she will do it in careful, painstaking detail.  And

4   I think -- I think now -- keep interrupting if you like, but it

5   would be helpful to you if I walk through what she will do at

6   trial.

7          First of all, it is Dr. Ray.  It's not Dr. Rose.

8          In responding to plaintiff's claim that there was an

9   unreasonable risk of injury that was created by Hunter Douglas

10  offering corded window coverings in 1995, they want to stand up

11  and discuss the number of injuries and deaths and basically

12  stop there.  By this motion, as Mr. Jauregui says, they're

13  seeking to prevent the jury from hearing any context, or as you

14  say perspective, to put those accidents in or hold them up to.

15  In order to have any basis to determine whether the risk of

16  injury or death posed by this product was an unreasonable

17  one -- and we have to look at it in 1995, not 2013, after it's

18  been involved in Max Padilla's death -- they have to have that

19  context.

20         Dr. Ray's analysis is very specific and very narrow.

21  She takes, as I said, population of zero to three.  And I

22  explained the reason she did that.  That's the relevant

23  population.  It's also the one that produces the highest

24  incident rate.

25         She then compares that rate of injury for three

1    different time periods, and counsel commented on that.  He

2    actually commented on one.  She only looked at 1990 through

3    2000.  She started with 1990 because the information available

4    before then was less reliable, spottier, and in all likelihood

5    would tend to underrepresent the incidents.  So 1990 is the

6    beginning of what she believes is the quality level of

7    information.

8         She then went to two different dates going forward.

9    She went to 1993, which would be the last date that would have

10   been available if Hunter Douglas had known all of this

11   information -- available to it in time to design and

12   manufacture product in 1995.  So she did an analysis up through

13   1993.

14        Then she did another one from 1990 to 1995, basically

15   assuming sort of fictionally that the time this was designed

16   Hunter Douglas knew of every incident that was out there, even

17   without any time lag.  And then finally she did the period from

18   1990 to 2007, the last complete year of information before

19   Max's death in 2008.  So those were the three time periods that

20   she did.

21        She then did two analyses for each time period.  The

22   first one was deaths to children associated with these selected

23   window products.  I don't know if you have her report handy,

24   your Honor.  I can hand you a copy if you like one.

25        THE COURT:  I have it.  Thank you.

1          MR. WILLIAMS:  And so the table you see here sets

2     forth the various products that she compared it against.  And

3     what's important is, down at the bottom the information that

4     she relies upon, her source material, because counsel has for

5     some reason chosen to criticize it.  And so I am going to point

6     out why that's not a good idea.

7          She relies exclusively on data from the NEISS database

8     maintained by the CPSC, as you heard the best information

9     that's available, and with respect to the various exposures.

10    So the NEISS database gives you basically the numerator.  It

11    tells you how many incidents there have been of deaths

12    involving beds, buckets, window shades, et cetera that gives

13    you your numerator.

14          She then has to have a denominator.  And she,

15    therefore, needs to be able to calculate the number of

16    exposures that children would have to each of these products.

17          So she sets forth in the next page, behind the nice,

18    readable by attorneys bar chart, she sets forth a table

19    containing the same data.  But it shows not only the deaths, in

20    this column the numerator, but also the population.  And she

21    explains below there, and I won't belabor it now, the source

22    for each of her population.  She has to have reliable

23    information to show how many exposures there are to beds, how

24    many to window blinds, et cetera.

25          So all of that is set forth in her report that's been

1    in counsel's hands for over two years.  And she takes that

2    scientific methodology.  And she applies it and then breaks

3    down deaths to children zero to three years old.  And then

4    separately she prepared a parallel table for each time period,

5    showing the rate of injuries and deaths combined.  So the only

6    difference here is, she adds in injuries.

7              And what you see here is that window shades is at the

8    bottom of the scale.  And the reason for that is when there is

9    an accident involving window shade, a higher portion of

10   fatalities.  So when you add in the injuries, there aren't that

11   many more to add in.

12             So she goes through.  She performs that analysis.  And

13   she explained in her report and in her deposition the reasons

14   that she selected the products that she did.  If you continue

15   to look to her report at Appendix C, she actually gives us, and

16   you in particular, some information with respect to fatality

17   rates that she did not include to again provide additional

18   perspective.

19             I would not propose to offer this to the jury.  But

20   for your purposes to see how selective she has been, you know,

21   the accident or the deaths per 100,000 population for motor

22   vehicle accidents is 16.7.  Back on that bar chart, the rate

23   for children's deaths with the highest incidents on beds was

24   not even three.

25             So obviously there are bigger fatality rates that she

1   could be comparing things to.  She is not doing that here

2   because she doesn't believe that motor vehicle incidents or

3   falls or poisonings or fires are as relevant as the products

4   that she selected.

5        So she has been very selective in what she has chosen

6   to present to the jury.  We are not bringing in everything that

7   we could.

8        Plaintiff's opposition is that -- is several things.

9   One of their arguments is that she's chosen products that don't

10  cause strangulation.  You didn't hear that today, but that's in

11  their brief.  That's silly.  She's choosing products that can

12  kill children by any means.

13       You also heard that she didn't base her analysis on

14  other products that were either defective products or that had

15  latent defects.  That's what we are here to decide is whether

16  there was an unreasonably dangerous product.  That's the cart

17  before the horse in the worst possible way.  That's what the

18  jury is going to be asked to consider here.

19       They argue that this is not related to matters growing

20  naturally out of research that she's done independent from this

21  litigation.  She has been doing that.  She has been published

22  for over 20 years.

23       But more importantly, the NEISS database is a database

24  that's used by the CPSC and other agencies to perform

25  comparative risk analyses all the time.  As Dr. Ray said in the

1   affidavit that she supplied in connection with our opposition

2   in this case, that we refiled again this past May, she explains

3   that the Consumer Product Safety Commission does comparative

4   risk analyses, for example, comparing the risk associated with

5   chain saws as opposed to walk behind power mowers.  Or the risk

6   of drowning in a home swimming pool for children under age five

7   was compared by the CPSC to the risk of death for children

8   under age five in motor vehicle crashes, all of them accidents

9   in spas.

10         That's what a comparative risk analysis is.  And it's

11   a tool not developed for litigation.  It's a tool that's used

12   by scientists who look at products and look at safety of

13   products and look at how to make products safer.  And it's

14   simply one that she has done in a way that plaintiff's counsel

15   can't challenge.  Not only her qualifications but her

16   methodology are, I think, as tight as can be.

17         But your Honor seems concerned about whether there is

18   any underlying relevance to this at all, which I am a little

19   surprised at, but I want to try to respond to.  Counsel

20   suggested that in his deposition she asked her if she ever

21   testified to this type of analysis in trial.  And she said she

22   had not.  I -- I am trying to be patient with the confusion

23   that we have sometimes.  But I have a hard time when your Honor

24   has things misrepresented to him.

25         In her affidavit submitted back in 2011, and refiled

1    again back in May of this year, Dr. Ray lists at paragraph 4

2    about 15 cases in which she says, I testified as an expert

3    witness in numerous jurisdictions throughout the United States

4    on issues similar to those I have been asked to address here.

5    Specifically I was qualified as an expert in a court of law on

6    statistical analysis in at least the following lawsuits, all

7    but two of which involved comparative risk analysis.  She lists

8    those lawsuits.

9           It's disingenuous, it's dishonest, to represent to the

10   Court that she has never been allowed to testify as an expert

11   on precisely this subject before because that's what she does

12   all the time.  And she's allowed to do it all the time because

13   other courts have recognized that having that context, having

14   that perspective, is helpful to a jury.

15          It doesn't mean that because there are other products

16   that are more risky or less safe than window blind cords, that

17   ipso facto window blind cords are safe.  But it gives the jury

18   some context.  It allows them to take the blinders off and to

19   evaluate the risk here.

20          And we can put up numbers just of window blind cords.

21   But a jury is going to sit there and scratch their head and

22   say, well, okay, this many per hundred thousand, or this many

23   per 10 million.  But how does that compare to things that I

24   know?

25          What Dr. Ray will do very carefully and very

1    conservatively is answer that question for the jury.  And

2    that's why I believe she not only meets the Daubert standard.

3    I don't think there is any question that her qualifications and

4    methodology do that.  But I believe she provides a very, very

5    important, relevant item of information that the jury simply

6    needs to have in this case.  Or they're going to have no

7    perspective with respect to judging the reasonableness of this

8    risk or not.

9              THE COURT:  Okay.  Thank you.

10             Rebuttal?

11             MR. JAUREGUI:  Thank you, Judge.

12             I'd like to clear something up at the outset.  I have

13   known Mr. Williams for the last three years since we have been

14   working on this case, putting up with each other.  And one time

15   he was even kind enough to give me a ride to the airport.  So I

16   greatly appreciate that.

17             But I do resent him accusing me of dishonesty in front

18   of the Court as to whether or not Dr. Rose had ever testified

19   using the principles in this case.  So let me put up her

20   deposition.  On page 181, there is -- let's start with page 180

21   so we are fair here.

22             The first question there:  Is the approach that you

23   have taken in this case, the comparative risk analysis, that

24   you are doing, it has -- it has never been either accepted or

25   rejected by a court of law, is that correct?

1        No, that's not correct.  This is a type of analysis --

2  this type of analysis has been admitted in testimony in --

3        Question:  I'm sorry, Doctor.  I think I did not give

4  you the proper question that I wanted to give you.

5        Mr. Williams:  Can she just finish her answer?

6        Mr. Jauregui:  Go ahead.

7        The Witness:  I am mostly finished.  I know that

8  comparative risk analysis specifically of this type has been

9  admitted in many courts of law by my own testimony.

10        I know that the very similar types of analysis have

11  been admitted in courts of law by testimony of colleagues of

12  mine, specifically colleagues that I am aware of.

13        There may have been many other places, but testimony

14  by Jahup Padmanabhan, phonetic and testimony by Roger McCarthy

15  has been admitted.

16        MR. WILLIAMS:  Counsel, can we move the slide, so we

17  can read along on the monitor.  Thank you.

18        MR. JAUREGUI:  There were -- let's see.  Also probably

19  William Wecker.  There may be many others, but these are just

20  the ones that I am personally -- that I personally know about.

21        By Mr. Jauregui, Question:  Are these folks that work

22  for Exponent also?

23        No, some of them once worked for Exponent.  William

24  Wecker never worked for Exponent.

25        Question:  I guess my question was intended to be more

1    specific.  So let me attempt it in this matter:  The

2    comparative risk analysis is that you -- that you have done for

3    the rate of injury comparing the rate of injury to young

4    children from window blind cords to the household common

5    products that you have used, has that specific analysis

6    comparing those products ever been either accepted or rejected

7    by a court of law?

8            Answer:  I don't know if a risk analysis using this

9    commonly accepted methodology by specifically to these

10   particular products has ever been presented in any way to a

11   court of law.

12           Judge, we don't dispute that Dr. Ray is entitled to do

13   a comparative risk analysis.  She has every right to do that.

14   But there have to be accepted methods of how she goes about

15   doing that.  And the way she has done that, it doesn't do that

16   here.

17           She was retained in another case out of Florida.  And

18   in that case, she included -- that case never went to trial.

19   And apparently she never testified.  But in any event, she

20   disclosed to me during her deposition that in that case she

21   included all of the same items here, with the exception of

22   pails.  And I asked her, pails or buckets, why are you

23   including that category here?  Well, you know, it's something

24   that is commonly found in the house.

25           Nothing else.  We don't have absolutely any other

1    validation for her testimony that the only reason why she is

2    using this analysis is because these are items that are found

3    in the house.

4            Let me show you something here.  Mr. Williams showed

5    you that graph.  And that graph represents the rate of injury

6    for the various products that Dr. Ray is using in her analysis.

7    And as it can be seen, window shades, Venetian blinds or indoor

8    shutters, it's somewhere there.  One, two, three, four, five.

9    No. 5.  It's a very small percentage, and the percentage has

10   continued to decrease with regards to the other items.

11           So the question that I have here, and Dr. Ray is not

12   here to answer it, and the question that the Court should be

13   asking, is it that -- is it the reason that -- strike that.

14   Did she even take into account when doing her analysis and

15   using all of those items in the house of how many of those

16   items were in the house?  For example, how many beds, bathtubs,

17   buckets, sofas, couches, chairs, glass doors, windows, doors,

18   stairs, tables and coins.  How many of all of those items are

19   in a given household in relation to window blinds?

20           I mean, that seems to me that that -- if you are -- if

21   she is not taking that into account, then her sample here, the

22   extrapolation of the data that she is using here, has -- it's

23   totally invalid.  There is absolutely no basis for that kind of

24   analysis here.

25           I mean, common sense would tell me that if you add up

1   all of those items in any household, you are going to find a
2   lot more of those items in a household than you are going to
3   find window blinds.  And if that is the case, yeah, then a
4   child is more likely to be injured by one of those items by
5   virtue of the fact that there are more items than there are
6   window coverings in the household.

7          Now a critical flaw in her analysis is that she did
8   not take into account the foreseeability of injury in the --
9   the foreseeability in the manner in which these deaths have
10  been occurring in window covering blinds.  It is foreseeable.
11  Everyone -- you heard from the -- all of the expert witnesses
12  that the manner in which children are strangulated is when they
13  climb up on furniture and they attempt to look out the window.
14  That's was -- that is one of the ways.  It is foreseeable.

15         So when we're trying to -- when she's tying to
16  determine the risk of injury that is posed by -- that is posed
17  by a product that is dangerous, and she compares it to a
18  product that is not dangerous, it's a comparison of apples to
19  oranges, Judge.  I don't see any valid analysis in this case.
20  There is not a single case that defendants can cite to of all
21  those cases that, you know, she has testified.  There is not a
22  single case where she has brought this type of analysis
23  particular to this issue in this case.

24         And she has been around for 40 years.  There has been
25  quite a bit of litigation out there relating to window covering

1    cords.  So this is the first time that they are trying to get a

2    court of law to adopt this type of analysis for the proposition

3    that when you look at these issues, the rate of injury, whether

4    or not there is any similarity to the products, that there is

5    really -- there is really -- that there -- that the rate of

6    injury doesn't go up.

7         And I don't -- I can't put it in any other words to

8    the Court other than it's just going to utterly confuse the

9    jury.  It doesn't answer the question of whether or not this

10   particular window blind was unreasonably dangerous.

11        We are prepared to meet our burden to this Court and

12   before the jury to show with the evidence that this particular

13   window covering cord was unreasonably dangerous.  There is some

14   issues, some evidence, burdens of proof that we have to meet.

15   But we cannot fight again all those statistics and let the

16   jury -- give the jury the impression that because more kids get

17   injured by chairs, therefore, you know, the window covering

18   blind in this case is not dangerous.

19        It has nothing -- the rate of injury in determining

20   whether a product is dangerous or not has nothing to do in the

21   analysis under Illinois tort law.

22        THE COURT:  Thank you, counsel.  And thank you to

23   everyone again today for the arguments that are very helpful.

24   And I will go ahead and take a look at the motions and issue a

25   ruling by mail.

1          Now the other thing I wanted to do today was set trial

2     dates.  So it also seems to me that the pretrial conference in

3     this case, that it might be worth while to at least put aside

4     two days for the pretrial conference so that we can deal

5     with -- I like dealing with jury instructions beforehand,

6     preliminarily.  And so keep that in mind as well.

7          At this point in time -- and I was looking at my trial

8     calendar during the break.  The trial dates that I am looking

9     at -- and again this is going to be two weeks I will set aside

10    for a jury trial -- would be in January of next year.  And so

11    the dates I propose would be the week of January 19, and the

12    week of January 26.  I just want to give you an opportunity to

13    check your schedules to see if that works.

14         The pretrial dates, the two days that we set aside,

15    and actually what we would do is set aside two afternoons,

16    would be the week before.  That is the week of January 12.

17         MR. WILLIAMS:  May I jump in to completely bollix up

18    the works, your Honor?

19         THE COURT:  Yes, of course.

20         MR. WILLIAMS:  I shouldn't apologize but I will

21    anyway.  I have a two week trial set in Maricopa County, in

22    Phoenix, on January 13.  And if there were any realistic chance

23    that it would settle any time soon, I would tell you that.  And

24    I don't know what your position is on double setting.  I know

25    typically judges sitting where you do are ready to go and try

1    to set aside a date unless there's a criminal matter in the

2    way.  And so I don't want to be in a position of trailing or

3    keeping your Honor up in the air.

4              Right now the weeks of the 13th and 20th for me are --

5    sorry.

6              THE COURT:  No, that's why I wanted everyone here

7    while we are setting these dates.  As a practical matter, I do

8    not like to double set dates, just because of the Speedy Trial

9    Act.  Criminal cases always end up unfortunately at times

10   bumping civil trials.  So I like to set trial dates for civil,

11   keep them to the extent I can.

12             In this case, as I was reviewing the Daubert motions,

13   I thought that it would be helpful to hear from -- have some

14   live testimony with regard to a couple of the experts.  And

15   that's why I scheduled it the way I did.

16             So, counsel, your trial starts on January 13, is that

17   what you said?

18             MR. WILLIAMS:  It does, your Honor.

19             THE COURT:  And it goes for two weeks?

20             MR. WILLIAMS:  Maximum.  I think similar to this one.

21   I think it should be eight to ten day.

22             MR. JAUREGUI:  Judge, if I can --

23             THE COURT:  Yes.

24             MR. JAUREGUI:  -- advise the Court, preparing for the

25   trial, the near trial experience, we thought that perhaps the

1    case could be put on in about seven days.  I don't know if

2    Mr. --

3              MR. WILLIAMS:  I don't disagree.  I think we actually

4    had talked about an eight-day as opposed to two weeks for

5    whatever that matters.  With a good two-day pretrial that

6    should shorten the trial, I would hope.

7              THE COURT:  What about March 10, the week of March 10

8    and then going into the week of March 17?  Are we going to run

9    into spring break issues at that point?

10             MR. WILLIAMS:  I have just been complaining recently

11   about having my youngest graduate from college.  So I am old

12   enough to be not constrained by academic calendars.  So that's

13   not an issue at least on my side of the table.  And right now

14   for very different reasons it's not an issue for Mr. Watson.

15             MR. JAUREGUI:  We are okay.  We're fine with --

16             MR. WILLIAMS:  I am pretty sure I don't have anything

17   on my calendar, your Honor.  I got a nagging feeling, but I

18   don't think there is anything.

19             THE COURT:  Let's go and set those dates then.  So we

20   will start on March 10.  And I will set aside, just in case,

21   the week of March 10 and the week of March 17.  As far as the

22   pretrial, let's do the pretrial in the last week of January.

23   Does that work?  Looking at the afternoons of the 28th and

24   29th?

25             MR. WILLIAMS:  Yes, that does here, your Honor.

1    THE COURT:  Will that give you enough time after your

2  trial?

3    MR. WILLIAMS:  The work's been done, and I just think

4  I am going to paralyze the system if I worry too much about

5  having a nice leisurely break.  So I will get myself here from

6  Phoenix by the 29th on that.

7    Actually the only thing I want to mention, but not to

8  request any change, is, those weeks of March 10 and 17 I have a

9  trial on February 25.  But I, A, believe that should be

10 shorter, believe has a higher likelihood of success that I just

11 don't want to.

12   THE COURT:  You will have a busy spring, but that's

13 probably both good and a bad thing.  Good for your partners,

14 not necessarily for you.

15   So let's go ahead and set the pretrial for the

16 afternoon of the 28th and 29th of January.  We will start at --

17 let's start at 1:30 on those dates.  If we can get through it

18 all in one afternoon we will.  If not, then at least we still

19 have the second day.

20   MR. JAUREGUI:  Judge, can I ask a rather difficult

21 question here?  Is there a -- I know at this point we don't

22 know when the ruling we are going to get from the Court on

23 these motions.  But after we get your ruling, because it may

24 impact on the pretrial order, the submissions to the parties,

25 if we can have a period of time so that we can respond

1    accordingly to submit perhaps a revised pretrial order, and

2    give you additional jury instructions.  I don't know if it's

3    appropriate at this time to consider that.

4            THE COURT:  No, I think that one of the reasons again

5    why I wanted this hearing is because I realize Daubert motions

6    would have an impact, significant impact, on the trial if they

7    were to be granted either in whole or in part.  What I will do

8    is, once we issue the ruling -- and my hope is to get them out

9    sooner rather than later so that the parties can have the

10   benefit of them.  Sounds a little strange.  But so the parties

11   can at least review them.

12           What I will do is, we will have -- I will call a

13   status hearing after the ruling has come out.  At that point in

14   time the parties can address to me -- and, Mr. Williams, since

15   you are from out of town, you two are --

16           MR. JAUREGUI:  We are here.

17           THE COURT:  You can participate by phone if you

18   wish --

19           MR. WILLIAMS:  Thank you.

20           THE COURT:  -- so long as someone from your Chicago

21   office is here.  And then the parties can talk about how they

22   want to proceed based upon those rulings.  And if the parties

23   feel that some revisions of the pretrial orders will need to be

24   made, then we can talk about it then.

25           MR. WILLIAMS:  Your Honor, the only other items that

1    are I think worth noting now are, I don't believe there has

2    been a ruling on plaintiff's motion to -- for a second amended

3    complaint.  That's pending and has been fully briefed.  And

4    then if you -- I am not sure if you put these over to the

5    pretrial conference.  We filed three motions in limine as part

6    of the pretrial submissions three, four weeks ago.  And those

7    are pending as well.  No opposition.

8           THE COURT:  Yes, with regard to the motion to file

9    amended complaint, you will have that ruling very shortly as

10   well.  And as far as the other motions in limine, we will

11   address those as part of the pretrial conference.

12          MR. WILLIAMS:  Thank you, your Honor.

13          MR. JAUREGUI:  Judge, just advise the Court on that we

14   have agreed to withdraw our strict warranty claims from the

15   complaint.  So there is no reason for the Court to proceed with

16   that.  We -- strict warranty.  We had implied warranty and

17   express warranty.  So we have agreed to withdraw the express

18   warranty as one of our counts of the complaint.  If the Judge

19   like me --

20          MR. WILLIAMS:  Because you combine the two, strict

21   liability has long since been stipulated to be dismissed.  And

22   counsel has informed, advised as to the express warranty claims

23   also being dropped.

24          THE COURT:  You should go ahead and file something.

25          MR. JAUREGUI:  File a revised complaint with those --

1          THE COURT:  No, what you should do is file a

2     stipulation or an unopposed motion letting the Court know that

3     you are going to be dropping that count.

4          MR. JAUREGUI:  Very well.

5          THE COURT:  With regard to the amended complaint, I

6     have taken a look at the papers.  And, you know, it's one thing

7     if the plaintiff wants to amend the complaint to take out the

8     parties who are now no longer part of this case, as well as the

9     counts that are no longer at issue.  There has, however, been a

10    response by defendants that in fact there has been some

11    substantive changes to the allegations because the allegations

12    are somewhat intermeshed to some extent.  And that's what we

13    are looking at right now.

14         MR. JAUREGUI:  Since we do not -- you invited

15    defendant to file a response.  We have not.  We just filed a

16    complaint.  Can plaintiffs be allowed to file a response?

17         THE COURT:  I don't think I will need a reply.  I

18    think it's simple enough.  I just need to sit down and take a

19    look at it.  Very good.

20         MR. WILLIAMS:  Thank you very much for the time.

21         THE COURT:  Thank you.  Thank you to both parties.

22    Like I said, I think that the arguments were very helpful.  And

23    I appreciate your patience with the process.

24         MR. WILLIAMS:  Your Honor, with respect to the

25    exhibits that we used and identified, do you want them lodged,

1   filed electronically?  What would you like?

2          THE COURT:  I think that it would be helpful to have

3   them filed as part of the hearing.  And so what I would propose

4   is, the parties can just do a joint filing of the exhibits that

5   were -- and they are not really admitted, right?  They were

6   used.  So you can call them exhibits used and referred to

7   during the hearings on these dates.  And go ahead and file them

8   so they are part of the record.

9          MR. WILLIAMS:  Thank you, your Honor.  May I -- I

10  think I handed you my original exhibit sticker with the

11  PowerPoint, if I am correct about that?  May I --

12         THE COURT:  Yes.

13         MR. WILLIAMS:  -- retrieve that?  Thank you.

14         THE COURT:  Also I do have a copy of the, What Is a

15  Warning and When Will It Work.  Can you go ahead and file that

16  as well?

17         MR. WILLIAMS:  Okay.  Actually for the record, since

18  you identified that and looked at that, may I request that it

19  be marked as Exhibit 4 to Dr. Sala's Daubert testimony.

20         THE COURT:  Thank you very much.

21         MR. WILLIAMS:  Thank you, your Honor.

22         MR. JAUREGUI:  Thank you, your Honor.

23     (Which were all the proceedings heard in this case.)

24

25

1                          CERTIFICATE

2          I HEREBY CERTIFY that the foregoing is a true, correct

3   and complete transcript of the proceedings had at the hearing

4   of the aforementioned cause on the day and date hereof.

5

6    /s/Alexandra Roth                          6/13/2018
    _____        _____
7    Official Court Reporter                     Date
     U.S. District Court
8    Northern District of Illinois
     Eastern Division
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25